Mark C. Zauderer, Esq.  **11 CIV 2670**
Jonathan D. Lupkin, Esq.
Jason T. Cohen, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006-1404
Telephone: (212) 412-9500
Facsimile: (212) 964-9200
Email: mzauderer@fzwz.com

RECEIVED
APR 19 2011
U.S.D.C. S.D. N.Y.
CASHIERS

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

ASHOT EGIAZARYAN,                           :
                                            :      Civ. Action No.
                  Plaintiff,                :
                                            :
         -against-                          :
                                            :      COMPLAINT
PETER ZALMAYEV,                             :
                                            :
                  Defendant.                :
-------------------------------------------------------x

Plaintiff, by his attorneys, Flemming Zulack Williamson Zauderer LLP, alleges

upon personal knowledge as to himself and his own acts, and upon information and belief

as to all other matters, as follows:

### Nature of the Action

1.       This is an action for defamation and injurious falsehood brought by Ashot

Egiazaryan against Peter Zalmayev arising from a malicious disinformation campaign

being conducted by Mr. Zalmayev against Mr. Egiazaryan. The smear campaign against

Mr. Egiazaryan is part of a Russian "corporate raid" and Mr. Egiazaryan's fall into

political disfavor in Russia. After challenging the legality of the raid through

international litigations, Mr. Egiazaryan and his family have been prevented from

returning to Russia from the United States out of concern for their personal safety. The

campaign against Mr. Egiazaryan is intended to force him to return to Russia, where he and his family will be subject to risk of loss of life and liberty, as well as physical, reputational and pecuniary harm, and where he will be coerced to abandon his legal claims associated with his valuable investment. It is impossible for Mr. Egiazaryan to secure justice in a Russian court.

2.     Defendant Peter Zalmayev has played a key role in the campaign against Mr. Egiazaryan through his participation in an elaborate negative public relations and lobbying effort. To further the illegitimate efforts of his masters in Russia, Mr. Zalmayev has communicated false, defamatory and injurious statements to prominent individuals and organizations that plaintiff is, among other things: (1) anti-Semitic, (2) anti-American, (3) a leader of an ultra-nationalist party in Russia associated with anti-Semitism, anti-Americanism, Holocaust denial, and that blames the Jews for sparking the Russian revolution, World War II, and 9/11, (4) a significant contributor to a climate of ethnically-based intolerance and xenophobia in Russia, (5) a human rights violator, and (6) a corrupt Russian legislator who has embezzled funds intended for war-torn Chechnya.

3.     Mr. Zalmayev's words, written and spoken, were false, defamatory and injurious, were known or should have been known to the defendant to be false, defamatory and injurious, and were written and spoken willfully and maliciously with intent to damage plaintiff's name, credibility and reputation, sabotage his investment and undermine his ability to remain in the United States.

## The Parties

4.      Plaintiff Ashot Egiazaryan is a Russian citizen who is no longer able to return to Russia.  He currently resides with his family in the State of California.  A prominent former banker and holder of a Ph.D. in Economics, Mr. Egiazaryan is an elected public servant representing the Russian people as a member of the Russian Duma (lower house of the Russian parliament) and is a member of the Duma's Budget and Taxes Committee.

5.      Defendant Peter Zalmayev is a United States citizen, a domiciliary of the State of New York and the director of the New York-based organization Eurasia Democracy Initiative.  As set forth more fully herein, Mr. Zalmayev is a central figure in a smear campaign against Mr. Egiazaryan.

## Jurisdiction and Venue

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over defendant because he is, and at all relevant times has been, domiciled in the state of New York.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because defendant resides in this judicial district.

## Factual Background

9.      The false, defamatory and injurious factual statements that are the subject of this Complaint are the outgrowth of a now longstanding dispute and litigation in which Mr. Egiazaryan's opponents have engaged in a campaign of harassment, intimidation,

persecution, abuse and character assassination to achieve their desired outcome. This factual history gives context to the statements and communications that form the basis of plaintiff's Complaint against Mr. Zalmayev.

**Enlisting The Assistance Of Powerful Russian Politicians And Corrupt Law Enforcement Officials, Mr. Egiazaryan's Opponents Wrest From Him Control Of A Lucrative Real Estate Project To Rebuild The Historic Moskva Hotel In Moscow.**

10.    Mr. Egiazaryan is currently engaged in a complex, international legal dispute resulting from a Russian "corporate raid,"[1] orchestrated by Russian Senator and billionaire Suleyman Kerimov, to steal Mr. Egiazaryan's ownership interest in a project to rebuild and develop the landmark Moskva Hotel, which sits on prime Moscow real estate near the Kremlin ("Hotel Project" or "Project").

11.    From 2002 to 2008, Mr. Egiazaryan worked diligently to demolish and rebuild the Moskva Hotel. Mr. Egiazaryan raised and contributed over US$250 million in financing for the Hotel Project. Mr. Egiazaryan also arranged for a US$792 million loan from Deutsche Bank AG, one of the largest loans ever made for a real estate project in Russia. Mr. Egiazaryan secured the financing with his own interest in the Hotel

---

[1] A Russian "corporate raid" is

>the redistribution of a company's ownership through a combination of legal, illegal, and illegitimate means, including forced bankruptcies, the use of administrative resources, raids by police, tax officers, or government inspectors, and even violent seizure of documents, assets, offices, and places of business.

Alexander Settles, *Evolving Corruption: Hostile Takeovers, Corporate Raiding, and Company Capture in Russia,* ECONOMIC REFORM FEATURE SERVICE (Center for Int'l Private Enterprise, D.C.), August 31, 2009, at 2.

Project and another project. As a result of Mr. Egiazaryan's efforts, the old Moskva Hotel was demolished and a new building was constructed.

12. Ultimately, Mr. Kerimov, Moscow Mayor Yury Luzhkov and Arkadi Rotenberg, a close confidant of Russian Prime Minister Vladimir Putin, embarked on an illegal corporate raid to strip Mr. Egiazaryan of his interest in the Project and transfer it to Mr. Kerimov. This corporate raid included the following elements:

- The City of Moscow (through the arbitrary and bad faith withholding of the City's consent) caused a loan for the Project to fail and forced Mr. Egiazaryan to enter into a contractual arrangement whereby control of the Hotel Project was effectively transferred to the City of Moscow;

- The City of Moscow and certain individuals forged corporate minutes to install a Kerimov employee as director in a company controlled by Mr. Egiazaryan, a position that directly controlled the Hotel Project;

- Armed raids by special police forces in masks and with automatic weapons were carried out on (a) the homes of three of Mr. Egiazaryan's associates and family members, (b) an office building where Mr. Egiazaryan's office was located, and (c) Mr. Egiazaryan's legal advisers in connection with the Hotel Project, including the preeminent international law firms of White & Case LLP, DLA Piper and Lovells;

- Threats of spurious criminal prosecution were made against Mr. Egiazaryan (including on February 17, 2009, when Mr. Kemirov personally told Mr. Egiazaryan that he would be subject to criminal proceedings based on trumped-up charges if he did not sign certain agreements pertaining to the Hotel Project), and baseless claims alleging fraud were brought against Mr. Egiazaryan's associate Vitaly Gogokhiya; and

- Political pressure was applied by Mayor Luzhkov, including a request to the Prosecutor General of Russia that proceedings be initiated to strip Mr. Egiazaryan of

his parliamentary immunity and for the commencement
of a criminal prosecution against him.

13.     In June 2009, the illegal corporate raid and related actions eventually

forced Mr. Egiazaryan to transfer to Mr. Kerimov his entire interest in the Project for

nothing.

**Mr. Egiazaryan Seeks Legal Redress in Litigation in the
United Kingdom, And His Russian Opponents Respond
With Ominous Threats Against The Egiazaryan Family.**

14.     On September 13, 2010, Mr. Egiazaryan commenced arbitrations in

London seeking damages and to invalidate the agreements Mr. Kerimov illegally coerced

Mr. Egiazaryan into signing.

15.     Mr. Kerimov's and his accomplices' harassment of and threats to Mr.

Egiazaryan did not end with the transfer of the Hotel Project to Mr. Kerimov.  To

discourage Mr. Egiazaryan from exercising his legal rights to challenge the Project's

transfer, Mr. Egiazaryan continued to be pressured.  For example, in the months

following Kerimov's illegal takeover, Mr. Egiazaryan received anonymous death threats

on his work and parliament telephones warning him to stay away from the Hotel Project.

Threats were also made against Mr. Egiazaryan's family.

**Mr. Egiazaryan Remains In The Cross-Hairs Of His Well-Connected
And Well-Heeled Opponents, Even In The United States.**

16.     In 2010, Mr. Egiazaryan decided that he had no choice but to challenge

the theft of the Hotel Project.  At the time the claims were filed, Mr. Egiazaryan was in

the United States.  Almost immediately after filing the claims, direct threats were made

against his family in Russia, and they promptly took measures to join him.

17.     Despite uprooting his family and moving to the United States, the attacks on Mr. Egiazaryan have hardly abated. Since his arrival in the United States, Mr. Egiazaryan and others in his circle have been under constant surveillance. In late-November 2010, Aslan Aslanbekov, Mr. Egiazaryan's cousin-in-law, received a telephone call from Mr. Kerimov in which Mr. Kerimov asked Mr. Aslanbekov to "cooperate" in his campaign against Mr. Egiazaryan. Mr. Aslanbekov refused. A week later, Mr. Aslanbekov was executed, "gangland" style, with a gunshot to the head.

**Egiazaryan's Enemies Organize A Multi-Faceted Disinformation Campaign Designed to Force Mr. Egiazaryan From The United States And To Otherwise Undermine Mr. Egiazaryan's Ability To Exercise His Litigation Rights.**

18.     Beginning at around the time of Mr. Egiazaryan's arrival in the United States, defendant Mr. Zalmayev and others began a black (*i.e.,* negative) public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia. Mr. Egiazaryan's litigation foes and the corrupt Russian authorities, who are believed to have enlisted Mr. Zalmayev's active participation in this campaign, have tactical reasons to discredit Mr. Egiazaryan and force him to return to Russia. In Russia, where he and his family face a real and imminent risk of losing life and liberty, Mr. Egiazaryan can be permanently silenced or more easily controlled.

19.     Since August 29, 2010, the smear operation against Mr. Egiazaryan also involved the creation of www.ashotyegiazaryan.com, an English language website that misappropriates his name and exists for no purpose other than to publish defamatory and offensive material about Mr. Egiazaryan.

20.     Beginning no later than January 2011, Mr. Zalmayev co-opted respected human rights advocates and organizations into the dirty tricks campaign against Mr. Egiazaryan. Mr. Zalmayev misled these otherwise legitimate organizations into action against Mr. Egiazaryan by spoon-feeding them false, defamatory and injurious statements and convincing them to speak out to in a negative way against Mr. Egiazaryan.

21.     Mr. Zalmayev's efforts to date have included:

    i.     publishing an article on March 9, 2011 in the Jewish Journal, a publication with an active circulation of 150,000 households. In his article, entitled "Hiding in Beverly Hills," Mr. Zalmayev makes numerous defamatory statements against Mr. Egiazaryan, including the accusation that Mr. Egiazaryan is an avowed anti-Semite and the leader of an ultra-nationalist party in Russia known for fomenting hatred against the Jewish community there and elsewhere around the world.

    ii.     inducing the publication of a defamatory article, "No Safe U.S. Haven for Hatemongers," published on March 14, 2011 in the Moscow Times. This article states, among other things, that Mr. Egiazaryan is "an anti-Semitic bigot" with a "well-established record of anti-Semitism and hate speech";

    iii.     inducing Russian human rights organizations to write false and misleading letters about Mr. Egiazaryan to members of the United States House of Representatives, asserting that Mr. Egiazaryan is not fit to be present in the United States. These letters, sent in late January

8

2011, were soon retracted, with both of the signatories independently stating that they were "misled" into writing and sending the letters; and

iv. inducing United States human rights and Jewish advocacy organizations to send letters in March of 2011 to the United States Department of State Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security. These letters repeat false, defamatory and injurious statements and forcefully advocate for the removal of Mr. Egiazaryan and his family from the United States.

22.     The specific defamatory and injurious language contained in these writings and communications is discussed more fully below.

## The Defamatory and Injurious Statements

### A. "Hiding in Beverly Hills"

23.     The Jewish Journal claims to be the largest Jewish weekly outside New York City and to reach 150,000 educated, involved and affluent readers each week. The Jewish Journal also boasts that its website, www.JewishJournal.com, is America's most widely used Jewish news site.

24.     On March 9, 2011, the Jewish Journal published an article entitled "Hiding in Beverly Hills." A copy of the article is attached as Exhibit A to this Complaint and can also be found at http://www.jewishjournal.com/opinion/article/hiding_in_beverly_hills_20110309/ (last

visited on April 19, 2011). The <u>Jewish Journal</u> disseminated the article in its print and on-line editions, and the article was and remains available nation-wide.

25.     According to the by-line, the article at issue was authored by defendant Zalmayev. The biography that accompanied the article describes Mr. Zalmayev as the "director of the Eurasia Democracy Initiative, a U.S.-based international nonprofit organization dedicated to fighting anti-Semitism and xenophobia and to promoting democracy and rule of law in post-communist transitional societies of Eastern and Central Europe, the Caucasus and Central Asia."

26.     "Hiding in Beverly Hills," which is about Mr. Egiazaryan and reproduces a picture of him, contains a number of false, defamatory and injurious statements and meanings that constitute "defamation *per se*," "defamation *per quod*" and make out a *prima facie* claim for the tort of injurious falsehood.

27.     The Article begins by asking:

> Why would a wealthy businessman with ties to his notorious ultranationalist party known for its anti-American and anti-Semitic positions flee to Beverly Hills?

This immediately establishes the primary subject matter of the article (*i.e.,* Mr. Egiazaryan and his purported anti-American and anti-Semitic proclivities).

28.     Later, the article picks up on its lead theme -- Mr. Egiazaryan's alleged anti-Semitic and anti-American beliefs and associations:

> Since 1999, he has been a prominent financial backer and member of the ultranationalist Liberal Democratic Party of Russia (LDPR), headed by his friend Vladimir Zhirinovsky.
>
> Zhirinovsky, who is infamous for his outspoken anti-American and anti-Semitic attacks . . . remains the vice

10

chair of the Duma and continues to speak out freely on any and all subjects – often repugnant – without threat of retribution by the state.

*　　*　　*

Jewish groups in America and Russia have repeatedly condemned the LDPR and its leader as anti-Semitic and have urged Americans, as a form of protest, to avoid any meetings with members of Zhirinovsky's party who may visit the United States.

Zhirinovsky denies his party is anti-Semitic, while blaming the Jews for sparking both the Bolshevik revolution and World War II, provoking the Holocaust and masterminding 9/11.

29.     The article concludes that Mr. Egiazaryan is a leader of a racist and anti-Semitic movement and is himself an anti-Semite:

The Zhirinovsky-Egiazaryan party's racism and bigotry has contributed significantly to Russia's growing climate of ethnically based intolerance and xenophobia. Anti-Semitism remains pernicious and insidious, as the recent scandal with Christian Dior's John Galliano has demonstrated so vividly. The fashion label must be commended for the swiftness with which it condemned its bigoted designer's rant and distanced itself from him. The U.S. government must likewise put anti-Semites worldwide on notice: You are not welcome in this country.

30.     The false, defamatory and injurious meanings of the article, communicated through the literal words of the article and also by implication, are that Mr. Egiazaryan is anti-Semitic and actively supports anti-Semitism.

31.     In fact, the 676 word article uses the word or a variant of the word anti-Semitism seven times, it alleges to be authored by someone "dedicated to fighting anti-Semitism," it was published in a Jewish magazine and website, and the Jewish Journal web-site on which it was published lists "anti-Semitic" as a search tag for the article.

http://www.jewishjournal.com/opinion/article/hiding_in_beverly_hills_20110309/ (last visited on April 19, 2011).

32.     Clear insinuations in the article that Mr. Egiazaryan is anti-American, are also false, defamatory and injurious. The article uses the term "anti-American" twice and the website also lists "anti-American" as a search tag. *Id.*

33.     These messages are communicated through the ordinary and everyday meanings, express and implied, of the specific words and phrases employed in the article and their juxtaposition, the subject and subject matter of the article, as well as the gist of the article, when considered in the context of the avowed background and mission of the author and the nature of the publication and its readership.

**The Article's Falsity**

34.     The article's defamatory and injurious statements, express and implied, that Mr. Egiazaryan is an anti-Semite and is anti-American, are entirely false.

35.     The defamatory and injurious statements, express and implied, that Mr. Zalmayev suggests demonstrate as a matter of fact that Mr. Egiazaryan is an anti-Semite and is anti-American, are also entirely false.

36.     The article provides no evidence of any bigoted or anti-Semitic or anti-American statements by Mr. Egiazaryan or attributed to him in support of the article's inflammatory rhetoric.  Mr. Egiazaryan condemns anti-Semitism and has never preached it or made anti-Semitic statements.  Nor has he supported any anti-Semitic policies or legislative proposals.  In fact, there is no legitimate record of Mr. Egiazaryan having ever made anti-Semitic or anti-American statements or having taken anti-Semitic or anti-

12

American positions in his personal life, in his professional life, as a member of the Russian Duma or in any other capacity.

37.     Mr. Egiazaryan is not and has never been a member or a leader of the Liberal Democratic Party of Russia ("LDPR"), or even attended a LDPR party conference. He is a non-party candidate nominated to its parliament group.[2] As such, Mr. Egiazaryan is neither bound by the LDPR's program nor the decisions of its leadership, much less by the personal views expressed by its individual members, including Vladimir Zhirinovsky.

38.     Mr. Egiazaryan has not blamed Jewish people for horrific, historic events and has never made any of the inflammatory statements regarding the responsibility of the Jews for such events.

39.     Mr. Egiazaryan is not a friend of Mr. Zhirinovsky.

**B. Mr. Zalmayev's Clandestine Operations Against Mr. Egiazaryan**

40.     In addition to writing and having published an article containing false, defamatory and injurious statements about Mr. Egiazaryan, Mr. Zalmayev has also worked furtively to promote the circulation of these false, defamatory and injurious statements through written and spoken communications with others.

**i. "No Safe U.S. Haven for Hatemongers"**

41.     Mr. Zalmayev communicated false, defamatory and injurious statements to Leonid Komarovsky that led or contributed to Mr. Komarovsky's March 14, 2011 article in the Moscow Times entitled "No Safe U.S. Haven for Hatemongers." A copy of this article is attached as Exhibit B. The article is available on the English language

---

[2] "Fraktsiya" in Russian.

website of the <u>Moscow Times</u> at <u>http://www.themoscowtimes.com/opinion/article/no-safe-us-haven-for-hatemongers/432450.html</u> (last visited April 19, 2011).

42.     The <u>Moscow Times</u> is an English-language daily newspaper published in Moscow, Russia.  The internet edition has world-wide circulation and is widely read by Russian expatriates residing in the United States and others with a professional and personal interest in Russian politics, business and culture.

43.     Mr. Komarovsky's article is a remix of Mr. Zalmayev's "Hiding in Beverly Hills," and the articles use many of the same themes and phrases.  The article is itself false, defamatory and injurious.

44.     Among other things, Mr. Komarovsky's article, whose title itself tars Mr. Egiazaryan a "Hatemonger," falsely states:

- "As a long-standing member of the Liberal Democratic Party, or LDPR, and, consequently, its anti-Semitic and xenophobic agenda, Yegiazaryan does not deserve safe haven in the United States."

- "[C]allers to my daily Russian-language radio show have voiced concerns over Yegiazaryan's . . . well-established record of anti-Semitism and hate speech."

- "if there is a database containing names of terrorists banned from entering the United States, there should likewise be one for characters like Yegiazaryan."

- "Undoubtedly, Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance."

The article concludes by explicitly branding Mr. Egiazaryan an "Anti-Semitic bigot."

45. The similarities between Mr. Kamarovsky's article and Mr. Zelmayev's are striking and make clear that Mr. Kamarovsky was influenced by Mr. Zelmayev. For example:

     i.   Mr. Komarovsky's article makes the same associations between Mr. Egiazaryan and the LDPR as does Mr. Zelmayev's article "Hiding in Beverly Hills."

     ii.   Both articles explicitly advocate for Mr. Egiazaryan's expulsion from the United States;

     iii.   Both articles make the same odd John Galliano analogy ("As demonstrated by the recent scandal following Christian Dior designer John Galliano being caught on tape spouting anti-Semitic vitriol, anti-Semitism remains an insidious scourge of our society."); and

     iv.   Mr. Kamarovsky's article makes similar claims as does Mr. Zalmayev's article that "Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance" and that "the party has made shockingly incendiary pronouncements, which, among other things, assigned Jews blame for 'starting World War II,' and 'provoking the Holocaust,' 'masterminding 9/11,' . . . and generally, 'running the world.'"

**The Article's Falsity**

46. Like the defamatory statements identified in Mr. Zalmayev's "Hiding in Beverly Hills" article, the defamatory and injurious statements, express and implied, that Mr. Egiazaryan is an anti-Semite, are entirely false.

47.     The defamatory and injurious statements, express and implied, that Mr. Komarovsky suggests demonstrate as a matter of fact that Mr. Egiazaryan is an anti-Semite, are also entirely false.

48.     The article provides no evidence of any bigoted or anti-Semitic statements by Mr. Egiazaryan or attributed to him in support of the article's untrue and injurious statements. Mr. Egiazaryan condemns anti-Semitism and has never preached it or made anti-Semitic statements. Nor has he supported any anti-Semitic policies or legislative proposals. In fact, there is no legitimate record of Mr. Egiazaryan having ever made anti-Semitic statements or having taken anti-Semitic positions in his personal life, in his professional life, as a member of the Russian Duma or in any other capacity.

49.     Mr. Egiazaryan is not and has never been a member or a leader of the LDPR, or even attended a LDPR party conference. He is a non-party candidate nominated to its parliament group. As such, Mr. Egiazaryan is neither bound by the LDPR's program nor the decisions and views of its leadership.

50.     Mr. Egiazaryan has not blamed Jewish people for horrific, historic events and has never made any of the inflammatory statements regarding the responsibility of the Jews for such events.

**ii. The Letters of Lev Ponomarev and Lyudmila Alexeyeva**

51.     Based on ongoing investigations and documentary evidence, in or around January 2011, Mr. Zalmayev made false, defamatory and injurious statements to Lev Ponomarev and Lyudmila Alexeyeva, two prominent Russian human rights activists, about Mr. Egiazaryan. These statements induced Mr. Ponomarev and Ms. Alexeyeva to

write to the United States Congress to encourage Congress to place Mr. Egiazaryan on a "no-entry list" for foreign nationals due to his allegedly abhorrent views and positions.

52. Mr. Ponomarev is the Executive Director of the All-Russian Public Movement for Human Rights. Ms. Alexeyeva is the Chairperson for the Moscow Helsinki Group. Both are based in Russia.

53. Copies of the two letters, dated January 29, 2011 and January 30, 2011, are attached to the Complaint as Exhibit C.

54. Both letters imply that Mr. Egiazaryan is one of the leaders of the LDPR. *See* Ponomarev letter ("Mr. Yegiazaryan was for many years a member of the Russian Parliament for the extreme-Nationalist Liberal-Democratic Party of Russia (with Vladimir Zhirinovsky as its head)); Alexeyeva letter ("As a ranking member of Vladimir Zhirinovsky's ultra-nationalist Liberal-Democratic Party of Russia, Mr. Yegiazaryan . . .").

55. Both letters associate Mr. Egiazaryan with Teodoro Nguema Obiang, an allegedly corrupt son of Equatorial Guinea's president, based merely on the allegation that the two are "neighbors" in Beverly Hills, California. *See* Ponomarev letter ("Mr. Ashot Yegiazaryan is currently enjoying luxurious living in Beverly Hills. . . . Teodoro Nguema Obiang, the son of Equatorial Guinea's notoriously corrupt president, who happens to be Yegiazaryan's Beverly Hills neighbor."); Alexeyeva letter (Teodoro Nguema Obiang, the son of Equatorial Guinea's notoriously corrupt president, whose luxurious living in Beverly Hills. . . . Mr. Ashot Yegiazaryan, has fled Russia and is at the present moment residing in comfort and luxury in Beverly Hills. . .").

56.     Both letters accuse Mr. Egiazaryan of having committed war crimes as well as the theft, embezzlement or mismanagement of funds. *See* Ponomarev letter:

> In 2000, Mr. Yegiazaryan initiated the creation of the Duma committee for Assistance in Political Regulation and Observance of Human rights in Chechnya, of which he would become deputy chairman and which dissolved in 2003. The Committee was entrusted with funds for the reconstruction of the war-torn region – a large portion of which funds, according to several credible reports, did not reach their addressee. As such Mr. Yegiazaryan was a contributor to the destructive second Chechen war.

Alexeyeva letter:

> Mr. Yegiazaryan occupied from 2000 to 2003 the post of deputy chairman of the Duma committee for Assistance in Political Regulation and Observance of Human Rights in Chechnya, which he himself initiated and helped set up. In addition to providing cover for the numerous well-documented atrocities during the war, the Committee's management of the funds allocated for Chechnya's reconstruction was said to have resulted in significant amounts never reaching their destination – the destitute people of the war-torn republic.

**The Letters' Falsity And Their Immediate Retraction**

57.     As noted above, Mr. Egiazaryan is not a member of the LDPR and does not share any "ultra-nationalist" views of the LDPR and Mr. Zhirinovsky.

58.     The letters seek to establish an affiliation between Mr. Egiazaryan and "Teodoro Nguema Obiang, the son of Equatorial Guinea's notoriously corrupt president." Mr. Egiazaryan has never met Mr. Obiang, has never had any contact of any sort with him, and has no knowledge of any homes at which he may reside in Beverly Hills.

59.     The letters suggest, with no factual basis, that Mr. Egiazaryan embezzled or mismanaged funds from a parliamentary "committee" meant to assist in Chechnya's reconstruction. In fact, these funds were controlled not by the "Committee" (actually, a

18

commission), but by the Russian Ministry of Finance. Mr. Egiazaryan had no access to these funds. In fact, he has repeatedly and publicly criticized the Ministry's lack of transparency and oversight.

60.     The letters falsely suggest that Mr. Egiazaryan was responsible for war crimes or contributed to human rights violations. Indeed, the Ponomarev letter says that "Mr. Yegiazarian was a contributor to the destructive second Chechen war." Mr. Egiazaryan never committed any war crimes or contributed to any human rights atrocities at any time in his life and certainly was not the cause of the Second Chechen War.

61.     Mr. Ponomarev and Ms. Alexeyeva almost immediately wrote retractions of their letters and sent the retraction letters to the Congressional recipients of the original letters. Mr. Ponomarev sent retractions to Representatives Christopher Smith and Dana Rohrabacher and Senator Benjamin Cardin on or about February 7, 2011. Ms. Alexeyeva sent a retraction letter to Representative Christopher Smith on or about February 7, 2011. Copies of the retraction letters are attached as Exhibit D. The almost immediate retraction of these January 2011 Ponomarev and Alexeyeva letters demonstrates not only the falsity of their contents, but that the original letters were drafted by Mr. Zalmayev.

62.     Mr. Ponomarev's retractions admit that he "made a grave mistake," that "[h]aving reviewed the circumstances of this matter linked to the so-called Egiazaryan case, I, acting within my mandate of a human rights defender, withdraw my signature from that letter. Once again, I express my apologies if I have misled you."

63.     Ms. Alexeyeva likewise admitted that "[r]ecently I got new information about Mr. Yegiazaryan's activity which was mentioned in my letter and which was the point of my concern. And this information has been called by me into questions[sic]."

**Mr. Zalmayev Orchestrated The Creation and
Dissemination of the Ponomarev and Alexeyeva Letters.**

64.     The two letters were drafted and provided to Mr. Ponomarev and Ms. Alexeyeva by Mr. Zalmayev or, alternatively, Mr. Zalmayev communicated to Mr. Ponomarev and Ms. Alexeyeva the false, defamatory and injurious content of the letters and encouraged them to prepare and send the letters.

65.     The January 2011 Ponomarev and Alexeyeva letters are addressed to the same members of Congress, were sent within one day of on another and are nearly identical in content and writing style.

66.     An Associated Press reporter told representatives of Mr. Egiazaryan that Mr. Zalmayev contacted him and brought the Ponomarev and Alexeyeva letters (neither of which were addressed to Mr. Zalmayev) to his attention.

67.     Ms. Alexeyeva stated in a Voice of America Russian Service interview that she "had been misled" when she sent the letters and that "[j]udging by how promptly [Mr. Egiazaryan] was stripped of his parliamentary immunity some very high-ranking individuals have a stake in making short shrift of him. In no way do I want to play into their hands. This person did not do what I accused him of doing." The interview is discussed in depth in a February 9, 2011 Associated Press article, which states, among other things:

> In a telephone interview with VOA Russian Service, head of the Moscow Helsinki Group, Lyudmila Alexeyeva said that she "had been misled" when, on January 29, 2011, she sent a letter to key US legislators asking that the matter of Yeghiazarian's presence in the United States be raised with the State Department and the Department of Homeland Security. Last Monday, she sent another letter to Washington in which she explained her mistake. "The thing is," she said to a VOA correspondent, "that

Yeghiazarian (who is listed as Deputy Chairman of the State Duma Committee for Budget and Taxes – M.G.) did not have anything to do with the plundering of the public during the distribution of compensatory payments for housing in Chechnya," of which he had been suspected by human rights advocates.

68.     Based on investigation and inferences from the evidence, the person who "misled" Ms. Alexeyeva was Mr. Zalmayev.

69.     Further supporting the conclusion that Mr. Zalmayev was the impetus behind the false letter campaign to Congress, representatives of Mr. Egiazaryan spoke to colleagues of Mr. Ponomarev, who indicated that Mr. Zalmayev provided drafts of the letters to Mr. Ponomarev, and further, that Mr. Zalmayev sought to meet with Mr. Ponomarev in Moscow after the retractions, but Mr. Ponomarev declined.

70.     Finally, it appears that the original letters and the retractions feature different writing styles and use of the English language. The fact that the originals are written in fluid English while the retractions are written in awkward, stilted English suggests that the original letters were drafted by someone more facile with English than the author of the retractions.

71.     Ms. Alexeyeva's original letter is prepared on a sheet of paper bearing a header copied and pasted from the Moscow Helsinki Group website and an awkward signature using English script. Ms. Alexeyeva's retraction is prepared on an official letterhead and bears her freehand signature in Russian.

72.     Plaintiff is not suing Mr. Ponomarev or Ms. Alexeyeva. They were misled by Mr. Zalmayev into sending the letters by Mr. Zalmayev's false, defamatory and injurious statements to them and are themselves victims of Mr. Zalmayev's devious and dishonest tactics.

21

### iii. The Freedom House Letters

73.     Seeking to further perpetuate his false, defamatory and injurious statements, Mr. Zalmayev visited Freedom House, another human rights organization, with the January 2011 Ponomarev Alexeyeva letters, but not the retractions. At this meeting, which took place after the retractions were issued, Mr. Zalmayev made false, defamatory and injurious statements to representatives of Freedom House, the American Jewish Committee and the National Council on Soviet Jewry. At no time in enlisting the assistance of these organizations in the smear campaign against Mr. Egiazaryan did Mr. Zalmayev disclose that he prepared the January 2011 Ponomarev Alexeyeva letters, that he misled Mr. Ponomarev and Ms. Alexeyeva into signing them or that the letters were later retracted.

74.     Just as Mr. Zalmayev misled Mr. Ponomarev and Ms. Alexeyeva, he misled Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and caused them to send false and defamatory letters to the United States State Department Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security. The metadata to the electronic version of the letters identify the author as "peter." The two nearly identical March 14, 2011 letters are attached as Exhibit E.

75.     The fact that the letters were sent to the United States State Department Office to Monitor and Combat Anti-Semitism and to the United States Department of Homeland Security in and of itself suggests that the letters assert allegations of anti-Semitism and that Mr. Egiazaryan somehow poses a threat to the national security of the United States.

76. The two letters begin by stating that:

> We are writing to express our concern about media reports which indicate that Mr. Ashot Egiazaryan, a Russian businessman and member of the Russian Duma who is wanted in his country for fraud and other criminal charges, had fled to the United States and intends to apply for political asylum. His actions in Russia do not equate with American standards of sanctuary, and we do not believe that his record qualifies him for a status generally conferred on those who have risked their own welfare for freedom, democracy and human rights of others.

77. The letters continue by describing the false and misleading information fed to these organizations by Mr. Zalmayev and upon which they assert that Mr. Egiazaryan does not have the character and fitness to warrant remaining in the United States. The letters state that:

> Mr. Egiazaryan has for years been one of the leaders and a Duma representative of the Liberal Democratic Party of Russia (LDPR), which is known for its virulently anti-Semitic, anti-American and xenophobic views. The party and its leader, Vladimir Zhirinovsky, have blamed Jews for many of Russia's and the world's ills, assigning them blame for "starting World War II," "provoking the Holocaust" and "orchestrating 9/11," just to name of few of the well known assertions. As major U.S. Jewish and human rights organizations, we have consistently condemned LDPR's message of hate, appealing to the U.S. public and policy-makers to boycott its leaders and preclude them from visiting – much less receiving asylum in – the United States.

78. The false and defamatory statements associating Mr. Egiazaryan with anti-Semitic, anti-American and other reprehensible views and positions are almost identical to the false statements contained in Mr. Zalmayev's article "Hiding in Beverly Hills" that was published five days earlier and in Mr. Komarovsky's article "No Safe U.S. Haven for Hatemongers" published that same day.

79.    The third paragraph of the letters go on to draw a parallel with the John Galliano scandal in which the fashion designer was fired from his job at Christian Dior for making racist comments to customers in a café.  The same analogy is used in the Zalmayev and Komarovsky articles.

80.    The letters end with the statement that "[w]e believe that in the case of Mr. Egiazaryan the United States government must once again demonstrate its intolerance for bigotry by denying his bid [to remain in the United States.]"  This is consistent with what Mr. Zalmayev has expressed as his goal.

81.    Based upon these similarities and the fact that Mr. Zalmayev met with representatives of the organizations just before the letters were sent, plaintiff asserts that Mr. Zalmayev fed these organizations these pernicious lies about Mr. Egiazaryan and encouraged them to send the defamatory letters to U.S. government officials.

**In Publishing The False And Defamatory Statements Described Above, Defendant Zalmayev Acted Both Negligently As Well As Intentionally And With Reckless Disregard for the Truth.**

82.    Mr. Egiazaryan is a private figure leading a private life in the United States.  He is not an elected or public figure in the United States.  He has not assumed any roles of special prominence in the affairs of United States society or sought to influence any policy or any issue.  He has not thrust himself into the public eye in any way.  He has not appeared on television shows, published any writings, or given any presentations or speeches in the United States.  As such, he is not a pubic figure and he needs only plead and prove negligence to support his defamation claim.

83.     In publishing the false, defamatory and injurious statements (express and implied) described above, Mr. Zalmayev was negligent in that he failed to exercise reasonable care in verifying the statements' accuracy.

84.     In fact, Mr. Zalmayev's conduct transcends mere negligence. His defamatory statements were made intentionally and with reckless disregard for whether or not the statements were true.

85.     The defamatory meanings and injurious conclusions alleged in this Complaint were not, and could not have been, mere happenstance, accident or mistake. Mr. Zalmayev employed phrasing, sequencing and "guilt by association" in an intentional and calculated fashion to convey the defamatory meaning that Mr. Egiazaryan is anti-American, a vile and pernicious anti-Semite and a supporter of human rights abuses.

86.     Moreover, Mr. Zalmayev did more than merely publish a single article in a single publication. The willfulness and maliciousness of Mr. Zalmayev's actions are manifested in his active recruitments of others to advance his false, defamatory and injurious statements about Mr. Egiazaryan.

87.     The methods used by Mr. Zalmayev -- discrediting by association with disreputable people or groups -- are particularly reprehensible. For example and without limitation, Mr. Zalmayev deliberately and recklessly misled his intended audience by associating Mr. Egiazaryan with statements allegedly made by Mr. Zhirinovsky and positions allegedly proclaimed by the LDPR. Had Mr. Egiazaryan made such statements, Mr. Zalmayev would have surely advised his audience to support his thesis. But Mr. Zalmayev never tells his audience that there are no such statements by Mr. Egiazaryan.

To have done so would have undermined the clear purpose of the article: to tarnish Mr. Egiazaryan as an "anti-Semite" and as "anti-American."

88.     The true facts were readily available to Mr. Zalmayev, but it appears, he never made any effort to confirm the veracity of his published statements or, alternatively, published them with knowledge of their falsity. For example, and without limitation, Mr. Zalmayev never contacted Mr. Egiazaryan to seek verification of, or even comment regarding, the defamatory statements. Moreover, in the case of the meetings that led to the Freedom House letters, Mr. Zalmayev provided his audience with the defamatory January 2011 Ponomarev and Alexeyeva letters, but not the corresponding retractions by the letters' signatories.

**Damage to Plaintiff**

89.     The defamatory and injurious statements, express and implied, that were communicated by Mr. Zalmayev in his article "Hiding in Beverly Hills" and in his statements to others that caused them to write false, defamatory and injurious articles or letters caused and continue to cause Mr. Egiazaryan serious damage. These damages include:

i.  Damage to Mr. Egiazaryan's reputation;

ii.  damage to Mr. Egiazaryan's peace-of-mind and well-being;

iii.  damage to Mr. Egiazaryan's efforts to remain safely in the United States. Among other things, because of the smear campaign orchestrated by Mr. Zalmayev, Mr. Egiazaryan has been forced to expend significant additional sums in order to combat the defamation. These constitute special damages and include amounts paid to

attorneys, consultants and public relations professionals to fight the defendant's smear campaign which to date have amounted to in excess of $100,000; and

    iv.   damage to Mr. Egiazaryan's ability to conduct his affairs in the United States.

99.    If Mr. Egiazaryan is forced to return to Russia, he will be subject to severe harassment, the possibility of incarceration for trumped-up criminal charges, and he and his family may well be physically assaulted or even killed.

100.    As a result of the foregoing, Mr. Egiazaryan seeks special damages, actual and presumed damages and punitive damages.

**COUNT I**
**(Defamation with Regard to the Article "Hiding in Beverly Hills")**

101.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 100 of this Complaint as if fully set forth herein.

102.    In his article, "Hiding in Beverly Hills," defendant Zalmayev made several statements of fact about plaintiff Egiazaryan, which are set forth in detail above.

103.    The ordinary and everyday meanings, express and implied, of the words and phrases used in the article, as well as the overall impression of the article -- that Mr. Egiazaryan is anti-Semitic and anti-American -- are communicated principally in the opening paragraph and second half of the article, in the paragraphs reproduced above.

104.    The opening sentence says that Mr. Egiazaryan has ties to a Russian "ultranationalist party known for its anti-American and anti-Semitic positions." The sentence clearly suggests to an ordinary reader that Mr. Egiazaryan shares those positions.

105.     Later in the article, the author makes additional false and misleading statements, including that Mr. Egiazaryan is a friend of Mr. Zhirinovsky, the notorious head of the LDPR. These statements are intended to falsely and misleadingly associate Mr. Egiazaryan with Mr. Zhirinovsky's statements and views.

106.     The next paragraph discusses Mr. Zhirinovsky in more detail to hammer home the false and misleading "guilt by association" point made in the prior paragraph by making reference to Mr. Zhirinovsky's "outspoken anti-American and anti-Semitic attacks."

107.     Two paragraphs later, in the thirteenth paragraph, in seeking to add verisimilitude and gravity to the account, Mr. Zalmayev continues to discuss what he alleges are the abhorrent views of the LDPR and Mr. Zhirinovsky, including that "Jewish Groups in America and Russia have repeatedly condemned the LDPR and its leader as anti-Semitic and have urged Americans, as a form of protest, to avoid any meetings with members of Zhirinovsky's party who may visit the United States."

108.     In the next paragraph, Mr. Zalmayev says that Mr. Zhirinovsky blames the Jews for "sparking both the Russian revolution and World War II, provoking the Holocaust and masterminding 9/11."

109.     In one of the article's most damaging and deceptive passages, the final paragraph explicitly connects for the reader everything that Mr. Zalmayev has said about Mr. Zhirinovsky and the LDPR to Mr. Egiazaryan. It refers to the LDPR as the "Zhirinovsky-Egiazaryan party," and thus accuses Mr. Egiazaryan of "racism and bigotry [that] has contributed significantly to Russia's growing climate of ethnically based intolerance and xenophobia."

110.    When Mr. Zalmayev writes that Americans should "avoid any meetings with members of Mr. Zhirinovsky's party who may visit the United States," he is clearly implying that Mr. Egiazaryan's anti-Semitic and anti-American positions are so despicable that people should not even meet with him.

111.    When Mr. Zalmayev says that "[a]nti-Semitism remains pernicious and insidious," the reader can reach no conclusion other than that Mr. Zalmayev is writing about Mr. Egiazaryan's anti-Semitism.

112.    When Mr. Zalmayev next writes that "The U.S. government must likewise put anti-Semites worldwide on notice:  You are not welcome in this country," it is obvious that the conclusion that Mr. Zalmayev intends the reader to reach is that the "anti-Semite" who is "not welcome in this country" is Mr. Egiazaryan.

113.    Taken as a whole, the article is understood to the average reader as communicating the false, defamatory and injurious meaning that Mr. Egiazaryan is a hardcore bigot and anti-Semite unworthy of the rights and freedoms afforded to United States residents and, indeed, is so detestable a human being that no American should even meet with him.

114.    "Hiding in Beverly Hills," was published, both in hard copy and on-line, in the <u>Jewish Journal,</u> a periodical with a large number of subscribers and other readers around the United States.

115.    Defendant Zalmayev was negligent in verifying the statements contained in the article.

116.    Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements contained in the article.

117.    By writing and publishing "Hiding in Beverly Hills," defendant Zalmayev caused plaintiff to suffer the damages set forth more fully above.

118.    By reason of the foregoing, plaintiff is entitled to monetary damages from defendant in an amount to be determined at trial.

**COUNT II**
**(Defamation Resulting from Defendant's Communications that Caused
Or Contributed to the Article "No Safe U.S. Haven for Hatemongers")**

119.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.    Defendant Zalmayev had one or more communications about plaintiff Egiazaryan with Leonid Komarovsky, a journalist and United States-based Russian-language radio talk show host.

121.    Defendant Zalmayev communicated to Mr. Komarovsky the statements Mr. Zalmayev published in his article, "Hiding in Beverly Hills" and induced Mr. Komarovsky to publish a similar article in another publication.

122.    Mr. Komarovsky's published a March 14, 2011 article in the Moscow Times entitled "No Safe U.S. Haven for Hatemongers."

123.    The Moscow Times is an English-language daily newspaper published in Moscow, Russia. The internet edition has world-wide circulation and is widely read by Russian expatriates residing in the United States and others with a professional and personal interest in Russian politics, business and culture.

124.    Among other things, Mr. Komarovsky's article, whose title itself tars Mr. Egiazaryan a "Hatemonger," re-publishes the false and defamatory statements made to him by defendant Zalmayev. Among other things, the article falsely states:

- "As a long-standing member of the Liberal Democratic Party, or LDPR, and, consequently, its anti-Semitic and xenophobic agenda, Yegiazaryan does not deserve safe haven in the United States."

- "[C]allers to my daily Russian-language radio show have voiced concerns over Yegiazaryan's . . . well-established record of anti-Semitism and hate speech."

- "if there is a database containing names of terrorists banned from entering the United States, there should likewise be one for characters like Yegiazaryan."

- "Undoubtedly, Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance."

The article concludes by explicitly branding Mr. Egiazaryan an "Anti-Semitic bigot."

125.   Defendant Zalmayev was negligent in verifying the statements communicated to Mr. Komarovsky and that were republished by Mr. Komarovsky in the Moscow Times article.

126.   Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements communicated to Mr. Komarovsky and that were republished by Mr. Komarovsky in the Moscow Times article.

127.   By communicating the false and defamatory statements to Mr. Komarovsky and inducing Mr. Komarovsky to republish the statements in the Moscow Times article, defendant Mr. Zalmayev caused plaintiff to suffer the damages set forth more fully above.

128.   By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

**COUNT III**
**(Defamation Resulting from Defendant's Communications with Lev Ponomarev and Lyudmila Alexeyeva that Caused or Contributed to the January 29 and January 30, 2011 Letters)**

129.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully set forth herein.

130.    In or around January 2011, Mr. Zalmayev made false, defamatory and injurious statements to Lev Ponomarev and Lyudmila Alexeyeva, two prominent Russian human rights activists, about Mr. Egiazaryan. These statements induced Mr. Ponomarev and Ms. Alexeyeva to write to the United States Congress on January 29, 2011 and January 30, 2011 and to encourage Congress to place Mr. Egiazaryan on a "no-entry list" for foreign nationals due to his allegedly abhorrent views and positions.

131.    Both letters imply that Mr. Egiazaryan is a leader of the LDPR. *See* Ponomarev letter ("Mr. Yegiazaryan was for many years an influential member of the Russian Parliament for the extreme-nationalist Liberal-Democratic Party of Russia (with Vladimir Zhirinovsky as its head)); Alexeyeva letter ("As a ranking member of Vladimir Zhirinovsky's ultra-nationalist Liberal-Democratic Party of Russia, Mr. Yegiazaryan . . .").

132.    Both letters associate Mr. Egiazaryan with Teodoro Nguema Obiang, an allegedly corrupt son of Equatorial Guinea's president, based merely on the allegation that the two are "neighbors" in Beverly Hills, California. *See* Ponomarev letter ("Mr. Ashot Yegiazaryan is currently enjoying luxurious living in Beverly Hills. . . . Teodoro Nguema Obiang, the son of Equatorial Guinea's notoriously corrupt president, who happens to be Yegiazaryan's Beverly Hills neighbor."); Alexeyeva letter ("Teodoro Nguema Obiang, the son of Equatorial Guinea's notoriously corrupt president, whose luxurious living in

Beverly Hills. . . . Mr. Ashot Yegiazaryan, has fled Russia and is at the present moment residing in comfort and luxury in Beverly Hills. . .").

133.    Both letters accuse Mr. Egiazaryan of having committed war crimes as well as the theft, embezzlement or mismanagement of funds, as set forth more fully above.

134.    Defendant Zalmayev was negligent in verifying the statements communicated to Mr. Ponomarev and Ms. Alexeyeva that were republished by them in their letters of January 29, 2011 and January 30, 2011.

135.    Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements communicated to Mr. Ponomarev and Ms. Alexeyeva that were republished by them in their letters of January 29, 2011 and January 30, 2011.

136.    By communicating the false and defamatory statements to Mr. Ponomarev and Ms. Alexeyeva and encouraging them to publish these statements in their letters of January 29, 2011 and January 30, 2011, defendant Zalmayev caused plaintiff to suffer the damages set forth more fully above.

137.    Defendant Zalmayev's false and defamatory statements to Mr. Ponomarev and Ms. Alexeyeva concerning plaintiff Egiazaryan's alleged embezzlement and his alleged involvement in the funding of war crimes, which were ultimately republished in the Ponomarev and Alexeyeva letters of January 29, 2011 and January 30, 2011 constitute defamation *per se,* and damages with respect to these statements are presumed.

138.    By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

## COUNT IV
### (Defamation Resulting from Defendant's Communications with Freedom House, The American Jewish Committee and The National Council On Soviet Jewry That Caused or Contributed to the March 14, 2011 Letters)

139.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 138 of this Complaint as if fully set forth herein.

140.    Seeking to further perpetuate his false, defamatory and injurious statements, Mr. Zalmayev visited Freedom House, a human rights organization, with the January 2011 Ponomarev Alexeyeva letters, but not the retractions sent by Mr. Ponomarev and Ms. Alexeyeva shortly thereafter.

141.    At this meeting, which took place after the retractions of their January 2011 letters were issued, Mr. Zalmayev made false, defamatory and injurious statements to representatives of Freedom House, the American Jewish Committee and the National Council on Soviet Jewry.  At no time during this meeting, during which Mr. Zalmayev sought to enlist the assistance of these organizations in the smear campaign against Mr. Egiazaryan, did Mr. Zalmayev inform these organizations that he played any role in preparing or inducing the preparation of the January 2011 Ponomarev and Alexeyeva letters, that he misled Mr. Ponomarev and Ms. Alexeyeva into signing them or that the letters were later retracted.

142.    Defendant Zalmayev caused Freedom House, the American Jewish Committee and the National Council on Soviet Jewry to send false and defamatory letters to the United States State Department Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

143.    The two letters contain false, defamatory and injurious statements, as set forth more fully above.

144. Defendant Zalmayev was negligent in verifying his statements concerning Mr. Egiazaryan communicated to Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and republished by them in letters to the United States Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

145. Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements concerning Mr. Egiazaryan communicated to Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and republished by them in letters to the United States Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

146. By communicating the false and defamatory statements to Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and inducing them to republish these statements in letters to these departments of the United States Government, defendant Zalmayev caused plaintiff to suffer the damages as set forth more fully above.

147. By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

## COUNT V
### (Injurious Falsehood)

148. Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 147 of this Complaint as if fully set forth herein.

149. As set forth in detail above, defendant Zalmayev either made or caused others to make false and misleading statements concerning plaintiff Egiazaryan as part of an overall smear campaign, the purpose of which was to undermine Mr. Egiazaryan's

ability to remain in the United States and thereby adversely impact upon his ability to prosecute his litigations concerning the Hotel Property.

150.    In so doing, defendant Zalmayev acted maliciously, with the intent to harm plaintiff Zalmayev and with a reckless disregard of the consequences his efforts would cause to plaintiff Egiazaryan.

151.    A reasonably prudent person would have or should have anticipated the harm that defendant Zalmayev's concerted efforts would cause to Mr. Egiazaryian.

152.    By orchestrating this malicious smear campaign, defendant Zalmayev caused plaintiff to suffer the damages set forth more fully above.

153.    As a result of defendant's wrongful acts, plaintiff has been damaged and will continue to be damaged.  By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

WHEREFORE, plaintiff respectfully requests that judgment be entered, for plaintiff and against defendant, as follows:

   a.  On Count I, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

   b.  on Count II, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

   c.  on Count III, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

d.  on Count IV, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

e.  on Count V, awarding damages, including special damages, in an amount to be determined at trial but which are well in excess of the jurisdictional amount;

f.  awarding punitive damages in an amount to be determined at trial;

g.  awarding the costs and disbursements of this action; and

h.  awarding such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Ashot Egiazaryan demands a trial by jury on all issues so triable.

Dated:  New York, New York
April 19, 2011

FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP

By:  _____
Mark C. Zauderer
Jonathan D. Lupkin
Jason T. Cohen
One Liberty Plaza
New York, New York 10006
(212) 412-9500

Attorneys for Plaintiff Ashot Egiazaryan