UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                    :
ASHOT EGIAZARYAN                    :
                                    :
        v.                          :      Case No. 1:11-cv-02670 (PKC)
                                    :
PETER ZALMAYEV                      :
                                    :
_____   :

**ANSWER TO COUNT I,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

**NATURE OF ACTION**

In answer to the complaint, Peter Zalmayev:

1.   Denies the need to respond to the allegations in
paragraph 1 because they constitute conclusions of law,
characterizations of the complaint, and argument.  To the extent
a response is required, denies the allegations in the first two
sentences; denies knowledge or information sufficient to admit
or deny the truth of the allegations in the remaining sentences
of the paragraph.

2.   Denies the allegations in paragraph 2 except
admits that he has communicated with individuals and
organizations concerning Mr. Egiazaryan and refers the Court to
his commentary for its contents.

3.   Denies the need to respond to the allegations in
paragraph 3 because they constitute conclusions of law and
argument.  To the extent a response is required, denies the
allegations.

1

**THE PARTIES**

4.     In response to paragraph 4, admits Mr. Egiazaryan is a Russian citizen and a former banker who has been a member of the Russian Duma; denies knowledge or information sufficient to admit or deny the truth of the allegations concerning Mr. Egiazaryan's ability to return to Russia, his current residence, his academic credentials, and his membership on the Duma's Budget and Taxes Committee; denies the remaining allegations and specifically denies that Mr. Egiazaryan was elected to the Duma as a public servant representing the Russian people and affirmatively alleges that Mr. Egiazaryan was appointed to the Duma by the Liberal Democratic Party of Russia.

5.     In response to paragraph 5, admits the allegations in the first sentence and denies the allegations in the second sentence.

**JURISDICTION AND VENUE**

6.     Denies the need to respond to the allegations in paragraph 6, because they are conclusions of law.

7.     Denies the need to respond to the allegations in paragraph 7, because they are conclusions of law.

8.     Denies the need to respond to the allegations in paragraph 8, because they are conclusions of law.

## FACTUAL BACKGROUND

9.    Denies the need to respond to the allegations in paragraph 9 because they are conclusions of law, characterizations of the complaint, and argument.  To the extent a response is required, denies knowledge or information sufficient to admit or deny the truth of the allegations concerning the existence of "a campaign of harassment, intimidation, persecution, abuse and character assassination" arising out of the Moskva Hotel project and denies the remaining allegations.

10.    In response to paragraph 10, admits that the Moskva Hotel is located near the Kremlin and denies knowledge or information sufficient to admit or deny the truth of the remaining allegations.

11.    In response to paragraph 11, denies knowledge or information sufficient to admit or deny the truth of the allegations.

12.    In response to paragraph 12, denies knowledge or information sufficient to admit or deny the truth of the allegations.

13.    In response to paragraph 13, denies knowledge or information sufficient to admit or deny the truth of the allegations.

14.  In response to paragraph 14, denies knowledge or information sufficient to admit or deny the truth of the allegations.

15.  In response to paragraph 15, denies knowledge or information sufficient to admit or deny the truth of the allegations.

16.  In response to paragraph 16, denies knowledge or information sufficient to admit or deny the truth of the allegations.

17.  In response to paragraph 17, denies knowledge or information sufficient to admit or deny the truth of the allegations.

18.  In response to paragraph 18, denies his involvement in a corrupt campaign as described, and states that he is opposed to Mr. Egiazaryan's asylum application and has written and collaborated with others to oppose Mr. Egiazaryan's continued presence in the United States.

19.  In response to paragraph 19, denies knowledge or information sufficient to admit or deny the truth of the allegations, except admits that www.ashotyegiazaryan.com is an English language website.

20.  Denies the allegations in paragraph 20.

21.i.   In response to paragraph 21.i., admits writing commentary entitled "Hiding in Beverly Hills" that was

published in the _Jewish Journal_ on or about March 9, 2011;
denies knowledge or information sufficient to admit or deny the
truth of the allegations concerning the circulation of the
_Jewish Journal_; denies the remaining allegations and the
paragraph's characterization of the commentary; and refers the
Court to the commentary for its contents.

21.ii.    In response to paragraph 21.ii, admits that
commentary entitled "No Safe U.S. Haven for Hatemongers" was
published in the _Moscow Times_ on or about March 14, 2011; denies
the remaining allegations and the paragraph's characterization
of the commentary; and respectfully refers the Court to the
commentary for its contents.

21.iii.    In response to paragraph 21.iii, admits that
Russian human rights organizations sent letters to members of
the United States House of Representatives concerning Mr.
Egiazaryan on or about the end of January 2011; denies the
remaining allegations and the paragraph's characterization of
the commentary; and respectfully refers the Court to the letters
for their contents.

21.iv.    In response to paragraph 21.iv, admits that
United States human rights and Jewish advocacy organizations
sent letters to the Department of State and the Department of
Homeland Security concerning Mr. Egiazaryan in or about March
2011; denies the remaining allegations and the paragraph's

characterization of the commentary; and respectfully refers the Court to the letters for their contents.

22.  Denies the need to respond to the allegations in paragraph 22 because they are conclusions of law, descriptions of the complaint, and argument.  To the extent a response is required, denies the allegations.

**"HIDING IN BEVERLY HILLS"**

23.  In response to paragraph 23, denies knowledge or information sufficient to admit or deny the truth of the allegations.

24.  Admits the allegations in paragraph 24.

25.  Admits the allegations in paragraph 25.

26.  In response to paragraph 26, admits that "Hiding in Beverly Hills" discusses Mr. Egiazaryan and that a picture of Mr. Egiazaryan was published with the commentary in the Jewish Journal; denies the need to respond to the remaining allegations because they are conclusions of law and argument; and to the extent a response is required, denies the remaining allegations and the paragraph's characterization of the commentary; and respectfully refers the Court to the commentary for its contents.

27.  In response to paragraph 27, admits the first sentence; denies the allegations in the second sentence and the

paragraph's characterization of the commentary; and respectfully refers the Court to the commentary for its contents.

28.   Denies the allegations in paragraph 28 and the paragraph's characterization of the commentary; and respectfully refers the Court to the commentary for its contents.

29.   Denies the allegations in paragraph 29 and the paragraph's characterization of the commentary; and respectfully refers the Court to the commentary for its contents.

30.   Denies the need to respond to the allegations in paragraph 30 to the extent they constitute conclusions of law and argument.  To the extent a response is required, denies the allegations and the paragraph's characterization of the commentary; and respectfully refers the Court to the commentary for its contents.

31.   Denies the allegations in paragraph 31, except admits that the commentary was published in the Jewish Journal and its web-site and that the electronic version has a tag to "anti-Semitism;" and refers the Court to the commentary for its contents.

32.   Denies the need to respond to the allegations in paragraph 32 to the extent they constitute conclusions of law and argument.  To the extent a response is required, denies the allegations and the paragraph's characterization of the commentary, except admits that the commentary uses the phrase

"anti-American" twice and that the electronic version has a tag
to "anti-American"; and respectfully refers the Court to the
commentary for its contents.

33.   Denies the need to respond to the allegations in
paragraph 33 to the extent they constitute conclusions of law
and argument.  To the extent a response is required, denies the
allegations and the paragraph's characterization of the
commentary; and respectfully refers the Court to the commentary
for its contents.

34.   Denies the allegations in paragraph 34 and the
paragraph's characterization of the commentary; and respectfully
refers the Court to the commentary for its contents.

35.   Denies the allegations in paragraph 35 and the
paragraph's characterization of the commentary; and respectfully
refers the Court to the commentary for its contents.

36.   Denies the allegations in paragraph 36;
affirmatively alleges that Mr. Egiazaryan's membership in,
affiliation with, financial support of and representation of the
Liberal Democratic Party of Russia demonstrates support for
bigoted, anti-Semitic, and anti-American policies; and refers
the Court to the commentary for its contents.

37.   Denies the allegations in paragraph 37, except
denies knowledge or information sufficient to admit or deny the

truth of the allegations concerning Mr. Egiazaryan's attendance at party conferences of the Liberal Democratic Party of Russia.

38.　Denies the allegations in paragraph 38.

39.　Denies the allegations in paragraph 39.

40.　Denies the need to respond to the allegations in paragraph 40 to the extent they constitute conclusions of law and argument.　To the extent a response is required, denies the allegations.

### "NO SAFE HAVEN FOR HATEMONGERS"

41.　In response to the first sentence in paragraph 41, admits that he communicated with Leonid Komarovsky prior to March 14, 2011, but denies the remaining allegations; and admits the allegations in the second and third sentences.

42.　Admits the allegations in the first sentence of paragraph 42, and admits that the internet edition is on the internet, but denies knowledge or information sufficient to admit or deny the truth of the remaining allegations in the second sentence.

43.　Denies the allegations in paragraph 43 and the paragraph's characterization of Mr. Komarovsky's commentary; except admits that Mr. Komarovsky's commentary uses some of the themes used in Mr. Zalmayev's commentary in the Jewish Journal; and refers the Court to the two commentaries for their respective contents.

44.　Denies the allegations in paragraph 44 and the paragraph's characterization of the commentary; and respectfully refers the Court to the commentary for its contents.

45.　Denies knowledge or information sufficient to admit or deny the truth of the allegations in paragraph 45 concerning Mr. Zalmayev's influence upon Mr. Komarovsky's commentary; admits that Mr. Komarovsky's commentary uses some of the themes used in Mr. Zalmayev's commentary in the <u>Jewish Journal</u>; denies the remaining allegations and the paragraph's characterization of Mr. Komarovsky's commentary; and respectfully refers the Court to the two commentaries for their respective contents.

46.　Denies the allegations in paragraph 46 and the paragraph's characterization of Mr. Komarovsky's commentary; and refers the Court to the two commentaries for their respective contents.

47.　Denies the allegations in paragraph 47 and the paragraph's characterization of the commentary; and refers the Court to the commentary for its contents.

48.　Denies the allegations in paragraph 48, affirmatively states that Mr. Egiazaryan's membership in, affiliation with, financial support of and representation of the Liberal Democratic Party of Russia demonstrates support for

bigoted, anti-Semitic, and anti-American policies, and refers the Court to the commentary for its contents.

49.   Denies the allegations in paragraph 49, except denies knowledge or information sufficient to admit or deny the truth of the allegations concerning Mr. Egiazaryan's attendance at party conferences of the Liberal Democratic Party of Russia.

50.   Denies the allegations in paragraph 50.

**THE LETTERS OF LEV PONOMAREV AND LYUDMILA ALEXEYEVA**

51.   Denies the allegations of this paragraph except states that he collaborated with them in the preparation of the referenced letters, and refers the Court to the letters for their contents.

52.   Admits the allegations in paragraph 52.

53.   Admits the allegations in paragraph 53.

54.   Denies the allegations in paragraph 54 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters for their contents.

55.   Denies the allegations in paragraph 55 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters for their contents.

56.   Denies the allegations in paragraph 56 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters for their contents.

57.   Denies the allegations in paragraph 57.

58.    Denies the allegations in the first sentence of paragraph 58 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters their contents.  Denies knowledge or information sufficient to admit or deny the truth of the allegations in the second sentence of the paragraph.

59.    Denies the allegations in the first sentence of paragraph 59 and the paragraph's characterization of the letters; and refers the Court to the letters for their contents. Denies knowledge or information sufficient to admit or deny the truth of the allegations in the subsequent sentences of the paragraph.

60.    Denies the allegations in the first two sentences of paragraph 60 and the paragraph's characterization of the letters; and refers the Court to the letters for their contents. Denies knowledge or information sufficient to admit or deny the truth of the allegations in the third sentence of the paragraph.

61.    Denies that Mr. Ponomarev's and Ms. Alexeyeva's letters are false and states that Mr. Zalmayev collaborated with Mr. Ponomarev and Ms. Alexeyeva in preparing the letters.  Both Mr. Ponomarev and Ms. Alexeyeva were familiar with Mr. Egiazaryan and collaborated with Mr. Zalmayev in preparing the letters.  As set forth in the counterclaim, Mr. Egiazaryan's

representatives pressured Mr. Ponomarev and Ms. Alexeyeva into retracting the letters.  Ms. Alexeyeva retracted her retraction.

62.   Denies the allegations in paragraph 62 and the paragraph's characterization of the letter; and respectfully refers the Court to the letter for its contents.

63.   Denies the allegations in paragraph 63 and the paragraph's characterization of the letter; and respectfully refers the Court to the letter for its contents.

64.   Denies that there is anything false, defamatory or injurious in the letters and admits that Mr. Zalmayev collaborated on the letters.

65.   Refers the Court to the letters for a their respective contents.

66.   Denies knowledge or information sufficient to admit or deny the truth of the allegations in paragraph 66.

67.   Denies the allegations in paragraph 67 and the paragraph's characterization of the interview and Associated Press article; and refers the Court to the interview and the Associated Press article for their contents.

68.   Denies the allegations in paragraph 68.

69.   Denies there was a false letter campaign and that Mr. Zalmayev was its "impetus" and admits that after Mr. Ponomarev was pressured by Mr. Egiazaryan's representatives Mr. Ponomarev did not want to meet with Mr. Zalmayev to discuss the

pressure in detail. Mr. Egiazaryan's representative told Mr. Ponomarev that if he did not retract his letter he would be drawn into a complicated situation that would interfere with the goal of his organization, which is the promotion of human rights.

70. Denies the allegations in paragraph 70 and refers the Court to the letters for their contents.

71. Denies the allegations in paragraph 71 as stated and admits that it appears that Ms. Alexeyeva signed one of the letters in English and the other letter using her Russian alphabet signature.

72. Denies the allegations in paragraph 72. Mr. Zalmayev did not mislead Mr. Ponomarev or Ms. Alexeyeva and believes that Mr. Egiazaryan is suing only him for the reasons set forth in the counterclaim.

## THE FREEDOM HOUSE LETTERS

73. Denies the allegations in paragraph 73.

74. Denies the allegations in paragraph 74 and states that he collaborated on the letters.

75. Denies the allegations in paragraph 75 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters for their contents.

76.    Denies the allegations in paragraph 76 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters for their contents.

77.    Denies the allegations in paragraph 77 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters for their contents.

78.    Denies the allegations in paragraph 78 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters, Mr. Zalmayev's commentary, and Mr. Komarovsky's commentary for their respective contents.

79.    Denies the allegations in paragraph 79 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters, Mr. Zalmayev's commentary, and Mr. Komarovsky's commentary for their respective contents.

80.    Denies the allegations in paragraph 80 and the paragraph's characterization of the letters; and respectfully refers the Court to the letters and Mr. Zalmayev's commentary for their respective contents.

81.    Denies the allegations in paragraph 81.

82.    Denies the need to respond to the allegations in paragraph 82 because they are conclusions of law.  To the extent a response is required, denies the allegations, except denies knowledge or information sufficient to admit or deny the truth

of the allegation that Mr. Egiazaryan has not been elected to office in the United States.

83. Denies the need to respond to the allegations in paragraph 83 because they constitute conclusions of law and argument. To the extent a response is required, denies the allegations.

84. Denies the need to respond to the allegations in paragraph 84 because they constitute conclusions of law and argument. To the extent a response is required, denies the allegations.

85. Denies the need to respond to the allegations in paragraph 85 because they constitute conclusions of law and argument. To the extent a response is required, denies the allegations.

86. Denies the need to respond to the allegations in paragraph 86 because they constitute conclusions of law and argument. To the extent a response is required, denies the allegations.

87. Denies the need to respond to the allegations in paragraph 87 because they constitute conclusions of law and argument. To the extent a response is required, denies the allegations.

88. Denies the allegations in paragraph 88, except admits that he did not contact Mr. Egiazaryan.

**DAMAGE TO PLAINTIFF**

89.  Denies the need to respond to the allegations in paragraph 89 because they constitute conclusions of law and argument.  To the extent a response is required, denies the allegations.

99.  In response to paragraph 99, denies knowledge or information sufficient to admit or deny the truth of the allegations.

100. Denies the need to respond to the allegations in paragraph 100 because they are conclusions of law.  To the extent a response is required, denies the allegations.

**COUNT I**

101. Incorporates by reference the above responses to paragraphs 1 through 100 as if fully set forth.

102. Denies the allegations in paragraph 102 and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

103. Denies the allegations in paragraph 103 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

104. Denies the allegations in paragraph 104 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

105. Denies the allegations in paragraph 105 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

106. Denies the allegations in paragraph 106 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

107. Denies the allegations in paragraph 107 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

108. Denies the allegations in paragraph 108 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

109. Denies the allegations in paragraph 109 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

110. Denies the allegations in paragraph 110 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

111. Denies the allegations in paragraph 111 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

112. Denies the allegations in paragraph 112 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

113. Denies the allegations in paragraph 113 and the paragraph's characterization of the commentary; and respectfully refers the Court to Mr. Zalmayev's commentary for its contents.

114. Admits the allegations in paragraph 114, except denies knowledge or information sufficient to admit or deny the truth of the allegations concerning the number of subscribers and other readers around the United States.

115. Denies the need to respond to the allegations in paragraph 115 because they are conclusions of law.  To the extent a response is required, denies the allegations.

116. Denies the need to respond to the allegations in paragraph 116 because they are conclusions of law.  To the extent a response is required, denies the allegations.

117. Denies the allegations in paragraph 117.

118. Denies the allegations in paragraph 118.

### COUNTS II — V

Having moved to dismiss Counts II through V of the complaint pursuant to Fed. R. Civ. P. 12(b)(6), Mr. Zalmayev is not required to respond to Counts II through V at this time and reserves the right to file an answer to any of those Counts that are not dismissed.

WHEREFORE, Peter Zalmayev requests that Count I of the complaint be dismissed and that judgment be entered in his favor, including an award of his costs, attorneys' fees and

expenses of this action and such other relief as this Court may deem just and proper.

<strong>AFFIRMATIVE DEFENSES</strong>

1.   Mr. Zalmayev did not violate any duty to or right of Mr. Egiazaryan.

2.   The claims are barred, in whole or in part, by the doctrines of laches, estoppel, unclean hands, and/or other equitable defenses.

3.   Mr. Zalmayev's challenged statements were expressions of opinion and not defamatory.

4.   Mr. Zalmayev's challenged statements were true and not defamatory.

5.   Mr. Zalmayev acted at all relevant times with due care and without negligence toward Mr. Egiazaryan.

6.   Mr. Zalmayev acted at all relevant times without actual malice toward Mr. Egiazaryan.

7.   Mr. Zalmayev acted at all relevant times in good faith towards Mr. Egiazaryan.  The claims of Mr. Egiazaryan for damages are barred or limited by Mr. Zalmayev's good faith.

8.   Mr. Zalmayev's challenged statements concerning Mr. Egiazaryan were privileged and protected from liability by the First Amendment to the United States Constitution.  Mr. Zalmayev's challenged statements concerning Mr. Egiazaryan were

privileged and protected from all liability by the New York Constitution, including but not limited to Article 1, Section 8.

9.   Mr. Egiazaryan is a public figure, and therefore Mr. Egiazaryan cannot recover for defamation without proving actual malice.

10.   Mr. Zalmayev's commentary discussed a matter of public concern, and therefore Mr. Egiazaryan cannot recover for defamation without proving actual malice.

WHEREFORE, Peter Zalmayev requests that Count I of the complaint be dismissed and that judgment be entered in his favor, including an award of his costs, attorneys' fees and expenses of this action and such other relief as this Court may deem just and proper.

**COUNTERCLAIM**

1.   Peter Zalmayev is a naturalized American citizen who lives in New York City.  He is from Ukraine, in the former Soviet Union.

2.   Mr. Egiazaryan is a Russian citizen who lives in California.

3.   This court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Mr. Zalmayev and Mr. Egiazaryan and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Mr. Zalmayev obtained a first degree from Freed-Hardeman University in Tennessee and a masters degree from Columbia University.

5. Mr. Zalmayev is the executive director of the Eurasia Democracy Initiative, which he founded, to promote democracy, the rule of law and tolerance in post-Communist societies and countries in Eastern and Central Europe, the Caucasus and Central Asia.

6. Mr. Zalmayev's activities in promoting democracy, the rule of the law and tolerance in post-Soviet Europe and Asia are inspired in part by the experience of his family. Mr. Zalmayev's Jewish grandfather was sent from his home in Ukraine to a labor camp in Siberia in the early 1930s by Stalin's government. Mr. Zalmayev's Jewish grandmother was sent to Siberia in the late 1930s. Mr. Zalmayev's mother was born in Siberia in 1948. Mr. Zalmayev's grandparents and mother were permitted to return to Ukraine in the early 1960s.

7. There is a long history of anti-Semitism in czarist Russia and the Soviet Union just as there is a long history of political and cultural oppression contrary to American ideals of freedom.

8. Mr. Zalmayev has been involved in human rights activities for his entire adult life. For example, in 2001, he attended the United Nations World Conference Against Racism,

Racial Discrimination, Xenophobia and Related Intolerance as one of the representatives of the International League for Human Rights. In his six years at the League, Mr. Zalmayev participated in the work of several United Nations treaty-monitoring bodies, including the United Nations Committee to eliminate Racial Discrimination. Since founding Eurasia Democracy Initiative, Mr. Zalmayev regularly acted as an expert witness on behalf of asylum-seekers in the United States fleeing religious and political persecution, and racial discrimination, in countries of the former Soviet Union.

9. Unlike Mr. Egiazaryan, who is a public figure, Mr. Zalmayev is a private figure who needs plead and prove only negligence to support his defamation claim.

10. The exact means of obtaining seats in the Russian legislative body called the Duma changed a little over the relevant period. In the 1999 and 2003 elections, 225 members, called deputies, ran for office to represent individual districts and were elected directly and 225 deputies were appointed by political parties receiving votes above a threshold, according to the votes. The Duma is the lower of two legislative bodies. In the 2007 elections all 450 deputies were appointed by the political parties receiving votes above the threshold.

11.   In the 2007 elections four parties together
obtained 90% of the vote and appointed all the deputies of the
Duma.  The parties are United Russia, Communist Party, Fair
Russia and the Liberal Democratic Party of Russia (LDPR).  In
2007, United Russia received 64% of the votes, Communist Party
received 12%, LDPR received 8% and Fair Russia received 8%.
Seven other parties received less than 3% each and appointed no
Duma deputies.  The numbers of Duma deputies appointed in 2007 by
each party are: United Russia, 315, Communist Party, 57, LDPR,
40, Fair Russia 38.

12.   LDPR was founded by Vladimir Zhirinovsky, who is
still the leader of LDPR.

13.   LDPR's policies, rhetoric and actions are "right
wing" to a degree not existent in American politics as
represented in elected legislatures.  LDPR is harshly anti-
American, xenophobic and anti-Semitic.  Zhirinovsky, as the party
leader, has accused Jews of ruining Russia, of sending Russian
women to foreign countries as prostitutes and provoking the
Holocaust.  He has stated his admiration for Adolf Hitler and is
friends with Austrian industrialist Edwin Neuwirth, a proud
former SS officer who denies the occurrence of the Holocaust.  He
has expressed his hatred of Turks and has called for the
deportation of all Chinese from eastern Russia.  In a visit to
the United States Zhirinovsky called for the preservation of the

white race and said that white Americans were in danger of losing America to black and Hispanic people. When United States Secretary of State Condoleezza Rice criticized an aspect of Russian foreign policy, Zhirinovsky said that "Condoleezza Rice needs a company of soldiers [and] needs to be taken to barracks where she would be satisfied." Pravda, 11.01.2006, cited at Wikipedia, Zhirinovsky, note 31.

14.   Mr. Zhirinovsky blamed the 1917 Bolshevik Revolution on Jews, saying "[y]ou will always find Jews where war is raging because they realize that money flows where blood is spilled." Associated Press, April 9, 1998.

15.   Mr. Zhirinovsky said that the September 11, 2001, terrorist attack on New York City was "the work of American and Israeli intelligence agents." On September 19, 2001, the Duma deputies stood to observe a minute of silence in memory of the September 11 victims, but the LDPR deputes refused to stand.

16.   Mr. Egiazaryan has been a deputy of the Duma since 1999 as a member of the LDPR.

17.   A Russian organization, the National Strategy Institute reported that following the 1999 election, strictly according to procedures, Mr. Egiazaryan would not have received a Duma deputy position, but Mr. Zhirinovsky ordered  another LDPR member, Stanislav Zhebrovsky, to withdraw his entitlement to his Duma deputy position so that his seat would be held by Mr.

Egiazaryan, who began his service as a Duma deputy for the LDPR in 1999.  Mr. Egiazaryan was appointed LDPR member of the Budget and Taxes Committee, which is as important in the Duma as it's counterpart committees are in the United States House of Representatives.

18.  The list of candidates for the Duma nominated by LDPR for the 2003 election, certified by the Central Election Commission of the Russian Federation includes "YEGHIAZARYAN [Egiazaryan is sometimes spelled in translation Yeghiazaryan] ASHOT Gevorkovich, . . . Member Liberal Democratic Party [LDPR]."

19.  During his time as a LDPR Duma deputy, Mr. Egiazaryan never repudiated Mr. Zhirinovsky's statements or the policies of the LDPR

20.  Mr. Egiazaryan has personally provided large amounts of money to the LDPR.  Mr. Egiazaryan might have chose any political party to receive his money and to put him in the Duma, but he chose LDPR.

21.  Alexey Mitrofanov wrote a book titled History of LDPR, published in 2007, which he considers to be the official history of the party.  The cover contains photographs of 24 of the most important LDPR members, including the author Mr. Mitrofanov, Mr. Zhirinovsky, and Mr. Egiazaryan.  The book contains short biographies of LDPR members, including Mr.

Egiazaryan.  Mr. Mitrofanov describes Mr. Zhirinovsky and Mr. Egiazaryan as business partners and that Mr. Egiazaryan voted with the LDPR.

22.  Duma deputies have immunity from criminal prosecution.

23.  Gazeta.Ru., 02.04.1999, reports that Mr. Egiazaryan and his brother Suren paid $100,000 for prostitutes to entertain Yuriy Skuratov, the Prosecutor General of the Russian Federation, usually at an apartment owned by Suren Egiazaryan.

24.  Mr. Egiazaryan is involved in litigation over involvement in the a real estate project known as the Moskva Hotel, about which he gives his side in the complaint.  The litigation exists or existed in at least the London Court of International Arbitration and in Cyprus.  Mr. Egiazaryan's dispute is with Russian businessman and senator Suleyman Kerimov, former Moscow Mayor Yuri Luzhkov and his wife Elena Baturina, and Russian businessman Arkady Rotenberg.

25.  Mr. Egiazaryan is involved in litigation with Vitaly Smagin, who sued Mr. Egiazaryan, alleging him of illegal activity in connection with their investment in a shopping mall in Moscow called Europark.  Mr. Egiazaryan sued Mr. Smagin for libel.

26.   In October/November 2010 the Duma voted to eliminate Mr. Egiazaryan's immunity from criminal prosecution. 352 (of 450) deputies voted to eliminate the immunity.  Only 39 deputies voted to retain the immunity, all members of the LDPR. Since the 2007 LDPR deputies totaled 40, the only one who did not vote to retain immunity was apparently Mr. Egiazaryan, and only because he was not there to vote.

27.   Criminal charges were brought against Mr. Egiazaryan between October 2010 and March 2011.  Mr. Egiazaryan is subject to arrest.

28.   Before Mr. Egiazaryan's immunity was eliminated, Russia Magazine wrote an article titled "Russian Con Artist Enjoys Political Immunity," in which the magazine describes how Mikhail Ananyev accused Mr. Egiazaryan of stealing an $18 million investment, how Mr. Smagin accused Mr. Egiazaryan of stealing $30 million, how after Mr. Egiazaryan became the vice chairman of Unikombank, millions of dollars disappeared and Unikombank became bankrupt, how Andrey Vavilov accused Mr. Egiazaryan of the theft of $231 million from a deal to sell MIG fighters to India, and how Mr. Egiazaryan failed to fully report his real estate assets in Duma filings.  The article says that Mr. Egiazaryan "was recently spotted purchasing sex toys in bulk and partying in the South of France with two prostitutes, . . ."

29.  Mr. Egiazaryan fled Russia apparently before the Duma vote(s) in October/November to eliminate his immunity.  He surfaced in the United States in February 2011.

30.  Associate Press reporter Douglas Birch met with Mr. Egiazaryan, who was "flanked by lawyers," in Washington D.C. between the end of December 2010 and February 6, 2011, when Mr. Birch wrote his article.  Mr. Egiazaryan told Mr. Birch that he was considering seeking asylum in the United States.  The visit to Mr. Birch was part of Mr. Egiazaryan's use of "attorneys, consultants and public relations professionals" to advance his asylum effort.  Complaint, ¶ 89. iii.

31.  Mr. Zalmayev became aware of Mr. Egiazaryan and his activities first from a November 23, 2009, article in the Washington Times, titled "Corruption drags down Russian economy," about the Hotel Moscow/Moskva development project, which is the focus of the complaint.  The article describes a business climate of widespread corruption and that in a suspicious way, control of the Hotel Moscow project was shifted to a group that included Mr. Egiazaryan.  "Among the main stakeholders was Ashot Yegiazaryan, a veteran banker and member of parliament suspected of having ties with criminal networks."  The article says that

> for the past two decades Mr. Yegiazaryan has
> colluded with Moscow government officials to
> secure properties illegally and development
> rights at a fraction of their real value.  In the

early 1990s, Mr. Yegiazaryan founded Moscow
National Bank, where, according to the Novaya
Gazeta newspaper, a leading independent daily, he
used high-level official contacts to divert tens
of millions of dollars in state funds. It soon
became one the largest banks in Russia. Mr.
Yegiazaryan departed as the bank's fortunes
soured, and subsequently moved on to co-own
Unikombank. Within several years, the bank
declared bankruptcy. By then, he had also left
that company.

The article quotes another journalist, who said that Mr.

Egiazaryan "was always considered one of the most corrupt.  For

sure, he was never a model businessman."

32.  Mr. Egiazaryan's website contains a link to

Transparency International, a respected organization that

studies and reports on government corruption around the world.

Transparency International first looked at Mr. Egiazaryan's

activities in 2010 and determined that he submitted incomplete

financial information to the Duma.  Transparency International

never received support from Mr. Egiazaryan and is unaware of any

anti-corruption efforts by him.

33.  Mr. Zalmayev increased his research into Mr.

Egiazaryan's activities and talked to people who shared his

opposition to people such as Mr. Egiazaryan and their efforts to

evade responsibility and prosecution by fleeing Russia and other

post-Soviet countries, especially by fleeing to the United

States with the use of corruptly obtained money.

34.  Mr. Zalmayev collaborated with Lev Ponomarev, Executive Director of the All-Russian Public Movement "For Human Rights," on letters to members of the United States Congress about Mr. Egiazaryan.  Mr. Ponomarev was aware of Mr. Egiazaryan, his situation and the public information and criticism of him. Part of the collaboration was that Mr. Zalmayev's English is better than Mr. Ponomarev's English.

35.  Mr. Zalmayev collaborated with Lyudmila Alexeyeva, Chairperson, Moscow Helsinki Group, on letters to members of the United States Congress about Mr. Egiazaryan.  Ms. Alexeyeva was aware of Mr. Egiazaryan, his situation and the public information and criticism of him.  Part of the collaboration was that Mr. Zalmayev's English is better than Ms. Alexeyeva's English.

36.  Around the time of Mr. Egiazaryan's and his lawyer's visit to the Associated Press's Mr. Birch, representatives of Mr. Egiazaryan visited Lev Ponomarev in Moscow, pressured him to retract his letter and told Mr. Ponomarev that if he did not retract his letter he would be drawn into a complicated situation that would interfere with the goal of his organization, which is the promotion of human rights.  On the basis of Mr. Ponomarev's "retraction" (complaint, ¶ 61-62), Mr. Zalmayev believes that Mr. Egiazaryan's

representatives made defamatory statements about Mr. Zalmayev such as those contained in the complaint.

37.  Mr. Zalmayev believes that Mr. Egiazaryan's representatives similarly visited Ms. Alexeyeva, made similar statements to her and pressured her, and made defamatory statements about Mr. Zalmayev such as those contained in the complaint.

38.  On March 22, 2011, Interfax, an internet news agency, reported that Ms. Alexeyeva had retracted her retraction.  She said that Mr. Egiazaryan does not deserve the status of political refugee.  She said "I don't believe he deserves this status, and I don't think he's being prosecuted for his claimed stance against corruption.  He's neither a human rights defender nor a philanthropist."

39.  Mr. Zalmayev believes that Mr. Egiazaryan's representatives made defamatory statements about Mr. Zalmayev people in addition to Mr. Ponomarev and Ms. Alexeyeva.

40.  On March 9, 2011, the Jewish Journal published Mr. Zalmayev's commentary.

41.  Mr. Egiazaryan's activities and problems in Russia, his multi-country litigation, his fleeing to the United States and his application for asylum are matters of international significance, involving American foreign policy.

42.  Mr. Zalmayev's commentary on Mr. Egiazaryan and his collaboration with people such as Mr. Ponomarev and Ms. Alexeyeva are exactly what was contemplated for Constitutional First Amendment protection.

43.  Mr. Egiazaryan filed his 153-paragaph complaint against Mr. Zalmayev on April 19, 2011, only six weeks after Mr. Zalmayev's commentary.  The 153-paragraph complaint is disproportionate to Mr. Zalmayev's one and one-half page commentary, especially given Fed. R. Civ. P. 8's requirement of a "short and plain statement of the claim," and is mostly devoted to Mr. Egiazaryan's international litigation with Mr. Kerimov.

44.  The complaint, among other things, says that Mr. Zalmayev:

   a.   conspired with Mr. Egiazaryan's opponents "in a campaign of harassment, intimidation, persecution, abuse and character assassination . . ." ¶ 9

   b.   assisted Suleyman Kerimov in committing theft from Mr. Egiazaryan.  ¶ 10

   c.   is involved in murder. ¶ 17

   d.   is working with corrupt Russian authorities. ¶ 18

      e.    misled people into participating in a dirty
              tricks campaign. ¶ 20

      f.    manipulated sophisticated adults into
              writing untrue statements that Mr. Zalmayev
              knew were untrue.  ¶ 21, ¶ 40

      g.    conspired to return Mr. Egiazaryan to
              Russia, where "he and his family may well be
              physically assaulted or even killed.  ¶ 99.

45. The complaint is defamatory if not subject to a judicial or litigation privilege.

46. Moscow Times reporter Nikolaus von Twickel called Mr. Zalmayev on June 9, 2011, about an article he was writing about Mr. Egiazaryan, and said that he received the complaint in this case.  He did not say who sent the complaint to him, but the only logical inference is that it was sent by Mr. Egiazaryan's representatives.  From Mr. Egiazaryan's use of lawyers, consultants and public relations professionals (complaint ¶ 98), Mr. Zalmayev believes that the complaint was widely circulated.

47. The circulation of the complaint eliminates the complaint's judicial privilege and Mr. Egiazaryan's immunity. Because of Mr. Egiazaryan's wealth, the vast amount of published articles about him associating him with fraud, corruption and the LDPR, Mr. Zalmayev's obvious, to someone as sophisticated as Mr. Egiazaryan and lawyers, inability to satisfy any judgment,

Mr. Zalmayev believes that the principal purpose of the complaint is to widely circulate it. Because of the existing published material about Mr. Egiazaryan, he could not have a reasonable belief that Mr. Zalmayev's commentary or discussions with others could have damaged his reputation.

48. Mr. Egiazaryan did not sue the <u>Jewish</u> <u>Journal</u>, where Mr. Zalmayev's commentary was published, the <u>Moscow</u> <u>Times</u>, where Mr. Komarovsky's commentary was published, or any of the letter writers about whom he complains. The reason is that Mr. Egiazaryan seeks to burden and defame Mr. Zalmayev and use the defamatory contents of the complaint to "support" his asylum application.

49. Although Mr. Egiazaryan's actions concerning Mr. Zalmayev were deliberate, Mr. Zalmayev need prove only negligence to prove his defamation claim.

50. The judicial or litigation privilege does not apply to the dissemination of defamatory statements that would be privileged if contained in the lawsuit and does not apply to the complaint.

51. Mr. Egiazaryan's representatives' statements to Mr. Ponomarev and Ms. Alexeyeva, and others, and the dissemination of the defamatory statements contained in the complaint damaged Mr. Zalmayev, including:

      a.   damage to Mr. Zalmayev's reputation;

        b.    causing emotional distress;

        c.    causing him to spend time countering the defamation, which prevents him from devoting time to his career.

**COUNT ONE**

**DEFAMATION**

52.  Mr. Zalmayev incorporates the allegations of paragraphs 1 through 51 as if set forth in full.

53.  Mr. Egiazaryan is liable for defamation.

**COUNT TWO**

**DAMAGES FOR EGIAZARYAN'S SLAPP SUIT**

54.  Mr. Zalmayev incorporates the allegations of paragraphs 1 through 51 as if set forth in full.

55.  Mr. Egiazaryan's application for asylum makes him a "public applicant or permittee" under Mckinney's Civil Rights Law § 76-a (b), Mckinney's Con. Laws of N Y, Chapter 6, Article 7.

56.  Mr. Zalmayev has engaged in public petition and participation regarding Mr. Egiazaryan's application for asylum under Mckinney's Civil Rights Law § 76-a (a).

57.  The complaint was commenced and continued without a substantial basis in fact and law, under § 70-a (a).

58.  Mr. Zalmayev is entitled to attorney's fees and costs.

59.  The complaint was commenced and continued for the purpose of harassing, intimidating, punishing and otherwise maliciously inhibiting the free exercise of speech, petition or association rights, under § 70-a (b).

60.  Mr. Egiazaryan is liable to Mr. Zalmayev for damages.

61.  The complaint was commenced and continued for the *sole* purpose of harassing, intimidating, punishing and otherwise maliciously inhibiting the free exercise of speech, petition or association rights, making punitive damages appropriate under § 70-a (c).

WHEREFORE, Peter Zalmayev requests judgment be entered in his favor, in an amount exceeding $75,000 and the amount requiring referral of the counterclaim to arbitration, and an award of his costs, attorneys' fees and expenses of this action and such other relief as this Court may deem just and proper.

## JURY DEMAND

Mr. Zalmayev demands a jury on all counts in the counterclaim.

/s/ Andrew J Ryan
_____
Andrew J. Ryan
Matthew P. Feser
SALISBURY & RYAN
1325 Avenue of the Americas, 7th Fl.
New York, NY 10019
212-977-4660
212-977-4668 (fax)
ar@salisburyryan.com
mf@salisburyryan.com

/s/ James P. Golden
_____
JAMES P. GOLDEN (Pro Hac)
THOMAS B. ROBERTS (TR5233)
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA 19103
(215) 255-8593 (O)
(215) 255-8583 (fax)
goldenjp@hamburg-golden.com
robertstb@hamburg-golden.com

Attorneys for defendant-
counterclaim plaintiff
Peter Zalmayev

Dated: August 5, 2011

## CERTIFICATE OF SERVICE

I, James P. Golden, certify that the foregoing Answer, Affirmative Defenses and Counterclaim has been filed electronically and is now available for viewing and downloading from the Court's Electronic Case Filing System.  I further certify that a copy of the foregoing Answer, Affirmative Defenses and Counterclaim  was served by regular mail on August 5, 2011, on:

> Mark C. Zauderer, Esquire
> Flemming Zulack Williamson
>   Zauderer, LLP
> One Liberty Plaza
> New York, NY  10006

and by email on:

> Mark C. Zauderer, Esquire
> mzauderer@fzwz.com
>
> Jonathon D. Lupkin, Esquire
> jlupkin@fzwz.com
>
> Jason T. Cohen, Esquire
> jcohen@fzwz.com
>
> Attorneys for Plaintiff

/s/ James P. Golden
JAMES P. GOLDEN

Date: August 5, 2011