# HAMBURG & GOLDEN, P.C.
Attorneys

1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
(215) 255-8590
Facsimile: (215) 255-8583
goldenjp@hamburg-golden.com

James P. Golden
Neil J. Hamburg
Michael E. Sacks
Cameron J. Etezady
Maureen Hogan Krueger
Jane C. Silver
Thomas B. Roberts

Writer's Direct Dial:
215-255-8593

October 17, 2011


Honorable Gabriel W. Gorenstein
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY  10007-1312

>    Re:  <u>Egiazaryan v. Zalmayev</u>, 11 Civ 2670 (PKC)(GWG)

Dear Judge Gorenstein:

Andrew Ryan and I represent defendant Peter Zalmayev. Further to Your Honor's October 7, 2011, Order, this letter supersedes my October 6 letter.

I write in response to plaintiff Ashot Egiazaryan's September 27, 2011, letter requesting a conference with the Court to discuss the issuance of a Rule 26(c) protective order limiting the scope of deposition questioning of witnesses Artem Egiazaryan and Suren Egiazaryan and precluding the production of documents requested by subpoenas to them. Mr. Zalmayev's subpoenas to Artem and Suren are attached as exhibit 13.

Ashot Egiazaryan's counsel, Flemming Zulack Williamson Zauderer LLP, represents the subpoenaed witnesses, Artem Egiazaryan, Ashot Egiazaryan's brother, and Suren Egiazaryan, Ashot Egiazaryan's cousin or step-brother. We also served subpoenas on Ashot Egiazaryan's public relations and lobbying firm, and two of its employees, BGR Group. They too are represented by Fleming Zulack and are resisting some of the requested discovery.

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 2 of 14


Further to Your Honor's September 27, 2011, Order in which Your Honor instructed counsel to discuss the document requests in dispute, on October 4 my colleague Jane Silver and I met with Fleming Zulack's Jonathan Lupkin, Jason Cohen and Anne Nicholson at Fleming Zulack's office for more than five hours. We discussed the document requests and the disputes that are the subject of this letter. All counsel agreed that we narrowed and clarified the disputed issues.

We are scheduled for a conference on the application for a protective order with Your Honor October 27 at 4:00.

**CASE SUMMARY AND EGIAZARYAN'S DISCOVERY**

The complaint begins with claims that Mr. Zalmayev harmed Mr. Egiazaryan, his family, and his business, caused risk of physical harm to him and his family and will prevent him from remaining in the United States. ¶ 1-3, exhibit 1 to Mr. Lupkin's September 27 letter. The complaint contains details of Mr. Egiazaryan's alleged activities and problems encountered in Russia and in the United States: the international litigations; the "powerful Russian politicians and corrupt law enforcement officials" who allegedly took control of Mr. Egiazaryan's real estate project to rebuild the Moskva Hotel; the criminal charges against Mr. Egiazaryan; Mr. Egiazaryan's fall from political favor in Russia; his Duma positions; the death threats; and the alleged "smear campaign against Mr. Egiazaryan" which is part of a "Russian 'corporate raid'" by a Russian Senator, the Moscow Mayor, and a close confident of Russian Prime Minister Vladimir Putin. ¶¶ 1, 2, 10, 12, 15.

The complaint puts the respected human rights activist, Peter Zalmayev, at the heart of these detailed factual allegations. Mr. Egiazaryan alleges that Mr. Zalmayev's "active participation" in this "black (*i*.e., negative) public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia," was "believed" to have been "enlisted" by "Mr. Egiazaryan's litigation foes and the corrupt Russian authorities." ¶ 18.

According to the complaint, "Mr. Zalmayev co-opted respected human rights advocates and organizations into the dirty tricks campaign against Mr. Egiazaryan." ¶ 20. The allegedly "false, defamatory, and injurious statements" include

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 3 of 14

those made by Mr. Egiazaryan in an article published in the Jewish Journal on March 9, 2011, and those allegedly induced by Mr. Zalmayev in letters from the "respected human rights advocates and organizations." ¶ 20.

In the complaint, Mr. Egiazaryan denies being anti-Semitic (¶¶ 36, 38, 46-48), denies being anti-American (¶ 36), denies being a member of the LDPR (¶¶ 37, 49, 57), denies being a friend of LDPR leader Mr. Zhirinovsky (¶ 39), denies supporting anti-Semitic policies or legislative proposals, denies ever having "made any anti-Semitic or anti-American statements or having taken anti-Semitic or anti-American positions in his personal life, his professional life, as a member of the Russian Duma or in any other capacity." ¶ 36. Mr. Egiazaryan denies that he "embezzled or mismanaged funds from a parliamentary 'committee' meant to assist in Chechnya's reconstruction." ¶ 59. Mr. Egiazaryan alleges that he is a private figure leading "a private life in the United States." ¶ 82. He claims that "[h]e has not thrust himself into the public eye in any way." ¶ 82. In *today's* online edition of the Wall Street Journal Mr. Egiazaryan exercises the First Amendment rights he has as a guest in the United States in commentary in which he criticizes Vladimir Putin and declares that "Russia has never been as rich as today nor as corrupt." He is identified as a member of the Duma.

Mr. Egiazaryan is conducting his own very broad discovery, including serving more than 20 third-party subpoenas for documents and/or testimony.

Mr. Egiazaryan served subpoenas on a public relations firm, Public Strategies, and its employee, Greg Hitt. Exhibit 7. Unlike Mr. Egiazaryan's public relations/lobby firm, BGR Group, who is represented by Fleming Zulack, Public Strategies and Hitt are represented by lawyers other than my firm. Those lawyers objected to the discovery and Egiazaryan moved to compel discovery, emphasizing the breadth of permitted discovery, including non-party discovery.

Mr. Egiazaryan's memorandum of law in support of his motion to compel discovery, currently pending in the United States District Court for the District of Columbia, sets forth the "well settled" scope of a Rule 45 subpoena and is instructive of the broad discovery permitted and which should be allowed in connection with the subpoenas for testimony and

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 4 of 14

documents served by Mr. Zalmayev on Artem Egiazaryan and Suren Egiazaryan.  Exhibit 8.

The memorandum of law in support of Egiazaryan's motion to compel discovery from Greg Hitt and Public Strategies states:

> It is well settled that the scope of a Rule 45 subpoena is informed by Rule 26, which governs civil discovery generally.  *E.g., Coleman v. District of Columbia,* 275 F.R.D. 33, 36 (D.D.C. 2011); *Rendon Group, Inc. v. Rigsby*, 268 F.R.D. 124, 126 (D.D.C. 2010) ("Rule 26 of the Federal Rules of Civil Procedure defines and governs the scope of discovery for all discovery devices, and, therefore, Rule 45 must be read in light of it.").  Rule 26(b)(1) provides that "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense...." Fed. R. Civ. P. 26(b)(1).  <u>Therefore, federal courts recognize that the "scope of discovery in civil actions is broad [and the] term relevance at the discovery stage is [to be] broadly construed.</u>"  *Convertino v. U.S. Dep't of Justice*, 565 F. Supp. 2d 10, 12 (D.D.C. 2008).

Mr. Egiazaryan's memorandum, p. 8 (emphasis added).  He also describes the objections to the Hitt and Public Strategies as "a set of boilerplate objections" (mem. p. 5), which is exactly how Egiazaryan responded to the Zalmayev document requests, the subject of a still-pending dispute before Your Honor.  Counsel are discussing the objections as Your Honor instructed.

The United States Court of Appeals for the Second Circuit similarly permits broad discovery:

> Discovery serves important purposes, such as avoiding surprise, fully disclosing the nature and scope of the controversy, narrowing, simplifying, and framing the issues involved, and enabling the parties to obtain the factual information needed to prepare for trial. 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2001 (1970).  Rules governing discovery should be interpreted broadly to achieve those purposes. *See, e.g., Schlesinger Investment Partnership v. Fluor Corp.*, 671 F.2d 739, 742 (2d Cir. 1982) ("The Federal Rules evince a liberal policy with

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 5 of 14

>regard to discovery in order to allow litigants to secure helpful evidence from the hands of their adversaries").

Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2d Cir. 1985); Mathias v. Jacobs, 167 F. Supp.2d 606, 622-628 (S.D.N.Y. 2001) (Marrero, J.).

In Mathias v. Jacobs, 167 F. Supp.2d 606, (S.D.N.Y. 2001) (Marrero, J.), the district court vacated a magistrate's order imposing sanctions in connection with defense counsel's depositions of witnesses, holding that the magistrate's limitations and sanctions were improper.  In Mathias, the magistrate "characterized three categories of questions posed by [defendant's] attorneys as improper and designed exclusively "to embarrass the witness."  Id. at 622.  "These included inquiries about financial contributions to [the witness's] election campaigns in the 1970's, a disgraced former business associate of [the witness's] wife, and allegations that [the witness] improperly exerted his political influence in the awarding of a government contract."  Id.  Judge Marrero ruled that "[t]he questions were within the parameters of accepted discovery practice . . . ."  Id. at 627 (emphasis added).

The magistrate had precluded questioning abut a witness's "campaign financing, his political influence, and his wife's business associate convicted of fraud."  Id. at 626-627.  The disputed questioning for another witness involved business relationships.  The discovery approved by the district court related to defenses of duress and improper contacts, and so involved questioning about which witnesses had interests in companies, attended meetings, were aware of conversations or threats, use of political influence, contacts among individuals and companies, and other matters *not directly* related to the restrictive covenant in the contract at issue.

The court noted that it was particularly inappropriate to limit deposition questioning in advance because:

>The taking of a deposition assumes a rhythm and character that informs an attorney's decision about what questions to pose.  The quality of a deponent's memory, his degree of cooperation, and the substance of responses to questions already posed help dictate what will be asked.  During the course of his

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 6 of 14

> deposition [the witness] claimed that his memory failed him in response to several questions.  This memory loss may have convinced [the questioning lawyers] that [the witness] would not be capable of providing probative information on other relevant subjects.  Such a conclusion is not without a reasonable basis.

Id. at 625.  The district court found the discovery proper to obtain impeachment evidence *if* the witnesses testified at trial.  The court said that that defense counsel's

> argument that he was merely seeking impeachment material in the event that [the witness] was called to testify at trial as a hostile witness is credible and an appropriate use of deposition discovery.

Id. at 628.  Since Mr. Egiazaryan's complaint refers repeatedly to his family, and since Artem and Suren live and work closely with him, they are certain to be trial witnesses.

Other examples of Mr. Egiazaryan's far-reaching discovery include Ilya Merenzon (exhibit 9), EAN Holdings (exhibit 10) and Lawrence Wiist (exhibit 11).

Ilya Merenzon is alleged by Mr. Egiazaryan to have created a website unflattering to Mr. Egiazaryan.  EAN holdings apparently operates EZ Pass, and Mr. Egiazaryan seeks EZ Pass records of specified cars.  Wiist is a private investigator who conducted surveillance of Mr. Egiazaryan.  Mr. Wiist's activities are not the subject of speculation because he submitted a declaration in a 28 U.S.C. §1782 proceeding in Los Angeles in which he described his surveillance.  Mr. Zalmayev was not involved in that proceeding.

The Wiist subpoena seeks agreements, invoices, bills, payments, bank statements, cancelled checks, investigative files, documents concerning Egiazaryan and all communications with Mr. Egiazaryan's apparent nemesis Mr. Kerimov or the Kerimov entities.  Egiazaryan involves his family, including his brother Artem and cousin Suren in the scope of his discovery and includes 26 companies involved with Kerimov.  "Egiazaryan" is defined in the subpoena rider as follows:

> "Egiazaryan" means plaintiff Ashot Egiazaryan and any representatives, agents or attorneys acting on his

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 7 of 14


>         behalf <u>as well as any members of Egiazaryan's family,
> including Artem Egiazaryan, Suren Egiazaryan and
> Natalia Tsagolova [Ashot's wife]</u>.

Instruction D, Request 1 (emphasis added), exhibit 11.  There are 26 "Kerimov Entities" named in the subpoena about which documents are sought by Mr. Egiazaryan.  Instruction G, Request 9.  This discovery by Mr. Egiazaryan is comparable to Mr. Zalmayev's discovery to which Mr. Egiazaryan objects.

        Mr. Egiazaryan served subpoenas on SquareSpace, Inc. and Dotster, Inc.  Exhibits 12 and 13.

        Mr. Zalmayev had nothing to do with Wiist, Merenzon, the cars listed on the EZ Pass subpoena, SquareSpace or Dotster.

        Mr. Egiazaryan *knows* that Zalmayev has no connection to Wiist or Lawrence & Associates.  Mr. Wiist submitted an declaration filed on October 28, 2010, in the U.S. District Court for the Central District of California in support of the Application of Denoro Investments Limited For A Subpoena Pursuant To 28 U.S.C. §1782 to take the deposition of Ashot Egiazaryan in connection with the London Arbitration proceeding.  Exhibit 12.

        In Mr. Egiazaryan's defamation case against Mr. Zalmayev, Mr. Egiazaryan alleges that in the London Arbitration, Egiazaryan is "seeking damages and to invalidate the agreements Mr. Kerimov illegally coerced Mr. Egiazaryan into signing" (¶ 14) after the "June 2009 illegal corporate raid and related actions eventually forced Mr. Egiazaryan to transfer to Mr. Kerimov his interest in the [Moskva Hotel] Project for nothing." ¶¶ 12-13.  Either Mr. Egiazaryan is using this case against Mr. Zalmayev improperly to get discovery for his London Arbitration, or he wants to test his remote speculation that Mr. Zalmayev has something to do with Mr. Wiist.  Either way, Mr. Zalmayev has not objected to the discovery because it will disprove the allegations against him.  Mr. Wiist, represented by lawyers others than me, has objected.

        When asked for a showing of connection of Wiist, Merenzon or the cars to Mr. Zalmayev, Mr. Egiazaryan's counsel said they did not have to tell me any connection and noted that we did not attempt to prevent that discovery, which is exactly the point.  We *want* Mr. Egiazaryan to conduct that discovery because it will reveal that Mr. Zalmayev had nothing to do with

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 8 of 14


those people or activities, and that is exactly why Mr. Egiazaryan objects to our discovery about his financial affairs—it will show that Mr. Egiazaryan's allegations in his complaint are untrue, that his reputation for financial and political corruption is deserved, and that he is a significant financer of the LDPR.

It is inappropriate for Mr. Egiazaryan to block discovery claiming Mr. Zalmayev is on a fishing expedition and, at the same time, seek discovery from those with whom Mr. Zalmayev has no connection.  Unlike Mr. Egiazaryan, we are not moving to limit the subpoenas.  We agree that, in light of the expansive allegations in the complaint and the information needed to prove Mr. Zalmayev's defense and counterclaim, the scope of discovery must be very broad, as broad as the discovery being conducted by Mr. Egiazaryan, as this broad discovery is consistent with the intention of the Federal Rules and the purpose behind those rules.  The scope of discovery must be equally broad for Mr. Egiazaryan and Mr. Zalmayev.

Our discovery requests are relevant to prove that what Mr. Zalmayev wrote and said is true, that Mr. Egiazaryan paid money to the LDPR, that Mr. Egiazaryan is financially and politically corrupt and as such he is not defamable, that he has not been financially damaged as he claims, and that he is not credible.  Respecting the counterclaim, it is relevant to showing that the complaint is defamatory, that the complaint was improperly circulated, that Mr. Egiazaryan has a purpose of this complaint other than protecting his reputation or recovering damages.

Some of the issues addressed in this letter are also involved in Mr. Zalmayev's request for documents from Mr. Egiazaryan.

   A.   **RESIDENCES**

Wiist's affidavit is publicly available through Pacer, and it contains the address and registered owner (Endrino Corp.) of Ashot and Suren Egiazaryan's residence, the makes, models, and VIN and license plate numbers of the two cars registered to Suren.  Since this information is already public, the privacy concerns asserted by Mr. Egiazaryan in the letter submission cannot be genuine.  The affidavit is available on Pacer, and had we seen it before sending out the subpoena and document request, we would have simply requested that the address be confirmed and

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 9 of 14

Artem's be provided.  The more important point is that it shows the disingenuousness of Mr. Egiazaryan's objections.

> B.   **PERSONAL AND FINANCIAL INFORMATION**

The allegations contained in the complaint make Mr. Zalmayev's discovery of the information and documents sought from brother Artem Egiazaryan and cousin, or step-brother, Suren Egiazaryan proper.  The complaint alleges that:

> The campaign against Mr. Egiazaryan is intended to force him to return to Russia, where he <u>and his family</u> will be subject to risk of loss of life and liberty, as well as physical, reputational and pecuniary harm, and where he will be coerced to abandon his legal claims associated with <u>his valuable investment</u>. . . .

¶ 1 (emphasis added).

One of the alleged defamatory and injurious statements allegedly communicated by Mr. Zalmayev, is that "plaintiff is, among other things: . . . (6) a corrupt Russian legislator who has embezzled funds intended for war-torn Chechnya."  (¶ 2).

The complaint also alleges that:

> Mr. Zalmayev's words . . . were written and spoken willfully and maliciously with intent to damage plaintiff's name, credibility and reputation, <u>sabotage his investment</u> and undermine his ability to remain in the United States.

¶ 3 (emphasis added).

Mr. Egiazaryan also claims to have been defamed by letters allegedly accusing him of "having committed war crimes as well as <u>theft, embezzlement or mismanagement of funds</u>" after he "initiated the creation of the Duma Committee for Assistance in Political Regulation and Observance of Human Rights in Chechyna . . . ."  ¶ 56 (emphasis added).

Mr. Egiazaryan claims to have suffered  . . . damage to "his efforts to remain safely in the United States."  Complaint, ¶ 89.  According to Mr. Egiazaryan, "[b]ecause of the [alleged] smear campaign orchestrated by Mr. Zalmayev, "Mr. Egiazaryan has been forced to expend significant additional sums

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 10 of 14

in order to combat the defamation. . . . including "amounts paid to attorneys, consultants and public relations professionals to fight the defendant's smear campaign . . ." and has suffered "damage to Mr. Egiazaryan's ability to conduct his affairs in the United States." Complaint ¶ 89 (emphasis added). Mr. Egiazaryan claims that if he "is forced to return to Russia, he will be subject to severe harassment, the possibility of incarceration for trumped-up criminal charges, and he and his family may be physically assaulted or even killed." ¶ 99.

The central issue in the case is Mr. Egiazaryan's financial support of the repellant political party LDPR (¶¶ 2, 28), which he denies. We have shown preliminarily with a statement by Dmitri Garkusha that Mr. Egiazaryan financially supported the LDPR, at least sometimes with currency. The English translation of the statement is attached as exhibit 2. So long as Mr. Egiazaryan continues to deny his support of the LDPR and fails to credibly provide discovery showing his payments, the only alternative is for us to get all his financial records to prove his payments to LDPR.

Artem and Suren are knowledgeable about Ashot's business affairs. Fleming Zulack has informed us that Artem and Ashot are jointly represented both for this discovery and by other counsel in connection with the business dispute being litigated in London ¶ 14. In the California 28 U.S.C. §1782 proceeding Suren submitted a declaration in which he describes his knowledge of Ashot's activities, for example, saying that Ashot intends "to remain permanently in the United States." ¶ 6 of that declaration. The litigation between Mr. Egiazaryan and Mr. Kerimov includes a suit in Cyprus that is based on an affidavit by Artem, on Ashot's behalf.

Many published statements about Mr. Egiazaryan describe him as financially and politically corrupt. Mr. Egiazaryan denies it. Examples include articles under the heading Russian Mafia and Russian Mafiozi, exhibits 3 and 4. The March 6 article (exhibit 3) describes evidenced that Ashot Egiazaryan and his brother Artyom (Artem, here) committed fraud. The May 7 article says that the Russian Anti-Corruption Committee

> has asked the US Department of Justice to investigate into [sic] the legality of the assets of member [sic] of the Russian State Duma Ashot Yegiazaryan

>       [Egiazaryan, here] and his relatives, who fled to the
>       USA."

Russian Mafia, Kompromat.ru, May 7, 2011, exhibit 4 (emphasis added). The article says that in 2006-2010 "Yegiazaryan, together with Artemy Yegiazaryan (his brother) . . . and others, defrauded businessman Vitaly Smagin . . . of" 1.57 billion rubles worth of shares of a company.

His actual conduct and reputation, especially given his assertions of purity, are relevant to his defamability and damage claim. Cerasini v. Sony Corp., 991 F.Supp. 343 (S.D.N.Y. 1998). Plaintiff John Cerasini was an apparent member of organized crime who was indicted, and acquitted once, with an indictment pending during that defamation case, based on Cerasini's depiction in the movie "Donnie Brasco," about an undercover FBI agent who infiltrated the Bonanno Crime Family.

Mr. Egiazaryan says we have spun "fanciful . . . theories" about his relatives laundering money for him. Our theories are more supported even now than his theories about Mr. Zalmayev's connection to Merenzon, the cars and Wiist—we have shown that Artem and Suren have knowledge about Mr. Egiazaryan's business and that Artem has "fronted" for him. The theories are not fanciful.

Andrey Gloriozov started to work for Mr. Egiazaryan in 1998 by acting "as a named owner of offshore companies while in fact these companies were owned . . . by Ashot Egiazaryan." Gloriozov declaration, ¶ 2, exhibit 5. In 1998 he transferred $20 million of Mr. Egiazaryan's money through a web of companies for use by Suren Egiazaryan for Mr. Egiazaryan's use. Gloriozov declaration, ¶3. Mr. Egiazaryan and Suren in 2011 asked Mr. Gloriozov to back-date a $20 million note to 2001 from Suren to Mr. Gloriozov. Gloriozov declaration, ¶4, and attached back-dated note. The reason Mr. Gloriozov "fronted" for Mr. Egiazaryan "was to minimize Ashot Egiazaryan's and Artem Egiazaryan's identification and direct involvement in these companies, including for safety reasons. Gloriozov declaration, ¶ 5.

Other witnesses corroborate Mr. Egiazaryan's use of his brother Artem to "front" for him and admit to have laundered money for Mr. Egaiazaryan. Mikhail Ananiev worked for Mr.

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 12 of 14


Egiazaryan beginning in 1996.  He said that Artem has served as a "nominal owner" of businesses but took instructions from Ashot. Mr. Ananiev was the nominal owner of companies "at the disposal of Egiazaryan Ashot [sic]."  He generally describes passing money to, from and for Mr. Egiazaryan without documentation.  Exhibit 16, p. PZ000402.  Alexey Mironiuk also describes his involvement in what can only be described as laundering money and moving currency to, from and for Mr. Egiazaryan.  Exhibit 17, p. PZ0004112.

    C.    **PROSTITUTION FILMING STING**

Mr. Egiazaryan seeks to preclude testimony and Ashot's and Suren's use of prostitutes to bribe or blackmail Yuriy Skuratov, Prosecutor General of the Russian Federation, apparently because the press about it and the subjects are *too embarrassing*.  Mr. Egiazaryan's association publicly with something so scandalous is exactly why this discovery should be permitted, not why it should be precluded.

An article in Gazeta.Ru entitled "Criminal Case against Yuriy Skuratov Opened on Evidence provided by Call-Girls" reported that Suren and Ashot paid $100,000 for "meetings" between Skuratov and groups of call-girls in an apartment purchased by Ashot's bank for Suren Egiazaryan. Exhibit 6.  The article reported that criminal charges against Skuratov were in part based upon videotapes obtained because the apartment was equipped with bugs installed by the bank's security service.  The article reports that Ashot and Suren Egiazaryan "were investigated for criminal offenses and payment for the girls was a part of their payment for delay in investigation."

The information goes to Egiazaryan's defamability, the truth of statements about him and the intertwining of assets by the Egiazaryans.

    D.    **IMMIGRATION STATUS**

Mr. Egiazaryan has made his asylum application a central issue in the case and *he made his application public*. In the complaint, he claims that Mr. Zalmayev intended "to undermine [Mr. Egiazaryan's] ability to remain in the United States." ¶ 3.  He claims damage to "Mr. Egiazaryan's efforts to remain safely in the United States" and damages for the cost of

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 13 of 14

hiring "public relations professionals to fight [Mr. Zalmayev's] smear campaign." ¶ 89.iii.  The only way to defend against these applications is to obtain discovery about his asylum application to see whether and why it is delayed or denied, and whether anything Mr. Zalmayev may have done improperly affected the application.

Mr. Egiazaryan's contract with his public relations/lobbying firm BGR is exhibit 1 to my September 21 letter.  When BGR Public Relations President (who is named in the contract) was deposed, he said that BGR was retained by Mr. Egiazaryan *to assist him in his attempt to obtain asylum*.  Mr. Birnbaum said nothing about fighting a smear campaign.

> Q. And what were you told was the assignment?
>
> A. I was told that Ashot -- until – just until recently I did not really remember what his last name was, so I've always referred to him as Ashot, and I mean no disrespect but his last name.
>
> In any case, I was told that he was in Los Angeles seeking asylum in the United States, and that it was our job to assist him.

Jeffrey Birnbaum deposition, September 28, 2011, p. 66.

While 8 C.F.R. § 208.6 requires government officials to respect the confidentiality of the asylum process, such an obligation has no bearing on Mr. Zalmayev's public opposition to Mr. Egiazaryan's asylum application, which began with Mr. Egiazaryan's contact with AP reporter Birch.  Exhibit 4 to September 21 letter.  The point of the confidentiality is to restrict notice to the asylum seeker's home country and his/her enemies there.  Mr. Egiazaryan chose to broadcast his asylum intentions to the world and apparently agreed to pay BGR $924,000 to help him do it.

Honorable Gabriel W. Gorenstein
October 17, 2011
Page 14 of 14

      Since the asylum application is part of the claims and defenses it is discoverable. The regulations specifically except asylum information from the confidentiality provisions when asylum is part of "[t]he defense of any legal action of which the asylum application . . . is a part;" 8 C.F.R. § 208.6(c)(iv).

                                            Respectfully,

                                            */s/ James P. Golden*

                                            JAMES P. GOLDEN

JPG:st

cc:  Jonathan D. Lupkin, Esquire (by email to jlupkin@fzwz.com)
     Andrew J. Ryan, Esquire (by email to ar@salisburyryan.com)

<u>HAND DELIVERED</u>