UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____  :
                                :
ASHOT EGIAZARYAN                :
                                :
            v.                  :      No. 1:11-cv-02670 (PKC) (GWG)
                                :
PETER ZALMAYEV                  :
                                :
_____  :


**PETER ZALMAYEV'S MEMORANDUM IN OPPOSITION TO
ASHOT EGIAZARYAN'S MOTION FOR A PROTECTIVE ORDER**

TABLE OF CONTENTS

                                                                    Page

INTRODUCTION ............................................    1

ARGUMENT ................................................    5

I.    EGIAZARYAN'S REPUTATION, FACTS UNDERLYING HIS
      REPUTATION AND OTHER SIMILAR ACTS ARE DISCOVERABLE..    5

      A.    Egiazaryan's Claims Of Defamation Are Broad ....    5

      B.    Egiazaryan's Reputation Is Widespread And
            Exclusively Negative ...........................   10

      C.    Because Egiazaryan Will Challenge The Facts
            Underlying His Reputation, The Underlying
            Facts Are Discoverable .........................   15

      D.    Egiazaryan's Damage Claims Makes Discovery
            Into His Reputation And The Underlying Facts
            Relevant .......................................   16

      E.    Egiazaryan Concedes That Discovery is
            Permitted On Similar Acts ......................   17

      F.    The Discovery Is Relevant to Zalmayev's
            Counterclaim ...................................   21

II.   EGIAZARYAN'S IMMIGRATION STATUS IS RELEVANT AND
      DISCOVERABLE .........................................   26

      A.    The Court Has Ruled That Egiazaryan's
            Immigration Status is Relevant and
            Discoverable ...................................   26

      B.    Egiazaryan Has Put More Than His Asylum
            Application At Issue ...........................   28

III.  EGIAZARYAN'S BUSINESS AND FINANCE ACTIVITIES ARE
      RELEVANT AND DISCOVERABLE ............................   32

      A.    Egiazaryan's Financial Support Of The LDPR Is
            A Central Issue In The Case ....................   32

                                                            Page

        B.    The Court Decided on November 8 That
              Egiazaryan's Business and Financial Information
              Was Discoverable From Ashot Egiazaryan ........    33

CONCLUSION ..............................................    35

## TABLE OF CASES

CASES, STATUTES and RULES                    Page

CASES

Cardillo v. Doubleday & Co., 518 F.2d 638, 639 (2d.
Cir. 1975) ...............................................   8

Cerasani v. Sony Corp., 991 F. Supp. 343, 254
(S.D.N.Y. 1998) .........................................   8-9

Church of Scientology Int'l v. Behar, 238 F.3d 168,
176 n. 2 (2d Cir. 2001) .................................   20-21

Cowley v. Seattle Times Co., 2007 WL 241377 (Cal.
App. 3 Dist. Jan. 30, 2007) .............................   13

Gary Plastic Packing Corp. v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 756 F.2d 230, 236 (2d Cir.
1985). ..................................................   23

Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303
(2d Cir. 1986) ..........................................   8-9

Jewell v. NYP Holdings, Inc., 23 F. Supp. 2d 348, 393
(S.D.N.Y. 1998) .........................................   8, 21

Masson v. New Yorker Magazine, Inc., 501 U.S. 496
(1991) ..................................................   21

Mathias v. Jacobs, 167 F. Supp.2d 606, 622-628
(S.D.N.Y. 2001) .........................................   23

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Savino,
2007 WL 895767, at *12 n.4 (S.D.N.Y. Mar. 23, 2007) ...   10

Michtavi v. New York Daily News, 587 F.3d 551, 552
(2d Cir. 2009) ..........................................   13

November v. Time Inc., 13 N.Y.2d 175, 178-79, 244
N.Y.S.2d 309, 312 (1963) ................................   14

Sharon v. Time, Inc., 103 F.R.D. 86, 92, 95 (S.D.N.Y.
1984) ...................................................   17-20

<u>Sharon v. Time, Inc.</u>, 575 F. Supp. 1162 (S.D.N.Y. 1983). .............................................   18

<u>Stern v. Cosby</u>, 645 F. Supp. 2d 258, 270 (S.D.N.Y. 2009) ..........................................   8-10, 17

STATUTES

New York Civil Rights law §§ 70-a and 76-a ............   4, 21

8 C.F.R. § 208.6 .......................................   27

RULES

Fed. R. Evid. 403 .....................................   16

**INTRODUCTION**

The complaint begins with claims that Mr. Zalmayev harmed Mr. Egiazaryan, his family, and his business, caused risk of physical harm to him and his family and will prevent him from remaining in the United States.  ¶ 1-3, exhibit 1 to Mr. Lupkin's September 27 letter.  The complaint contains details of Mr. Egiazaryan's alleged activities and problems encountered in Russia and in the United States:  the international litigations; the "powerful Russian politicians and corrupt law enforcement officials" who allegedly took control of Mr. Egiazaryan's real estate project to rebuild the Moskva Hotel; the criminal charges against Mr. Egiazaryan; Mr. Egiazaryan's fall from political favor in Russia; his Duma positions; the death threats; and the alleged "smear campaign against Mr. Egiazaryan" which is part of a "Russian 'corporate raid'" by a Russian Senator, the Moscow Mayor, and a close confident of Russian Prime Minister Vladimir Putin.  ¶¶ 1, 2, 10, 12, 15.

Mr. Egiazaryan alleges that Mr. Zalmayev's "active Participation" in this

> black (i.e., negative) public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia,

was "believed" to have been "enlisted" by "Mr. Egiazaryan's litigation foes and the corrupt Russian authorities."  ¶ 18.

According to the complaint, "Mr. Zalmayev co-opted respected human rights advocates and organizations into the dirty tricks campaign against Mr. Egiazaryan." ¶ 20.  The allegedly "false, defamatory, and injurious statements" include those made by Mr. Egiazaryan in an article published in the Jewish Journal on March 9, 2011, and those allegedly induced by Mr. Zalmayev in letters from the "respected human rights advocates and organizations" who were "co-opted." ¶ 20.

Mr. Egiazaryan alleges that he is a private figure leading "a private life in the United States." ¶ 82.  He claims that "[h]e has not thrust himself into the public eye in any way." ¶ 82.  Yet, in the October 17, 2011, online edition of the *Wall Street Journal* Mr. Egiazaryan exercises the First Amendment rights he has as a guest in the United States in commentary in which he criticizes Vladimir Putin and declares that "Russia has never been as rich as today or as corrupt." Exhibit 4.  He is identified as a member of the Duma, Russia's lower house of parliament.

On August 5, 2011, after discussions about witness and counsel availability, Mr. Zalmayev scheduled Mr. Egiazaryan's deposition for October 3, 2011.  Exhibit 5.  Shortly after the deposition was scheduled, Mr. Egiazaryan's counsel advised that only Mark Zauderer could attend Mr. Egiazaryan's deposition and he was unavailable for the entire month of October.  As the end

2

of October approached Mr. Zalmayev's counsel made two or three
requests to depose Mr. Egiazaryan.  November 8, 2011, hearing pp.
19-20.  At the hearing Mr. Zalmayev's counsel asked the Court's
assistance in scheduling Mr. Egiazaryan's deposition.  P. 55.
The Court said to Mr. Lupkin:  "When can you make your client
available?"  P.55.  Mr. Lupkin replied with the "need" for the
motion addressed here.  These issues could have been raised
months ago, but making the motion now maximizes the delay Mr.
Egiazaryan seeks.

Mr. Egiazaryan does not want to be deposed.  All his
reasons for this may not be known until the end of the case, but
one reason is to delay or avoid the need to assert a criminal
investigation privilege.  In a 28 U.S.C. § 1782 application to
depose Mr. Egiazaryan in Denoro Investments Limited v. Ashot
Egiazaryan, U.S.D.C., Central District of California, No. 2:10-
CV-8583, at a November 12, 2010, hearing, Mr. Egiazaryan's
counsel advised of a Russian criminal investigation and Russia's
equivalent to our Fifth Amendment privilege.

> . . . And we have not yet closely examined what
> the potential allegations are, but I did want to
> put the Court and counsel on notice that Russia
> has a similar constitutional provision as our
> Fifth Amendment, and if this deposition were to
> go forward, we would have to closely examine the
> impact of what we have been informed in
> connection with this Russian — potential Russian
> proceeding or Russian proceeding and the
> questions that are being asked.

3

> And, again, this also goes back to the
> inability to unring the bell.  If he were forced
> to ask [sic] [probably answer] questions with the
> pending Russian criminal investigation, it would
> put him in a potential violation of his Article
> 54 rights.  Article 54[1] is the provision under
> Russian law which would allow him to claim what
> is a comparable privilege to the Fifth
> Amendment. . . .

November 12, 2010, transcript, p. 18.  Exhibit 8.  That

application was denied and Mr. Egiazaryan was not deposed.

It is not fair for any party, but especially a

plaintiff, to delay and obstruct his deposition.

Mr. Zalmayev has counterclaims for defamation and

under New York Civil Rights law §§ 70-a and 76-a, the anti-SLAPP

statute, based primarily on (1) the complaint's defamatory

content, and the loss of its judicial privilege when the

complaint was widely disseminated, and (2) the lawsuit's purpose

to inhibit Mr. Zalmayev and others from publicly opposing Mr.

Egiazaryan's application for asylum.

Most of the issues in Mr. Egiazaryan's motion were

addressed and decided, directly or indirectly, at the November

8, 2011, hearing.  Mr. Egiazaryan just repeats the arguments he

made about discovery directed to Artem and Suren, in which the

Court ruled that reputation subjects such as the prostitution

sting were discoverable, by arguing that Mr. Egiazaryan's

---

[1]   Article 51 of the Russian constitution contains the
testimonial privilege.

4

reputation in Russia is not relevant, and by again opposing discovery into asylum issues, and discovery of Mr. Egiazaryan's business affairs, on which the Court also ruled.

He even says in this motion that the discovery is burdensome, when all that is at issue now is Mr. Egiazaryan's deposition.

**ARGUMENT**

**I.   EGIAZARYAN'S REPUTATION, FACTS UNDERLYING HIS REPUTATION AND OTHER SIMILAR ACTS ARE DISCOVERABLE**

   **A.   Egiazaryan's Claims Of Defamation Are Broad**

This is a discovery motion, not a motion for summary judgment.  Mr. Egiazaryan's motion addresses at length the aspects of a defense in a defamation case sometimes called libel-proof and sometimes called incremental harm.  Mr. Egiazaryan incorrectly describes these defenses as "affirmative."  They are not affirmative defenses.  They are defenses.

Mr. Egiazaryan apparently wants to preclude all discovery into Mr. Egiazaryan's reputation, or at least is now describing the scope of the case much more narrowly than the 153-paragaph complaint.  Mr. Egiazaryan alleges he was defamed by Mr. Zalmayev's words that Mr. Egiazaryan is,

> . . . among other things: (1) anti-Semitic, (2) anti-American, (3) a leader of an ultra-nationalist party in Russia associated with anti-Semitism, anti-Americanism, Holocaust denial, and that blames the Jews for sparking the Russian

> revolution, World War II, and 9/11, (4) a
> significant contributor to a climate of
> ethnically-based intolerance and xenophobia in
> Russia (5) a human rights violator, and (6) a
> corrupt Russian legislator who has embezzled
> funds intended for war-torn Chechnya.

Complaint ¶ 2.

Contrary to his assertion, Mr. Egiazaryan's self executing disclosure does not limit the complaint. First, it is not a pleading. Second, it does not limit the claimed damages because it says "[p]laintiff is entitled to actual or special compensatory damages for financial loss suffered by Plaintiff," without categorical limitation. Exhibit 10 to Egiazaryan motion, p. 7, subsection (iii) b. Third, it reserves the right to *add* damage categories: "Plaintiff reserves the right to identify additional categories of damages and designate experts on such matters." Id.

Mr. Egiazaryan denies being anti-Semitic (¶¶ 36, 38, 46-48), denies being anti-American (¶ 36), denies being a member of the LDPR (¶¶ 37, 49, 57), denies being a friend of LDPR leader Mr. Zhirinovsky (¶ 39), denies supporting anti-Semitic policies or legislative proposals, denies ever having "made any anti-Semitic or anti-American statements or having taken anti-Semitic or anti-American positions in his personal life, his professional life, as a member of the Russian Duma or in any other capacity." ¶ 36. Mr. Egiazaryan denies that he committed theft, embezzlement or mismanagement of funds, and was defamed

by the assertions that he did, (complaint ¶ 56) and denies that he "embezzled or mismanaged funds from a parliamentary 'committee' meant to assist in Chechnya's reconstruction." ¶ 59.

Mr. Egiazaryan asserts that Zalmayev has "premised his improper efforts to seek wide-ranging discovery concerning irrelevant issues upon the so-called 'libel-proof' plaintiff doctrine." (Egiazaryan mem. at 4). First, Mr. Zalmayev has <u>not</u> singularly premised his discovery on the "libel-proof" plaintiff doctrine. Second, the discovery sought by Zalmayev is relevant to both the substantive claims and defenses and is well within the proper scope of permissible discovery under the Federal Rules.

Whether Egiazaryan is a libel-proof plaintiff, or whether he has been substantially harmed or only incrementally harmed is a proper matter for this Court to decide, as a matter of law, or something which should be decided after a trial. In any event, Mr. Zalmayev needs to take full discovery of the topics on which Egiazaryan resists discovery for those determinations to be made. Aside from the obvious fact that the discovery sought goes to proving the truth or falsity of the claimed defamatory statements, whether Mr. Zalmayev acted with or without actual malice, and whether Mr. Egiazaryan suffered damages as a result of anything done by Mr. Zalmayev, the libel-

proof plaintiff doctrine and the incremental harm doctrine
require this same discovery.

The incremental harm doctrine has "value . . . in
separating trivial complaints from those deserving judicial
attention, thereby protecting speakers from the use of the
courts purely for retribution or intimidation." Jewell v. NYP
Holdings, Inc., 23 F. Supp. 2d 348, 393 (S.D.N.Y. 1998).  In
Jewell, this Court described the incremental harm doctrine:

> The doctrine recognizes that if an article is
> both injurious and substantially true, its minor
> mistakes are themselves unlikely to result in
> substantial harm. [FN].  And it therefore helps
> protect against litigation designed to punish a
> speaker for stating harmful truths rather than to
> compensate the plaintiff for the insignificant
> falsehoods.

Jewell v. NYP Holdings, Inc., 23 F. Supp. 2d 348, 393 (S.D.N.Y.
1998) (footnote omitted).

"Whether a plaintiff is libel-proof is a question of
law for the Court to decide." Stern v. Cosby, 645 F. Supp. 2d
258, 270 (S.D.N.Y. 2009) (citing Guccione v. Hustler Magazine,
Inc., 800 F.2d 298, 303 (2d Cir. 1986) (holding that plaintiff
is libel-proof as a matter of law); Cardillo v. Doubleday & Co.,
518 F.2d 638, 639 (2d. Cir. 1975) (same); Cerasani v. Sony
Corp., 991 F. Supp. 343, 254 (S.D.N.Y. 1998) (same)).

Mr. Egiazaryan's briefing of the viability of the
libel-proof plaintiff doctrine and incorrect citing of numerous
cases impugning the viability and application of this doctrine

is misplaced in the context of Mr. Egiazaryan's motion for a
protective order.  The doctrine and whether Mr. Egiazaryan is, in
fact, libel-proof or whether, Mr. Egiazaryan has been
incrementally harmed, or whether Zalmayev simply stated non-
actionable and non-compensable "harmful truths" requires full
discovery at the outset.  This discovery is necessary for a
determination of libel-proof status, incremental harm, actual
malice, damages, reputation, credibility and to prove the truth.

   The "Second Circuit has held that 'a plaintiff's
reputation with respect to a specific subject may be so badly
tarnished that he cannot be further injured by allegedly false
statements on that subject." Cerasani v. Sony Corp., 991 F.
Supp. 343, 352 (S.D.N.Y. 1998) (citing authorities); Stern v.
Cosby, 645 F. Supp. 2d 258, 270 (S.D.N.Y. 2009).  "Under the
libel-proof plaintiff doctrine, if there is little or no harm to
a plaintiff's already low reputation, then the statements are
not actionable." Cerasani v. Sony Corp., 991 F. Supp. 343, 352
(S.D.N.Y. 1998) (citation omitted).

   Contrary to Mr. Egiazaryan's representations
(Egiazaryan mem. at 5), the Second Circuit has confirmed that
"the doctrine is not limited to plaintiffs with criminal
records." Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303
(2d Cir. 1986) (citation omitted); see also Cerasani v. Sony
Corp., 991 F. Supp. 343, 353 (S.D.N.Y. 1998) (citing authorities

for the proposition that "the doctrine is not limited to plaintiffs with criminal records"). Egiazaryan boldly asserts that:

> In fact the applicability of the doctrine is generally limited to situations involving plaintiffs who have an extensive record of criminal convictions.

(Egiazaryan mem. at 5). The law is well settled that the doctrine is not limited to plaintiffs with criminal records. Egiazaryan cites and partially quotes Stern, but omits the end of the quoted sentence relating to criminal convictions that concludes, "it is not limited to plaintiffs with criminal records." Stern, 645 F. Supp. 2d at 270. Egiazaryan also relies upon Merrill Lynch, Pierce, Fenner & Smith Inc. v. Savino, 2007 WL 895767, at *12 n.4 (S.D.N.Y. Mar. 23, 2007) (Preska, J.), a case decided under New Jersey law.

Mr. Egiazaryan's argument that discovery should be curtailed at the outset, before this Court and Mr. Zalmayev have access to the requisite information upon which a determination about the viability of the libel-proof plaintiff defense can be made is, simply put, backwards.

### B.   Egiazaryan's Reputation Is Widespread And Exclusively Negative

A November 23, 2009, article in the Washington Times, titled "Corruption drags down Russian economy," describes the Hotel Moscow/Moskva development project, which is the focus of

10

the complaint.  The article describes a business climate of widespread corruption and that in a suspicious way, control of the Hotel Moscow project was shifted to a group that included Mr. Egiazaryan.  "Among the main stakeholders was Ashot Yegiazaryan[2], a veteran banker and member of parliament suspected of having ties with criminal networks."  The article says that

> for the past two decades Mr. Yegiazaryan has
> colluded with Moscow government officials to
> secure properties illegally and development
> rights at a fraction of their real value.  In the
> early 1990s, Mr. Yegiazaryan founded Moscow
> National Bank, where, according to the Novaya
> Gazeta newspaper, a leading independent daily, he
> used high-level official contacts to divert tens
> of millions of dollars in state funds. It soon
> became one the largest banks in Russia. Mr.
> Egiazaryan departed as the bank's fortunes soured,
> and subsequently moved on to co-own Unikombank.
> Within several years, the bank declared
> bankruptcy. By then, he had also left that
> company.

The article quotes another journalist, who said that Mr. Egiazaryan "was always considered one of the most corrupt.  For sure, he was never a model businessman."  Exhibit 9.

Ashot's motion to preclude discovery about his reputation and the truth of his reputation is the same as his brothers' Artem and Suren's attempts to prevent discovery into the prostitution sting, which is the subject of at least one article, and probably a lot more.  Exhibit 12.

---

[2]     Sometimes Egiazaryan is spelled Yegiazaryan.

Mr. Egiazaryan sought to preclude questioning about Ashot's and Suren's use of prostitutes to bribe or blackmail Yuriy Skuratov, Prosecutor General of the Russian Federation, apparently because the press about it and the subjects are *too embarrassing*. Mr. Egiazaryan's association publicly with something so scandalous is exactly why this discovery should be permitted, not why it should be precluded. An article in Gazeta.Ru entitled "Criminal Case against Yuriy Skuratov Opened on Evidence provided by Call-Girls" reported that Suren and Ashot paid $100,000 for "meetings" between Skuratov and groups of call-girls in an apartment purchased by Ashot's bank for Suren Egiazaryan. Exhibit 12. The article reports that Ashot and Suren Egiazaryan "were investigated for criminal offenses and payment for the girls was a part of their payment for delay in investigation."

In an attempt to fish for yet another reason to preclude relevant discovery, Mr. Egiazaryan claims that his reputation in Russia is not relevant, notwithstanding that his reputation in Russia forms the basis for every allegation of defamation. Without this discovery, Zalmayev cannot defend the case. Egiazaryan cites three cases claiming that, "Courts have held that evidence concerning a plaintiff's reputation in a foreign community has no relevance to that plaintiff's reputation in the community where the defamatory statements were

published." (Egiazaryan mem. at 8).  For this, Egiazaryan cites

a non-published, non-citable California state court opinion

(Cowley v. Seattle Times Co., 2007 WL 241377 (Cal. App. 3 Dist.

Jan. 30, 2007).  Egiazaryan also relies on Michtavi v. New York

Daily News, 587 F.3d 551, 552 (2d Cir. 2009), a prisoner pro se

action against a newspaper in which the prisoner claimed that

the publisher's statement that the prisoner planned to cooperate

with the government was defamatory.  In affirming the district

court's holding that the statement was not defamatory, the court

stated:

> The newspapers may not have been addressed
> specifically to the prison population, but that
> is clearly the group whose good opinion matters
> to Michtavi [the plaintiff].  However, "the fact
> that a communication tends to prejudice another
> in the eyes of even a substantial group is not
> enough [to make the statement defamatory] if the
> group is one whose standards are so anti-social
> that it is not proper for the courts to recognize
> them.

Michtavi obviously does not stand for the proposition noted by

Egiazaryan and certainly has nothing to do with whether

discovery of Egiazaryan's reputation in Russia should be

permitted, especially because his reputation is Russia is the

very subject of the allegedly defamatory statements.

      Mr. Egiazaryan's self-executing disclosure

contemplates materials from his Russian and international life.

He intends to support his claim with documents referenced in his

complaint, documents relating to the "corporate raid" he

describes in his complaint, documents relating to violence and intimidation against him, documents relating to his role in the Duma.  Egiazaryan self-executing disclosure, p. 6, subsection (ii), exhibit 10 to Egiazaryan motion.

Mr. Egiazaryan also cites November v. Time Inc., 13 N.Y.2d 175, 178-79, 244 N.Y.S.2d 309, 312 (1963), which similarly has no application to the argument that "plaintiff's reputation in a foreign community" has no relevance to "plaintiff's reputation in the community where the defamatory statements were published." (Egiazaryan mem. at 8).  In November, Sports Illustrated published a story that was capable of defamatory meaning, but nothing is said about discovery of reputational evidence of the plaintiff.

Mr. Egiazaryan's assertion that, "[i]t is undisputed that the target audience of Mr. Zalmayev's black public relations campaign is Jewish residents of the United States" (Egiazaryan mem. at 9) is offensive and insulting, and is untrue.  Aside from the disputed fact that Mr. Zalmayev engaged in the alleged "black public relations campaign" the issue about which Mr. Zalmayev expressed concern and wrote about-—when proven to be true-—would be of serious concern to all citizens around the world, regardless of whether they are Jewish or reside in the United States.

Mr. Egiazaryan conflates discovery of his reputation in Russia with the so-called "target audience" of "Mr. Zalmayev's [alleged] black public relations campaign." (Egiazaryan mem. at 9). Mr. Egiazaryan asserts that:

> Since Russia is not the target audience, any alleged reputation of Mr. Egiazaryan in Russia on which Mr. Zalmayev may seek discovery is irrelevant. Put differently, Mr. Egiazaryan's reputation in Russia has no bearing upon whether Mr. Zalmayev has injured plaintiff's reputation in the United States by labeling him a virulent anti-Semite, Russo-centric xenophobe, embezzler and war criminal.

(Egiazaryan mem. at 8).

In this case, discovery of these issues goes to the heart of the defamation claim, it would be impossible to litigate the case without this information. Egiazaryan's argument, and the case law cited within this argument, make no sense.

**C.   Because Egiazaryan Will Challenge The Facts Underlying His Reputation, The Underlying Facts Are Discoverable**

The issue of discoverability about Mr. Egiazaryan's reputation has been addressed and the reputation, without geographic limitation, is discoverable. This was addressed at the November 8, 2011, hearing, pp. 23-27, exhibit 7. Because Mr. Egiazaryan refused to "concede that the truth or falsity of whether this scandal occurred will not be raised by you at trial" (p. 26) Mr. Zalmayev "can ask about it." P. 27.

Mr. Egiazaryan's motion is the same.  Mr. Egiazaryan's reputation is relevant.  Because Mr. Egiazaryan intends to dispute his reputation by challenging the underlying facts, Mr. Zalmayev has to be able to do discovery about the underlying facts.  Issues of admissibility for trial, such as Fed. R. Evid. 403, have to be decided at trial and should not be used to limit discovery.  The Court ruled on the issue of discoverability of the underlying facts of Mr. Egiazaryan's reputation.  The Court said to Mr. Lupkin:

> If you are ready at a future time to say that you will not raise the truth or . . . [falsity] of this issue under any circumstances in the future in defense of summary judgment or trial, then I'm willing to grant you the application to not question that.

November 8, 2011, hearing, p. 27, exhibit 7.

### D. Egiazaryan's Damage Claims Makes Discovery Into His Reputation And The Underlying Facts Relevant

Mr. Egiazaryan claims that Mr. Zalmayev's words will damage Mr. Egiazaryan's "name, credibility and reputation, sabotage his investment and undermine his ability to remain in the United States."  Complaint ¶ 3.  He claims damages for

    i.   damage to his reputation.

    ii.  damage to his peace-of-mind and well-being.

    iii. damages to effort to remain in the United States, and to recover money spent for "attorneys,

16

consults and public relations professionals to
fight [Mr. Zalmayev's] smear campaign.

iv.  damage to Mr. Egiazaryan's ability "to conduct
his affairs in the United States," which
apparently, based on other allegations in the
complaint, refers to *business* affairs.

Complaint, ¶89 i — iv.  This was elaborated by counsel, who said
the damages included Mr. Egiazaryan's [in]ability to do
business.  November 8, 2011, hearing, p. 7, exhibit 7.

Discovery has to include all aspects of Mr.
Egiazaryan's reputation, his business, his ability to remain in
the United States and all the people, other than Mr. Zalmayev,
who might "damage his peace-of-mind and well-being."

**E.  Egiazaryan Concedes That Discovery is Permitted On
Similar Acts**

Mr. Egiazaryan's argument for the limitation of
discovery is premised upon the incorrect assertion that the
discovery should be precluded because "the defendant attempts to
rely on evidence of prior events or the plaintiff's reputation
with respect to subject matters that are different in kind to
the events or subjects described in the complaint." (Egiazaryan
mem. 5, 7).  Egiazaryan relies upon <u>Sharon v. Time, Inc.</u>, 103
F.R.D. 86, 92, 95 (S.D.N.Y. 1984) and <u>Stern v. Cosby</u>, 645 F.
Supp. 2d 258, 269-70 (S.D.N.Y. 2009) (Chin, J.), among others,
to support his motion for protective order.  These cases actually

17

support Zalmayev's opposition to Egiazaryan's motion and support
disclosure of the information.

      In <u>Sharon v. Time, Inc</u>., 103 F.R.D. 86 (S.D.N.Y. 1984),
in permitting certain discovery and limiting other, the court
had already held that the libel-proof plaintiff doctrine did not
support dismissing the complaint at the outset. <u>Id</u>. at 89
(citing <u>Sharon v. Time, Inc.</u>, 575 F. Supp. 1162 (S.D.N.Y.
1983)). <u>Sharon</u> stands for the proposition that discovery is
permitted regardless of whether the plaintiff is libel-proof
where, as here, the discovery relates to acts "similar in kind"
to the events described in the complaint. In <u>Sharon v. Time,
Inc</u>., 103 F.R.D. 86 (S.D.N.Y. 1984), General Ariel Sharon sued
Time, Inc., charging that the magazine libeled him for
suggesting that General Sharon "knowingly participated in the
slaughter of civilians condemned by international law." <u>Id</u>. at
92. The court permitted discovery, <u>inter alia</u>, "into his
finances to the extent necessary to know the basis for his
[damage] claim." <u>Id</u>. at 90. This discovery included discovery
into General Sharon's stature and reputation related to the
damage issue and the issue of malice. Discovery was also
permitted on the impact on his reputation of media coverage of
his involvement at the locations described. Discovery related to
"other acts" was also permitted to "shed relevant light on

Time's lack of actual malice, or on the question of damages

. . . ." Id. at 90.

> Evidence concerning General Sharon's alleged
> record of "vicious brutality toward Arab
> civilians," Defendant's Statement at 1, is
> properly discoverable to the extent that it
> concerns incidents similar in kind to the events
> which occurred at Sabra and Shatilla [the
> locations described]. The requirement that these
> events be similar places a significant limit on
> the scope of defendant's inquiry. This case is
> not a trial of General Ariel Sharon's character
> or of his military career.

Id. at 92. The court in Sharon explained that, "TIME will be

given an opportunity after discovery to make offers of proof

that demonstrate the requisite level of similarity and probative

worth" Id. at 93 (emphasis added). According to the court:

> Evidence of plaintiff's alleged past misconduct
> will generally be admissible, however, on the
> issue of defendant's malice, if the requisite
> foundation for such evidence is laid."

Id. at 93.

Through discovery, Mr. Zalmayev will prove that

negative information exists about Egiazaryan and that this

negative conduct is fundamentally the same as--not different

than--the conduct that is the subject of Mr. Egiazaryan's

defamation claim against Mr. Zalmayev. This discovery is

crucial to Mr. Zalmayev's proof that nothing Mr. Zalmayev wrote

or said caused Mr. Egiazaryan harm, and that he acted without

malice—that is, there was enough in existence reported about Mr.

Egiazaryan that Mr. Zalmayev acted reasonably in writing what he

did, even if what he wrote is not true.  To issue a protective order would be prejudicial to Mr. Zalmayev's defense of the complaint and prosecution of the counterclaim.

Mr. Egiazaryan argues that that "the viability of the libel-proof plaintiff doctrine defense is dubious" (Egiazaryan mem. at 4) in an attempt to shelter Egiazaryan from Zalmayev's discovery of the very subjects about which he has brought a defamation action against Zalmayev.  As Judge Gorenstein accurately noted:

> This is a case about your client wanting money .
> . . . It's about him getting money.  That's fine.
> He has the right to do that, but sometimes
> there's a price for that and the price for that
> is that one has to open up one's life.  It doesn't
> just happen in this situation.  It happens in all
> kinds of other situations.

(Exhibit 7 at p. 50).

With the exception of Sharon v. Time, Inc., 103 F.R.D. 86 (S.D.N.Y. 1984), which actually supports Zalmayev's requested discovery, the cases relied upon by Mr. Egiazaryan have no bearing on whether Zalmayev may properly take discovery of the issues sought to be protected.  Mr. Egiazaryan cites Church of Scientology Int'l v. Behar, 238 F.3d 168, 176 n. 2 (2d Cir. 2001), claiming that that case stands for the proposition that "'continued viability' of the libel-proof plaintiff doctrine is an open question." (Egiazaryan mem. at 4).  Church of Scientology Int'l does not even involve the libel-proof

20

plaintiff doctrine.  The court states in a footnote, "[b]ecause
that doctrine is not before us, we take no position on its
continued viability after Masson."  Id. at 176 n.2 (citing Masson
v. New Yorker Magazine, Inc., 501 U.S. 496 (1991)).

      In Masson, the Supreme Court held that "the
'incremental harm' doctrine is not a creature of federal
constitutional law." Church of Scientology Int'l, 238 F.3d at
175-176.  In Church of Scientology Int'l, the court "also note[d]
that both the incremental harm and subsidiary meaning doctrines
are distinct from the 'libel-proof-plaintiff' doctrine." Church
of Scientology Int'l, 238 F.3d at 176 n2.

      Jewell v. NYP Holdings, Inc., 23 F. Supp. 2d 348, 390
n.29 (S.D.N.Y. 1998) (Preska, J.) is similarly not a libel-proof
plaintiff case, and holds that, after Masson, "that New York
Court's *would* adopt the [incremental harm] doctrine." Id. at
391 (emphasis added).

    **F.**   **The Discovery Is Relevant to Zalmayev's Counterclaims**

      Mr. Zalmayev filed two counterclaims, one for libel
and slander and one for breach of New York Civil Rights Law
§§ 70-a and 76-a, the anti-SLAPP statute, because the
complaint's contents are defamatory and the complaint lost is
judicial privilege when it was widely disseminated, and because
the complaint was brought for the purpose of inhibiting Mr.
Zalmayev and others from publicly opposing Mr. Egiazaryan's

asylum application.  Mr. Zalmayev needs to question Mr.
Egiazaryan about the defamatory allegations of the complaint.

The complaint says Mr. Zalmayev "is a central figure
in the smear campaign" (¶ 5) and actively participated (¶ 18) in
the conspiracy to commit theft, force Egiazaryan to return to
Russian where "he and his family may well be physically
assaulted or even killed," (¶ 99), and which included murder.
¶ 17.

The memorandum of law in support of Mr. Egiazaryan's
motion to compel discovery from Greg Hitt and Public Strategies
(the recipient of Mr. Egiazaryan's subpoenas) states:

> It is well settled that the scope of a Rule 45
> subpoena is informed by Rule 26, which governs
> civil discovery generally. *E.g., Coleman v.
> District of Columbia,* 275 F.R.D. 33, 36 (D.D.C.
> 2011); *Rendon Group, Inc. v. Rigsby*, 268 F.R.D.
> 124, 126 (D.D.C. 2010) ("Rule 26 of the Federal
> Rules of Civil Procedure defines and governs the
> scope of discovery for all discovery devices,
> and, therefore, Rule 45 must be read in light of
> it."). Rule 26(b)(1) provides that "Parties may
> obtain discovery regarding any nonprivileged
> matter that is relevant to any party's claim or
> defense...." Fed. R. Civ. P. 26(b)(1). <u>Therefore,
> federal courts recognize that the "scope of
> discovery in civil actions is broad [and the]
> term relevance at the discovery stage is [to be]
> broadly construed.</u>" *Convertino v. U.S. Dep't of
> Justice*, 565 F. Supp. 2d 10, 12 (D.D.C. 2008).

Mr. Egiazaryan's memorandum, p. 8 (emphasis added).

The United States Court of Appeals for the Second
Circuit similarly permits broad discovery:

> Discovery serves important purposes, such as avoiding surprise, fully disclosing the nature and scope of the controversy, narrowing, simplifying, and framing the issues involved, and enabling the parties to obtain the factual information needed to prepare for trial. 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2001 (1970). Rules governing discovery should be interpreted broadly to achieve those purposes. *See, e.g., Schlesinger Investment Partnership v. Fluor Corp.*, 671 F.2d 739, 742 (2d Cir. 1982) ("The Federal Rules evince a liberal policy with regard to discovery in order to allow litigants to secure helpful evidence from the hands of their adversaries").

Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2d Cir. 1985); Mathias v. Jacobs, 167 F. Supp.2d 606, 622-628 (S.D.N.Y. 2001) (Marrero, J.).

In Mathias v. Jacobs, 167 F. Supp.2d 606, (S.D.N.Y. 2001) (Marrero, J.), the district court vacated a magistrate's order imposing sanctions in connection with defense counsel's depositions of witnesses, holding that the magistrate's limitations and sanctions were improper. In Mathias, the magistrate "characterized three categories of questions posed by [defendant's] attorneys as improper and designed exclusively "to embarrass the witness." Id. at 622. "These included inquiries about financial contributions to [the witness's] election campaigns in the 1970's, a disgraced former business associate of [the witness's] wife, and allegations that [the witness] improperly exerted his political influence in the awarding of a

23

government contract." <u>Id</u>.  Judge Marrero ruled that "[t]he
questions were within the parameters of accepted discovery
practice . . . ." <u>Id</u>. at 627 (emphasis added).

The magistrate had precluded questioning abut a
witness's "campaign financing, his political influence, and his
wife's business associate convicted of fraud." <u>Id</u>. at 626-627.
The disputed questioning for another witness involved business
relationships.  The discovery approved by the district court
related to defenses of duress and improper contacts, and so
involved questioning about which witnesses had interests in
companies, attended meetings, were aware of conversations or
threats, use of political influence, contacts among individuals
and companies, and other matters *not directly* related to the
restrictive covenant in the contract at issue.

The court noted that it was particularly inappropriate
to limit deposition questioning in advance because:

> The taking of a deposition assumes a rhythm and
> character that informs an attorney's decision
> about what questions to pose.  The quality of a
> deponent's memory, his degree of cooperation, and
> the substance of responses to questions already
> posed help dictate what will be asked.  During the
> course of his deposition [the witness] claimed
> that his memory failed him in response to several
> questions.  This memory loss may have convinced
> [the questioning lawyers] that [the witness]
> would not be capable of providing probative
> information on other relevant subjects.  Such a
> conclusion is not without a reasonable basis.

Id. at 625.  The district court found the discovery proper to obtain impeachment evidence *if* the witnesses testified at trial. The court said that that defense counsel's

> argument that he was merely seeking impeachment
> material in the event that [the witness] was
> called to testify at trial as a hostile witness
> is credible and an appropriate use of deposition
> discovery.

Id. at 628.  Mr. Egiazaryan will testify at trial.

Respecting point one of Mr. Egiazaryan's motion, counsel intends to question Mr. Egiazaryan about[3]:

1.   The allegations of the complaint.

2.   The alleged defamatory statements.

3.   Mr. Egiazaryan's reputation regarding the
     subjects of the alleged defamation, his
     reputation as suggested by published or public
     materials, and the truth or falsity of his
     reputation.

4.   Damage to his reputation.

5.   Subjects that follow Mr. Egiazaryan's answers.

These topics are relevant, discoverable and were the subjects of the Court's rulings and guidance at the November 8, 2011, hearing.

---

[3]    Mr. Zalmayev's counsel does not intend to limit questioning to the subjects listed in this brief.  The three lists in this brief are to identify areas of questioning as to the three points in Mr. Egiazaryan's motion.

## II.  EGIAZARYAN'S IMMIGRATION STATUS IS RELEVANT AND DISCOVERABLE

### A.  The Court Has Ruled That Egiazaryan's Immigration Status is Relevant and Discoverable

Mr. Egiazaryan contends that Mr. Zalmayev actively participated in a conspiracy to "discredit him, undermine his chances of remaining in the United States and force him to return to Russia." Complaint ¶ 18.

Despite the Court's ruling on this subject, Mr. Egiazaryan again says that

> Mr. Zalmayev has not and cannot make a showing as to the relevance of Mr. Egiazaryan's overall immigration status on the claims and defenses in this matter.

Egiazaryan mem., p. 14.

Mr. Egiazaryan has made his asylum application a central issue in the case and *he made his application public*. In the complaint, he claims that Mr. Zalmayev intended "to undermine [Mr. Egiazaryan's] ability to remain in the United States." ¶ 3. He claims damage to "Mr. Egiazaryan's efforts to remain safely in the United States" and damages for the cost of hiring "public relations professionals to fight [Mr. Zalmayev's] smear campaign." ¶ 89.iii. The only way to defend against these applications is to obtain discovery about his asylum application to see whether and why it is delayed or denied, and whether anything Mr. Zalmayev may have done improperly affected the application.

26

Mr. Egiazaryan's contract with his public relations/lobbying firm BGR is exhibit 6.  When BGR Public Relations President (who is named in the contract) was deposed, he said that BGR was retained by Mr. Egiazaryan *to assist him in his attempt to obtain asylum*.  Mr. Birnbaum said nothing about fighting a smear campaign.

> Q.   And what were you told was the assignment?
>
> A.   I was told that Ashot -- until — just until recently I did not really remember what his last name was, so I've always referred to him as Ashot, and I mean no disrespect but his last name.
>
> In any case, I was told that he was in Los Angeles seeking asylum in the United States, and that it was our job to assist him.

Jeffrey Birnbaum deposition, September 28, 2011, p. 66.

While 8 C.F.R. § 208.6 requires *government officials* to respect the confidentiality of the asylum process, such an obligation has no bearing on Mr. Zalmayev's public opposition to Mr. Egiazaryan's asylum application, which began with Mr. Egiazaryan's contact with Associated Press reporter Birch.  The point of the confidentiality is to restrict notice to the asylum seeker's home country and his/her enemies there.  Mr. Egiazaryan chose to broadcast his asylum intentions to the world and apparently agreed to pay BGR $924,000 to help him do it.  Exhibit 6.

**B.    Egiazaryan Has Put More Than His Asylum Application At Issue**

Associated Press reporter Douglas Birch wrote on February 6, 2011, that he met with Mr. Egiazaryan, who was "flanked by lawyers," and that Mr. Egiazaryan said that "he is considering seeking asylum in the U.S." Exhibit 1.  On March 9, 2011, Birch wrote again about Mr. Egiazaryan, though he does not say whether Mr. Egiazaryan was "flanked by lawyers" when they met.  He wrote that Mr. Egiazaryan "denounced a vote in Russia's parliament authorizing his arrest in a $65 million fraud and embezzlement case."  Birch reported again that Mr. Egiazaryan had "told the Associated Press that he is considering asylum in the U.S."  Exhibit 2.  Regarding Mr. Egiazaryan's denial of affiliation with LDPR and LDPR's leader Zhirinovsky, Birch, who met with Mr. Egiazaryan and his lawyers, wrote:

> Egiazaryan is a member of the Duma faction of the ultranationalist Liberal Democratic Party of Russia.  RIA Novosti reported that the party's flamboyant leader, Vladimir Zhirinovski denounced [the Duma vote authorizing Egiazaryan's arrest].

Exhibit 2.

Birch wrote about Mr. Egiazaryan a third time, on May 27, 2011.  Exhibit 3.  Birch wrote that Egiazaryan had told him that Egiazaryan was considering asylum, that Egiazaryan is "fighting to remain in the United States despite a request by Interpol to have him arrested and deported," and that the Russian Embassy had provided "documents to the U.S. seeking

28

Egiazaryan's extradition."  Exhibit 3.  He also wrote about this lawsuit, apparently having received the complaint from Mr. Egiazaryan's agents.

On October 17, 2011, Mr. Egiazaryan was the author of commentary in the Wall Street Journal online edition.  Exhibit 4. His commentary concluded by indirectly describing his immigration status:

> Mr. Egiazaryan is a member of Russia's outgoing
> State Duma and is currently living in the United
> States out of fear for his personal safety.

One does not have to be an immigration lawyer to know that a tourist cannot stay in the United States permanently, nor can an alien with a work visa. Mr. Egiazaryan does not even imply that he is here on a work visa.  The article includes five pages of comments that tend to show the Mr. Egiazaryan's reputation for corruption is widely known.

Discovery of the immigration and asylum issue was addressed at length on November 8, 2011, with the Court ordering the production of Mr. Egiazaryan's asylum materials on an attorney's eyes only limitation, with a prohibition against questioning Mr. Egiazaryan about the "contents of the [asylum] documents itself without coming to me first to figure out how we're going to do it."  P. 51, exhibit 7.

This limitation is not ripe now because the asylum materials have not been produced, as recognized at the November

8, 2011, hearing.  P. 55, exhibit 7.  In four published articles,
however, all of which included contact with or were written by
Mr. Egiazaryan, his immigration status and asylum is addressed.
Exhibits 1, 2, 3, and 4.  Mr. Lupkin made it clear that the
damage claim related to Mr. Egiazaryan's immigration status
exists.  He said:

> MR. LUPKIN:   . . . in light of the Court's
> ruling on the asylum application to the extent
> that it exists assuming that the stay — assuming
> that Judge Castel affirms, Your Honor, we would
> like the opportunity to withdraw the limitation
> placed on damages since the whole great
> [unintelligible] of that limitation was to avoid
> the production of any hypothetical asylum
> application.
>
> THE COURT:    I think you can consider it
> withdrawn right now because I was taking you down
> a road to avoid having it produced at all, so I
> consider it withdrawn.

November 8, 2011, hearing, p. 57, exhibit 7 (emphasis added).

The asylum application is relevant to Mr. Egiazaryan's
damage claim for public relations expenses, which Mr. Zalmayev
contends, based on Mr. Birnbaum's statement, were not to combat
Mr. Zalmayev's "defamation," but were to help Mr. Egiazaryan get
asylum.  November 8, 2011, hearing, p. 41, exhibit 7.  The
application is relevant to Mr. Egiazaryan's credibility.  P. 42.
The Court said:

> Well, there's nothing like a plaintiff's own
> statements about [what] his actions were made
> under oath and in a situation that he's
> personally involved in, there's nothing can beat

that so I don't think there's any other sources
can substitute for this.

November 8, 2011, hearing, p. 52, exhibit 7.

Regarding Mr. Egiazaryan's immigration status, counsel

intends to address the following subjects at his deposition:

1.   Allegations in the complaint about Mr.
     Egiazaryan's ability to remain in the United
     States.

2.   Contents of the four articles (exhibits 1, 2, 3,
     4).

3.   His expenses in obtaining asylum or permanent
     United States residence.

4.   What his consultants have done for him to obtain
     asylum or permanent residence in the United
     States.

5.   Why he wants asylum or permanent residence in the
     United States.

6.   Why he thinks he deserves asylum or permanent
     residence in the United States.

7.   What are the obstacles to his asylum or permanent
     residence in the United States.

8.   Who opposes his asylum or permanent residence in
     the United States.

9.   Damages alleged caused by Mr. Zalmayev if Mr.
     Egiazaryan does not obtain asylum or permanent
     residence in the United States.

10.  The timing and status of his attempt to obtain
     asylum or permanent residence in the United
     States.

11.  What application for permanent or other residence
     (other than asylum) he has made, who worked on
     the application and what its contents are.

31

12. Whether he applied for asylum, and if so, who worked on the application, and what was the preparation process, such as Mr. Egiazaryan's contribution to its contents and his review and verification of it, whether he made oral or written statements under oath, for the purpose of laying a foundation for questioning him at trial about the contents of the asylum materials.

13. Subjects that follow Mr. Egiazaryan's answers.

These topics are relevant, discoverable and were the subjects of the Court's rulings and guidance at the November 8, 2011, hearing.

## III. EGIAZARYAN'S BUSINESS AND FINANCE ACTIVITIES ARE RELEVANT AND DISCOVERABLE

### A. Egiazaryan's Financial Support Of The LDPR Is A Central Issue In The Case

Mr. Egiazaryan alleges "Zalmayev's active participation" in a conspiracy to steal hundreds of millions of dollars from him, (¶ 10), to force him to return to Russia to face "trumped-up criminal charges," (¶ 99), and which included a "'gangland' style" murder. (¶ 17). As described above, he claims damages to business activities. Most important, he claims he never financially supported the LDPR.

Intending to prove this claim, Mr. Egiazaryan identifies the following categories of documents it will use to support its claims.

a. Documents . . . referenced in Plaintiff's complaint;

b. Documents relating to the Russian "corporate raid" instituted against Plaintiff;

32

       c.    Documents relating to acts of violence, intimidation and disinformation against Plaintiff;

       d.    Documents relating to Plaintiff's role in the Russian Duma; and

       e.    Documents relating to damages suffered by Plaintiff.

Mr. Egiazaryan's self-executing disclosure, p. 6, subsection (ii), exhibit 10 to Egiazaryan motion.  Mr. Egiazaryan has made far-reaching allegations (reaching literally to Russia) and has identified vast categories of relevant documents for *his* proof and discovery.

The central issue in the case is Mr. Egiazaryan's financial support of the repellant political party LDPR (¶¶ 2, 28), which he denies.  Mr. Zalmayev has shown preliminarily with a statement by Dmitri Garkusha that Mr. Egiazaryan financially supported the LDPR, at least sometimes with currency.  The English translation of the statement is attached as exhibit 10. We have shown preliminarily that Mr. Egiazaryan hides his financial transactions in a web of companies with the help of others.  Gloriozov declaration, exhibit 11.

**B.**    **The Court Decided on November 8 That Egiazaryan's Business and Financial Information Was Discoverable From Ashot Egiazaryan**

So long as Mr. Egiazaryan continues to deny his support of the LDPR and fails to credibly provide discovery showing his payments, the only alternative is for Mr. Zalmayev

to get all his financial records to prove his payments to LDPR. This was addressed at the November 8 hearing, where Mr. Zalmayev's counsel followed the Court's suggestion to depose Ashot *before* Artem and Suren so he could determine whether Ashot's testimony and records provided the information necessary for Mr. Zalmayev's defense and counterclaim.  November 8, 2011, hearing, pp. 15-20, exhibit 7.  Artem and Suren discovery will be "raised again once you [Mr. Zalmayev] have more information about the actual plaintiff's financial records."  P. 21, exhibit 7.  Having delayed Artem and Suren's deposition by the focus returning to Ashot, now Mr. Egiazaryan is attempting to obstruct Ashot's deposition, where Mr. Zalmayev intends to get "more information about the actual plaintiff's financial records," as directed by the Court.  Id.

Respecting point three of Mr. Egiazaryan's motion, counsel intends to question Mr. Egiazaryan about:

1.   The allegations of the complaint.

2.   The alleged defamatory statements.

3.   Financing and support of the LDPR.

4.   Mr. Egiazaryan's use of others to hide his involvement in business activities, including the support of the LDPR.

5.   Mr. Egiazaryan's reputation regarding the subjects of the alleged defamation, his reputation as suggested by published or public materials, and the truth or falsity of his reputation.

34

6.   Mr. Egiazaryan's reputation as a businessman and the truth or falsity of his reputation.

7.   Damage to his ability to do business.

8.   The business activities described in the complaint.

9.   Subjects that follow Mr. Egiazaryan's answers.

These topics are relevant, discoverable and were the subjects of the Court's rulings and guidance at the November 8, 2011, hearing.

**CONCLUSION**

Mr. Egiazaryan's motion for a protective order should be denied.  Mr. Egiazaryan should be ordered to provide within 10 days a date for his deposition, which should occur before January 13, 2010.

Respectfully submitted


/s/ Andrew J. Ryan
Andrew J. Ryan
Matthew P. Feser
SALISBURY & RYAN
1325 Avenue of the Americas,
7th Floor
New York, NY  10019
212-977-4660 (O)
212-977-4668 (fax)
ar@salisburyryan.com
mf@salisburyryan.com

/s/ James P. Golden
_____
James P. Golden (Pro Hac)
Thomas B. Roberts (TR5233)
HAMBURG & GOLDEN, P.C.
1601 Market Street, Ste. 3310
Philadelphia, PA  19103
215-255-8590 (O)
215-255-8583 (fax)
goldenjp@hamburg-golden.com
robertstb@hamburg-golden.com

Attorneys for defendant-
counterclaim plaintiff
Peter Zalmayev

Dated:  November 22, 2011

**EXHIBITS**

1.   February 6, 2011, Washington Post article.

2.   March 9, 2011, Washington Post article.

3.   May 27, 2011, Washington Post article.

4.   Wall Street Journal commentary, October 17, 2011.

5.   Ashot Egiazaryan deposition notice.

6.   Egiazaryan/Gibson Dunn public relations lobbying contract
     with BGR.

7.   November 8, 2011, hearing transcript.

8.   California § 1782 proceeding transcript, November 12, 2010.

9.   November 23, 2009, Washington Times article.

10.  Dimitri Vladimirovich Garkusha statement.

11.  Andrey Gloriozov declaration and exhibits.

12.  Prostitution sting article February 4, 1999.