**EXHIBIT 7**

```
1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    ASHOT EGIAZARYAN,                  :
                                        :   11-CV-02670 (GWG)
5                       Plaintiff,      :
                                        :   500 Pearl Street
6                 v.                    :   New York, New York
                                        :
7    PETER ZALMAYEV,                    :
                                        :   November 8, 2011
8                    Defendant.         :
     ------------------------------------X
9
           TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
10         BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
                  UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
13   For the Plaintiff:          JONATHAN DANIEL LUPKIN, ESQ.
                                 JASON TODD COHEN, ESQ.
14                               Flemming Zulack Williamson
                                    Zauderer, LLP
15                               One Liberty Plaza
                                 New York, New York  10006
16
                                 SANFORD M. SAUNDERS, ES.
17                               Greenberg Traurig
                                 2101 L Street NW
18                               Washington, D.C.  20037

19   For the Defendant:          JAMES P. GOLDEN, ESQ.
                                 Hamburg & Golden, P.C.
20                               1601 Market Street
                                 Suite 3310
21                               Philadelphia, Pennsylvania  19103

22                               ANDREW RYAN, ESQ.
                                 Salisbury & Ryan, LLP
23                               1325 Avenue of the Americas
                                 New York, New York  10019
24
     Court Transcriber:          RUTH ANN HAGER
25                               TypeWrite Word Processing Service
                                 211 N. Milton Road
                                 Saratoga Springs, New York  12866


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1          THE COURT:  The case of <u>Egiazaryan v. Zalmayev</u>,

2     docket 11-CV-2670.

3          Counsel, please state your names for the record.

4          MR. LUPKIN:  It's Jonathan Lupkin from the firm of

5     Flemming, Zulack, Williamson, Zauderer, LLP, on behalf of Ashot

6     Egiazaryan.

7          MR. COHEN:  Jason Cohen also from Flemming, Zulack,

8     Williamson, Zauderer, also on behalf of plaintiff Ashot

9     Egiazaryan.

10         MR. SAUNDERS:  Sanford Saunders from Greenberg

11    Traurig on behalf of Ashot Egiazaryan.

12         MR. LUPKIN:  I would note just before we begin that

13    Mr. Saunders, who is immigration counsel for Mr. Egiazaryan, is

14    not admitted in the Southern District of New York but under the

15    circumstances, since he is going to be addressing immigration

16    issues, we would ask the Court's indulgence and permit him to

17    sit at counsel's table with us.

18         THE COURT:  That's fine.

19         MR. LUPKIN:  Thank you.

20         MR. GOLDEN:  James Golden from Hamburg & Golden

21    representing the defendant Peter Zalmayev.

22         MR. RYAN:  Andrew Ryan, Salisbury & Ryan representing

23    Peter Zalmayev, defendant.

24         THE COURT:  Okay.  You can be seated if you're not

25    addressing the Court.  You know, those curtains are open so

3

1   that, you know -- if you can close that.  Are you any of you in

2   the sun?  Normally we don't have the curtains open like this.

3   The sun happens to be coming in very directly right now.  Are

4   you folks --

5            MR. LUPKIN:  We're okay, thank you.

6            THE COURT:  All right.

7            MR. GOLDEN:   Your Honor?

8            THE COURT:  Yes.

9            MR. GOLDEN:   That one is getting us over here.

10            THE COURT:  Okay.  I think I've been in this

11   courtroom five years, the first time I've ever seen the

12   curtains open.  It may not be that obvious how to close them.

13   There's no device on the left or the right side?  There we go.

14   No, it only does the other ones?  I think that's -- they've

15   done as well as they can.  All right.  We'll wait for your co-

16   counsel to return.  Eventually the sun will set.

17            MR. LUPKIN:  Shortly.

18            THE COURT:  Okay.  I want to start by talking about

19   the scope of discovery before we get to the specific issues

20   here.  And I guess I'll be getting to a rather simple question,

21   which is have the parties already or do they plan to stipulate

22   to having more than ten depositions per side?  That's for

23   anybody.

24            MR. LUPKIN:  Jonathan Lupkin for the plaintiff.  At

25   the outset of this litigation during our 26(f) conference the

4

1   parties discussed amongst themselves and agreed at least at
2   that juncture not to stipulate to the extension of the ten
3   deposition limits.  Obviously things have developed a little
4   bit over the course of discovery that may necessitate in excess
5   of ten depositions but if so not but much, maybe by one or two,
6   at least from the plaintiff's perspective.
7           THE COURT:  Unless I miscounted, I saw more than that
8   from somebody.  Maybe it was not on your side.
9           MR. LUPKIN:  It was not us, Judge.
10          THE COURT:  You're right.  You I counted about 11.
11  The other side I counted as more than that.  So what's your
12  view on this?
13          MR. GOLDEN:  Your Honor, as I remember, that
14  discussion we expected that there was a very real possibility
15  that we would see ten, especially if we need to go to Russia to
16  take the testimony of witnesses because they wouldn't be here
17  for trial.  And it was tentatively agreed by counsel that we
18  would agree -- it would take more than ten depositions.
19          MR. LUPKIN:  Your Honor, if I may, the details of
20  what it is that we stipulated to or did not stipulate to is set
21  forth in the order that was submitted to Judge Castel in
22  advance of the Rule 16 conference.
23          THE COURT:  Does anyone have this document because I
24  don't think it was put on the ECF system.
25          MR. LUPKIN:  Bear with us just a moment, Judge.

5

1          THE COURT:   And I have his civil case scheduling

2    order.   Is that what you're talking about?

3          MR. LUPKIN:   Yes.   That's correct.

4          THE COURT:   I have it in front of me.

5          MR. LUPKIN:   There is a provision that talks about

6    deviations from the presumptive limitations of the Federal

7    Rules.

8          THE COURT:   If there is, I didn't see it.

9          MR. LUPKIN:   Bear with me.   Yes.   It's item number 13

10   which incorporates by reference Rule 26(f)(3) which enumerate

11   various items to consider.   One of those issues is deviation

12   from the presumptive limitations of the Federal Rules.   We had

13   two specific agreements to deviate in that regard.   One is the

14   party depositions could go for two days and there are only two

15   party depositions.   And to the extent there is going to be a

16   difficulty with respect to nonparty depositions, largely due to

17   the fact that some of these witnesses will be testifying in

18   Russian, we endeavored and agreed to discuss with one another

19   whether or not additional time was appropriate.   There is no

20   other deviation set forth there.

21          But having said that, we have 11 on our list.

22   Frankly, I'm not certain that we're going to be able to get at

23   least one or two of the witnesses because they're out of the

24   jurisdiction and unlocatable.   But to the extent that Mr.

25   Golden has the intention of calling well in excess of ten,

6

1   we'll obviously take it on a deponent-by-deponent basis, but to

2   far exceed it is something that I think is premature to discuss

3   at this juncture.

4          THE COURT:  All right.  Next question.  Tell me what

5   the damages in your view could be in this case or what you're

6   seeking.  I have your 26(a) disclosure so I know something.

7          MR. LUPKIN:  They're basically broken up into three

8   components, Your Honor.  One of them is the amount of money

9   outlaid by Mr. Egiazaryan to combat what we've described in the

10  complaint as the black PR campaign.  At the time that the 26(a)

11  disclosure statement was served that amount liquidated to

12  approximately 250-plus thousand dollars which represented fees

13  paid to a public relations company, PGR Gavarro [Ph.].  And

14  those fees we contend were the result of the need to combat the

15  negative PR campaign.  Obviously, since time has passed since

16  the service of those 26(a) disclosures, we'll need to

17  supplement but the damages will essentially be along the same

18  lines.  That's deponent number one.

19         Number two, obviously punitive damages is what we

20  claim.  And number three are the damages associated with the

21  harm to reputation, which I think are not capable of a precise

22  computation.

23         THE COURT:  Well, I think you need to give me some

24  idea of what those could be.  How are you going to approve them

25  and -- I mean, I don't -- his current employment is a little

7

1    mysterious, so I don't know if the notion is that this

2    defamation has hurt his chances for employment.  You tell me.

3          MR. LUPKIN:  Well, Mr. Egiazaryan is a businessman

4    and obviously for the reasons set forth in the complaint and

5    the subsequent filings it's very difficult, certainly at this

6    juncture, to do any business in Russia.  If he intends to do

7    any business it would probably be here in the United States and

8    the defamation was targeted to a United States audience.

9          Moreover, I would say that there are certain

10   components of the defamation that are defamation per se for

11   which there need not be a calculation of precise damages.  The

12   damages are presumed --

13         THE COURT:  In which case you get nominal damages.

14         MR. LUPKIN:  Correct, yes.

15         THE COURT:  Okay.  How about your damages, the cost

16   of the lawsuit, I assume.

17         MR. GOLDEN:  That's principally the harm, although in

18   my client's case it may be loss of employment, but at the

19   moment it's just the cost of the lawsuit.

20         THE COURT:  Well, the reason I ask is that I'm very

21   concerned about the number of depositions that are being asked

22   for in this case even if they don't exceed ten.  Certainly they

23   do exceed ten.  And, you know, it would be one thing if this

24   was two corporations deposing each other's employees.  I'd be

25   happy to let you do all the depositions you want probably, but

8

1   you're dragging third parties into this and I am very concerned

2   about that.   There doesn't seem to be any monetary restraint on

3   either side.   I don't know.   Maybe I shouldn't assume that.

4   People have -- their clients have all the money they want to

5   fund this litigation?   Any limits on your client's ability to

6   fund litigation or don't you know?

7           MR. LUPKIN:   I'm not certain I understand the Court's

8   question.   I mean, obviously we're working on a budget.   The

9   client -- it's no secret that the client has money.   The issue

10  is --

11          THE COURT:   He has lots of money.

12          MR. LUPKIN:   Yes.

13          THE COURT:   Does your client have lots of money?

14          MR. GOLDEN:   My client does not have lots of money.

15          MR. LUPKIN:   If I may be heard on that.

16          THE COURT:   Yeah.

17          MR. LUPKIN:   That may well be the case.   That

18  certainly has been claimed in a variety of submissions, but as

19  I look at the list that the defendant has submitted here, it

20  contemplates all sorts of international discovery with trips to

21  Russia, trips to Luxembourg and we haven't asked for those.   In

22  fact, virtually all of our depositions are in the United

23  States.

24          THE COURT:   That's what I can't figure out.   You

25  know, one of the factors under Rule 26(b)(2) is the abilities

9

1    of the parties to pay for the discovery being sought.  It also

2    looks at the damages which is why I asked you about how much

3    money this case is about and it doesn't seem like it's a huge

4    amount of money to me.  It's mysterious to me as to why this

5    litigation has ballooned to what it is now.  It's a complete

6    mystery.  I'm not quite sure what to do about it at this point.

7    I mean, I'm going to go through your depositions and talk about

8    what they are.

9            The thing is that, you know, it wouldn't surprise me

10   if you could make a relevance case for literally a thousand

11   depositions.  If the question is, you know, did your -- did the

12   plaintiff fund the Chechen War or some of the other broad

13   allegations, I mean, there's probably hundreds of people who

14   talk to that question and hundreds of institutions with

15   documents relevant to them, so I don't know that going through

16   the list of deponents is going to solve the problem.  I guess I

17   could make some judgment about the degree of relevance, but I

18   can't imagine regardless of the party's agreement allowing more

19   than ten depositions per side.  It seems to me extremely

20   unlikely.  I'm telling you now I'm enforcing that limit.  I

21   don't care what the parties stipulate to.  If you want to try

22   making an application as to why you need more, I'll consider

23   it, but in the absence of my granting an order that says you

24   can have more than ten depositions per side you can't have them

25   and when I say "depositions," I'm including party and nonparty

10

1   obviously, so maybe that's the limit we need to cause the

2   parties to use some restraint.

3           Now, it may be that there are certain parties that

4   are going to come to me or come to other courts about the

5   necessity for their particular deposition and maybe they'll be

6   successful with me or other courts.  And I guess under the

7   ruling I just gave you now you could -- if those depositions

8   were not allowed, you could replace them with others as long as

9   you didn't exceed the number ten limit.

10          But, again, you know, my concern here since the

11  parties have not claimed lack of financial resources, at least

12  up until the moment I asked the defendant, my concern here is

13  the third parties and the burden that's being put on them for a

14  case that seems to be seeking discovery way beyond what

15  26(b)(2), it seems to me, would find to be appropriate.

16          But I don't have anyone in front of me complaining,

17  so I think for right now I'm just going to do the ten

18  deposition limit with a warning to each side that they simply

19  cannot notice or do a subpoena for an 11th deposition and they

20  had better keep that in mind when they do their discovery,

21  again, unless they persuade me otherwise by means of an

22  application.

23          Any questions about what I just said before we get to

24  the specific discovery dispute before us?

25          MR. LUPKIN:  No, Your Honor.

11

1          MR. GOLDEN:  No questions.

2          THE COURT:  Okay.  All right.  I'm slightly hampered

3   because I forgot the piece of paper where I took notes in your

4   letter, so I'm going to have to go through it again a little

5   bit orally with you.

6          All right.  The first questions was about asking

7   about the residences of the relatives and the abse -- I mean,

8   as long as there's no issue of service on anybody I can't see

9   why that's something that needs to be asked about, so I

10  remember the letters enough from both to not inquire anything

11  further about that, so that's not something that should be

12  asked.

13         Social Security, bank accounts, tax returns:

14  certainly none of that from the actual deponents.  As I recall,

15  it's possible that the defendant was seeking information from

16  the deponents about the plaintiff's bank accounts, tax returns

17  or other information.  I don't know.  Is that what's going on?

18         MR. GOLDEN:  Your Honor, what that is about is we had

19  determined from at least two nonparty witnesses that the way

20  the plaintiff conducts his business is to use other people and

21  companies run by other people.  So it's not so much a question

22  as a pure and simple --

23         THE COURT:  By the way, just to help me, that's going

24  to be relevant because of the money laundering claim?  Is that

25  the theory or what?

12

1        MR. GOLDEN:  Well, it's relevant to two things, at

2  least two things.  But the single most important thing that is

3  relevant to is Mr. Egiazaryan's financing of the LDPR which if

4  there is a core issue in the case, that is the core issue in

5  the case.  The evidence is and the --

6        THE COURT:  That's okay.  I know that that's an issue

7  in the case.

8        MR. GOLDEN:  So --

9        THE COURT:  So the theory is that the relatives will

10  have information about where he sends his money to?

11        MR. GOLDEN:  Yes, Your Honor.  We already have a

12  statement from a witness who says that he witnessed and was

13  told by Egiazaryan that Egiazaryan used other people to make

14  contributions to the LDPR in cash.  Now, in normal discovery if

15  we ask a question to Mr. Egiazaryan, did you ever give money

16  to -- in any form to LDPR, he's already told us in this case

17  that the answer is no.  If we were to ask for his financial

18  records, we know from that declaration that his financial

19  records would not show that because we have a declaration from

20  a witness.  And to provide prima facie support for our charge

21  the only way that we have an opportunity to prove that he

22  actually gave money to LDPR is to ask the people who we suspect

23  and have reason to suspect handled that money transfer for him.

24  And that's why we need to ask his brother or cousin, although

25  I'm not sure what the relationship is, about their financial

13

1   records because that's where this information will be.

2           MR. LUPKIN:  Your Honor, if I may respond briefly.

3           THE COURT:  Go ahead.

4           MR. LUPKIN:  There's a bit of a misunderstanding as

5   to what it is we're seeking protective order about.  My letter

6   of October 21st on page 6 at the very top indicates

7   unequivocally, "We do not object to the questioning of the

8   Egiazaryan relatives" -- that's Artan [Ph.] and Sureyn [Ph.]

9   Egiazaryan -- regarding whether they provided financial support

10  to the LDPR on behalf of plaintiff.  The objection pertains to

11  the questioning of these relatives about their bank accounts

12  and financial transactions for those of Mr. Egiazaryan.

13          THE COURT:  Wait.  So let me have that again.

14          MR. LUPKIN:  Yes.

15          THE COURT:  It's okay to ask them --

16          MR. LUPKIN:  If they want to ask questions of --

17          THE COURT:  And that's due orally but not to get

18  documents about it?

19          MR. LUPKIN:  Well, the statement that Mister --

20          THE COURT:  Is this -- by the way, is your

21  application relate to a document request or the deposition

22  request?

23          MR. LUPKIN:  Both.

24          THE COURT:  Okay.  Go ahead.

25          MR. LUPKIN:  The witness -- the nonparty witness that

14

1   Mr. Golden refers to talks about -- if you believe it -- cash

2   payments, so in fact there are cash payments.  That's not going

3   to show up in a bank account, so that what this winds up being

4   is an expedition or what are the limits on the bank reference?

5   There are none.  Period.  Full stop.  That's the only evidence

6   Mr. Golden submits in connection with the LDPR contributions.

7   And according to that affidavit to accept it, it was done in

8   cash so let him ask the brother and the cousin.  He can ask Mr.

9   Egiazaryan if they'd like.

10          THE COURT:  All right.  Mr. Golden, did you want to

11  respond?

12          MR. GOLDEN:  If we just ask they're all going to say

13  no and --

14          THE COURT:  Well, is it just cash or not?

15          MR. GOLDEN:  The declaration that we have pertains to

16  a cash transaction.  The declaration also says -- he describes

17  the cash transaction and then he also says, "Ashot Egiazaryan

18  personally told me that he gave money to Lebadid Egor [Ph.] for

19  financing of operations of LDPR's party.  As explained by

20  Egiazaryan Ashot, money given for" --

21          THE COURT:  Wait, wait.  Lebadid Egor is --

22          MR. GOLDEN:  Lebadid Egor is the son of Vladimir

23  Ziranofsky [Ph.].  Ziranofsky is the founder --

24          THE COURT:  But not one of the deponents.

25          MR. GOLDEN:  No.

15

```
1              THE COURT:  Okay.
2              MR. GOLDEN:  No, no.  He's --
3              THE COURT:  Tell me how the deponents come into this.
4              MR. GOLDEN:  In this instance what he says is
5    Egiazaryan Ashot, "Money given financing" -- as explained by
6    Egiazaryan Ashot, "Money given for financing of operation of
7    the party were calculated by millions of U.S. dollars."
8              Now, we have another declaration.  The other
9    declaration is from Andre Gloriosuf [Ph.].  That, I believe, is
10   one of the submissions that we made to Your Honor.  Mr.
11   Gloriosuf says that for -- since 1998 he was involved in moving
12   Ashot Egiazaryan's money around the world through the hands of
13   the deponents, Artan and Sureyn, so that Artan and Sureyn --
14             THE COURT:  Hands?  The word was "hands"?
15             MR. GOLDEN:  I can -- I'll leave --
16             THE COURT:  I ask because that's -- I didn't know if
17   that was a signal for cash.
18             MR. GOLDEN:  The hands was -- that was my summary,
19   Your Honor.  He begins by saying, "In 1998 in two wires I
20   arranged the transfer of 20 million U.S. dollars to a Nevada
21   entity."  And then he describes the chain of ownership.  Then
22   he says, "The 20 million that I transferred to the Nevada
23   entity was Ashot Egiazaryan's money.  It's my understanding
24   that the Nevada entity which had a bank account with Bank of
25   America in Las Vegas was used by Sureyn Egiazaryan as the bank
```

16

1  account to pay Egiazaryan's expenses in Los Angeles for

2  approximately ten years."  Then he goes on to say, "Artan

3  Egiazaryan," the other deponent, "was involved in many of the

4  company's reference to in paragraph 2 above and in certain

5  cases was himself the ultimate beneficial owner of certain of

6  these companies."  And the paragraph 2 the declaration says,

7  "Beginning about 1998 I started to work for Ashot Egiazaryan as

8  an international money manager and as a person who acted as a

9  named owner of offshore companies while in fact these companies

10 were owned either directly or indirectly by Ashot Egiazaryan."

11 He goes on to say, "The reason why I acted as a named owner of

12 these companies was to minimize Ashot Egiazaryan's and Artan

13 Egiazaryan's identification and direct involvement in these

14 companies including for safety reasons."

15      So what he is saying is that he -- Mr. Gloriosuf and

16 Artan and Sureyn, both themselves and through companies that

17 they were nominally the owners of -- this is my word -- handled

18 Ashot Egiazaryan's money.  So if we're looking for the

19 evidence --

20      THE COURT:  What time period did he get those?

21      MR. GOLDEN:  He started in 1998 and the -- this

22 declaration was given in October of 2011.  The other doc -- the

23 documents connected to the declaration suggest -- it's only one

24 page long -- that it was going on up until September or October

25 of 2011, so it's the entire period from 1998 until today.  So

17

1    what we have is we have through two witnesses -- and we're just

2    getting started, but we have two witnesses who said that Ashot

3    Egiazaryan does business in a way to hide his connection to

4    money.  We have two witnesses who say that he does this by

5    using Artan and Sureyn and companies that they nominally

6    control.  And so on the core issue of Mr. Egiazaryan's

7    financial support for the LDPR, the only way that we're going

8    to find paper evidence of this is to begin by getting the

9    records from Artan and Sureyn and the companies that they

10   nominally control.

11          And with regard to Mr. Lupkin's comment that this is

12   cash, I'm sure everybody in this room has been involved in

13   financial cases where there's cash transactions and when there

14   are often the evidence of the cash transaction is a withdrawal

15   in some account in some time reasonably related to the cash

16   transaction.  And that's why we need to see these papers and

17   that's why we need to see the papers from Artan and Sureyn.

18          MR. LUPKIN:  Your Honor, if I may be heard briefly in

19   response.  Two points I'd like to make:  First of all, with

20   respect to the Gloriosuf declaration, the two wire transfers at

21   issue were made, if you believe them, in 1998.  Mr. Egiazaryan

22   did not become a member of the Duma until 1999.  So the

23   suggestion that this declaration and 20 million-dollar transfer

24   has anything to do with the LDPR or contributions to the LDPR

25   doesn't pass muster in light of the un -- what I think are the

18

1   undisputed facts as to when he started working as a member of

2   the Duma.

3          The second point is that the Gloriosuf declaration

4   does not talk about the LDPR.  Indeed it doesn't even talk

5   about business transactions.  What it talks about are living

6   expenses, assuming again that it's true.

7          THE COURT:  What expenses?

8          MR. LUPKIN:  The living expenses.  So what Mr. Golden

9   is seeking here is the right to rummage through what could

10  conceivably be, you know, years' worth of bank records for a

11  variety of companies and looking for what?  The only evidence

12  at least facially that we have is a cash payment and a wire

13  transfer that occurred one year prior to the time that Mr.

14  Egiazaryan began in the Duma.

15         THE COURT:  Has the plaintiff been deposed yet?

16         MR. LUPKIN:  Not yet.

17         THE COURT:  Have documents from the plaintiff been

18  exchanged yet?

19         MR. LUPKIN:  We are in the process of collecting

20  those documents and producing them.  To date we have produced

21  approximately 4700 pages of documents.  Part of the reason that

22  it's taking longer than what otherwise it would take is we have

23  had to collect documents from Russia and we've also had to

24  collect which under these circumstances particularly difficult

25  to get.

19

1      And moreover, we have undertaken to collect documents

2  from Mr. Hollander [Ph.] who is Mr. Golden -- Mr. Egiazaryan's

3  attorney.  We're collecting those because Mr. Egiazaryan is

4  seeking control of Mr. Hollander.  And we're also undertaking

5  and have undertaken to collect documents from BGR Gavarro

6  [Ph.], the public relations firm in London, and producing them

7  as part of Mr. Egiazaryan's document production.

8      THE COURT:  The reason I ask is I'm wondering if it

9  doesn't make more sense before I reach this question to see

10  what the financial records of the plaintiff say because it

11  might at least provide some limitation.  I mean, right now

12  you're asking for every financial record of these deponents?

13      MR. GOLDEN:  Yes.  And if I could respond to your

14  last comment, Your Honor, two points and I think it's important

15  to Your Honor's suggestion.  First is that 90 percent of the

16  documents that were referred to by Mr. Lupkin were sent to my

17  office for delivery today, so --

18      THE COURT:  So why were you planning to depose these

19  people before the plaintiff?

20      MR. GOLDEN:  Well, that's an interesting thing, Your

21  Honor.  That's my second point.  I've been trying to take the

22  plaintiff's deposition for a long time.  For all kinds of

23  reasons it was delayed at the request of the plaintiff so I

24  thought, well, time is a-wasting.  I'd better take some of

25  these depositions, so I'll take Artan's and Sureyn's.  And I

1   have in the last three weeks made two or three requests to

2   depose the plaintiff.  I would like to depose the plaintiff in

3   the next 30 days.  And if Your Honor could facilitate that,

4   maybe we could put off this dispute about Artan and Sureyn

5   until I've looked at these 4600 documents and depose the

6   plaintiff.

7           THE COURT:  Well, I'm not sure I'm going to condition

8   it on your request, but I think that before we take these two

9   individuals and expose their entire financial history to you

10  there has to be some attempt to focus it.  I'm not saying you

11  might not in the end be entitled to it, but I think there

12  should be some basis for perhaps limiting it to certain

13  entities or find -- you know, somehow and that information from

14  the plaintiff is going to be the way to do that.  Is that

15  possible?

16          MR. GOLDEN:  I'm sorry.  The last phrase.

17          THE COURT:  That information from the plaintiff is

18  going to be a way to accomplish that limitation.

19          MR. GOLDEN:  I agree completely, Your Honor, and I

20  would request that -- although this wasn't formally set before

21  Your Honor, I think Your Honor could facilitate the scheduling

22  of the plaintiff's deposition.

23          THE COURT:  Well, let's not worry about the timing

24  yet.  I think what I want to do is skip this for the moment.

25  Maybe I'll come back to it today -- I doubt it -- and proceed

21

1   on the assumption that it can be raised again once you have

2   more information about the actual plaintiff's financial

3   records.

4           MR. LUPKIN:  Your Honor, there's one issue on this

5   subject that needs to be raised.  Last week we received

6   notification that Mr. Golden's office served a nonparty

7   subpoena for documents on Bank of America asking for all sorts

8   of records relating to these Las Vegas entities.  To the extent

9   that we're going to be deferring this issue, we would ask that

10  the Court impose a temporary stay on the production of those

11  documents until we resolve this issue.

12          THE COURT:  Just so you know, I'm less concerned

13  about corporate records than personal records, but go ahead.

14  I'm not -- well, tell me -- my concern is about their personal

15  taxes, their personal bank accounts.  I'm not concerned about

16  the corporation records in the same way at all.  So if you're

17  asking me to do something about the Bank of America subpoena,

18  Mr. Lupkin, you have not made the case.  So if you want another

19  shot, go ahead.

20          MR. LUPKIN:  Certainly.  Let me try a different

21  angle.  The subpoenas called for -- were for Bank of America

22  because they hold accounts.  Some of those accounts that were

23  asked for relate not only to the corporations that are

24  identified, at least not by name but referred to in paragraph

25  3, but they also call for the personal bank records of two

22

1   individuals with the last name of Panomonov [Ph.], and so to

2   the extent that you are differentiating between individual bank

3   records and corporate bank records, at the very least there

4   should be a stay on the production of individual bank records

5   belonging to two other nonparties that are not even

6   corporations.

7           THE COURT:  Okay.  And when I say "individuals," I'm

8   assuming I was talking about people you were representing, so

9   are you representing these people?

10          MR. LUPKIN:  We are not.

11          THE COURT:  Who are they?  Who are they?

12          MR. LUPKIN:  They are individuals with whom Mr.

13  Egiazaryan has done business in the past.

14          THE COURT:  And surely Bank of America will tell them

15  about the subpoena.

16          MR. LUPKIN:  Well, it's interesting.  We received a

17  copy of the letter that was sent by Mr. Golden to Bank of

18  America.  We called Bank of America, their subpoena department,

19  and the procedure is normally that the subpoena is reviewed and

20  to the extent that any particular account holder or holders are

21  implicated a letter was supposed to go out to them.  Our

22  understanding having spoken indirectly with these individuals

23  is that they've received no such letter.  We sent them a copy

24  of Mr. Golden's letter and they have indicated to us --

25          THE COURT:  You spoke to the individuals.

23

 1          MR. LUPKIN:  I did not; my co-counsel in London did.

 2          THE COURT:  You folks spoke to them.

 3          MR. LUPKIN:  Correct.

 4          THE COURT:  So they now know about it.

 5          MR. LUPKIN:  Correct.

 6          THE COURT:  Okay.  Good.  So they can object to it if

 7  they have a problem.

 8          MR. LUPKIN:  Okay.

 9          THE COURT:  All right.  So to the extent that was an

10  application about the Bank of America, it's denied at this

11  time.  So we're skipping over the particular requests here,

12  which is regarding the records of the two deponents for their

13  personal account information.

14          Now, to the extent there's -- they happen to have

15  corporate records, that's not an issue for me.  Okay.  Again,

16  my concern was things that are in their own name.  Okay.

17          The next is the scandalous event of 1999, so I'm

18  going to ask Mr. Golden to tell me why this is relevant.

19          MR. GOLDEN:  The relevance has to do with what Mr.

20  Egiazaryan's existing reputation is because he can only be

21  harmed if something that my client said that is defamatory made

22  his reputation worse than it already is.  A very, very, very

23  important part of this case will be that Mr. Egiazaryan does

24  not have a good reputation.  There are hundreds and hundreds

25  and hundreds of articles written about him all over the world

24

1    that call him names far worse than what --

2         THE COURT:  Surely those are the -- that's the way

3    you'll prove his reputation; not through him.  Right?  It will

4    be the articles.  You're not offering it for the truth; you're

5    offering it for his reputation.

6         MR. GOLDEN:  Yes.  And what I anticipate from what

7    has been pled and the discussions that I've had with counsel

8    about that is that with regard to all of these articles that

9    relate to his reputation he will assert, as he has asserted in

10   the complaint, that none of those things are true.  So if I --

11   if he's --

12        THE COURT:  I'm not talking about the accusations of

13   defamation which obviously he's going to -- well, I guess

14   there's claims that you defamed him.  Obviously he's going to

15   assert that those things are untrue, but this is not anyone's

16   claim as to a defamatory remark.  You're just -- is this the

17   famous -- I forget what the word is -- your damages proof in

18   the libel area?  Is that what this argument is because the

19   reputation is so bad?

20        MR. GOLDEN:  Yes.

21        THE COURT:  Yeah.

22        MR. GOLDEN:  Yes.  And --

23        THE COURT:  So under this theory you can ask him

24   about everything he did ever in his life that was bad, ask him

25   about adultery, anything you want then, right?

25

1          MR. GOLDEN:   No.   It relates I -- the way I interpret
2     that doctrine, it would pertain only to things that are
3     already -- that are already published.   So I can -- I mean,
4     like you said, adultery -- I'm unaware of the article that
5     calls him an adulterer and because of that it would be
6     irrelevant for me to ask questions about his adultery.   But
7     here we have a situation where there is an article about
8     something that he did that is a bad thing.

9          THE COURT:   You know, and I go back to my original
10    point, which is the reputation is what it is and whether he
11    says it's true or not is not the point.   So I don't see why you
12    don't just get to say -- have someone stand -- get on the stand
13    or however you're going to do it, say here's his reputation,
14    and he'll be free to say it's untrue, but you'll be free to
15    say, well, that's irrelevant because his reputation is what it
16    is and I couldn't have heard it and that's that.

17         MR. GOLDEN:   Well, I think that in a trial and one of
18    the issues that permeates all of this is that a lot of the
19    importance and the relevance of discovery depends on our
20    contemplation of what the trial is.   Now, at trial the trial
21    judge can control the questioning, can decide what can be said,
22    what can't be said.   The problem with limiting discovery on the
23    basis of that is that if I don't get the discovery, I don't
24    even have the chance to do it at trial.   And on this point, for
25    instance because we have discussed this with counsel, counsel

26

1    claims -- and Mr. Egiazaryan's counsel claims that that

2    article, the article about the -- what I call the prostitution

3    sting was the subject of some kind of a defamation suit in

4    Russia that resulted in some kind of an award.  I was given a

5    copy of that opinion and maybe that will be an issue in the

6    case and maybe it won't be an issue in the case.  But I have to

7    assume that when we get to trial and I talk about all of these

8    things that are part of his reputation because they have been

9    published or publicly said, he'll say it wasn't true.

10            THE COURT:  I have an easy solution to this.  Mr.

11   Lupkin, will you concede that the truth or falsity of whether

12   this scandal occurred will not be an issue raised by you at

13   trial?

14            MR. LUPKIN:  Yes, Your Honor.

15            THE COURT:  Solves your problem.

16            MR. GOLDEN:  Yes, it does.

17            THE COURT:  Okay.

18            MR. LUPKIN:  As long as I get a concomitant agreement

19   from the other side that they're not going to raise this

20   incidence in order to prove his reputation.

21            THE COURT:  No, no, no, no.  Oh, no.  They're going

22   to raise it to prove his reputation and his fear is that you're

23   going to try to counteract that by saying this never happened.

24   I'm not sure that's a good way to counter.

25            MR. LUPKIN:  Beyond that --

27

1          THE COURT:  I'm not sure it's a good way to

2   counteract it, but that's their fear.  So one way to avoid this

3   would be to say we will not try to counteract such a charge by

4   alleging -- by bringing -- raising the issue of the truth or

5   falsity of the allegation as --

6          MR. LUPKIN:  Your Honor, my position on this is that

7   an event that occurred in 1999 having nothing to do with any of

8   the allegations in this case would likely be subject to a

9   motion in limine under 403.

10          THE COURT:  Well, if you're not willing to make the

11   concession that I ask that it's not relevant, I'm going to

12   allow him to ask the witness about it.  That doesn't mean to

13   get to ask anyone else in the world about it because I am

14   allowed to put limits on discovery, but for purposes of this

15   witness in the absence of the concession that it's irrelevant,

16   you can ask about it.

17          MR. LUPKIN:  Your Honor, if we may --

18          THE COURT:  Yeah.  Sure.

19          MR. LUPKIN:  We would like -- as you can imagine

20   wanted to talk about this issue.

21          THE COURT:  If you are ready at a future time to say

22   that you will not raise the issue of the truth or relevance of

23   this issue under any circumstances in the future in defense of

24   summary judgment or trial, then I'm willing to grant you the

25   application to not question that.

28

1            MR. LUPKIN:   The truth or relevance?

2            THE COURT:   I'm sorry.   Falsity.   That you will not

3   raise --

4            MR. LUPKIN:   Truth or falsity.

5            THE COURT:   -- the truth or falsity of this charge as

6   part of a trial or summary judgment or any other point, then

7   that's fine.

8            MR. LUPKIN:   Very well, Your Honor.

9            THE COURT:   Okay.   Okay.   Last I guess for the moment

10   is the immigration status question.   So, Mr. Golden, tell me

11   about this.

12            MR. GOLDEN:   One of the allegations in the complaint

13   is that Mr. Zalmayev's article and his conversations with other

14   people had the effect of undermining Mr. Egiazaryan's ability

15   to remain in the United States.

16            THE COURT:   Let me ask you this, Mr. Golden.   If

17   they're willing to disclaim all damages from any effect that

18   the allegedly defamatory statements had on his ability to

19   remain in the United States, which would include the potential

20   of a denial of any asylum application, assuming there is one,

21   is it relevant?

22            MR. GOLDEN:   As narrowly put by Your Honor, probably

23   not.   I thought a lot about that because it has a lot to do

24   with the discovery in this case.   In the complaint, which is

25   153 paragraphs long, there are all kinds of allegations that

29

1    are made against my client.  The scope of the alleged --

2         THE COURT:  Some of which are not part of the alleged

3    defamatory statements, right?

4         MR. GOLDEN:  Well, I can't tell.  That's the problem.

5    The problem is when I read the complaint -- and I don't know

6    what's going to happen when I get to trial -- but when one

7    reads the complaint you can't tell.  Paragraph 2 --

8         THE COURT:  Which is why it's useful to the extent

9    you want discovery on something and they're resisting it on

10   relevance grounds, you get an agreement from them that the

11   issue will not be raised in the case law during summary

12   judgment or trial which solves your problem, right?

13        MR. GOLDEN:  Except that -- yes, in theory.  But

14   because the complaint is so broad, it can't practically be

15   done.  Now, if Mr. Egiazaryan's lawyers want to ask for

16   permission to file an amended complaint -- to file a complaint

17   that says very narrowly what they say the case is about, we can

18   proceed. Otherwise, what I'm afraid, Your Honor, is we're going

19   to get -- counsel are going to get hung up negotiating forever

20   over a stipulation.  And as you can see by the exchanges I had

21   with Mr. Lupkin about this one narrow point that I was able to

22   answer very quickly, Mr. Lupkin is a very thoughtful, tenacious

23   negotiator.  And as a practical matter, the problem isn't

24   solvable by Your Honor's suggestion.

25        THE COURT:  I completely disagree because what

30

1   happens is you ask for something, as you do here with the

2   asylum application.  If they are willing -- and we haven't

3   asked them yet -- to say that they are not going to raise the

4   asylum application with respect to any claim in this case

5   including damages, then it becomes perhaps irrelevant and that

6   solves your problem.  And then if they don't do it, then they

7   may have lost that argument, so no negotiations required.

8   Nothing of that kind.  A simple question when the issue comes

9   up.  So I'll turn to them to ask the question.

10              MR. LUPKIN:  May we have two seconds, Your Honor?

11              THE COURT:  Sure.  Take your time.

12                   [Pause in the proceedings.]

13              MR. LUPKIN:  Your Honor, as to whether or not we are

14   going to be seeking any damages that flow from any affect on

15   any hypothetical asylum application or the denial of any such

16   hypothetical application, we will not seek damages on that.

17   But just to be clear, the whole gravimum of our case is we need

18   to be able to establish the efforts that have been taken by Mr.

19   Zalmayev and others to seek to have him excluded or expelled

20   from the United States and --

21              THE COURT:  And that's relevant to what issue in this

22   case?

23              MR. LUPKIN:  It's the whole purpose behind the

24   scheme.  The other side, Mr. Golden --

25              THE COURT:  But his motive --

31

1        MR. LUPKIN:  It's his motive.  It's his actual

2  malice.  It's directly relevant.

3        THE COURT:  Okay.  So now we know that in your

4  view -- and I may have phrased the question too narrowly -- it

5  may help you on the damages front but we need to know what role

6  it's going to play in the case before I can answer the question

7  of whether the discovery they're seeking is relevant, so let me

8  try to understand it.

9        The theory from the plaintiff's point of view then is

10  that the defendant was motivated to stop your client from

11  remaining in the United States in making these statements that

12  was his reason for doing it, it shows malice to the extent you

13  need to show that or the reason for the malice.  And therefore,

14  I may turn to defendant to find out why the actual asylum

15  application itself is going to be relevant to defending that

16  charge.  So try it again.  We now know it's not going to be

17  part of damages.  Okay.

18        MR. LUPKIN:  I'm sorry.  I didn't hear that, Judge.

19        THE COURT:  We now know their asylum application is

20  not going to form part of the damages claim.

21        MR. LUPKIN:  Correct.

22        THE COURT:  So now with that limited tell me what you

23  need the asylum application for, understanding that they're

24  going to want to raise your client's motive or desire to keep

25  the plaintiff out of the United States.

32

1            MR. GOLDEN:  If --

2            THE COURT:  It seems -- just so it's clear, whether

3      he's successful in doing that doesn't seem terribly relevant to

4      the question of what his motive was in making the statements.

5      Do you see what I'm saying?

6            MR. GOLDEN:  Yes.  I see exactly what you're saying.

7            THE COURT:  And, therefore, the disposition of the

8      application, should it ever happen, doesn't seem to me terribly

9      relevant but tell me why the application as it stands now is

10     relevant.

11           MR. GOLDEN:  Because the plaintiff has made it part

12     of the case substantively and it's part of the damage claim.

13           THE COURT:  Stop, stop, stop, stop because it's going

14     to drive me crazy.  We just said it's not part of the damage

15     claim.

16           MR. GOLDEN:  But it is because what Mr. Lupkin forgot

17     is that the first -- the monetary part of their damage claim is

18     for what they say are public relation expenses except we have

19     take the deposition of one of the public relations people and

20     he says that his firm was hired for $77,000.00 a month to help

21     Mr. Egiazaryan get asylum, not to combat the defamation by

22     Peter Zalmayev.  So it's part of that part of the damage case.

23     That's the simplest answer to Your Honor's question.

24           The second answer which is a little more complicated

25     is that it would need to be -- the plaintiff would have to say

33

1   that -- and I don't know that this would be enough unless they

2   also withdraw the public relations expenses claim and pretty

3   soon we're -- there isn't really a case.  But what they would

4   have to do is to say nothing is part of the case.  Asylum is

5   not part of the -- excuse me.  I misspoke.  They would have to

6   say asylum is not part of the case at all other than having one

7   question asked of Peter Zalmayev that said, did you want Mr.

8   Egiazaryan to stay in the country or not.  And I think the

9   answer to that question is plainly Mr. Zalmayev did not because

10  that's what he said in the article that he wrote.

11          THE COURT:  You need to help me.  Tell me --

12          MR. GOLDEN:  I'm sorry, Judge.

13          THE COURT:  Think about this in terms of the Federal

14  Rules of Evidence.  What is it about the asylum application or

15  something you could find in there that's going to make it more

16  or less likely than an element of the claim or defenses true?

17          MR. GOLDEN:  I hate to say this, but I'm afraid it

18  depends on the way the plaintiffs make it part of the case.

19  For instance, as long as they're claiming the -- as damages the

20  money they paid to their public relations firm, BGR Group, it's

21  relevant because the BGR witness testified that that money was

22  spent for asylum.

23          THE COURT:  Okay.  So let me work on that.  I just

24  need to talk it out a little with you.  So the theory is that

25  the damages that they're claiming you're going to say are money

34

1   that was used to somehow help him in his asylum application.

2   And why is the asylum application itself relevant to your

3   proving that?

4           MR. GOLDEN:  Then it gets layered because it depends

5   on their answer to that question.  If their position in a trial

6   is no, that's not what the money was spent for, then we have to

7   have evidence that the whole asylum process to test who's right

8   and who's wrong.  And I have a witness.  I didn't -- this isn't

9   speculation.  The man said that -- Mr. Jeffrey Birnbaum

10  [Ph.] -- I said, "What were you told was the assignment?"  He

11  said, "I was told that he was in Los Angeles seeking asylum in

12  the United States and that it was our job to assist him."

13  Those are his exact words.

14          But to answer Your Honor's question, so much of what

15  Your Honor has posed to the discovery depends on something else

16  and what happens at trial.  And all of it could be solved with

17  a long stipulation or a six-paragraph complaint, but to get

18  back to Your Honor's narrow question, which I'm not sure that I

19  answered and every judge deserves an answer, if the only issue

20  in the case about asylum was did my client want Mr.

21  Egiazaryan's asylum application to be rejected, the answer is

22  yes.  And if it's just that question then we don't need to do

23  discovery, but it's not just that question.  We don't have an

24  agreement by them to take it out of the case and we have this

25  really important issue where the -- I think if I'm following

35

now -- the only real element of damages is the expenditure of

that money.  Their witness, who will advance, says it was for

asylum.  I don't know how he's -- the whole status of the

asylum could be out of the case.  If they withdrew that damage

claim --

THE COURT:  But I think you need to focus on the

asylum -- I mean, application itself, which presumably says,

you know, here are the things that I fear upon my return to

Russia if I return there and here's the things that happened to

me in the past, and so forth.  Why is that going to be relevant

to any of the things you're talking about?

MR. GOLDEN:  It will be -- it is relevant because --

and I apologize for repeating, but it's in the complaint as an

element of damage, although that can be withdrawn.  But also in

the complaint -- and we at the trial could be put on this way

is that Mr. Egiazaryan will testify that he is an honest and

pure businessman who is being victimized by Mr. Zalmayev and

other people and his asylum application goes to the heart of

that.

One of the attachments to one of the recent letters I

sent to Your Honor was an opinion piece that when Mr.

Egiazaryan had in *The Wall Street Journal* -- it had to be the

day that I wrote to Your Honor.  It was October 17th.  He wrote

to *The Wall Street Journal* and he had an opinion piece, I'm

sure placed by the PR firm -- that's what they do -- in which

36

1    he talked about how terrible things were in Russia.  And then

2    at the bottom of the article it said Mr. Egiazaryan is a member

3    of the Duma -- a former member of the Duma living in the United

4    States for fear of his safety.  So there he is putting an

5    opinion piece in *The Wall Street Journal* advancing this asylum

6    application.  I don't see how the contents of it and the

7    process of it will not inevitably be part of the case so long

8    as the case exists in the form of which --

9            THE COURT:  Mr. Golden, you're going all over the

10   place and I -- you know, I don't blame you because this is

11   probably not an issue that's been framed for you in this way

12   but I'm getting like four, five half-answers to my question.

13           MR. GOLDEN:  I apologize, Your Honor.

14           THE COURT:  Okay.  So let's try it again.  Tell me

15   why the contents of the asylum application is going to be

16   relevant to the case.  Try it one more time.

17           MR. GOLDEN:  Because we have reason to believe that

18   it will show that Mr. Egiazaryan is not an honest victimized --

19           THE COURT:  It's for credibility.  You want to see if

20   the things he says about his life in the deposition in court

21   would be asylum application?  I'm not -- don't read my question

22   as trying to help you necessarily.  I mean, it's an honest

23   question.  Is that what this is?

24           MR. GOLDEN:  Well, with Your Honor's hypotheticals,

25   yes.  That's not why we requested discovery of it to begin

37

1   with.

2            THE COURT:  Well, give me all your reasons.  I'm just

3   trying to get through them so I understand what they are.  I

4   mean, the thing is, you know, I -- I mean, I discount the

5   concept that there's any legal bar to him providing it.  The

6   regulations are irrelevant.  It's -- the regulations bind only

7   the Government, not him.  If you're requesting from the

8   Government then the regulations come in, but you're not; you're

9   requesting it from him.  So that's irrelevant to me, but it

10  still is a sensitive or could be a sensitive document.  So I

11  don't want to just have him provide it without basis for

12  thinking it's important for the case.

13           You know, he did bring the case against your client,

14  so he's opened up his life about his own reputation.  He's

15  certainly opened up his life to a degree that most asylum

16  applicants do not.  So, you know, I'm sympathetic but I still

17  need to understand the relevance.

18           MR. GOLDEN:  Let me try one more time starting with

19  the complaint as it is written.

20           THE COURT:  The complaint doesn't mention the asylum

21  application.  It mentions that you've inter -- your client has

22  interfered with his ability to remain in the United States.

23           MR. GOLDEN:  Yes.

24           THE COURT:  So let's go with that.

25           MR. GOLDEN:  That's what --

38

1          THE COURT:  Definitely.

2          MR. GOLDEN:  That's what the complaint says, yes.

3   And he has -- that has to mean interfering with his asylum

4   application because the plaintiff --

5          THE COURT:  It could mean.  Yes.  I'll accept that it

6   could mean.

7          MR. GOLDEN:  Okay.

8          THE COURT:  I don't think it has to, but it could

9   mean.

10         MR. GOLDEN:  So that --

11         THE COURT:  If he has an asylum application

12  presumably there's some view that that could affect it.  Okay.

13         MR. GOLDEN:  The second reason that it's --

14         THE COURT:  Okay.  No, no.  Stop there.

15         MR. GOLDEN:  Oh.

16         THE COURT:  I want to do one reason at a time.

17         MR. GOLDEN:  Okay.

18         THE COURT:  So why is the ability to remain in the

19  United States important?  To me, it was only important for

20  purposes of damages.  That's how it gets mentioned in the

21  complaint.

22         MR. GOLDEN:  Yes.

23         THE COURT:  It gets mentioned because your client is

24  interfering with him to remain in the United States thereby

25  causing him damages, right?  That's what the complaint --

39

1          MR. GOLDEN:  Correct.  Yes.

2          THE COURT:  -- is saying.  So it seemed to me we got

3   somewhere when they were willing to say, I think, that they

4   would not rely on the grant or the denial or effect on asylum

5   application in any way in a damages claim.  So that's -- for

6   the first reason you gave me, I think that's been solved.  So

7   now you need to give me other reasons if there are.

8          MR. GOLDEN:  Second reason.

9          THE COURT:  Yes.

10         MR. GOLDEN:  Has to do with the monetary damage claim

11  where Mr. Egiazaryan says he spent money on public relations --

12         THE COURT:  Okay.

13         MR. GOLDEN:  -- and [unintelligible] --

14         THE COURT:  All right.  Let me just try to talk that

15  one out.  So your theory on that one is that they're suing me

16  to get the money he spent to -- for the PR campaign to combat

17  your alleged -- your client's alleged defamations.  And you've

18  got someone who says that the PR campaign was actually to help

19  out on his asylum application.  So let's grant all of that for

20  purposes of this argument.  Tell me why the actual asylum

21  application itself is going to be relevant to the question of

22  why this firm was hired and what their purpose was.

23         MR. GOLDEN:  That has to do with whether Mr.

24  Egiazaryan acknowledges that that was the reason or not.

25         THE COURT:  Well, okay.  I mean, I guess if -- since

40

1   he's not conceding there's an asylum application, the fact that

2   there is one would help your position, that that's what the PR

3   firm was for.

4               MR. GOLDEN:  Yes.

5               THE COURT:  The fact of there being one.  Okay.  I

6   think you're right on that.  How about the contents?

7               MR. GOLDEN:  The contents if the damage claim is

8   out --

9               THE COURT:  Yes.

10              MR. GOLDEN:  -- and the -- the two damage claims are

11  out and we're --

12              THE COURT:  I'm sorry.  Stop.  Two damage claims?

13              MR. GOLDEN:  Well, one was no damage from undermining

14  his ability to remain in the United States.

15              THE COURT:  Right.

16              MR. GOLDEN:  The second is no claim for public

17  relations expenses.

18              THE COURT:  No, we're talking about the public

19  relations expenses right now.

20              MR. GOLDEN:  Um-hum.  Yes.

21              THE COURT:  That is the second.  That --

22              MR. GOLDEN:  Well, our position is on that, that it

23  is inevitable as long as Egiazaryan is pressing the argument

24  that that was for public relations --

25              THE COURT:  Yes.

41

1         MR. GOLDEN:  -- that we have to know the process and
2    the contents of the asylum.
3         THE COURT:  Okay.  It's great for you to say it, but
4    I still don't understand why you need the contents.  I
5    understand why you might want to show that there is one because
6    that would show that it was more likely that the firm was hired
7    for it than if there was no asylum application, which would
8    make it very hard to make the claim -- the firm was hired for
9    that purpose.  The contents.  That's what I want you to
10   address.
11        MR. GOLDEN:  My expectations -- and I haven't
12   disclosed them yet, but my expectation that Mr. Egiazaryan
13   might say something like, I didn't need to pay these people a
14   million dollars to help me because I had a great asylum case.
15   And then I'm stuck if I don't have the contents.
16        THE COURT:  Okay.  So you need it -- you need the
17   contents to show that it was such a great asylum application
18   that no one would need to hire a PR firm to combat your
19   client's alleged defamation.
20        MR. GOLDEN:  No, no.  The opposite.
21        THE COURT:  I'm sorry.
22        MR. GOLDEN:  My position would be the opposite.
23        THE COURT:  Yeah, yeah.  Okay.  That it was such a
24   great application that -- no, no.  Your --
25        MR. GOLDEN:  Bad application.

42

1          THE COURT:  It was such a bad application -- go

2     ahead.  Tell me.

3          MR. GOLDEN:  He needed to spend at least a million

4     dollars or more --

5          THE COURT:  For the PR piece.

6          MR. GOLDEN:  PR and --

7          THE COURT:  PR piece is not to combat your client's

8     defamation.  Yes.  Exactly.

9          MR. GOLDEN:  Right.

10         THE COURT:  All right.  Possible.  Possible.  I'll

11    have to think about that.  Anything else you've got?

12    Credibility.  That was the third thing you mentioned.

13         MR. GOLDEN:  Yes.

14         THE COURT:  You might find some dirt in there -- or

15    no, not dirt but things that are inconsistent with other things

16    he said about his past life in Russia.

17         MR. GOLDEN:  Right.  And on this point, one relevant

18    case on this, Phillips v. Immigration and Customs Enforcement,

19    which is a Southern District of New York case, 2005.

20         THE COURT:  Did you bring copies for everyone?

21         MR. GOLDEN:  I didn't.  No, I'm sorry.

22         THE COURT:  Go ahead.

23         MR. GOLDEN:  385 F. Supp. 2d. 296.  It's not

24    substantively relevant but an asylum -- that was a Freedom of

25    Information Act request and in that case the judge looked at

43

1   the asylum application and saw the materials in camera which

2   provided the answers to a lot of what -- a lot of

3   [unintelligible].

4          THE COURT:   Yeah.   That's not going to happen here.

5   So we have three reasons then turning back to the other side.

6   The first one I think you disposed of on the damages point, so

7   you need to deal with two and three.   Now, you can deal with

8   number two by saying, you know what, forget the damages from

9   hiring the firm.   We're not going to pursue that.   I have a

10  feeling you're not going to do that, so now you need to tell me

11  why there might not be something in there that's relevant

12  showing whether -- what purpose the firm was actually hired for

13  since you're contending it wasn't hired for this element.

14         MR. LUPKIN:   I would submit, Judge, that my

15  [unintelligible] put off this issue because Mr. Golden has

16  subpoenaed several times various BGR representatives.   We have

17  undertaken --

18         THE COURT:   Various what representatives?

19         MR. LUPKIN:   BGR.

20         THE COURT:   That's the firm?

21         MR. LUPKIN:   The public relations firm.

22         THE COURT:   Okay.

23         MR. LUPKIN:   Representatives.   We have undertaken to

24  produce to Mr. Golden nonprivilege documents from BGR including

25  the documents from London.   Let him look at those first.   Given

44

1   the sensitivities associated with asylum applications, I think

2   that that --

3           THE COURT:  What if we have attorney's eyes only?

4   Wouldn't that perhaps solve the problem?

5           MR. LUPKIN:  We don't believe that would be

6   sufficient, Judge, under these circumstances.

7           THE COURT:  I mean, I don't know that waiting for the

8   firm is going to solve anything.  I don't know what the firm

9   could say that would put to rest this question.

10          MR. LUPKIN:  Well, I don't understand whether review

11  of the -- other than pure speculation on the part of Mr. Golden

12  what any application for asylum would say about the purpose for

13  hiring or not hiring a PR agency is.

14          THE COURT:  Well, there might have been things

15  that -- you know, I just can't discount the fact that there's

16  someone from that agency saying that's what the purpose was

17  for.

18          MR. LUPKIN:  From which agency?  Oh, from BGR?

19          THE COURT:  Yeah.  Was it a BGR person or who was it?

20          MR. LUPKIN:  Yes, it was.

21          THE COURT:  Yeah.

22          MR. LUPKIN:  It was the president of BGR public

23  relations.

24          THE COURT:  Yeah.  Hard to get around that.  It's

25  not -- doesn't seem terribly speculative now.

45

1              MR. LUPKIN:  Well, except for one thing.  If you read

2     on in the deposition, Mr. Birnbaum will indicate that he had

3     virtually no role in this matter.  The role in the matter was

4     handled out of London by two individuals:  Eva Gavarro [Ph.]

5     and John Roth [Ph.].  And efforts have been undertaken by Mr.

6     Golden to obtain their testimony through his letters

7     [unintelligible] and we'll deal with that as it happens.  I

8     suspect that once the [unintelligible] mentioned process is

9     completed, they'll have the deposition and then we can

10    introduce the issue.  But I don't think anything in the

11    deposition of Mr. Birnbaum would suggest that he had any sort

12    of knowing or substantive role in what went on here.

13             THE COURT:  He was -- he obviously had some

14    knowledge.  He was engaged -- wasn't he engaged by the

15    plaintiff for this transaction?

16             MR. LUPKIN:  He was not; BGR Gavarro in London was.

17             THE COURT:  So why is -- what did he say the basis of

18    his knowledge was, Mr. Golden?

19             MR. GOLDEN:  He was one of the four principals or

20    employees of BGR Gavarro listed in the contract to do the work.

21    That was the basis for his knowledge.

22             MR. LUPKIN:  By the way, Your Honor, I would say that

23    we've also produced the engagement letter for BGR Gavarro which

24    sets forth the purposes for the retention.  I mean, the

25    retention letter does not mention anything, even internally

46

1  between the lawyer that hired them and BGR Gavarro about

2  asylum.

3       THE COURT:  Not everything is put in letters.  How

4  about the issue of just the fact that, you know, he's -- his

5  activities in Russia are part of this case?  The asylum

6  application may speak to that.

7       MR. LUPKIN:  Well, I would submit, Judge, that to the

8  extent that there was an asylum application, Mr. Egiazaryan

9  would not be putting in materials that cast him in a poor

10 light.  They would be put in --

11      THE COURT:  No, but they might say things like, you

12 know, I once gave money to this group and now I did something

13 to them and they hate me and they're going to kill me, and that

14 could help the other side.

15      MR. LUPKIN:  Let me actually -- if I -- I can't -- I

16 have to tell you, I have not seen any asylum application.

17      THE COURT:  No, no, no.  I'm not going to accept

18 representations about what's in it.  If we're getting to that

19 point, I'm just going to have you produce it to the other side

20 with an attorney's eyes only designation.  So you need to speak

21 to me conceptually about the point I just made which is, you

22 know, your plaintiff is the one who brought this suit.  He's

23 saying that things that the defendant said about his activities

24 involving Russian groups are false.  Surely that's something

25 that could be in the asylum application.

47

1              MR. LUPKIN:  I see Mr. Saunders looking to stand.

2              THE COURT:  Feel free.  Go ahead.

3              MR. SAUNDERS:  Well, Your Honor, as to the -- even

4    the issue of the existence of the asylum application is not for

5    public discussion.  Your Honor referenced earlier, it is

6    absolutely correct.  The Government has no authority where with

7    only limited exceptions can the Secretary of the Department of

8    Homeland Security authorize the release of that for law

9    enforcement --

10             THE COURT:  What's that got to do with this case?

11             MR. SAUNDERS:  Well, it has everything to do with

12   this case, Your Honor, in that before --

13             THE COURT:  If he wants to drop his suit, it's not an

14   issue.

15             MR. SAUNDERS:  But the suit isn't about the asylum

16   application.  Mr. Lupkin covered that.  The asylum -- the

17   existence of an asylum application isn't raised in the

18   complaint at all.  Mr. Golden's hypothetical --

19             THE COURT:  Address my question.  My question is,

20   there could be -- the nature of an asylum application has to do

21   with your activities in the home country which is Russia,

22   which -- and has to do with persecution or the potential for

23   persecution.  And I don't see how that might not be relevant to

24   the very claim that your client has made here that the

25   defendants have lied about what he is -- his activities in

48

1    Russia were.

2            MR. SAUNDERS:   Your Honor, for -- the plaintiff has

3    made up stories about -- and allegations --

4            THE COURT:   The plaintiff?

5            MR. SAUNDERS:   I mean, the defendant rather, has made

6    up allegations about what Mr. Egiazaryan allegedly did in

7    Russia and it seems to be --

8            THE COURT:   No, no.   I'm talking about the defamation

9    claim.

10           MR. SAUNDERS:   I know.   That's what I'm --

11           THE COURT:   Right.   That's what he sued about.

12           MR. SAUNDERS:   That's right.

13           THE COURT:   Good.   You're with me.   Go ahead.

14           MR. SAUNDERS:   And now to take what is considered by

15   the U.S. Government to be one of the most highly sensitive

16   functions that the Government employs with -- when somebody

17   files an asylum application that whatever would be in such a

18   hypothetical application to force that -- to force him to then

19   have to turn that over would be standing -- would be standing

20   the process upside down.   And we're talking about a very

21   sensitive situation involving -- there's no question about Mr.

22   Egiazaryan's situation in Russia and the public statements that

23   he is here for his safety.   He can be here without having filed

24   an asylum application.

25           Their efforts to expel him have nothing to do with an

49

1    asylum application.  It doesn't have to exist to expel him.  He

2    doesn't have to have an asylum application to stay in the

3    country.  And it is -- it's taking the regulations and putting

4    the defendant -- putting the plaintiff in a Hobson's choice

5    where the complaint was drafted so as to not address any asylum

6    application.  Real contemplated in the future as Mr. Lupkin has

7    said they're not -- the plaintiff isn't seeking damages over

8    the result of any hypothetical or potential asylum application,

9    but to force somebody to disclose it goes to one of the most

10   sacrosanct documents that can be generated in this country.

11   And particularly involving Russia and what is going on in

12   Russia today, how many people -- how many more people need to

13   die?  And that's what we're talking about.

14          Mr. Egiazaryan's relatives have died.  Others who

15   have spoken about -- against, others who have gotten into a

16   conflict with the government in Russia have died, lawyers who

17   might have worked with him died in defending their clients

18   because they refused to manufacture evidence.  So at that point

19   the asylum application if and when it ever exists, if it ever

20   does, is a document that needs to be treated quite gently.

21          And to say that the plaintiff -- or the defendant can

22   somehow justify making statements accusing Mr. Egiazaryan of

23   things like anti-Semitism because it is so sensitive, because

24   it roils the emotions and touches people the way that it does

25   because nobody could possibly be for it and link it -- to say

50

1  that that allows him to then go take discovery of this

2  sacrosanct document is pushing the process too far when the

3  document isn't part of the case.  Anything that might be

4  covered by the document as far as its result, its impact, the

5  plaintiff is stipulating is out of the case.  They're taking

6  discovery about an asylum application that there isn't one

7  word.  The complaint never says asylum application.  So the

8  plaintiff shouldn't be allowed -- the defendant shouldn't be

9  allowed to go that far to avoid a claim that it had no basis

10  for making the statements that are at issue what are in the

11  letters that were submitted that Mr. Zalmayev generated.  And

12  that's what the allegation is about, so there's no reason to go

13  that far.

14        THE COURT:  Okay.  Well, I'm back where I was which

15  is that -- well, maybe I should say, you know, obviously the

16  risks to life are something that's very important.  I don't --

17  you know, this case is not saving anybody's life.  This is a

18  case about your client wanting to get money.  Okay.  It's not a

19  case about him enjoining anyone from saying bad things about

20  him in the future or doing anything like this.  It's about him

21  getting money.  That's fine.  He has the right to do that, but

22  sometimes there's a price for that and the price for that is

23  that one has to open up one's life.  It doesn't just happen in

24  this situation.  It happens in all kinds of other situations.

25        I cannot get past the fact that one of the claims

. 51

1   here that he's seeking money for is that the defendant falsely
2   said that he's involved in this highly visible Russian
3   political party and I can't get past the fact that that is
4   something that could be reflected in any asylum application if
5   there is one.  So I think for that reason alone there is
6   potential relevance here and I think we can alleviate the
7   concern about danger and so forth by making this a document
8   that is examined by the attorney only.  In fact, I'm willing to
9   have a situation where the actual document itself is kept in
10  the offices of plaintiff's counsel and can be examined there by
11  the defendant's attorney and should be allowed to take whatever
12  notes he wants, but not make copies of the document.  And then
13  down the road if it turns out that there's things in there that
14  he wants to do questioning about or that is -- he can make a
15  case should be -- should cause the document to be relieved of
16  these restrictions, I'm going to hear him.  So that's the
17  circumstances under which he can get the document.
18          In terms of questioning the plaintiff -- assuming it
19  exists in terms of questioning the plaintiff about it, I mean I
20  think the assumption should be that anything in the deposition
21  is not confidential.  Therefore, he shouldn't be questioning
22  about anything regarding the contents of the documents itself
23  without coming to me first to figure out how we're going to do
24  it.  So that's my ruling on that.
25          I don't know what's left of the plaintiff's letter at

52

1   this point.

2           MR. GOLDEN:  Your Honor, if I may.

3           THE COURT:  Sure.

4           MR. GOLDEN:  If the issue is Mr. Egiazaryan's

5   relationship to the LDPR --

6           THE COURT:  Yes.

7           MR. GOLDEN:  -- there are infinite number of public

8   sources that --

9           THE COURT:  I've heard you on this.  It's okay.  I

10  don't care --

11          MR. GOLDEN:  Not going into the asylum application.

12          THE COURT:  Well, there's nothing like a plaintiff's

13  own statements about was his actions were made under oath and

14  in a situation that he's personally involved in, there's

15  nothing can beat that so I don't think there's any other

16  sources that can substitute for this.

17          Mr. Lupkin, what's left?

18          MR. LUPKIN:  Your Honor, in light of your apparent

19  ruling given the obvious importance of this issue to us. we

20  would like to request a stay of your ruling so that we can seek

21  an objection up to Judge Castel and if necessary go up to the

22  Second Circuit.

23          THE COURT:  No problem.  I will -- how soon can you

24  do an objection to Judge Castel?

25          MR. LUPKIN:  Fourteen days.

53

1          THE COURT:  You need the whole fourteen days.  Why do

2   you need fourteen days for this?

3          MR. LUPKIN:  Your Honor, this will be the first

4   application of its kind that I'm aware of.  There are no

5   reported decisions --

6          THE COURT:  Counsel, this is not -- this has to do

7   with discovery between parties, not between someone getting the

8   document from the Government.

9          MR. LUPKIN:  No, Your Honor.  This is the first

10  reported -- this would be the first reported decision of a

11  court -- of a United States court ordering that an asylum

12  application, assuming it exists, be turned over.  This is a

13  first.

14         THE COURT:  Fine, fine.  Fourteen days.  You've got

15  it.  So you have a stay until November 22nd meaning that the

16  stay is -- and if we file the objections it continues until

17  Judge Castel resolves the dispute.  That's fine.

18         MR. LUPKIN:  Thank you, Judge.

19         THE COURT:  Anything else, Mr. Lupkin?

20         MR. LUPKIN:  The only other thing I would ask is that

21  both parties have jointly submitted a request for an adjustment

22  of the fact discovery deadline by three months.

23         THE COURT:  I saw that.  I guess that's fine.

24         MR. LUPKIN:  And that the interim days will be

25  adjusted amongst the parties.

54

1          THE COURT:   That's fine.   All right.   I have the

2   letter.   Anything else?   Mr. Lupkin?

3          MR. LUPKIN:   No.   That's all.   Thank you.

4          THE COURT:   Mr. Golden, anything?

5          MR. GOLDEN:   Two things, Judge.   We submitted two

6   requests to Your Honor for Hague Convention discovery.   I think

7   Your Honor --

8          THE COURT:   Oh, now --

9          MR. GOLDEN:   -- has assigned something and then we go

10  up on --

11          THE COURT:   I think I was waiting on this conference.

12  Sure you want this?   It's counting towards your ten, right?

13          MR. GOLDEN:   Well, it may be that before I actually

14  take them I'll decide that there are ten that are more

15  important but because they take so long I would like to get

16  started.

17          THE COURT:   Let me just look and see who these people

18  are.   Maybe you can describe them.   Here we go.   Hold on.   I

19  found your letter.   This is John Luff [Ph.].   Oh, this is the

20  BGR people.

21          MR. GOLDEN:   That's who Luff is.   Yes.

22          THE COURT:   All right.   All right.   So shall I give

23  it to you right now?   Would that solve it?   Is that an easy way

24  to do it?

25          MR. GOLDEN:   That will be fine.

55

1          THE COURT:  Hold on.  Oh, hold on a second.  This is
2     supposed to be signed by the clerk.
3          MR. GOLDEN:  I wish I could answer that question with
4     authority, Judge.
5          THE COURT:  Okay.  You know what?  I think I'm
6     supposed to sign something and the clerk is supposed to do
7     something, so let's not do it now.  I can't hand it to you.
8          MR. GOLDEN:  Okay.  The next and last item, Judge, is
9     for purposes generally and because it relates to a comment that
10    Your Honor made, I have been trying to schedule the deposition
11    of the plaintiff and perhaps you could suggest to counsel that
12    they should make him available to me.
13         THE COURT:  Well, do -- you willing to do this
14    without having the asylum application because maybe there's a
15    stay on that right now.
16         MR. GOLDEN:  Yes, I am.
17         THE COURT:  Okay.  Well, are you willing -- what
18    about the whole document problem?
19         MR. GOLDEN:  I will work with what I have.
20         THE COURT:  When can you make your client available?
21         MR. LUPKIN:  Your Honor, we received yesterday
22    pursuant to the Court's order a request to describe the subject
23    matters of the testimony.  We received Mr. Golden's request
24    yesterday.  It's 15 pages long.  And Mr. Egiazaryan's list of
25    subject to testimony probably about 33 different subjects.

56

1   Most of them we don't have a problem with; some of them we do

2   but we've not had an opportunity to study it with any degree of

3   care.  We'd like to be able to do it.  There are certainly

4   stuff I could tell you right now we're going to have a problem

5   with and are likely to bring a protective order application.

6           THE COURT:  Can I just tell you you're -- if it

7   wasn't for my order which asked for that normally one wouldn't

8   have that at all.

9           MR. LUPKIN:  Well, we -- I understand that, but the

10  fact is that the order exists -- we would have sought -- we

11  would have sought a protective order on certain subjects

12  because it appears clear from what has been sought with respect

13  to Ashot Egiazaryan but there are additional subjects here.

14  We'd like the opportunity, as we did with respect to Mr. Golden

15  on the documents that would resolve virtually all of the issues

16  to review these items, discuss them with them, and if there's

17  an issue we'll come back.

18          THE COURT:  All right.  But you have to do that soon.

19  I mean, this case -- I mean needs to start moving along.  It

20  originally had a discovery deadline in January so the plaintiff

21  is the first one to go normally.  How soon can you get me this

22  letter?  Don't tell me two weeks.

23          MR. LUPKIN:  The letter on the protective order?

24          THE COURT:  Yes.

25          MR. LUPKIN:  We can get it to you within a week,

57

```
 1   Judge.
 2              THE COURT:  All right.  So you can respond to that as
 3   soon as you can after that.
 4              MR. GOLDEN:  Yes.
 5              THE COURT:  Okay.  And then we'll see where we are.
 6   Anything else?
 7              MR. LUPKIN:  The only other item, and it's really
 8   more of a housekeeping issue in light of the Judge's -- in
 9   light of the Court's ruling on the asylum application to the
10   extent that it exists assuming that the stay -- assuming that
11   Judge Castel affirms, Your Honor, we would like the opportunity
12   to withdraw the limitation placed on damages since the whole
13   great [unintelligible] of that limitation was to avoid the
14   production of any hypothetical asylum application.
15              THE COURT:  I think you can consider it withdrawn
16   right now because I was taking you down a road to avoid having
17   it produced at all, so I consider it withdrawn.
18              MR. LUPKIN:  Very good.
19              THE COURT:  And -- yeah, I think that's the end of
20   it.  It's withdrawn because it's not -- it's no longer getting
21   you the relief you wanted which is not to have to show the
22   asylum application to the other side.  All right.  Anything
23   else?
24              MR. LUPKIN:  That's all, Your Honor.  Thank you.
25              MR. GOLDEN:  Nothing, Your Honor.  Thank you.
```

58

1          THE COURT:  All right.  Thank you.

2                      *  *  *  *  *  *

59

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4

5

6          _____

7                    Ruth Ann Hager

8     Dated:   November 9, 2011

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25