# EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EX PARTE APPLICATION PURSUANT TO 28 U.S.C. 1782 OF DENORO INVESTMENTS LIMITED, ET AL., | ) ) ) ) ) | CASE NO: 2:10-CV-8583-ODW-SH |
| Plaintiffs, | ) ) | CIVIL |
| vs. | ) ) | Los Angeles, California |
| ASHOT EGIAZARYAN, | ) ) | Friday, November 12, 2010 |
| Defendant. | ) ) | (10:10 a.m. to 11:17 a.m.) |
| IN RE APPLICATION PURSUANT TO 28 U.S.C. SECTION 1782 OF DENORO INVESTMENT LIMITED, | ) ) ) ) | CASE NO: 2:10-MC-00387(SH) |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| DENORO INVESTMENTS LIMITED, | ) ) | |
| Defendant. | ) | |

EX PARTE APPLICATION, MOTION TO COMPEL
AND APPLICATION TO QUASH SUBPOENA

BEFORE THE HONORABLE STEPHEN J. HILLMAN,
UNITED STATES MAGISTRATE JUDGE

Appearances:             See next page

Court Reporter:          Recorded; CourtSmart

Transcribed by:          Exceptional Reporting Services, Inc.
                         14493 S. Padre Island Drive
                         Suite A-400
                         Corpus Christi, TX 78418-5940
                         361 949-2988

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

APPEARANCES FOR:


Plaintiffs:                    MAURICE M. SUH, ESQ.
                               DANIEL LEIGH WEISS, ESQ.
                               LAURENCE SHORE, ESQ.
                               Gibson Dunn & Crutcher, LLP
                               333 S. Grand Avenue
                               Los Angeles, CA 90071

Defendants:                    STEPHEN A. MANSFIELD, ESQ.
                               CHAD A. STEGEMAN, ESQ.
                               Akin Gump Strauss Hauer & Feld
                               2029 Century Park East, Suite 2400
                               Los Angeles, CA 90067

Courtroom Deputy:              Sandra L. Butler

1    <u>Los Angeles, California; Friday, November 12, 2010; 10:10 a.m.</u>

2                          (Call to Order)

3          THE CLERK:  Magistrate Judge presiding.  Calling Case

4    Number CV-10-8583, also Case Number 10-MC-387.  This is in the

5    matter of the Ex Parte Application pursuant to 28 U.S.C. 1782

6    of Denoro Investment, Limited.  Counsel, please enter your

7    appearance for the record.

8          THE COURT:  And the cross motion.

9          MR. MANSFIELD:  Good morning, your Honor, Steve

10   Mansfield and Chad Stegeman of Akin Gump for Denoro Investments

11   Limited.

12         THE COURT:  Good morning.

13         MR. SUH:  Good morning, your Honor, Maurice Suh

14   appearing on behalf of Mr. Ashot Egiazaryan.  With me here at

15   Counsel table is Larry Shore and Daniel Weiss.  They are both

16   with Gibson Dunn, as am I.

17         THE COURT:  Good morning.  I apologize for the brief

18   delay.  I was sitting for the Cypriot bar exam, as we all were,

19   I guess.

20             Having gone through all the papers twice -- and I

21   have no reply to either motion; is that correct?  I just have

22   oppositions but not --

23         MR. SUH:  That's correct, your Honor.

24         THE COURT:  Yeah.  What it pretty much comes down to

25   for me is I would like to hear from you, Mr. Suh, a response to

4

1   Denoro's opposition paper which I just received myself a few

2   minutes ago --opposition of Denoro to respondent's ex parte

3   application to quash --

4           MR. SUH:  Yes, your Honor.

5           THE COURT:  -- and I just would like your response on

6   the four Intel factors.

7           MR. SUH:  Thank you, your Honor.  Judge, as I

8   prefaced to my comments about the Intel factors, I think it's

9   valuable for us to put into context how the Intel factors, we

10  believe, set forth to guide this Court about the critical issue

11  of extending this Court's power into a foreign proceeding that

12  will materially impact both the Cyprus action as well as the

13  London arbitration.  We believe that the Intel factors are

14  focused on the appropriate measure of comity and respect for

15  the foreign jurisdiction.  We believe that this is not a

16  mechanistic application of the factors but a holistic

17  application of them to judge that very impact and when we

18  examine them as they are here, we believe there is no

19  justification for permitting Mr. Egiazaryan's deposition at

20  this time in these very complicated matters with the many

21  parties at issue.

22          It comes down to we believe there are two fundamental

23  pillars of Denoro's argument and they come right out of the

24  opposition to our motion to quash.  The first is Denoro wants

25  Mr. Egiazaryan's deposition because -- and I'm reading from

EXCEPTIONAL REPORTING SERVICES, INC

5

1   Page 7 -- that they think it will be more compelling and let me

2   quote it exactly.  "Denoro's denial of facts alleged in the

3           affidavit with which the Cyprus Plaintiffs obtained

4           the Cyprus order will not be as compelling as

5           Mr. Egiazaryan's own admissions that he misstated or

6           admitted material facts in that affidavit" and that

7   Egiazaryan is Artem (phonetic) Egiazaryan, the affiant in the

8   case.

9           The second pillar of their argument is contained on

10  Page 8 that in essence this Court should simply order the

11  deposition of Ashot Egiazaryan and let the Cypriot Court sort

12  out its admissibility.  We believe these two pillars seek to

13  fundamentally re-write the law under Section 1782, that if it

14  was always the case that simply that the moving party wanted to

15  have in their opinion a discovery procedure which they felt was

16  better than that was afforded to them, in many cases that

17  discovery would always be ordered when directed to U.S.

18  discovery procedures and secondly, of course, that the argument

19  that somehow the depositions would simply be ordered and then

20  let the foreign jurisdiction sort it out would be an abdication

21  of the Intel factors.  In that case we never would need to

22  examine either one of those.

23           And when we look at these -- the two fundamental

24  pillars of their opposition, I think it in fact attempts to, as

25  I've mentioned, rewrite the law on Section 1782 and those four

6

1  factors which we will examine I guess in greater detail right

2  now.

3          So on the first factor, we think that in response to

4  our argument that of course Mr. Ashot Egiazaryan is not just a

5  party but he is the plaintiff in the action that the issue is

6  really not whether or not they would prefer to have the

7  deposition testimony of Mr. Egiazaryan but in fact whether or

8  not that information, the evidence, is in fact available to

9  Denoro and that is in fact precisely the situation --

10         **THE COURT:**  What do you mean "available"?

11         **MR. SUH:**  Available to Denoro in that Mr. Egiazaryan

12  -- Artem Egiazaryan is subject to cross examination on his

13  affidavit and the reason why ostensibly the deposition of Ashot

14  Egiazaryan is sought by Denoro is for the purpose of testing

15  whether or not there is missing or incomplete or false

16  information in Artem Egiazaryan's affidavit.

17         Now, that evidence is in fact available to Denoro

18  through the cross examination of Artem.  Denoro has made the

19  decision that for them, it is better for them to in fact simply

20  try to get this through Ashot Egiazaryan but that really isn't

21  the test under Intel Factor Number 1.  Intel Factor Number 1

22  really looks at whether or not the evidence is obtainable.

23  Whether or not the evidence obtainable is the key factor and

24  that factor -- that is exactly the case here and there are two

25  things, I think, that highlight this difference between what

1   the law is and what Denoro attempts to do here.

2        The first thing is it is clear they have not tried to

3   do anything in order to get that evidence and secondly -- and I

4   guess the key point there is that they had the -- they have the

5   ability to get documents from Artem Egiazaryan as well as from

6   Ashot Egiazaryan but instead they've elected to go straight to

7   the deposition.  They have not done anything in order to

8   determine whether or not the evidence is obtainable and this is

9   not --

10       **THE COURT:**  And that would be via the London

11  arbitration or the Cyprus action?

12       **MR. SUH:**  By the Cypriot -- the Cypriot rules.  The

13  Cypriot rules permit for this and I think these facts really

14  highlight the difference between the *Servico* case which is

15  repeatedly cited by Denoro's Counsel and what is in fact

16  present here because in *Servico*, what we had there is the

17  non-moving party resisted attempts to get the underlying

18  foundational evidence which would have allowed that evidence to

19  be used in the Venezuelan court.  There was an affirmative

20  effort by the parties in the foreign jurisdiction to get that

21  evidence and it was because there was a resistance to get it in

22  that jurisdiction, it was unobtainable and the Court commented,

23  well, we have a corporation located in our district.  This is a

24  technical violation and this renders it a very unique

25  circumstance.

8

1          Those circumstances don't exist here and, in fact, if

2     the Court were to apply Intel Factor 1 against Mr. Ashot

3     Egiazaryan in this circumstance, that Intel Factor 1 would be

4     meaningless because in many places in the world, there is

5     nothing more powerful compared to their procedures than a

6     videotaped, transcribed deposition, especially at the stage

7     that they seek to use it and in many ways parties -- moving

8     parties would always be able to say, we like this better.  They

9     would come into Court -- the U.S. Court and say, we would like

10    to get this discovery tool.

11          We haven't done anything in the foreign court to try

12    to obtain the very evidence and we want to get it against the

13    party and, again, we have not been able to identify any case

14    that says that such a great extension of the law under Intel

15    Factor Number 1 and so we think Intel Factor 1, we would

16    submit, your Honor, squarely weighs in favor of Mr. Ashot

17    Egiazaryan and furthermore that the case that they cite,

18    *Servico*, is an example of precisely why that is true.

19          With respect to Intel Factor Number 2, again I think

20    this issue is also squarely in Mr. Ashot Egiazaryan's favor

21    because the Cypriot Court cannot and will not consider any

22    deposition examination of anyone at this stage in the

23    injunction proceeding and this is something, again, out of

24    respect for comity and the procedures in the foreign

25    jurisdiction, we submit that U.S. Courts should not get

1    involved.

2           Again, there are many procedures in place in foreign

3    jurisdictions around the world where depositions are not

4    permitted at preliminary stages and that's exactly what we have

5    here, a very preliminary stage.  There is -- I would note that

6    Denoro has repeatedly stated in its opposition papers that the

7    Court has not issued any rulings or made any statements that it

8    would not receive evidence that was developed in the United

9    States.  I feel that this is -- really only tells half the

10   story and, in fact, provides an inaccurate picture of what has

11   happened here because the issues that we're talking about here

12   have never in fact been raised in the Cypriot Court and thereby

13   would allow the Court to comment on it in the first instance.

14          So the Cypriot Court is sitting there unknowledgeable

15   about this procedure going on here in the United States and in

16   fact it has not received any requests to get any of the

17   evidence with which they would otherwise be entitled under

18   Cypriot rules.

19          **THE COURT:**  Would it be helpful to them on an

20   international basis to see that we are assisting the procedures

21   and letting them make the final decision as to admissibility?

22          **MR. SUH:**  Well, Judge, I think we would submit in

23   that circumstance that if that were the case, then we would

24   never need any of the Intel factors.  If the point is simply to

25   always allow the moving party to get their Section 1782 relief,

1   to then throw it back to the other foreign jurisdiction to make

2   the decision, we feel that would be a -- in fact, an abdication

3   of the Section 1782 factors.

4           And might I add one thing here which I'll get to in a

5   moment?  Because this is holistic approach to the situation at

6   hand, even if that were true, Judge -- even if it were true

7   that in some circumstances we would do that, we would strongly

8   urge the Court not to do it here because, as I'll talk about,

9   there are real -- there's a real prejudicial effect for

10  Mr. Ashot Egiazaryan.  This is not a simple proceeding

11  occurring by itself alone.  This is a proceeding which is part

12  of the London arbitration which, again, has its own set of

13  rules and as I'll speak more about in a moment, that he would

14  suffer severe prejudice.

15          So even if it were true, Judge, that in some

16  circumstances we would order the -- you would order the

17  requested deposition but then turn around and allow the foreign

18  jurisdiction the decision about its admissibility, there are

19  many factors here that would render it, we believe, very

20  inappropriate in the circumstance.

21          With respect to Intel Factor Number 3 --

22          THE COURT:  One thing on 2, and I have not had a

23  chance to read the case law in the opposition brief but there

24  is a Ninth Circuit case I see, *Advanced Micro Devices*, noting

25  the Court rejected a requirement regarding admissibility in the

11

1    foreign tribunal citing another Ninth Circuit case.  Do you

2    have any comment on that case -- those cases?

3           MR. SUH:  I do, Judge.  We have seen a long line of

4    citation to cases about just pure admissibility and again we

5    feel that is a very different factor in this case and this goes

6    to whether or not there is a substantive versus a procedural

7    issue about whether or not to admit this evidence.  This is not

8    -- we are not asking the Court to make the determination that,

9    for example, there's a hearsay exception or a foundational

10   issue.

11          What we're asking the Court to recognize that under

12   Cypriot procedure -- Cypriot procedural rules, they will not

13   hear this testimony.  They will not hear this evidence at this

14   time and part of that is -- arises, as you can from

15   Mr. Javiar's (phonetic) declaration, in the structure of the

16   way the preliminary injunction proceeding is held, that is,

17   that there is in essence a kind of TRO issued and there is an

18   application on that injunction.  The affiants are cross

19   examined and the cross examination of those affiants then

20   proceeds forward.  We --

21          THE COURT:  So -- excuse me.  So these Ninth Circuit

22   cases, I take it, refer to evidentiary rules, not procedural

23   rules?

24          MR. SUH:  One moment, Judge.

25          Judge, before I say unequivocally yes, I think I

12

1    would want to briefly review those cases.  But I would like to

2    point out one critical factor that I think would affect the

3    Court's analysis of this, is that these cases dealt with a

4    statutory fact -- the statutory factors, not the discretionary

5    factors at issue; That is, whether admissibility is required to

6    establish one of the statutory factors, and not the

7    discretionary factors in the Intel case.

8            But, your Honor, I think these cases, at base, do

9    nothing to change the analysis that from a structural

10   standpoint these are not raw procedural admissibility

11   arguments, and this argument -- these are the -- this is the

12   exact same issue raised in the opposition to quash on page 10,

13   where Denoro says -- makes the distinction between a

14   substantive limit on the admissibility of discovered evidence

15   versus a procedural limitation.

16           And I think the substantive limitation is exactly

17   what we have here.  The substantive limitation is the

18   limitation that under the structure of the Cypress rules and

19   the Cypriot procedure on handling an injunction proceeding,

20   that it is -- it is -- would be -- the Cypriot court would not

21   be receptive to that requested discovery.

22           Lastly -- well, actually, next Intel factor number

23   three:  the circumvention of foreign proof-gathering.

24           Again, we'd submit that Intel factor number three is

25   closely tied to Intel factor number two, especially as it

1    applies to substantive limitations here.  Again, there is,

2    under the circumvention of foreign proof-gathering issues,

3    there is -- we have the same issues with respect to the absence

4    of Denoro to make any affirmative effort to obtain the evidence

5    that they feel is important or at least the evidence that they

6    have put forward as the reason for the Section 1782.

7              And, again, I would make the point here that this is

8    not an exhaustion of remedies argument, as I think has been

9    made in the opposition papers.  It is -- we're not saying that

10   they need to exhaust their remedies.  We simply are saying that

11   if they want to fall within the exceptions of these very unique

12   cases like *Servico*, that the facts here simply don't justify

13   it.  And if you were to apply the analysis that, again, they

14   are -- that Denoro is using here, the Section 1782 factors

15   would literally be gutted; that we would have persons,

16   applicants, coming in saying, "Well, we want this discovery;

17   it's really -- you know, we really may not be able to use it

18   there, but, Judge, simply order it and let them decide, and we

19   haven't made any affirmative effort to get the evidence, and

20   we're doing it right against a party that's subject to the

21   jurisdiction of that court."  And I think when you look at

22   this, again, holistically, this is precisely the kind of case

23   that a Section 1782 deposition should be ordered -- should not

24   be ordered.

25             So, that takes us to Intel factor number three.  Most

14

1  of this is within our papers, but, Judge, I will say that there

2  is a deep concern by our client, as I'm sure the Court is

3  aware --

4       THE COURT:  You're talking about the fourth factor

5  now, right?

6       MR. SUH:  The fourth factor.

7       THE COURT:  Yeah.

8       MR. SUH:  Yeah; the fourth factor, which goes to

9  intimidation and harassment.

10      This case is, obviously, part of a series of other

11  matters that are ongoing, not just the London arbitration, but

12  another one, which I will let the Court know about in a moment.

13  But, in essence, there are -- in particular, there have been

14  threats against Mr. Ashot Egiazaryan's wife.  Some of those

15  included the allegation that there would be revealed women that

16  he had relationships with.  The fact that we have a picture of

17  Ashot Egiazaryan with a woman not his wife has caused

18  significant harm to their marriage.  This has all happened

19  within the past week.  I can represent to the Court I was at

20  least witness to some of that significant discord.

21      This series of events has been both a shock and very

22  difficult for Mr. Egiazaryan.  He's been -- he's undergone

23  surveillance since about September 13th here in the United

24  States, per Denoro's investigator's own declaration, and that

25  surveillance has gone on, including other contacts, up to and

15

1   including even last night.  And I think that the facts related

2   to this, the harassment that is ongoing to Mr. Egiazaryan, are

3   factors that the Court must take into consideration when

4   ordering something as extreme as a videotaped deposition for

5   the purpose that they've made this application.

6          I will say -- and I want to make clear, Judge -- I am

7   not casting any specific aspersion on Mr. Mansfield or

8   Mr. Stegeman or any of the counsel here.  We have no indication

9   that the surveillance or anything else was directed by Akin

10  Gump or anyone else.  I would represent to the Court that I

11  know Mr. Mansfield; we have known each other for years.  I am

12  not making any aspersion against him or his firm.

13         **THE COURT:**  I understand that.

14         **MR. SUH:**  But it is -- there are other -- I think the

15  problem is there are other undercurrents ongoing in this case

16  which are extremely troubling.

17         And that, in fact, takes us to, I think, the look at

18  the prejudice and the equities broadly here.  If the deposition

19  is ordered, that bell cannot be unrung.  And we have a deep

20  concern here that, although the Court can issue a protective

21  order with respect to Denoro, there are many, many parties

22  involved in a London arbitration.  If the Court is interested,

23  my partner, Larry Shore, who is co-chair of the firm's

24  arbitration -- international arbitration group, who is going to

25  try the arbitration in London, can give you more detail on the

16

1   parties and how they relate to each other.  We even have a

2   chart for some of that if the Court is interested.  But I will

3   say that once this deposition transcript is out, it's out in

4   the world, and we don't know how to control it or how it will

5   be used, and certainly, even though a court can issue an order

6   against Denoro, it is impossible to determine where that's

7   going to go.

8          We have a lot of concerns about other things.  For

9   example, there is slanderous website up that --

10  www.ashotegiazaryan -- that's not his website.  There is

11  nothing on it but information which is both false and

12  slanderous to Mr. Egiazaryan.  If this deposition is

13  videotaped, we fully expect that videotape to be posted on that

14  website.  If there is an issue related to the London

15  arbitration, we can go and have Mr. Shore address exactly how

16  limited the rights of taking a deposition in connection with

17  that proceeding will be and what the order of it will occur.

18         But I think the main point here is that this is part

19  of a series of other cases.  As the Court is aware, the Cypress

20  injunction action is merely the action to prevent the

21  dissipation of assets.  This is really tied to the London

22  arbitration; this case is about the London arbitration; and

23  ordering it here would make it impossible to unring the bell or

24  control its use in other -- in the other context.

25         I think the other issue which was raised in our

1    protective order is that there is no ability, at least as it

2    stands now, absent the Court's issuance of a protective order

3    along these lines, to have a deposition of Mr. Karamov --

4    Mr. Karamov is, in fact, Denoro -- and have it work in the same

5    way to allow a reciprocal advantage.  If something like a

6    deposition of Mr. Egiazaryan was to go forward, it would only

7    be fair in the context of allowing this early fact-gathering

8    process to have the same thing --

9              THE COURT:  I don't think that would be my

10   inclination.

11             MR. SUH:  Okay.  Thank you, Judge.

12             ~~THE~~ COURT:  I think I will either grant the motion or

13   deny the motion, but --

14   Mr. Suh.  ~~THE~~ COURT:  Thank you, Judge.

15             And the other prejudicial factors are, of course,

16   that Mr. Egiazaryan is here in the United States, as his wife's

17   declaration indicates, because he was -- in essence, received

18   such threats and intimidation that prompted his move here.  And

19   in order -- these are the same threats and intimidations as

20   will be developed in the other cases, which have come from the

21   parties, with which he is opposed to, and for them, Denoro and

22   others, to take the unfair advantage of those threats to get

23   deposition testimony that they would not have otherwise been

24   able to get if those threats had not existed would be -- would

25   really be a miscarriage of justice and would be, frankly, wrong

1  in the context of the way this case has unfolded.

2        Lastly -- and I want to be careful how I describe

3  this, because we have only very preliminary information -- but

4  we have recently received information that Mr. Egiazaryan is

5  the subject of a criminal investigation in Russia.  We believe

6  that this criminal investigation is closely tied to and

7  prompted by the very parties that he has sued in connection

8  with the London arbitration.  And we have not yet closely

9  examined what the potential allegations are, but I did want to

10  put the Court and counsel on notice that Russia has a similar

11  constitutional provision as our Fifth Amendment, and if this

12  deposition were to go forward, we would have to closely examine

13  the impact of what we have been informed in connection with

14  this Russian -- potential Russian proceeding or Russian

15  proceeding and the questions that are being asked.

16        And, again, this also goes back to the inability to

17  unring the bell.  If he were to be forced to ask questions with

18  the pending Russian criminal investigation, it would put him in

19  a potential violation of his Article 54 rights.  Article 54 is

20  the provision under Russian law which would allow him to claim

21  what is a comparable privilege to the Fifth Amendment.  And,

22  so, I did want to put the Court on notice.

23        Two more points, Judge.  The exigency that we have

24  repeatedly heard about we believe is no exigency at all.  This

25  November 17th hearing date in Cypress is a date which was set

1   by Denoro's counsel.  I would note that it was set six weeks or

2   so after the initial appearance in the case and nothing had

3   been done about getting Mr. Ashot Egiazaryan's deposition in

4   place in a more timely fashion, and, so, therefore, that there

5   should be no exigency created by Denoro itself.

6          We also believe that there is no exigency related to

7   any billions of dollars.  And that is in large part because

8   Denoro transferred the shares that really would be the only

9   shares that represent billions of dollars in the case at or

10  about the same time the injunction went in place.  And, so, in

11  effect, we don't believe at all that there are billions of

12  dollars at issue.  Denoro is a shelf company in Cypress.  It

13  doesn't, to our knowledge, have any employees or officers or

14  anything else, and we believe it's entirely Mr. Karamov, and

15  that all of that is -- indicates that there is no exigency at

16  all here.  And if the Court needed additional time for its

17  consideration of all the issues in place, we would --

18          THE COURT:  You would be happy to give me the time.

19      (Laughter)

20      MR. SUH:  We would be happy to stipulate to move the

21  November 17th date in Cypress and cooperate with counsel to do

22  that so there is no hearing date, even though that the

23  deposition transcript, we believe, and have submitted to our

24  Cypriot counsel, would not be admissible in any case in

25  connection with the November 17th hearing.

20

1         So, I believe I have taken -- I have addressed the

2  Intel factors and talked about the prejudice issues that are at

3  hand here.  Judge, there is a discussion we would have about

4  some of the protective order components.  I think that I would

5  hold on that, given the Court's comment, and if the Court

6  wanted to ask specific questions about our recommendation for a

7  protective order, that would be -- that would be fine.

8         THE COURT:  I think until I decide the main motion,

9  that's premature.

10         MR. SUH:  All right.

11         THE COURT:  And we could do that telephonically if it

12  reaches that point.

13         Mr. Mansfield?

14         Thank you.

15         MR. MANSFIELD:  Thank you, your Honor.

16         Mr. Egiazaryan obtained an ex parte order freezing

17  billions of dollars of assets which each day have caused

18  irreparable harm and prejudice to my client, Denoro Investments

19  Limited.  What we're asking for is, and what we have obtained

20  from this Court, is a deposition subpoena in order to obtain

21  discovery to challenge that freezing order in the Cypress

22  court.  There is a substantial risk, we understand from our

23  counsel in the Cypress action, that if we do not get this

24  deposition done before the 17th, it will not be accepted by the

25  Court there.  This is our initial first opportunity --

1          THE COURT:   Where is there a declaration that says if

2    you do get the deposition it will or may be considered by the

3    Cypress Court?

4          MR. MANSFIELD:   It's in -- I'm going to say G.T.'s

5    declaration because I have difficulty pronouncing --

6          THE COURT:   I know who you mean.

7          MR. MANSFIELD:   -- paragraph 5 of his declaration.

8          THE COURT:   And read me the paragraph, please, or at

9    least the pertinent part.

10       (Pause)

11         MR. MANSFIELD:   This is the paragraph that indicates

12   that the Court will accept as an exhibit a deposition in

13   connection with the proceeding, but I think the Court's

14   question was with respect to the date, November 17th?

15         THE COURT:   With respect to the upcoming hearing in

16   Cypress.

17         MR. MANSFIELD:   Oh, then it's paragraph 5 and it's

18   what I just read, lines 11 through 13.

19         THE COURT:   If you could read it to me so I don't

20   find it here.

21         MR. MANSFIELD:   I'm sorry.

22         "Further, under Cypriote Civil Procedure Rules, in my

23         opinion, out of court evidence is allowed in

24         applications for interim injunctions like the present

25         one and, therefore, the Court will admit as an

1          exhibit to an affidavit the sworn evidence of a

2          person taken abroad."

3          THE COURT:  An exhibit to an affidavit by an affiant,

4  right?

5          MR. MANSFIELD:  Right.  The Court would accept the

6  transcript as an exhibit to an affidavit submitted in the

7  Cypress Court.  So, you'd submit an affidavit and attached to

8  it would be the transcript of the deposition -- the sworn

9  testimony.

10          THE COURT:  You think that the attorney could be the

11  affiant and attach the deposition transcript?

12          MR. MANSFIELD:  Yes.  That's how the procedure works

13  there.

14          THE COURT:  Hold on to that thought, because I want

15  to hear your response.  Okay.  Yes?

16          MR. MANSFIELD:  So, the purpose of this deposition,

17  your Honor, is solely focused and exclusively focused on the

18  Cypress action.  There's been comment and papers and an

19  argument today about an arbitration in London.  There is no

20  intent to use this in any way in the London arbitration.  If

21  the Court were to issue an order that limited it solely to the

22  Cypress action we would not oppose that.  That's all we want it

23  for.  We would sign a stipulation to that effect.  It's just to

24  clear the air.

25          There is no interest or strategy of using this

23

1    deposition in connection with the London arbitration.  The

2    purpose is to effectively challenge what has occurred in the

3    Cypress Court, which has damaged our client in terms of the

4    freezing order.  It is that simple and straightforward.

5            With respect to the four factors, if I could briefly

6    review them, your Honor?

7            THE COURT:  Just tell me again what evidence I have

8    before me of irreparable daily ongoing harm to Denoro.  There

9    was one declaration that was fairly conclusory, but I don't

10   know whose declaration that was.

11           (Pause)

12           MR. MANSFIELD:  In Exhibit A to -- we'll call them

13   G.T.'s declaration -- paragraph 9, and this is the order at

14   issue.  "And this Court further orders and prohibits directors

15   of Denoro Investments Limited, its officers and

16   representatives" --

17           THE COURT:  That's the order --

18           MR. MANSFIELD:  Yes.

19           THE COURT:  -- but what's the ongoing harm as we

20   speak?  Is there any evidence of exigent circumstances or

21   interruption to Denoro's businesses or --?

22           MR. MANSFIELD:  Well, your Honor, by virtue of the

23   order, they're unable to engage in any of the real estate

24   financing business activities because of the imposition of the

25   freezing order.  They can't operate as a real estate investment

24

1    business.  It locks them up.  There's simply nothing -- they

2    can't operate.

3            THE COURT:  But the other side says apparently that a

4    lot of funds were transferred right prior to the injunction.

5            MR. MANSFIELD:  I haven't seen any of it to that

6    effect, your Honor, at all, other than the representations.

7            THE COURT:  It may be a wash for my purposes.  There

8    may just be a draw on this issue.  But go ahead.  You were

9    going to talk about the *Intel* factor.

10           MR. MANSFIELD:  *Intel* factors.  I wanted to start

11   with what is often referred to as the fourth factor first,

12   because I think it sort of sets the stage for this.  This Court

13   is sort of being asked to be sitting in the place of a Cypress

14   Court judicial official making decisions and that's not

15   necessary under 1782.

16           What we're seeking is a deposition, plain and simple.

17   It is not burdensome; no documents whatsoever have been

18   requested.  It is only for use in the Cypress action; no way

19   used in any other way for any other litigation; a one-day

20   discovery event.  That's what we're looking at.

21           The Court properly exercised its discretion in

22   issuing the deposition subpoena based on the factors because

23   this type of discovery is not available in the foreign

24   proceedings.  And as the declaration of G.T. demonstrates, the

25   Cypress Court would not be hostile to receiving a transcript of

1   this deposition in connection with the Cypress proceedings.

2        Now, I know that Mr. Egiazaryan's counsel have

3   produced an opposing deposition on the point.  They disagree

4   about its admissibility and its receipt in evidence.  That

5   leads to the question that I think the Court referred to

6   earlier of admissibility.  That is not a question for this

7   Court.  It's the question for the Cypress Court at the end of

8   the day, what they will admit and what they will not admit.

9   But that shouldn't influence the strict application of 1782

10  factors in granting the opportunity to take the deposition.

11       The factor about circumventing substantive Cypress

12  discovery limitations; I want to clear this up a bit.  There's

13  a distinction that we see in the case law when the Courts talk

14  about this third *Intel* factor between substantive limitations

15  and procedural.  And I do think they make it quite clear what

16  the difference is and the clarity is in our favor and the

17  *Servicio Pan Americano* case probably says it in the clearest

18  way, but in short, what they're talking about there is if

19  there's a substantive limitation, they mean an issue of

20  privilege.  You can't go there.  It's privileged.  And if

21  you're trying to use 1782 to circumvent a rule prohibiting

22  invasion of privilege or some other protected, inadmissible

23  area, that's a substantive limitation.

24       Procedural limitations about what might be available

25  in the Rules of Civil Procedure in the Cypress Court are not

26

1    considered circumventing.  And the language on page 6 of the

2    *Servicio Pan Americano* case, I think, says it very clearly in

3    referencing the Supreme Court's decision in *Intel*.

4              "The Supreme Court recognized in the *Intel* case that

5              a foreign Court's procedural discovery limitations,

6              as opposed to substantive limits on the admissibility

7              of discovered evidence, should not prevent a district

8              court from enabling a foreign litigant to obtain

9              admissible evidence here to Section 1782."

10             And I think that really does clear up what we're

11   dealing with here.  This is not a circumvention of a

12   substantive Cypress limitation at all.

13             **THE COURT:**  Doesn't that depend on which attorney I'm

14   persuaded by?  Which declaration I'm persuaded by?

15             **MR. MANSFIELD:**  I would say no, your Honor, because I

16   think at the end of the day the Cypress Court is the Court that

17   makes the decision.  This Court -- 1782 and as you read -- as

18   one reads *Intel* and the other cases, this is a broad effort in

19   this statute to encourage discovery for purposes of efficiency

20   and reciprocity.  And so, it is a statutory vehicle that is

21   about encouraging and being broad, as long as you meet the

22   discretionary factors, obviously.  It's not without limits.

23             But if you meet those discretionary factors, it is

24   about allowing and encouraging the gathering of evidence to

25   encourage other countries to reciprocate in the future.  But

27

1   it's always left to the tribunal litigating the matter and that

2   judge to make those decisions about admissibility and its own

3   laws within the jurisdiction.

4        And really, I think what this comes out to is a very

5   straightforward application for a non-burdensome, seven-hour

6   deposition.  We're prepared to begin it today or finish it

7   today if we can.  The Court, I think properly, ~~waived~~ *weighed* the

8   factors and exercised its discretion in granting the deposition

9   subpoena.  I don't think anything has been --

10        **THE COURT:**  That was untested.  That was ex parte.  I

11   mean, I have the whole thing in front of me now and, obviously,

12   it's a much more complicated question than it was in October.

13   But go ahead.

14        **MR. MANSFIELD:**  I wanted to -- having addressed those

15   four factors -- just address a few of the arguments that Mr.

16   Suh raised.  A claim of prejudice that they're making that if

17   the deposition is order, the bell cannot be unrung.  Well, with

18   all due respect, we disagree.

19        I mean, if we go forward with the deposition, and I

20   believe we should under 1782, they will have an opportunity to

21   argue in the Cypress Court that it should not be admitted.

22   That's the only Court we're looking at here.  So, if they want

23   to call that unringing the bell, they get to challenge it

24   later, but we get to have our 1782 rights and go forward.  So,

25   then can unring the bell.  There's no prejudice there.  We're

1  in the course of a discovery procedure.

2         The second claimed prejudice is that, well, if you

3  order a deposition it's going to get out and it will prejudice

4  them.  I don't believe if there really is a need, and I don't

5  believe there's a need, but if there really is an articulated

6  need to take steps to prevent against dissemination, including

7  orders covering counsel, I mean, we're capable of doing those

8  things.  In certain cases, Courts make those orders and we

9  follow orders.  So, I don't see any prejudice in doing it.  I

10 think it needs to get done to protect Denoro's rights in

11 pursuing its challenge to the freezing order.

12        And there were a few other -- just to address --

13 arguments made about Denoro not moving in a timely fashion in

14 its 1782 application; that we waited until too close to this

15 date that is so important.  And I think, frankly, that's

16 unfair.  While they didn't challenge the threshold element we

17 needed to prove that Mr. Egiazaryan was in this district, that

18 actually did require some time and effort to prove up and I

19 know that there were comments made about surveillance.

20        But in order to appropriately apply for a 1782

21 application, we needed to have evidence that we could provide

22 to the Court that showed he was, in fact, in the district.

23 That took some time.  Obviously, if we could have brought this

24 earlier and we had that evidence, we would have done it.  So, I

25 don't think that was a fair criticism of the way in which we've

29

1    handled our application.

2          And then, lastly, I would add that the notion of

3    attempting to move the November 17th date would have no

4    irreparable harm on us is just simply not true.  The terms of

5    the orders essentially lock up the business activities.

6    Obviously, they obtained the freezing order because they wanted

7    to do that.  They would love a delay because it continues the

8    order that they obtained ex parte.

9          We haven't had a chance yet -- we haven't had a

10   chance as we're having today to actually address that in the

11   Cypress Court.  So, moving that date back would be grossly

12   unfair to us and continue the prejudice and irreparable harm to

13   us.  And we would be very opposed to that.

14          **THE COURT:**  Any brief comment about the potential

15   Russian prosecution?

16          **MR. MANSFIELD:**  I don't know personally anything

17   about it.  I don't -- the first I learned about it was hearing

18   Mr. Suh say what he said today.  I wasn't aware of those things

19   and it has no relevance as far as we are concerned.  This is a

20   very narrowly focused, specifically tailored effort to get a

21   one-day deposition, no documents, in order to effectively avail

22   ourselves of our rights to challenge a freezing order covering

23   billions of dollars and we're entitled under 1782 and we would

24   ask that the Court allow the deposition to go forward this

25   afternoon.

1              Thank you, your Honor.

2              **THE COURT:**  Thank you.  Yes?

3              **MR. SUH:**  Judge, may I remain at counsel table?  I

4    have --

5              **THE COURT:**  Sure.  Of course.

6              **MR. SUH:**  -- all the declarations in front of me.

7              Judge, we'll be -- I'll be brief.

8              First, I would like to address, I think, the Court's

9    comment about Cypriot procedure and about which attorney you

10   would be persuaded by in connection with the Cypriot

11   injunction.

12             I would direct the Court -- first, I'd make the

13   comment that our Cypriot counsel provided a very detailed and

14   thorough declaration which was very specific on each of the

15   points.  And contrary to that, I believe Mr. Triantafyllides,

16   their expert, was very careful and cautious in the way he

17   described how this could be used in the Cypriot procedure.  And

18   I'd like to read the entirety of Paragraph 5 to you.  There are

19   only three substantive paragraphs that address procedures.  In

20   Mr. Triantafyllides' declaration.  But it reads as follows:

21             Paragraph 5 begins,

22             "Under Cyprus law and procedure, no mechanism exists

23             for taking depositions.  However, based on my 30

24             years of case experience in Cyprus courts, the lack

25             of such a formal mechanism does not prevent in my

31

1          opinion the Court from taking into account deposition

2          testimony taken in other countries such as the United

3          States provided it is produced in court in the proper

4          way.

5          "For example, attached is exhibit to an affidavit

6          filed in Cypress in support of the opposition to the

7          Cypress injunctive proceeding."

8          We then go to the portion that was read in Court:

9          "Further under Cypriot civil procedure rules in my

10         opinion out-of-court evidence is allowed in

11         applications for interim injunctions like the present

12         one; and therefore, the court will admit as an

13         exhibit to an affidavit the sworn evidence of a

14         person taken abroad."

15         I think this is a very carefully drafted paragraph,

16    and we actually read it a number of times and talked about it

17    in great detail with our expert in drafting our declaration.

18    And, you know, I think the fundamental point here is that the

19    -- Mr. Triantafyllides is saying there is -- the lack of such a

20    formal mechanism does not prevent the Court from taking into

21    account deposition testimony which again is very different than

22    the detailed analysis provided by Mr. Haviaras given orders 39

23    and 48 during the procedure.  And I think perhaps it would be

24    easier to have the Court, if it wished, review orders 39 and

25    48.  But from the way they are written, it is I think to my

1   mind supports Mr. Haviaras' affirm opinion which is repeated

2   throughout his declaration that the -- and I'm reading from

3   Paragraph 26 --

4           "In my opinion, given the procedures prescribed in

5           orders 38 and 48, the Cypriot Court would not only be

6           unreceptive to evidence obtained in a deposition in

7           the United States but also could not accept the

8           transcript of the examination of a non-affiant such

9           as Mr. Ashot Egiazaryan because to do so would

10          contravene the Cypriot civil procedure rules and

11          destroy the integrity of the injunctive proceeding."

12          So I think --

13          THE COURT:   What is the definition of an affiant?

14  Could it be an attorney attaching a deposition transcript or

15  does it have to be someone with percipient knowledge about the

16  litigation?

17          MR. SUH:   Judge, I believe that's addressed in the

18  orders but I must admit I can't answer that question right now.

19  But I --

20          MR. MANSFIELD:   Your Honor, if it would be helpful, I

21  don't there would be dispute but I believe the lawyers are the

22  affiants in the Cyprus court proceedings.

23          MR. SPEAKER:   That's not true.   The Cyprus --

24      (Several parties reply negatively)

25          MR. MANSFIELD:   But we disagree then.

1          **MR. SUH:**  We agree to disagree.

2              But, Judge, I mean, I think one of the things to look

3     at in examining the structure here is that the affiant process

4     is to put forth evidence.  If they simply attach Mr.

5     Egiazaryan's deposition transcript, they have to -- they are,

6     in effect, producing no other independent evidence of their

7     own.  There would be no opportunity to cross examine their

8     affiant underneath the rules which is what I think the

9     integrity of the injunctive proceeding is about.  I mean, would

10    our right be to cross examine the lawyer saying this is the

11    deposition of Ashot Egiazaryan?  Of course, it's the deposition

12    of Ashot Egiazaryan.  It doesn't allow us the reciprocal right.

13    They have the right to cross examine Artem Egiazaryan.  But in

14    our case, if they get -- excuse me.  They cross -- yeah, Artem

15    Egiazaryan.

16             In our case, if they attach Asot Egiazaryan's

17    deposition, we are being offered the ability to merely cross

18    examine our own client or cross examine on a fact which is

19    utterly not in dispute which is that this is his deposition

20    transcript.

21             And I think when you look at it in that structure, it

22    just shows you how much this requested discovery is attempting

23    to turn the Cypriot procedure on its head.

24             In essence, it would avoid -- and we would plainly

25    submit, your Honor, the reason why this is being done in this

1  fashion is that no officer or employee can be submitted because

2  frankly, Carimav (phonetic) is Mr. -- Mr. Carimav is Denoro.

3  And in fact, we have counsel for Mr. Carimav present here in

4  the courtroom today.  And it's plainly an attempt to circumvent

5  the procedural structure in place in Cyprus.

6          And the fact that their lawyer has carefully crafted

7  a paragraph where he says there is nothing preventing the Court

8  from taking into account this deposition, does plainly -- it's

9  not even -- not even this deposition -- says there's nothing

10  preventing the Court from taking into account deposition

11  testimony.  So not even addressed to this -- to an injunction

12  proceeding that I think -- I think this plainly weighs in our

13  favor.

14          I would like to once again say with respect to

15  unringing the bell, we feel quite strongly about this.  The --

16  once the deposition transcript is submitted in the Cyprus

17  action, there has been -- once it is to clients and persons

18  involved, in particular we are concerned about Mr. Carimav

19  because he does control and is deeply involved with many of the

20  entities that are part of the London arbitration, there's no

21  way to control that particular transcript.  And again, I cast

22  no aspersion on Mr. Mansfield or Mr. Stegeman or Akin Gump but

23  once the transcript is out -- and by the way, this decision --

24  it's claimed that there's no videotape necessary but once the

25  transcript alone is out, there's no way to control it in a

1  foreign jurisdiction.  Those parties that could use it in this

2  case are not within this Court's jurisdiction, and there's no

3  way to fashion an appropriate protective order to account for

4  it.

5          And, Judge, just to make clear.  We're not saying

6  that any of these issues alone should be determinative.  We

7  don't believe any of these issues alone are determinative.  But

8  when you take a step back and look at whether or not it is

9  appropriate for a U.S. Court to exercise its power to order

10 this deposition in the context of all of these factors, we

11 think it's -- it is -- it would be plainly inappropriate.

12          I'm going to leave this last point about the billions

13 of dollars for last but I would like to say in advance of that

14 that the need to establish his presence in Los Angeles -- if

15 you turn to --

16          **THE COURT:**  I'm sorry.  The need to what?

17          **MR. SUH:**  Presence -- presence in Los Angeles, your

18 Honor.  If you turn to the declaration of Lawrence Wiist, I

19 read from Paragraph 3.

20          "I have been monitoring Mr. Egiazaryan to ascertain

21          his residence starting in mid-September 2010 -- "

22          Mid-September.

23          "-- and continuing on a day-to-day basis to the

24          present date.  On 43 occasions and at varying times

25          throughout the day including 9:15 a.m., 12:26 p.m.,

1              2:20 p.m. and 8:26 p.m. I have observed A. Egiazaryan

2              depart from 65 Endrino Place (phonetic), visit

3              different public venues throughout Los Angeles and

4              consistently return.

5              "I most recently -- "

6              "-- returned to 65 Endrino Place.

7              "I most recently observed him on October 24, 2010,

8              depart from 65 Endrino Place and return there

9              visiting a venue in Los Angeles."

10             Forty-three occasions from mid-September.  And to

11     review the bidding, your Honor, on the timeline here.

12     September 13th, the London arbitration, request for arbitration

13     was filed.  September 15th, the Cyprus injunction proceeding

14     was filed.  September 17th, the -- what is, in effect, the TRO

15     in place was put in place.  On November 1st, there was a

16     briefing schedule in place suggested -- excuse me.

17             I don't think -- I believe it was six weeks prior.

18             September 27th, excuse me.  On September 27th, the

19     November 17th date was set by Denoro in the Cyprus court.

20             So he's been under surveillance here in Los Angeles

21     per Mr. Wiist's declaration since mid-September.  And if there

22     truly was an exigent circumstance, then you would think, number

23     one, this would have been brought sooner; and number two, that

24     six weeks wouldn't have been set for this hearing on November

25     17th by Denoro on September 27th.

37

1          And so for all of these factors, I think there is no

2     exigent circumstance that is not at least at part if not wholly

3     created by Denoro.

4          And, Judge, I would make the following representation

5     about the comment by counsel that this is a simple, one-day

6     event.  Obviously, Judge, we have spent substantial amounts of

7     time preparing an opposition.  If it were only tied to this

8     Cyprus and it didn't have an impact on everything else ongoing,

9     we wouldn't do this.  The reason why we are contesting and

10    moving to quash is not because Mr. Egiazaryan wants to spend a

11    substantial amount of money having counsel in here fight over a

12    one-day deposition.  We're here because of all of these other

13    moving pieces in place.  And it is -- it would occur at a very

14    delicate time in the London arbitration -- just -- the

15    procedures have not yet begun.  It's not even at issue.  We

16    just received two days ago the response to the request for

17    arbitration.  And the preliminary stage that this Cyprus is at

18    and, I think, again this factor alone wouldn't govern and

19    shouldn't govern the Court's assessment of the case.  But it is

20    one of a number of factors that give you the picture, the

21    holistic approach which we think that the Supreme Court Intel

22    was encouraging us to follow.

23          And with that, I think I would turn to this billions

24    of dollars issue because we did think this was going to come

25    up.  We made a chart, and I'm going to actually have Mr. Shore

38

1  -- can you give a copy (indiscernible)

2          Let's put this right here.

3          MR. SPEAKER:  Your Honor, may I approach the Clerk

4  for a copy for you?

5          MR. MANSFIELD:  Your Honor, I --

6          THE COURT:  I'm not sure --

7          MR. MANSFIELD:  Obviously, they spent some time on

8  this chart but we were never provided this before just now.

9          THE COURT:  I'm not sure it's going to be helpful to

10  me.  I mean, I understand the general transaction at issue.

11  Why don't you just make your point without it; and then if I

12  need it, I'll tell you.

13          MR. SUH:  Judge, I think the central point is is that

14  the -- that Denoro which is the red box holds with others

15  Limerick (phonetic), which is a BVI (phonetic) company, which

16  holds Tribolen (phonetic), which is a Cypriot company, which

17  holds Decorum (phonetic).  And Decorum is the entity that held

18  the Decmos (phonetic) shares.  Decmos is the entity that had as

19  its asset the Mosclo Hotel (phonetic).  And the -- Decorum

20  liquidated the Decmos shares --

21          THE COURT:  I understand what you're saying.

22          MR. SUH:  -- on September 17th.  So there are no --

23  there aren't billions of dollars.  What there are, Judge, is

24  there are notes but the notes don't total anywhere near a

25  billion dollars.  They total about $80 million.  And, frankly,

1  because they are held by entities that are controlled by Mr.

2  Carimav, it is -- they are essentially not at issue here.  We

3  don't believe at this juncture that the issue has anything to

4  do with billions of dollars.  It would be wonderful if there

5  were billions of dollars in Denoro that were actually frozen.

6  That's simply not the case.

7          We had, in fact, -- we're -- the reason why we

8  wanted, in fact, this injunction against all these entities

9  because at the time that it was put in place we didn't know.

10  And we also don't know how funds will get transferred in and

11  out of these entities if that occurs at a later date.  So

12  that's -- I'm just saying that because they may answer the

13  question well if, Mr. Suh, there's no shares in there.  Why

14  don't you just release the injunction and have this be done

15  with?  Although we have considered that, I think the concern is

16  that we don't know where all this money is being transferred in

17  and out of.  And it is an entity that could be used for this

18  purpose and we're trying to be very careful on how we proceed,

19  given the large amount of money at issue in the Lemon

20  (phonetic) arbitration.

21          And I think -- and just to follow up on that, no

22  Denoro officer or employee or director has submitted a

23  declaration here.  We think in large part this procedure is a

24  way to prevent that from happening in the Cypriot court; which,

25  again, is a stratagem that should not be given credence by this

1    court.

2              **THE COURT:**  Mr. Mansfield.  Thank you.

3              **MR. MANSFIELD:**  Thank you, your Honor.  Just a couple

4    of sort of clean-up points.

5              There's no evidence or declaration submitted on any

6    of this.  This is argument.  We weren't given this last night.

7    They obviously spent some time preparing the chart.  There's

8    nothing in the record to support it.

9              **THE COURT:**  I'll let you go over the chart.  I hear

10   the argument.

11             **MR. MANSFIELD:**  And the argument as well is not

12   supported by anything in the record.

13             Also, very briefly.  This issue of the time it took

14   to do the surveillance to meet the perfunctory first step of

15   the application.  The standard that we had to prove was whether

16   he lives in the district.  Out -- you can see someone a number

17   of times in an area and they might be visiting and we certainly

18   wouldn't want to jump the gun because we know what they would

19   claim if we did.  So obviously some decision was made at a

20   point when they thought that determination could be made.  So

21   the notion that this wasn't exigent and it wasn't important and

22   we weren't moving diligently is simply not correct.

23             Now, the key point, the key point that I think was

24   discussed is the declarations, the opposing declarations.  And

25   there were comments, criticisms made of our declarant because

1   his deposition was rather general in saying that the transcript

2   could be used in the Cypriot court proceeding.

3         Well, I would say this. There's clearly a

4   disagreement among experts of Cypriot law. It will ultimately

5   have to be decided there. However, what's most important is

6   the argument or the reasoning presented by their expert is

7   inconsistent with the standards for 1782. All of those

8   detailed paragraphs and the references to Cypriot civil

9   procedure are missing the point. It's not the point when you

10   go to the law that interprets 1782 Intel and Servicio Pan

11   Americano (phonetic). Again, page 6, interpreting Intel, the

12   Supreme Court recognized in Intel that a foreign court's

13   procedural discovery limitations, allowed to take depositions -

14   - whatever the other ones are -- as opposed to substantive

15   limits on admissibility for privilege or other reasons, should

16   not prevent a district court from enabling a foreign litigant,

17   Denoro, to obtain admissible evidence under 1782. So all the

18   detail arguments about their rules of civil procedure missed

19   the point. To the extent the declarants disagree on whether

20   it's admissible, the Cypriot court will make that decision and

21   they will make whatever is the correct decision based on what

22   they're presented.

23         I would like to make one other point that I think has

24   sort of maybe gotten lost or I haven't featured before and that

25   is, we have a deposition. The deposition is going to be

1  helpful in attacking the freezing order.  The deposition is

2  also going to be helpful because the information learned will

3  lead to the discovery of other evidence, documents, other

4  witnesses, other things that we can do in challenging it.  So

5  there are multiple purposes and benefits that this foreign

6  evidence gathering through 1782 provides to Denoro in order to

7  avail itself of its first upcoming opportunity to challenge

8  this freezing order and we've urged the court to allow the

9  deposition to go forward.

10         **THE COURT:**  Do you want to make one brief comment or?

11         **MR. SUH:**  Very brief, Judge.

12         **THE COURT:**  Okay.

13         **MR. SUH:**  I find Mr. Mansfield's last comment a

14  little inexplicable because that seems to favor exactly the

15  reason why a deposition shouldn't be ordered if it's for wide

16  ranging discovery which is not contemplated at all in the

17  Cypriot structure.  And again, I think it brings us back to

18  this:  It's not the type of discovery that is available.  Not

19  whether or not the deposition -- a deposition is available.

20  The issue is whether or not the evidence is available for the

21  purposes that they want to use it.  And the evidence, which is

22  -- this is the first I've heard there's some other reason they

23  want to get a Section 1782 deposition -- but for the purpose of

24  attacking Artem Egiazaryan's affidavit, that evidence is

25  available.  That evidence is the cross examination Artem

43

1    Egiazaryan.  And with that we would submit, your Honor.

2            **THE COURT:**  All right.  Thank you-all.

3            I'm going to need until about 2:00, 2:30 to issue a

4    ruling.  If I do order the deposition to go forward, it will

5    have to commence sometime mid-afternoon and go until completed.

6    And that's not to indicate that I'm about to order the

7    deposition to go forward but I'm just telling you I can't rush

8    myself more than I have and I need to review some things before

9    I make, hopefully an intelligent ruling.  Obviously it's not

10   going to be a lengthy written ruling because I -- well, it's

11   not going to be a lengthy written ruling.  And if I prohibit

12   the deposition from going forward then Denoro may wish to seek

13   review of that immediately, so that's another reason that I

14   don't want to promise any kind of a lengthy written ruling.

15           And finally, if I do permit the deposition to go

16   forward, I'd like counsel to be available telephonically to

17   discuss any need for a protective order or any other details.

18   Am I sufficiently opaque about how I'm going to rule (laughs)

19   because I really don't know.

20           Any questions?

21           **MR. SUH:**  No, your Honor.  Just to be clear that if

22   it is possible that the court orders a deposition, that we will

23   have an opportunity to address some of the protective order

24   issues --

25           **THE COURT:**  Right.

44

1          MR. SUH:  -- telephonically.

2          THE COURT:  Right.

3          MR. SUH:  And we would also, if the court is thinking

4    along those lines -- we didn't get to this point but there are

5    certainly less intrusive ways than to conduct a videotaped

6    deposition in person.  Perhaps one of those would even be a

7    written series of questions.  There are a lot of ways to skin

8    this cat.  And at the end of the day, I think one of the things

9    we need to do and we will assert to the court we will do is

10   immediately begin to get to the bottom of these allegations in

11   Russia because that may cover a lot of what they seek to

12   discover.

13         THE COURT:  All right.  Thank you-all very much.

14         MR. SUH:  Thank you, Judge.

15         MR. UNIDENTIFIED:  Your Honor, there is one other

16   housekeeping issue.  Mr. Elliott Lauer (phonetic) has a pro

17   hoc --

18         THE COURT:  Yes, I signed both of those.

19         MR. UNIDENTIFIED:  I think there were three in total.

20         THE COURT:  Oh, I only saw two.

21         MR. UNIDENTIFIED:  There's Mr. Shore (phonetic),

22   there was Mr. Butler -- which I have these two.

23         THE COURT:  I'm sure I'll sign the third one but I've

24   signed two.

25         MR. UNIDENTIFIED:  Okay.

45

1          THE COURT:  Okay.

2      (Attorneys thank the Court)

3          Thank you.

4      (Proceeding adjourned at 11:17 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    November 15, 2010

        Signed                                              Dated


*TONI HUDSON, TRANSCRIBER*