USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12-7-11_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ASHOT EGIAZARYAN,

                            Plaintiff,                          11 Civ. 2670 (PKC)

            -against-

                                                               MEMORANDUM
                                                               AND ORDER

PETER ZALMAYEV,
                            Defendant.
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

            Plaintiff Ashot Egiazaryan brings this action against defendant Peter Zalmayev

asserting claims for defamation and injurious falsehood.  Zalmayev counterclaims, alleging that

Egiazaryan's suit is a strategic lawsuit against public participation (a "SLAPP" suit, entitling

defendant to damages under N.Y. Civ. Rights Law § 70-a) and that Egiazaryan defamed him by

circulating copies of the Complaint.  Zalmayev moves to dismiss the injurious falsehood claim

and all defamation claims, except for one arising from an article written by Zalmayev.

Egiazaryan moves to dismiss the Counterclaims in their entirety or, in the alternative, to strike

certain paragraphs from the Counterclaims.  For the reasons discussed, Zalmayev's motion is

granted, and Egiazaryan's motion is granted in part and denied in part.

BACKGROUND

I.          The Complaint

            Ashot Egiazaryan is a Russian businessman and member of the Duma, Russia's

lower house of parliament.  (Compl. ¶ 4.)  He is "engaged in a complex international legal

dispute" to recover his ownership interest in a project to redevelop the "landmark Moskva hotel."

(Compl. ¶ 10).  He alleges that a rival businessman, Suleyman Kerimov, and his associates

orchestrated a "corporate raid" to steal his ownership interest, and that Kerimov and his associates are behind various threats leveled against him and his family.  (Compl. ¶¶ 10, 12, 15-16.)  The threats include criminal charges, the stripping of his parliamentary immunity from prosecution, and death.  (Compl. ¶¶ 12, 15.)  Because of the threats, Egiazaryan moved with his family to the United States in 2010.  (Compl. ¶ 16.)  Were they to return to Russia, Egiazaryan and his family would "face a real and imminent risk of losing life and liberty."  (Compl. ¶¶ 17-18.)

Since his arrival in the United States, Egiazaryan has been the subject of negative publicity ("a black . . . public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia").  (Compl. ¶ 18.)  Peter Zalmayev, the director of the New York-based organization "Eurasia Democracy Initiative," is alleged to have been the source of some of this publicity. (Compl. ¶ 5.)  Specifically, Zalmayev has allegedly written or caused to be written several negative and allegedly defamatory articles and letters.  Each will be separately described.

Zalmayev Article (Count I).  On March 8, 2011, an article authored by Zalmayev, titled "Hiding in Beverly Hills," appeared in the Jewish Journal, a Jewish weekly with 150,000 readers and a popular website.  (Compl. ¶¶ 23-25 and Ex. A.)  The subject of the article is Egiazaryan, and it questions the desirability of his presence in the United States.  (Compl. ¶¶ 26-27 and Ex. A.)  The article asserts that Egiazaryan is a "prominent financial backer and member of the ultranationalist Liberal Democratic Party of Russia (LDPR), headed by his friend Vladimir Zhirinovsky."  (Compl. Ex. A.)  At one point, the article refers to the LDPR as the "Zhirinovsky-Egiazaryan party."  (Id.)  It goes on to assert that Jewish groups have "repeatedly condemned" Zhirinovsky and the LDPR as "anti-American" and "anti-Semitic."  (Id.)  The article concludes

by commending Christian Dior's swift condemnation of designer John Galliano's anti-Semitic rant, and it urges the United States "likewise [to] put anti-Semites worldwide on notice:  You are not welcome in this country."  (Id.)  Egiazaryan alleges that, contrary to the assertions of the article, he is not a member or leader of the LDPR, a friend of Zhirinovsky, or an anti-Semite. (Compl. ¶¶ 36-39).

Komarovsky Article (Count II).  Subsequent to the publication of Zalmayev's article, on March 14, 2011, an article by Leonid Komarovsky, titled "No Safe U.S. Haven for Hatemongers," appeared in the Moscow Times, an English-language daily published in Moscow. (Compl. ¶¶ 41-42 and Ex. B.)  Therein, Komarovsky asserts that Egiazaryan is a "long-standing member of the [LDPR], and, consequently its anti-Semitic and xenophobic agenda."  (Compl. Ex. B.)  Komarovsky also makes reference to the Galliano scandal and urges "Washington [to] follow the example of the fashion label," and "get real on anti-Semitism" by creating a no-entry list for "characters like [E]giazaryan."  (Id.)

Ponomarev and Alexeyeva Letters (Count III).  Prior to the publication of the Zalmayev and Komarovsky articles, human rights activists Lev Ponomarev and Lyudmilla Alexeyeva sent letters to Representative Chris Smith, "Ranking Member of the Commission on Security and Cooperation in Europe," stating their concern over Egiazaryan's presence in the United States.  (Compl. ¶¶ 51-53 and Ex. C., Ponomarev Ltr., January 29, 2011, and Alexeyeva Ltr., January 31, 2011.)  Colleagues of Ponomarev "indicated that Mr. Zalmayev provided drafts of the letters to Mr. Ponomarev."  (Compl. ¶ 69.)  Zalmayev admits that he "collaborated with [Ponomarev and Alexeyeva] in the preparation of the referenced letters."  (Answer ¶ 51.)

Both letters assert that Egiazaryan is associated with the LDPR.  (Ex. C.)  Both add the assertion that Egiazaryan helped create and then became deputy chairman of the Duma

Committee for Assistance in Political Regulation and Observance of Human Rights in Chechnya (The "Chechnya Committee").  (Id.)  Both assert that funds entrusted to the Chechnya Committee never reached their intended recipients.  (Id.)  Ponomarev concludes that this makes Egiazaryan "a contributor to the destructive second Chechen war."  (Id., Ponomarev Ltr.)  Alexeyeva further asserts that the Committee "provid[ed] cover for the numerous well-documented atrocities during the war."  (Id., Alexeyeva Ltr.)  Both letters reference the possible creation of a no-entry list; both urge the recipient to raise their concerns with the Department of State and the Department of Homeland Security so that those departments might reconsider the appropriateness of Egiazaryan's continued presence in the United States.  (Id.)

Ponomarev and Alexeyeva almost immediately sent retractions of their letters to Representative Smith.  (Compl. ¶ 61 and Ex. D, Ponomarev Retraction and Alexeyeva Retraction, February 7, 2011.)  Ponomarev stated that he "made a grave mistake," while Alexeyeva explained that she "had been misled."  (Compl. ¶ 67 and Ex. D.)

Freedom House Letters (Count IV).  In March 2011, Zalmayev visited another human rights organization, "Freedom House," with copies of the Ponomarev and Alexeyeva letters but not their retractions.  (Compl. ¶ 73.)  He did not make known his own participation in the production of the letters or that the letters had been retracted.  (Compl. ¶ 73.)  On March 14, 2011, Freedom House sent letters to the Department of Homeland Security and the United States Department of State Office to Monitor and Combat Anti-Semitism.  (Compl. ¶ 74 and Ex. E.)  The nearly identical letters assert that Egiazaryan "has for years been one of the leaders and a Duma representative of the LDPR, which is known for its virulently anti-Semitic, anti-American and xenophobic views."  (Ex. E.)  The letters conclude by urging the United States to take swift action and deny any bid by Egiazaryan for asylum.  (Id.)

4

II.    The Counterclaim

Zalmayev alleges that Egiazaryan has defamed him by producing and circulating the Complaint in this action and that Egiazaryan's lawsuit is a SLAPP suit against Zalmayev, which entitles Zalmayev to damages.  (Countercl. ¶¶ 52-53; 54-61.)

To support the defamation claim, Zalmayev points to the following allegedly defamatory aspects of the Complaint.  The Complaint alleges that Zalmayev is working with corrupt Russian authorities.  (Countercl. ¶ 44(d); Compl. ¶ 18.)  It further alleges that Zalmayev misled people into participating in a "dirty tricks" campaign, which included manipulating sophisticated adults into writing untrue statements that Zalmayev knew were untrue.  (Countercl. ¶ 44(e)-(f); Compl. ¶¶ 20-21, 40.)  In Zalmayev's view, the Complaint alleges falsely that Zalmayev "conspired to return Mr. Egiazaryan to Russia," where Egiazaryan and his family face grave danger.  (Countercl. ¶ 44(g); see Compl. ¶¶ 18, 89, 99.)[1]

Zalmayev alleges that, on June 9, 2011, a Moscow Times reporter called Zalmayev and said that he had received a copy of the Complaint; he did not say who had sent him the Complaint.  (Countercl. ¶ 46.)  Zalmayev notes that Egiazaryan has used lawyers, consultants and public relations professionals to respond to the negative publicity.  (Countercl. ¶ 46; Compl. ¶ 89(iv).)

DISCUSSION

I.    Standard of Review Under Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint [or counterclaim] must contain sufficient factual matter, accepted as true, to 'state a

---

[1] Zalmayev also alleges that the Complaint accuses Zalmayev of conspiring in a campaign of harassment, intimidation, persecution, abuse and character assassination; of assisting Kerimov in stealing from Egiazaryan; and of being involved in murder. (Countercl. ¶¶ 44(a)-(c)). However, the paragraphs that Zalmayev cites to support these allegations cannot be fairly read to accuse Zalmayev of those acts. (See Compl. ¶¶ 9-10, 17.)

claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In assessing plausibility, courts

draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust Litig.,

502 F.3d 47, 50 (2d Cir. 2007).  However, legal conclusions are not entitled to any assumption of

truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 129 S.Ct. at

1950.  Instead, the court examines only the well-pleaded factual allegations, if any, "and then

determines whether they plausibly give rise to an entitlement to relief."  Id.  If not, the complaint

must be dismissed.

## II.  Choice of Law

Jurisdiction in this case is premised on diversity of citizenship, and the parties

both present arguments based on New York law, the law of the forum state.  Accordingly, the

Court will apply New York law.  See, e.g., Tehran-Berkeley Civil and Envtl. Engr's v. Tippetts-

Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.1989) ("consent to use a forum's law is

sufficient to establish choice of law").

## III. Defamation Claims and Counterclaim

### a.  Applicable Law

Under New York law, the elements of defamation are (1) a defamatory statement

of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with

the applicable level of fault, (6) causing injury, and (7) not protected by privilege.  See Dillon v.

City of New York, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (citing Restatement (Second) of Torts §

588); see also Albert v. Loksen, 239 F.3d 256, 265 (2001) (same elements, following Dillon).  At

common law, falsity and fault were presumed; however, a series of Supreme Court cases

balancing the personal protections of defamation law against First Amendment concerns have

6

removed those presumptions in cases in which the plaintiff is a public official or a "public figure."  See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1985); Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974); Curtis Publishing v. Butts, 388 U.S. 130 (1967); New York Times Co. v. Sullivan, 376 U.S. 254 (1964).  Therefore, public officials and public figures must allege both the falsity of challenged statements and that they were made with "actual malice," that is, with knowledge of falsity or reckless disregard for the truth.  See Sullivan, 376 U.S. at 280; Curtis, 388 U.S. at 163 (Warren, C.J., concurring); Rinaldi v. Holt, Reinhart & Winston, Inc., 42 N.Y.2d 369, 380 (1977).

This heightened burden is justified not only by the need to protect public debate, but also by the differences between public people and private individuals.  Public officials, by seeking public office, "accept certain necessary consequences" including public scrutiny of many aspects of life.  Gertz, 418 U.S. at 344-45.  Public figures "stand in a similar position," because they have "assumed special prominence in the affairs of society."  Id. at 345.  "All purpose" public figures "occupy positions of . . . pervasive power and influence," while limited public figures have "thrust themselves to the forefront of particular public controversies."  Id.  In either case, they have invited attention and, like public officials, have "voluntarily exposed themselves to increased risk from defamatory falsehood concerning them."  Id.  Furthermore, public officials and public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."  Id. at 344.

With these tenets in mind, several lower courts have found foreign public officials to be public officials or public figures for the purposes of constitutional defamation law.  See Sharon v. Time, Inc., 599 F.Supp. 538, 563 (S.D.N.Y. 1984) ("parties properly assume" Ariel

Sharon, former Israeli defense minister, was "'public official,' or, in any event, a 'public figure'"); Desai v. Hersh, 719 F. Supp. 670, 673 (N.D. Ill. 1989) (confirming parties' stipulation that former high official in the Indian government was public figure).  In Lopez v. Univision Comm'cns, Inc., 45 F. Supp. 2d 348 (S.D.N.Y. 1999) (Kaplan, J.), the plaintiff was a member of the Colombian Senate and a doctor with an extensive practice, and he alleged defamation concerning his practice of medicine.  See id.  Judge Kaplan stated that he was "not prepared to say that the holding of any foreign public office was alone sufficient to invoke [the heightened defamation burden] at least as to a publication that does not identify the plaintiff as a public official and that does not directly concern the plaintiff's performance of official duties."  Id. at 361.  Still, Judge Kaplan noted, "plaintiff's public position is relevant to the determination whether he is a public figure."  Id.

"When the facts concerning this issue are not in dispute and are sufficiently set forth in the papers, the public-figure determination should properly be made by the court" as a matter of law.  Krauss v. Globe Int'l, Inc., 674 N.Y.S.2d 662, 663-64 (1st Dep't 1998); see Rosenblat v. Baer, 383 U.S. 75, 88 (1966).

In this case, the facts alleged in the Complaint, taken as a whole, establish that Egiazaryan is a public figure.  According to the Complaint, Egiazaryan is "an elected public servant representing the Russian people as a member of the Russian Duma (lower house of the Russian parliament) and . . . [as] a member of the Duma's Budget and Taxes Committee." (Compl. ¶ 4.)  The Complaint further alleges that Egiazaryan was able to secure more than one billion dollars in funding for his hotel project, including arranging "one of the largest loans ever made for a real estate project in Russia."  (Compl. ¶ 11.)  Egiazaryan secured that loan "with his own interest in the Hotel project and another project."  (Id.)  A "prominent former banker"

8

(Compl. ¶ 4) and politician who can arrange a billion dollars of investment based on his own credit occupies a position of pervasive power and influence and invites the sort of attention that justifies a heightened burden of proof for defamation.  See Gertz, 418 U.S. at 345.  Finally, the Complaint alleges that Egiazaryan has employed "attorneys, consultants and public relations professionals to fight the defendant's smear campaign."  (Compl. ¶ 89.iii.)  That is to say, Egiazaryan "enjoy[s] significantly greater access to the channels of effective communication and hence ha[s] a more realistic opportunity to counteract false statements than private individuals normally enjoy."  Gertz, 418 U.S. at 345.

True, Egiazaryan expressly denies that he is a public figure and alleges that he is a "private figure leading a private life in the United States."  (Compl. ¶ 82.)  But the above-referenced combination of facts alleged elsewhere in the Complaint is more than ample for this Court to conclude, as a matter of law, that he is a public figure.

Therefore, to survive the present motion, Egiazaryan must plausibly allege (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with actual malice, (6) causing injury, and (7) not protected by privilege. However, the Court assumes without deciding that Egiazaryan adequately alleges the first two and last two elements, because Egiazaryan's claims fail, variously, to establish publication to a third party, falsity, or actual malice. Likewise, the Court need not decide Zalmayev's public or private status, because his defamation counterclaim fails plausibly to overcome a relevant privilege.  The four relevant elements—publication, falsity, malice, and privilege—are discussed below.

Published to A Third Party by Defendant.  "In the law of defamation, 'publication' is a term of art," signifying communication of the defamatory statement to someone

9

other than the subject of the statement.  Ostrowe v. Lee, 256 N. Y. 36, 38 (1931); see Fedrizzi v. Washingtonville Cent. Sch. Dist., 611 N.Y.S.2d 584, 585 (1994).  The original publisher of defamation is responsible for the harm caused by republication by a third party if the original publisher approved of, participated in, or intended the republication.  Karaduman v. Newsday, Inc., 51 N.Y.2d 531, 540 (1980); Campo v. Paar, 239 N.Y.S.2d 494, 498 (1st Dep't 1963); see also Restatement (Second) of Torts § 576.  However, the original publisher is not liable for republication where he had "nothing to do with the decision to [republish] and [he] had no control over it."  Rinaldi v. Viking Penguin, Inc., 425 N.Y.S.2d 101, 104 (1st Dep't 1980).

Falsity.  "Under New York law, it is not necessary to demonstrate complete accuracy to defeat a charge of libel.  It is only necessary that the gist or substance of the challenged statements be true."  Printers II, Inc. v. Professionals Publ'g, Inc., 784 F.2d 141, 146 (2d Cir. 1986) (citing Rinaldi v. Holt, Reinhart & Winson, Inc., 42 N.Y.2d 369; Fairley v. Peekskill Star Corp., 445 N.Y.S.2d 156 (2d Dep't 1981)).  A statement is substantially true if its effect on the mind of the reader is no worse than the pleaded truth would have been.  Fleckenstein v. Friedman, 266 N.Y. 19, 23 (1934); accord Guccione v. Hustler Magazine, Inc, 800 F.2d 298, 302 (1986).

Actual Malice.  To act with actual malice, a defendant must have "in fact entertained serious doubts as to the truth of his publication."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).  Otherwise put, "only those false statements made with [a] high degree of awareness of their probable falsity . . . may be the subject of either civil or criminal sanctions."  Garrison v. Louisiana, 379 U.S. 64, 74 (1964).  It is not enough to allege that the defendant intended to inflict harm; the defendant must intend to inflict harm through falsehood.  Id. at 73.

Privilege.  Absolute privilege attaches to any person's fair and accurate reporting of judicial proceedings.  N.Y. Civ. Rights Law § 74 ("A civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding . . . .").  However, the New York Court of Appeals has held that "it was never the intention of the Legislature in enacting section 74 to allow 'any person' maliciously to institute a judicial proceeding alleging false and defamatory charges, and then to circulate a press release or other communication based thereon and escape liability by invoking the statute."  Williams v. Williams, 23 N.Y.2d 592, 599 (1969).  Therefore, in Williams, the Court of Appeals refused to dismiss the plaintiff's claim that the defendant had filed an earlier suit against the plaintiff solely to create a complaint that the defendants could circulate to defame the plaintiff.  "The *Williams* exception is narrow and 'does not apply in the absence of any allegation that the . . . action was brought maliciously and solely for the purpose of later defaming the plaintiff.'"  Fuji Photo Film U.S.A., Inc. v. McNulty, 669 F. Supp. 2d. 405, 412 (S.D.N.Y. 2009) (quoting Branca v. Mayesh, 476 N.Y.S.2d 187, 188 (2d Dep't 1984)) (alteration in original).

      b.       Application to Egiazaryan's Defamation Claims

Egiazaryan fails to state a claim for defamation arising from the Komarovsky article, the Ponomarev and Alexyeyeva letters, or the Freedom House letters. Because Zalmayev has not moved to dismiss the defamation claim based on Zalmayev's Jewish Times article, it is not further discussed herein.

Komarovsky Article (Count II).  The Komarovsky count fails because Egiazaryan alleges no nonconclusory facts to support the assertion that Zalmayev communicated the allegedly defamatory statements in the article to Komarovsky.  Egiazaryan relies on the purported similarity of "themes and phrases" to assert that Komarovsky's article is a "remix of

Mr. Zalmayev's 'Hiding in Beverly Hills.'"  (Compl. ¶ 43.)  But a simple "remixing," or republishing, of an earlier publication does not, on its own, state a claim for defamation against the original publisher.  See Rinaldi v. Viking Penguin, Inc., 425 N.Y.S.2d at 104.  Instead, Egiazaryan must allege facts tending to show that Zalmayev approved of, participated in, or intended the republication.  See Karaduman, 51 N.Y.2d at 540; Campo, 239 N.Y.S.2d at 498.  Egiazaryan does not offer any such facts.  Instead, he declares that "Zalmayev communicated false, defamatory and injurious statements to Leonid Komarovsky that led or contributed" to the article.  (Compl. ¶ 41.)[2]  Communication to a third party is an element of the cause of action; reciting that such communication occurred, without more, is a legal conclusion not entitled to a presumption of truth.  See Iqbal, 129 S.Ct. at 1950 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Without showing facts that support the conclusion that there was communication, there is no plausible allegation of Zalmayev's involvement in Komarovsky's article.  Therefore, the Komarovsky count fails.

Ponomarev and Alexeyeva Letters (Count III).  Egiazaryan fails plausibly to allege the falsity of some of the challenged statements in the Ponomarev and Alexeyeva letters and fails plausibly to allege actual malice as regards any of them.

The first alleged falsehood is the "impl[ication] that Egiazaryan is one of the leaders of the LDPR."  The Ponomarev letter refers to Egiazaryan as a long-time "member of the Russian Parliament from the extreme-nationalist [LDPR]," and the Alexeyeva Letter refers to him as a "ranking member of Vladimir Zhirinovsky's ultra-nationalist [LDPR]."  (Compl. Ex. C.)  Egiazaryan objects that he is not a leader or even a member of the LDPR, but rather "a non-party candidate nominated to its parliament group."  (Compl. ¶¶ 37, 57.)  However, the

_____

[2] In the preamble to the Complaint, Zalmayev states that only allegations relating to "himself and his own acts" are on personal knowledge; all other allegations are on "information and belief."  (Compl. at 1.)

challenged statements are substantially true, because they allege the "gist" of the pleaded truth. Printers II, Inc., 784 F.2d at 146.  In fact, the Ponomarev letter appears to assert the same truth alleged by Egiazaryan—that he is a member of parliament officially associated with the LDPR. Although the Alexeyeva letter states that Egiazaryan is a "ranking member" of the party, this statement is also substantially true because, in the context of a letter focused on his individual actions and not on his political affiliations, it would not have a worse effect on the reader than the pleaded truth.  See Fleckenstein, 266 N.Y. at 23.

The second alleged falsehood is the "affiliation between Egiazaryan and Teodoro Nguema Obiang," whom both letters describe as the son of Equatorial Guinea's "notoriously corrupt president."  (Compl. ¶ 58 and Ex. C.)  The only association the letters make is that both Egiazaryan and Obiang live luxuriously in Beverly Hills.  (See Ex. C.)  Egiazaryan nowhere denies that he lives in Beverly Hills or that Obiang may live there as well.  The letters do object to the presence of both men in the United States, but no false statement of connection between them is alleged.

The final alleged falsehood is the "suggest[ion] . . . that Mr. Egiazaryan embezzled or mismanaged funds" and that Egiazaryan "was responsible for war crimes or contributed to human rights violations."  (Compl. ¶¶ 59, 60.)  Both letters allege that Egiazaryan helped create and direct the Chechnya Committee and that the committee managed funds that did not reach the intended recipients.   (See Compl. Ex. C.)  The Ponomarev letter concludes that Egiazaryan was therefore "a contributor to the destructive second Chechen war."  (Compl. Ex. C., Ponomarev Ltr.)  Taken as a whole, the statements in both letters imply as fact that Egiazaryan was complicit in the mismanagement or misappropriation of humanitarian funds. See Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235, 254 (1991) (statements must be viewed "in

their context . . . to determine whether a reasonable person would view them as expressing or implying any facts" (emphasis removed)).  Egiazaryan plausibly alleges the falsity of this fact because he alleges that the committee never controlled the funds, that Egiazaryan was in fact a critic of the actual controller of the funds, the Ministry of Finance, and that Ponomarev and Alexeyeva retracted their allegations.  (Compl. ¶¶ 59, 61 and Ex. D.)

However, Egiazaryan fails plausibly to allege actual malice in the publication of this or any other fact in the letters.  Egiazaryan's repeated assertion that Zalmayev acted with malice (Compl. ¶¶ 84, 86-87) is unavailing because it is a legal conclusion not entitled to presumption of truth, and he alleges no facts plausibly supporting that conclusion.  See Iqbal, 129 S.Ct. at 1950.[3]  Malice in defamation law is not the intent to inflict harm; it is the attempt to inflict harm through *falsehood*.  See Garrison v. Louisiana, 379 U.S. at 73.  Therefore, the allegation that Zalmayev actively recruited others to his cause (Compl. ¶ 86), which says nothing of falsehood, does not plausibly establish actual malice. Likewise, the allegation that Zalmayev "employed phrasing, sequencing and 'guilt by association' in an intentional and calculated fashion to convey" that Egiazaryan is a "supporter of human rights abuses" (Compl. ¶ 85) does not plausibly establish actual malice because it does not suggest that the phrases, the sequences,

---

[3] Although malice is a "condition of mind" that may be "alleged generally," under Rule 9(b), Fed. R. Civ. P., the pleading requirements of Iqbal apply with equal force. See 129 S.Ct. at 1954 ("'[G]enerally' is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading [a condition of mind] under an elevated pleading standard.  It does not give him license to evade the less rigid-though still operative-strictures of Rule 8. . . .  And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss."); see, e.g, Hakky v. Wash. Post Co., No. 9 Civ. 2406, 2010 WL 2573902, *6 (M.D.Fla. June 24, 2010) (granting motion to dismiss for "fail[ure] to allege sufficient facts demonstrating negligence or actual malice"); Diario El Pais, S.L. v. Nielsen Co. (US), Inc., No. 07 Civ. 11295, 2008 WL 4833012 *6-7 (granting motion to dismiss action for trade libel for failure to allege malice beyond conclusory and unsupported assertions).

or their implication comprised knowing or reckless falsehoods.  Without more, allegations of

Zalmayev's hostility fail plausibly to establish Zalmayev's actual malice.

Freedom House Letters (Count IV).  As above, Egiazaryan makes a sufficient

allegation of falsity but no plausible allegation of actual malice as to the Freedom House letters.

Egiazaryan alleges that statements in the Freedom House letters "associating [him] with anti-

Semitic, anti-American and other reprehensible views" are false.  (Compl. ¶ 78.)  Both letters

describe Egiazaryan as a "leader and Duma representative of the LDPR" and allege that the

LDPR is known for its "virulently anti-Semitic, anti-American and xenophobic views."  (Compl.

Ex. D.)  The letters urge the United States to demonstrate its intolerance of bigotry by denying

Egiazaryan asylum.  (Id.)  The letters rely on the association of Egiazaryan with the LDPR for

the inference that he is a bigot.  In this context, the strength of Egiazaryan's association with the

LDPR is meaningful.  Accepting Egiazaryan's allegation that he is a "non-party candidate

nominated to [LPDR]'s parliamentary group," and that this is different from formal membership

(Compl. ¶ 37), the statement that Egiazaryan is a leader of the LDPR may be false: conceivably,

it might have a worse effect on the reader than the pleaded truth, see Fleckenstein, 266 N.Y. at

23.

However, Egiazaryan does not plausibly allege actual malice in the publication of

this falsehood.  Although the Court accepts for purposes of the motion that the distinction

between non-party parliamentary affiliation and actual party membership is meaningful, the

distinction is not obvious.  Egiazaryan does not deny that he is formally associated in parliament

with the LDPR or that he is prominent in and out of parliament.  (See Compl. ¶¶ 4, 37.)  Without

other factual allegations, Zalmayev's failure to recognize the difference between a prominent

LDPR politician and a prominent politician who is a part of the LDPR's parliamentary group cannot plausibly be called reckless or knowingly false.

Egiazaryan's factual allegations are again unavailing.  Egiazaryan's only new allegation with regard to these letters is that Zalmayev prompted the writing of the letters by visiting Freedom House with copies of the Ponomarev and Alexeyeva letters but not their retractions.  (Compl. ¶ 88.)  This allegation fails to support actual malice for two reasons.  First, it assumes, without explanation, that Zalmayev knew about the retractions. Second, the Freedom House letters repeat almost nothing stated in the Ponomarev and Alexeyeva letters, making their retraction largely irrelevant.  (Compare Compl. Ex. D. with Compl. Ex. E.)  The only commonality between the letters is Alexeyeva's statement that Egiazaryan is a "ranking member" of the LDPR (Compl. Ex. C, Alexeyeva Ltr.) and the Freedom House statement that Egiazaryan is a "leader" of the LDPR (Compl. Ex. E).  But Alexeyeva's retraction goes only to Egiazaryan's alleged "activity," not his political status.  (Compl. Ex. D., Alexeyeva Retraction.)  Therefore, even assuming Zalmayev was aware of the retractions, nothing in them would have given him notice of the likely falsity of the statements he allegedly made in the Freedom House letters.[4]

### c.   Application to Zalmayev's Defamation Counterclaim

Zalmayev's counterclaim for defamation fails because the "fair and accurate reportage" privilege protects the alleged circulation of the Complaint in this case.  As discussed,

---

[4] Because Zalmayev has not raised the issue, the Court does not address whether the Noerr-Pennington doctrine prevents imposition of tort liability for the Ponomarev, Alexeyeva, and Freedom House letters, which are addressed to officials and departments of the federal government.  See E. R.R. Presidents Conference. v. Noerr Motor Freight Inc., 365 U.S. 127 (1961) (no antitrust liability for petitioning government for favorable and potentially anti-competitive legislation); Ottensmeyer v. Chesapeake & Potomac Tel. Co. of Md., 756 F.2d 986, 992 -993 (4th Cir. 1985) ("The policies behind the Noerr-Pennington doctrine include preserving an individual's first amendment right to petition government officials."); see, e.g., Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3d Cir. 1988) ("[Noerr-Pennington] rule that liability cannot be imposed for damage caused by inducing legislative, administrative, or judicial action is applicable" to defendants' attempts to call nursing home's violations to attention of federal and state authorities).

under New York law "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding . . . ."  N.Y. Civ. Rights Law § 74. The "narrow" <u>Williams</u> exception to this privilege applies only where it is alleged "that the . . . action was brought maliciously and solely for the purpose of later defaming the plaintiff."  <u>Fuji Photo Film U.S.A., Inc.</u>, 669 F. Supp. 2d at 412.

Zalmayev states that "he believes that the principal purpose of the complaint is to widely circulate it."  (Countercl. ¶ 47.)  And, in setting forth his SLAPP claim, he asserts that the action "was commenced for the purpose of harassing, intimidating, punishing, and otherwise maliciously inhibiting the free exercise of speech."  (Countercl. ¶ 59.)  But neither of these statements alleges, as the narrow exception requires, that the *sole* purpose of the suit is to *defame* Zalmayev.  Moreover, even if the Counterclaim could be read to allege a solely defamatory purpose, it would still fail because the allegation is not supported by any nonconclusory factual allegation.  It is not enough to blankly allege the legal conclusion that is required to remove the privilege.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1950.  Finally, the only factual allegation that Zalmayev makes to support the conclusion that Egiazaryan circulated the Complaint is that a reporter had a copy and did not say how he received it.  (Compl. ¶ 46.)  Given that the Complaint is a publicly available court filing, these facts do not plausibly establish Egiazaryan as the source of the alleged distribution.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1949; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (claim must be "plausible" not merely "conceivable").

IV.  <u>Egiazaryan's Injurious Falsehood Claim</u>

The fifth count of Egiazaryan's Complaint is for injurious falsehood. (Compl. Count V.)  Injurious Falsehood is "essentially a form of interference with commercial or business relations."  <u>Tolisano v. Texon</u>, 533 N.Y.S.2d 874, 877 (1st Dep't 1988) (Smith, J.,

17

dissenting), *rev'd for reasons stated in dissenting opinion*, 75 N.Y.2d 732 (1989) (citations omitted).  The gravamen of an injurious falsehood action is a false and disparaging statement about another's property or directly damaging to one's pecuniary interests.  See Cunningham v. Hagedorn, 422 N.Y.S.2d 70, 73 (1st Dep't 1979) ("The action . . . lies when one publishes false and disparaging statements about another's property under circumstances which would lead a reasonable person to anticipate that damage might flow therefrom."); Lampert v. Edelman, 261 N.Y.S.2d 450, 451 (1st Dep't 1965) ("For the most part injurious falsehood cases have been concerned with aspersions upon the title to property, or its quality." (internal citations and quotations omitted)); Restatement (Second) of  Torts § 623A and cmt. a (injurious falsehood concerns disparagement of property and statements that do harm to "interests . . . having pecuniary value").  Although the tort has "been extended to include interference with other property as well as nonproperty interests, the 'commercial or economic interest' aspect" has remained.  Tolisano, 533 N.Y.S.2d at 877.  For that reason, special damages must be alleged, consisting of a "direct financial loss." Payrolls & Tabulating v. Sperry Rand Corp., 257 N.Y.S.2d 884, 886 (1st Dep't 1965); see also Restatement (Second) of Torts § 633 (requiring "pecuniary loss that results directly and immediately from the effect of the conduct of third persons").

Egiazaryan alleges neither disparagement of a property interest nor a statement that directly harmed a pecuniary interest.  Instead, he alleges that Zalmayev made false statements about him as part of a "smear campaign," which imperiled his U.S. residency, which in turn "adversely impacted upon his ability to prosecute his litigations concerning the Hotel property."  (Compl. ¶ 149.)  The indirect injury alleged is insufficient to state a claim for injurious falsehood.

18

V.  Zalmayev's Anti-SLAPP Counterclaim

Zalmayev has asserted a right to recovery pursuant to New York's "anti-SLAPP" statute.  N.Y. Civ. Rights Law § 70-a.  SLAPP suits, or "strategic lawsuit[s] against public participation," are "primarily defamation suits, [brought] to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards."  600 W. 115th St. Corp. v. Von Gutfield, 80 N.Y.2d 130, 138 n.12 (1992).  In order to "broaden[] the protection of citizens facing litigation arising from their public petition and participation," New York State enacted an anti-SLAPP statute.  Id.  The statute provides as follows:

- A defendant in an action involving public petition or participation . . . may maintain [a] . . . counterclaim to recover damages . . . from any person who commenced or continued such action.

- An "action involving public petition and participation" is an action  . . . for damages that is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission.

- "Public applicant or permittee" shall mean any person who has applied for or obtained a permit, zoning change, lease, license, certificate, or other entitlement for use or permission to act from any government body [including the federal government].

N.Y. Civ. Rights Law §§ 70-a(1); 76-a(1)(a)-(b), (d).

The statute has been interpreted narrowly according to its language.  "Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission."  Chandok v. Klessig, 632 F.3d 803, 819 (2d Cir. 2011) (collecting New York cases).  And, "[a] narrow construction of the anti-SLAPP law requires that a SLAPP-suit

defendant must directly challenge an application or permission in order to establish a cause of action."  Guerrero v. Carva, 779 N.Y.S.2d 12, 21 (1st Dep't 2004) (citing Harfenes v. Sea Gate Ass'n, Inc., 647 N.Y.S.2d 329, 333 (N.Y. Sup. Ct. 1995)).

Under New York principles of statutory interpretation, specific examples in a statute limit the meaning of subsequent more general wording.  See N.Y. Stat. § 239 ("Noscitur a sociis and ejusdem generis").  Section 76-a defines a public applicant as an applicant for a "permit, zoning change, lease, license, certificate, or other entitlement for use or permission to act."  N.Y. Civ. Rights Law § 76-a(1)(b).  Therefore, for section 76-a to apply to asylum, asylum must be "of the same nature," People v. Schmidt, 222 N.Y.S. 647, 649 (1st Dep't 1927), as a permit, zoning change, lease, license or certificate.  A grant of asylum entails privileges that might be deemed permissions or entitlements of the same nature as the ones listed, including the right to remain and to work in the United States.  See 8 U.S.C. § 1158(c)(1)(A)-(B).

However, asylum applications are generally confidential.  See 8 C.F.R. § 208.6(a)-(b) ("Information contained in or pertaining to any asylum application  . . . shall not be disclosed without the written consent of the applicant . . . .  The confidentiality of other records kept by the Service and the Executive Office for Immigration Review [on related matters] . . . shall also be protected from disclosure.").  This confidentiality may prevent "direct[] challenge[]" to an asylum application, as required by the "narrow construction" of the statute. See Guerrero, 779 N.Y.S.2d at 21.  On the other hand, a person who is aware of the possible filing of an asylum application may urge public officials to deny an application.  The person may seek to influence government action as to a class of asylum seekers or as to a particular individual's asylum application.  In this case, the retracted Ponomarev and Alexeyeva letters urged a member of Congress to raise their concerns about Egiazaryan with the Department of

20

State and the Department of Homeland Security, and the Freedom House letters appealed

directly to those departments.  (See Compl. Ex's C and D.)  The Department of Homeland

Security houses both the asylum officers who evaluate applications and the attorneys who

oppose applications that are referred to immigration court.  See Homeland Security Act of 2002

§ 451, 6 U.S.C. § 271 (establishing Bureau of Citizenship and Immigration Services within

Department of Homeland Security); Jaya Ramji-Nogales et al., Refugee Roulette: Disparities in

Asylum Adjudication, 60 Stan. L. Rev. 295, 305-309 (2008) (overview of asylum process).

When appropriate, asylum officers consult with the Department of State on pending applications.

U.S. Citizenship and Immigration Services, Affirmative Asylum Procedures Manual 38-39

(revised 2010).  The activists' letters are directed toward these departments and, according to

Egiazaryan's own pleadings, they are part of a campaign to challenge Egiazaryan's continued

presence in the United States.  (See Compl. ¶¶ 3, 89.iii, 149.)

      On balance, this Court concludes that a petition for asylum by Egiazaryan is an

application for "permission to act," and that Egiazaryan's Complaint, as reasonably construed in

favor of the non-movant, is materially related to Zalmayev's alleged efforts to "comment on, . . .

challenge or oppose" any asylum application by Egiazaryan.  Therefore, Zalmayev's anti-SLAPP

counterclaim survives the present motion.

      VI. Egiazaryan's Alternative Motion
          to Strike Paragraphs From the Counterclaims

      Egiazaryan asserts that, if the Counterclaims are not dismissed, paragraphs 23, 25-

28, and 31-32 of the Counterclaims should be stricken.  "The court may strike from a pleading an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Rule

12(f), Fed. R. Civ. P.  However, "it is settled that the motion [to strike] will be denied, unless it

can be shown that no evidence in support of the allegation would be admissible."  Lipsky v.

Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976) (citations omitted).  "Thus the courts should not tamper with the pleadings unless there is a strong reason for so doing."  Id.

No sufficiently strong reason appears for striking the challenged paragraphs. Some of the paragraphs allege and repeat the substance of media accounts suggesting that Egiazaryan is corrupt.  (Countercl. ¶¶ 23, 28, 31-32).  The others allege that Egiazaryan has sued another person for libel, that the Duma has stripped Egiazaryan's immunity, and that criminal charges have been brought against Egiazaryan.  (Compl. ¶¶ 25-27.)  These allegations are not patently irrelevant to the surviving counterclaim, and the Court will not strike the paragraphs "on the sterile field of the pleadings alone."  Lipsky, 551 F.2d at 893.

## CONCLUSION

For the foregoing reasons, Zalmayev's motion to dismiss Counts II, III, IV, and V of the Complaint is GRANTED.  Egiazaryan's motion to dismiss the Counterclaims is GRANTED as to the defamation claim (Countercl. Count One) and DENIED as to the anti-SLAPP counterclaim (Countercl. Count Two).  Egiazarayan's motion in the alternative to strike portions of the Counterclaims is DENIED.  The Clerk of the Court is directed also to terminate the original motion to dismiss the Counterclaims (Docket # 31), which was replaced by the amended motion (Docket #34) disposed of by this Order.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       December 6, 2011