UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ASHOT EGIAZARYAN,                                   :
                                                    :
                        Plaintiff,                  :     11 CV 02670 (PKC)
                                                    :
            -against-                               :     ECF
                                                    :
PETER ZALMAYEV,                                     :
                                                    :
                        Defendant.                  :
-------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION TO DISMISS THE AMENDED COMPLAINT

**FLEMMING ZULACK WILLIAMSON ZAUDERER LLP**
**One Liberty Plaza**
**New York, New York  10006**
**(212) 412-9500**

*Attorneys for Plaintiff Ashot Egiazaryan*

# Table of Contents

**Page(s)**

Table of Authorities ........................................................................................................... iv

Preliminary Statement ........................................................................................................ 1

Statement of Facts .............................................................................................................. 4

    Judge P. Kevin Castel's December 7, 2011 Order ...................................................... 4

    The Amended Complaint Plausibly Alleges Actual Malice ........................................ 6

        A.  Mr. Zalmayev Purposefully Avoided the Truth and/or
            Had Serious Doubts as to the Truth of His Publications ................................. 6

        B.  Mr. Zalmayev was Motivated by Ill Will
            and Hostility Towards Mr. Egiazaryan ........................................................... 8

        C.  Mr. Zalmayev Drafted and Disseminated the Defamatory Statements
            At Issue, and He Purposefully Distorted Facts to Maximize Injury to
            Plaintiff and Omitted Facts That Would Have Mitigated Injury to Plaintiff ......10

    Mr. Zalmayev Drafted and Disseminated the Moscow Times Article ..................... 12

    New Facts Recently Adduced During Discovery Further
    Bolster Mr. Egiazaryan's Claims that Mr. Zalmayev Acted
    With Actual Malice in Publishing the Defamatory Statements ................................ 13

        Mr. Zalmayev Knew of the Falsity of His Defamatory
        Statements Alleging that Mr. Egiazaryan was Engaged in War
        Crimes and Theft or Embezzlement of Chechen Relief Funds........................... 14

        Mr. Zalmayev Knew of the Falsity of His Defamatory Statements Alleging
        That Mr. Egiazaryan was Anti-Semitic, Anti-American and Xenophobic ......... 14

        Mr. Zalmayev Purposefully Avoided the Truth and/or Failed to Investigate
        and Conduct Due Diligence as to the Accuracy of any of the Defamatory
        Statements, Which Supports Mr. Egiazaryan's Claim of Actual Malice ........... 14

        Mr. Zalmayev's Defamatory Statements Were Motivated
        by Ill Will and Hostility Towards Mr. Egiazaryan,
        Which Supports Mr. Egiazaryan's Claim of Actual Malice .............................. 15

        The Manner in Which Mr. Zalmayev Drafted and Disseminated the
        Defamatory Statements at Issue, Including the Distortion of Facts to
        Maximize Injury and the Omission of Facts that Would Have Mitigated
        Injury, Supports Mr. Egiazaryan's Claim of Actual Malice .............................. 16

**Table of Contents** (cont'd)

**Page(s)**

ARGUMENT ...............................................................................................16

POINT I      STANDARD OF REVIEW ........................................................16

POINT II     THE COURT SHOULD NOT DISMISS THE AMENDED
COMPLAINT BECAUSE COUNTS I THROUGH IV ALL STATE
VIABLE CLAIMS FOR DEFAMATION UNDER NEW YORK LAW .......18

    A.  Mr. Zalmayev May Be Held Liable (And Cannot Be
Immunized) for Making False Statements About
Mr. Egiazaryan to Third Parties Who, In Turn, Published
These False Statements to Others ........................................................19

    B.  The Amended Complaint Plausibly Alleges That
Mr. Zalmayev Acted With Actual Malice In
Publishing The Defamatory Statements At Issue ...............................21

        i.  The Amended Complaint describes direct and
circumstantial evidence which, taken together,
plausibly establish that Mr. Zalmayev acted
with actual malice ...................................................................22

        ii.  In any event, Mr. Egiazaryan need not allege
actual malice because he is not a public figure in
the community where the defamatory statements
at issue were published ..........................................................25

    C.  The Defamatory Statements At Issue Constitute Actionable
Factual Assertions, As Opposed To Non-Actionable Opinion ...........27

        i.  The challenged statements have "precise
meaning[s] which [are] readily understood".............................28

             Anti-Semitism and Bigotry....................................28

             Charges of Embezzlement and War Crimes ...............31

        ii.  Mr. Zalmayev's defamatory statements can be
proven true or false ................................................................32

        iii.  The "full context" of these communications as well
as "the broader social context and surrounding
circumstances" make clear that "what is being read
or heard" is fact, not opinion...................................................33

**Table of Contents** (cont'd)

                                                                              **Page(s)**

POINT III        IF THE COURT GRANTS MR. ZALMAYEV'S
                 MOTION TO DISMISS THE AMENDED COMPLAINT, THE
                 COURT SHOULD GRANT MR. EGIAZARYAN LEAVE TO
                 AMEND FURTHER HIS PLEADING ...........................................................34

CONCLUSION.....................................................................................................................36

## Table of Authorities

**Cases**                                                                                    **Page(s)**

*Afshari v. Barer,*
    1 Misc.3d 57, 769 N.Y.S.2d 687 (N.Y. App. Term 2003) ..................................................... 20

*Alianza Dominicana, Inc. v. Luna,*
    229 A.D.2d 328, 645 N.Y.S.2d 28 (1st Dep't 1996),
    *lv. app. dismd.* 89 N.Y.2d 1029, 658 N.Y.S.2d 244 (1997) ................................................... 17

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544, 127 S. Ct. 1955 (2007) .................................................................................... 17

*Brentwood Pharmacy, Inc. v. Sheppard,*
    229 N.Y.S.2d 511 (Sup. Ct. Suffolk Co. 1962) ..................................................................... 31

*Buckley v. Littell,*
    539 F.2d 882 (2d Cir. 1976) ................................................................................................... 29

*Calore v. Powell-Savory Corp.,*
    21 A.D.2d 877, 251 N.Y.S.2d 732 (2d Dep't 1964) .............................................................. 29

*Campo v. Paar,*
    18 A.D.2d 364, 239 N.Y.S.2d 494 (1st Dep't 1963) ............................................................. 20

*Carto v. Buckley,*
    649 F. Supp. 502 (S.D.N.Y. 1986) ........................................................................................ 29

*Celle v. Filipino Reporter Enters. Inc.,*
    209 F.3d 163 (2d Cir. 2000) ....................................................................................... 22, 23, 24

*Como v. Riley,*
    287 A.D.2d 416, 731 N.Y.S.2d 731 (1st Dep't 2001) ........................................................... 28

*Devany v. Quill,*
    187 Misc. 698, 64 N.Y.S.2d 733 (Sup. Ct. Bronx Co. 1946) ........................................... 29, 32

*Diario El Pais, S.L. v. Nielsen Co., (US), Inc.,*
    No. 07 Civ. 11295, 2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) ......................................... 18

*DiLaura v. Power Auth. of the State of N.Y.,*
    982 F.2d 73 (2d Cir. 1992) ..................................................................................................... 26

*Edgington v Fitzmaurice,*
    29 Ch D 459 (Ct. of Appeal 1885) (Bowen, LJ) ................................................................... 33

*Fischer v. OBG Cameron Banfill LLP,*
    No. 08 Civ. 7707, 2010 WL 3733882 (S.D.N.Y. Sept. 24, 2010) ......................................... 20

**Table of Authorities** (cont'd)

**Page(s)**

*Goldwater v. Ginzburg,*
    261 F. Supp. 784 (S.D.N.Y. 1966) ........................................................................ 17

*Greenbaum v. Google, Inc.,*
    18 Misc.3d 185, 845 N.Y.S.2d 695 (Sup. Ct. N.Y. Co. 2007) ................................ 30

*Gross v. New York Times Co.,*
    82 N.Y.2d 146, 603 N.Y.S.2d 813 (1993) ............................................................. 27

*Guccione v. Flynt,*
    618 F. Supp. 164 (S.D.N.Y. 1985) ........................................................................ 23

*Guerrero v. Carva,*
    10 A.D.3d 105, 779 N.Y.S.2d 12 (1st Dep't 2004) ............................................... 27

*Hakky v. Wash. Post Co.,*
    No. 09 Civ. 2406, 2010 WL 2573902 (M.D.Fla. June 24, 20120) .......................... 18

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
    491 U.S. 657, 109 S. Ct. 2678 (1989) .............................................................. 22, 24

*Hayne v. The Innocence Project,*
    No. 09-CV-218, 2011 WL 198128 (S.D. Miss. Jan. 20, 2011) ............................... 23

*Herbert v. Lando,*
    441 U.S. 153, 99 S. Ct.1635 (1979) ...................................................................... 22

*Herlihy v. Metro. Museum of Art,*
    214 A.D.2d 250, 633 N.Y.S.2d 106 (1st Dep't 1995) ........................................... 28

*Hollander v. Long Island Plastic Surgical Group,*
    104 A.D.2d 357, 478 N.Y.S.2d 687 (2d Dep't 1984) ............................................ 18

*Immuno AG. v. Moor-Jankowski,*
    77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991) ......................................................... 27, 31

*Karedes v. Ackerley Group, Inc.,*
    423 F.3d 107 (2d Cir. 2005) .................................................................................. 17

*Keohane v. Stewart,*
    882 P.2d 1293 (Colo. 1994) .................................................................................... 1

*LaBozzo v. Brooks Bros., Inc.,*
    No. 120538/01, 2002 WL 1275155 (Sup. Ct. N.Y. Co. Apr. 25, 2002) .................. 31

*Liverpool v. Con-Way, Inc.,*
    No. 08-CV-4076, 2009 WL 1362965 (E.D.N.Y. May 15, 2009) ............................ 20

**Table of Authorities** (cont'd)

<u>Page(s)</u>

*Lopez v. Univision Commc'ns Inc.*,
  45 F. Supp. 2d 348 (S.D.N.Y. 1999).............................................................. 26

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
  651 F.3d 268 (2d Cir. 2011)............................................................................ 17

*Moore v. Vislosky*,
  240 Fed. Appx. 457 (3d Cir. 2007).................................................................. 22

*O'Neil v. Peekskill Faculty Ass'n*,
  120 A.D.2d 36, 507 N.Y.S.2d 173 (2nd Dep't 1986) .................................... 18

*Oluwo v. Hallum*,
  No. 35145/06, 2007 WL 2701286 (Sup. Ct. Kings Co. Aug. 31, 2007)........ 29

*Patane v. Clark*,
  508 F.3d 106 (2d Cir. 2007)............................................................................ 17

*People v. Ivanov*,
  No. 772-08, 2008 WL 6125444 (Sup. Ct. Kings Co. Sept. 12, 2008) ........... 32

*Pisani v. Staten Island Univ. Hosp.*,
  440 F. Supp. 2d 168 (E.D.N.Y. 2006) ............................................................ 20

*Rosenblatt v. Baer*,
  383 U.S. 75, 86 S. Ct. 669 (1966) (Stewart, J., concurring) ............................ 1

*Rottem v. Giovanelli*,
  No. 601499/08, 2009 WL 3240384 (Sup. Ct. N.Y. Co. Sept. 25, 2009) ....... 20

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
  86 A.D.3d 32, 925 N.Y.S.2d 407 (1st Dep't May 19, 2011) ......................... 30

*Shaare Tefila Congregation v. Cobb*,
  481 U.S. 615, 107 S. Ct. 2019 (1987).............................................................. 33

*Shiamili v. The Real Estate Group of New York, Inc.*,
  No. 600460/08, 2008 WL 5478706 (Sup. Ct. N.Y. Co. Dec. 26, 2008),
  *rev'd on other grounds*, 68 A.D.3d 581, 892 N.Y.S.2d 52 (1st Dep't 2009) ......... 29

*Silsdorf v. Levine*,
  59 N.Y.2d 8, 462 N.Y.S.2d 822 (1983) ........................................................... 31

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)............................................................................ 17

Table of Authorities (cont'd)

**Page(s)**

*Stern v. Cosby,*
  645 F. Supp. 2d 258 (S.D.N.Y. 2009)...................................................................... 22, 24

*Stokes v. CBS Inc.,*
  25 F. Supp. 2d 992 (D. Minn. 1998)........................................................................... 24

*Stuart v. Anti-Defamation League of B'Nai B'rith,*
  127 N.Y.S.2d 362 (Sup. Ct. N.Y. Co. 1953) ............................................................. 29

*Sweeney v. Patterson,*
  128 F.2d 457 (D.C. Cir. 1942) .................................................................................. 30

*Sweeney v. Schenectady Union Pub. Co.,*
  122 F.2d 288 (2d Cir. 1941),
  *aff'd by an equally divided court,* 316 U.S. 642, 62 S.Ct. 1031 (1942) ............................ 30, 31

*U.S. v. Lane,*
  883 F.2d 1484 (10th Cir. 1989) ................................................................................ 32

*Velez v. Levy,*
  401 F.3d 75 (2d Cir. 2005)........................................................................................ 17

*Weiss v. La Suisse,*
  131 F. Supp. 2d 446 (S.D.N.Y. 2001)........................................................................ 33

*Westerbeke Corp. v. Daihatsu Motor Co.,*
  304 F.3d 200 (2d Cir. 2002)...................................................................................... 26

**Statutes**

18 U.S.C. § 245(b)(2) (2011)........................................................................................ 32

28 U.S.C. § 636 (2012) ................................................................................................. 19

28 U.S.C. § 1784........................................................................................................... 9

42 U.S.C. § 1981........................................................................................................... 33

42 U.S.C. § 1982........................................................................................................... 33

N.Y. Civil Rights Law § 76-a(2) ................................................................................... 26

N.Y. Penal Law § 485.05 (2011) ................................................................................... 32

*Testimony regarding Peter Zalmayev's knowledge of the falsity of his claims
that Ashot Egiazaryan engaged in war crimes
and embezzled relief funds earmarked for war-torn Chechnya:*

**"We couldn't find any credible information."**[1]

        *                 \*                 \**

*Testimony regarding Peter Zalmayev's knowledge of the falsity
of his claims that Ashot Egiazaryan is an anti-Semite:*

*Q. Let me ask you are you aware of any anti-Semitic statements made by Ashot Egiazaryan
either in public or in private?*
     *A. No.*
*Q. Are you aware of any vote cast by Ashot Egiazaryan while he was in Duma for any
legislation that was anti-Semitic?*
     *A. No.*
*Q. Are you aware of Mr. Egiazaryan taking any positions that were anti-Semitic?*
     *A. No.*[2]

## PRELIMINARY STATEMENT

In the United States, "[t]he right of a man to the protection of his own reputation from
unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential
dignity and worth of every human being - a concept at the root of any decent system of ordered
liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S. Ct. 669, 679 (1966) (Stewart, J., concurring).
Indeed, "defamatory statements are . . . intolerable because the statement destroys an individual's
reputation: a characteristic which cannot be bought, and one that, once lost, is extremely
difficult to restore." *Keohane v. Stewart*, 882 P.2d 1293, 1298 (Colo. 1994).

At the behest of and in cooperation with powerful overseas puppeteers, defendant Peter
Zalmayev oversaw a malicious public relations campaign to blacken Ashot Egiazaryan's
reputation in this country -- a country that he hopes to make his new home.  Mr. Zalmayev

---

[1] Transcript of Deposition of Peter Zalmayev's principal collaborator, Rinat Akhmetshin ("Akhmetshin Tr."),
attached as Exhibit 1 to the Declaration of Jonathan D. Lupkin, dated May 4, 2012 (the "Lupkin Decl."), p. 287.

[2] Transcript of deposition of Peter Zalmayev ("Zalmayev Tr."), attached as Exhibit 2 to the Lupkin Decl., pp. 8-9.

publicly branded Mr. Egiazaryan an anti-Semite, an anti-American, an embezzler of

humanitarian relief funds and a war criminal.  These accusations are false and were known by

defendant to be false or highly suspect when he made them.  Through this defamation claim, Mr.

Egiazaryan hopes to clear his name, vindicate his previously non-existent reputation in this

country, and to obtain compensation for damage to his reputation.

Mr. Zalmayev has deceptively attempted to turn the tables on plaintiff and portray *himself*

as the victim in this saga, electing to cast himself as the biblical "David" under legal siege by Mr.

Egiazaryan, the Russian "Goliath."  But Mr. Zalmayev is not "David" to Mr. Egiazaryan's

"Goliath," as defendant would have this Court believe, and he is far from being the

"impoverished" human rights activist that he purports to be in submissions to this Court.  Mr.

Zalmayev was a hired gun who was paid at least $100,000 to tarnish Mr. Egiazaryan's reputation

in the United States.  For that $100,000, Mr. Zalmayev dutifully, and with blind obedience,

carried out the orders of his Russian masters.  He paid others to allow their names to be used on

his publications and knowingly or with reckless disregard for the truth published false and

malicious statements alleging that Mr. Egiazaryan was a virulent anti-Semite, an anti-American,

an embezzler of Russian governmental relief funds and a war criminal.

Mr. Zalmayev has sought to hide his role in many of the communications at issue.

Through discovery, plaintiff has learned that Mr. Zalmayev tried to obscure the fact that he knew

that his published accusations against Mr. Egiazaryan were false.  Some of what was learned in

discovery and could not have been known at the time of the filing of the Complaint is

incorporated into the Amended Complaint.  Additional incriminating information has been

learned since the filing of the Amended Complaint.

At his recent deposition, and notwithstanding his published statements that plaintiff has a "well-established record of anti-Semitism and hate speech," Mr. Zalmayev testified unequivocally that he was unaware of any statements made (or actions or positions taken) by Mr. Egiazaryan that were anti-Semitic. Equally startling is the revelation that defendant had no "credible evidence" that Mr. Egiazaryan embezzled Chechen relief funds or engaged in activities constituting war crimes, as claimed in several of the letters that he penned for someone else's signature. In his own words, Mr. Zalmayev simply "wasn't" interested in Mr. Egiazaryan's side of the story. Finally, the evidence establishes that defendant views this very litigation as merely another "stage" of the anti-Egiazaryan campaign.

Mr. Zalmayev has acknowledged that he undertook this paid advocacy campaign on behalf of a Russian oligarch and politician who has a deep-seated animus towards Mr. Egiazaryan. Defendant also has claimed that the oligarch not only paid for the campaign itself, but is now paying no fewer than five separate law firms around the world to litigate this case on defendant's behalf. At the same time, there is significant evidence supporting plaintiff's claim that Russian Senator Suleyman Kerimov, through his representatives, is, in fact, orchestrating the anti-Egiazaryan campaign spearheaded by defendant, along with the assistance of at least three large public relations firms, one global investigative firm, and several government lobbyists.

As set forth in detail below, Mr. Egiazaryan's Amended Complaint more than plausibly alleges that Mr. Zalmayev acted intentionally and with reckless disregard for the truth in publishing the false and defamatory statements of fact that are the subject of this lawsuit. This Court should deny in its entirety Mr. Zalmayev's motion to dismiss the Amended Complaint.[3]

---

[3] A blacklined version of Mr. Egiazaryan's Amended Complaint, reflecting the changes from the initial pleading, is attached as Exhibit 12 to the Lupkin Decl.

## STATEMENT OF FACTS

### Judge P. Kevin Castel's December 7, 2011 Order

Mr. Egiazaryan filed his Amended Complaint shortly after this Court dismissed all but one of Mr. Egiazaryan's claims for defamation in its December 7, 2011 Memorandum and Order (the "December 7 Order") and in direct response to the deficiencies that the Court identified in that order.[4] In its December 7 Order, and after concluding that plaintiff was a "public figure," the Court conducted an extensive analysis of Counts II through IV of Mr. Egiazaryan's Complaint. Its salient findings are as follows:

| **Cause of Action** | **Adequately Plead** | **Not Adequately Plead** |
|---|---|---|
| Count II ("No Safe U.S. Haven for Hatemongers") | | Publication to Third Party: Mr. Egiazaryan did not allege "nonconclusory facts to support the assertion that Zalmayev communicated the allegedly defamatory statements in the article to Komarovsky." (December 7 Order, p. 11.) |
| Count III (the Alexeyeva and Ponomarev letters) | (1) The Statement at Issue is a Statement of Fact: "Taken as a whole, the statements in both letters imply as fact that Egiazaryan was complicit in the mismanagement or misappropriation of humanitarian funds." (December 7 Order, p. 13.)

(2) Falsity: Mr. Egiazaryan "plausibly alleges the falsity" of statements implying that he was complicit in the mismanagement or misappropriation of humanitarian funds. (December 7 Order, p. 14.) | Actual Malice: Mr. Egiazaryan "fails plausibly to allege actual malice in the publication" of these letters. (December 7 Order, p. 14.) |

---

[4] The December 7 Order is attached as Exhibit 3 to the Lupkin Decl.

| Count IV (the "Freedom House" letters) | (1) <u>Falsity</u>: Mr. Egiazaryan "makes a sufficient allegation of falsity" with respect to statements associating [him] with anti-Semitic, anti-American and other reprehensible views." (December 7 Order, p. 15.)<br><br>(2) <u>Falsity</u>: "[T]he statement that Egiazaryan is a leader of the LDPR may be false." (December 7 Order, p. 15.) | <u>Actual Malice</u>: Mr. Egiazaryan "does not plausibly allege actual malice in the publication" of these letters. (December 7 Order, p. 15.) |

Stripped to its essence, the Court's December 7 Order identified two deficiencies in the pleading. *First*, with respect to Count II, the Court determined that Mr. Egiazaryan failed to allege sufficient nonconclusory facts to demonstrate Mr. Zalmayev's role in drafting and disseminating the defamatory statements appearing in the <u>Moscow Times</u> article ostensibly written by Leonid Komarovsky. *Second*, after concluding that Mr. Egiazaryan constituted a "public figure" under the First Amendment, the Court held that the Complaint failed to allege nonconclusory facts sufficient to support a claim that the defamatory statements made in Counts III and IV were made with actual malice. Notably, the Court premised its dismissal upon factual deficiencies in the initial pleading; it did *not* conclude that the original complaint suffered from fundamental legal infirmities.

Mr. Egiazaryan's Amended Complaint cures both of these deficiencies. A brief summary of those nonconclusory facts described in the Amended Complaint that rectify the initial pleading's perceived shortcomings are described below.[5]

---

[5] Because the Court is familiar with the background of this action and because Mr. Egiazaryan discussed the facts at length in opposition to Mr. Zalmayev's first motion to dismiss (*See* Plaintiff's Memorandum of Law in Opposition to Motion for Partial Dismissal, dated August 1, 2011, Docket Entry #25), Mr. Egiazaryan will not provide a summary of all the relevant facts giving rise to this action. However, the complete set of facts giving rise to this action is set forth in detail in the Amended Complaint, dated February 28, 2012.

**The Amended Complaint Plausibly Alleges Actual Malice**

### A. Mr. Zalmayev Purposefully Avoided the Truth and/or Had Serious Doubts as to the Truth of His Publications[6]

As described in the Amended Complaint, Mr. Zalmayev and his confederates recognized that there was no evidence of Mr. Egiazaryan ever uttering any anti-Semitic statement or holding any anti-Semitic view.  According to a memorandum prepared by Douglas Bloomfield, a Washington, D.C.-based political consultant and close Zalmayev confederate, of a conversation he had with Mr. Zalmayev, the two men agreed that the *only* way to effectively accuse plaintiff of anti-Semitism is through guilt-by-association.  According to Mr. Bloomfield's memorandum, making the case for Mr. Egiazaryan as an anti-Semite is "[n]ot an easy issue, largely circumstantial, [because] it is the party and its leader, Zhirinovsky."  (Amended Complaint, pp. 35-36, ¶ 125.)

In light of the acknowledged absence of any record of anti-Semitism or hate speech and the expression of doubt regarding such claim, drawing all inferences in plaintiff's favor, the Amended Complaint plausibly pleads actual malice by the publication of statements that plaintiff is an "anti-Semitic bigot" with a "well-established record of anti-Semitism and hate speech" whose presence in the United States is so repulsive that as an "anti-Semite" he should be placed "on notice:  You are not welcome in this country."  (Amended Complaint, p. 36, ¶ 126.)

Mr. Zalmayev manifested the same doubts about and reckless disregard for the truth with regard to claims that while a member of the Duma Committee for Assistance in Political Regulation and Observance of Human rights in Chechnya, Mr. Egiazaryan embezzled funds earmarked for Chechen war relief.  In written communications with close Zalmayev confederate Rinat Akhmetshin, another Washington, D.C.-based consultant, Mr. Zalmayev acknowledged the

---

[6] *See* Point II(B)(i), *infra.*

absence of evidence to support the claim.  Defendant noted that "this commission is quite murky and no one I've called in [M]oscow has any good idea or details about it. [sic.] and [sic.] there's hardly anything on-line."  Had Mr. Zalmayev researched further, he would have uncovered contemporaneous media reports in which Mr. Egiazaryan criticized the mismanagement of the Chechen relief funds by the executive authorities and called for an investigation and further transparency.  (Amended Complaint, p. 36, ¶¶ 127-128.)

Mr. Zalmayev also manifested his recklessness in connection with his claims that Mr. Egiazaryan was a war criminal who "provid[ed] cover for the numerous well-documented atrocities during the war" and "was a contributor to the destructive second Chechen war."  In communications with Mr. Akhmetshin, Mr. Zalmayev acknowledged that ascribing fault to Mr. Egiazaryan for war atrocities was something about which "caution" needed to be taken. Defendant admitted to Mr. Akhmetshin that "we need to think how to formulate that, cause [sic.] that second phase has been prosecuted, really, under the auspices of [sic.] Kremlin's current occupants."  Put differently, defendant acknowledged that the atrocities committed during this "second phase" were really attributable to those then in power in the Kremlin (*i.e.*, not Egiazaryan).  (Amended Complaint, pp. 36-37, ¶ 130.)

Notwithstanding the dearth of condemnatory information, and in reckless disregard for the truth, Mr. Zalmayev nevertheless paid thousands of dollars in cash to Lev Ponomarev and Lyudmila Alexeyeva to sign and send letters drafted by him to members of Congress that accuse Mr. Egiazaryan of embezzling Chechen war relief funds and contributing to the atrocities committed during the Second Chechen War.  (Amended Complaint, pp. 36-37, ¶¶ 129, 131.) Compounding his recklessness, Mr. Zalmayev continued to circulate copies of these letters even after Mr. Ponomarev and Mr. Alexeyeva issued formal retractions, stating that "I have made a

grave mistake" and that "this information has been called by me into questions [sic]." (*See* Amended Complaint, pp. 25, 27, ¶¶ 90-91, 98.)

**B.  Mr. Zalmayev was Motivated by Ill Will and Hostility Towards Mr. Egiazaryan[7]**

Mr. Zalmayev himself has characterized his black (*i.e.,* negative) public relations campaign against Mr. Egiazaryan as an "aggressive advocacy campaign" designed to remove Mr. Egiazaryan from the United States and have him returned to Russia.  Mr. Zalmayev recruited, paid and collaborated with others to advance his false, defamatory and injurious statements about Mr. Egiazaryan in published periodicals and other formats.  Mr. Zalmayev recruited Mr. Bloomfield and Mr. Ahkmetshin to work on the campaign, and despite his claims of being "impoverished," Mr. Zalmayev paid at least $20,000 to Mr. Bloomfield for his efforts and at least $10,000 to Mr. Akhmetshin for his efforts.  (Amended Complaint, p. 10, ¶¶ 28-31.)

As alleged in the Amended Complaint, Mr. Zalmayev's United States-based smear campaign was underwritten by Mr. Egiazaryan's political and business rival, Russian Senator and billionaire Suleyman Kerimov or his agents.  That Mr. Zalmayev was working as a paid participant in part of Mr. Kerimov's anti-Egiazaryan efforts is evidenced by the following:

- Mr. Zalmayev's possession of private investigators' reports concerning Mr. Egiazaryan as well as surveillance photographs of Mr. Egiazaryan that were prepared or taken by private investigators retained by Mr. Kerimov's wholly held company, Denoro Investments Ltd. ("Denoro");

- Mr. Zalmayev's possession of personal information regarding Mr. Egiazaryan and his family that was gathered by private investigators retained by Mr. Kerimov's company, Denoro;

- Mr. Zalmayev's production in this litigation of several documents that were either filed in the confidential LCIA arbitration described in the Amended Complaint or that were prepared on behalf of Denoro for a proceeding filed by Mr. Egiazaryan in California pursuant to 28 U.S.C. § 1784, but that were never filed publicly; and

---

[7] *See* Point II(B)(i), *infra.*

- Mr. Zalmayev's possession of e-mails between Mr. Akhmetshin and Public Strategies, Inc., a Washington D.C.-based public relations firm hired by Mr. Kerimov's company Denoro to perform anti-Egiazaryan public relations work in the United States.  (Amended Complaint, pp. 30-32, ¶¶ 113-115.)

In furtherance of this paid-for smear campaign, Mr. Zalmayev engaged in significant conduct with the sole intention of harming Mr. Egiazaryan through falsehood.  This conduct included:

- publishing an article on March 9, 2011 in the Jewish Journal, a publication with an active circulation of 150,000 households.  In his article, entitled "Hiding in Beverly Hills," Mr. Zalmayev makes numerous defamatory statements against Mr. Egiazaryan, including that Mr. Egiazaryan is an avowed anti-Semite;

- drafting and then inducing the publication of a defamatory article, "No Safe U.S. Haven for Hatemongers," published on March 14, 2011 in the Moscow Times.  This article states, among other things, that Mr. Egiazaryan is "an anti-Semitic bigot" with a "well-established record of anti-Semitism and hate speech";

- drafting and then inducing Russian human rights organizations to sign false and misleading letters about Mr. Egiazaryan to members of the United States House of Representatives, asserting that Mr. Egiazaryan is not fit to be present in the United States.  Among other things, these letters falsely state that Mr. Egiazaryan "provid[ed] cover for the numerous well-documented atrocities during the war" and that he "was a contributor to the destructive second Chechen war."  These letters, sent in late January 2011, were soon retracted, with both of the signatories independently stating that they were "misled" into writing and sending the letters; and

- drafting and then inducing United States human rights and Jewish advocacy organizations to sign letters in March of 2011 to the United States Department of State Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security, repeating false, defamatory and injurious statements.

(Amended Complaint, pp. 11-12, ¶ 36.)  Each of these published writings concluded with a plea that, based on the factual statements made therein, Mr. Egiazaryan should be expelled from the United States.  (Amended Complaint, pp. 15, 18, 22, and 26, ¶¶ 47, 62, 77 and 95.)

- 9 -

### C. Mr. Zalmayev Drafted and Disseminated the Defamatory Statements At Issue, and He Purposefully Distorted Facts to Maximize Injury to Plaintiff and Omitted Facts That Would Have Mitigated Injury to Plaintiff [8]

The manner in which Mr. Zalmayev edited and distorted the facts in and sources of these defamatory statements also serves as evidence that he published the statements with actual malice.  Mr. Zalmayev employed phrasing, sequencing and "guilt by association" in an intentional and calculated fashion to convey the defamatory meaning that Mr. Egiazaryan is anti-American, a vile and pernicious anti-Semite and a supporter of human rights abuses.  Mr. Zalmayev edited and distorted his publications in such a way as to maximize the damage done by the publications, and he intentionally omitted facts which would have mitigated any damage to Mr. Egiazaryan.  (Amended Complaint, p. 33, ¶ 117.)

For example, Mr. Zalmayev and his collaborators deliberately and recklessly misled his intended audience by ascribing to Mr. Egiazaryan anti-Semitic and anti-American statements allegedly made by Mr. Zhirinovsky.  This reprehensible tactic was actually criticized by certain third parties who had received Mr. Zalmayev's publications.  As described in the Amended Complaint, when Mr. Zalmayev attempted to arrange for a condemnation of Mr. Egiazaryan to be placed in the Congressional Record, the staffer with whom Mr. Zalmayev was speaking refused to do so.  After being provided with a copy of Mr. Zalmayev's Jewish Journal article, the staffer responded "No guilt by association.  Zhirinovsky may be anti-Semitic . . . but the article doesn't provide any evidence that Egiazaryan is."  (Amended Complaint, p. 33, ¶ 118.)  The jury in this case should be entitled to reach the same conclusion.

Moreover, discovery to date shows that among Mr. Zalmayev and his collaborators, there was disagreement as to whether, in connection with the campaign to tar plaintiff as an anti-Semite, efforts should be made to link Mr. Egiazaryan with Mr. Zhirinovsky.  Mr. Akhmetshin

---

[8] See Point II(B)(i), infra.

- 10 -

expressed concern that the inclusion of references to Zhirinovsky will "dilute our punch."  Mr.

Bloomfield expressed a contrary view: "Zhirinovsky definitely enhances our case.  His name is

well-known among nearly all those we will be contacting.  He is an identifier for Ashot. . . ."

After vetting the issue and recognizing that Mr. Egiazaryan himself had never uttered an anti-

Semitic statement verbally or in writing, defendant and his confederates concluded that the only

way to portray plaintiff as an anti-Semite was to link prominently plaintiff with Mr. Zhirinovsky

and Zhirinovsky's reputation for anti-Semitism.  (Amended Complaint, pp. 33-34, ¶¶ 119-120.)

Mr. Zalmayev also deceptively altered the various letters that he and his collaborators

drafted so that they would not appear to be coming from one source.  Mr. Akhmetshin supported

this strategy and stated that they should "have several variations [of the letters], so it doesn't look

suspiciously similar coming from different folks."  (Amended Complaint, p. 34, ¶ 121.)

Mr. Zalmayev also engaged in activities calculated to suppress information that could

have mitigated injury to Mr. Egiazaryan.  In one instance, Mr. Zalmayev provided the signatories

of the Freedom House Letters with the defamatory Ponomarev and Alexeyeva Letters, but not

the corresponding retractions by the letters' signatories.  By omitting the retractions, Mr.

Zalmayev increased the chances that the organizations, none of whom had heard of Mr.

Egiazaryan prior to learning about him from defendant, would sign onto the Freedom House

Letters.  Mr. Zalmayev also attempted to lower the "Google rankings" of Mr. Egiazaryan's

website, which Mr. Egiazaryan established to combat the black public relations campaign, and a

blog that asserted that Mr. Zalmayev's own human rights organization is a front for commercial

lobbying and public relations activities.  By lowering the "Google rankings" of Mr. Egiazaryan's

website and the blog criticizing Mr. Zalmayev, defendant made it less likely that people

conducting internet searches on Mr. Egiazaryan would find and read information in his defense

or that would cause them to question the source of the false accusations against Mr. Egiazaryan.

(Amended Complaint, pp. 34-35, ¶ 122.)

**Mr. Zalmayev Drafted and Disseminated the Moscow Times Article**

As described in the Amended Complaint, in mid-February of 2011, Mr. Zalmayev

retained Leonid Komarovsky and paid him $7,000 from an expense account that had been

established by Mr. Zalmayev for his campaign against Mr. Egiazaryan.  After being retained by

Mr. Zalmayev, Mr. Komarovsky wrote a Russian language piece on Mr. Egiazaryan for the

newspaper *Yevreisky Mir* (Jewish World).  However, Mr. Zalmayev was dissatisfied with the

piece, and on February 23, 2011, he wrote to Mr. Akhmetshin:  "[I] just read it and was a bit

horrified at how long and rambling it was – but remember … he's only playing to the Russian-

Jewish community, who like this sort of shit, and its only for the Rus-Jewish newspaper… for

the Boston Globe piece, of course, it'll have to be much different."  Mr. Akhmetshin replied:

"sure, go ahead and draft that Boston globe piece yrslf".  Later that day, Mr. Zalmayev wrote to

Mr. Komarovsky: "I thought about it and decided that the text format does not suit the BG and it

would be better to simply re-write the whole thing.  I will write everything from scratch, about

700-800 words, and send it to you".  (Amended Complaint, pp. 18-19, ¶¶ 63-65.)

Shortly thereafter, on March 4, 2011, Mr. Zalmayev and Mr. Akhmetshin discussed the

need to submit a piece about Mr. Egiazaryan to the Moscow Times.  During his discussions with

Mr. Akhmetshin, Mr. Zalmayev suggested, with respect to the proposed article, "maybe sign it

with Komarovsky's name? let's discuss."  On the following day, Mr. Zalmayev submitted a draft

of the article entitled "No Safe U.S. Haven for Hatemongers", the subject of Count II of the

Amended Complaint, to the Moscow Times on "behalf" of Mr. Komarovsky (the

"Zalmayev/Komarovsky Article").  Indeed, as he subsequently recounted to Mr. Akhmetshin,

- 12 -

Mr. Zalmayev "took the liberty of writing [the <u>Moscow Times</u> piece] on behalf of Komar[ovsky]. let's see if they respond." (Amended Complaint, p. 19, ¶¶ 66-67.)

On March 13, 2011, the <u>Moscow Times</u> e-mailed Mr. Komarovsky, thanking him for submitting the article about Mr. Egiazaryan and expressing its desire to publish it. It also provided a "readback" of the article for Mr. Komarovsky's approval. Mr. Komarovsky was surprised by the e-mail and asked Mr. Zalmayev about it. Mr. Zalmayev responded to Mr. Komarovsky that he "wrote to [the <u>Moscow Times</u>] in your name and left your address expressing indignation about Ashot's article last week. Please reply to him with the following words: 'looked it over, op-ed good to go.'" (Amended Complaint, pp. 19-20, ¶¶ 68-69.)

These allegations, based on incontrovertible documentary evidence, demonstrate that Mr. Zalmayev drafted the Zalmayev/Komarovsky Article and "took the liberty" of publishing it to the <u>Moscow Times</u>. The <u>Moscow Times</u> subsequently published Mr. Zalmayev's article, which had been "sign[ed] with Komarovsky's name," to its readers on March 14, 2011.

**New Facts Recently Adduced During Discovery Further
Bolster Mr. Egiazaryan's Claims that Mr. Zalmayev Acted
<u>With Actual Malice in Publishing the Defamatory Statements</u>**

Were the Court to conclude that even these fulsome and detailed allegations are insufficient to cure Mr. Egiazaryan's pleading deficiencies, Mr. Egiazaryan seeks leave to amend his pleading further so as to add reference to evidence adduced after the filing of the Amended Complaint, including admissions contained in the depositions of Peter Zalmayev and his co-conspirator, Rinat Akhmetshin. These recently discovered facts bolster further the conclusion that Mr. Zalmayev acted intentionally and with reckless disregard for the truth in publishing the false and defamatory statements at the heart of this case.

What follows is just a sampling of the facts adduced since the filing of the Amended

Complaint:

### Mr. Zalmayev Knew of the Falsity of His Defamatory Statements Alleging that Mr. Egiazaryan was Engaged in War Crimes and Theft or Embezzlement of Chechen Relief Funds

- Mr. Zalmayev conceded at his deposition that he saw no documentation suggesting that Mr. Egiazaryan embezzled funds earmarked for Chechnya. (Ex. 2, pp. 210-217.)

- At his deposition, Mr. Akhmetshin admitted that the allegations against Mr. Egiazaryan were unfounded: "We established that Chechnya thing was not – we could not say with certainty.  So, therefore, we dropped the matter and focused on other matter."  (Ex. 1, p. 368.)

- Mr. Akhmetshin testified further that "We couldn't find any credible information.  And I think that was the time when discussion of Mr. Egiazaryan's Chechen record was suspended, because we couldn't say with certainty about his Chechen activity."  (Ex. 1, pp. 286-287.)

### Mr. Zalmayev Knew of the Falsity of His Defamatory Statements Alleging That Mr. Egiazaryan was Anti-Semitic, Anti-American and Xenophobic

- Although the Egiazaryan project team claims to have "investigate[d] all aspects of Mr. Egiazaryan's activities," and "did do very thorough due diligence", they did not identify and were unaware of a single anti-Semitic, anti-American or xenophobic statement or act by Mr. Egiazaryan.  (Ex. 2 (Zalmayev Tr.), pp. 8-9; Ex. 1 (Akhmetshin Tr.), pp. 114-120, 183, 186-187, 224-225, 357, 351-366; Transcript of Deposition of Douglas Bloomfield, attached as Exhibit 4 to the Lupkin Decl., pp. 59-65, 235.)

- Mr. Zalmayev and his collaborators entertained serious doubts about the truth of his publications casting Mr. Egiazaryan as anti-Semitic, anti-American and xenophobic.  For example, Mr. Akhmetshin conceded that "he, himself, [Mr. Egiazaryan] was almost never on the record on anything."  (February 5, 2011 e-mail from Mr. Akhmetshin, attached as Exhibit 5 to the Lupkin Decl.)

### Mr. Zalmayev Purposefully Avoided the Truth and/or Failed to Investigate and Conduct Due Diligence as to the Accuracy of any of the Defamatory Statements, Which Supports Mr. Egiazaryan's Claim of Actual Malice

- Messrs. Zalmayev's and Akhmetshin's testimony attests to the fact that the research conducted was mostly internet research and communications with those who had a dispute with Egiazaryan, people who represented people who

had a dispute with Egiazaryan, and journalists.  As to the internet, the anti-Egiazaryan campaign's primary source, Mr. Akhmetshin testified that "there's a lot of rubbish online and, you know, some stuff which is absolutely outrageous."  (Ex. 1, pp. 363-364.);

- Mr. Zalmayev conceded that his was not a quest for the truth, but spearheading a paid-for campaign dedicated to besmirching Mr. Egiazaryan's reputation.  Mr. Zalmayev claimed to have a "source" in Egiazaryan's entourage and touted that source in attempt to garner interest and credibility in the eyes of the press.  But at no time did Mr. Zalmayev or anyone working on his campaign reach out to speak to Mr. Egiazaryan and get his side of the story.  In fact, Mr. Zalmayev testified that he had *no interest* in Mr. Egiazaryan's side of the story.  (Ex. 1 (Akhmetshin Tr.), pp. 187-190; Ex. 2 (Zalmayev Tr.), pp. 359, 362.)

**Mr. Zalmayev's Defamatory Statements Were Motivated by Ill Will and Hostility Towards Mr. Egiazaryan,**
**Which Supports Mr. Egiazaryan's Claim of Actual Malice**

- Mr. Zalmayev conceded that one of Mr. Egiazaryan's wealthy foes commissioned him to launch the disinformation campaign in an attempt to have Mr. Egiazaryan expelled from the United States.  According to Messrs. Zalmayev and Akhmetshin, the anti-Egiazaryan project was initiated and paid for by Russian billionaire Andrey Vavilov.  (Ex. 1 (Akhmetshin Tr.), p. 81, 98-99, 108; Defendant's Responses to Plaintiff's First Set of Interrogatories to Defendant, attached as Exhibit 6 to the Lupkin Decl.)

- According to Mr. Akhmetshin at his deposition: "Mr. Vavilov hates your client's guts." (Ex. 1, pp. 97, 102, 251.)

- Mr. Zalmayev testified that the campaign against Mr. Egiazaryan was driven by "a degree of animosity."  (Ex. 2, p. 95.)

- The goal of the anti-Egiazaryan project was to hurt Mr. Egiazaryan through a campaign intended "to send Mr. Egiazaryan packing" (Position Paper, attached as Exhibit 7 to the Lupkin Decl.), and "send his ass to where he came from."  (E-mail chain between Messrs. Zalmayev and Akhmetshin, dated February 22-23, 2011, attached as Exhibit 8 to the Lupkin Decl.)

- Documents establish that defendant views this very litigation as merely another "stage" of the anti-Egiazaryan campaign.  (Ex. 2 (Zalmayev Tr.), p. 597-99.)

- 15 -

**The Manner in Which Mr. Zalmayev Drafted and Disseminated the Defamatory Statements at Issue, Including the Distortion of Facts to Maximize Injury and the Omission of Facts that Would Have Mitigated Injury, Supports Mr. Egiazaryan's Claim of Actual Malice**

- Mr. Zalmayev misled numerous human rights activists and United States government officials by concealing the fact that he was not functioning as an altruistic human rights activist, but, instead, that he was acting on behalf of a paying client who wired him substantial funds from an offshore bank account. (Ex. 2 (Zalmayev Tr.), pp. 173, 225-228, 264, 361, 374, 593-595; Chase bank account statement reflecting a $70,000.00 wire to Mr. Zalmayev's New York-based organization Eurasia Democracy Initiative, Inc., attached as Exhibit 11 to the Lupkin Decl.)

- Mr. Zalmayev manipulated Google search results to cause false negative information about Mr. Egiazaryan to appear above results favorable to Mr. Egiazaryan. (Ex. 2 (Zalmayev Tr.), pp. 547-558.) By so doing, Mr. Zalmayev actively sought to prevent Mr. Egiazaryan from presenting his side of the story to the public.

- Leonid Komarovsky, the nominal author of the Moscow Times article "No U.S. Safe-Haven for Hatemongers," hosts a regular radio program for Russian émigrés in the United States. In order to create the misimpression that there was a groundswell of outrage among Komarovsky's listeners about Mr. Egiazaryan's presence in this country, Mr. Zalmayev, using a Russian pseudonym, called in to the show to prompt a pre-scripted "discussion" about Mr. Egiazaryan with Mr. Komarovsky. (Ex. 2 (Zalmayev Tr.), pp. 578-580.)

We submit that this, coupled with the detailed set of facts set forth in the Amended Complaint, is not only sufficient as a matter of pleading, but would be sufficient to defeat any motion for summary judgment that Mr. Zalmayev may choose to make in the future. Moreover, additional discovery will be conducted that is likely to result in additional relevant evidence.

## ARGUMENT

## POINT I

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the court must "accept as true" the factual allegations in the Amended Complaint and "draw all inferences in the plaintiff's favor."

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 270 (2d Cir. 2011) (citations omitted).  In deciding such a motion, the issue is not whether a plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (quotation and citation omitted).  Indeed, "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

On a motion to dismiss, the court's function is not to weigh the evidence that plaintiff might present in support of her claims at trial.  *Velez v. Levy*, 401 F.3d 75, 80 (2d Cir. 2005) (citation omitted).  Rather, the court must confine itself to evaluating the legal sufficiency of the allegations in the complaint.  *Id.* (citation omitted).

Moreover, because the "resolution of the falsity and actual malice inquiries typically requires discovery," defamation claims should not usually be resolved at the pleading stage. *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005).  New York courts in particular have held that it is "premature" to dismiss a defamation claim for the inadequate pleading of malice because the plaintiff should be permitted to prove actual malice "after discovery has been completed." *Alianza Dominicana, Inc. v. Luna*, 229 A.D.2d 328, 329, 645 N.Y.S.2d 28, 30 (1st Dep't 1996), *lv. app. dismd.* 89 N.Y.2d 1029, 658 N.Y.S.2d 244 (1997); *accord Goldwater v. Ginzburg*, 261 F. Supp. 784, 788 (S.D.N.Y. 1966) ("The issue of actual malice on the part of defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns 'motive, intent, and subjective feelings and reactions'.  The Supreme Court has cautioned against summary judgment [and it should be doubly the case with

respect to motions to dismiss] 'where motive and intent play leading roles'.") (citations omitted);

*O'Neil v. Peekskill Faculty Ass'n*, 120 A.D.2d 36, 43, 507 N.Y.S.2d 173, 179 (2nd Dep't 1986)

("Actual malice involves a determination of the state of mind of a defendant and is thus not an

issue that easily lends itself to summary disposition."); *Hollander v. Long Island Plastic Surgical*

*Group*, 104 A.D.2d 357, 358, 478 N.Y.S.2d 687, 688 (2d Dep't 1984) ("[A]ctual malice involves

a determination of the state of mind of the defendant, and therefore, is not particularly

susceptible to summary resolution....").[9]

     Given these standards, Defendant's motion to dismiss the Amended Complaint must be

denied.

## POINT II

### THE COURT SHOULD NOT DISMISS THE AMENDED COMPLAINT BECAUSE COUNTS I THROUGH IV ALL STATE VIABLE CLAIMS FOR DEFAMATION UNDER NEW YORK LAW

     Mr. Zalmayev asserts three principal arguments in support of his motion to dismiss

Counts I through IV of the Amended Complaint:  (1) Mr. Zalmayev cannot be liable for the

---

[9] In its December 7 Order, the Court cited to two cases that dismissed defamation claims at the pleading stage: *Hakky v. Wash. Post Co.*, No. 09 Civ. 2406, 2010 WL 2573902, at *6 (M.D.Fla. June 24, 20120) and *Diario El Pais, S.L. v. Nielsen Co., (US), Inc.*, No. 07 Civ. 11295, 2008 WL 4833012, at *6-7 (S.D.N.Y. Nov. 6, 2008).  Unlike Mr. Egiazaryan's Amended Complaint, which contains several pages of factual allegations regarding Mr. Zalmayev's state of mind and actual malice, the complaints in the *Hakky* and *Diario* cases each contain nothing more than a few conclusory sentences regarding the defendants' state of mind.  For example, the six-page complaint that was dismissed in the *Hakky* case contained only two paragraphs concerning the defendants' state of mind.  One paragraph said only that the "foregoing statements... were made without reasonable care and with at least negligence as to the truth or falsity of the statements." (*Hakky* Complaint, attached as Exhibit 9 to the Lupkin Decl., at ¶ 7.)  The second paragraph said only that the "foregoing statements were published with express malice and with knowledge that they were false, including falsely misleadingly, or with reckless disregard of whether they were true or false, and without reasonable grounds for the defendants to believe they were true and with intent to injure and defame Dr. Hakky." (Ex. 9, ¶ 8.)  The complaint in the *Diario* case was similarly devoid of any factual allegations concerning the defendant's state of mind.  The only allegations concerning this issue consisted of unsupported assertions that "[o]n information and belief, Defendant is aware that its estimates... are inaccurate and rest on a faulty methodology" (*Diario* Complaint, attached as Ex. 10 to the Lupkin Decl., at ¶ 81); that the defendant "is conscious and aware that its flawed methodology causes harm to Plaintiffs" (Ex. 10, ¶ 82); and that the defendant "has committed and is committing the acts alleged in this Complaint, with reckless and willful disregard regarding the accuracy of its statistics, data and ratings" (Ex. 10, ¶ 91).

published writings described in Counts II through IV because they do not bear his signature

(Defendant's Memorandum of Law in Support of His Motion to Dismiss the Amended

Complaint ("Defendant's MOL"), p. 22); (2) the Amended Complaint fails to allege facts

demonstrating that the defamatory statements at issue were made with actual malice

(Defendant's MOL, pp. 16-21); and (3) the challenged statements constitute non-actionable

opinions rather than actionable statements of fact (Defendant's MOL, pp. 22-31).  For the

reasons that follow, each of these arguments is flawed and must fail.[10]

### A.  Mr. Zalmayev May Be Held Liable (And Cannot Be Immunized) for Making False Statements About Mr. Egiazaryan to Third Parties Who, In Turn, Published These False Statements to Others

In moving to dismiss the Amended Complaint, Mr. Zalmayev claims that he "cannot be

held responsible for letters sent by independent human rights advocates or news commentaries

approved by independent journalists even though he collaborated on them."  (Defendant's MOL,

p. 22.)  This assertion reflects a fundamental misunderstanding of defamation law.

According to Judge Robert Sack, the author of the leading treatise on defamation law,

everyone in the chain of communication that results in a publication is potentially liable for the

publication: "[i]f a person tells a false and defamatory story to a reporter, who publishes it in a

---

[10] Mr. Zalmayev also argues in his motion that because Mr. Egiazaryan "has not offered a statement concerning good cause" for filing the Amended Complaint past the deadline for filing amended pleadings set forth in the June 27, 2011 Scheduling Order, "[i]t is within the sound discretion of the Court to strike the amended complaint for having been filed out of time."  (Defendant's MOL, p. 12.)  However, Mr. Egiazaryan's amendment was appropriate for the following reasons:  First, Mr. Zalmayev's argument is moot because he explicitly consented to the amendment, and Magistrate Judge Gorenstein granted Mr. Egiazaryan's unopposed motion for leave to amend. Second, Magistrate Judge Gorenstein's grant of plaintiff's amendment motion was tantamount to adjusting a deadline in the extant scheduling order, which, as the magistrate to whom discovery has been referred, Magistrate Judge Gorenstein had the authority to do.  *See* 28 U.S.C. § 636 (2012).  In any event, though, there is more than ample cause to justify Mr. Egiazaryan's election to seek leave when he did.  The Amended Complaint was prepared specifically to cure perceived deficiencies identified by Judge Castel in his December 7 Order (which was issued long after the deadline in the original Scheduling Order for amending pleadings had passed) and referenced information and material that plaintiff collected well after he filed the original pleading.   Within five weeks of the Court's December 7 Order, a time period that included the Christmas and New Year holidays, Mr. Egiazaryan forwarded copies of his proposed amended pleading to Mr. Zalmayev for his review and consent to filing.

newspaper, the source, the reporter, the newspaper, the printer, and the distributor, at least theoretically and under some circumstances, may all be liable for publication." *Sack on Defamation*, p. 2-166.  This is because, as Judge Sack notes elsewhere, "[e]very distinct publication of a libelous writing or slanderous statement gives rise to a separate cause of action. . . . [P]ublication need not be proved with respect to specific recipients of the allegedly defamatory message.  It is enough to establish, by direct or circumstantial evidence, that third parties did indeed receive it." *Sack on Defamation*, p. 2-89; *accord Liverpool v. Con-Way, Inc.*, No. 08-CV-4076, 2009 WL 1362965, at *10 (E.D.N.Y. May 15, 2009) (denying motion to dismiss with respect to defamation claims because "a party may be held liable for the repetition of libel or slander if the repetition was reasonably to be expected.") (quotation and citations omitted); *Campo v. Paar*, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494, 498 (1st Dep't 1963) ("Anyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication.") (citations omitted).

Moreover, a party, while not the author of the defamatory statement in question, may be held liable as long as he shared responsibility for publication of the remarks.  *See Fischer v. OBG Cameron Banfill LLP*, No. 08 Civ. 7707, 2010 WL 3733882, at *2 (S.D.N.Y. Sept. 24, 2010) ("[U]nder New York law, all who take part in the procurement, composition and publication of a libel are responsible in law and equally so.") (quotation and citations omitted); *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 179 (E.D.N.Y. 2006) (same; denying motion to dismiss); *see also Rottem v. Giovanelli*, No. 601499/08, 2009 WL 3240384 (Sup. Ct. N.Y. Co. Sept. 25, 2009) ("[A]ll who take part in the procurement, composition, and publication of a libel are equally responsible in law for the resulting damages.") (quotation and citations omitted); *Afshari v. Barer*, 1 Misc.3d 57, 58, 769 N.Y.S.2d 687, 689 (N.Y. App. Term 2003)

(spouse of attorney's former client who participated in the preparation and publication of letter containing libelous statements about attorney was liable for defamation even though she was not a signatory to the letter).

Here, Mr. Zalmayev did more than merely "collaborate" with the ostensible authors in the preparation of the defamatory statements described in Counts II through IV of the Amended Complaint; he drafted each of the statements. Mr. Zalmayev's motion to dismiss fails to address any of the substantial number of allegations in the Amended Complaint concerning his role in drafting each of the defamatory statements described in Counts II through IV. (*See* Amended Complaint, pp. 18-20, ¶¶ 63-70 (the Zalmayev/Komarovsky Article), p. 22, ¶¶ 80-81 (the Ponomarev and Alexeyeva Letters), pp. 26-29, ¶¶ 95-106 (the Freedom House letters). Mr. Zalmayev cannot escape liability for publishing defamatory statements because he ghost wrote publications and paid-off or otherwise induced other individuals to be the signatories.

Because Mr. Zalmayev drafted the defamatory statements described in the Amended Complaint and subsequently published those statements to third parties, the Amended Complaint may not be dismissed on this basis.

### B. The Amended Complaint Plausibly Alleges That Mr. Zalmayev Acted With Actual Malice In Publishing The Defamatory Statements At Issue

Mr. Egiazaryan's Amended Complaint more than adequately pleads "actual malice" and corrects any of the factual deficiencies that the Court perceived in the original pleading. Non-conclusory factual allegations of malice pervade Mr. Egiazaryan's amended pleading, which even contains a nine page stand-alone section entitled "In Publishing The False And Defamatory Statements Described Above, Defendant Zalmayev Acted Both Negligently As Well As Intentionally And With Reckless Disregard For The Truth." (Amended Complaint, pp. 29-37, ¶¶

107-131.) Accordingly, this Court should deny defendant's motion to dismiss on this basis as well.

> **i.   The Amended Complaint describes direct and circumstantial evidence which, taken together, plausibly establish that Mr. Zalmayev acted with actual malice**

Courts have observed that "[t]he existence of actual malice may be shown in many ways. As a general rule, [for the practical reason that knowledge of the falsity of the claims is something that is typically in the sole possession of defendant] any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown...." *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct.1635, 1643 n.12 (1979) (holding that a plaintiff required to prove actual malice is not precluded from direct inquiry into a media defendant's editorial process or its state of mind) (quotation and citation omitted); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668, 109 S. Ct. 2678, 2686 (1989) ("[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence."); *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) ("In determining whether a plaintiff has adduced sufficient evidence to reach a jury, the Court may consider plaintiff's evidence of actual malice in the aggregate.").

In 2000, the Second Circuit explicitly recognized this reality when it affirmed the jury's finding of libel as to certain publications and held that "[a]lthough actual malice is subjective, a court typically will infer actual malice from objective facts. These facts should provide evidence of negligence, motive and intent such that *an accumulation of the evidence and appropriate inferences* supports the existence of actual malice." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (internal quotations and citations omitted) (emphasis in original); *see also Moore v. Vislosky*, 240 Fed. Appx. 457, 468 (3d Cir. 2007) ("[A] plaintiff may rarely be

successful in proving awareness of falsehood from the mouth of the defendant himself. Accordingly, objective circumstantial evidence can suffice to demonstrate actual malice and can even override defendants' protestations of good faith and honest belief that the report was true. A court may infer actual malice from objective facts that provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.") (quotations and citations omitted).

Here, the Amended Complaint alleges both direct *and* circumstantial evidence which, taken together, plausibly establishes that Mr. Zalmayev acted with actual malice. Such evidence includes allegations concerning (i) Mr. Zalmayev purposefully avoiding the truth and/or had serious doubts as to the accuracy of the statements at issue (*e.g.*, Amended Complaint, at pp. 35-37, ¶¶ 123-31; Statement of Facts, pp. 6-7, *supra*); (ii) Mr. Zalmayev's ill will and hostility towards Mr. Egiazaryan (*e.g.*, Amended Complaint, at pp. 30-33, ¶¶ 112-16; Statement of Facts, pp. 8-9, *supra*); and (iii) the manner in which Mr. Zalmayev drafted and disseminated the defamatory statements at issue, including the distortion of facts to maximize injury and the omission of facts that would have mitigated injury (*e.g.*, Amended Complaint, at pp. 33-35, ¶¶ 117-22; Statement of Facts, pp. 10-11, *supra*). Courts have found all of these factors to be persuasive evidence of a defendant's actual malice.[11]

---

[11] In each of the following cases, the court either affirmed a jury verdict finding certain statements to be defamatory based on the sufficiency of the evidence as to actual malice or denied defendants' dispositive motions based on the sufficiency of the plaintiffs' allegations concerning actual malice. *See, e.g., Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice."); *Guccione v. Flynt*, 618 F. Supp. 164, 166 (S.D.N.Y. 1985) (evidence of "the state of relations existing between the parties" is a factor that courts may consider in evaluating the existence of actual malice, as is "the degree of investigation undertaken by the defendants"); *Hayne v. The Innocence Project*, No. 09-CV-218, 2011 WL 198128, at *5 (S.D. Miss. Jan. 20, 2011) (courts may consider as evidence of actual malice the manner in which defendants "edited and distorted the actual facts ... so as to maximize the damage and harm to [the plaintiff], his reputation, and his ability to earn a living in his chosen profession" and whether defendants "ignore[d] all contrary evidence and/or ... edit[ed] their publications in such a way as to maximize the false light that was cast on [the plaintiff]"; in other words, actual malice may be demonstrated by defendants "editing and distorting facts in an effort to maximize the damage done by the publication, and... intentionally omit[ing] facts which would mitigate said damage.") (quotations and citations

Mr. Zalmayev's dismissal motion misses the mark.  Ignoring the Second Circuit's admonition that evidence of actual malice must be examined in its totality, Mr. Zalmayev addresses certain of Mr. Egiazaryan's allegations in isolation and argues that those allegations, standing alone, are insufficient to establish actual malice.  (*See, e.g.*, Defendant's MOL, at 16 ("hostility does not prove actual malice"), 19 ("There are insufficient allegaltions [sic] that Zalmayev had doubts about the accuracy of the statements in the letters concerning the misappropriation of funds intended for Chechnya."), 21 ("allegations about Zalmayev and Suleyman [Kerimov] are irrelevant to the issue of whether Zalmayev 'entertained serious doubts as to the truth of his publication.'").)  Mr. Zalmayev never disputes that Mr. Egiazaryan's allegations *taken together* plausibly allege the existence of actual malice.  *Accord Celle*, 209 F.3d at 183; *Stern*, 645 F. Supp. at 278 (holding that the Court should "consider plaintiff's evidence of actual malice in the aggregate").  Mr. Zalmayev's inability to rebut the totality of the many different types of actual malice evidence is fatal to his argument that Mr. Egiazaryan failed to adequately plead this element of his claims.

Accordingly, because Mr. Egiazaryan's amended pleading plausibly alleges more than enough facts that may establish Mr. Zalmayev's actual malice, defendant's motion to dismiss the Amended Complaint should be denied.

---

omitted); *Stokes v. CBS Inc.*, 25 F. Supp. 2d 992, 1004-05 (D. Minn. 1998) ("Finally, in combination with these other factors, the highly slanted perspective of each report would further support a finding of actual malice.  In fact, as the court has already discussed, the broadcasts' one-sidedness goes beyond merely favoring one party's version of events over another.  Through the use of ambush tactics and distorting visual and editorial techniques, both reports actively contributed to the impression that Stokes committed the crime.") (internal citations omitted); *Harte-Hanks Commc'ns*, 491 U.S. at 692, 109 S.Ct. at 2698 (1989) ("[I]t is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges.  Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.") (internal citations omitted).

### ii. In any event, Mr. Egiazaryan need not allege actual malice because he is not a public figure in the community where the defamatory statements at issue were published

Even though the Amended Complaint sufficiently alleges that Mr. Zalmayev acted with actual malice, Mr. Egiazaryan may only need to prove that the defendant was negligent in publishing the defamatory statements. In its December 7 Order, this Court found that the facts alleged in the Complaint, "taken as a whole," established that Mr. Egiazaryan is a public figure. (December 7 Order, Ex. 3, p. 8.) But the Amended Complaint contains facts that now establish just the opposite -- that Mr. Egiazaryan is a private figure leading a private life in the United States.[12]

The Amended Complaint refers to compelling evidence on this point:

- Mr. Zalmayev himself has characterized Mr. Egiazaryan as "little known" in the United States (Amended Complaint, p. 29, ¶ 108); and

- Of the six witnesses deposed in the action by the time the Amended Complaint was filed, including one of Mr. Zalmayev's own confederates and those whom he deceived into sending anti-Egiazaryan letters to government officials, none had ever heard of Mr. Egiazaryan prior to being introduced to him by Mr. Zalmayev or those working with him. (*Id.*) Notably, these witnesses all worked in positions that should have and would have made them knowledgeable about notorious anti-Semitism or anti-Semitics in Russia. (*Id.*)

In its March 12, 2012 Order (Docket Entry #111), granting Mr. Zalmayev leave to file a motion to dismiss the Amended Complaint, the Court suggested that "the doctrine of the law of the case may well foreclose revisiting the issue of whether plaintiff is a public figure." We respectfully submit that the law of the case doctrine does not impose an insurmountable obstacle.

The Second Circuit has described "law of the case" as a "discretionary doctrine" which is a "judicially crafted policy that expresses the practice of courts generally to refuse to reopen

---

[12] Mr. Egiazaryan's status as private or public figure is an issue on which additional evidence has been adduced during discovery, which has been ongoing, since the Amended Complaint was filed. (*See* Statement of Facts, p. 14, *supra*.)

what has been decided, [but that it] is not a limit to their power.  As such, law of the case is necessarily amorphous in that it 'directs a court's discretion, but does not restrict its authority.'" *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 219 (2d Cir. 2002) (citations omitted); *see also DiLaura v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (holding that the law of the case "doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.") (quotation and citations omitted). Generally, "'[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'... In any event the doctrine of law of the case 'permits a change of position if it appears that the court's original ruling was erroneous.'" *DiLaura*, 982 F.2d at 76-77 (quotation and citations omitted) (alteration in original).

Under the circumstances presented here, the law of the case doctrine should not foreclose upon the Court's ability to revisit the issue of whether Mr. Egiazaryan is a public or private figure.  Although the factors previously considered by the Court may well establish that Mr. Egiazaryan is a public figure in Russia[13], the new evidence adduced during discovery and described in the Amended Complaint, including Mr. Zalmayev's own admission that Mr. Egiazaryan is "little known" in the United States, demonstrates that Mr. Egiazaryan is a private figure in the United States, where the defamatory statements were published.[14]

---

[13] However, Mr. Egiazaryan's position in the Russian Duma, without more, does not transform him into a "public figure" in the United States for First Amendment purposes. *See Lopez v. Univision Commc'ns Inc.*, 45 F. Supp. 2d 348, 361 (S.D.N.Y. 1999) ("[T]his Court is not prepared to say that the holding of any foreign public office is alone sufficient to require application of the *Times* standard. . . .  In consequence, the fact that the plaintiff is a member of the Colombian Senate does not alone require him to prove constitutional malice. . . .").

[14] Mr. Zalmayev also argues that regardless of whether or not he is a public figure, Mr. Egiazaryan should have to prove actual malice by virtue of New York's anti-SLAPP statute.  That statute permits a defamation plaintiff to recover damages in a SLAPP suit only if "in addition to all other necessary elements, [it] established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false."  N.Y. Civil Rights Law § 76-a(2).  Before the actual malice

### C. The Defamatory Statements At Issue Constitute Actionable Factual Assertions, As Opposed To Non-Actionable Opinion

Mr. Zalmayev's final argument for dismissal is that the "challenged statements are opinions and therefore not defamatory under New York law." (Defendant's MOL, p. 22.) This argument is equally unpersuasive and meritless.

In *Gross v. New York Times Co.*, the New York Court of Appeals set forth the analysis to be followed by New York courts in determining whether a statement constitutes fact rather than non-actionable opinion:

> In our State the inquiry, which must be made by the court, entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "'signal * * * readers or listeners that what is being read or heard is likely to be opinion, not fact.'"

*Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 817 (1993) (citations omitted); *accord Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 243, 254, 566 N.Y.S.2d 906, 909-10, 917 (1991) ("The key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact. . . . In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view

---

standard is imposed pursuant to the anti-SLAPP statute, though, the Court must first determine that Mr. Egiazaryan's lawsuit constitutes a SLAPP suit. *See Guerrero v. Carva*, 10 A.D.3d 105, 116, 779 N.Y.S.2d 12, 21 (1st Dep't 2004) (before "an actual malice standard is imposed," there must be a "finding that an action is a SLAPP suit"). Contrary to the contention in Mr. Zalmayev's brief, the Court's December 7 Order did not categorize Mr. Egiazaryan's lawsuit as a SLAPP suit, but rather, held only that Mr. Zalmayev alleged sufficient facts to permit his anti-SLAPP counterclaim to survive a motion to dismiss. Until and unless this Court first determines that Mr. Egiazaryan's lawsuit is in fact a SLAPP suit, the actual malice standard should not be imposed on Mr. Egiazaryan pursuant to the New York statute. Moreover, it is not clear that Mr. Zalmayev's anti-SLAPP counterclaim will ever reach a jury, as Mr. Egiazaryan intends to move for summary judgment on that claim at the close of fact discovery.

of the reasonable person…. [F]alse statements are actionable when they would be perceived as factual by the reasonable person.").

Applying these principles to the claims in the Amended Complaint leads inexorably to the conclusion that the offending statements at issue here are actionable facts, not mere opinions.

### i.   The challenged statements have "precise meaning[s] which [are] readily understood"

Mr. Zalmayev's statements, which accuse Mr. Egiazaryan of being an "anti-Semitic bigot" with a "well-established record of anti-Semitism and hate speech," anti-American, an embezzler of government funds and one who covers up war crimes, are charges that can be readily understood by a reader or listener as factual. The statements are not couched in vague, metaphoric or hyperbolic language that lack precise meaning; indeed, they are (and were meant to be) "readily understood." The very purpose of Mr. Zalmayev's efforts was to present false factual statements to paint Mr. Egiazaryan as a reprehensible individual who should be ostracized and not be allowed to stay in this country.

### Anti-Semitism and Bigotry

Courts have readily held allegations of racism, anti-Semitism and anti-Americanism to be actionable under New York law. *See, e.g., Como v. Riley*, 287 A.D.2d 416, 416, 731 N.Y.S.2d 731, 731 (1st Dep't 2001) (reinstating plaintiff's defamation claims because where an e-mail stated "that plaintiff's office cubicle contained a statuette of a black man hanging from a white noose . . . defendants' views premised on such statement, published under the heading 'Racism,' are not immune from redress for defamation as non-actionable statements of opinion."); *Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 261, 633 N.Y.S.2d 106, 113 (1st Dep't 1995) (because the "natural connotation of defendants' statements is that plaintiff was anti-Semitic and biased in her treatment of Jewish volunteers," a claim of slander per se was stated and

defendants' motion for summary judgment on that cause of action was properly denied); *Calore*

*v. Powell-Savory Corp.*, 21 A.D.2d 877, 878, 251 N.Y.S.2d 732, 733 (2d Dep't 1964) (denying

defendants' motions to dismiss with respect to defamation claim where plaintiff was alleged to

be "guilty of anti-Negro discrimination. . . .   In view of the temper of the times and the current of

contemporary public opinion, we deem such a charge, when falsely made against a labor union,

to be libelous *per se*."); *Shiamili v. The Real Estate Group of New York, Inc.*, No. 600460/08,

2008 WL 5478706 (Sup. Ct. N.Y. Co. Dec. 26, 2008) (denying defendants' motion to dismiss

where statements at issue alleged that plaintiff "discriminated against employees based on racial

or anti-semitic bias"), *rev'd on other grounds*, 68 A.D.3d 581, 892 N.Y.S.2d 52 (1st Dep't

2009); *Oluwo v. Hallum*, No. 35145/06, 2007 WL 2701286, at *4-5 (Sup. Ct. Kings Co. Aug. 31,

2007) (denying motion to dismiss with respect to certain statements made by defendants alleging

that "plaintiff had made threatening anti-Semitic remarks"); *Stuart v. Anti-Defamation League of*

*B'Nai B'rith*, 127 N.Y.S.2d 362, 363-64 (Sup. Ct. N.Y. Co. 1953) (denying motion to dismiss

with respect to cause of action concerning statement "that the plaintiff was 'being subsidized' in

the performance of his office as editor 'by a known anti-Semite'"); *Devany v. Quill*, 187 Misc.

698, 703, 64 N.Y.S.2d 733, 738 (Sup. Ct. Bronx Co. 1946) (accusations that a person is a Nazi or

Communist, or "a dangerous, able, and seditious agitator, or other words charging sedition or

disloyalty" to the United States constitute libel per se) (quotation and citations omitted).[15]

---

[15] The cases cited by Mr. Zalmayev to support his erroneous position that the "labeling of Egiazaryan as an anti-Semite . . . is also protected opinion" (Defendant's MOL, pp. 28-29) are inapposite; none arose in the context of motions to dismiss.  Moreover, several of them are distinguishable in that they involved different and less precise terms used in a different context.  *See Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976) (statements such as "fascist," "fellow traveler" and "radical right" "cannot be regarded as having been proved to be statements of fact . . . because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate. . . . [The terms] are concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity."); *Carto v. Buckley*, 649 F. Supp. 502, 508 (S.D.N.Y. 1986) (the "general terms 'racial and religious bigotry' are imprecise concepts which cannot be proven true or false as statements of fact. . . .  There is no one opinion of what constitutes 'racial and religious bigotry,' or for that matter what constitutes 'bigotry' generally.")

Consistent with the conclusions reached by these New York state courts, the Second

Circuit itself held that accusing someone of being an anti-Semite constitutes actionable

defamation. *See Sweeney v. Schenectady Union Pub. Co.,* 122 F.2d 288 (2d Cir. 1941), *aff'd by*

*an equally divided court,* 316 U.S. 642, 62 S.Ct. 1031 (1942). Notably, the Second Circuit's

conclusion diverged completely from that of the D.C. Circuit in a related case – one cited by Mr.

Zalmayev and featured prominently in his moving papers (Defendant's MOL at 29). Both cases

involved the very same claims by the very same plaintiff, albeit against two different

publications. *Compare Schenectady Union Pub.*, 122 F.2d at 289 *with Sweeney v. Patterson*, 128

F.2d 457, 457-58 (D.C. Cir. 1942) (Sweeney's lawsuit was "one of a series of libel suits which

appellant brought, in various courts and against various defendants").

At issue in both *Sweeney* cases were statements concerning a Congressman's desire to

block the appointment of a judge to the U.S. District Court allegedly because he was Jewish and

foreign born. Applying New York law, the Second Circuit found the statements, which involved

accusations of anti-Semitism, to be actionable because they could well cause readers to "hate,

despise, scorn or be contemptuous of the person concerning whom the false statements have

---

Here, however, the terms anti-American and anti-Semite are not "so debatable, loose and varying" as to be insusceptible to proof of truth or falsity.

The remaining cases cited by Mr. Zalmayev, *Greenbaum v. Google, Inc.*, 18 Misc.3d 185, 190, 845 N.Y.S.2d 695, 700 (Sup. Ct. N.Y. Co. 2007) and *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 42-43, 925 N.Y.S.2d 407, 415 (1st Dep't May 19, 2011), are distinguishable for different reasons. In *Greenbaum,* which involved claims against an internet blogger, the court rejected a defamation claim stemming from charges of bigotry and anti-Semitism. The blogger never referred to plaintiff as "a bigot and an anti-semite," but merely noted that plaintiff had "no interest in helping the private school community" based on her opposition to the use of public school funds for educational programs for private school children in a district where a substantial number of the children attended Yeshivas. *Greenbaum,* 18 Misc.3d at 189, 845 N.Y.S.2d at 699-700. In *Sandals Resorts Int'l Ltd. v. Google, Inc.,* the court also rejected a defamation claim grounded in accusations of bigotry. The Court concluded that the e-mail in question was an "exercise in rhetoric, seeking to raise questions in the mind of the reader" about the financial relationship between plaintiff and certain Jamaican nationals and to highlight issues that need to be investigated, rather than a statement of facts. *Sandals Resorts Int'l Ltd.,* 86 A.D.3d at 42-43, 925 N.Y.S.2d at 415. Here, by contrast, Zalmayev's statements were not couched as mere conjecture or advanced simply to raise questions about Mr. Egiazaryan. Rather, Mr. Zalmayev made specific assertions of fact in support of a concrete goal: to garner support for Mr. Egiazaryan's expulsion from the United States.

been published." *Schenectady Union Pub.*, 122 F.2d at 290. The Second Circuit buttressed its conclusion by emphasizing that the demographics of the publication's constituent readership consisted of a large Jewish population:

> "[I]n places where Jews make up a sizeable portion of the population, as they are known to do in part of the territory in which it is alleged that the defendant's newspaper circulated when the publication was made, it may be taken for granted that there will be an appreciable number who will hate or hold in contempt one who discriminates against a Jew merely because he is a Jew whether born in this country or not."

*Schenectady Union Pub. Co,* 122 F.2d at 291.

In this case, Mr. Zalmayev's target audience also includes those "who will hate or hold in contempt" an anti-Semite: the sizable Jewish community of Los Angeles, prominent Jewish organizations and proponents of human rights. Accordingly, Mr. Zalmayev, like the defendant in *Schenectady Union,* "should be required to meet [charges of anti-Semitism] on the merits." *Id.*

### **Charges of Embezzlement and War Crimes**

Like false charges of anti-Semitism, and as recognized by this Court in the December 7 Order, false accusations about the commission of crimes are actionable as defamatory statements of fact under New York law. *E.g.*, December 7 Order, Ex. 3, p. 13 ("[t]aken as a whole, the statements in both letters imply as *fact* that Egiazaryan was complicit in the mismanagement or misappropriation of humanitarian funds.") (citing *Immuno AG.*, 77 N.Y.2d at 254) (emphasis added); *see also LaBozzo v. Brooks Bros., Inc.*, No. 120538/01, 2002 WL 1275155, at *6 (Sup. Ct. N.Y. Co. Apr. 25, 2002) ("Accusations of criminal activity, if false, are slanderous per se.") (citing *Silsdorf v. Levine*, 59 N.Y.2d 8, 16, 462 N.Y.S.2d 822, 826 (1983) (accusations of criminal or illegal activity, even in the form of opinion, are not constitutionally protected)); *Brentwood Pharmacy, Inc. v. Sheppard*, 229 N.Y.S.2d 511, 513 (Sup. Ct. Suffolk Co. 1962) ("A false accusation that a person has committed a crime is slander per se. . . .") (citations omitted).

Here, Mr. Zalmayev drafted the statements in the Ponomarev and Alexeyeva Letters alleging that Mr. Egiazaryan committed or covered up war crimes, embezzled or mismanaged funds and was a "contributor to the second Chechen war." (Amended Complaint, pp. 22-26, ¶¶ 77-94). Because these accusations falsely implicate Mr. Egiazaryan's involvement in criminal acts involving moral turpitude and offenses that are generally punishable as a crime, the accusations constitute actionable defamation. *See Devany*, 187 Misc. at 702-03, 64 N.Y.S.2d at 737 ("Words falsely spoken of a person which impute to the party the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished" are "actionable per se.") (quotation and citation omitted).

### ii.  Mr. Zalmayev's defamatory statements can be proven true or false

In considering this factor, a crucial distinction must be drawn between the "opinions" held by individuals who are anti-Semitic, anti-American or xenophobic and the "fact" that someone is anti-Semitic, anti-American or xenophobic. The latter is surely capable of being proven right or wrong. It cannot be disputed, for example, that Adolf Hitler, the leader of the Third Reich and author of Mein Kampf, and Adolf Eichmann, the Nazi architect of the "Final Solution to the Jewish Question," were anti-Semites and that their status as such are objectively provable facts. Indeed, courts and juries in our society can and do make these determinations routinely; they decide whether defendants have committed so-called "hate crimes"[16] and whether

---

[16] *See, e.g.* 18 U.S.C. § 245(b)(2) (2011) (making it a federal crime to "willfully injure[], intimidate[] or interfere[] with, or attempt[] to injure, intimidate or interfere with any person because of his . . . religion or national origin" while that person engages in federally protected activities); *U.S. v. Lane*, 883 F.2d 1484, 1487 (10th Cir. 1989) (affirming convictions where defendants were convicted of violating 18 U.S.C. § 245(b)(2) in connection with the murder of a Jewish radio talk show host); N.Y. Penal Law § 485.05 (2011) (criminalizing situation in which defendant either "intentionally selects" the victim of certain predicate offenses or "intentionally commits" certain predicate offenses "in whole or in substantial part because of a belief or perception regarding . . . religion [or] religious practice . . . ."); *People v. Ivanov*, No. 772-08, 2008 WL 6125444, at *1 (Sup. Ct. Kings Co. Sept. 12, 2008) (denying motion to dismiss indictment under Penal Law § 485.05 against defendant accused of "defacing *inter alia* numerous buildings (including two synagogues), sidewalks and motor vehicles by spray-painting or etching vile anti-Semitic words and/or symbols").

someone has suffered discrimination based upon race, religion or ethnicity.[17]  These assessments

of a person's state of mind are capable of empirical verification; as observed by a noted jurist in

the famous English case of *Edgington v Fitzmaurice,* "the state of a man's mind is as much a

fact as the state of his digestion...." *Edgington,* 29 Ch D 459 (Ct. of Appeal 1885) (Bowen, LJ).

      The charges in this Amended Complaint are clear.  Mr. Zalmayev has falsely accused

Mr. Egiazaryan of being an anti-Semite in order to persuade those with whom he has shared

those views (*i.e.* the Jewish readers of the <u>Jewish Journal</u>, as well as several Jewish advocacy

organizations, human rights activists and others) that Mr. Egiazaryan is an anti-Semitic and anti-

American war criminal and embezzler who should be expelled from the United States.  Because

these accusations are capable of being proven true or false, they satisfy this prong of the "fact vs.

opinion" analysis.

### iii. The "full context" of these communications as well as "the broader social context and surrounding circumstances" make clear that "what is being read or heard" is fact, not opinion

      The third factor, which requires the Court to consider the offending statements in their

full context, also supports the conclusion that Mr. Zalmayev's statements are actionable factual

assertions, not opinion.  The raison d'etre of Mr. Zalmayev's statements and actions are to

persuade others that Mr. Egiazaryan does not deserve to remain in this country.  To do this, he

asserts among other things, that Mr. Egiazaryan is an "anti-Semitic bigot" with a "well-

established record of anti-Semitism and hate speech."  These statements are made in the context

of defendant's self-described (but demonstrably false) characterization of himself as one

---

[17] *See, e.g. Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 616-18, 107 S. Ct. 2019, 2021 (1987) (holding that Jewish Congregation and its individual members may bring civil rights claim under 42 U.S.C. § 1982 against defendants who allegedly desecrated walls of synagogue "with large anti-Semitic slogans, phrases, and symbols"); *Weiss v. La Suisse,* 131 F. Supp. 2d 446, 448-50 (S.D.N.Y. 2001) (upholding civil rights complaint under 42 U.S.C. § 1981 where Jewish plaintiffs alleged discrimination based upon their ethnic and racial identity).

"dedicated to fighting anti-Semitism and xenophobia and to promoting democracy"; his role in

an overall campaign against Mr. Egiazaryan, paid for and supported by Mr. Egiazaryan's avowed

enemies; the deceptive manner in which some of the statements were made; the audiences that he

targeted for the statements; and all of the facts contained in plaintiff's Amended Complaint.

Even Mr. Zalmayev's moving brief confirms that accusations of anti-Semitism and

bigotry are factual in nature.  In describing his own article about Mr. Egiazaryan, "Hiding in

Beverly Hills," Mr. Zalmayev posits that:

- "[A]nti-Semitism continues to be a threat";

- "[R]esponsible people distance themselves from anti-Semites" like the leadership of the LDPR; and

- "[therefore] the United States government should not welcome anti-Semites by granting Egiazaryan asylum."

(Defendant's MOL at 26.)  In constructing this syllogism, Mr. Zalmayev explicitly refers to Mr.

Egiazaryan as an "anti-Semite[] not welcome in this country" and urges others to support his

expulsion from the country by virtue of the facts of his anti-Semitism and other abhorrent views

or acts.

For these reasons, this factor too militates in favor of concluding that Mr. Zalmayev's

accusations constitute actionable facts.

## POINT III

### IF THE COURT GRANTS MR. ZALMAYEV'S MOTION TO DISMISS THE AMENDED COMPLAINT, THE COURT SHOULD GRANT MR. EGIAZARYAN LEAVE TO AMEND FURTHER HIS PLEADING

Were the Court to grant Mr. Zalmayev's motion to dismiss, the Court should grant Mr.

Egiazaryan leave to amend further his pleading.  As set forth above, material evidence that is

highly relevant to the issues on this motion, including facts and admissions relating to Mr.

Zalmayev's actual malice, has been adduced during discovery taken since the Amended Complaint was filed.  (*See* Statement of Facts, pp. 14-16, *supra*.)  Were the current pleading still found to be lacking, permitting amendment of Mr. Egiazaryan's pleading to refer to this evidence, adduced only after the submission of the Amended Complaint should eliminate any questions that the Court might have as to the legal sufficiency of Mr. Egiazaryan's claims.

Moreover, discovery is ongoing and Mr. Egiazaryan anticipates that additional discovery will result in additional evidence demonstrating actual malice.  Mr. Egiazaryan will take the deposition of Greg Hitt, the Managing Director of Public Strategies, Inc., which is the Washington D.C.-based public relations firm hired by Mr. Kerimov's company, Denoro, to perform anti-Egiazaryan public relations work in the United States.  Mr. Akhmetshin reported to Public Strategies both Mr. Zalmayev's defamatory communications and the legal advice obtained by Messrs. Akhmetshin and Zalmayev with the aim of removing Mr. Egiazaryan from the United States.  Among other things, Mr. Hitt's testimony is expected to establish further the connection between Mr. Kerimov and Mr. Zalmayev as well as Mr. Zalmayev's role in the smear campaign being waged against Mr. Egiazaryan.

Mr. Egiazaryan also plans to depose additional third parties involved in orchestrating and funding the smear campaign against Mr. Egiazaryan.  (*See* Statement of Facts, p. 15, *supra*.) Among other things, these third parties are expected to testify about the ill will and hostility of the foreign principals behind the black public relations campaign against Mr. Egiazaryan, and their role in initiating and funding Mr. Zalmayev to spread false and injurious lies about Mr. Egiazaryan in furtherance of the campaign.

Accordingly, should the Court grant Mr. Zalmayev's motion to dismiss, Mr. Egiazaryan respectfully requests that the Court grant him leave to amend further his pleading.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the Amended Complaint should be denied.

Dated:  New York, New York
        May 4, 2012

                        FLEMMING ZULACK
                            WILLIAMSON ZAUDERER LLP

                        By:_____/s/_____
                            Mark C. Zauderer
                            Jonathan D. Lupkin
                            Jason T. Cohen
                        One Liberty Plaza
                        New York, New York 10006
                        (212) 412-9500

                        *Attorneys for Plaintiff Ashot Egiazaryan*