USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7-30-12_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ASHOT EGIAZARYAN,

                                    Plaintiff,                          11 Civ. 2670 (PKC) (GWG)

              -against-

                                                                        MEMORANDUM
                                                                        AND ORDER

PETER ZALMAYEV,

                                    Defendant.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

              Plaintiff Ashot Egiazaryan commenced this action in April 2011, asserting claims

of defamation and injurious falsehood against defendant Peter Zalmayev.  By Memorandum and

Order dated December 7, 2011, this Court dismissed plaintiff's injurious falsehood claim and

three of his four defamation claims.  Egiazaryan v. Zalmayev, 2011 WL 6097136 (S.D.N.Y. Dec.

7, 2011).  Plaintiff thereafter sought leave to amend his complaint, which was granted.

Plaintiff's amended complaint asserts the same four defamation claims but omits the claim of

injurious falsehood.  Defendant now moves to dismiss the amended complaint.  Because plaintiff

fails plausibly to allege that defendant made false assertions of fact, defendant's motion is

granted, and leave to further amend is denied.

## BACKGROUND

              I.        Parties and People

              Ashot Egiazaryan is a Russian businessman and was, at the time of the actions

giving rise to his complaint, a member of the Duma, Russia's lower house of parliament.  (Am

Compl. ¶ 5.)  He is "engaged in a complex international legal dispute" to recover his ownership

interest in a project to redevelop the "landmark Moskva hotel."  (Id. ¶ 16.)  He alleges that a rival

businessman, Suleyman Kerimov, and his associates orchestrated a "corporate raid" to steal his ownership interest, and that Kerimov and his associates are behind various threats leveled against him and his family.  (Id. ¶¶ 16, 18, 21-23.)  Because of the threats, Egiazaryan moved with his family to the United States in 2010.  (Id. ¶ 24.)  Egiazaryan alleges that, were he and his family to return to Russia, they would "face a real and imminent risk of losing life and liberty."  (Id. ¶ 27.)

Since his arrival in the United States, Egiazaryan has been the subject of negative publicity ("a black . . . public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia").  (Id.)  Egiazaryan alleges that Kerimov is the "sponsor" of this negative publicity and that, through his company, Denoro, he has retained the public relations firm Public Strategies, Inc., and the investigative firm Thomas Dale & Associates to aid the "smear campaign."  (Id. ¶ 8.)

Defendant Zalmayev is the director of the New York-based non-profit organization Eurasia Democracy Initiative.  (Id. ¶ 6.)  As detailed below, Zalmayev wrote or helped draft several newspaper articles and letters urging the United States to deny Egiazaryan asylum.  Egiazaryan alleges that Zalmayev wrote and/or helped draft the articles and letters as part of his role as a "central figure in a dishonest smear campaign against Mr. Egiazaryan."  (Id. ¶ 7.)  Zalmayev describes his actions as an "aggressive advocacy campaign" against Egiazayran. (Id. ¶ 28.)

Zalmayev paid several people for assistance in generating publicity against Egiazaryan.  Zalmayev paid two political consultants, Rinat Akhmetshin and Douglas Bloomfield, a total of $30,000.  (Id. ¶¶ 9-10.)  Egiazaryan alleges that Akhmetshin worked not

only with Zalmayev but also "in concert with Public Strategies and Mr. Kerimov." (Id. ¶ 9.) Zalmayev also paid $7,000 to Leonid Komarovsky, a radio host and the apparent author of one of the negative articles. (Id. ¶ 63.) Egiazaryan alleges that Kerimov provided Zalmayev the money for these payments. (Id. First ¶ 115 at p. 33.)

II.      The Articles and Letters

a.      Zalmayev Article (Count I)

On March 9, 2011, the Jewish Journal, a Jewish weekly with 150,000 readers and a popular website, published an article titled "Hiding in Beverly Hills," with Zalmayev listed as the author. (Id. ¶ 38 & Ex. A.) The online edition of the article, which is the one provided to the Court, appears in the "opinion" section of the website. (Ex. A.) The subject of the article is Egiazaryan, and it questions the desirability of his presence in the United States. (Id.) The article asserts that Egiazaryan is a "prominent financial backer and member of the ultranationalist Liberal Democratic Party of Russia (LDPR), headed by his friend Vladimir Zhirinovsky." (Id.) At one point, the article refers to the LDPR as the "Zhirinovsky-Egiazaryan party." (Id.) It goes on to assert that Jewish groups have "repeatedly condemned" Zhirinovsky and the LDPR as "anti-American" and "anti-Semitic." (Id.) The article concludes by commending Christian Dior's swift condemnation of designer John Galliano's anti-Semitic rant, and it urges the United States "likewise [to] put anti-Semites worldwide on notice: You are not welcome in this country." (Id.) Egiazaryan alleges that, contrary to the assertions of the article, he is not a member or leader of the LDPR, but instead is a "non-party candidate nominated to its parliamentary group." (Am. Compl. ¶ 55.) Egiazaryan also alleges that he is neither an anti-Semite nor a friend of Zhirinovsky. (Id. ¶¶ 53, 57.)

        b.  <u>Komarovsky Article (Count II)</u>

On March 14, 2011, the <u>Moscow</u> <u>Times</u>, an English-language daily published in Moscow and generally available online, published an article titled "No Safe U.S. Haven for Hatemongers," with Komarovsky listed as the author.  (<u>Id.</u> Ex. B.)  The online edition—again the format provided to the Court—appears in the "opinion" pages of the website.  (<u>Id.</u>)  Zalmayev wrote the <u>Moscow</u> <u>Times</u> article himself and submitted it under Komarovsky's name, because Zalmayev was dissatisfied with Komarovsky's earlier writing.  (<u>Id.</u> ¶¶ 64-67.)  The article asserts that Egiazaryan is a "long-standing member of the [LDPR], and, consequently its anti-Semitic and xenophobic agenda."  (<u>Id.</u>)  The article also makes reference to the Galliano scandal and urges "Washington [to] follow the example of the fashion label," and "get real on anti-Semitism" by creating a no-entry list for "anti-Semitic bigots like [E]giazaryan."  (<u>Id.</u>)  As noted, Egiazaryan denies that he is a "member" of the LDPR or that he is an anti-Semite.  (<u>Id.</u> ¶¶ 73-74.)

        c.  <u>Ponomarev and Alexeyeva Letters (Count III)</u>

Prior to the publication of the Zalmayev and Komarovsky articles, human rights activists Lev Ponomarev and Lyudmilla Alexeyeva sent letters to Representative Chris Smith, "Ranking Member of the Commission on Security and Cooperation in Europe," stating their concern over Egiazaryan's presence in the United States.  (<u>Id.</u> Ex. C., Ponomarev Ltr., January 29, 2011, & Alexeyeva Ltr., January 30, 2011.)  Zalmayev "admit[s] that he drafted the two letters and provided them to Mr. Ponomarev and Ms. Alexeyeva for their respective signatures."  (<u>Id.</u> ¶ 80.)

Both letters assert that Egiazaryan is associated with the LDPR.  (<u>Id.</u> Ex. C.)  Both add the assertion that Egiazaryan helped create and then became deputy chairman of the Duma

Committee for Assistance in Political Regulation and Observance of Human Rights in Chechnya (The "Chechnya Committee").  (Id.)  Both repeat reports that funds entrusted to the Chechnya Committee never reached their intended recipients.  (Id.)  The Ponomarev letter states that this makes Egiazaryan "a contributor to the destructive second Chechen war."  (Id., Ponomarev Ltr.)  The Alexeyeva letter further states that the Committee "provid[ed] cover for the numerous well-documented atrocities during the war."  (Id., Alexeyeva Ltr.)  Both letters reference the possible creation of a no-entry list; both urge the recipient to raise their concerns with the Department of State and the Department of Homeland Security so that those departments might investigate the appropriateness of Egiazaryan's continued presence in the United States.  (Id.)  Egiazaryan denies that the Chechnya Committee controlled the mislaid funds, and he further denies any implication that, as a result of his role on the Committee, he contributed to war crimes or human rights violations.  (Am. Compl. ¶¶ 87-88.)

Ponomarev and Alexeyeva retracted their letters within days of signing them. (Am. Compl. Ex. D, Ponomarev Retraction & Alexeyeva Retraction, February 7, 2011.) Ponomarev stated that he "made a grave mistake."  (Id.)  Alexeyeva later explained in a radio interview that she "had been misled" and that Egiazaryan "did not do what I accused him of doing."  (Id. ¶ 92.)

d.   Freedom House Letters (Count IV)

On March 14, 2011, the human rights organizations Freedom House, American Jewish Committee, and National Council on Soviet Jewry sent joint letters to the Department of Homeland Security and the United States Department of State Office to Monitor and Combat Anti-Semitism (collectively, the "Freedom House Letters").  (Id. Ex. E.)  The nearly identical letters assert that Egiazaryan "has for years been one of the leaders and a Duma representative of

the LDPR, which is known for its virulently anti-Semitic, anti-American and xenophobic views."
(Id.)  The letters conclude by urging the United States to take swift action and deny any bid by
Egiazaryan for asylum.  (Id.)  Zalmayev drafted these letters with help of Bloomfield and
Akhmetshin.  (Id. ¶ 99.)

> III.     Dismissal of Defamation Claims in Original Complaint

On December 7, 2011, this Court dismissed defamation Counts II, III, and IV of
plaintiff's original complaint.  2011 WL 6097136.  (Zalmayev did not move for dismissal of
Count I.)

The Court first held that plaintiff was a "public figure" for the purposes of
defamation law and that he therefore had to meet a heightened pleading requirement.  The Court
explained that public figures are held to a heightened pleading standard in defamation cases both
because of the importance of public debate and because public figures enjoy access to channels
of effective communication to rebut allegations against them.  Id. at *3-*4.  The Court stated
that public figures are those who have achieved "'special prominence in the affairs of society.'"
Id. at *3 (quoting Gertz v. Robert Welch, 418 U.S. 323, 344-45 (1974).  The Court held that
Egiazaryan was a public figure because he was a member of the Russian parliament, a banker
who had arranged one of the largest loans ever made for a real estate project in Russia, and a
man with the resources to employ "attorneys, consultants, and public relations professionals to
fight the defendant's smear campaign."  Id. at *4 (quoting Compl. ¶ 89.iii).  Therefore, in order
to adequately plead a defamation cause of action, Egiazaryan was required plausibly to allege
"(1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4)
that was false, (5) made with the actual malice (6) causing injury, and (7) not protected by

privilege." Id. at *5 (citing Dillon v. City of New York, 704 N.Y.S.2d 1, 5 (1st Dep't 1999);

Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001).

As to Counts III and IV, the Court held that Egiazaryan failed plausibly to allege

actual malice. In order to act with actual malice, "the defendant 'must . . . entertain serious

doubts as to the truth of his publication.'" Id. at *7 (quoting St. Amant v. Thompson, 390 U.S.

727, 731 (1968). The Court examined whether Egiazaryan plausibly alleged that Zalmayev

entertained serious doubt as to the truth of two statements that the Court speculated were

statements of fact: the fact implied in the Ponomarev and Alexeyeva Letters that Egiazaryan was

"complicit in the mismanagement or misappropriation of humanitarian funds,"[1] and the fact

stated in the Freedom House Letters that Egiazaryan was a "leader" of the LDPR. Id. at *7-*8.

The Court held that Egiazaryan failed plausibly to allege that Zalmayev entertained serious

doubts as to the truth of either assertion. Id. Egiazaryan attempted to sustain the allegation of

actual malice in the Ponomarev and Alexeyeva Letters with allegations that Zalmayev had

recruited others to his cause and that he had employed deliberate phrasing to create "guilt by

association." Id. at *8. But those allegations established only Zalmayev's hostility to

Egiazaryan; they said nothing about whether Zalmayev doubted the truth of the assertion that

Egiazaryan was complicit in misappropriation. Id. at *8. As regards the Freedom House letters,

Egiazaryan failed to establish that Zalmayev seriously doubted whether Egiazaryan was a leader

of the LDPR simply because Zalmayev overlooked the distinction between being a prominent

LDPR politician (the allegedly false assertion) and being a prominent politician who happens to

occupy one of LDPR's seats in parliament (the alleged truth). Id.

---

[1] Notwithstanding the language of this Court's prior Memorandum and Order, neither the Ponomarev nor Alexeyeva Letter accuses Egiazaryan of complicity in the "misappropriation" of any funds. The letters assert that a "large portion" of funds allocated for reconstruction did not reach their intended recipients. (Am. Compl. Ex. C., Ponomarev Ltr; see also id., Alexeyeva Ltr.)

The Court held that Count II failed because Egiazaryan failed plausibly to allege that Zalmayev was responsible for publishing the Moscow Times article.  In the original complaint Egiazaryan alleged only that the Komarovsky article was a "remix" of the Zalmayev article; he did not allege that Zalmayev had in fact written the article or that he had directly participated in its publication.  "The original publisher is not liable for republication where he had 'nothing to do with the decision to [republish] and [he] had no control over it.'"  Id. (quoting Rinaldi v. Viking Penguin, Inc., 425 N.Y.S.2d 101, 104 (1st Dep't 1980).  The Court held that because Egiazaryan did not allege Zalmayev's involvement in the "remixed" article, Egiazaryan failed plausibly to allege Zalmayev's publication of the article.

On February 14, 2012, Egiazaryan moved for leave to amend his complaint. Egiazaryan asserted that, with the aid of evidence obtained during ongoing discovery, he could cure the deficiencies in his first complaint.[2]  Leave to amend was granted, and on February 29, 2012, Egiazaryan filed his amended complaint.

## DISCUSSION

### I.        Standard of Review Under Rule 12(b)(6)

Zalmayev now moves to dismiss Egiazaryan's amended complaint in its entirety. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing plausibility, courts draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). However, legal conclusions are not entitled to any assumption of truth, and a court assessing the

_____

[2] Zalmayev's first motion to dismiss did not encompass Count I, relating to the Zalmayev article, and discovery continued during the pendency of the motion.

sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the court examines

only the well-pleaded factual allegations, if any, "and then determines whether they plausibly

give rise to an entitlement to relief."  Id.  If not, the complaint must be dismissed.

        II.     Law of the Case

        Both parties urge the Court to adopt statements from the Court's earlier opinion as

the law of the case governing the present motion.  "[L]aw of the case is concerned with the

extent to which law applied in a decision at one stage of litigation becomes the governing

principle in later stages of the same litigation."  Rezzonico v. H & R Block, Inc., 182 F.3d 144,

148 (2d Cir. 1999).  "As most commonly defined, the doctrine posits that when a court decides

upon a rule of law, that decision should continue to govern the same issues in subsequent stages

in the same case."  Arizona v. California, 460 U.S. 605, 618 (1983).  However, "[t]he doctrine of

law of the case comes into play only with respect to issues previously determined."  Quern v.

Jordan, 440 U.S. 332, 347 n.18 (1979).  Because the issue must have been determined, dictum,

i.e., a statement not essential to the holding, is not the law of the case.  See U.S. v. Hussein, 178

F.3d 125, 129-30 (2d Cir. 1999); Wright, Miller & Cooper, Federal Practice and Procedure:

Jurisdiction 2d § 4478 at 664 (2002).

        As Egiazaryan points out, even when the law of the case doctrine applies, it

"directs a court's discretion, it does not limit the tribunal's power."  Arizona, 460 U.S. at 618.

Rulings of a district court remain subject to revision "at any time before entry of final judgment."

Rule 54(b), Fed R. Civ. P.  "The major grounds justifying reconsideration are an intervening

change of controlling law, the availability of new evidence, or the need to correct a clear error or

prevent manifest injustice."  DiLauria v. Power Auth. of N.Y., 982 F.2d 73, 76 (2d Cir. 1992)

(quotations and citations omitted).

a.  <u>Egiazaryan's Status as a Public Figure is the Law of the Case.</u>

Zalmayev argues that Egiazaryan's status as a public figure is the law of the case. (Def. Mem. 12.)  Egiazaryan admits the same, but he asks the Court to "revisit" this conclusion based on new allegations in the amended complaint.  (Pl. Mem. 25-26.)  The only relevant additions to the amended complaint are allegations that Zalmayev described Egiazaryan as "little known" in the United States and that most of Zalmayev's alleged collaborators had not heard of Egiazaryan before Zalmayev brought him to their attention.  (Am. Compl. ¶ 108.)   These new allegations do not in any way alter or reduce the import of the alleged facts on which the Court based its first decision, <u>i.e.</u>, that Egiazaryan was a prominent member of the Russian Parliament, a banker able to secure unprecedented loans based on his own business interests, and a man capable of—indeed, in the process of—marshalling his own channels of effective communication to combat Zalmayev's writings.  <u>See</u> 2011 WL 6097136 at *4.  Accordingly, the Court adheres to the established law of the case:  Egiazaryan is a public figure.

b.  The Adequacy of Egiazaryan's Pleadings Regarding
<u>Assertions of Fact is Not the Law of the Case.</u>

Egiazaryan argues that the Court "recognized" that the allegedly false accusations in the Ponomarev and Alexeyeva Letters were actionable statements of fact.  (Pl. Mem. 31.)  The Court did state in its earlier opinion that Egiazaryan had adequately alleged false assertions of fact not only in the Alexeyeva and Ponomarev Letters but also in the Freedom House Letters. 2011 WL 6097136 at *7-*8.  However, the Court then went on to hold that Egiazaryan failed plausibly to allege that Zalmayev acted with actual malice in making any assertions in the letters. <u>Id.</u> at *7-*9.  Therefore, any conclusions as to whether the letters contained false assertions of fact were unnecessary to the holding and cannot operate as law of the case.  <u>See</u> <u>Hussein</u>, 178 F.3d at 129-30; Wright, Miller & Cooper, <u>supra</u>, § 4478 at 664.  Even if the Court's earlier

10

statements regarding false assertions of fact were the law of the case, the Court would revise those statements to "correct a clear error," DeLauria, 982 F.2d at 76, for the reasons stated in Part III, below.

III.     Egiazaryan Fails Plausibly to Allege False Statements of Fact.

Egiazaryan asserts, as he must to support this action, that the statements to which he objects are false statements of fact.  This Court concludes that the statements are either not plausibly false or are statements of opinion.  Therefore, the challenged statements cannot support a defamation action.

a.  Applicable Law

In order to support a defamation claim a statement must be one of fact, not opinion.  "Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only statements alleging facts can properly be the subject of a defamation action.'"  Gross v. N.Y. Times Co., 82 N.Y.2d 146, 153 (1993) (quoting 600 W. 115th St. Corp. v. Von Gutfield, 80 N.Y.2d 130, 139 (1992)).  Statements of opinion, on the other hand, are not proper subjects of a defamation action; instead, they receive "absolute protection" under the New York Constitution.  Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 178 (2d Cir. 2000).

To qualify as opinion, the statement must be accompanied by a recitation of the accurate facts on which it is based.  Steinhilber v. Alphonse, 68 N.Y.2d 283, 289 (1986).  When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable "mixed opinion."  Id.  If the predicate facts are stated but are themselves false, to a degree that the difference between the stated facts and the actual truth would cause a reader to question the validity of the opinion, then that opinion may be an

actionable "defamatory opinion."  Silsdorf v. Levine, 59 N.Y.2d 8, 15-16 (1983) (reinstating defamation claim based on letter accusing former mayor of corruption because listed facts demonstrating corruption were allegedly false); see Como v. Riley, 731 N.Y.S.2d 731, 731 (1st Dep't 2001).

Similarly, even where a statement is found to be a statement of fact, the statement is not itself a false defamatory fact if it is substantially true.  "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." Cafferty v. S. Tier Publ'g Co., 226 N.Y. 87, 93 (1919).  The proper test is whether "the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Fleckenstein v. Friedman, 266 N.Y. 19, 23 (1934); accord Guccione v. Hustler Magazine, Inc, 800 F.2d 298, 302 (2d Cir. 1986).  Put succiently, "[u]nder New York law . . . [i]t is only necessary that the gist or substance of the challenged statements be true," Printers II, Inc. v. Professionals Publ'g, Inc., 784 F.2d 141, 146 (2d Cir. 1986) (citations omitted).

Whether a particular statement expresses fact or opinion is a question that the court must decide as a matter of law.  Id.  In order to distinguish expressions of opinion from expressions of fact, the New York Court of Appeals has adopted a variant of the four-factor "Ollman" analysis.  The four Ollman factors are as follows:

> (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous;
>
> (2) a determination of whether the statement is capable of being objectively characterized as true or false;
>
> (3) an examination of the full context of the communication in which the statement appears; and

> (4) a consideration of the broader social context or setting
> surrounding the communication including the existence of any
> applicable customs or conventions which might 'signal to readers
> or listeners that what is being read or heard is likely to be opinion,
> not fact.'"

Steinhilber, 68 N.Y.2d. at 292 (citing and quoting Ollman v. Evans, 750 F.2d 970, 978-84 (D.C. Cir. 1984) (plurality opinion)).  To provide a full understanding of how New York applies the Ollman analysis, the Court examines four decisions of the New York Court of Appeals.

### A.  Steinhilber

The Court of Appeals first adopted the Ollman analysis in Steinhilber, 68 N.Y.2d 283.  There, the court considered whether the defendant, a union official, had defamed the plaintiff, a picket-line crosser, in a message he recorded for a union telephone number.  Id. at 286-87.  Through a serious of rude "one-liner" jokes, the defendant implied and/or expressed that the plaintiff was a dumb, ugly, fat, backstabbing, talentless failure.  Id. at 287.  The Steinhilber defendants urged that all of the statements were protected opinions.

In determining whether the defendants' statements asserted facts or opinions, the court relied for guidance on the above-quoted Ollman factors and focused on the third and fourth, or contextual, factors.  The court concluded that the context of the message itself made clear that the statements were all jokes intended as invective and that the broader social context—a punishing phone message during a heated labor dispute—would signal to listeners that it set forth pure opinion.  Id. at 294.  The court accepted that at least one of the message's assertions, that plaintiff lacked talent, ambition, and initiative, could be taken as fact under the first and second of the Ollman factors; however, the court found that the weight of the contextual factors overwhelmed the first two factors, stating that "even apparent statements of fact may assume the character of statements of opinion . . . when made in public debate, heated labor

dispute, or other circumstances in which an audience may anticipate [the use] of epithets, fiery

rhetoric or hyperbole." Id. (quoting Info. Control Corp. v. Genesis One Computer Corp., 611

F.2d 781, 784 (9th Cir. 1980) (quotation and citation omitted)).

### B.  Immuno AG

In Immuno AG v. Moor-Jankowski, 77 N.Y. 2d 235 (1991), the Court of Appeals

held that context should be the primary focus of the fact/opinion analysis.  Plaintiff, a maker of

"biologic blood products" had hoped to open a facility in Sierra Leone for hepatitis research

involving chimpanzees.  Id. at 240.  Defendant, editor of the Journal of Medical Primatology,

published a letter to the editor, written by Dr. Shirley McGreal, Chairwoman of the International

Primate Protection League.  Id.  The letter speculated that plaintiff's plan was intended to avoid

legal restrictions on chimpanzee importation, that it would decimate the chimpanzee population,

and that returning animals to the wild could cause hepatitis to spread.  Id.

The case came before the Court of Appeals twice.  On first hearing, the court

affirmed the holdings of the Appellate Division that (1) there were no triable issues concerning

the falsity of the avowedly factual statements in the McGreal letter, and (2) Dr. McGreal's other

statements were protected opinion.  See id. at 242.  Thereafter, the U.S. Supreme Court decided

Milkovich v. Lorraine Journal Co., 497 U.S. 1 (1990).  Milkovich reversed a state-court

judgment that had relied heavily on the contextual Ollman factors in holding that the challenged

statements were expressions of opinion.  Id. at 9-10.  Milkovich "look[ed] at basically the same

first two Ollman factors," but then "reduced [the contextual factors] essentially to one:  type of

speech," by which the Supreme Court "had in mind . . . [only] rhetorical hyperbole, vigorous

epithets and lusty and imaginative expression."  Immuno AG, 77 N.Y.2d at 244.  The U.S.

Supreme Court vacated the first <u>Immuno</u> ruling and remanded for reconsideration in light of <u>Milkovich</u>.

On remand, the Court of Appeals affirmed dismissal again, both on federal and on independent state-law grounds. The court's state-law analysis expressly departed from the federal-law analysis, because, under the federal "type of speech" analysis, "insufficient protection may be afforded to central values protected by the law of [New York] state." <u>Id.</u> at 250. Instead, the court held, <u>Steinhilber</u> "furnishes the operative standard in [New York]." <u>Id.</u> at 252. According to the court, the <u>Steinhilber</u> standard required focusing first, and primarily, on context:

> [A]n analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions . . . . [S]tatements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying <u>any</u> facts.

<u>Id.</u> at 255 (citation omitted).

As regards the broader context, the court noted that "the common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion." <u>Id.</u> at 253 (quotation and citation omitted). Turning to the immediate context, the court emphasized that the journal had a specialized readership steeped in the issues addressed by the letter and that the author—and the institution she represented—had a clear, and clearly identified, point of view. <u>Id.</u> at 254. Furthermore, the letter made clear that its purpose was to draw attention to the situation. <u>Id.</u> In this context McGreal's conclusions, based on stated facts, were opinions. <u>Id.</u> at 255.

C.  Gross

Two subsequent Court of Appeals cases applying the Steinhilber analysis demonstrate the determinative power of context.  In Gross v N.Y. Times Co., 82 N.Y.2d 146 (1993), the court reversed the dismissal of a libel action against the New York Times.  Plaintiff was the City's Chief Medical Examiner.  Id. at 149.  Defendant newspaper published a series of investigative reports that alleged that plaintiff had altered autopsy reports in cases in which people died in police custody.  Id.  The articles included quotes from sources in the office that plaintiff had "ben[t] over backwards to help the police," and that he was either incompetent or "looking for a way out for the police."  Id.  According to the court "[t]he over-all thrust of the series was that plaintiff had issued false or misleading reports . . . to protect the police" and that his conduct ranged from 'highly suspicious' to 'possibly illegal.'" Id. (quoting articles).

The court held that, in the context of investigative news reports, allegations of cover-ups, "misleading" autopsy reports, and "possibly illegal" conduct would be understood as assertions of fact.  Id. at 154.  In the Court's view, the circumstances of the investigative reports, namely, their placement as a series of special features in the news section and their apparent basis in a "thorough investigation" and "deliberation," would have "ecourag[ed] the reasonable reader to be less skeptical and more willing to conclude that [they] stat[ed] or impl[ied] facts." Id. (quoting Von Gutfield, 80 N.Y.2d at 142).

D.  Richardson

In Brian v. Richardson, 87 N.Y.2d 46 (1995), the court distinguished Gross and held that accusations of misbehavior and criminal conduct made in an op-ed in the New York Times were pure opinion.  The defendant, a former United States Attorney General, had recently been the attorney for a software company.  Id. at 48.  He adopted and built upon the reports of

16

one "Michael Riconosciuto, an out-of-fiction character" who claimed that the company's

software had been stolen and pirated "as part of a payoff to [plaintiff] for helping to get some

Iranian leaders to collude in the so-called October surprise, the alleged plot by the Reagan

campaign in 1980 to conspire with Iranian agents to hold up release of the American Embassy

hostages until after election." Id. at 49 (quotations omitted).  Defendant credited this sensational

report based on its alleged corroboration by "credible . . . informants from the world of covert

operations." Id.  He concluded by calling for the appointment of a special prosecutor. Id. at 49-

50.

    The court found the op-ed distinguishable from Gross.  As regards broader

context, the court held that, unlike the investigative reports in Gross and similarly to the letter to

the editor in Immuno AG, the op-ed format created the "common expectation" that the

communication would "represent the viewpoint of [its] author[] and . . . contain considerable

hyperbole, speculation, diversified forms of expression and opinion." Id. at 53.  As regards

immediate context, the court noted that the author disclosed that he was associated with the

software company, thereby "signaling that he was not a disinterested observer." Id.

Furthermore, the court noted, the defendant had stated the bases for his allegations, and based on

those alleged facts had called for official investigation. Id.  Under such circumstances, the court

held, "a reasonable reader would understand the statements made about plaintiff as mere

"allegations to be investigated rather than as facts." Id.

b.  <u>Application</u>

1.  <u>Zalmayev Article</u>

`        Egiazaryan asserts that the Zalmayev article falsely concludes that Egiazaryan is anti-Semitic and anti-American, based on the false predicates that Egiazaryan is a "member" of the LDPR and a "friend" of Zhirinovsky.  (Am. Compl. ¶¶ 52-57.)

The Court considers the alleged statements in their context.  Beginning with the broader context, the article appears in the "opinion" section of the newspaper.  As the Court of Appeals noted in both <u>Immuno AG</u> and <u>Richardson</u>, editorial formats—in sharp contrast to news reporting, <u>e.g.</u>, <u>Gross</u>, 82 N.Y.2d 146—create the "common expectation" that the communication would "represent the viewpoint of [its] author[] and . . . contain considerable hyperbole, speculation, diversified forms of expression and opinion."  <u>Richardson</u>, 87 N.Y.2d at 53; <u>see also</u> <u>Immuno AG</u>, 77 N.Y.2d at 253.  Turning to the immediate context, the article describes the author, Zalmayev, as the director of an organization "dedicated to fighting anti-Semitism and xenophobia," thereby "signaling that he was not a disinterested observer."  <u>Richardson</u>, 87 N.Y.2d at 54; <u>see also</u> <u>Immuno AG</u>, 77 N.Y.2d at 254.  The article appeared in the <u>Jewish Journal</u>, a "Jewish weekly" (Am. Compl. ¶ 38), a choice of publication that seems calculated "to draw th[e] situation to the attention of interested parties," who bring to the article a "well-developed understanding of the issues" raised, <u>Immuno AG</u>, 77 N.Y.2d at 254.  While the tone of the article is undoubtedly serious, it is also rife with the "epithets, fiery rhetoric, [and] hyperbole," <u>Steinhilber</u>, 68 N.Y.2d at 294 (quotation and citation omitted), that signal advocacy. (<u>See</u> Ex. A, <u>Jewish Times</u> Article, at 1-2 (finding various assertions and viewpoints "blasphemous," "repugnant," "reprehensible," "pernicious," and "insidious"; labeling Zhirinhovsky "infamous"; and coining phrase "Zhirinovsky-Egiazaryan party").

In this context, the reasonable reader would understand any implication that Egiazaryan himself is anti-Semitic and/or anti-American to be the opinion of a person "voicing no more than a highly partisan point of view." Immuno AG, 77 N.Y.2d at 255. Zalmayev does not state that Egiazaryan is anti-Semitic or anti-American. Instead, as Egiazaryan recognizes when he decries Zalmayev's "guilt by association" tactics (e.g. Am. Compl. ¶ 117), Zalmayev states only that Egiazrayan is strongly associated with a group, the LDPR, that has a record of anti-Semitic and anti-American expression. Even assuming that Zalmayev thereby implies that Egiazaryan is himself anti-Semitic or anti-American—rather than asserting that anyone who willingly associates with anti-Semites and xenophobes should be shunned—it is overtly a "personal surmise built upon th[e] facts [of Egiazaryan's association with LDPR]." Gross, 82 N.Y.2d at 155.

Similarly, the statement that Egiazaryan is a "friend" of Zhirinovsky is the "rhetorical flourish or . . . speculative accusation" of a partisan. Id. The reasonable reader would understand that, in this hyperbole-laden opinion piece, the designation of Egiazaryan as a "friend" of Zhirinovsky is another way of stating the author's opinion that a person long associated with the LDPR is probably allied with LDPR's leader and sympathetic to his views.

Moreover, in the context of the political associations involved in this case, the word "friend" is too vague, and the relationship it describes too immune to proof, to be an expression of fact. Even under the less protective federal standard, a statement must "contain a provably false factual connotation" in order to be an expression of fact. Milkovich, 497 U.S. at 19. Words that are imprecise, whose meanings are "debatable, loose and varying," are "insusceptible to proof of truth or falsity." Buckley v. Litell, 539 F.2d 882, 894 (2d Cir. 1976). Usage of words in the "realm of political debate" increases their imprecision. Id. For that

reason, in <u>Buckley</u>, the Second Circuit held that the statement that a political commentator was a "fellow traveler" of fascism was an unprovable statement of opinion.  <u>Id.</u>  Like the phrase "fellow traveler," the word "friend," when used to describe the relationship of one prominent politician to another prominent politician with whom he has some association, has a meaning too "debatable, loose, and varying," <u>id.</u>, to be proven.

Zalmayev's assertion that Egiazaryan is a "member" of the LDPR may be an expression of fact.  However, this statement need only be substantially true, and it is.  For purposes of defamation law, a statement is substantially true if it "would [not] have a different effect on the mind of the reader from that which the pleaded truth would have produced." <u>Fleckenstein</u>, 266 N.Y. at 23.  The pleaded truth is that Egiazaryan was for many years a "non-party candidate nominated to [LDPR's] parliamentary group."  (Am. Compl. ¶ 55.)  Egiazaryan also does not deny that he has been a "prominent financial backer" of the LDPR.  (<u>Id.</u> Ex. A.) Without special explanation—and none is provided by Egiazaryan—the allegation of membership in the LDPR seems likely to produce the same, or lesser, effect on the reader than the pleaded truth of long-time parliamentary representation and financial backing.  "[T]he gist or substance of the challenged statement," <u>Printers II, Inc.</u>, 784 F.2d at 146, is, at worst, the same: Egiazaryan has long been associated with the LDPR.  In sum, then, the Zalmayev article is a communication that the intended reader would understand to contain conclusions based on stated, substantially accurate facts—in other words, "pure opinion."  <u>Steinhilber</u> 68 N.Y.2d at 289.

2.   <u>Komarovsky Article</u>

Egiazaryan asserts that the Komarovsky article falsely concludes that Egiazaryan is anti-Semitic, based on the false predicate that Egiazaryan is a "member" of the LDPR.[3]  (Am. Compl. ¶¶ 72-75.)  As just discussed, Egiazaryan's membership in the LDPR is not plausibly false for present purposes.  Accordingly, the only challenged statement is the alleged implication that Egiazaryan is anti-Semitic.

As with the Zalmayev article, the context of the Komarovsky article signals that any allegation of anti-Semitism is opinion, not fact.  Beginning with the broader context, the Komarovsky article is another "opinion" piece, again creating the expectation of viewpoint and speculation.  <u>See</u> <u>Richardson</u>, 87 N.Y.2d at 53; <u>see</u> <u>also</u> <u>Immuno AG</u>, 77 N.Y.2d at 253.  Turning to the immediate context, the Komarovsky article has fewer cues to partisanship than the Zalmayev article, but it has the tone, emphasized in <u>Richardson</u>, of a call for investigation based on what the author had "gleaned from the public record and from private sources and personal knowledge."  87 N.Y.2d at 54.  Specifically, the apparent author, Komarovsky, relayed what he had gleaned from listeners to his radio show, certain identified critics and human rights lawyers, and from personal and public knowledge about Egiazaryan and the LDPR; based on this information, he urged "the relevant judicial authority" to "swiftly review [the] merits" of Egiazaryan's application to reside in the United States.  (Am. Compl. Ex. B.)  The author, who is identified as a "journalist," "host of a . . . radio talk show," and "new American . . . concerned about unsavory characters . . . try[ing] to fool the public and the justice system," (<u>id.</u>) is not a news writer for the periodical and does not purport to have undertaken a "thorough

---

[3] Egiazaryan also denies that he is a "leader" of the LDPR (Am. Compl. ¶ 74), but the Komarovsky article does not assert that Egiazaryan is a leader of the LDPR.  The Freedom House Letters state that Egiazaryan is or was a leader of the LDPR.  (<u>Id.</u> Ex. E.)  The status of that statement in that context is discussed in Part III.b.3, <u>infra</u>.

investigation" or to have "deliberat[ed]" over the statements, <u>Gross</u>, 82 N.Y.2d at 156. "Given

this contextual background, . . . a reasonable reader would understand the statements defendant

made about plaintiff as mere <u>allegations</u> to be investigated." <u>Richardson</u>, 87 N.Y.2d at 54

(distinguishing <u>Gross</u>, 82 N.Y.2d at 155-56). As such, any implication of anti-Semitism is not

intended as "demonstrable fact" and is non-actionable opinion. <u>See</u> <u>id.</u>

### 3. <u>Ponomarev and Alexeyeva Letters</u>

Egiazaryan argues that Ponomarev and Alexeyeva letters "falsely suggest" that he

"embezzled or mismanaged funds" and that he was "responsible for war crimes or contributed to

human rights violations." (Am. Compl. ¶¶ 87-89.) Egiazaryan also alleges that the reports cited

in the letters are false to the extent that they state or imply that the Committee managed funds

that did not reach their intended recipients. (<u>Id.</u> ¶ 87.)

Turning first to the broader context, these are letters to an elected official from

representatives of advocacy groups. They are unsworn missives from members of the public

who are not parties to any proceeding before the government. In general, substantial leeway is

afforded to this sort of petitioning activity. <u>See, e.g</u>, <u>E. R.R. President's Conf. v. Noerr Motor</u>

<u>Freight, Inc.</u>, 365 U.S. 127, 140-141 (1961) (because "extreme caution" warranted in regulating

political activity, Court will not construe Sherman Act to prohibit "widespread" "unethical" and

"decept[ive]" public relations practices designed to make "propaganda circulated by a party in

interest" appear independent). Perhaps as a result, government officials and their staffs treat

such submissions with skepticism. Two examples of this skepticism are found in Egiazaryan's

own pleadings. First, Egiazaryan alleges that when an assistant to Senator Benjamim Cardin

received copies of the Alexeyeva and Ponomarev letters, the staffer questioned the format and,

indicating that he understood such letters to be parts of larger advocacy campaigns, questioned

who was organizing the campaign.  (Am. Compl. ¶ 83.)  Second, Egiazaryan alleges that when a

congressional staffer was given a copy of the Jewish Times article to support a condemnation of

Egiazaryan in the Congressional Record, the staffer refused to act, understanding that the article

merely speculated as to Egiazaryan's anti-Semitism without offering hard proof.  (Id. ¶ 118.)

The broader context indicates that these advocacy-campaign letters are a type of communication

that the intended reader expects will contain opinion and speculation.

        The immediate context also signals to the intended reader to expect opinion and

speculation.  The apparent authors are, respectively, a "member of" and the "chairperson of" the

Moscow Helsinki Group, Russia's "largest" and "oldest" human rights organization (Id. Ex. C.),

thus indicating that they are "not . . . disinterested observer[s]."  Richardson, 87 N.Y.2d at 53;

compare id., and Immuno AG, 77 N.Y.2d at 254, with Gross, 82 N.Y.2d at 156.  The letters are

addressed to an elected official, Representative Chris Smith, serving on a Committee charged

with monitoring "[s]ecurity and [c]ooperation" in the region in which the advocates work.  (Am.

Compl. Ex. C).  Presumably, Representative Smith is an "interested part[y]," who brings to the

article a "well-developed understanding of the issues" raised.  Immuno AG, 77 N.Y.2d at 254.

The letters are also notably speculative in tone, discussing their "concerns" over "information

[they] have received," "widely-held perception[s]," and "credible reports."  (Am. Compl. Ex. C.,

Ponomarev Ltr.; see also id., Alexeyeva Ltr.)  And, as in Richardson, 87 N.Y.2d at 53-54, based

on these reports, the authors urge investigation, requesting that the recipients "inquire" and "raise

their concerns" with the relevant governmental officials.  (Am. Compl. Ex. C.)  As such, these

letters are both calls for investigation, see Richardson, 87 N.Y.2d at 54, and attempts to "draw

the situation to the attention of interested parties," Immuno AG, 77 N.Y.2d at 254.  They are not,

by contrast, conclusions of an exhaustive investigation undertaken by disinterested parties and offered as matters of general interest.  E.g. Gross, 82 N.Y.2d at 156.

        In this context, the challenged statements are expressions of opinion.  Even accepting Egiazaryan's assertion that the letters "suggest that [he] was responsible for war crimes or contributed to human rights violations," (Id. ¶ 88) these are not assertions of fact. First, these allegations, vaguely imputing to an elected official responsibility for wrongs that occurred during his incumbency, are not specific or provable enough to stand as assertions of fact.  See Buckley, 539 F.2d at 894.  Second, the intended reader would readily view such hyperbolic suggestions as an advocate's "rhetorical flourish or . . . speculative accusation," Gross, 82 N.Y.2d at 155-56, based on the stated predicates.

        More importantly, a fair reading of the letters does not disclose the assertions that Egiazaryan finds in them.  The letters do not accuse Egiazaryan of responsibility for war crimes, contributing to human rights violations, or, lastly, embezzlement.  Instead, the letters first note Egiazayran's role in founding and leading the Committee.  The letters then allege that reports exist stating that the Committee's "management" (Am. Compl Ex. C., Alexeyeva Ltr.) of funds "entrusted" to it (Id., Ponomarev Ltr.) resulted in a "large portion" (id.) not reaching its intended recipients.  The Ponomarev letter concludes that "therefore, [E]giazaryan was a contributor to the destructive second Chechen war."  (Id.)  The Alexeyeva Letter draws no conclusions; it ends by urging an airing of the "concerns."  (Id., Alexeyeva Ltr.)  The fair reading is that the author believes Egiazaryan bears responsibility for mismanagement by the Committee because he was a founder and leader of the Committee.[4]  There is no accusation that Egiazaryan misappropriated

---

[4] At his deposition, excerpts of which Egiazaryan has included in his present submissions, Zalmayev asserted that the any allegations against Egiazaryan regarding his "Chechen record" were based on his association with the Committee.  (Lupkin Decl., May 4,2012, Ex. 2, at 211-12 ("He was associated with the [Committee], and therefore

or obtained the use or benefit of any of the funds.  The assertion that funds for reconstruction in a war zone did not reach their intended recipients does not accuse Egiazaryan himself of venality or gross negligence.[5]  The author is asserting an opinion about Egiazaryan's shared supervisory responsibility, not asserting facts about Egiazaryan's personal actions.

Finally, the alleged falsity of reports that funds managed by the Chechnya Committee did not reach their intended recipients does not support a defamation action.  The allegation is not a defamatory statement <u>about</u> Egiazaryan and so cannot support a defamation action on its own.  <u>See</u> <u>Albert</u>, 239 F.3d at 265 (statement must be "of and concerning" plaintiff).  Although false facts alleged in support of a "defamatory opinion," may make the opinion actionable, <u>Silsdorf</u>, 59 N.Y.2d at15-16, the opinion must have a defamatory character.  A statement is defamatory if it "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society.'" <u>Celle</u>, 209 F.3d at 177 (quoting <u>Kimmerle v. N.Y. Evening Journal</u>, 262 N.Y 99, 102 (1933)).  Here, the opinion expressed, which amounts to an accusation of failed oversight, would not result in "hatred," "shame," "ostracism" or any of the other extreme results covered by the above-quoted definition.  Because the allegedly false fact is not about Egiazaryan and also does not form the basis of a defamatory opinion about him, its alleged falsity does not support a defamation action.

---

in my opinion and view he was associated with whatever the [Committee] was known for and its results, the results of its work, whatever allegations were made against it.").)

[5] <u>Cf.</u> Office of the Special Investigator for Iraq Reconstruction, <u>Final Forensic Audit Report of Iraq Reconstruction Funds</u>, Preface (July 13, 2012), <u>available</u> <u>at</u> http://www.sigir.mil/files/audits/12-017.pdf. ("SIGIR audits, inspections, and investigations have found serious weaknesses in the government's controls over Iraq reconstruction funds that put billions of American taxpayer dollars at risk of waste and misappropriation.")

Moreover, even if the allegation that reconstruction of funds did not reach their intended recipients could support a defamation action, it would not in this case because it is, in context, no more than another "allegation[] to be investigated." Richardson, 87 N.Y.2d at 54 (emphasis removed).  The Court recognizes that "the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character." Id.  However, this was not a hurdle to the Richardson court's finding that the specific and sensational assertions in that case, which seemed to demand little in the way further inquiry, were non-actionable statements to be investigated. See id. at 49.  Here, the reports make unelaborated assertion that government funds destined for a war zone did not reach their intended recipients.  At least as much as in Richardson, "the[se] charges were included not necessarily to convince the reader of the plaintiff's dishonesty but rather to demonstrate the need for an investigation." Id. at 54.

### 4.   Freedom House Letters

The bases for the fourth defamation count are the Freedom House letters.  The nearly identical letters state that the LDPR is anti-Semitic and anti-American; that Egiazaryan has been a "leader" of the LDPR; and that leaders of the LDPR should be "boycott[ed]."  (Am. Compl. Ex. E.)  The letters conclude that "the United States government must once again demonstrate its intolerance for bigotry by denying [Egiazaryan's] bid for asylum."  (Id.) Egiazaryan asserts that the letters falsely accuse him of "anti-Semitic [and] anti-American . . . views" (id. ¶ 103) based on the false predicate that he is a "leader" of the LDPR (id. ¶ 74).

For much the same reason that Egiazaryan's alleged friendship with Zhirinovsky is an expression of opinion, the assertion that Egiazaryan is or was a "leader" of the LDPR is an expression of opinion.  When used in political discourse, terms of relation and association often

26

have meanings that are "debatable, loose, and varying," rendering the relationships they describe insusceptible of proof of truth or falsity. Buckley, 539 F.2d at 894. The word "leader" has a debatable, loose and varying meaning when used to describe the relationship of a prominent politician to the political party he overtly represents. Egiazaryan is an admittedly "prominent" former banker who assumed managerial roles in the Duma while occupying an LDPR seat there for over a decade. Given the vagueness of the word "leader" in this context, and given Egiazaryan's admitted prominence and overt association with the LDPR, the assertion that he is a "leader" of the LDPR is a non-provable opinion.

To the degree the Freedom House Letters can be fairly read to accuse Egiazaryan of being anti-Semitic or anti-American—rather than asserting that he is unfit for asylum simply because of his association with the LDPR—those accusations are also expressions of opinion. Beginning with the broader context, the Freedom House Letters are, like the Ponomarev and Alexeyeva letters, petitions to the government from advocacy groups, and, for the reasons explained in discussing the Ponomarev and Alexeyeva letters, the intended reader would expect speculation and opinion. See Part III.b.3, supra. The immediate context also signals that the letters contain opinion. First, the letters, coming from self-identified "major U.S. Jewish and human rights organizations" who have "consistently condemned LDPR's message of hate," (Am. Compl. Ex. E.) are overt works of advocacy. Compare Immuno AG, 77 N.Y.2d at 254, and Richardson, 87 N.Y.2d at 54, with Gross, 82 N.Y.2d at 156. Second, the letters, addressed to government officials responsible for homeland security and monitoring anti-Semitism, respectively, are clearly calculated "to draw th[e] situation to the attention of interested parties," who bring to the article a "well-developed understanding of the issues" raised. Immuno AG, 77 N.Y.2d at 254. Third, there is no implication that the authors base their statements on a special

27

investigation into Egiazaryan's background.  E.g. Gross, 82 N.Y.2d at 156.  In this context, any conclusion that Egiazaryan himself is anti-Semitic and/or anti-American is "personal surmise," Gross, 82 N.Y.2d at 155, based solely on Egiazaryan's being a leader of the LDPR—no other predicates are stated or implied.  The challenged statements—if they exist in the letters—are opinions.

As a final note regarding allegations of anti-Semitism, the Court does not resolve the parties' debate over whether "anti-Semite" is a term of sufficient specificity and provability to support a defamation claim.  Plaintiff offers a host of cases supporting the proposition that false allegations of anti-Semitic and racist acts can be sufficiently factual, and damaging, to support defamation actions.  (Pl. Mem. 28-30.)  Defendant argues that all of the cited cases concern demonstrably false allegations regarding the plainitffs' actions, not their beliefs, and offers cases in which defamation actions based on allegations of racism have been dismissed.  (Def. Reply Mem. 15-16 & n.2.)  In this action, the positions of the parties, however resolved, are not controlling.  The Court assumes arguendo that accusations of anti-Semitism generally, even apart from false allegations of anti-Semitic acts, can be defamatory statements of fact.  The Court concludes that in the present context they are statements of opinion.  See, e.g., Steinhilber, 68 N.Y.2d at 294 (assuming that assertion of lack of talent, etc., could be factual, but holding that circumstances make the assertion a statement of opinion).

IV.     Leave to Amend is Denied.

Egiazaryan asks for leave to further amend his pleadings in the event the Court dismisses the Amended Complaint.  The basis for this request is that ongoing discovery allegedly has revealed and will continue to reveal further evidence demonstrating Zalmayev's actual malice.  (Def. Mem. 34-35.)  The Court has concluded as a matter of law that all of the

challenged statements are statements of opinion or are not plausibly false.  See Part III, supra.  It

was not necessary for the Court to reach the allegations of actual malice.  Further amendment has

no prospect of altering the Court's legal conclusion.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (ECF No. 117) is

GRANTED.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
      July 30, 2012

29