From:        rinat akhmetshin [akhmetshin@gmail.com]
Sent:        Friday, February 25, 2011 4:30 PM
To:          levan zgenti
Cc:          Jeff Eller; Greg Hitt; Butler, Paul
Subject:     Suggested Talking Points

dear colleagues, below please find a set of talking points i developed this afternoon from all our research on AE and LDPR. i suggest we use for our outreach work on antisemitism direction of our efforts. we should develop similar sets of talking points on other working angles we discussed - Chechnya, False Charitable Claims, False Relative Assassination, His Financial and other fake claims

Talking Points

Ashot Egiazaryan is a fugitive Russian businessman, member of the parliament, the Duma, and a leading figure in a notoriously extremist political party.

He fled to the United States [possibly using a diplomatic passport to enter] to avoid responsibility and prosecution for a business deal that went sour. He is seeking political asylum under false claims of political persecution.

He is a leading financial backer and member of the ultra-nationalist Liberal Democratic Party of Russia (LDPR) since 1999 and a close associate of the LDPR's notorious leader, Vladimir Zhirinovsky.

A number of Jewish groups, in America, Russia and elsewhere, have repeatedly condemned the party and its leader as anti-Semitic. They have repeatedly urged Americans, as a form of protest, to avoid any meetings with members of the LDPR who may visit the United States.

The LDPR is outspokenly anti-American. Mr. Egiazaryan has been a prominent financial backer and fundraiser for the LDPR while leaving the public face of the party to Mr. Zhirinovsky. It is ironic that Mr.
Egiazaryan would seek sanctuary in a country his party has long excoriated as Russia's natural enemy and, indeed, the world's enemy.
Furthering the irony is that he has moved into an exclusive Los Angeles area with a sizeable Jewish population.

Mr. Egiazaryan's claims that he is a political fugitive are false by virtue of the fact that his friend and party leader, Mr. Zhirinovsky, continues in his role as vice chair of the Duma and continues to speak freely on any and all subjects - often repugnant -- without threat of retribution by the state. In fact, Mr. Egiazaryan continues to be a member of the Duma, although in November it voted overwhelmingly to strip him of his parliamentary immunity. One reason may be that he reportedly obtained a U.S. Social Security card and an immigration Green Card, both of which are illegal for Russian lawmakers.

The real reason Mr. Egiazaryan fled Russia was to escape possible criminal prosecution arising out of financial disputes with his former business associates, including the discredited former mayor of Moscow, Yuri Luzhkov. There is a question of just who swindled whom in multi-billion-dollar real estate deal gone sour. A criminal case was opened against Mr. Giazaryan on November 6, 2010; charges include defrauding business parters.



DEPOSITION
EXHIBIT
173
3/20/12   CLS
PENGAD 800-631-6989

PSI002189
CONFIDENTIAL

Mr. Egiazaryan and his lawyers seek to portray him as a political figure fleeing persecution for his uncompromising stance against corruption and other misdeeds.  The truth is just the opposite: he is fleeing prosecution for his own role in corruption and various misdeeds. He has put on the international wanted list by the Russian Federation Investigative Committee for large-scale fraud and there is a request for his arrest, which are the real reasons he fled to the United States.

He may be unable – and apparently unwilling – to return to Russia, but that is not sufficient reason for him to be permitted to remain in the United States.  He has financial holdings and dealings in several other countries and could seek residency there.


To be eligible for asylum, he must be able to demonstrate that he has suffered persecution in the past our could fear future persecution by the Russian government, or by a group Moscow is either unwilling or unable to control, because of his political opinion, race, nationality, religion or membership in a particular social group.
However, escaping prosecution for a felony or convictions and arrests for serious crimes would likely register an applicant statutorily ineligible for asylum.

The United States must not provide sanctuary and immunity from prosecution for corrupt Russian business figures, particularly those who bring with them a record of association with anti-American, anti-Semitic extremist organizations.

The Memorial Human Rights Center and other Russian human rights groups have noted the irony of Mr. Egiazaryan's sudden conversion into a human rights activist and anti-corruption crusader – if you choose to believe what he puts on his web site.

The LDPR Record:
It has blamed the Jews for "starting World War II" and "provoking the Holocaust.
It has accused the Jews of "masterminding 9/11" and generally "running the world."
The Egiazaryan-Zhirinovsky party's racism has contributed significantly to Russia's growing climate of ethnically-based intolerance and xenophobia.
The Anti-Defamation League has condemned the LDPR message and called on Americans to boycott party members during their visits to this country.
"The essence of the conflict around the Jewish people is that when their number grows too much in some country, war breaks out there….That happened in Germany . . . where there were too many Jews….You will always find Jews where war is raging because they realize that money flows where blood is spilled," Zhirinovsky has said.
"The media outlets who (sic) are publishing bad articles about Islam are headed by Semites. The biggest banks and world corporations are run by Jews," he said.

An outspoken supporter of Saddam Hussein, the LDPR leader dispatched several volunteers dubbed "Falcons of Zhirinovsky" to help Saddam survive Desert Storm.

2

PSI002190
CONFIDENTIAL

**From:**        rinat akhmetshin [akhmetshin@gmail.com]
**Sent:**        Monday, March 21, 2011 7:52 AM
**To:**          Greg Hitt; Butler, Paul; Jeff Eller
**Subject:**     relevant memo, let's discuss
**Attachments:** Ashot Yeghiazaryan Grounds for Deportation.doc

atatched is some analysis of d situation regarding ay. russian government is placing him on a red notice shortly, we must b ready to comment on that and make it a news. also, an opportunity opened up to place an opinion piece into huffington post. we need a person who will do it, piece must reflect some of the points of the legal memo. we believe that ay has already applied for asylum, this is another news opportunity. i am snwbrdng in aspen with my daughter till friday but am available for phone conversations (pls keep in mind 2 hr time difference). ra



DEPOSITION
EXHIBIT
174
3/20/10   C15
PENGAD 800-631-6989

1

PSI002124
CONFIDENTIAL

**From:** rinat akhmetshin [akhmetshin@gmail.com]
**Sent:** Wednesday, April 13, 2011 8:58 AM
**To:** Hale, Sarah
**Cc:** Gadzhiev Nariman; Lauer, Eliot; Jeff Eller; jmartin@pstrategies.com; Butler, Paul; Jim Langdon; Greg Hitt
**Subject:** Re: Denoro/SK: Radio Free Europe

will b in touch with you, sarah. i would prefer not to have yr company of SK at all in d story. i will see nikola on friday for a friendly chat and will try to persuade him to drop the SK angle. the story, really, is about an asylum matter in d US, hance no need to get into london and cyprus legal matters. will report on my progress. ra



**From:** rinat akhmetshin [mailto:akhmetshin@gmail.com]
**Sent:** Tuesday, April 12, 2011 7:25 PM
**To:** Hale, Sarah
**Cc:** Gadzhiev Nariman; Lauer, Eliot; Jeff Eller; jmartin@pstrategies.com; Butler, Paul; Jim Langdon; Greg Hitt
**Subject:** Re: Denoro/SK: Radio Free Europe

i know that guy - he covered kazakhstan related FCPA case i was involved in. will talk to him and try to get him off this angle in his story. sk has nothing to do with the asylum mater anyway. i will be in ny on friday, will meet him and work on that. ra



1

DEPOSITION
EXHIBIT
175
3/20/12   C15
PENGAD 800-631-6989

PSI002107
CONFIDENTIAL

**From:** rinat akhmetshin [akhmetshin@gmail.com]
**Sent:** Friday, February 04, 2011 11:01 AM
**To:** Jeff Eller
**Subject:** Re: AP Inquiry

jeff, i am at 2023611041, am leaving for geneve this eveng bit can tlk any time before 1700. please call when you will have a moment. ra





**From:** rinat akhmetshin [mailto:akhmetshin@gmail.com]
**Sent:** Thursday, February 03, 2011 5:27 PM
**To:** Hale, Sarah
**Cc:** Butler, Paul; Richard Blee; Jeff Eller; Lauer, Eliot
**Subject:** Re: AP Inquiry

i am good with that



1



DEPOSITION
EXHIBIT
176
3/20/12   CLS
PENGAD 800-631-6989

PSI002102
CONFIDENTIAL



2

PSI002103
CONFIDENTIAL



PSI002104
CONFIDENTIAL



4

PSI002105
CONFIDENTIAL



5

**PSI002106
CONFIDENTIAL**

| | |
|---|---|
| **From:** | rinat akhmetshin [akhmetshin@gmail.com] |
| **Sent:** | Saturday, February 05, 2011 6:33 PM |
| **To:** | Butler, Paul; Richard Blee; Jeff Eller; Lauer, Eliot; Hale, Sarah |
| **Subject:** | more on AY |
| **Attachments:** | AY.doc |

just to update you all on the status of that AP piece and my efforts to insert an alternative narrative into that story: friendly human rights NGO person from NY met birch in DC on friday and briefed him on the chechen angle, since than i thought of *one more extremely relevant angle and narrative* that would expose AY's real face to US immigration authorities and public - his duma party affiliation - an LDPR party of which he was a member is rabidly anti-semitic and anti-american. below pls find a short summary of those facts in the exchange between that NGO person and birch. birch's editor at AP is in the loop and is making sure AY's real face is presented in the birch's piece. also attached is the letter from yet another prominent russian human rights organisation "Memorial"raising concerns with the US Congress on AY's presence in the US. ra

---------- Forwarded message ----------
From: **peter zalmayev** <zalmayev@yahoo.com>
Date: Sat, Feb 5, 2011 at 7:02 PM
Subject: more on AY
To: "Douglas M.Birch" <DBirch@ap.org>

Dear Doug,

As a follow-up to our meeting, here's another important aspect of Mr. Yegiazaryan's Duma years to keep in mind: his financial support of Vladimir Zhirinovsky's Liberal-Democratic Party of Russia (LDPR), of which he has been a member since 1999.

While, granted, he was far from an active parliamentarian and failed to submit a singe piece of legislation, nor, indeed, make any significant policy statements, the fact of his membership in and steadfast support (with money out of his own pocket) of Zhirinovsky's virulently anti-Semitic and anti-American agenda makes him Zhirinovsky's accomplice. It is the greatest irony that such a man would now seek safe haven in a country his party has for years lambasted as Russia's natural enemy and, indeed, the world's enemy.

Below are just some of Zhirinovsky's notable anti-Semitic and anti-American statements that he has made over the past decade.

Also, for your information, the Memorial Human Rights Center has just joined the chorus of Russian human rights watchdogs in expressing its concern with Yegiazaryan's miraculous twelveth-hour's transformation into a human rights activist and a corruption-buster. The letter is by a prominent activist who was nominated for the Nobel Peace prize last year and the woman who could be seen in that article in the Times handing the portrait of Estemirova to President Medvedev.  Please see attached.

Regards,

Peter

**Anti-semitism:**

DEPOSITION
EXHIBIT
177
3/20/12   CLS
PENGAD 800-631-6989

1

PSI002227
CONFIDENTIAL

From:        rinat akhmetshin [akhmetshin@gmail.com]
Sent:        Friday, February 25, 2011 11:51 AM
To:          Greg Hitt
Subject:     Fwd: op-ed draft

*U.S. Must Get Real on Anti-Semitism and Xenophobia: No Safe Haven for Hate-Mongers *

Just as the U.S.-Russia relations enter a new phase in their "reset-button"
policy aimed at rapprochement, an escalating scandal involving the case of a fugitive Russian
businessman-cum-member of the Russian parliament (Duma) is threatening to throw a wrench into
the wheels of this "reset" machine.  Ashot Egiazaryan, a member of the Duma from the
notoriously anti-Semitic Liberal-Democratic Party of Russia (LDPR), fled Russia last summer,
following a series of unraveling business deals and the resulting fall-out with his business
partners, including the former disgraced mayor of Moscow, Yuri Luzhkov. Stopping over in the
south of France for a few months, he then proceeded to Beverly Hills, California.  According
to the February 6 piece by the Associated Press, Mr. Egiazaryan is considering seeking
political asylum in the United States. This was shortly after Russian prosecutors had decided
to strip Egiazaryan of his immunity and press criminal charges against him for defrauding his
former business partners. As a long-standing financial backer of LDPR and, consequently, its
anti-Semitic and xenophobic agenda, Egiazaryan does not deserve safe haven in the U.S.
Washington must get real on anti-Semitism, anti-Islamism and other hate-mongering creeds: if
there is a database containing names of terrorists banned from entering the U.S., there
should likewise be one for characters like Egiazaryan.

Surrounded by a veritable army of expensive lobbyists and lawyers, Egiazaryan has been making
the rounds in the nation's capital and speaking to the press, presenting himself as the
latest victim of Russia's capricious justice system. All for exposing corruption at the "top
of the country's political establishment," as he claims on his website. Most disturbingly,
his lawyers are comparing him with Mikhail Khodorkovsky, the former boss of the Yukos oil
company and a vocal critic of the Russian government, who has been languishing in the Russian
Gulag for almost decade.  In fact, nothing could be further from the truth: Egiazaryan's is
an all-too-familiar case of a businessman using his wealth to concoct a political case in
order to avoid responsibility for his less-than-clean business dealings.

In a recent piece published on the website of Russia's only remaining independent radio
station, *Ekho Moskvy,* scores of prominent Russian opposition leaders and civil society
activists have roundly rejected political motivation as a reason for Egiazaryan's criminal
prosecution.
Among them was Boris Nemtsov, an outspoken critic of the Kremlin, who recently spent 2 weeks
in jail for organizing an anti-government protest: "I have never heard about Egiazaryan ever
being involved in politics….I think he will have a very hard time proving his political
refugee's credentials." Yuri Shmidt, a prominent human rights lawyer who represented
Khodorkovsky, expressed his incredulity at the parallels that have been drawn between the
plight of his client and that of Egiazaryan, calling them "blasphemous."

The only remotely political connection Egiazaryan did have was with the misnamed Liberal
Democratic Party of Russia - a pro-Kremlin, anti-Semitic, anti-U.S. party, which he
represented in the Duma since 1999. It is widely alleged that Duma members from LDPR - many
of them implicated in criminal dealings - pay dues to the party and may be even to its boss
for the seat and, therefore, immunity from prosecution, which would make Egiazaryan one of
the party's long-time financial backers. A number of Jewish-American groups, including ADL,
have repeatedly condemned its anti-Semitic message, calling on the U.S. public to boycott
party members during their visits to the country.  Over the years, the party has made
shockingly incendiary pronouncements, which, among others, assigned Jews blame for "starting

1

DEPOSITION
EXHIBIT
178
3/20/12 CLS

PENGAD 800-631-6989

PSI002084
CONFIDENTIAL

World War II," and "provoking the Holocaust," "masterminding 9/11," "trafficking Russian women into foreign sex trade" and, generally, "running the world."
Undoubtedly, Egiazaryan's party's anti-Semitic platform contributed significantly to Russia's prevailing climate of growing ethnically-based intolerance and xenophobia. Xenophobia is one of the main ills plaguing our societies and must not be taken lightly.

As a new American who came here from Russia, I am concerned about unsavory characters like Egiazaryan jumping on the bandwagon of legitimate political persecution in their country and using their ill-gotten wealth to try to fool the public and the justice system. I wonder why there still isn't, apparently, a database of persons banned from entering the U.S. for their xenophobic views and, if there is, why anti-Semitic bigots like Egiazaryan are not in it. The United States is a law-based society and even someone like Mr. Egiazaryan should have the right to make his case, though not to buy it.  The relevant judicial authority must swiftly review its merits, and as it does, I hope it will take into consideration the evidence against his being a political figure, his shady business past and his moral character.

2

PSI002085
CONFIDENTIAL

**From:**       rinat akhmetshin [akhmetshin@gmail.com]
**Sent:**       Sunday, March 13, 2011 4:57 PM
**Subject:**    good news on the moscow times op-ed

through an old contact we placed a response on AY's op-ed and it run today at the moscow times op-ed section. AY must know that we will not allow him to misinform people and every time he tries to get his message of hate and lies about our friends out we will set the record straight. we will have the last word. pls note a caricature - it speaks lauder than 1000 words! ra

.http://www.themoscowtimes.com/opinion/article/no-safe-us-haven-for-hatemongers/432450.html



# No Safe U.S. Haven for Hatemongers

*13 March 2011*
By Leonid Komarovsky



Just as U.S.-Russian relations enter a new phase in a policy aimed at rapprochement, an escalating scandal involving the case of a fugitive businessmen-cum-State Duma deputy is threatening to throw a wrench into the wheels of this "reset" machine. Ashot Yegiazaryan, a member of the notoriously anti-Semitic Liberal Democratic Party, fled Russia last summer following a series of unraveling business deals and the resulting fallout with his business partners, including disgraced former Moscow Mayor Yury Luzhkov. Stopping over in the south of France for a few months, he then proceeded to Beverly Hills, California, where he is reportedly considering a request for political asylum. At home, Russian prosecutors have decided to strip Yegiazaryan of his immunity and press criminal charges against him for allegedly defrauding his former business partners.

1



DEPOSITION
EXHIBIT
179
3/20/12

PSI002030
CONFIDENTIAL

As a long-standing member of the Liberal Democratic Party, or LDPR, and, consequently, its anti-Semitic and xenophobic agenda, Yegiazaryan does not deserve safe haven in the United States. In the last couple of weeks, callers to my daily Russian-language radio show have voiced concerns over Yegiazaryan's and his party's well-established record of anti-Semitism and hate speech. On March 1, I conducted an informal poll of my listeners, asking them whether they believed the United States should provide him with safe haven should he seek it. Ninety-one percent said "no." As demonstrated by the recent scandal following Christian Dior designer John Galliano being caught on tape spouting anti-Semitic vitriol, anti-Semitism remains an insidious scourge of our society. Washington must follow the example of the fashion label, which moved with lightning speed to distance itself from its tainted designer and get real on anti-Semitism, anti-Islamism and other hatemongering creeds. If there is a database containing names of terrorists banned from entering the United States, there should likewise be one for characters like Yegiazaryan.

Surrounded by a veritable army of expensive lobbyists and lawyers, Yegiazaryan has been making the rounds in Washington and speaking to the press, presenting himself as the latest victim of Russia's capricious justice system and a dissident determined to expose corruption at the "top of the country's political establishment," as he claims on his web site. Most disturbingly, his lawyers are comparing him to Mikhail Khodorkovsky, the former boss of the Yukos oil company and a vocal critic of the Russian government who has been languishing in prison for almost decade.

In fact, nothing could be further from the truth. Yegiazaryan's circumstances represent an all-too-familiar case of a businessman using his wealth to concoct a political case to avoid responsibility for his less-than-clean business dealings. In a recent piece published on the web site of Ekho Moskvy radio, prominent Russian opposition leaders and civil society activists roundly rejected political motivation as a reason for Yegiazaryan's criminal prosecution. Among them was Boris Nemtsov, an outspoken critic of the Kremlin who recently spent two weeks in jail for organizing an anti-government protest. "I have never heard about Yegiazaryan ever being involved in politics. ... I think he will have a very hard time proving his political refugee's credentials," Nemtsov said.

Yury Shmidt, a prominent human rights lawyer who represents Khodorkovsky, has expressed his incredulity at the parallels that have been drawn between the plight of his client and that of Yegiazaryan, calling them "blasphemous."

The only remotely political connection that Yegiazaryan does have is with the pro-Kremlin, anti-U.S. LDPR, which he represented in the Duma since 1999. It is widely alleged that Duma members from the LDPR — several of whom have been implicated in or convicted of criminal dealings in the past — pay dues to the party for their seats and, therefore, immunity from prosecution, which would make Yegiazaryan one of the party's long-time financial backers.

A number of Jewish-American groups, including the ADL, has repeatedly condemned the LDPR's anti-Semitic message, calling on the U.S. public to boycott party members during their visits to the country. Over the years, the party has made shockingly incendiary pronouncements, which, among others, assigned Jews blame for "starting World War II," and "provoking the Holocaust," "masterminding 9/11," "trafficking Russian women into foreign sex trade" and, generally, "running the world." Undoubtedly, Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance. Xenophobia is one of the main contemporary ills plaguing our societies and must not be taken lightly.

As a new American who moved to the United States from Russia, I am concerned about unsavory characters like Yegiazaryan jumping on the bandwagon of legitimate political persecution in their country and using their ill-gotten wealth to try to fool the public and the justice system. I wonder why there still isn't, apparently, a database of persons banned from entering the United States for their xenophobic views and, if there is, why anti-Semitic bigots like Yegiazaryan are not in it.

The United States is a law-based society and even someone like Yegiazaryan should have the right to make his case, though not to buy it. The relevant judicial authority must swiftly review its merits, and as it does, I hope it will take into consideration the evidence against his being a political figure, his shady business past and his moral character.

*Leonid Komarovsky is a journalist and host of a Russian-language radio talk show in Boston.*

PSI002031
CONFIDENTIAL

© Copyright 2011. The Moscow Times. All rights reserved.

---------- Forwarded message ----------
From: **Andrew McChesney** <mcchesney@imedia.ru>
Date: 2011/3/13
Subject: Moscow Times readback
To: lskomar@gmail.com

Dear Leonid,

Thank you for submitting this piece about Egiazaryan. I would like to publish it in Monday's issue, and have attached a copy for a readback.

Best,

Andy

No Safe U.S. Haven for Hate-Mongers

By Leonid Komarovsky

Just as U.S.-Russian relations enter a new phase in a policy aimed at rapprochement, an escalating scandal involving the case of a fugitive businessmen-cum-State Duma deputy is threatening to throw a wrench into the wheels of this ³reset² machine.  Ashot Egiazaryan, a member of the notoriously anti-Semitic Liberal Democratic Party, fled Russia last summer following a series of unraveling business deals and the resulting fallout with his business partners, including disgraced former Moscow Mayor Yury Luzhkov. Stopping over in the south of France for a few months, he then proceeded to Beverly Hills, California, where he is reportedly considering a request for political asylum. At home, Russian prosecutors have decided to strip Egiazaryan of his immunity and press criminal charges against him for allegedly defrauding his former business partners.

As a long-standing member of LDPR and, consequently, its anti-Semitic and xenophobic agenda, Egiazaryan does not deserve safe haven in the United States. In the last couple of weeks, callers to my daily Russian-language radio show have voiced concerns with Egiazaryan¹s and his party¹s well-established record of anti-Semitism and hate speech. On March 1, I conducted an informal poll of my listeners, asking them if they believed the

3

United States should provide him with safe haven should he seek it. Ninety-one percent said ³No.² As demonstrated by the recent scandal following Christian Dior designer John Galliano being caught on tape spouting anti-Semitic vitriol, anti-Semitism remains an insidious scourge of our society. Washington must follow the example of the fashion label, which moved with lightening speed to distance itself from its tainted designer and get real on anti-Semitism, anti-Islamism and other hate-mongering creeds. If there is a database containing names of terrorists banned from entering the United States, there should likewise be one for characters like Egiazaryan.

Surrounded by a veritable army of expensive lobbyists and lawyers, Egiazaryan has been making the rounds in Washington and speaking to the press, presenting himself as the latest victim of Russia's capricious justice system and a dissident determined to expose corruption at the ³top of the country's political establishment,² as he claims on his web site. Most disturbingly, his lawyers are comparing him with Mikhail Khodorkovsky, the former boss of the Yukos oil company and a vocal critic of the Russian government who has been languishing in prison for almost decade.

In fact, nothing could be further from the truth. Egiazaryan's circumstances represent an all-too-familiar case of a businessman using his wealth to concoct a political case in order to avoid responsibility for his less-than-clean business dealings. In a recent piece published on the web site of Ekho Moskvy radio, prominent Russian opposition leaders and civil society activists roundly rejected political motivation as a reason for Egiazaryan's criminal prosecution. Among them was Boris Nemtsov, an outspoken critic of the Kremlin who recently spent two weeks in jail for organizing an anti-government protest. ³I have never heard about Egiazaryan ever being involved in politics. Š I think he will have a very hard time proving his political refugee's credentials,² Nemtsov said.

Yury Shmidt, a prominent human rights lawyer who represents Khodorkovsky, has expressed his incredulity at the parallels that have been drawn between the plight of his client and that of Egiazaryan, calling them ³blasphemous.²

The only remotely political connection that Egiazaryan does have is with the pro-Kremlin, anti-U.S. LDPR, which he represented in the Duma since 1999. It is widely alleged that Duma members from LDPR ‹ several of whom have been implicated in or convicted of criminal dealings in the past ‹ pay dues to the party for their seats and, therefore, immunity from prosecution, which would make Egiazaryan one of the party's long-time financial backers.

PSI002033
CONFIDENTIAL

A number of Jewish-American groups, including the ADL, has repeatedly condemned LDPR's anti-Semitic message, calling on the U.S. public to boycott party members during their visits to the country. Over the years, the party has made shockingly incendiary pronouncements, which, among others, assigned Jews blame for 'starting World War II,' and 'provoking the Holocaust,' 'masterminding 9/11,' 'trafficking Russian women into foreign sex trade' and, generally, 'running the world.' Undoubtedly, Egiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance. Xenophobia is one of the main contemporary ills plaguing our societies and must not be taken lightly.

As a new American who moved to the United States from Russia, I am concerned about unsavory characters like Egiazaryan jumping on the bandwagon of legitimate political persecution in their country and using their ill-gotten wealth to try to fool the public and the justice system. I wonder why there still isn't, apparently, a database of persons banned from entering the United States for their xenophobic views and, if there is, why anti-Semitic bigots like Egiazaryan are not in it.

The United States is a law-based society and even someone like Egiazaryan should have the right to make his case, though not to buy it. The relevant judicial authority must swiftly review its merits, and as it does, I hope it will take into consideration the evidence against his being a political figure, his shady business past and his moral character.

***Leonid Komarovsky is a journalist and host of a Russian-language radio talk show in Boston.***

5

PSI002034
CONFIDENTIAL

| | |
|---|---|
| **From:** | rinat akhmetshin [akhmetshin@gmail.com] |
| **Sent:** | Tuesday, February 22, 2011 9:10 AM |
| **To:** | Gadzhiev Nariman |
| **Cc:** | Jeff Eller; Виктор Новичков; Jack Martin; Greg Hitt |
| **Subject:** | us jewish-russian response so far |
| **Attachments:** | Komarovskiy_02-18-2011_11.12-11.30.mp3; Komarovskiy_02-15-2011_11.50-12.00 _new.mp3; ЗАЧЕМ НАМ В США-1.doc |

this is on d syndicated us russian-jewish radio program, preparing a response from the jewish organizations to d congress and an article in d russian paper in NY. plus he is submitting an op-ed to the boston globe paper this week. all other efforts with nyt, sf chronicle, politico and others r in progress.



1

PSI002035
CONFIDENTIAL

| | |
|---|---|
| **From:** | rinat akhmetshin [akhmetshin@gmail.com] |
| **Sent:** | Monday, March 14, 2011 1:04 PM |
| **To:** | Greg Hitt; Jeff Eller |
| **Subject:** | Fwd: Letter - Done |
| **Attachments:** | GroupLetter_final edits_napolitano.doc; GroupLetter_final edits_rosenthal.doc |

ok, gentlemen, it took a long time, but this beauty is finally cooked and ready to be served. attached are the two letters, signed off on by all parties.



1

PSI002029
CONFIDENTIAL

**From:**      rinat akhmetshin [akhmetshin@gmail.com]
**Sent:**      Wednesday, March 23, 2011 6:03 PM
**To:**        levan zgenti
**Cc:**        Jeff Eller; Greg Hitt
**Subject:**   ashot in dc

guys, it looks like our friend ashot is in washington next week - doing rounds on the hill and with the ngo's. two of my sources informed me that his lawyers from GT have approached them for a mtng. let;t tlk how we can use his presence in dc to spotlight his crappy nature. ra



DEPOSITION
EXHIBIT
182
3/20/12  CLJ

PENAD 000-691-6999

PSI002062
CONFIDENTIAL

| | |
|---|---|
| **From:** | rinat akhmetshin [akhmetshin@gmail.com] |
| **Sent:** | Wednesday, March 09, 2011 7:20 PM |
| **To:** | Greg Hitt; Jeff Eller; Butler, Paul |
| **Subject:** | response is needed |

http://www.themoscowtimes.com/opinion/article/the-state-raided-me/432210.html

just saw this - i think it needs an immediate response - a letter to the editor or an alternative op-ed submission from some prominent american legal expert, perhaps even Thomas Firestone himself, or his former bosses at the state department. it is funny how ashot's article has absolutely no facts, just speculations and re-telling of Thomas Firestone piece,. some credible lawyer, former congressman, etc shld weight in on not allowing criminals to come to the US, especially antisemitic people - he shld have been smarter not to give money to the antisemitic and anti-american party  y when he was a member of the parliament from LDPR - we should zoom in on that - he chose to advertise that fact - little fool... i can ghostwrite d response - do you have any good ppl to sign it? this article, no doubt, will go into ashot's asylum file, we should have another one that will invalidate it.



DEPOSITION
EXHIBIT
183
3|20|12    CLS

1

PSI002188
CONFIDENTIAL

To:     RA

From:   Zhanna Snelbecker, Immigration Attorney, zsnelbecker@nilg-dc.com; (202) 487 8438

Date:    March 19, 2011

Re:     Ashot Yeghiazaryan/Grounds of Deportation/Extradition

## Deportation

Deportation (now called "removal") occurs when the US federal government formally removes a foreigner (a foreigner is defined as a non-citizen of the US, including a US permanent resident) from the United States for violations of one or a number of immigration or criminal laws. Once deported, an alien may lose the right to return to the United States for many years, sometimes forever.

Removal is a legal proceeding. It only may be initiated by the US immigration authorities, not through filing a petition by any private party or through any formal complaint filed by any other US Government entity. On an informal basis, information could be conveyed to US immigration authorities. An alien who is subject to this procedure has legal rights prior to being removed from the country, including the right to challenge the removal itself on procedural grounds. An alien also has a right to invoke various defenses in the removal proceedings (asylum – whether pending or granted – is one of the defenses).

## Inadmissible or Deportable?

Aliens who have not been yet admitted to the United States are subject to removal on grounds of inadmissibility. Aliens who already have been admitted to the United States are subject to removal on grounds of deportability. Some grounds of inadmissibility and deportability overlap, although it is commonly understood that the grounds for deportability are usually more serious. In other words, it is fairly easy to deny someone a visa while they are abroad; it is harder to deny an entry while someone is applying for admission to the US at the US point of entry; it is even harder procedurally to deport someone who has already entered into the US. It can sometimes take 5 years and more to go through all available appeals—longer if the case is accepted to be decided by the US Supreme Court.

PSI002125
CONFIDENTIAL

**Nature of Deportation Proceedings:**

Removal proceedings are adversarial. Respondents (defendants) in removal proceedings are entitled to legal counsel and discovery, but the costs are to be born on their own.  They can examine evidence against them and may present their own evidence and witnesses. An Immigration Judge at the US Immigration Court renders decisions, at the lowest level of adjudication in these cases.   Respondents have the right to appeal adverse decisions to the Board of Immigration Appeals, then to a U.S. Circuit Court of Appeals, and even ultimately to the Supreme Court. Cases before the US Immigration Court and the Board of Immigration Appeals are in an administrative process, under the US executive branch and distinct from the US judicial branch.  Respondents who claim to have new evidence may file post-decision Motions to Reopen. They may seek post-decision relief from removal under a variety of statutes and policies, such as political asylum, Convention Against Torture and withholding of removal, to name a few.   An alien respondent in removal proceedings has notably more appellate rights and opportunities than a criminal defendant in the Federal court system. That is why any heavily contested US immigration case can take years to resolve. Quick and simple deportations only happen in uncontested cases or in cases with heinous aggravated felony convictions for crimes committed in the US (premeditated murder, terrorism, drug offenses involving minors).

**Use of Case Law in Immigration Cases (Asylum and Deportation):**

US Immigration Proceedings are federal and administrative in nature and are generally and mostly governed by detailed and established statutes and laws, such as the Immigration and Naturalization Act.  The case law is used sparingly and only in the areas of unclear interpretation.  Most immigration cases at the US Immigration Court level are never published, and not all Board of Immigration Appeals decisions are published.  Asylum proceedings are not open to public at the Asylum officer level.

**Asylum Statistics for Asylum Applicants from Russia:**

In 2009, the last year for which official statistics is available, 495 applicants from Russia were granted asylum in the US.   This constitutes around 40% of all filed asylum cases from Russia.

PSI002126
CONFIDENTIAL

The most frequent reasons for granting asylum for applications from Russia were: ethnical minorities from war-torn territories (Chechnya), gay applicants, Jewish applicants and political activists who are fleeing persecution.

**Deportation or Removal Process**

If it is correct that Mr. Yeghiazaryan already has applied for asylum, he is not yet in the removal process.  He would enter the removal process only under two scenarios: First, he loses an initial asylum office hearing (which would take place 3-6 weeks after an asylum application is filed); and/or the US government decides for whatever reason (perhaps after having received information informally about the case) to initiate the removal proceedings.  Once initiated, the removal process is as follows:

1. If the US government has reasons to believe that a particular alien is deportable, a Notice to Appear (NTA) is issued by the U.S. Immigration and Customs Enforcement, served to the alien, and filed with the immigration court. In addition to containing general information about the immigrant (name, country of origin, etc.), the NTA also states the reasons for the deportation or removal.

2. A hearing is scheduled, at which the immigration judge asks if the alien is ready to proceed with the case, or if he or she needs time to secure an attorney. If the alien needs time to secure an attorney, a hearing is scheduled for a later date.

3. Once the alien has an attorney, or has elected to proceed without one, the alien will be asked by the immigration judge to verify the contents of the NTA.

4. If the judge determines that the information in the NTA is correct and that the alien can be deported, the alien is given the opportunity to apply for any form of relief from deportation (pending or granted asylum case is one of them). If the alien is eligible for a form of relief and decides to apply for it, an individual hearing date is scheduled. If the alien is not eligible, deportation will be ordered. An asylum application could be made at this stage, or if an application had been made earlier, it would be considered as a defense—it could be accepted as a defense at this stage, or it could be overturned and revoked.

5. If an individual hearing is held, the alien will be given the opportunity to give testimony and have witnesses testify on his or her behalf. At the conclusion of the hearing, the

immigration judge will either make an oral decision on the matter, or will release a written decision at a later date.

6. If the alien has been ordered deported, the alien has 30 days from the date of the decision to appeal the decision to the Board of Immigration Appeals (BIA). If the BIA decides against the alien, the alien has the option of appealing to the appropriate U.S. Court of Appeals. The immigration service has the opportunity to appeal an unfavorable individual hearing decision, but may not appeal an unfavorable decision by the BIA. An appellate court decision can be appealed to the U.S. Supreme Court by either the alien or the immigration service.

## Rules of Evidence and Precedents in US Immigration Proceedings:

Since removal proceedings are administrative in nature, the rules of evidence are somewhat different and less restrictive than in criminal proceedings.  In other words, both parties can introduce evidence that they deem supportive of their case. The standard of proof (being found "removable") in such proceedings is "clear, convincing and unequivocal" as opposed to "beyond a reasonable doubt" in criminal cases. This means that as long as the US government has found the negative evidence to be clear and convincing, the alien will be deported.  US criminal proceedings and US immigration proceedings, even based on the same activity, like money laundering or participation in organized crime, are separate from each other, and separate results are possible: e.g. alien found removable, but no criminal conviction resulted.

## INTERPOL Red Notices

An INTERPOL Red Notice is the closest instrument to an international arrest warrant.  If a Red Notice is issued, the prosecutor's office is obligated to do whatever work is required to produce the necessary extradition documents within the time limits prescribed by the controlling extradition treaty whenever and wherever the fugitive is arrested.  It is unlikely that an asylum or a permanent residency (for which an Asylee is eligible once one year passes after the granting of asylum) will be granted to anyone who is on the INTERPOL list.

Foreign requests for extradition of fugitives from the United States are ordinarily submitted by the embassy of the country making the request to the Department of State, which reviews and forwards them to the Criminal Division's Office of International Affairs (OIA). The requests are

PSI002128
CONFIDENTIAL

of two types: formal requisitions supported by all documents required under the applicable treaty, or requests for provisional arrest. (Requests for provisional arrest may be received directly by the Department of Justice if the treaty permits).

**Extradition and Deportation:**

International extradition is the formal process by which a person found in one country is surrendered to another country for trial or punishment.  The process is regulated by treaty and conducted between the Department of Justice of the United States and the government of a foreign country.

Deportation is the formal process by which a person found in one country is sent back to another country.  The US government typically is not concerned as to the whereabouts of the alien after the deportation, as long as the alien is not in the US. The process is conducted by the US Immigration Court and ICE Enforcement Unit.

Extradition proceedings are separate and apart from deportation proceedings and the Government's success or failure in obtaining an order of extradition has no effect on deportation proceedings. *Matter of McMullen, 17 I&N Dec. 542 (BIA 1980), rev'd on other grounds, 658 F.2d 1312 (9th Cir. 1981), on remand, Matter of McMullen, 19 I&N Dec. 90 (BIA 1984), aff'd, 788 F.2d 591 (9th Cir. 1986), followed.*

**Classes of Deportable Aliens**

Any alien who is in the United States may be subject to deportation or removal if he or she:

- Is an inadmissible alien according to immigration laws in effect at the time of entry to the U.S. or adjustment of nonimmigrant status;
- Is present in the U.S. in violation of the Immigration and Nationality Act or any other U.S. law;
- Violated nonimmigrant status or a condition of entry into the U.S.;
- Terminated a conditional permanent residence;
- Encouraged or aided any other alien to enter the U.S. illegally;
- Engaged in marriage fraud to gain admission to the U.S.;

PSI002129
CONFIDENTIAL

- Was convicted of certain criminal offenses;
- Failed to register or falsified documents relating to entry in to the U.S.;
- Engaged in any activity that endangers public safety or creates a risk of national security; or
- Engaged in unlawful voting.

## **Crimes Involving Moral Turpitude (Including Money Laundering and Organized Crime)**

The INA makes removable a noncitizen **convicted (either in a home country or in the US)** of a crime involving moral turpitude (CIMT) committed within five years of the date of admission and resulting in a sentence of imprisonment for at least one year, as well as an alien convicted of two CIMTs not arising out of a single scheme of criminal misconduct. For a conviction to lead to removal in the first case, it must be committed within five years of admission and result in the specified criminal sentence. However, for a conviction in the latter case to result in removal, neither the time of commission of the offense nor the sentence imposed is relevant.

## **Offenses Deemed CIMTs:**

- Crimes against the person:
  - Involving moral turpitude: murder; voluntary or reckless manslaughter, kidnapping, attempted murder and assault with intent to rob or kill or to commit abortion or rape
  - Domestic violence; stalking; child abuse; child neglect; child abandonment and violation of a protection order against credible threats of violence, repeated harassment or bodily injury.
- Sexual offenses:
  - Involving moral turpitude: rape, whether common law or statutory; adultery; bigamy; prostitution; lewdness; sodomy; abortion; gross indecency and possession of child pornography
- Crimes against property:
  - Burglary is a CIMT only if the intended offense involves moral turpitude, since unlawful entry and remaining unlawfully on a property by themselves are not CIMTs.

- o A theft offense (including receipt of stolen property), which may be both a CIMT and an aggravated felony, includes aiding and abetting the theft offense.
  - o Trafficking in counterfeit goods is a CIMT.
- Crimes against the government:
  - o Involving moral turpitude: counterfeiting, perjury, willful tax evasion, bribery, using mails to defraud, misprision of a felony, harboring a fugitive, conspiracy to commit an offense against the United States, making false statements to avoid being drafted and draft evasion
- Crimes involving fraud:
  - o Any crime involving fraud is almost always a crime of moral turpitude, whether against government or individuals, except for false statements not amounting to perjury.
  - o Involving moral turpitude: making false statements to obtain a passport or for naturalization, making false statements to obtain a driver's license, making a false statement on a firearm application, passing bad checks, false representation of a Social Security number, money laundering, and conspiracy to affect a public market in securities
- Violations of regulatory laws:
  - o This category includes illegal gambling and drunk driving.

**RELEVANT DEPORTATION CASES:**

Overriding the Need for Criminal Conviction for Deportation Based on National Security Grounds:

The former Immigration and Naturalization Service (INS) in Miami in 1996 deported a Cuban spy named Jorge Luis Rodriguez.  Rodriguez was never charged criminally but was in fact deported for having engaged in espionage related activities in violation of the Foreign Agents Registration Act.  This case became a precedent for other such removal cases, bolstering the U.S. Government's ability to bring such cases into Immigration Court and beyond in the appellate process.  Based on the above case, the US government has successfully targeted foreign nationals who were involved in espionage, terrorism support and even organized crime, but who were not criminally convicted for the underlying activities. In particularly egregious cases, the aliens were

ordered removed with no previous criminal conviction. The legal theory in the Rodriguez case was based on the national security deportation provisions within the Immigration and Nationality Act found at 8 USC 1227(a)(4). This case serves as a basis for overriding the need for a criminal conviction in deportation cases, but only based on compelling US national security grounds.

## Deportation Based on Money Laundering Charges:

*In re Mahesh Nenumal TEJWANI, Respondent, 24 I&N Dec. 97 (BIA 2007) Interim Decision #3553*

A person who deliberately takes affirmative steps to conceal or disguise the proceeds of criminal conduct (here illegal drug sales) acts in an inherently deceptive manner and impairs governmental function, specifically the ability to detect and combat criminal activity. Such interference in governmental function is inherently dishonest and contrary to accepted moral standards. The act of deliberately concealing illegal activity is categorically a crime involving moral turpitude Tejwani was ordered removed to India for conviction of a crime involving moral turpitude within five years of the date of admission to the United States. INA§ 237(a)(2)(A)(i).

## Deportation of Two INTERPOL Fugitives:

In 2010, the U.S. Immigration and Customs Enforcement (ICE) officers deported a Brazilian couple wanted in their home country for murder and concealment of a corpse. The International Criminal Police Organization (INTERPOL) issued a Red Notice in early 2010, which alerted law enforcement agencies in member countries worldwide about the couple. An INTERPOL Red Notice lets law enforcement agencies know that arrest warrants have been issued and extradition will be sought for the fugitives. The Red Notice sparked a collaborative effort between ICE, U.S. Marshals Service (USMS), Brazilian authorities, and INTERPOL to identify, apprehend, and extradite the fugitives. ICE fugitive operations officers and U.S. Marshals arrested the couple pending their deportation. The couple's deportation hearing took place and they were ordered deported, then were extradited to their home country for justice to be served. "ICE's transfer of these fugitives to the Brazilian National Police should send a message that the United States will not permit foreign fugitives from justice to hide within our borders," said Scott A. Weber, field office director for the ICE Office of Detention and Removal Operations in Newark.

PSI002132
CONFIDENTIAL

The INTERPOL Red Notice placed on these individuals facilitated ICE's identification of these fugitives and aided in their deportation and extradition.

**Previous Russian Businessman US Asylum Case:**

On June 27, 1996 INS agents along with Russian federal prosecutors arrested Konanykhin, a young oligarch from Russia in his Watergate apartment in Washington, D.C.  Konanykhin had served as vice president for the international development of Khodorkovsky's bank, Menatep. He was taken to Arlington, Virginia and charged in federal immigration court with violating the conditions of his temporary U.S. visa (visa overstay).   In the Immigration Court, Konanykhin invoked asylum as a defense to deportation. He claimed that his deportation was being masterminded by the Russian army prosecutor for political reasons, and that his life was consequently in danger.  The trial touched upon issues as to whether the secret police had taken over the Russian banking industry, and also if the United States government had been fooled into going after Konanykhin.  In court Konanykhin testified that he was being targeted by the Russian prosecutor because of his anti-corruption campaign, and his lawyers argued that he had transferred money to private accounts only to prevent it from being stolen.  Appearing as witnesses at the trial were FBI agents who testified that the Russian mafia had previously taken out a contract on Konanykhin's life.  This testimony was one of the cornerstones in the case.  In parallel, in a lawsuit filed in February, 1997 with the Arlington County Circuit Court, Konanykhin alleged defamation against the daily Russian newspaper Izvestia which had reported him involved in various criminal acts. The suit claimed that the information was erroneous and published with "reckless disregard for its truth or actual malice."  An Arlington County Circuit Court jury recommended Konanykhin should be awarded $33.5 million. Soon thereafter the same court awarded Konanykhin an additional $3 million in a libel case against the Russian financial journal Kommersant.  On February 23, 1999 in Federal Immigration court Judge Bryant finally granted political asylum to Konanykhin, saying the former banker faced persecution and possible death by the hands of the Mafia if returned to Russia to face embezzlement charges. In his decision Judge Bryant wrote that testimony from several FBI experts had convinced him that Konanykhin was being targeted for prosecution for political reasons.  Temporarily freed from his trials with the Russian and American governments, Konanykhin went on to develop a $100 million Internet startup in New York called KMGi, among other businesses.  However, on

November 20, 2003 the Board of Immigration Appeals revoked Konanykhin's political asylum and ordered him returned to Russia.   The ruling came less than a month (October 25, 2003) after the arrest of Mikhail Khodorkovsky, Konanykhin's former banking rival in Russia and business partner during his exile.  However, this ruling was also subsequently revoked and Konanykhin's asylum was reinstated.   Konanykhin currently resides in the US.

**Summary:** Many crimes, particularly money laundering crimes and organized crime, can serve as an excellent ground for deportation.  However, unless the case involves matters of the United Status national security, a criminal conviction is generally required.  On the other hand, since asylum and a permanent residency application are also a matter of discretion, it is highly advisable that all instances of money laundering and organized crime activities are brought to the attention of the US government officials (as described in my previous memo), as they can significantly influence the discretionary decision of the officer.  Finally, being placed on an INTERPOL wanted list could most certainly lead to a denial of an asylum claim, and possibly to successful extradition efforts. Given the discretionary nature of the process and the speed of events, it is most important to get information quickly into the hands of officers making a determination.

PSI002134
CONFIDENTIAL