**EXHIBIT 6**

```
 1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3    -------------------------------------X
                                          :
 4    ASHOT EGIAZARYAN,                   :
                                          :   11-CV-02670 (PKC)
 5                     Plaintiff,         :
                                          :
 6              v.                        :
                                          :   500 Pearl Street
 7    PETER ZALMAYEV,                     :   New York, New York
                                          :
 8                     Defendant.    :   August 24, 2012
      -------------------------------------X
 9

10         TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
            BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
11              UNITED STATES MAGISTRATE JUDGE

12    APPEARANCES:

13    For the Plaintiff:          JONATHAN DANIEL LUPKIN, ESQ.
                                  JASON TODD COHEN, ESQ.
14                                Flemming Zulack Williamson
                                     Zauderer, LLP
15                                One Liberty Plaza
                                  New York, New York  10006
16
      For the Defendant:          JAMES P. GOLDEN, ESQ.
17                                Hamburg & Golden, P.C.
                                  1601 Market Street, Suite 3310
18                                Philadelphia, Pennsylvania  19103

19                                ANDREW J. RYAN, ESQ.
                                  Salisbury & Ryan, LLP
20                                1325 Avenue of Americas
                                  New York, New York  10019
21
                                  JANE SILVER, ESQ.
22

23    Court Transcriber:          RUTH ANN HAGER, C.E.T.**D-641
                                  TypeWrite Word Processing Service
24                                211 N. Milton Road
                                  Saratoga Springs, New York  12866
25
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1          THE CLERK:  Egiazaryan v. Zalmayev, docket number
2    11-CV-02670.
3          Counsel, please state your appearances for the
4    record.
5          MR. LUPKIN:  Jonathan Lupkin from the firm of
6    Flemming Zulack Williamson Zauderer, LLP, on behalf of
7    Mr. Egiazaryan with my colleague Jason Cohen from the same
8    firm.  Good morning.
9          MR. GOLDEN:  Good morning, Your Honor.  James Golden
10   from Hamburg & Golden for the defendant Peter Zalmayev.
11         MR. RYAN:  Andrew Ryan also for the defendant Peter
12   Zalmayev from Salisbury & Ryan.
13         MS. SILVER:  Jane Silver, also for defendant Peter
14   Zalmayev.
15         THE COURT:  Okay.  Welcome everyone.  You can be
16   seated if you're not addressing the Court.  We're here, I
17   think as I expressed in my order, to talk about relevance but
18   since it seemed to be fully briefed.  I was going to talk
19   about the July 24th letter unless the parties weren't prepared
20   to talk about the requests in that letter.
21         Mr. Golden, are you prepared?
22         MR. GOLDEN:  Yes, I am.
23         THE COURT:  Mr. Lupkin, are you prepared?
24         MR. LUPKIN:  Yes, I think.  The July 24th letter
25   pertains to what?

3

1          THE COURT:  The depositions of the BGR employees --

2          MR. LUPKIN:  Yes.

3          THE COURT:  -- and the documents.

4          MR. LUPKIN:  Yes, I'm ready, Your Honor.

5          THE COURT:  I figured you would be.

6          The thing I'm not going to talk about is the asylum

7    motion yet.  I guess when I issued the -- my order about

8    relevance, I guess I had some hope that it was going to change

9    the scope of discovery in this case, but it seems to me that

10   if the defendant has to prove a lack of good-faith basis for

11   the suit, I'm not sure how I can avoid the conclusion that

12   that would necessarily involve the merits of the case.

13          Mr. Lupkin, is there any -- I mean, do you have any

14   other ideas on this?

15          MR. LUPKIN:  Yes, I do, Your Honor.  Couple of

16   things.  The issue -- the only issue that is before the Court

17   is this last statute, as you know.  And in order to make that

18   showing, there has to be a showing that we lack a substantial

19   basis to bring a defamation claim.  Defamation only has five

20   elements:  it's a -- you know, a statement of fact that it's

21   false; that it was transmitted to a third party, in this case,

22   actual malice and damages.  Applying that standard to this

23   case the question is whether Mr. Egiazaryan had a substantial

24   basis to claim that Mr. Zalmayev's publications of statements

25   that he was an anti-Semite, a war criminal with issues in

4

1   Chechnya and the diverter of funds in Chechnya is the only

2   question in the case.  There's no longer an issue about is he

3   in the LDPR, is he not in the LDPR.  The issue has been

4   substantially narrowed in my view and I don't believe that the

5   question of mere relevance is the inquiry.

6           Looking at the Federal Rules there's several things

7   that I'd just like to mention.  First is --

8           THE COURT:  Before we get to the Federal Rules, I

9   just want to understand what you just said.

10          So here Zalmayev has to show that Egiazaryan didn't

11  have a substantial basis for filing the various claims he did

12  in which he alleges that Zalmayev falsely called him an anti-

13  Semite and a member of this party and so forth.  So whether

14  he's a member of this party or said anti-Semitic things and so

15  forth, how could that not be relevant?

16          MR. LUPKIN:  The standard for the purposes of this

17  counterclaim is not whether or not we would have won a trial

18  or lost a trial.  The only question that the Court has to

19  focus on is whether we had a substantial basis to bring it.

20  And simply --

21          THE COURT:  But the substantial basis, that judgment

22  is based upon the actual evidence that was available to him as

23  of the time the suit was brought, right?  That's --

24          MR. LUPKIN:  And thereafter because --

25          THE COURT:  Right.  Or thereafter.  Exactly.  Now

5

1   you're expanding it even more.  At the time the suit was

2   brought and to the extent it was pursued thereafter up until

3   the date Judge Castel dismissed it.

4          MR. LUPKIN:  And my view is, one need look no

5   further than the defendant's testimony at his deposition to

6   reach the conclusion frankly.  I know this is not a motion for

7   summary judgment, but we had a substantial basis.  I asked him

8   a series of three questions.  The first one was the following:

9   "Q.  Let me ask you, are you aware of any anti-Semitic

10  statements made by Ashot Egiazaryan either in public or in

11  private?"

12  "A.  No."

13  "Q.  Are you aware of any vote cast by Ashot Egiazaryan while

14  he was in the Duma for any legislation that was anti-Semitic?"

15  "A.  No."

16  "Q.  Are you aware of Mr. Egiazaryan taking any positions that

17  were anti-Semitic?"

18  "A.  No."

19          THE COURT:  What does this have to do with anything?

20          MR. LUPKIN:  It has to do with the fact that that

21  testimony alone substantiates the claim that there was a

22  substantial basis.

23          And there's another issue that I'd like to address

24  that goes more to the procedural --

25          THE COURT:  Wait, wait, wait.  Stop.  I can't just

6

1   let that go.  Isn't truth a defense to a defamation claim even

2   if the person didn't know it was true at the time?

3         MR. LUPKIN:  I think that the evidence will show

4   based on the extinct -- the evidence we have already in front

5   of us that other than arguable affiliation with the LDPR there

6   was no evidence that Mr. Zalmayev had at the time --

7         THE COURT:  Well, that's a different question.  I

8   thought you were acting as if the defendant's knowledge was

9   the be-all and end-all of the defamation claim.  It's

10  obviously not.

11        Look, I think -- I don't want to start getting into

12  the evidence because that wasn't the question I asked.

13        MR. LUPKIN:  Let me also point out that one other

14  thing If I may, Judge.  There has already been an enormous

15  amount of discovery in this case.  We're not writing on a

16  clean slate, if you will.  There have been an enormous number

17  of depositions.  We have produced as the plaintiff over 13,000

18  pages of documents --

19        THE COURT:  Okay.  Now you're doing a different

20  point which I'm perhaps sympathetic to which has to do with

21  proportionality and we can get to that, but that wasn't my

22  question.  My question was relevance.

23        I think -- I've read the letters on this and I think

24  I've heard enough.  Is there some other point on my question,

25  Mr. Lupkin, you want to say?  Anything else you want to say?

7

1          MR. LUPKIN:  Yeah.  I think that there's a
2   difference between the standard that used to apply here in
3   relevance which is reasonably calculated to lead to the
4   discovery of admissible evidence, but that changed.  The
5   standard now is relevant to a claim or defense of a party
6   which is narrower.

7          THE COURT:  Changed ten years ago but, yes, go
8   ahead.

9          MR. LUPKIN:  Right.  But the point is that that
10  yardstick is the yardstick that should be the yardstick used
11  in terms of analyzing either or not the variety of discovery
12  that Mr. Golden is seeking is relevant here in light of the
13  fact that everything but the --

14         THE COURT:  Have I --

15         MR. LUPKIN:  -- anti-Semitic claim --

16         THE COURT:  -- used some other yardstick up until
17  today to your knowledge?

18         MR. LUPKIN:  Explicitly or implicitly?

19         THE COURT:  Either way.  I asked you a question
20  about relevance and whether the dismissal of the main claim
21  changes the scope of relevance here.  I've gotten a bunch of
22  irrelevant answers and now you're talking to me about a
23  standard of discovery that's been applicable at least ten
24  years implying that that's something new.  I'm totally lost,
25  Mr. Lupkin.  You need to hep me.  If you have something else

8

1   to say on the topic I asked you about, which is the effect of

2   the dismissal on the scope of relevance, I'm happy to hear

3   you.

4           MR. LUPKIN:  I'll sit down, Judge.

5           THE COURT:  Okay.  I don't -- I mean, at this point

6   I don't think that the subject here is -- of discovery has

7   changed.  You know, notwithstanding that, I recognize I have

8   significant power to restrict the scope of discovery and it

9   may be that it affects the proportionality analysis under

10  26(b)(2)(C)(iii) which allows me to take into account not

11  merely the benefit and the burden, but also the needs of the

12  case and the amount in controversy and the importance of the

13  issues and the importance of the discovery.  So perhaps it

14  will have some affect on that, but I'll have to do it on a

15  case-by-case basis or I should be more accurate and say on a

16  discovery request-by-discovery request basis.

17          So with that in mind, let me just turn to the July

18  24th letter.  I'm not even sure I need argument from the

19  parties.  I've got a number of letters in response.  I have

20  letters dated July 30th, August 7th, August 14th.  That's the

21  dates.

22          So I now look at the July 24th letter and look what

23  I'm being asked to do.  And as to the first one -- I'm looking

24  at the conclusion -- "We request the Court to order the

25  depositions of Gabarra [Ph.] and Amsterdam to proceed on all

9

1   topics identified in the Hague requests."

2           So, you know, I looked at all the case law the

3   parties cited and all of that law involves considerations to

4   be waived or procedures to be undertaken by a court prior to

5   the issuance of a letter of request under the Hague

6   Convention.  I didn't see a single case -- and someone can

7   tell me if I'm wrong -- that once a court has issued a letter

8   of request a court can then issue some additional order to a

9   foreign court regarding that request or the scope or anything

10  else.  Did I miss something?  Is there a case that does that?

11          MR. GOLDEN:  Let me just check the names of the

12  case, Judge, but I think that cases cited in our letter --

13          THE COURT:  Just give me a case that does it.

14          MR. GOLDEN:  Metso Minerals.

15          THE COURT:  Hold on.  You're wrong on this one.  I'm

16  not going to listen to any others, so I suggest you pick your

17  best one.  Is this it?

18          MR. GOLDEN:  That's all I have, Judge.

19          THE COURT:  Citation is -- if you could give it to

20  me again since I'm on the computer right now.

21          MR. LUPKIN:  Your Honor, it's 2007 Westlaw 1875560.

22          THE COURT:  "Before the Court is a motion by the

23  defendants for the issuance of a letter of request," first

24  sentence.  So I repeat what I said earlier.  I don't think

25  I've ever seen a case where once a letter of request has been

10

1   issued there's some procedure or mechanism for a court to

2   issue an order to the foreign court.  I don't think it's

3   appropriate.  I think all of these issues should have been

4   raised, whatever they are, when the letter of request was

5   made.  We very carefully checked to see if there was any

6   objection by the plaintiff and the request was issued, so

7   that's it.

8           If someone wants to -- if the person who requested

9   it wants me to vacate it, that would be the defendant, I will

10  talk about that and then we'll start the process all over

11  again with no promises, but in the absence of that request,

12  that's the end of it.  I assume you're not making that

13  request, Mr. Golden.  Am I right?

14          MR. GOLDEN:  No, I'm not, but I would like to be

15  heard on that point.

16          THE COURT:  Go ahead.

17          MR. GOLDEN:  And our point is that I'm concerned

18  that the letter of request issued exactly as you said without

19  objection --

20          THE COURT:  And drafted by you.

21          MR. GOLDEN:  Yes.

22          THE COURT:  Yes.

23          MR. GOLDEN:  Without objection as to the documents

24  which was withdrawn.

25          My concern is, because of the statements made by the

11

1  plaintiff's counsel that when we get to London there will be

2  an attempt to litigate what was not litigated here, which is

3  the scope of the questioning.  And because the form of the

4  letter of the request is not in order, although apparently to

5  Your Honor and I agree with Your Honor that it has the affect

6  of Your Honor's view about relevance.  What we're asking is

7  for an order which we think will be more persuasive to a court

8  in London where Your Honor issues an order and you say that my

9  letters of request were issued under the following procedures

10  and it is my determination as the judge in the foreign court

11  that the scope of that discovery is appropriate for the case.

12        Now, I think that's implicit in Your Honor's letters

13  of requests, but my concern is that when we get to London

14  where they're a little fussier about things, they may not look

15  at that as an order.  And I think that the reason why there

16  are no --

17        THE COURT:  May not look at what as an order?

18        MR. GOLDEN:  They will not look at the letters of

19  request --

20        THE COURT:  Right.  It's not an order; it's a

21  request.

22        MR. GOLDEN:  Correct, correct.  And I think that the

23  reason why there are no cases in which an order was issued

24  after the letters of request were issued is that objecting

25  parties made their objections in the United States so that it

12

1    was done.  So we're looking for Your Honor's assistance to

2    confirm the letters of request because I think that will be

3    clearer and more persuasive to the London court in the event

4    that the plaintiffs object, which they have indicated to us

5    that they will, even though they haven't told us what the

6    basis of the objection was.

7            THE COURT:  Request is denied for the reasons I

8    stated.

9            The letters from -- letter from defendant also made

10   reference to the possibility that some of the proposed

11   deponents may be located in the United States, though

12   apparently not in New York.  And I would just note that I have

13   no subpoenas before me to anyone here and if they were

14   anywhere other than New York or within 100 miles, I don't

15   think I would have jurisdiction anyway so I don't think any of

16   that was relevant.

17           I think the next issue is the BGR documents.  I --

18   you know, I'd like to try to enforce agreements between the

19   parties when they exist, but I'm a little concerned that the

20   agreement here might have had some ambiguity as to what's

21   being talked about.  I mean, I can understand why documents

22   between BGR and the law firm might have been within the

23   original request, though I'm not, you know, 100 percent sure

24   about that, but I -- certainly if there were communications

25   between BGR and the plaintiffs on relevant topics, that's

13

1   your -- Golden -- Mr. Golden, your view is that was within the

2   agreement, too?

3           MR. GOLDEN:  I'm sorry, Your Honor, I didn't

4   understand your --

5           THE COURT:  Documents between BGR and the actual

6   plaintiff Mr. Egiazaryan or other entities.

7           MR. GOLDEN:  That -- our position is is --

8           THE COURT:  I'm sorry.  Not you.  Mr. Lupkin.

9           MR. LUPKIN:  Yes.  Your Honor, in his letter in

10  response to my August 7th letter, Mr. Golden acknowledged a

11  point that we made in our letter which is to say that

12  Mr. Egiazaryan produced the BGR documents under the Rule 34

13  concept of possession, custody and control.  We had effective

14  control because we -- they worked for us and so, therefore, we

15  undertook together --

16          THE COURT:  Wait, wait.  "Us" meaning Egiazaryan.

17          MR. LUPKIN:  "We," Egiazaryan un --

18          THE COURT:  Not the firm.  Maybe we need to

19  distinguish at some point but go ahead.

20          MR. LUPKIN:  Sure.  Mr. Egiazaryan undertook to

21  gather through his lawyers the documents that were in BGR's

22  possession, custody and control.  There were documents that

23  were located in Washington and there were documents that were

24  located in London.  I suppose we could have taken the position

25  that the documents too should have been obtained through

14

1  London but we didn't take that position.  We took the position

2  that as the party we had an obligation to produce it and the

3  agreement that was entered into between Ms. Silver and I was

4  clear.  It says, "The parties shall not have to log privileged

5  materials post the commencement of the litigation."

6         THE COURT:  Right.  But, you know, if -- there's a

7  reason people make those agreements and the reason is, if you

8  took document requests literally it would require every time

9  you wrote a memo to the file or your associate or did a draft

10 of the memorandum of law in this case, you'd have to log it.

11 That's why people have those agreements.

12        MR. LUPKIN:  Right.

13        THE COURT:  So I'm asking about something that seems

14 to me should be really outside the agreement, which would be

15 documents between -- if there are any -- between BGR and the

16 actual plaintiff, Egiazaryan, relating to pertinent topics.

17        MR. LUPKIN:  There are none.

18        THE COURT:  There are none.  Okay.  So we're now

19 talking about -- and I assume you don't mind saying that in

20 writing.

21        MR. LUPKIN:  No.

22        THE COURT:  Yes.  Okay.

23        MR. LUPKIN:  Yes, I don't mind saying it in writing.

24        THE COURT:  Right.  So that may lay to rest

25 something, but now the question is, BGR documents between --

15

1   are there BGR documents between you and your firm or members

2   of your firm.  Is that what's -- what's out there that's not

3   being logged?

4           MR. LUPKIN:  There are several categories:  one is

5   communications between members and employees of my firm and

6   BGR; small number of internal communications within BGR that

7   reflect communications transmitted to them by our law firm;

8   and the third a category of documents between BGR and an

9   individual by the name of Drew Holiner, who is

10  Mr. Egiazaryan's personal counsel, for lack of a better word.

11          THE COURT:  Last name.

12          MR. LUPKIN:  Holiner, H-O-L-I-N-E-R.

13          THE COURT:  Okay.

14          MR. LUPKIN:  He's a Russian advocate and a British

15  barrister.

16          THE COURT:  Okay.

17          MR. LUPKIN:  And he is sort of the quarterback, if

18  you will, for these various litigations.  And he had post-

19  commencement of this litigation discussions with BGR about

20  issues pertaining to the litigation.

21          THE COURT:  Okay.  So let's talk about -- maybe we

22  can't talk about the subject matter of these documents, but my

23  problem is that, you know, when -- like I said, when people

24  make agreements of this kind it's to avoid production of

25  internal documents and documents between them and their

16

1  client.  That's the purpose because it's a complete waste of

2  time because we know that they're all going to be work

3  product.

4            This -- you know, I don't know how clear it is that

5  documents between BGR and Holiner are work product.  Your

6  firm, maybe that's a closer case.

7            MR. LUPKIN:  Our firm was retained explicitly by

8  BGR --

9            THE COURT:  For what purpose?

10           MR. LUPKIN:  To act as their counsel to represent

11 them in connection with the subpoenas that were served.

12           THE COURT:  Oh, well, then it does seem like we're

13 getting somewhere that's a waste of time.

14           Well, let me hear from Mr. Golden.  Why isn't this a

15 waste of time?

16           MR. LUPKIN:  And before --

17           THE COURT:  Yeah.

18           MR. LUPKIN:  Before I sit down -- well, I'll sit

19 down.  Never mind.

20           THE COURT:  Go ahead.

21           MR. GOLDEN:  There are a number of aspects of this

22 and unfortunately, it's maybe more complicated than it ought

23 to be, but let me start with this.

24           At the time that the complaint was filed Flemming

25 Zulack did not have an attorney/client relationship with BGR.

17

```
 1   I don't know when that occurred but it -- and perhaps -- the
 2   time of that is relevant.
 3              THE COURT:  So let's just cut to the chase.
 4   There -- for your point of view, whatever arguments made here
 5   would only apply to the time when they were retained.  When
 6   were you retained.  Do you know?
 7              MR. LUPKIN:  We have retainer letters dated the 6th
 8   of September, so the retention occurred somewhere shortly
 9   before that.
10              THE COURT:  2012.
11              MR. LUPKIN:  2011.
12              THE COURT:  2011.
13              MR. LUPKIN:  September 6th.
14              THE COURT:  Whatever documents between April -- I'm
15   sorry.  Between April 2000 -- wait.  When's your cutoff?
16              MR. GOLDEN:  April 2011 is the complaint.
17              THE COURT:  Okay.  Are there documents between April
18   2011, September 2011 between your firm and BGR?
19              MR. LUPKIN:  I don't know.  I don't know offhand.
20              THE COURT:  Okay.  All right.  So thank you.  You
21   can be seated.
22              So to continue, Mr. Golden, I guess I see the
23   potential distinction between pre-September 6, 2011 and post-
24   September 6th, so why don't you discuss those in two separate
25   categories?
```

18

1          MR. GOLDEN:  Right.  And there's another variable
2   that applies to the communications between Flemming Zulack and
3   BGR.  First, anything before September 6th or approximately
4   couldn't possibly be privileged by any -- by any test because
5   there wasn't an attorney/client relationship.  After September
6   6th communications between Flemming Zulack and BGR, this is
7   not addressing the other categories but those communications,
8   fall into two categories:  one is privileged; one is not
9   privileged.
10          The privilege is if there's a communication between
11   Flemming Zulack and BGR for the purpose of giving legal advice
12   to BGR that's a privileged document.  Now, our position is, it
13   still has to be logged so we have a basis for determining what
14   we're talking about but that's a privileged document.
15          What's not privileged, even after September 6th, is
16   a communication between Flemming Zulack and BGR about Ashot
17   Egiazaryan.  We had that dispute.  We made a motion on that
18   category beginning on March 9th of this year.  Egiazaryan
19   withdrew its assertion of privilege of that category of
20   documents and they were provided to us.
21          THE COURT:  Wait, wait, wait.  Those were documents
22   of Egiazaryan between him and BGR, right?
23          MR. GOLDEN:  Well, they weren't between Egiazaryan.
24   Actually one of the interesting things having seen a couple of
25   thousand BGR documents is that Mr. Egiazaryan never

19

1   communicates with BGR.

2           THE COURT:  Well, was it between his law firm --

3   this law firm and BGR?

4           MR. GOLDEN:  It's -- many of them are -- I would say

5   if I had to pick the largest category they are in internal

6   communications with BGR.  Sometimes there are copies sent to

7   other lawyers.  There are a few that were sent to Mr. Lupkin

8   and Mr. Cohen.  There are some that are sent to

9   Mr. Egiazaryan's other lawyers at Gibson Dunn & Crutcher.

10  There are many that are sent -- copies are sent or there are

11  communications with or references to this Drew Holiner.  And a

12  good example -- this is one that was provided but so far is

13  subject to an attorney's-eyes-only designation, but this is a

14  good example of what we're talking about.  This is an

15  exhibit --

16          THE COURT:  This is in an open courtroom.  Maybe we

17  should be circumspect in describing it.

18          MR. LUPKIN:  May I propose the following just for

19  the sake of expediency?  I don't see anybody else --

20          THE COURT:  Well, we have a transcript that I have

21  no intention of sealing, so --

22          MR. LUPKIN:  Well --

23          THE COURT:  -- you have to think about the

24  transcript.

25          MR. LUPKIN:  Let me ask you a question.  When the

20

1   transcripts are posted on the ECF system we have an

2   opportunity to request redaction.

3            THE COURT:  I don't want to hear -- I'll just tell

4   you right now I don't want to hear any confidential

5   information right now.

6            MR. LUPKIN:  Okay.

7            THE COURT:  So don't --

8            MR. GOLDEN:  So I won't refer to it other than to

9   say that it is an exhibit --

10           THE COURT:  Why don't you just explain how it fits

11  into your argument?  It's what in your view nonprivileged

12  information between what parties?

13           MR. GOLDEN:  Sure.  It is a communication and it is

14  representative.  It is communication between two people at BGR

15  making references to discussions that the BGR people had with

16  Mr. Holiner.  And it is an exhibit to one of the documents

17  that I submitted to Your Honor in our --

18           THE COURT:  I don't have it in front of me.  It's

19  all right.  Unless it was in this letter.  Was it in the

20  letters?

21           MR. GOLDEN:  No.  It had already been submitted as

22  part of our memorandum in opposition to Mr. Egiazaryan's

23  motion for protective order with respect to the asylum

24  materials.

25           THE COURT:  Oh, okay.  I don't have that in front of

21

1   me right now.

2          MR. GOLDEN:  So what it is -- and it is

3   representative -- it's an email or a memorandum between John

4   Luff [Ph.] and Ivoca Barra [Ph.], two of the people we want to

5   depose.  This one, a copy is not sent to anybody.  There's a

6   reference to discussions that were had that were held with

7   Drew Holiner and they talk about their public relations

8   strategy --

9          THE COURT:  Well, don't get into the topic area.

10  It's not privileged, is the point.

11         MR. GOLDEN:  Yes.  And so getting back to what I was

12  working through before.  So there are many documents and, for

13  instance, that is a category that may very much -- may very

14  well be part of the documents that have not been provided to

15  us nor have been put on a privilege log because they occurred

16  after April of 2011.  Included in that, as Mr. Lupkin said,

17  there are documents that they are asserting are privileged

18  without putting them on a log that are communications between

19  BGR and BGR.  There are communications between BGR and Drew

20  Holiner.  There are communications between -- Mr. Lupkin

21  didn't say this, but based on what I've seen, there are likely

22  to also be communications that include Gibson Dunn & Crutcher.

23         In most of these instances, as is typical with email

24  communications, there are sort of three or four parties.

25  Sometimes the two BGR people are talking to people and they

22

1    send it to a lawyer, sometimes the lawyer sends it to one BGR

2    person, and the BGR forwards it to somebody else.  So

3    there's -- there are sort of a broad way -- a broad way to

4    look at those things.

5             What has not been described -- and this is the only

6    thing that could possibly be privileged -- is the

7    communication between Flemming Zulack and BGR for the purpose

8    of giving BGR legal advice.  The discussions in these

9    documents and based on the ones that we have, I assume that

10   most of the ones that have not been provided are like this

11   too, are about the strategy of the public relations campaign

12   and how it affects the case.  It is particularly relevant to

13   the anti-slap counterclaim because all of these discussions

14   pertain to the objectives and the motives of the lawsuit.

15             Now, the ones that we've seen so far don't say

16   anything about we have to undue the defamation that was

17   committed by Peter Zalmayev.  They say all kinds of other

18   things, like we have to get asylum, we have to publish

19   articles in the home countries of the arbitrators in the

20   London arbitration, we have to do things that will enhance the

21   asylum application.  That's what we're talking about.

22             Now, those materials, everything other than

23   communications between Flemming Zulack and BGR for the purpose

24   of giving BGR legal advice at one time were asserted to be

25   privileged by Mr. Egiazaryan through what they asserted to be

23

1   was the co-veil privilege.  In fact, there was not a co-veil

2   [ph.] privilege.  Co-veil is an absence of the waiver of the

3   privilege under some circumstances for purposes of public

4   relations firms, the law in the Southern District is cited in

5   case -- in our March 9 letter, do not make those things both

6   not privileged and if things that are otherwise privileged are

7   communicated to a public relations firm the privilege is

8   waived.  So --

9            THE COURT:  I don't want to get into the merits of

10  privilege.  I just want to understand what the potential is

11  for nonprivileged documents from your point of view.  I think

12  I have that sense.

13           What were your three categories again between

14  employees and the firm BGR, between BGR and Holiner --

15           MR. LUPKIN:  Yes, it was -- let me --

16           THE COURT:  What was the other one?

17           MR. LUPKIN:  Let me repeat them again.  It's

18  communications -- these are sort of broad categories --

19  communications between BGR and our firm after the subpoenas

20  were served and after we were retained, communications

21  internal to BGR reflecting instructions and advice that we

22  gave to BGR in connection with the collection of documents

23  among other things and in terms of responding to the subpoena.

24  And then the last category are communications with Mr. Drew

25  Holiner about -- in anticipation of litigation or as part of

24

1   the litigation.

2          Remember, we're not just talking about the

3   attorney/client privilege; we're also talking about the work

4   product doctrine.  And the work product doctrine waiver is

5   substantially -- the ability to wai -- the ability to

6   communicate with somebody without waiving the work product

7   privilege is substantially greater than with a strict

8   attorney/client privilege.

9          THE COURT:  Okay.  Well, you know, I kind of come

10  back to where I was which is, you know, I don't want law firms

11  to have to do privilege logs about their internal

12  communications and communications with their clients.  And,

13  again, that's normally why agreements like this are made.  So

14  I -- none of this is that.  Well, it is that, but it's only

15  that because for whatever reason BGR decided to hire the same

16  law firm as the plaintiff.  And I'm willing to hear some

17  methodology for lessening your burden but right now it seems

18  to me that any communication since BGR is an important

19  player -- strike that.  Since BGR's documents are agreed to by

20  both parties as being relevant here, there has to be a

21  mechanism to allow the defendant to check claims of privilege

22  and I can't say it's impossible that there are going to be

23  nonprivileged or non-work protected documents in these

24  categories that you mentioned.

25          So my order right now is to do a log for these

25

```
1   documents.  If there's some way you can think of to lessen
2   your burden for the documents that were, you know, purely,
3   here's a copy of our motion on your behalf -- I'm not sure you
4   have to -- did you ever file anything on behalf of BGR in this
5   court?  I don't think you did now that I think about it.
6                MR. LUPKIN:  I don't believe so.
7                THE COURT:  Yeah.  I mean, if you can think of some
8   method to lessen the burden by grouping some things, talk to
9   Mr. Golden first.  You know, I'm willing to be reasonable
10  about it, but my having read your letters and heard the
11  arguments today I think these materials have to be logged.
12               MR. LUPKIN:  Let me then say this.  It seems to me
13  that if it is appropriate for us to be logging communications
14  of this sort with "key players" we have to look at the
15  defendant because I think what we've done is the open the
16  Pandora's box.  The defendant has no fewer than four separate
17  law firms defending him, investigating matters, speaking to
18  witnesses, not necessarily communications between the lawyers
19  or between the lawyers and Mr. Zalmayev, but communications
20  with potential witnesses.  Is Mr. Golden going to agree to log
21  all of those documents as well?  It seems to me that there
22  should be reciprocity.
23               THE COURT:  Well, I'm not asking you to log your
24  documents with potential witnesses.  BGR is the subject -- the
25  BGR documents are the subject of a document request.  I'm not
```

26

1   asking you to log your communications with your clients.  I'm
2   not asking your client to log their communications with other
3   law firms or with Holiner, so that's not the road we're going
4   down.  And if you send them down that road then you're going
5   to be sent down that road.  This is an entity that is within
6   the control of the plaintiff that has responsive documents,
7   documents responsive to a Rule 34 request, and who has an
8   ongoing role apparently in relation to issues that are the
9   subject matter of this case.
10          So think -- you know, I know you're concerned but --
11  and I'm not going to hear any new requests now anyway, but
12  before you try to present something to me, just think about
13  the fact that to my mind this is narrow and whatever box I
14  heard you just mention would actually open up additional boxes
15  for you, so why don't you hold off on that application?
16  That's my suggestion.  If you want to make it to me in
17  writing, that's fine.  Okay.
18          I have two more items of business and then I'm
19  willing to hear from you, too.  One is I want to set a date
20  for oral argument on the asylum matter.  I don't know if you
21  have calendars here.
22          MR. LUPKIN:  It was confiscated downstairs.
23          THE COURT:  You have yours apparently.  Well, I'll
24  set it and then if it has to be moved, it will be moved.
25  Yeah.  I've got some bad September dates coming in.  You know

27

1    what?   Maybe day after Labor Day offhand sound available?

2              MR. LUPKIN:   What day is that, Judge?

3              THE COURT:   The 4th.

4              MR. LUPKIN:   Would it be possible to do it two days

5    after Labor Day?

6              THE COURT:   The 6th?

7              MR. LUPKIN:   Yeah.

8              MR. GOLDEN:   Well, the 5th would be two days

9    after --

10             THE COURT:   Oh, two days after Labor Day, the 5th.

11   Maybe.   You prefer that?

12             MR. LUPKIN:   I would.   Or perhaps even that Friday.

13             THE COURT:   Friday, can't do it.   All right.   Let's

14   think about the 5th.   I'll issue a separate order and if it's

15   a problem, you know, we can always move it.

16             MR. LUPKIN:   Um-hum.

17             THE COURT:   Let me think about this.   September is

18   just a mess the whole month.   October is great.   Let's see

19   what we can do on the 5th.   I'll issue an order.   If I

20   suddenly change it to October, don't be surprised.

21             Okay.   Last issue is, there was a letter dated

22   August 23rd from Mr. Zauderer to Judge Castel.   Judge Castel

23   has asked me to deal with the request made in this letter.

24   Maybe we should go off the record.

25             (Off the record.)

28

```
 1         THE COURT:  Okay.  We're back on the record.  I
 2  encouraged the parties to talk settlement with each other.  If
 3  both sides think it would help to have a settlement
 4  conference, I'm willing to do that.
 5         I want to talk about remaining discovery.  I know we
 6  have the Google subpoena.  I know we have the asylum
 7  application.  I know we have whatever is going to happen in
 8  London.  What else is out there starting with plaintiff?
 9         MR. LUPKIN:  Yes.  The only other thing that we have
10  extent are both a motion in the District of Columbia
11  pertaining to Public Strategies.  It's another public
12  relations firm.  And we're litigating about whether or not
13  they complied with the Court's order to produce privilege --
14  you know, non-privilege relevant documents and produce pri --
15  complete privilege log.  And we also have extent in that same
16  district a motion to compel them to provide a date certain for
17  an individual by the name of Greg Hitt [Ph.].
18         THE COURT:  And isn't this the one where they're
19  trying to get a stay so they can come to me on something?
20         MR. LUPKIN:  That's the one.
21         THE COURT:  Okay.
22         MR. LUPKIN:  So I --
23         THE COURT:  Anything else left from your point of
24  view?
25         MR. LUPKIN:  Just some follow-up items.  And we
```

29

1  would like to consider whether or not we need to serve request

2  for admissions or interrogatories.

3          THE COURT:  Interrogatories?  You mean, like

4  contention interrogatories?  What interrogatories?

5          MR. LUPKIN:  Yeah.  Contention interrogatories.

6          THE COURT:  Contention interrogatories?

7          MR. LUPKIN:  Yeah.

8          THE COURT:  Okay.  Just asking.

9          From your point of view, Mr. Golden?

10          MR. GOLDEN:  Other than what Your Honor mentioned,

11  we still need to take the deposition of Surian [Ph.]

12  Egiazaryan, whose deposition was scheduled for sometime in May

13  and was postponed because he was ill.  In addition, to that --

14          THE COURT:  This is a brother or something?

15          MR. GOLDEN:  This is a cousin.

16          THE COURT:  Cousin.  Okay.

17          MR. GOLDEN:  Yes.  So -- and we're still waiting for

18  information on the state of his health so that we can schedule

19  that.

20          Other than that, it is follow-up discovery that

21  would be suggested by the asylum application.  Once that issue

22  is resolved then we can talk to the people who are mentioned

23  in the asylum papers.

24          THE COURT:  Yes.  Well, I wouldn't hold out too much

25  hope on additional discovery.

30

1            Okay.  Well, given that we have things going on in

2   London and D.C. completely outside my control and since I have

3   a terrible September, I think I am going to adjourn the oral

4   argument on the asylum application and probably the Google

5   application until that first week in October.  So I'll figure

6   out a date and just send you an order and if you need to

7   change it, you let me know.

8            MR. LUPKIN:  Okay.

9            THE COURT:  I think that's probably it from my end.

10  Mr. Lupkin, anything else?

11           MR. LUPKIN:  No, Your Honor.  Thank you.

12           THE COURT:  Mr. Golden, anything?

13           MR. GOLDEN:  We -- with Your Honor's comments we'll

14  have to extend discovery schedule.  I'll send Your Honor --

15  unless you want to do that now I'll send --

16           THE COURT:  Well, I mean, my -- right now we have a

17  discovery cutoff, right?

18           MR. GOLDEN:  Yes.  September 18th.

19           THE COURT:  Okay.  And is there experts built into

20  that or no one is hiring experts?

21           MR. LUPKIN:  That's before experts.

22           THE COURT:  That's -- okay.  Anyone hiring experts?

23  You --

24           MR. LUPKIN:  We intend to.

25           MR. GOLDEN:  Haven't made a decision.

31

 1          THE COURT:  Okay.  But presumably we'd have to wait

 2  for London and Decision Strategies (*sic*) anyway, right, before

 3  we did experts?

 4          MR. LUPKIN:  Yes.

 5          MR. GOLDEN:  Yes.

 6          THE COURT:  Okay.  I mean, I think what I want to

 7  make clear and if I didn't already make clear is there's not

 8  going to be any new discovery requests.  I understand

 9  Mr. Golden wants to be able to make an application based upon

10  any newly-obtained information from the asylum application,

11  but that's going to be dealt with on its own terms.  Have I

12  previously said, you know, no new discovery requests or that

13  hasn't happened yet?

14          MR. LUPKIN:  That hasn't happened yet.

15          THE COURT:  Okay.  So I think if there's going to be

16  discovery, I don't want to extend this out on the theory that

17  people can come up with new ideas for discovery requests that

18  are independent of these few remaining items like the London

19  depositions, and the BGR documents, and Decision Strategies,

20  and the asylum application.

21          MR. LUPKIN:  You mean, Public Strategies.

22          THE COURT:  Sorry.  Public Strategies.  Thank you.

23          MR. LUPKIN:  That's another company.

24          THE COURT:  I know.  And the asylum application.  So

25  did anyone have any plans to make discovery requests apart

32

1   from things that arose out of those?

2           MR. LUPKIN:  No, apart from the potential for

3   contention interrogatories and request for admission.

4           THE COURT:  Okay.  How about your side?

5           MR. GOLDEN:  Other than what I said, we have no

6   other intentions.

7           THE COURT:  And what you said was that if something

8   arose out of the asylum application.

9           MR. GOLDEN:  Yes.

10          THE COURT:  Okay.  So that's clear.  No new

11  discovery requests other than things that may arise from

12  outstanding requests.

13          MR. LUPKIN:  I.e., follow-up for --

14          THE COURT:  No new requests other than applications

15  to take requests that were engendered from information learned

16  in response to these outstanding requests.

17          MR. LUPKIN:  Right.  There are -- correct.  And

18  there's a couple of follow-up items in terms of document

19  production.  It's not as --

20          THE COURT:  Previous requests that haven't been

21  fully complied with.

22          MR. LUPKIN:  Right.  Okay.

23          THE COURT:  Yes.  I think people should bring those

24  to my attention as soon as possible.

25          MR. LUPKIN:  Okay.

33

1          THE COURT:  But I'm talking about new requests for

2     discovery, not applications regarding preexisting discovery.

3          MR. LUPKIN:  Okay.

4          THE COURT:  Though, those should be made soon, in my

5     mind.

6          MR. LUPKIN:  Right.  Let me actually --

7          THE COURT:  So hold on.  So with that in mind,

8     extending the discovery deadline to me is not terribly

9     meaningful.  In my mind, it's over with the exception of what

10    I just said and I'm going to wait to hear reports on D.C. and

11    London.  I'll have -- hopefully have my pieces done by the

12    beginning of October.  And then once we get the reports, we'll

13    set dates for expert deadlines and it's possible if they're

14    taking too long that I'll say, tough luck, hire experts based

15    on the current record.

16         MR. LUPKIN:  Okay.

17         THE COURT:  I mean, do you need London and D.C.

18    for -- I know you don't need the asylum application.  What do

19    you need to do --

20         MR. LUPKIN:  Well, I personally don't need the BGR

21    documents or the depositions --

22         THE COURT:  Right.

23         MR. LUPKIN:  -- to --

24         THE COURT:  You don't need any of this to do your

25    expert.

34

1          MR. LUPKIN:  That's correct, but I don't want to be

2     on a different track than Mr. Golden.

3          THE COURT:  No.  I understand.  But there's probably

4     going to come a point where I'm not willing to wait for London

5     and we'll just say, tough.  We've got to move this case along

6     and we're going to have both sides' experts.

7          MR. LUPKIN:  Um-hum.

8          THE COURT:  Or D.C.  I might not be willing to wait

9     for them either.

10         MR. LUPKIN:  Perhaps -- may I suggest that we sort

11    of abide the event for a little bit and --

12         THE COURT:  Yeah, yeah.  I'm willing to wait a

13    little bit especially since I'm not willing -- I really can't

14    get to your stuff until the beginning of October anyway, so

15    after the oral argument with the time, we'll make some of

16    these decisions and I'll give you at least, you know, 30 days

17    to do your expert report from whatever date I say it's now

18    over, I'm not waiting any longer, okay?

19         MR. LUPKIN:  Maybe 60 days because --

20         THE COURT:  Sixty?  What kind of expert are you

21    hiring?

22         MR. LUPKIN:  Well, there could be -- a lot of them

23    are going to have to do with Russia and so it's going to be a

24    little difficult logistically.

25         THE COURT:  You should start getting to work on it,

35

1  then.

2          MR. LUPKIN:  Okay.

3          THE COURT:  How many days are you going to need for

4  rebuttal reports?  I'm giving you the same --

5          MR. GOLDEN:  Without --

6          THE COURT:  I'm going to give you the same time

7  period.

8          MR. GOLDEN:  Yes.  And, Your Honor, without seeing

9  or having any idea what the report is, I don't know, but 30

10  days probably is sufficient or 60 days if they have 60 days to

11  prepare.

12          THE COURT:  Well, I'm not guaranteeing 60.  We can

13  talk about it when you know who you're hiring.  I guess

14  there'll be some very happy historians.

15          MR. LUPKIN:  Your Honor, there was one other item I

16  just wanted to mention which I neglected to mention and that

17  is, we had served a subpoena to take the deposition of Leonid

18  Komarovski [Ph.] long time ago that was cancelled.  We

19  never --

20          THE COURT:  Third-party subpoena?

21          MR. LUPKIN:  He was a third-party subpoena.

22          THE COURT:  Okay.

23          MR. LUPKIN:  It's out there.  We don't know whether

24  we want to actually take it or not take it, but we'd like the

25  option to do so if it's necessary.

36

1          THE COURT:  Okay.  Well, I think you should do it --
2  what's to prevent you from doing it by the current discovery
3  deadline?
4          MR. LUPKIN:  His availability.
5          THE COURT:  Okay.  Well, I think you should fulfill
6  it by the current discovery deadline and if you can't write me
7  a letter, all right?
8          MR. LUPKIN:  Okay.
9          THE COURT:  Anything else, Mr. Golden?
10          MR. GOLDEN:  I'm just wondering since we're all here
11  since I could hear from Mr. Lupkin and Mr. Cohen on Suriat
12  Egiazaryan's health so we know when that deposition might be
13  taken.
14          THE COURT:  Yeah.  I'd like to have that taken by
15  the deadline if possible, too.
16          MR. LUPKIN:  Mr. Egiazaryan, we've been advised, has
17  a liver and heart condition and his doctor at least last time
18  we checked has counseled against putting him in a situation
19  where he has -- where he's going to experience either physical
20  or psychological stress.  And given --
21          THE COURT:  So this is never going to end.  This is
22  permanent.
23          MR. LUPKIN:  That -- I can't represent that because
24  I don't know what the situation is precisely, but we can
25  certainly find out and follow up.

37

1          THE COURT:  Yeah.  I think we might need something
2   from the doctor.
3          MR. LUPKIN:  Okay.  That's fine.
4          THE COURT:  Something detailed.  So why don't you
5   get that in the next couple of weeks to the other side?
6          MR. LUPKIN:  Okay.
7          THE COURT:  And you can let me know if there's some
8   further application.
9          MR. LUPKIN:  Thank you.
10         THE COURT:  Anything else, Mr. Golden?
11         MR. GOLDEN:  Nothing else.
12         THE COURT:  All right.  Thank you, everyone.
13         ATTORNEYS:  Thank you, Your Honor.
14                    *  *  *  *  *  *  *  *
15
16
17
18
19
20
21
22
23
24
25

38

1        I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5   _____

6        Ruth Ann Hager, C.E.T.**D-641

7   Dated:   August 29, 2012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25