UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ASHOT EGIAZARYAN,                                            :

                     Plaintiff,                             :          OPINION AND ORDER

      -v.-                                                  :
                                                                       11 Civ. 2670 (PKC) (GWG)
                                                            :

PETER ZALMAYEV,                                             :

                     Defendant.                             :
---------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       This lawsuit began when Ashot Egiazaryan sued Peter Zalmayev for defamation and

injurious falsehood.  In a counterclaim, Zalmayev alleged that the suit was a "strategic lawsuit

against public participation" in violation of N.Y. Civ. Rights Law §§ 70-a, 76-a (the "anti-

SLAPP" statute), and also asserted a defamation claim.  Following rulings on the parties'

motions to dismiss, the only remaining claim in this lawsuit is Zalmayev's anti-SLAPP

counterclaim against Egiazaryan.  See Egiazaryan v. Zalmayev, 880 F. Supp. 2d 494 (S.D.N.Y.

2012); Egiazaryan v. Zalmayev, 2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011).

       In this motion, Zalmayev seeks the production of 50 e-mails that were sent or received by

BGR Garbara Limited ("BGR"), a public relations firm Egiazaryan hired, and that have been

withheld on the basis of attorney-client privilege and the work product doctrine.[1]  For the reasons

_____

       [1]  See Peter Zalmayev's Notice of Motion to Compel Ashot Egiazaryan's Production of
BGR Documents, filed Nov. 28, 2012 (Docket # 195) ("Notice"); Peter Zalmayev's
Memorandum of Law in Support of Motion to Compel Ashot Egiazaryan's Production of BGR
Documents, filed Nov. 28, 2012 (Docket # 196) ("Def. Mem."); Declaration of James P. Golden,
filed Nov. 28, 2012 (Docket # 197) ("Golden Decl."); Declaration of Jason T. Cohen, filed Dec.
10, 2012 (Docket # 200) ("Cohen Decl."); Memorandum of Law in Opposition to Defendant's
Motion to Compel Ashot Egiazaryan's Production of BGR Documents, filed Dec. 10, 2012
(Docket # 201) ("Opp."); Peter Zalmayev's Reply Memorandum of Law in Support of Motion to
Compel Ashot Egiazaryan's Production of BGR Documents, filed Dec. 17, 2012 (Docket # 202)

stated below, Zalmayev's motion to compel the production of these e-mails is granted in part and denied in part.

I.      BACKGROUND

     A.      Relationship Between BGR, Egiazaryan, and Egiazaryan's Attorneys

     BGR is a public relations firm with offices in London, England.  See Cohen Decl. ¶ 2.  In February 2011, before this suit was filed, Egiazaryan's London counsel, Gibson Dunn & Crutcher LLP ("Gibson Dunn"), retained BGR to "assist with [Gibson Dunn's] representation of [Egiazaryan] in connection with certain arbitration proceedings."  See Letter from Ivo Ilic Gabara, President, BGR, to Laurence Shore, Partner, Gibson Dunn, dated Mar. 14, 2011 (annexed as Ex. 4 to Golden Decl.) ("BGR Agreement"), at 1.  BGR's scope of work encompassed "all global communication and United States government relations needs" that Egiazaryan required.  Id.  BGR was to "[d]evelop and implement a global media strategy," "[d]evelop a set of key messages and compelling narrative in support of the legal cases," "[m]anage UK and international media relations . . . with a view to securing positive, balanced and informed media coverage," "[p]rovide media training" to Egiazaryan, "[m]anage crisis communications," "[r]eview and manage the English-language content on Mr. Egiazaryan's English-language website," and "[d]evelop and implement a program in Washington DC in support of Mr. Egiazaryan's application to settle in the US."  Id.  BGR promised "not [to] disclose to any outside party [confidential] information either during the period of the

_____

("Reply"); Declaration of James P. Golden, filed Dec. 17, 2012 (Docket # 203); Declaration of John Lough, filed Jan. 30, 2013 (Docket # 211) ("Lough Decl."); Letter from Jason T. Cohen, Esq., Flemming Zulack Williamson Zauderer LLP, to Honorable Gabriel W. Gorenstein, filed Feb. 28, 2013 (Docket # 214) ("Jan. 24 Letter"); Letter from James P. Golden, Esq., Golden & Hamburg, P.C., to Judge Gorenstein, filed Feb. 28, 2013 (Docket # 215).

Agreement or afterwards, to the extent permitted by law." Id. at 3. Ivo Ilic Gabara headed

BGR's efforts with the assistance of Walker Roberts, Principal of BGR; Jeffrey Birnbaum,

Public Relations President; and John Lough, Vice President. Id. at 2.

According to Egiazaryan's attorney, BGR "facilitated the rendition of legal services"

with respect to "a London arbitration, this defamation lawsuit and Mr. Egiazaryan's efforts to

remain in the United States." Cohen Decl. ¶ 2. Lough states that "BGR advised counsel for Mr.

Egiazaryan as to what might be effectively done on the public relations front . . . so [counsel]

could properly advise their client as to the appropriate course of action in light of his wider

litigation interests." Lough Decl. ¶ 2. BGR believed it was part of "Egiazaryan's overall

litigation team and expected that its privileged communications would remain privileged." Id.

Starting in March 2011, BGR collected and facilitated the production of "documents" in

this lawsuit, Cohen Decl. ¶ 4, though it is not suggested that these documents involved anything

other than BGR's own documents. Egiazaryan's attorney states that BGR also "participated in

the developement of legal strategy in combating Mr. Zalmayev's malicious black public

relations campaign against Mr. Egiazaryan, including with regard to Mr. Egiazaryan's lawsuit."

Id. BGR conferred with Drew Holiner, Egiazaryan's personal attorney, regarding Egiazaryan's

"legal activities." Id. ¶ 5.

On July 18, 2011, Zalmayev served document requests on Egiazaryan, which included

requests for documents relating to BGR. See Peter Zalmayev's Request for Documents Directed

to Ashot Egiazaryan, dated July 18, 2011 (annexed as Ex. 1 to Lough Decl.) ("July 18 Doc.

Requests") (Document Request ## 42–45, 47–49, 56, 78, 89, 99). In response, BGR "undertook

a significant effort to assist" Egiazaryan's attorney on this case — Flemming Zulack Williamson

Zauderer LLP ("FZWZ") — in collecting "documents from BGR and relevant affiliates . . . ."

3

Lough Decl. ¶ 3.  BGR states that at that point in time it "reasonably expected that its communications and document-sharing with FZWZ were confidential and protected in order to promote the legal interests of our shared client, Mr. Egiazaryan."  Id. (citing Privilege Log for Post-Complaint BGR E-mails (annexed as Ex. 3 to Cohen Decl.) ("Revised Privilege Log"), Document ## 4, 14–16).

On August 19, 2011, Zalmayev served BGR's affiliate in Washington, D.C. with subpoenas.  See "History of Mr. Zalmayev's Attempts to Obtain Documents from BGR" (annexed as Ex. 12 to Golden Decl.) ("Procedural History"), at 1.  At an unspecified date — presumably in August 2011 — when it became "apparent" that Zalmayev sought to serve BGR with subpoenas, BGR "retained" FZWZ to represent it as a non-party witness.  Cohen Decl. ¶ 6; see also Lough Decl. ¶ 4 (referring to BGR "continu[ing]" with FZWZ as its "outside legal counsel").  On September 6, 2011, BGR signed a retainer agreement with FZWZ under which FZWZ would "provide representation in connection with the subpoenas issued" to BGR in this case.  Letter from Jonathan Lupkin, Esq., FZWZ, to Gabara & Lough, dated Sept. 6, 2011 (annexed as Ex. 4 to Lough Decl.) ("Engagement Letter"), at 1.  In signing the Engagement Letter, "BGR believed that it was merely documenting the privileged attorney-client relationship that had been established in July 2011."  Lough Decl. ¶ 6.  With the assistance of counsel, BGR produced over 3,200 pages of documents to Zalmayev.  Cohen Decl. ¶ 6.

    B.    <u>Procedural History of the Instant Motion</u>

As noted, Zalmayev served the BGR-related document requests on Egiazaryan on July 18, 2011.  The history that followed is somewhat complex — and not germane to the instant motion — so it will be recounted only briefly.  In August 2011, the parties agreed that neither side would be required to create a privilege log for documents created on or after April 19, 2011

4

— the date on which the complaint in this case had been filed.  See E-mail from Jane C. Silver, Esq., Hamburg & Golden, P.C., to Lupkin (Aug. 10, 2011, 16:58 EST) (annexed as Ex. 1 to Cohen Decl.).  On August 19, 2011, Zalmayev served subpoenas on BGR's affiliate in Washington, D.C., which included a subpoena for documents.  Procedural History at 1.  The affiliate objected to the subpoenas to the extent that they requested documents from BGR in London.  Id.  Ultimately, Egiazaryan produced a privilege log on December 12, 2011, which indicated that BGR was withholding over 300 documents generated prior to the filing of the complaint on the grounds of attorney-client privilege and work product protection.
See Egiazaryan Privilege Log (annexed as Ex. 5 to Golden Decl.).  After Zalmayev protested, counsel for Egiazaryan and BGR agreed to produce these documents, while at the same time noting that they had "entirely supportable" privilege claims.  Cohen Decl. ¶ 12.

On May 9, 2012, Zalmayev served requests on BGR in London pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents demanding, among other things, that it produce all responsive non-privileged documents.  Procedural History at 3. Egiazaryan moved to strike the Hague requests on the grounds that they were duplicative of document requests served upon him.  Id.  During a telephone conference with the Court on May 23, 2012, Egiazaryan's counsel represented that all responsive non-privileged BGR documents would be produced to Zalmayev.  Id.  As a result, Zalmayev withdrew his Hague requests insofar as they sought documents from BGR in London.  Id. at 3–4.

At a conference held on August 24, 2012, the Court ordered that a privilege log be created for BGR documents generated after April 19, 2011.  Transcript of Aug. 24, 2012 Proceeding, filed Sept. 6, 2012 (Docket # 183), at 24:9–25:11.  In October 2012, Egiazaryan submitted a privilege log withholding 48 BGR e-mails sent after April 19, 2011.  See Privilege

Log for Post-Complaint BGR E-mails (annexed as Ex. 7 to Golden Decl.); Procedural History at

4.  Then, on October 26, 2012, Egiazaryan submitted a revised privilege log which asserted

attorney-client privilege and work product protection as to 50 BGR e-mails.  See Revised

Privilege Log.[2]  On November 28, 2012, Zalmayev filed this motion to compel seeking

production of the e-mails.  At the request of the Court, see Order, filed Jan. 16, 2013 (Docket

# 207) ("Jan. 16 Order"), Egiazaryan submitted the withheld documents for in camera review.

II.   DISCUSSION

Egiazaryan relies on four grounds to withhold the BGR e-mails: (1) attorney-client

privilege arising out of FZWZ's representation of BGR as a non-party, Opp. at 5–7; (2) attorney-

client privilege under the agency exception for communications among BGR, FZWZ, and other

counsel for Egiazaryan, id. at 7–11; (3) attorney-client privilege under the "common interest"

doctrine, id. at 12–13; and (4) work product protection, id. at 13–15.  Each of these grounds is

discussed next.[3]

---

[2]  Zalmayev complains that the descriptions on the Revised Privilege Log are insufficiently detailed and asks that the Court order it supplemented.  Notice at 2; Def. Mem. at 15–17.  While the Court agrees that there are some scattered deficiencies, the underlying documents have now been produced to the Court and it would be an empty exercise to require supplementation of the log.  See, e.g., Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 168 (S.D.N.Y. 2008).

[3]  Zalmayev contends that Egiazaryan's privilege claims should not be heard now because Egiazaryan promised in March 2011 to provide BGR documents in exchange for Zalmayev withdrawing a prior motion.  See Def. Mem. at 5, 7, 11, 14; Reply at 4–5.  The record is hardly clear, however, that this promise meant that BGR was agreeing not to assert valid claims of privilege for documents post-dating the filing of this lawsuit.  See Letter from Lupkin to Golden & Andrew Ryan, Esq., Salisbury & Ryan LLP, dated Apr. 19, 2012 (annexed as part of Ex. 5 to Cohen Decl.); Letter from Cohen to Golden & Ryan, dated May 30, 2012 (annexed as part of Ex. 5 to Cohen Decl.); E-mail from Cohen to Golden & Ryan (Oct. 5, 2012, 16:52 EST) (annexed as part of Ex. 5 to Cohen Decl.).  Accordingly, we do not view this purported agreement as a basis for rejecting Egiazaryan's claims of privilege.

A.      Attorney-Client Privilege as a Result of FZWZ's Representation of BGR

To begin with, we must determine what party is asserting the claim of privilege arising out of BGR's representation.  The only brief filed on the topic is Egiazaryan's, which explicitly states that the attorneys who filed it are appearing only on behalf of Egiazaryan without referencing BGR.  See Opp. at 18.  Nonetheless, the brief argues that an attorney-client privilege arose out of FZWZ's representation of BGR and that this privilege protects a number of documents on the Revised Privilege Log.  See Opp. at 5–7 (specifying Revised Privilege Log Document ## 4, 14–16, 24–29, 31–34, 36–38, 40, 46–49).  Egiazaryan does not explain in the brief why he has standing to assert BGR's claim of privilege.  But inasmuch as the discrepancy has not been raised by Zalmayev, the Court will assume that the arguments in the brief relating to BGR's privilege are in fact being raised by BGR — and not by Egiazaryan — given that the attorneys representing Egiazaryan are also representing BGR.  See Engagement Letter; Lough Decl. ¶ 5.

Because this Court's subject matter jurisdiction is based upon diversity, see Amended Counterclaim, filed Aug. 5, 2011 (Docket # 27), ¶ 3, state law provides the rule of decision concerning the claim of attorney-client privilege.  See Fed. R. Evid. 501; In re Am. Tobacco Co., 880 F.2d 1520, 1527 (2d Cir. 1989) (citing Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d

---

On a separate point, Zalmayev's notice of motion seeks not only production of documents but an order that BGR remove any redactions, except for personal identifiers, from previously produced documents.  Notice at 1.  However, the motion to compel does not identify which documents have been improperly redacted.  Moreover, Zalmayev's memorandum of law states only that this motion concerns the "documents dated after the filing of the complaint on April 19, 2011, which were asserted to be privileged but not put on a privilege log."  Def. Mem. at 5.  Given that Zalmayev has not identified which documents were improperly redacted and has not given reasons why the redactions are improper, the Court rules only as to the 50 e-mails listed on the Revised Privilege Log.

Cir. 1975)).  New York's statutory codification of the attorney-client privilege provides as follows:

> [A]n attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication . . . .

N.Y. C.P.L.R. § 4503(a)(1).  "The attorney-client privilege protects confidential communications between a lawyer and client relating to legal advice sought by the client."  In re Nassau Cnty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003, 4 N.Y.3d 665, 678 (2005) (citing Priest v. Hennessy, 51 N.Y.2d 62, 68–69 (1980)) (additional citation omitted).  For the privilege to apply, the communication itself must be "primarily or predominantly of a legal character."  Rossi v. Blue Cross & Blue Shield of Greater N.Y., 73 N.Y.2d 588, 594 (1989).  "The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client."  Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 379 (1991).  The party asserting privilege carries the burden to prove every element of the privilege.  People v. Mitchell, 58 N.Y.2d 368, 373 (1983) (citing cases).  The party asserting privilege also has the burden to establish that there has been no waiver.  See John Blair Commc'ns, Inc. v. Reliance Capital Grp., 182 A.D.2d 578, 579 (1st Dep't 1992) (citation omitted).  Such showings must be based on competent evidence, usually through affidavits, deposition testimony, or other admissible evidence.  See von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 147 (2d Cir.), cert. denied, 481 U.S. 1015 (1987); Bowne of N.Y.C., Inc. v. AmBase Corp., 150 F.R.D. 465, 472 (S.D.N.Y. 1993).

　　In order for the privilege to apply, there must first be an attorney-client relationship.  See Mitchell, 58 N.Y.2d at 373 ("[I]t is beyond dispute that no attorney-client privilege arises unless

an attorney-client relationship has been established.") (citation omitted).  Here, Zalmayev argues

that BGR has not met its burden of establishing privilege for communications dated prior to

September 6, 2011 — the date BGR signed FZWZ's retention letter.  See Def. Mem. at 13.  Case

law provides that "[a]n attorney-client relationship is established where there is an explicit

undertaking to perform a specific task.  While the existence of the relationship is not dependent

upon the payment of a fee or an explicit agreement, a party cannot create the relationship based

on his or her own beliefs or actions."  Pellegrino v. Oppenheimer & Co., 49 A.D.3d 94, 99 (1st

Dep't 2008) (internal citations and quotation marks omitted); accord In re Out-of-State

Subpoenas Issued by N.Y. Counsel for Cal. Franchise Tax Bd., 33 Misc.3d 500, 516–517 (Sup.

Ct. 2011) ("[M]ere assertions that [a party] believed that an attorney-client relationship existed

and that [its] communications with [another party's] counsel were confidential are insufficient to

demonstrate the existence of [an attorney-client] relationship.").  On the other hand, an attorney-

client relationship may "encompass a preliminary consultation" when undertaken "'with a view

toward retention of'" the client.  Pellegrino, 49 A.D.3d at 99 (quoting Rose Ocko Found., Inc. v.

Liebovitz, 155 A.D.2d 426, 427 (2d Dep't 1989)).

    BGR's affidavit on the question of when it formed an attorney-client relationship with

FZWZ is vague.  Lough, a Vice President of BGR, asserts that a "confidential and privileged

working relationship" with FZWZ began on an unnamed date in July 2011, but he concedes that

this "working relationship" was only to "promote the legal interests of . . . Egiazaryan," Lough

Decl. ¶ 3, and not to provide legal representation to BGR.  Of course, the mere fact that BGR

was helping Egiazaryan's counsel collect documents in BGR's possession — even if BGR

thought its communications were "confidential," id. — does not establish an attorney-client

relationship.  Indeed, it frequently happens that a party served with document requests uses an

attorney to obtain responsive documents that are in the physical possession of a non-party because they are within the responding party's "control."  See Fed. R. Civ. P. 34(a).  There is no warrant in case law to conclude, however, that the non-party thereby develops an attorney-client relationship with the responding party's attorney.  Lough goes on to state that in "August" 2011, BGR "continued with FZWZ as our outside legal counsel . . . ."  Id. ¶ 4.  But he provides no detail as to what act or event precipitated the commencement of FZWZ becoming BGR's "legal counsel."

The lack of clarity on this question is puzzling given that the January 16, 2013 Order specifically cited the Pellegrino standard and directed the parties to provide affidavits that would allow it to determine "when the attorney-client relationship between BGR and FZWZ began." Jan. 16 Order at 1.  The Order required that a representative of BGR submit an affidavit "detailing the retention of FZWZ, describing when BGR believed that FZWZ represented it, and the reasons therefor."  Id. at 2.  Lough's affidavit fails to provide the information required by the Court because it does not explain when there was "an explicit undertaking [by FZWZ] to perform a specific task."  Pellegrino, 49 A.D.3d at 99.

Nonetheless, in its January 24, 2013 letter, FZWZ has pointed to particular e-mails produced ex parte as reflecting the existence of an attorney-client relationship.  See Jan. 24 Letter at 2 (referring to Revised Privilege Log Document ## 4, 14–16, 24–29).  Accordingly, the Court has examined these documents to determine what information they offer on this question. We begin by noting that neither these e-mails nor anything in the affidavits submitted to the Court reflect that BGR retained FZWZ to represent it with respect to any subject area other than "in connection with the subpoenas" Zalmayev issued on August 19, 2011.  See Engagement Letter at 1; Lough Decl. ¶ 4.  Based on an in camera review of the cited documents, the Court

concludes that BGR became aware of subpoenas on August 20, 2011.  See Revised Privilege

Log Document # 24.  Because the scope of FZWZ's representation was explicitly limited to

responding to the subpoenas, the attorney-client relationship between FZWZ and BGR could not

have formed prior to August 20, 2011.  Therefore, documents 4 and 14–16 on the Revised

Privilege Log — which pre-date August 20, 2011 — are not shielded by attorney-client privilege

arising from FZWZ's representation of BGR.

Subsequent to learning that service of subpoenas was imminent, however, BGR had

communications with FZWZ concerning how to respond, which are reflected in some of the

withheld e-mails.  See id. ## 24–25, 28–29.  Although BGR did not execute a formal retainer

agreement with FZWZ until September 6, 2011, the communications BGR had with FZWZ

beginning on August 21, 2011 — the content of which is reflected in the withheld e-mails —

were for the purpose of obtaining legal advice on how to respond to the subpoenas.  Because

these e-mails were confidential communications related to BGR seeking legal advice, the

attorney-client privilege protects these documents from disclosure.  See Pellegrino, 49 A.D.3d at

99; Roberts v. Corwin, 2012 WL 4512895, at *2 (N.Y. Sup. Ct. Sept. 10, 2012) ("An

attorney-client relationship may . . . exist prior to execution of a formal retainer.").  Accordingly,

documents 24–25, 28–29 on the Revised Privilege Log are shielded by the attorney-client

privilege.

Documents 26 and 27, while post-dating August 20, 2011, concern an internal BGR

telephone conference about the retention of FZWZ.  These e-mails do not reflect legal advice

from FZWZ regarding the subpoenas.  Nor is there any other suggestion that they relate to

obtaining legal advice.  Instead, they relate to fee arrangements.  Consequently, these e-mails are

not protected by the attorney-client privilege.  <u>Priest</u>, 51 N.Y.2d at 69 ("The fee arrangements between attorney and client do not ordinarily constitute a confidential communication and, thus, are not privileged in the usual case.") (citing cases).

The remaining e-mails to which BGR asserts attorney-client privilege post-date the September 6, 2011 retention agreement and an <u>in camera</u> review reveals that they are confidential communications between representatives of FZWZ and BGR concerning BGR's obligations to respond to subpoenas.  Accordingly, BGR has established attorney-client privilege for documents 31–34, 36–38, 40, 46–49 on the Revised Privilege Log as well.

In sum, the attorney-client privilege arising from FZWZ's representation of BGR shields documents 24–25, 28–29, 31–34, 36–38, 40, and 46–49 on the Revised Privilege Log from disclosure.

B.      <u>Attorney-Client Privilege and the Agency Exception</u>

Egiazaryan asserts attorney-client privilege over a number of documents that were shared with BGR: specifically, documents 1–3, 7–9, 11–12, 17, 19–21, 30, 35, 39, 41–42, and 50 on the Revised Privilege Log.  Zalmayev contends that any attorney-client privilege that attached to these communications was waived.  <u>See</u> Def. Mem. at 18–20; Reply at 3–4.  Egiazaryan argues that the privilege was not waived because BGR was his "agent."  <u>See</u> Opp. at 8–11.  For purposes of this argument, we assume <u>arguendo</u> that in the absence of these e-mails having been revealed to BGR, they otherwise would have been shielded by attorney-client privilege.

"Generally, communications made between a defendant and counsel in the known presence of a third party are not privileged."  <u>People v. Osorio</u>, 75 N.Y.2d 80, 84 (1989) (citing cases).  Rather, "[d]isclosure of attorney-client communication to a third party or communications with an attorney in the presence of a third party, not an agent or employee of

counsel, vitiates the confidentiality required for asserting the privilege." <u>Delta Fin. Corp. v. Morrison</u>, 13 Misc. 3d 441, 444–45 (Sup. Ct. 2006).  An exception exists where "communications [are] made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication."  <u>Osorio</u>, 75 N.Y.2d at 84.  While the scope of this exception "is not to be defined by a third party's employment or function," <u>id.</u>, the party asserting the agency exception must show: "(1) . . . a reasonable expectation of confidentiality under the circumstances, and (2) [that] disclosure to the third party was necessary for the client to obtain informed legal advice."  <u>Don v. Singer</u>, 2008 WL 2229743, at *5 (N.Y. Sup. Ct. 2008) (internal citations and quotation marks omitted); <u>accord</u> <u>Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.</u>, 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999).  "[T]he 'necessity' element means more than just useful and convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications."  <u>Nat'l Educ. Training Grp., Inc.</u>, 1999 WL 378337, at *4 (citing cases); <u>accord</u> <u>Don</u>, 2008 WL 2229743, at *5.  "Thus, where the third party's presence is merely useful but not necessary, the privilege is lost."  <u>Allied Irish Banks, P.L.C. v. Bank of Am., N.A.</u>, 240 F.R.D. 96, 104 (S.D.N.Y. 2007) (citation and internal quotation marks omitted).

Egiazaryan's assertion of attorney-client privilege must be denied as to attorney-client communications shared with BGR because he has failed to establish that the privilege was not waived.  Specifically, he has failed to show that BGR's participation in discussions regarding his legal strategy was "nearly indispensable" or otherwise necessary to facilitate his communications with his attorneys.  While BGR was retained to, among other things, "[d]evelop a set of key messages and compelling narrative in support of the legal cases," BGR Agreement at 1, and "participate[] in the development of legal strategy," Cohen Decl ¶ 4, Egiazaryan has not shown

that BGR's involvement was necessary to facilitate communications <u>between himself and his counsel</u>, as in the case of a translator or an accountant clarifying communications between an attorney and client, <u>see</u> <u>Osorio</u>, 75 N.Y.2d at 84 (citing <u>United States v. Kovel</u>, 296 F.2d 918, 921–22 (2d Cir. 1961)).  Egiazaryan's argument that BGR was "contributing legal recommendations, providing next step action plans, and weighing strategic considerations in order to promote Mr. Egiazaryan's overall legal goals," Opp. at 8, does nothing to fulfill the governing standard.  The same is true of his assertions that BGR "participated in the development of legal strategy," Cohen Decl ¶ 4; discussed "legal options" with Egiazaryan's attorneys, Opp. at 8; or gave "advice in determining the benefits of taking legal action," <u>id.</u>  These statements provide no evidence that, for example, BGR "improve[d] the comprehension of the communications between attorney and client."  <u>Delta Fin. Corp.</u>, 13 Misc. 3d at 447 (quoting <u>United States v. Ackert</u>, 169 F.3d 136, 139 (2d Cir. 1999)).  Obviously, BGR was not competent to act as Egiazaryan's attorney and the mere fact that it was inserted into the legal decision-making process does nothing to explain why BGR's involvement was necessary to Egiazaryan's obtaining legal advice from his actual attorneys.  Instead, it simply demonstrates the circumstances under which the waiver occurred.

Case law makes clear that "[a] media campaign is not a litigation strategy."  <u>Haugh v. Schroder Inv. Mgmt. N. Am. Inc.</u>, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("Some attorneys may feel it is desirable at times to conduct a media campaign, but that does not transform their coordination of a campaign into legal advice.").  Thus, to the extent BGR was performing public relations functions, its participation in attorney-client communications resulted in a waiver — even if those functions were related to the various litigations in which Egiazaryan was embroiled.

14

Egiazaryan cites to In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003) and In re Copper Market Antitrust Litigation, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) for the proposition that "privileged agents may include public relations professionals." Opp. at 9. But these cases are distinguishable on several grounds. First, because they were not diversity cases, each applied the principles of federal common law rather than New York State privilege law. See In re Grand Jury Subpoenas Dated Mar. 24, 2003, 265 F. Supp. 2d at 324; In re Copper Mkt. Antitrust Litig., 200 F.R.D. at 217. Egiazaryan cites to no case applying New York law that interprets the agency exception to include communications with public relations representatives. Nor is the Court aware of any such case. Rather, courts applying the agency exception under New York law have required that the third party "be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." Nat'l Educ. Training Grp., Inc., 1999 WL 378337, at *4. Indeed, one court rejected the applicability of In re Grand Jury Subpoenas Dated March 24, 2003, characterizing New York's agency exception as a "conservative approach" that "recognize[s] the [doctrine] only in narrow circumstances in which the non-lawyer's services are absolutely necessary to effectuate the lawyer's legal services." In re N.Y. Renu with Moistureloc Prod. Liab. Litig., 2008 WL 2338552, at *9 (D.S.C. May 8, 2008) (citing People v. Edney, 39 N.Y.2d 620 (1976)); accord NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 141 (N.D.N.Y. 2007) (agency exception inapplicable under New York law to communications with a public relations firm "providing ordinary public relations advice and assist[ing] counsel in assessing the probable public reaction to various strategic alternatives") (citation and internal quotation marks omitted); Nance v. Thompson Med. Co., 173 F.R.D. 178, 182–83 (E.D. Tex. 1997) (waiver of attorney-client privilege occurred under New York law when otherwise privileged documents were shared with

15

a public relations firm).

Both cases are also distinguishable on their facts.  In re Grand Jury Subpoenas Dated March 24, 2003 involved a public relations firm hired by lawyers to assist them in generating favorable publicity during a high profile grand jury investigation in order to lessen pressure on the prosecutors to secure an indictment.  See 265 F. Supp. 2d at 323–24.  In other words, the public relations function being performed  – characterized as a "lawyer's public advocacy on behalf of the client," id. at 329 – was necessary to achieve a circumscribed litigation goal: specifically, influencing the decision whether or not to indict.  In analyzing the governing legal principles, the court concluded that, even under these circumstances, the assertion of the privilege could be justified only if the communications involving the public relations consultants would either promote "observance of laws" or "the administration of justice."  See id. at 329–30. It could not be shown that the activities of the public relations firm promoted observance of laws because the conduct about which the consultations were made had already occurred.  Id.  By contrast, the court found that the "administration of justice" was promoted because the public relations activities involved a criminal prosecution and the public relations firm was needed to affect the media's influence on the United States Attorney's Office as prosecutor.  Id. at 330.

Here, Egiazaryan has not shown that the activities BGR was performing were part of FZWZ's efforts to conduct "public advocacy on behalf of" Egiazaryan in relation to this lawsuit. Indeed, BGR was retained before this litigation began.  Moreover, it was not called upon to perform a specific litigation task that the attorneys needed to accomplish in order to advance their litigation goals – let alone a task that could be characterized as relating to the "administration of justice."  Rather, it was involved in a wide variety of public relations activities aimed at burnishing Egiazaryan's image.  Thus, the reasoning of In re Grand Jury

Subpoenas Dated March 24, 2003 is inapplicable.  See also Ravenell v. Avis Budget Grp., Inc.,

2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) ("The reach of [In re Grand Jury Subpoenas

Dated March 24, 2003 is] limited by its context: the Court couched its finding in the narrow

scenario of public relations consultants assisting lawyers during a high profile grand jury

investigation."); In re Chevron Corp., 749 F. Supp. 2d 170, 184 n.64 (S.D.N.Y.) (interpreting

case as having a "very narrow holding" and applicable only in "cases such as . . . high profile

grand jury investigation[s]"), aff'd, 409 F. App'x 393 (2d Cir. 2010).  Other federal cases have

reached similar results.  See Haugh, 2003 WL 21998674, at *3 ("Plaintiff has not shown that

[the public relations specialist] performed anything other than standard public relations

services . . . [and] has not shown that her communications . . . were necessary so that [the

lawyer] could provide [plaintiff] with legal advice."); Calvin Klein Trademark Trust v. Wachner,

198 F.R.D. 53, 55 (S.D.N.Y. 2000) (agency exception inapplicable to public relations

communications that "simply serve[] to assist counsel in assessing the probable public reaction

to various strategic alternatives, as opposed to enabling counsel to understand aspects of the

client's own communications that could not otherwise be appreciated in the rendering of legal

advice").

     In re Copper Market Antitrust Litigation is also distinguishable.  In that case, a

corporation retained a "crisis management" firm in connection with ongoing litigation.  See 200

F.R.D. at 215.  The court accepted the contention that the public relations firm served as the

"functional equivalent" of corporate employees, including having "authority to make decisions"

and statements on the corporation's behalf, and that it was responsible for "seeking and receiving

legal advice from the corporation's counsel."  Id. at 216.  Here, there is no corporation involved

and no facts have been presented to suggest that BGR was functioning as the entity that gave

direction to FZWZ in lieu of Egiazaryan doing so.

In sum, any attorney-client privilege arising from Egiazaryan's relationship with his attorneys that may have attached to these documents was waived through their disclosure to BGR because there has been no showing that BGR's involvement was necessary to facilitate communications between FZWZ and Egiazaryan.

   C.    Attorney-Client Privilege and the Common Interest Doctrine

Egiazaryan asserts attorney-client privilege as to documents 9, 14–15, 19–20, 24–42, and 44–50 on the Revised Privilege Log — consisting of communications among BGR and Egiazaryan's counsel — based on the "common interest" doctrine.  Opp. at 12–13.  Because we have already found privilege with respect to a number of these documents, see section II.A, the only documents actually at issue are 9, 14–15, 19–20, 26–27, 30, 35, 39, 41–42, 44–45, and 50.

As an initial matter, we note that Egiazaryan argues that "FZWZ" and BGR share a common legal interest.  Opp. at 12–13.  But the common interest doctrine does not call for the consideration of an attorney's interest.  Instead, it evaluates the interests of parties and/or non-parties — that is, clients.  See, e.g., 330 Acquisition Co., LLC v. Regency Sav. Bank, F.S.B., 12 A.D.3d 214, 214 (1st Dep't 2004).  Accordingly, the Court construes Egiazaryan's argument as contending that Egiazaryan — not FZWZ — shared a common interest with BGR under the doctrine.

New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance.  See, e.g., U.S. Bank N.A. v. APP Int'l Fin. Co., 33 A.D.3d 430, 431 (1st Dep't 2006); Stenovich v. Wachtell, Lipton, Rosen & Katz, 195 Misc. 2d 99, 106–08 (Sup. Ct. 2003).  Therefore, the Court looks not only to New York but also to federal case law to determine the applicability of the rule.  See Allied Irish Banks, P.L.C., 252 F.R.D. at

18

170.

The common interest rule is not a separate privilege but "'an extension of the attorney client privilege.'"  United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (quoting Waller v. Fin. Corp. of Am., 828 F.2d 579, 583 n.7 (9th Cir. 1987)).  The rule

> serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. . . . Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected. . . .  The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter, . . . and it is therefore unnecessary . . . . for the attorney representing the communicating party to be present when the communication is made to the other party's attorney.

Id. at 243–44 (citations and internal quotation marks omitted); accord Am. Re-Ins. Co. v. U.S. Fid. & Guar. Co., 40 A.D.3d 486, 491 (1st Dep't 2007).

In order for the common interest rule to apply: "(1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought [must have been] designed to further that interest."  Allied Irish Banks, P.L.C., 252 F.R.D. at 171; accord HSH Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 71 (S.D.N.Y. 2009); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 471 (S.D.N.Y. 2003).  Thus, a "personal or business oriented" interest shared with another party is insufficient.  Yemini v. Goldberg, 12 Misc. 3d 1141, 1144 (Sup. Ct. 2006).  "The clearest indication of common interest is dual representation" in a particular litigation.  Am. Re-Ins. Co., 40 A.D.3d at 491 (citing cases).  "Thus, if A and B share a common interest, the disclosure by A to B of an otherwise privileged communication does not waive the privilege."  Id. at 494.  The doctrine "also extends to a situation where there is a joint defense or strategy, but separate representation."  Id. at 491.  Thus, communications are protected where

19

there is a disclosure by A to the attorney representing B and vice-versa.  See Schwimmer, 892

F.2d at 243 (doctrine protects "communications passing from one party to the attorney for

another party"); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 446

(S.D.N.Y. 1995) ("[T]he doctrine applies where parties are represented by separate counsel but

engage in a common legal enterprise.").  In both these situations, the doctrine "operates to

protect privileges such as the attorney-client privilege that otherwise would be waived by

disclosure."  Am. Re-Ins. Co., 40 A.D.3d at 494 (citation omitted).

The common interest rule does not apply merely because two parties share the same

attorney or because one party has an interest in a litigation involving another party.  Rather

"[t]here must be a substantial showing by parties attempting to invoke the protections of the

privilege of the need for a common defense as opposed to the mere existence of a common

problem."  Finkelman v. Klaus, 2007 WL 4303538, at *4 (N.Y. Sup. Ct. Nov. 28, 2007)

(citations, internal quotation marks, and bracketing omitted).  While some case law has

suggested there must be "identical legal interests" among the parties asserting the common

interest, see Gulf Islands Leasing, Inc., 215 F.R.D. at 471 (citing cases), more recent cases have

held that the parties need not have "total identity of interest" as long as "a limited common

purpose necessitates disclosure to certain parties," Eugenia VI Venture Holdings, Ltd. v. Chabra,

2006 WL 1096825, at *1 (S.D.N.Y. Apr. 25, 2006) (quoting In re Megan-Racine Assocs., Inc.,

189 B.R. 562, 571–72 (Bankr. N.D.N.Y. 1995)); see also GUS Consulting GmbH v. Chadbourne

& Parke LLP, 20 Misc. 3d 539, 542 (Sup. Ct. 2008) (common interest rule applies "where an

'interlocking relationship' or a 'limited common purpose' necessitates disclosure to certain

parties").

Here, assuming arguendo that the attorney-client privilege would otherwise protect the e-

20

mails at issue, Egiazaryan offers no proof of a common interest between himself and BGR that would satisfy the doctrine.  Egiazaryan argues that he and BGR had a common interest in "protecting [his] legal interests" and "formulating a legal strategy on [his] behalf . . . ."  Opp. at 13.  But the doctrine does not contemplate that an agent's desire for its principal to win a lawsuit is an interest sufficient to prevent waiver of privilege inasmuch as it does not reflect a common defense or legal strategy.  See, e.g., Sokol v. Wyeth, Inc., 2008 WL 3166662, at *8 (S.D.N.Y. Aug. 4, 2008) (common interest exception inapplicable where a third party "consultant" was retained to develop a legal strategy for plaintiff's case that was irrelevant to consultant's independent lawsuit).  BGR is not a party to any of Egiazaryan's various lawsuits and thus has no need to develop a common litigation strategy in defending those lawsuits.  Indeed, it makes no suggestion that it had a need to do so.[4]

Because none of the e-mails at issue were "made in the course of formulating a common legal strategy," Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York, 284 F.R.D. 132, 140 (S.D.N.Y. 2012) (quoting Sokol, 2008 WL 3166662, at *5), between BGR and Egiazaryan, the common interest exception is inapplicable.  Therefore, whatever attorney-client privilege that would otherwise have attached to these e-mails was waived when Egiazaryan shared them with BGR.

D.    Work Product Doctrine

Egiazaryan seeks work product protection for documents 1–18, 21–42, 44–45, and

---

[4]  Egiazaryan also argues that he and BGR shared "a common legal interest in orchestrating BGR's document production as a subpoenaed non-party" and "formulating their document production strategy."  Opp. at 12, 13.  But the communications to FZWZ that relate to the subpoena from Zalmayev to BGR are already protected, see section II.A, and thus there is no need to invoke the common interest doctrine for those documents.

47–50.  Opp. at 13–15.  In light of our ruling upholding some claims of attorney-client privilege, see section II.A, the only documents at issue are 1–18, 21–23, 26–27, 30, 35, 39, 41–42, 44–45, and 50.

While state law governs the question of attorney-client privilege in a diversity action, federal law governs the application of the work product doctrine.  Allied Irish Banks, P.L.C., 252 F.R.D. at 173; accord Danza v. Costco Wholesale Corp., 2012 WL 832289, at *1 (E.D.N.Y. Mar. 12, 2012) (citing cases).  The work product doctrine is codified in Fed. R. Civ. P. 26(b)(3), which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party makes a showing of substantial need and lack of undue hardship.  The purpose of the work product rule is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510–11 (1947)).  The work product doctrine protects materials prepared not only by attorneys but also by their agents.  Costabile v. Westchester, N.Y., 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (citing cases).  Under Rule 26(b)(3), the party asserting work product protection "bears the burden of establishing its applicability to the case at hand."  In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (citing cases).  That party must show "that material it seeks to protect (1) was prepared in anticipation of litigation and (2) was prepared by or for a party, or by his representative."  Koch v. Greenberg, 2012 WL 1449186, at *5 (S.D.N.Y. Apr. 13, 2012) (citing In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d at 383–84).

Because the protection arises only for materials "prepared in anticipation of litigation," it

22

is not enough to show merely that the material was prepared at the behest of a lawyer or was provided to a lawyer. Rather, the materials must result from the conduct of "investigative or analytical tasks to aid counsel in preparing for litigation." Costabile, 254 F.R.D. at 164 (citation omitted). Thus, "'public relations advice, even if it bears on anticipated litigation, [generally] falls outside the ambit' of the work product doctrine." Gucci America, Inc. v. Guess?, Inc., 271 F.R.D. 58, 78 (S.D.N.Y. 2010) (quoting Calvin Klein Trademark Trust, 198 F.R.D. at 55). Additionally, the work product doctrine does not extend to public relations activities even if they bear on the litigation strategy because "the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally." Calvin Klein Trademark Trust, 198 F.R.D. at 55; accord Chevron Corp. v. Salazar, 2011 WL 3880896, at *1 (S.D.N.Y. Sept. 1, 2011) (public relations consultant's analysis of the public reaction to a court judgment is not protected as work product); Gucci Am., Inc., 271 F.R.D. at 78 (work product doctrine was inapplicable to a "publicity strategy [that] was treated as a business concern"); N.Y. Times Co. v. U.S. Dep't of Defense, 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007) ("talking points" document was not work product under an exemption pursuant to the Freedom of Information Act because it "seem[ed] to have been drafted for public relations purposes"); de Espana v. Am. Bureau of Shipping, 2005 WL 3455782, at *3 (S.D.N.Y. Dec. 14, 2005) (notes from a meeting that "concern[ed] press and public relations strategies" was not work product because it would have been prepared "in the normal course of business without the threat of litigation").

Egiazaryan's papers provide little explanation of why the e-mails exchanged with BGR related to an attorney's efforts to prepare for litigation as opposed to BGR's efforts to implement Egiazaryan's public relations campaign — a campaign that was certainly not limited to assisting

attorneys in preparing for litigation.  See BGR Agreement at 1.  Instead, Egiazaryan conclusorily

states that the materials "contain FZWZ's legal strategy and attorney impressions," and that

because of this, they are necessarily protected.  Opp. at 14.  It was because of this lack of detail

that the Court directed the in camera review of the e-mails at issue.  Upon reviewing these e-

mails, the Court has identified a number that on their face relate solely to public relations

strategy and contain no discussion of legal strategy or attorney opinions or impressions:

specifically, documents 1, 3, 5–13, 17–18, 21–23, 35, 39, 44–45, and 50 on the Revised Privilege

Log.

　　　　For example, a number of the e-mails concern BGR's efforts to lobby Congress.

See Revised Privilege Log Document ## 6–12.  Materials prepared in furtherance of lobbying

activities, even when conducted by a lawyer, are generally unprotected under the work product

doctrine.  See In re Grand Jury Subpoenas dated Mar. 9, 2001, 179 F. Supp. 2d 270, 285

(S.D.N.Y. 2001); P. & B. Marina v. Logrande, 136 F.R.D. 50, 59 (E.D.N.Y. 1991), aff'd, 983

F.2d 1047 (2d Cir. 1992).  Some e-mails show the public relations staff gathering facts about

Egiazaryan's situation.  See Revised Privilege Log Document ## 1, 35.  Others relate to a

proposed public relations strategy for Egiazaryan to follow.  See id. ## 3, 5, 18, 21–23.  A

number relate to the efforts to bolster Egiazaryan's image, see id. ## 39, 44–45, and/or the actual

implementation of a public relations strategy, see id. ## 13, 17, 50.  There is no evidence that

any of these e-mails were generated specifically to assist an attorney in preparing for litigation of

this case.  Accordingly, Egiazaryan has not met his burden of showing that these documents are

within the scope of Fed. R. Civ. P. 26(b)(3).

　　　　On the other hand, it is clear from the content of the remaining e-mails that they were

prepared for purposes of litigation and therefore are within the scope of Fed. R. Civ. P. 26(b)(3).

See Haugh, 2003 WL 21998674, at *4 (documents drafted by public relations consultants which had an "impact on litigation strategy" and would not have been drafted in similar form in the absence of the litigation are protected as work product). Specifically, documents 2, 4, 14–16, 30, and 41–42 from BGR's Revised Privilege Log contain sufficient information to cause the Court to conclude that they were prepared for purposes of litigation.

A finding that a document was prepared in anticipation of litigation does not end the inquiry, however. The proponent of the protection must also show that work product has not been waived. See Allied Irish Banks, P.L.C., 240 F.R.D. at 105 (citing cases). As a general rule, work product is waived only "when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary." Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, 2008 WL 4452134, at *10 (S.D.N.Y. Oct. 2, 2008) (citations and internal quotation marks omitted); accord In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993). No waiver occurs where work product is disclosed to public relations consultants who intend to keep the information in confidence. In re Refco Sec. Litig., 280 F.R.D. 102, 105 (S.D.N.Y. 2011); Calvin Klein Trademark Trust, 198 F.R.D. at 55 (work product protection is not waived "simply because the attorney provides the [material] to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence"); cf. NXIVM Corp., 241 F.R.D. at 142 (finding waiver where document was given to a public relations firm in order to disseminate its contents to the public rather than to assist lawyers in strategizing over litigation); . Here, Egiazaryan had an expectation that BGR would maintain the work product in confidence, as BGR agreed to a confidentiality clause in its retainer agreement. See BGR Agreement at 3. Accordingly, Egiazaryan has carried his burden of showing that no waiver occurred by sharing work product with BGR.

25

While the protections accorded to documents prepared in anticipation of litigation may be overcome through a showing of "substantial need for the document and an inability to obtain its contents elsewhere without undue hardship," Adlman, 134 F.3d at 1203, Zalmayev makes no such attempt here.  Nor does the Court's review of the documents suggest any substantial need.

Finally, BGR asserts work product protection to e-mails related to its obligations under the subpoenas.  See Opp. at 13 (asserting work product to Revised Privilege Log Document ## 24–29, 31–34, 36–38, 40, 46–49).  In light of the Court's prior rulings permitting the withholding of documents based on attorney-client privilege, the only documents at issue within this category are documents 26 and 27.  There is no suggestion that these documents were prepared at the direction of FZWZ in its capacity as Egiazaryan's law firm.  Rather, they relate to BGR in its capacity as a non-party.  Because Fed. R. Civ. P. 26(b)(3) does not apply to non-parties, see Ricoh Co. v. Aeroflex Inc., 219 F.R.D. 66, 69 (S.D.N.Y. 2003) (citing cases), no protection pursuant to Rule 26 attaches to these documents.  Inasmuch as BGR has not argued that the common law work product doctrine otherwise shields these document from disclosure, they must be produced.

In sum, Egiazaryan has established that documents 2, 4, 14–16, 30, and 41–42 on the Revised Privilege Log are protected by the work product doctrine and Zalmayev has made no showing of substantial need or undue hardship to overcome the doctrine's applicability.  However, documents 1, 3, 5–13, 17–18, 21–23, 26–27, 35, 39, 44–45, and 50 on the Revised Privilege Log are not protected.

IV.   CONCLUSION

For the foregoing reasons, Zalmayev's motion to compel (Docket # 195) is granted in part and denied in part.  Egiazaryan shall produce documents 1, 3, 5–13, 17–23, 26–27, 35, 39,

43–45, and 50 from the Revised Privilege Log.[5] Zalmayev's motion is denied as to the remainder of the documents inasmuch as they are shielded by either the attorney-client privilege or work product protection.

SO ORDERED.

Dated: March 8, 2013
         New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[5] Egiazaryan has not adduced any argument as to why document # 43 should be protected.