UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ASHOT EGIAZARYAN,                                 :
                                                  :
                        Plaintiff,                :
                                                  :
            -against-                             :   11 CV 02670 (PKC)(GWG)
                                                  :
PETER ZALMAYEV,                                   :
                                                  :
                        Defendant.                :
-------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
<u>DISMISSING DEFENDANT'S ANTI-SLAPP COUNTERCLAIM</u>**


**FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York  10006
(212) 412-9500**

*Attorneys for Plaintiff Ashot Egiazaryan*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

    Mr. Zalmayev Is Not Eligible For SLAPP Suit Protections ................................. 1

    Mr. Egiazaryan Had A Substantial
    Basis To Bring A Defamation Action .................................................................... 2

    There Is No Evidence That The Intention Of The Defamation
    Action Was To Maliciously Inhibit Defendant's Free Speech Rights .................... 3

    This Court Should Exercise Its
    Discretion And Not Award Damages .................................................................... 3

FACTS ............................................................................................................... 4

    The Malicious Smear Campaign Against Mr. Egiazaryan
    Gave Rise To Plaintiff's Lawsuit Against Mr. Zalmayev ...................................... 4

    The Pleadings .................................................................................................... 11

    Judge Castel's December 7, 2011
    Order On The Parties' Motions to Dismiss .......................................................... 12

    Judge Castel's July 30, 2012 Order
    Dismissing Mr. Egiazaryan's Amended Complaint ............................................. 14

ARGUMENT ..................................................................................................... 15

    POINT I     MR. EGIAZRYAN IS ENTITLED TO SUMMARY JUDGMENT
              ON DEFENDANT'S ANTI-SLAPP COUNTERCLAIM BECAUSE
              MR. EGIAZARYAN'S LAWSUIT WAS NOT A SLAPP SUIT ............... 15

        A.     Mr. Egiazaryan's Alleged Filing Of A Highly Confidential
             And Sensitive Application For Asylum Does Not Make Him
             A "Public Applicant Or Permitee" Within The Meaning
             Of New York's Anti-SLAPP Statute .................................................... 16

        B.     Because He Did Not *Directly* And *Publicly* Challenge
             Mr. Egiazaryan's Alleged Application For Asylum, Defendant
             Did Not Engage In "Public Petition And Participation"
             Within The Meaning Of New York's Anti-SLAPP Statute ..................... 20

             1.     Mr. Zalmayev's Publications in the <u>Jewish Journal</u>
                  And <u>Moscow Times</u> Cannot be Construed as Direct
                  Challenges to Mr. Egiazaryan's Alleged Asylum Application ......... 22

2.      Neither the Ponomarev and Alexeyeva Letters
        Nor the Freedom House Letters can be
        Construed as Direct and Public Challenges
        To Mr. Egiazaryan's Alleged Asylum Application ...................................24

POINT II      MR. EGIAZARYAN IS ENTITLED TO SUMMARY
              JUDGMENT ON DEFENDANT'S ANTI-SLAPP
              COUNTERCLAIM BECAUSE MR. EGIAZARYAN'S
              LAWSUIT HAD A SUBSTANTIAL BASIS IN FACT AND LAW .........28

1.      Mr. Egiazaryan had a Substantial Basis to Conclude
        That Mr. Zalmayev's Statement that Mr. Egiazaryan
        Has a "well-established record of anti-Semitism and
        hate speech" was a Defamatory Statement of Fact ............................31

2.      Mr. Zalmayev's Statement was "Regarding the Plaintiff" .................34

3.      Mr. Zalmayev's Statement was Published to a Third Party..............34

4.      Mr. Zalmayev's Statement is False..................................................36

5.      Mr. Egiazaryan had a Substantial Basis to Conclude that
        Mr. Zalmayev Acted Intentionally and/or with a Reckless
        Disregard for the Truth in Publishing the False Statement................36

6.      Mr. Zalmayev's Statement Caused Injury To Mr. Egiazaryan.........39

7.      Mr. Zalmayev's Statement was Not Protected by Any Privilege ......40

POINT III     DEFENDANT CANNOT RECOVER ANY DAMAGES
              UNDER NEW YORK'S ANTI-SLAPP STATUTE ...................................40

A.      Mr. Egiazaryan Did Not Commence Or Continue His Lawsuit
        For The Purpose Of Harassing, Intimidating, Punishing Or
        Otherwise Maliciously Inhibiting Mr. Zalmayev's
        Free Exercise Of Speech, Petition Or Association Rights.................41

B.      Even If Mr. Zalmayev Could Be Awarded Damages Under
        The Anti-SLAPP Statute, The Court Should Exercise Its
        Discretion To Decline To Award Any Damages To Defendant.......44

        1.      Mr. Zalmayev's Unclean Hands Should Preclude an Award
                Of Damages Pursuant to New York's Anti-SLAPP Statute ....44

        2.      Any Attorneys' Fees Awarded to Mr. Zalmayev Pursuant to the
                Anti-SLAPP Statute Would Constitute an Improper Windfall................48

CONCLUSION..................................................................................................50

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*600 W. 115th St. Corp. v. Von Gutfeld*,
   80 N.Y.2d 130, 589 N.Y.S.2d 825 (1992)..........................................................19

*825 E. 57th St. Inc. v. Save-A-Pet Animal Rescue & Adoption Ctr., Inc.*,
   No. 09694-2010, 2010 N.Y. Misc. Lexis 3977
   (Sup. Ct. Suffolk Co. Aug. 16, 2010) ..........................................................21, 26

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001).........................................................................33

*Brady v. Town of Colchester*,
   863 F.2d 205 (2d Cir. 1988).........................................................................43

*Celle v. Filipino Reporter Enters. Inc.*,
   209 F.3d 163 (2d Cir. 2000)....................................................................37, 38

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S.Ct. 2548 (1986).............................................................43

*Chandok v. Klessig*,
   632 F.3d 803 (2d Cir. 2011)..............................................................16, 19, 21

*Clemente v. Impastato*,
   290 A.D.2d 864, 736 N.Y.S.2d 281 (3d Dep't 2002) .......................................29, 30

*Cooper v. Lipschutz*,
   3/24/2004 N.Y.L.J. 17, (col. 1) (N.Y. Co. Civ. Ct. 2004) .....................................21

*Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*,
   246 F.3d 142 (2d Cir. 2001)....................................................................48, 49

*DiLaura v. Power Auth. of the State of N.Y.*,
   982 F.2d 73 (2d Cir. 1992) .........................................................................16

*Dillon v. City of N.Y.*,
   704 N.Y.S.2d 1 (1st Dep't 1999) ...................................................................33

*Entm't Partners Group, Inc. v. Davis*,
   198 A.D.2d 63, 603 N.Y.S.2d 439 (1st Dep't 1993) .............................................21

*Foley v. CBS Broad., Inc.*,
   No. 108403/2005, 2006 WL 6619947 (Sup. Ct. N.Y. Co. Sept. 13, 2006) ...................21

*Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen*,
  313 F. Supp. 2d 339 (S.D.N.Y. 2004) ..................................................... 28, 31, 44

*Gross v. N.Y. Times Co.*,
  82 N.Y.2d 146, 603 N.Y.S.2d 813 (1993)............................................................ 32

*Guccione v. Flynt*,
  618 F. Supp. 164 (S.D.N.Y. 1985) .................................................................... 38

*Guerrero v. Carva*,
  10 A.D.3d 105, 779 N.Y.S.2d 12 (1st Dep't 2004)............................ 15, 21, 23, 24, 27

*Gurary v. Nu-Tech Bio-Med, Inc.*,
  303 F.3d 212 (2d Cir. 2002)............................................................................ 31

*Harfenes v. Sea Gate Ass'n, Inc.*,
  167 Misc. 2d 647, 647 N.Y.S.2d 329 (Sup. Ct. N.Y. Co. 1995) ...................... 1, 19, 21

*Hariri v. Amper*,
  51 A.D.3d 146, 854 N.Y.S.2d 126 (1st Dep't 2008) ......................................... 15, 21

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657, 109 S. Ct. 2678 (1989)........................................................... 37, 38

*Hayne v. The Innocence Project*,
  No. 09-CV-218, 2011 WL 198128 (S.D. Miss. Jan. 20, 2011)................................. 38

*Herbert v. Lando*,
  441 U.S. 153, 99 S. Ct.1635 (1979) ................................................................... 37

*Howard v. Gleason Corp.*,
  901 F.2d 1154 (2d Cir. 1990) ........................................................................... 42

*Immuno AG. v. Moor-Jankowski*,
  77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991)........................................................... 32

*Lopez v. Univision Commc'ns Inc.*,
  45 F. Supp. 2d 348 (S.D.N.Y. 1999) .................................................................. 36

*Miness v. Alter*,
  262 A.D.2d 374, 691 N.Y.S.2d 171 (2d Dep't 1999) ............................................ 44

*Moore v. Vislosky*,
  240 Fed. Appx. 457 (3d Cir. 2007) .................................................................... 37

*In re NTL, Inc. Sec. Litig.*,
  244 F.R.D. 179 (S.D.N.Y. 2007)........................................................................ 47

*Rosenblatt v. Baer,*
    383 U.S. 75, 86 S. Ct. 669 (1966) ………………………………………………… 42

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC,*
    36 Misc. 3d 660, 948 N.Y.S.2d 895 (Sup. Ct. N.Y. Co. 2012) ……………………… 24

*Stern v. Cosby,*
    645 F. Supp. 2d 258 (S.D.N.Y. 2009) ……………………………………………… 37

*Stokes v. CBS Inc.,*
    25 F. Supp. 2d 992 (D. Minn. 1998) ………………………………………………… 38

*Video-Cinema Films, Inc. v. Cable News Network, Inc.,*
    No. 98 Civ. 7128, 2004 WL 213032 (S.D.N.Y. Feb. 3, 2004) ……………………… 49

*West Branch Conservation Ass'n, Inc. v. Planning Bd. of Town of Clarkson,*
    222 A.D.2d 513, 636 N.Y.S.2d 61 (2d Dep't 1995) ………………………………… 45

*Westerbeke Corp. v. Daihatsu Motor Co.,*
    304 F.3d 200 (2d Cir. 2002) ………………………………………………………… 16

*Williams v. Johnson & Johnson,*
    50 F.R.D. 31 (S.D.N.Y. 1970) ……………………………………………………… 43

*Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*
    *by its Bd. of Trs. of the Vill. of New Hempstead,*
    98 F. Supp. 2d 347 (S.D.N.Y. 2000) ………………………………………………… 21

*Zubulake v. UBS Warburg LLC,*
    217 F.R.D. 309 (S.D.N.Y. 2003) …………………………………………………...47

## <u>Statutes</u>

8 C.F.R. §§ 208.6(a)-(b) …………………………………………………………………… 17

22 U.S.C. § 611 *et seq.* ……………………………………………………………………48

N.Y. Civil Rights Law § 70-a ………………………………………………… 12, 15, 21, 45

N.Y. Civil Rights Law § 70-a(1) ………………………………………………………… 15, 45

N.Y. Civil Rights Law § 70-a(1)(a) ……………………………………………………… 28

N.Y. Civil Rights Law § 70-a(1)(a)-(c) …………………………………………………… 41

N.Y. Civil Rights Law § 70-a(1)(b)-(c) ………………………………………………… 41, 44

N.Y. Civil Rights Law § 76-a ………………………………………………… 12, 15, 21, 22

N.Y. Civil Rights Law § 76-a(1)(a) ……………………………………………………… 15, 20

N.Y. Civil Rights Law § 76-a(1)(b)........................................................................................ 15, 16

## PRELIMINARY STATEMENT

Under New York's anti-SLAPP law, a defendant in a defamation action involving "public petition and participation," by a "public applicant or permitee," which was "commenced or continued without a substantial basis in fact and law," and which was intended to maliciously inhibit free speech rights, may -- but only in the court's discretion -- recover damages. Plaintiff Ashot Egiazaryan is entitled to judgment as a matter of law dismissing defendant Peter Zalmayev's anti-SLAPP counterclaim because he cannot make any of these showings. Dismissal of Mr. Zalmayev's anti-SLAPP counterclaim will result in the complete disposition of this action, because Mr. Egiazaryan's underlying lawsuit and Mr. Zalmayev's counterclaim for defamation have already been dismissed.

### Mr. Zalmayev Is Not Eligible For SLAPP Suit Protections

The anti-SLAPP law, which is in derogation of the common law and must be strictly construed, applies to a very narrow set of circumstances. The law was "specifically designed to *protect those citizens who*, usually before a government agency, *publicly challenge* applications . . . in a *public* forum with respect to issues of *public* concern." *Harfenes v. Sea Gate Ass'n, Inc.*, 167 Misc. 2d 647, 650-51, 647 N.Y.S.2d 329, 331 (Sup. Ct. N.Y. Co. 1995) (emphasis added). Mr. Zalmayev is not such a citizen. His activities against Mr. Egiazaryan were not public; they were clandestine operations performed as an agent of an undisclosed foreign principal. And his actions did not publically challenge an application, because the communications to public officials did not even bear Mr. Zalmayev's name; rather, they were signed by others who were not informed that they were unwitting participants in a paid-for advocacy campaign financed by a Russian billionaire bearing malice against Mr. Egiazaryan. While Mr. Egiazaryan neither confirms nor denies that he has applied for asylum, Mr. Zalmayev's publications that formed the basis of the defamation claims did not in any event challenge an asylum application; the publications either make no mention of

the application or make a vague reference to the possible existence of such an application.  Even if

Mr. Zalmayev did publically challenge an asylum application, which he did not, the application is

nevertheless not a matter of public concern because, as a matter of law, there is no public forum for

citizen involvement in asylum applications and there is no evidence that the publications were

reviewed or considered by any public official or in any public forum.  By asserting a claim against

Mr. Egiazaryan pursuant to New York's anti-SLAPP statute under these circumstances, Mr.

Zalmayev has done exactly what Governor Mario M. Cuomo feared would happen when he signed

the legislation into law:  the "misuse [of the statute] as an… additional weapon by those who place

self-interest, in the guise of public participation, above the public good."[1]

**Mr. Egiazaryan Had A Substantial
Basis To Bring A Defamation Action**

Mr. Zalmayev's claim also fails as a matter of law because he cannot prove that Mr.

Egiazaryan lacked a "substantial basis in fact and law" for commencing and continuing his action.

Mr. Egiazaryan was justified in exercising his right to assert defamation claims against Mr.

Zalmayev in light of the injury caused by defendant's false publications asserting as fact that he is

an anti-Semitic and anti-American xenophobe war criminal who embezzled Chechen relief funds.

Moreover, evidence adduced during discovery revealing the extent of defendant's role, knowledge

of falsity, and actual malice in the publication of those statements, provided Mr. Egiazaryan with a

substantial basis to continue his lawsuit until its dismissal by the Court on the grounds that Mr.

Zalmayev's statements constituted protected expressions of opinion.  Defendant concedes that the

dismissal of Mr. Egiazaryan's lawsuit does *not* establish that the complaint lacked a substantial

basis in fact and law.  Rather, in order to punish plaintiff for asserting legal claims, defendant would

---

[1] "Governor's Bill Jacket" for the anti-SLAPP statute (Bill Jacket, L. 1992, ch. 767), attached as Exhibit 1 to the Declaration of Jason T. Cohen, executed on April 19, 2013 (the "Cohen Decl."), p. 10.

have to demonstrate that plaintiff's complaint was frivolous, a demonstration that defendant cannot make.

**There Is No Evidence That The Intention Of The Defamation**
**Action Was To Maliciously Inhibit Defendant's Free Speech Rights**

Even if defendant could establish all of the elements described above, his claim for compensatory and punitive damages under the statute must be dismissed because he cannot prove that the *sole* intention (let alone any intention) of the defamation action was to maliciously inhibit defendant's free speech rights.  Mr. Egiazaryan's testimony that he brought a defamation action to "defend [his] honor and dignity" has gone unchallenged.  Moreover, defendant's counsel has claimed on the record that Mr. Egiazaryan brought the defamation action to gather information to assist in his alleged asylum application and with regard to ongoing litigation.  Accordingly, defendant's counsel's own statements defeat any claim that the sole intention of Mr. Egiazaryan's lawsuit was to maliciously inhibit free speech rights.

**This Court Should Exercise Its**
**Discretion And Not Award Damages**

Even if Mr. Egiazaryan's lawsuit were a baseless SLAPP suit brought for the sole purpose of maliciously inhibiting defendant's free speech rights, Mr. Zalmayev should not be awarded damages.  The decision to award damages pursuant to the anti-SLAPP statute is left entirely to the Court's discretion.  This Court should decline to award damages to Mr. Zalmayev and to reward him for his participation in an underhanded, black public relations campaign and misrepresentations to the public and the Court regarding his role and the nature of the campaign.  This Court should also exercise its discretion to avoid an undeserved windfall to Mr. Zalmayev, who has not paid, nor will he pay, any of the costs or attorneys' fees incurred in this action, the only specific damages that he has claimed.  All of Mr. Zalmayev's costs and legal fees are being paid by Andrey Vavilov, the Russian billionaire who Mr. Zalmayev says retained him to orchestrate the smear campaign against

plaintiff (although, for reasons explained below, Mr. Egiazaryan maintains that all of the contemporaneous evidence points to the fact that the campaign was engineered by Russian senator and billionaire Suleiman Kerimov, for whom Mr. Vavilov is only acting as a front to limit Mr. Kerimov's exposure to criticism).  Because the anti-SLAPP statute is not designed to compensate undisclosed foreign principals who finance a smear campaign through someone else in the name of still others, or to bestow a financial windfall on paid agents of smear campaign financiers, defendant should not be awarded any damages under the statute.

## FACTS

### The Malicious Smear Campaign Against Mr. Egiazaryan Gave Rise To Plaintiff's Lawsuit Against Mr. Zalmayev

At about the time that Mr. Egiazaryan arrived in the United States, Mr. Zalmayev was retained by a foreign principal to undertake a malicious public relations campaign against Mr. Egiazaryan.  The campaign was designed to discredit Mr. Egiazaryan and undermine his chances of remaining in the United States in order to force his return to Russia.  As part of the campaign, Mr. Zalmayev recruited, paid, collaborated with, and tricked others to advance false and harmful statements about Mr. Egiazaryan in periodicals and letters sent to various government officials.  Using a slush fund provided by a secret Russian billionaire, Mr. Zalmayev recruited Douglas Bloomfield and Rinat Akhmetshin to work on the campaign.  Mr. Zalmayev paid them a total of at least $30,000 for their efforts.[2]  Mr. Zalmayev also retained Leonid Komarovsky and paid him at least $7,000.[3]

---

[2] Transcript of the deposition of Rinat Akhmetshin, defendant's principal collaborator, dated March 20, 2012 ("Akhmetshin Tr."), attached as Exhibit 2 to the Cohen Decl., pp. 171-173; transcript of the deposition of defendant's collaborator Douglas Bloomfield, dated November 10, 2011 ("Bloomfield Tr."), attached as Exhibit 3 to the Cohen Decl., pp. 33-34.

[3] Transcript of the deposition of defendant Peter Zalmayev, dated March 27-28, 2012 ("Zalmayev Tr."), attached as Exhibit 4 to the Cohen Decl., pp. 571-572.

At his deposition in March 2012, Mr. Zalmayev testified that one of Mr. Egiazaryan's wealthy foes commissioned him to launch this disinformation campaign in an attempt to have Mr. Egiazaryan expelled from the United States.  According to Mr. Zalmayev and his co-conspirator Mr. Akhmetshin, the anti-Egiazaryan project was initiated and paid for by Russian billionaire Andrey Vavilov.[4]  The conspirators knew that the campaign they were being hired to orchestrate was driven by a "degree of animosity"[5] because Mr. Vavilov "hates [Mr. Egiazaryan's] guts."[6] Their goal was to hurt Mr. Egiazaryan through a malicious campaign intended "to send Mr. Egiazaryan packing"[7] and to "send his ass to where he came from"[8], and not to advance legitimate public policy goals.

However, as set forth in Mr. Egiazaryan's pleadings, although Mr. Vavilov may be the formal source of financing of Mr. Zalmayev's legal representation in this case, defendant has refused to disclose engagement agreements capable of revealing his true client, and there are abundant, contemporaneous communications[9] and documentary evidence[10] that compellingly

---

[4] Akhmetshin Tr. (Ex. 2), pp. 81, 98-99, 108; Defendant's Responses to Plaintiff's Second Set of Interrogatories to Defendant, attached as Exhibit 5 to the Cohen Decl.

[5] Zalmayev Tr. (Ex. 4), p 95.

[6] Akhmetshin Tr. (Ex. 2), pp. 97, 102, 251.

[7] Position Paper, Bates stamped PZ001160-61, attached as Exhibit 6 to the Cohen Decl, at PZ001161.

[8] E-mail chain between Messrs. Zalmayev and Akhmetshin, dated February 22-23, 2011, Bates stamped PZ002778, attached as Exhibit 7 to the Cohen Decl.

[9] See, e.g., the following communications between Mr. Zalmayev's collaborator Rinat Akhmetshin and various agents and employees of Mr. Kerimov discussing their joint campaign to discredit Mr. Egiazaryan (all of which are attached collectively as Exhibit 8 to the Cohen Decl. unless otherwise noted):

- e-mail to Greg Hitt of Public Strategies, Inc. ("PSI"), a U.S. public relations company retained by Mr. Kerimov's shell company Denoro Investments Ltd. ("Denoro") to conduct a public relations campaign against Mr. Egiazaryan, and Viktor Novichkov (acting under the pseudonym 'levan zgenti'), the Vice-President of Tainy Sovetnik, a Russian public relations firm hired by Mr. Kerimov, dated March 24, 2011, in which Mr. Akhmetshin reports to them on the efforts of "*my guy*" (Mr. Zalmayev) to place a negative article on Mr. Egiazaryan in the Los Angeles Times (Bates stamped PSI002060);

- e-mail from Mr. Akhmetshin dated April 13, 2011 (Bates stamped PSI002107-09) to Sarah Hale, Eliot Lauer (both Mr. Kerimov's personal counsel at Curtis Mallet), Nariman Gadzhiev (Mr. Kerimov's cousin), Paul Butler (counsel at Akin Gump for Mr. Kerimov's shell company Denoro) and Greg Hitt

demonstrate that defendant's U.S.-based black public relations campaign was closely coordinated at

every stage with agents of Mr. Kerimov -- a Russian billionaire with whom Mr. Egiazaryan is

---

(PR adviser to Mr. Kerimov's shell company Denoro), discussing their joint efforts to persuade an investigative journalist to "*drop the S[uleiman] K[erimov] angle*" in a media report that Mr. Zalmayev had initiated (*see* e-mail chain between Mr. Zalmayev and investigative journalist Nikola Krastev, dated March 24-25, 2011, Bates stamped PZ003541-42, attached to the Cohen Decl. as Exhibit 9);

- email from Mr. Akhmetshin dated February 15, 2011 (Bates stamped PSI002189-90) to Messrs Novichkov (again as 'levan zgenti'), Greg Hitt (PR adviser to Mr. Kerimov's shell company Denoro) and Paul Butler (counsel at Akin Gump for Kerimov's shell company Denoro), in which Akhmetshin addresses them as "*dear colleagues*" and sends them two pages of draft talking points, all directed at attacking Mr. Egiazaryan's character;

- e-mail from Mr. Akhmetshin dated March 21, 2011 (Bates stamped PSI002124) to Paul Butler (counsel at Akin Gump for Mr. Kerimov's shell company Denoro), Greg Hitt and Jeff Eller (PR advisers to Mr. Kerimov's shell company Denoro), in which Mr. Akhmetshin -- who has admitted in a sworn declaration in this case that his clients have included Russian government officials (*see* Declaration of Rinat Akhmetshin, executed on August 21, 2012, attached as Exhibit 10 to the Cohen Decl.) -- informs them that the "*russian government is placing [Egiazaryan] on an [Interpol] red notice shortly*" and gives them instructions on their next steps;

- e-mail from Mr. Akhmetshin dated February 5, 2011 (Bates stamped PSI002227) to Eliot Lauer (Mr. Kerimov's personal counsel at Curtis Mallet) reporting his and Mr. Zalmayev's efforts to "*insert an alternative narrative*" into an AP piece on Mr. Egiazaryan using the Alexeyeva and Ponomarev letters obtained by Mr. Zalmayev;

- e-mail from Mr. Akhmetshin dated February 22, 2011 (Bates stamped PSI002035) to Nariman Gadzhiev (Mr. Kerimov's cousin), Mr. Novichkov (PR adviser to Mr. Kerimov) (this time without the pseudonym) and Messrs. Hitt and Eller (PR advisers to Mr. Kerimov's shell company Denoro), reporting on Mr. Zalmayev's efforts with Leonid Komarovsky;

- e-mail from Mr. Akhmetshin dated March 14, 2011 (Bates stamped PSI002029) to Messrs Hitt and Eller (PR advisers to Mr. Kerimov's shell company Denoro), reporting to them on the Freedom House letters procured by Mr. Zalmayev;

- e-mail from Mr. Akhmetshin dated March 23, 2011 (Bates stamped PSI002062) to Mr. Novichkov (again as 'levan zgenti') and Greg Hitt and Jeff Eller (PR adviser to Mr. Kerimov's shell company Denoro), informing them of information he has received regarding an upcoming visit of Mr. Egiazaryan to Washington and  calling on them for a discussion as to "*how we can use [Mr. Egiazaryan's] presence in DC to spotlight his crappy nature*"; and

- e-mail from Mr. Akhmetshin dated March 9, 2011 (Bates stamped PSI002188) to Messrs Hitt, Eller and Butler (PR advisers and counsel to Mr. Kerimov's shell company Denoro, respectively) proposing that he ghost write a response to an op-ed by Mr. Egiazaryan, and asking them to propose an author.

*See also* Akhmetshin Tr. (Ex. 2), pp. 195-241.

[10] For example, discovery has shown that Mr. Zalmayev had in his possession a declaration prepared by attorneys for Mr. Kerimov's shell company Denoro for use in litigation against Mr. Egiazaryan in California, which was never served on Mr. Egiazaryan or filed in the public docket (Bates stamped PZ000527-28 and attached as Exhibit 11 to the Cohen Decl.), as well as a surveillance report prepared by a private investigator hired by Mr. Kerimov's shell company Denoro to monitor Mr. Egiazaryan and other members of his family for more than a year (Bates stamped PZ001099-1104 and attached as Exhibit 12 to the Cohen Decl.).

engaged in a legal dispute.  By contrast, there is no evidence of any contemporaneous written communications whatsoever between the defendant or Mr. Akhmetshin and Mr. Vavilov.

In furtherance of this paid-for smear campaign, Mr. Zalmayev engaged in conduct with the sole intention of tarnishing Mr. Egiazaryan's reputation in the United States through what reasonably could be perceived as false and misleading statements of fact, thus giving rise to a reasonable assertion of defamation claims, which included:

- publishing an article entitled "Hiding in Beverly Hills" on March 9, 2011 in the Jewish Journal, a Los Angeles-based publication with an active circulation of 150,000 households.[11]  In this article, Mr. Zalmayev made numerous false and harmful statements against Mr. Egiazaryan, including that Mr. Egiazaryan is an avowed anti-Semite and xenophobe;

- drafting and then inducing the publication of the article "No Safe U.S. Haven for Hatemongers," published on March 14, 2011 in the Moscow Times.[12]  This article states, among other things, that Mr. Egiazaryan is "an anti-Semitic bigot" with a "well-established record of anti-Semitism and hate speech."  Mr. Zalmayev drafted the statements in the Jewish Journal and Moscow Times notwithstanding his and his accomplices' unfamiliarity with even a single anti-Semitic, anti-American or xenophobic statement or act by Mr. Egiazaryan[13] and their concession that "he, himself, [Mr. Egiazaryan] was almost never on the record on anything"[14];

- drafting and then inducing Russian human rights activists Lev Ponomarev and Lyudmila Alexeyeva to sign false and misleading letters about Mr. Egiazaryan to members of the United States House of Representatives, asserting that Mr. Egiazaryan is not fit to be present in the United States (the "Ponomarev and Alexeyeva letters").[15]  Among other things, these letters falsely state that Mr. Egiazaryan "provid[ed] cover for the numerous well-documented atrocities during the war" and that he "was a contributor to the destructive second Chechen war."  Mr. Zalmayev drafted these letters notwithstanding:  (1) his concession that he saw no

---

[11] The article "Hiding in Beverly Hills," attached as Exhibit A to the Amended Complaint, is attached as Exhibit 13 to the Cohen Decl.

[12] The article "No Safe U.S. Haven for Hatemongers," attached as Exhibit B to the Amended Complaint, is attached as Exhibit 14 to the Cohen Decl.

[13] Zalmayev Tr. (Ex. 4), pp. 8-9; Akhmetshin Tr. (Ex. 2), pp. 114-120, 183, 186-187, 224-225, 357, 351-366; Bloomfield Tr. (Ex. 3), pp. 59-65, 235.

[14] February 5, 2011 e-mail from Mr. Akhmetshin, Bates stamped PZ002065-67, attached as Exhibit 15 to the Cohen Decl., at PZ002065.

[15] The Ponomarev and Alexeyeva letters, attached as Exhibit C to the Amended Complaint, are attached as Exhibit 16 to the Cohen Decl.

documentation suggesting that Mr. Egiazaryan embezzled funds earmarked for Chechnya[16]; and (2) Mr. Akhmetshin's concession that the allegations against Mr. Egiazaryan were unfounded ("We established that Chechnya thing was not – we could not say with certainty. So, therefore, we dropped this matter and we focused on other matter…. We couldn't find any credible information. And I think that was the time when discussion of Mr. Egiazaryan's Chechen record was suspended, because we couldn't say with certainty about his Chechen activity.")[17]. These letters, sent in late January 2011, were soon retracted, with both of the signatories independently stating that they were "misled" into writing and sending the letters[18]; and

- drafting and then inducing United States human rights and Jewish advocacy organizations to sign letters in March 2011 to the United States Department of State Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security, repeating false and harmful statements about Mr. Egiazaryan (the "Freedom House letters").[19] Mr. Zalmayev misled these human rights activists and United States government officials by concealing the fact that he was not functioning as an altruistic human rights activist, but, instead, that he was acting on behalf of a paying client who paid him substantial funds from an offshore bank account.[20]

Each of these published writings concluded with a plea that Mr. Egiazaryan should be expelled from the United States. Although he was not the signatory on the <u>Moscow Times</u> article, Ponomarev and Alexeyeva letters, or Freedom House Letters, Mr. Zalmayev conceded that he drafted each of those publications.[21]

The manner in which defendant edited and distorted the facts and sources of these harmful publications demonstrates that Mr. Zalmayev had no interest in communicating the truth about Mr.

---

[16] Zalmayev Tr. (Ex. 4), pp. 210-217; *see also* e-mail from Peter Zalmayev to Rinat Akhmetshin, dated December 29, 2010, Bates stamped PZ002696 ("[T]his commission is quite murky and no one I've called in [M]oscow has any good idea or details about it. [A]nd there's hardly anything online."), attached as Exhibit 17 to the Cohen Decl.

[17] Akhmetshin Tr. (Ex. 2), pp. 286-87, 368.

[18] The retractions, attached as Exhibit D to the Amended Complaint, are attached as Exhibit 18 to the Cohen Decl.

[19] The Freedom House letters, attached as Exhibit E to the Amended Complaint, are attached as Exhibit 19 to the Cohen Decl.

[20] Zalmayev Tr. (Ex. 4), pp. 173, 225-228, 264, 361, 374, 593-595; Chase bank account statement reflecting a $70,000.00 wire to Mr. Zalmayev's New York-based organization Eurasia Democracy Initiative, Inc., Bates stamped PZ003857, attached as Exhibit 20 to the Cohen Decl.

Egiazaryan to anyone.  Mr. Zalmayev employed phrasing, sequencing and "guilt by association" in an intentional and calculated fashion to convey the false or misleading meaning that Mr. Egiazaryan is anti-American, a vile and pernicious anti-Semite and a supporter of human rights abuses.  He also edited and distorted his publications in such a way as to maximize the damage done by the publications, and he intentionally omitted facts which would have mitigated any damage to Mr. Egiazaryan.

For example, Mr. Zalmayev and his collaborators deliberately misled the intended audience by ascribing to Mr. Egiazaryan anti-Semitic and anti-American statements allegedly made by Mr. Zhirinovsky.  This reprehensible tactic was criticized by certain third parties who had received Mr. Zalmayev's publications.  When Mr. Zalmayev and his co-conspirator, Mr. Akhmetshin, attempted to arrange for a condemnation of Mr. Egiazaryan to be placed in the Congressional Record, the staffer with whom they were speaking refused to do so.  After being provided with a copy of Mr. Zalmayev's <u>Jewish Journal</u> article, the staffer responded "No guilt by association.  Zhirinovsky may be anti-Semitic… but the article doesn't provide any evidence that Egiazaryan is"[22], even though the article falsely concludes that Mr. Egiazaryan is such a vehement anti-Semite that he does not deserve to remain in the United States.

Moreover, discovery of their e-mails shows that among Mr. Zalmayev and his collaborators, there was disagreement as to whether, in connection with the campaign to oust Mr. Egiazaryan from the United States, efforts should be made to link Mr. Egiazaryan with Mr. Zhirinovsky.  Mr. Akhmetshin expressed concern that the inclusion of references to Zhirinovsky will "dilute our

---

[21] Zalmayev Tr. (Ex. 4), pp. 157-59, 171-73, 179-80, 183-84, 293-95, 418-21, 589-94.

[22] E-mail chain among Peter Zalmayev, Rinat Akhmetshin and David Whiddon, dated March 9-10, 2011, Bates stamped PZ002843-45, attached as Exhibit 21 to the Cohen Decl., at PZ002843.

punch."[23]  Mr. Bloomfield commented:  "Zhirinovsky definitely enhances our case.  His name is well-known among nearly all those we will be contacting.  He is an identifier for Ashot. . . ."[24] After vetting the issue and recognizing that Mr. Egiazaryan had never uttered an anti-Semitic statement verbally or in writing, defendant and his confederates concluded that the only way to portray plaintiff as an anti-Semite (and thus have him ousted from the United States) was to link plaintiff prominently with Mr. Zhirinovsky and Zhirinovsky's reputation for anti-Semitism.

Mr. Zalmayev also deceptively altered the various letters that he and his collaborators drafted so that they would not appear to be coming from one source.  Mr. Akhmetshin supported this strategy and stated that they should "have several variations [of the letters], so it doesn't look suspiciously similar coming from different folks."[25]

Moreover, in order to create the misimpression that there was a groundswell of outrage about Mr. Egiazaryan's presence in this country, Mr. Zalmayev, using a Russian pseudonym, called in to a radio show to prompt a pre-scripted "conversation" about Mr. Egiazaryan with Mr. Komarovsky.[26]

Mr. Zalmayev also engaged in activities calculated to suppress information that could have mitigated injury to Mr. Egiazaryan.  He provided the signatories of the Freedom House letters with the defamatory Ponomarev and Alexeyeva letters, but not the corresponding *retractions* by the letters' signatories.[27]  By omitting the retractions, Mr. Zalmayev increased the chances that the organizations, none of whom had heard of Mr. Egiazaryan prior to learning about him from

---

[23] E-mail chain between defendant's co-conspirators Rinat Akhmetshin and Douglas Bloomfield, dated February 25, 2011, Bates stamped BA00007, attached as Exhibit 22 to the Cohen Decl.

[24] E-mail chain between defendant's co-conspirators Rinat Akhmetshin and Douglas Bloomfield, dated February 25, 2011, Bates stamped BA00125, attached as Exhibit 23 to the Cohen Decl.

[25] E-mail chain between defendant's co-conspirators Rinat Akhmetshin and Douglas Bloomfield, dated February 26, 2011, Bates stamped BA00146, attached as Exhibit 24 to the Cohen Decl.

[26] Zalmayev Tr. (Ex. 4), pp. 578-580.

defendant, would sign onto the Freedom House letters.  Mr. Zalmayev also interfered with Mr. Egiazaryan's freedom of expression.  He attempted to lower the "Google rankings" of both Mr. Egiazaryan's website, which Mr. Egiazaryan established to combat the black public relations campaign, and a blog that asserted that Mr. Zalmayev's own human rights organization is a front for commercial lobbying and public relations activities.  In so doing, defendant made it less likely that people conducting internet searches on Mr. Egiazaryan would find and read information in his defense or that would cause them to question the source of the false or misleading accusations against Mr. Egiazaryan.[28]

Finally, if there was any doubt as to whether he intended to communicate the truth about Mr. Egiazaryan to anyone, Mr. Zalmayev made it clear that he was not on a quest for the truth, but rather, that he was spearheading a paid-for campaign dedicated to besmirching Mr. Egiazaryan's reputation to drive him out of the United States:  Mr. Zalmayev testified that he had *no interest* in Mr. Egiazaryan's side of the story.[29]  Mr. Egiazaryan had a right to protect his reputation against the onslaught of false and misleading attacks by Mr. Zalmayev and had a substantial basis to assert defamation claims against Mr. Zalmayev.

**The Pleadings**

On April 19, 2011, Mr. Egiazaryan commenced his lawsuit against Mr. Zalmayev on the grounds that the above publications constituted defamatory statements which were designed to injure Mr. Egiazaryan's reputation.  Although the complained-of statements were part of a single scheme to defame and discredit Mr. Egiazaryan and undermine his ability to remain in the United

---

[27] Zalmayev Tr. (Ex. 4), p. 258.

[28] Zalmayev Tr. (Ex. 4), pp. 547-558.

[29] Akhmetshin Tr. (Ex. 2), pp. 187-190; Zalmayev Tr. (Ex. 4), pp. 359, 362.

States, Mr. Egiazaryan's lawsuit set forth four separate defamation counts, each addressing different defamatory publications.[30]

On August 5, 2011, Mr. Zalmayev answered the complaint. He *admitted* critical allegations in Mr. Egiazaryan's pleading[31], conceding that he had "written and collaborated with others to oppose Mr. Egiazaryan's continued presence in the United States" (Answer and Counterclaim, p. 4, ¶ 18); that, in particular, he "collaborated with Mr. Ponomarev and Ms. Alexeyeva in preparing the letters [that plaintiff alleged to be false and defamatory]" (Answer and Counterclaim, p. 12, ¶ 61); and that the explicit purpose for focusing attention on Mr. Egiazaryan's alleged membership in the Liberal Democratic Party of Russia was to "demonstrate [his] support for bigoted, anti-Semitic, and anti-American policies" (Answer and Counterclaim, pp. 8, 10-11, ¶¶ 36, 48). Defendant's responsive pleading also interposed two counterclaims: claims for defamation and the violation of Civil Rights Law §§ 70-a and 76-a, New York's anti-SLAPP statute.

**Judge Castel's December 7, 2011**
**Order On The Parties' Motions to Dismiss**

Mr. Zalmayev moved for partial dismissal of the complaint on June 20, 2011. He did not seek dismissal of plaintiff's first claim for relief. Mr. Egiazaryan moved to dismiss defendant's counterclaims on August 31, 2011. On December 7, 2011, Judge Castel issued a memorandum and order resolving those motions (the "December 7, 2011 Order"). The Court dismissed all but one of Mr. Egiazaryan's claims for defamation as well as defendant's counterclaim for defamation. The order left untouched Count I of the complaint, which concerned defendant's publication in the

---

[30] Mr. Egiazaryan's complaint, dated April 19, 2011, is attached as Exhibit 25 to the Cohen Decl., without its exhibits.

[31] A copy of defendant's Answer to Count I, Affirmative Defenses, and Counterclaim, dated August 5, 2011 ("Answer and Counterclaim"), is attached as Exhibit 26 to the Cohen Decl.

Jewish Journal, and Count II of defendant's counterclaims, which seeks recovery under New York's anti-SLAPP statute.[32]

The Court's December 7, 2011 Order identified two deficiencies in the plaintiff's pleading. *First*, with respect to Count II, the Court determined that Mr. Egiazaryan failed to allege sufficient nonconclusory facts to demonstrate Mr. Zalmayev's role in drafting and disseminating the defamatory statements appearing in the Moscow Times article ostensibly written by Leonid Komarovsky. *Second*, after concluding that Mr. Egiazaryan constituted a "public figure" under the First Amendment, a contention that Mr. Egiazaryan challenged, the Court held that the complaint failed to allege nonconclusory facts sufficient to support a claim that the defamatory statements made in Counts III and IV were made with actual malice. In considering whether the claims were baseless, the Court did *not* conclude that the allegedly defamatory statements described in the complaint would be incapable of constituting defamation as a matter of law.[33]

In light of the Court's December 7, 2011 Order, Mr. Egiazaryan filed an amended pleading on February 28, 2012, intended to cure the two deficiencies identified by the Court in its order. Totaling forty-seven pages and comprised of approximately 180 paragraphs, the Amended Complaint sets forth a significant number of factual allegations describing Mr. Zalmayev's role in

---

[32] The December 7, 2011 Order is attached as Exhibit 27 to the Cohen Decl.

[33] Notwithstanding its dismissal of Counts II through V of the complaint, the Court made several findings in the December 7, 2011 Order in support of the adequacy of Mr. Egiazaryan's pleading. With respect to the Ponomarev and Alexeyeva letters, the Court held that "[t]aken as a whole, the statements in both letters imply as fact that Egiazaryan was complicit in the mismanagement or misappropriation of humanitarian funds." (December 7, 2011 Order (Ex. 27), p. 13.) It also held that Mr. Egiazaryan "plausibly alleges the falsity" of statements implying that he was complicit in the mismanagement or misappropriation of humanitarian funds. (*Id.*, p. 14.) With respect to the Freedom House letters, the Court held that Mr. Egiazaryan "makes a sufficient allegation of falsity." (*Id.*, p. 15.) It also held that "the statement [of fact] that Egiazaryan is a leader of the LDPR may be false." (*Id.*, p. 15.)

drafting the publications at issue, the falsity of the publications, and the direct and circumstantial evidence demonstrating that Mr. Zalmayev acted with actual malice.[34]

**Judge Castel's July 30, 2012 Order**
**Dismissing Mr. Egiazaryan's Amended Complaint**

On March 30, 2012, defendant moved to dismiss Mr. Egiazaryan's Amended Complaint on the grounds that the pleading failed to adequately allege that Mr. Zalmayev published his statements with actual malice and that, in any event, the challenged writings constituted non-actionable *opinions*. Mr. Egiazaryan opposed the motion on the grounds that: (i) the Amended Complaint described a significant amount of direct and circumstantial evidence which, when taken together, plausibly established that Mr. Zalmayev acted with actual malice; and (ii) the statements at issue constituted actionable factual assertions that had precise meanings which were capable of being proven false.

Notwithstanding Mr. Egiazaryan's arguments in opposition, Judge Castel issued a memorandum and order on July 30, 2012 dismissing the Amended Complaint in its entirety (the "July 30, 2012 Order").[35] The Court's July 30, 2012 Order was premised on the ground that the challenged statements were protected expressions of *opinion*, as opposed to actionable statements of *fact*. This finding reflected a change of view from the Court's finding in its December 7, 2011 Order that certain of the allegedly defamatory statements were statements of fact and that Mr. Egiazaryan plausibly alleged their falsity.[36] The Court did not address the truth of Mr. Egiazaryan's factual allegations against Mr. Zalmayev, including the claim that Mr. Zalmayev orchestrated a paid, negative public relations campaign against Mr. Egiazaryan on behalf of powerful political

---

[34] Mr. Egiazaryan's Amended Complaint, dated February 28, 2012 ("Amended Complaint"), is attached as Exhibit 28 to the Cohen Decl., without its exhibits.

[35] The July 30, 2012 Order is attached as Exhibit 29 to the Cohen Decl.

[36] *See* note 33, *supra*.

foes.  The Court's decision also did not dispute Mr. Egiazaryan's contention that Mr. Zalmayev

acted with actual malice, even though that was the basis for the first dismissal.

## ARGUMENT

## POINT I

### MR. EGIAZRYAN IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S ANTI-SLAPP COUNTERCLAIM BECAUSE MR. EGIAZARYAN'S LAWSUIT WAS NOT A SLAPP SUIT

Mr. Zalmayev erroneously contends that "Mr. Egiazaryan's application for asylum makes

him a 'public applicant or permitee' [within the meaning of the anti-SLAPP statute]" and that

plaintiff's defamation claims concerned Mr. Zalmayev's alleged "engage[ment] in public petition

and participation [within the meaning of the anti-SLAPP statute] regarding Mr. Egiazaryan's

application for asylum."  (Answer and Counterclaim, p. 36, ¶¶ 55-56.)

New York Civil Rights Law §§ 70-a and 76-a provide, in pertinent part, as follows:

- "A defendant in an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of this article, may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action. . . . ." *N.Y. Civil Rights Law* § 70-a(1) (emphasis added).

- "An 'action involving public petition and participation' is an action, claim, cross claim or counterclaim for damages that is brought by a public applicant or permitee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission."  *N.Y. Civil Rights Law* § 76-a(1)(a) (emphasis added).

- "'Public applicant or permitee' shall mean any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body . . . ." *N.Y. Civil Rights Law* § 76-a(1)(b).

The "anti-SLAPP law is in derogation of the common law and must be strictly construed."

*Hariri v. Amper*, 51 A.D.3d 146, 151, 854 N.Y.S.2d 126, 130 (1st Dep't 2008); *Guerrero v. Carva*,

10 A.D.3d 105, 117, 779 N.Y.S.2d 12, 21 (1st Dep't 2004).

**A. Mr. Egiazaryan's Alleged Filing Of A Highly Confidential And Sensitive Application For Asylum Does Not Make Him A "Public Applicant Or Permitee" Within The Meaning Of New York's Anti-SLAPP Statute**

Mr. Zalmayev must first establish that plaintiff is a "public applicant or permitee" within the meaning of New York's anti-SLAPP law. *Civil Rights Law* § 76-a(1)(b). The Second Circuit has observed that, "[u]niformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission." *Chandok v. Klessig*, 632 F.3d 803, 819 (2d Cir. 2011).

In ruling on Mr. Egiazaryan's prior motion to dismiss defendant's counterclaim, this Court held in the December 7, 2011 Order that, at the pleading stage, it would consider a "petition for asylum by Egiazaryan [as] an application for 'permission to act'" within the meaning of the anti-SLAPP statute. (December 7, 2011 Order (Ex. 27), p. 21.) However, the evidence adduced during discovery and set forth below, showing that asylum proceedings are private and not public, conclusively establishes that an applicant for asylum is not a "public applicant or permitee" under New York's anti-SLAPP law. As a result, and in view of the obligation to strictly construe the statute, the Court's prior holding regarding Mr. Egiazaryan's status as a "public applicant or permitee" should not be regarded as law of the case.[37]

---

[37] The Second Circuit has described "law of the case" as a "discretionary doctrine" which is a "judicially crafted policy that expresses the practice of courts generally to refuse to reopen what has been decided, [but that it] is not a limit to their power. As such, law of the case is necessarily amorphous in that it 'directs a court's discretion, but does not restrict its authority.'" *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 219 (2d Cir. 2002) (citations omitted); *see also DiLaura v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (holding that the law of the case "doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.") (quotation and citations omitted). Generally, "'[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'… In any event the doctrine of law of the case 'permits a change of position if it appears that the court's original ruling was erroneous.'" *DiLaura*, 982 F.2d at 76-77 (quotation and citations omitted) (alteration in original); *see also* July 30, 2012 Order, p. 10-11 (indicating that the Court will revise its earlier statements to "correct a clear error").

Although this Court previously determined that a "grant of asylum entails privileges that *might be deemed permissions or entitlements*… including the right to remain and to work in the United States" (December 7, 2011 Order (Ex. 27), p. 20 (emphasis added)), both U.S. and international law regard the grant of asylum as an *obligation* which must be provided to protect refugees.  Pursuant to the 1951 Convention relating to the Status of Refugee and the 1967 Protocol relating to the Status of Refugees, this protection includes allowing refugees to remain and work in the country of refuge.[38]  An application for asylum is merely a process by which one seeks a *positive determination* that he meets the criteria for protection under the 1951 Convention or 1967 Protocol; it is not a request for *permission* to work or to remain in the country of refuge.  This is reflected in the fact that, unless and until a final adverse decision is reached, the asylum applicant may remain and work in the country of refuge.[39]  Indeed, a person is not required to apply for asylum at all; he may simply rely upon the 1951 Convention or 1967 Protocol as a defense to removal.[40]

Defendant's claim under New York's anti-SLAPP legislation must also fail because Mr. Zalmayev cannot establish a most fundamental characteristic of such a claim -- that the application or proceeding at issue is ***public*** in nature.  Asylum applications are not public records or public events.  To the contrary, asylum applications are protected by an extensive confidentiality regime set forth by federal regulation.  *See* 8 C.F.R. §§ 208.6(a)-(b).  The government must ensure that confidentiality is preserved with respect to any information concerning "the fact that the applicant

---

[38] *See* Convention relating to the Status of Refugee, July 28, 1951, 189 U.N.T.S. 150 (the "1951 Convention"), Articles 17, 21, 32-33; Protocol relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267, 19 U.S.T. 6223 (the "1967 Protocol"), Articles 17, 21, 32-33.

[39] *See* 1951 Convention and 1967 Protocol, Articles 32-33, containing various safeguards against the expulsion of refugees, including the principle of *nonrefoulement*, which provides that no one shall expel or return ("refouler") a refugee against his or her will, in any manner whatsoever, to a territory where he or she fears threats to life or freedom.

[40] *Id.*

has applied for asylum[,] specific facts or allegations pertaining to the individual asylum claim contained in an asylum application[, and] facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum." *Memorandum by Joseph E. Langlois*, U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, June 15, 2005, attached as Exhibit 30 to the Cohen Decl.; *see also Memorandum by Bo Cooper*, U.S. Department of Justice, Immigration and Naturalization Service, June 21, 2001, attached as Exhibit 31 to the Cohen Decl. ("As a general matter, the [federal] regulation prohibits INS personnel from commenting to any third party on the nature or even the existence of individual applications for asylum, and requires that the INS maintain the confidentiality of any INS records that indicate that an alien has applied for asylum.").  Asylum applications are not matters of public concern open to public challenge because it is understood that if information about their contents -- or even their existence -- were "disclosed publicly, [that public disclosure] could subject the claimant to retaliatory measures by government authorities or non-state actors in the event the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin." *Memorandum by Joseph E. Langlois*, U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, June 15, 2005 (Ex. 30).[41]

The articulated purpose behind New York's anti-SLAPP statute further bolsters the conclusion that Mr. Egiazaryan is not a "public applicant or permitee."  The Second Circuit has expressly recognized that the anti-SLAPP statute was enacted due to a "rising concern about the use of civil litigation… to intimidate or silence those who speak out at *public meetings* against proposed

---

[41] The notion that asylum applications should be treated by the government with the utmost sensitivity and confidentiality is not unique to the United States.  It is a principle to be applied any time an individual seeks asylum any where in the world.  *See* Advisory opinion on the rules of confidentiality regarding asylum information, United Nations High Commissioner for Refugees ("UNHCR"), Mar. 31, 2005, attached as Exhibit 32 to the Cohen Decl. ("*[T]he asylum procedure should at all stages respect the confidentiality of all aspects of an asylum claim, including the fact that the asylum-seeker has made such a request.*") (emphasis in original).

*land use development* and other activities requiring approval of *public boards*" (*Chandok*, 632 F.3d at 818 (quoting *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 138 n.1, 589 N.Y.S.2d 825, 828 n.1 (1992)) (emphasis added)), and that is was "'specifically designed to protect those citizens who, usually before a government agency, *publicly challenge applications by developers or other businesses for environmental and land use permits, leases, licenses or other approvals.*'" *Chandok*, 632 F.3d at 819 (quoting *Harfenes v. Sea Gate Ass'n, Inc.*, 167 Misc. 2d 647, 650, 647 N.Y.S.2d 329, 331 (Sup. Ct. N.Y. Co. 1995 (emphasis in original); *see also* Bill Jacket, L. 1992, ch. 767 (Ex. 1), p. 19 ("SLAPP Suits are usually brought to deter participation in such matters as landfill location, the disposal of hazardous waste, and the development of land.")

The anti-SLAPP statute was not designed to give defendants a counterclaim to any alleged attempt to inhibit free speech by litigation.  It was designed to apply in limited circumstances and provide a narrow degree of protection:  where the defendant exercised free speech in the form of *public* challenges in a *public* forum before a *governmental* agency on issues involving *public* participation.  The specific circumstances that the New York State legislature contemplated in enacting this statute were described by New York State Senator John Marchi, a sponsor of the anti-SLAPP statute, during the Senate Debate.  In explaining why the legislation was needed, Senator Marchi described only those situations concerning frivolous lawsuits brought by land use developers against civic associations, towns, planning and zoning boards and their individual members.  *See* transcript of New York Senate debate on the anti-SLAPP statute, NY Senate Debate on Assembly Bill 4299, July 1, 1992, attached as Ex. 33 to the Cohen Decl., p. 8706-07, 8719-21.

An asylum application is not the type of application that the New York legislature contemplated when enacting the anti-SLAPP statute.  The cloak of confidentiality that surrounds asylum applications completely removes them from the category of conduct that concerned the New

York legislature when it enacted the anti-SLAPP statute -- a *public* applicant's retaliation for *public* speech and expression with respect to *public* applications.

Despite defendant's contention that his anti-SLAPP claim is viable because "Mr. Egiazaryan's application for asylum makes him a 'public applicant or permitee' [within the meaning of the anti-SLAPP statute]" (Counterclaim, ¶ 55), Mr. Zalmayev is aware that the U.S. government does not consider asylum applications to be matters of public concern open to public debate and challenge.  Indeed, Mr. Zalmayev expressly concedes that an "asylum application [is] reviewed in a ***closed*** process."[42]  Mr. Zalmayev has good reason to know this.  When he tried to contact the Department of Homeland Security ("DHS") directly to challenge Mr. Egiazaryan's purported asylum application and to set up a meeting to discuss the matter further, the DHS rebuffed Mr. Zalmayev's efforts and explained that "privacy provisions relating to asylum applications… preclude [the DHS] from discussing even whether an individual has or hasn't filed an asylum application.  As such, [the DHS does] not believe it is appropriate to meet at this time."[43] As this correspondence demonstrates, unlike the public proceedings contemplated by the New York legislature when it drafted the anti-SLAPP statute -- *i.e.*, those proceedings where the public is entitled to participate in the application process -- the proceedings involved here are private, and the public is prohibited from participating.

### B. Because He Did Not *Directly* And *Publicly* Challenge Mr. Egiazaryan's Alleged Application For Asylum, Defendant Did Not Engage In "Public Petition And Participation" Within The Meaning Of New York's Anti-SLAPP Statute

As set forth in Civil Rights Law § 76-a(1)(a), an "action involving public petition and participation" is an action "for damages that is brought by a public applicant or permitee, and is

---

[42] Defendant's Memorandum of Law in Opposition to Ashot Egiazaryan's Motion to Dismiss the Counterclaims, dated September 15, 2011 (Docket Entry #36), at 2 (emphasis added).

materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." Because the "anti-SLAPP law is in derogation of the common law and must be strictly construed" (*Hariri*, 51 A.D.3d at 151, 854 N.Y.S.2d at 130; *Guerrero*, 10 A.D.3d at 117, 779 N.Y.S.2d at 21), the "narrow construction of the anti-SLAPP law requires that a SLAPP-suit defendant… *directly challenge* an application or permission in order to establish a cause of action under the Civil Rights Law." *Guerrero*, 10 A.D.3d at 117, 779 N.Y.S.2d at 21 (emphasis added); *see also Harfenes*, 167 Misc. 2d at 653, 647 N.Y.S.2d at 333 (dismissing anti-SLAPP suit because anti-SLAPP suit plaintiffs did not "*directly challenge* a license or permit application" which was necessary to establish a cause of action under Civil Rights Law § 70-a) (emphasis added). In addition, the SLAPP-suit defendant must show that his challenge was of a *public* nature[44], and that the challenge was made to the appropriate governmental agency.[45] Mr. Zalmayev cannot satisfy this burden.

---

[43] E-mail chain between Peter Zalmayev and DHS official Charles Nimick, dated March 31, 2011 to April 1, 2011, Bates stamped PZ003466-68, attached as Exhibit 34 to the Cohen Decl., at PZ003467.

[44] *See Chandok*, 632 F.3d at 819 (observing that New York's anti-SLAPP statute was "specifically designed to protect those citizens who, usually before a government agency, *publicly challenge* [the] applications" at issue) (quoting *Harfenes*, 167 Misc. 2d at 650, 647 N.Y.S.2d at 331) (emphasis added).

[45] *See Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead by its Bd. of Trs. of the Vill. of New Hempstead*, 98 F. Supp. 2d 347, 360 (S.D.N.Y. 2000) (refusing to apply New York's anti-SLAPP statute in part because "[d]efendants certainly were not engaging in their right to petition the government"); *Guerrero*, 10 A.D.3d at 118, 779 N.Y.S.2d at 22 ("[I]n the absence of evidence that defendants were petitioning an agency regarding an application or permission of plaintiffs, we must conclude that plaintiffs' action 'did not affect defendant[s'] rights of public petition and participation before public agencies and, accordingly, did not offend Civil Rights Law §§ 70-a and 76-a.'") (citations omitted); *Entm't Partners Group, Inc. v. Davis*, 198 A.D.2d 63, 64, 603 N.Y.S.2d 439, 440 (1st Dep't 1993) (anti-SLAPP suits are designed to protect a "citizen's right to petition the government or appropriate administrative agency"); *Foley v. CBS Broad., Inc.*, No. 108403/2005, 2006 WL 6619947, at *2 (Sup. Ct. N.Y. Co. Sept. 13, 2006) (refusing to apply New York's anti-SLAPP statute in part because "[d]efendants certainly were not engaging in their right to petition the government"); *Cooper v. Lipschutz*, 3/24/2004 N.Y.L.J. 17, (col. 1) (N.Y. Co. Civ. Ct. 2004) (denying defendant's motion for summary judgment on its anti-SLAPP counterclaim in part because defendants' statements "did not involve any government agency" and because plaintiff's complaint did not affect defendants' "rights of public petition and participation before public agencies"); *see also 825 E. 57th St. Inc. v. Save-A-Pet Animal Rescue & Adoption Ctr., Inc.*, No. 09694-2010, 2010 N.Y. Misc. Lexis 3977, at *4-6 (Sup. Ct. Suffolk Co. Aug. 16, 2010) (in declining to apply New York's anti-SLAPP statute, court found it persuasive that defendant never "addressed their protest to the appropriate (or any) license-issuing governmental body," though the court observed that the "law in New York is not fully settled with respect to

Although he claims to have "engaged in public petition and participation regarding Mr. Egiazaryan's [alleged] application for asylum" (Answer and Counterclaim, p. 36, ¶ 56), Mr. Zalmayev offers no facts or details to substantiate his claim -- nor can he.  The evidence adduced during discovery proves that none of Mr. Zalmayev's actions can be construed as *directly* and *publicly* challenging an asylum application with the appropriate governmental agency -- the U.S. Citizenship and Immigration Services ("USCIS") of the Department of Homeland Security.

Of the four separate publications alleged to be defamatory in the Amended Complaint, only two were publicly disseminated:  the statements published in the <u>Jewish Journal</u> (Count I of the Amended Complaint); and the statements published in the <u>Moscow Times</u> (Count II of the Amended Complaint).  The other statements described in the Amended Complaint were made privately by Mr. Zalmayev to third parties, who independently (albeit under the influence of Mr. Zalmayev's misrepresentations and/or financial incentives) published Mr. Zalmayev's statements in their own names in private letters sent to members of Congress or other government officials hiding the fact that defendant authored those letters (Counts III and IV of the Amended Complaint).  None of these statements directly challenged Mr. Egiazaryan's alleged asylum application, but sought to influence third parties to oppose his presence in the United States.

**1. Mr. Zalmayev's Publications in the <u>Jewish Journal</u> And <u>Moscow Times</u> Cannot be Construed as Direct Challenges to Mr. Egiazaryan's Alleged Asylum Application**

Although the articles published in the <u>Jewish Journal</u> and <u>Moscow Times</u> were publicly disseminated, they are not *direct* challenges to Mr. Egiazaryan's alleged asylum application under New York's anti-SLAPP law because:  (i) they were not directed to a relevant governmental body; and (ii) they do not specify whether Mr. Egiazaryan had filed an application for asylum or whether

---

construing § 76-a so as to require a would-be SLAPP defendant to demonstrate actual contact with the 'governmental body' in order to receive the protections of the statute.").

a specific proceeding was pending before a governmental agency in which the defendant was advocating in opposition to Mr. Egiazaryan.

First, there can be no dispute that the articles described in Counts I and II of the Amended Complaint were directed generally to the readers of newspapers rather than to a particular governmental body.  Mr. Zalmayev's article titled "Hiding in Beverly Hills" was published in the Jewish Journal on March 9, 2011 and distributed to a mass readership.  Although Mr. Zalmayev's article referenced a potential asylum application by Mr. Egiazaryan, the article was not designed or distributed to directly challenge the purported asylum application with the USCIS.  Instead, the article was designed merely to influence the opinions of the readers of the Jewish Journal. Similarly, the article titled "No Safe U.S. Haven for Hatemongers," drafted by Mr. Zalmayev but published on March 14, 2011 in the Moscow Times under Leonid Komarovsky's by-line, was not designed or distributed to challenge directly the purported asylum application with the USCIS. Rather, the article was intended only to tarnish Mr. Egiazaryan's reputation in the minds of the readers of the Moscow-based newspaper.  Because neither of these publications was directed to a governmental body or agency, let alone the USCIS, as they must be under New York's anti-SLAPP statue[46], they cannot be construed as direct challenges to Mr. Egiazaryan's alleged asylum application.

Second, in order to constitute a "direct challenge" under New York law, the publications at issue must identify a *particular* application or permit that plaintiffs have sought or received or cite to a *specific* proceeding pending before an administrative agency in which the defendants were advocating in opposition to the plaintiffs.  *See Guerrero*, 10 A.D.3d at 117, 779 N.Y.S.2d at 21 (finding that defendants did not directly challenge an application or permission because they "do not identify any *particular* application or permit that plaintiffs have sought or received.  Nor do they

---

[46] *See* note 45, *supra*.

cite any *specific* proceeding pending before an administrative agency in which they were advocating in opposition to the plaintiffs.") (emphasis added).  The articles published in the <u>Jewish Journal</u> and <u>Moscow Times</u> do neither.  They cannot constitute direct challenges to Mr. Egiazaryan's alleged asylum application because they do not specify whether an application actually had been filed by Mr. Egiazaryan, and they do not cite to any specific proceeding pending before a governmental agency in which defendant was advocating in opposition to Mr. Egiazaryan.  *See Guerrero*, 10 A.D.3d at 117, 779 N.Y.S.2d at 21; *see also Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 Misc. 3d 660, 667, 948 N.Y.S.2d 895, 901 (Sup. Ct. N.Y. Co. 2012) (finding that defendant did not pose a direct challenge to any petition or application because it did not allege that any such petition or application was actually pending at the time the statements were made).

Here, Mr. Zalmayev's publication in the <u>Jewish Journal</u> states only that Mr. Egiazaryan's "lawyers are reportedly seeking political asylum for their client."  Similarly, the publication in the <u>Moscow Times</u> states only that Mr. Egiazaryan "is reportedly considering a request for political asylum."  These equivocal statements amount to nothing more than defendant's speculation at the time.  They hardly can be considered specific references to an application actually filed or to a proceeding actually pending before a governmental agency.  *See Guerrero*, 10 A.D.3d at 117, 779 N.Y.S.2d at 21.

**2.   Neither the Ponomarev and Alexeyeva Letters**
**Nor the Freedom House Letters can be**
**Construed as Direct and Public Challenges**
**To Mr. Egiazaryan's Alleged Asylum Application**

The statements described in Counts III and IV of the Amended Complaint also fail to constitute direct and public challenges to Mr. Egiazaryan's alleged asylum application.  In its December 7, 2011 Order, the Court held that Mr. Zalmayev's anti-SLAPP counterclaim was sufficient to survive a motion to dismiss because the "retracted Ponomarev and Alexeyeva letters urged a member of Congress to raise their concerns about Egiazaryan with the Department of State

and the Department of Homeland Security, and the Freedom House letters appealed directly to those departments." (December 7, 2011 Order (Ex. 27), pp. 20-21.)  However, based on the uncontroverted evidence that has since been adduced during discovery, it is clear that the behind-the-scenes actions that Mr. Zalmayev took in meeting with Human Rights advocates -- drafting those advocates' letters to various U.S. government officials and then hiding his involvement in the drafting of those letters -- cannot constitute *direct* or *public* challenges on the part of Mr. Zalmayev. Put differently, Mr. Zalmayev's surreptitious back-door efforts to tarnish Mr. Egiazaryan's reputation cannot be construed as acts of "public petition and participation" that *directly* or *publicly* challenged Mr. Egiazaryan's alleged asylum application.

As a threshold matter, the specific statements that are alleged to be defamatory in Counts III and IV of the Amended Complaint are Mr. Zalmayev's statements to private third parties:  Mr. Ponomarev, Ms. Alexeyeva, and individuals affiliated with non-governmental organizations Freedom House, the American Jewish Committee and the National Council on Soviet Jewry.  (*See* Amended Complaint (Ex. 28), ¶¶ 77, 95.)  The evidence -- including defendant's own testimony -- is that Mr. Zalmayev drafted the Ponomarev and Alexeyeva letters and Freedom House letters, and then published them to these third parties.  (Zalmayev Tr. (Ex. 4), at 157-59, 171-73, 179-80, 183-84, 589-94.)  These are the acts that Mr. Egiazaryan alleged were defamatory; he did not allege that the defamation occurred once the third parties signed the letters and mailed them to government officials.  (*See* Amended Complaint (Ex. 28), ¶¶ 77, 95; Complaint (Ex. 25), ¶¶ 51, 73.) Accordingly, these communications cannot give rise to an anti-SLAPP claim because the anti-SLAPP statute has no applicability to communications with private and non-governmental actors.

However, even if the allegations in Counts III and IV focused on the acts of publishing the signed Ponomarev and Alexeyeva letters and Freedom House letters by the signatories to the recipients of the letters, the anti-SLAPP statute still has no applicability because it is undisputed that

Mr. Zalmayev was not a signatory to those letters.  In fact, Mr. Zalmayev intentionally tried to hide the extent of his involvement in the preparation of those letters, including in his representations to this Court.[47]  Mr. Zalmayev went to great lengths to conceal his involvement to the recipients of the letters he drafted by adopting a strategy to "have several variations [of the letters], so it doesn't look suspiciously similar coming from different folks."  (E-mail chain between defendant's co-conspirators Rinat Akhmetshin and Douglas Bloomfield, dated February 26, 2011, Bates stamped BA00146 (Ex. 24).)[48]

These uncontroverted facts demonstrate that there was nothing *public* about Mr. Zalmayev's involvement in the preparation of the Ponomarev and Alexeyeva letters and Freedom House letters. Therefore, it stands to reason that because Mr. Zalmayev was not a signatory to either the Ponomarev and Alexeyeva letters or Freedom House letters, and because defendant himself did not publicly challenge Mr. Egiazaryan's alleged asylum application in those letters, Mr. Zalmayev should not be permitted to claim the protection of New York's anti-SLAPP statute with regard to those letters.  *See 825 E. 57th St. Inc.*, 2010 N.Y. Misc. LEXIS 3977, at *3-4 (holding that only those individuals who actually engaged in the public protest at issue have standing to assert an anti-

---

[47] *See* Defendant's Memorandum of Law in Support of his Motion for Partial Dismissal, dated June 20, 2011 (Docket Entry # 16), at 16 ("Of particular importance is that Zalmayev did not write the articles or letters that are the subject of counts II through IV…."), 18-19 (denying that Mr. Zalmayev wrote the publications described in Counts II through IV of the complaint); *see also* Answer, ¶¶ 51, 61 (stating only that "Mr. Zalmayev collaborated with Mr. Ponomarev and Ms. Alexeyeva in preparing the letters"), 64, 74 (stating only that Mr. Zalmayev "collaborated on the [Freedom House] letters"); Counterclaim, ¶¶ 34, 35.

[48] It is telling that when he forwarded the Ponomarev and Alexeyeva letters to Kyle Parker, an assistant to Senator Benjamin Cardin, a Co-Chairman of the Helsinki Commission, Mr. Zalmayev did not voluntarily acknowledge that he drafted the letters he was attempting to pass off as coming from human rights activists. It was only after Mr. Parker replied that "these letters look strikingly similar and not in keeping with the usual manner that Lyud[mila Alexeyeva] [and] Lev [Ponomarev] … communicate with us" and asked **"[w]ho's orchestrating this campaign"** that Mr. Zalmayev reluctantly acknowledged some involvement in the preparation of the letters.  (E-mail chain between Kyle Parker and Peter Zalmayev, dated February 6-8, 2011, Bates stamped PZ003708-9, attached as Exhibit 35 to the Cohen Decl.)  Failing to address Mr. Parker's concern about **"[w]ho's orchestrating this campaign,"** Mr. Zalmayev responded that "it was decided that I would help draft the language, considering my greater degree of fluency in the language and with this sort of communications."  (*Id.*)

SLAPP claim).  The law does not permit an anti-SLAPP claimant to hide his involvement when convenient and then seek protections as if he were publically opposing an application.

However, even if he had publicly identified himself as the author of the Ponomarev and Alexeyeva letters and Freedom House letters, Mr. Zalmayev still would not be a proper claimant under the anti-SLAPP statute because the letters do not *directly* challenge Mr. Egiazaryan's alleged asylum application.  As set forth above, in order to constitute a "direct" challenge under New York law, the letters must have had to specify whether an asylum application actually had been filed by Mr. Egiazaryan or cite to a specific proceeding pending before a governmental agency in which defendant was advocating in opposition to Mr. Egiazaryan.  *See Guerrero*, 10 A.D.3d at 117, 779 N.Y.S.2d at 21.

Here, the Ponomarev and Alexeyeva letters do not even mention the word "asylum," let alone specify whether Mr. Egiazaryan had filed an application for asylum or cite to a specific proceeding pending before a particular governmental agency.  These letters have no bearing on any alleged asylum application or public proceeding concerning Mr. Egiazaryan or otherwise.  Rather, they concern only a potential "no-entry list" initiative on Capitol Hill.  (Exhibit C to Amended Complaint.)

Moreover, like the articles published in the <u>Jewish Journal</u> and <u>Moscow Times</u>, the Freedom House letters refer only generally to a potential asylum application.  In stating only that Mr. Egiazaryan "*intends* to apply for political asylum," the Freedom House letters do not indicate whether Mr. Egiazaryan had actually applied for asylum or whether a formal proceeding regarding his application was pending before the USCIS.  (Exhibit 19 (emphasis added).)  Under these circumstances, the letters that Mr. Zalmayev drafted cannot be construed as "direct" challenges to Mr. Egiazaryan's alleged asylum application.

## POINT II

### MR. EGIAZARYAN IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S ANTI-SLAPP COUNTERCLAIM BECAUSE MR. EGIAZARYAN'S LAWSUIT HAD A SUBSTANTIAL BASIS IN FACT AND LAW

Mr. Zalmayev must, in addition to establishing that the plaintiff's underlying lawsuit was a SLAPP suit (*i.e.*, where the plaintiff was a public applicant and where his lawsuit concerned the defendant's direct and public challenge of plaintiff's application), also prove that plaintiff's lawsuit was "commenced or continued without a substantial basis in fact and law."  N.Y. Civil Rights Law § 70-a(1)(a).  However, because Mr. Egiazaryan had a substantial basis to commence his action for defamation and then to continue that action as evidence adduced during discovery revealed the extent of defendant's role and actual malice in the publication of the allegedly defamatory statements, Mr. Zalmayev's anti-SLAPP counterclaim must be dismissed.

In order to prove that Mr. Egiazaryan's defamation claims lacked a "substantial basis in fact and law," Mr. Zalmayev must prove that plaintiff's pleadings were frivolous.  *See Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen*, 313 F. Supp. 2d 339, 344-45 (S.D.N.Y. 2004) (even if the court finds certain arguments to be unpersuasive, so long as the action is not frivolous, the anti-SLAPP claimant cannot prove that the action is "without a substantial basis in fact and law"); *see also* Bill Jacket, L. 1992, ch. 767 (Ex. 1), p. 24 ("This bill is intended to penalize *frivolous* SLAPP suits….") (emphasis added).  Because Mr. Egiazaryan's action was commenced "under a cognizable legal theory and it presented facts that tended to show some of [defendant's] statements were misleading," the action was not frivolous and it had a substantial basis in law and fact.  *Friends of Rockland Shelter Animals, Inc. (FORSA)*, 313 F. Supp. 2d at 344-45.

Consistent with Mr. Egiazaryan's view, Magistrate Judge Gabriel W. Gorenstein has characterized this "substantial basis" test as an "objective standard" which tracks the language of

Rule 11 of the Federal Rules of Civil Procedure.[49]   Magistrate Judge Gorenstein also explained that the "substantial basis" question "could be decided without any discovery at all based upon an evaluation of the complaint" because it has "nothing to do with motive."[50]   Magistrate Judge Gorenstein observed further that, in light of this standard:

> [T]his is going to be a trial about… two things.  One is a legal matter which presumably would be a summary judgment matter which is whether as a legal matter the complaint stated a claim and so forth sufficiently that it met the substantial basis in law and fact argument.  You don't need any discovery for that.  But I assume that you would also be allowed to test whether he had a basis for making factual allegations that make out his claim on the merits….  For that you're going to, if you wish, say in fact Zalmayev did not publish this article and write these two letters and do… all those other things and he had no substantial basis in fact for making those allegations.  You could do that.  That would also be a way to attack the complaint.

(October 3 Conf. Tr. (Ex. 36), pp. 22-23.)[51]

The "substantial basis" test applied by New York courts in anti-SLAPP actions is not the same -- or as strict -- as the standard used to evaluate complaints on a motion to dismiss.  *See Clemente v. Impastato*, 290 A.D.2d 864, 865, 736 N.Y.S.2d 281, 282 (3d Dep't 2002) ("[W]e conclude that plaintiff's defamation action, although now dismissed [after the court granted defendant's motion to dismiss], was commenced with a substantial basis in fact and law.").  Consistent with this view, Magistrate Judge Gorenstein observed that the "substantial basis" standard is a "completely different standard from the one Judge Castel applied."  (October 3 Conf. Tr. (Ex. 36), p. 16.)  Defendant, too, has recently acknowledged that the dismissal of plaintiff's

---

[49] Transcript of October 3, 2012 Conference ("October 3 Conf. Tr."), pp. 16, 21 (filed under seal), attached as Exhibit 36 to the Cohen Decl.; *see also* the Court's November 9, 2012 Order, Docket Entry # 192 (the "substantial basis" standard is an "objective test"), p. 2.

[50] October 3 Conf. Tr. (Ex. 36), pp. 16, 21.

[51] *See also* Judge Castel's order, dated February 14, 2013, denying Mr. Zalmayev's motion to set aside or modify Magistrate Judge Gorenstein's May 23, 2012 and November 9, 2012 orders (holding that proof regarding the substantial basis of Mr. Egiazaryan's complaint "lies in the factual and legal support for the now dismissed claims that the plaintiff asserted against defendant"), attached as Exhibit 37 to the Cohen Decl.

defamation claims "is not enough for Mr. Zalmayev to win his counterclaim."[52]  Therefore, the

Court's dismissal of Mr. Egiazaryan's defamation action in its July 30, 2012 Order does not prove

that his claims lacked a substantial basis in fact and law.  *See Clemente*, 290 A.D.2d at 865, 736

N.Y.S.2d at 282.

Mr. Egiazaryan had a substantial basis in both fact and law to assert his defamation claims

against Mr. Zalmayev.  First, all of the pertinent facts alleged in the Amended Complaint to support

the merits of Mr. Egiazaryan's defamation claims were and are true:  each of the challenged

writings said what Mr. Egiazaryan alleged they said; Mr. Zalmayev drafted and then published each

of the writings to private, non-government actors and third parties (*see* Point I.B.2, *supra*); and the

actions and communications that Mr. Zalmayev engaged in -- demonstrating his actual malice -- all

occurred.  (*See* Statement of Facts, *supra*.)  Indeed, nowhere in its July 30, 2012 Order did the Court

make a determination as to the truth of Mr. Egiazaryan's factual allegations against Mr. Zalmayev,

including the claim that Mr. Zalmayev orchestrated a paid, negative public relations campaign

against Mr. Egiazaryan on behalf of powerful political foes.  (*See generally* July 30, 2012 Order

(Ex. 29).)

Second, Mr. Egiazaryan's lawsuit had a substantial basis in the law.  The Amended

Complaint was not a bare legal instrument that provided only a formulaic recitation of the elements

of a defamation claim.  Nor was it devoid of any logical relation between the facts alleged and the

legal theories pleaded.  To the contrary, the Amended Complaint set forth a significant number of

factual allegations and described how those facts satisfied each element of a defamation claim.  It

cannot be said that there was anything frivolous or unreasonable about the legal theories asserted

based on the facts that had been alleged.  Moreover, even though the Court ultimately held after a

---

[52] Second Witness Statement of James Philip Golden, counsel for Mr. Zalmayev, dated November 9, 2012, in connection with defendant's attempt to obtain non-party discovery pursuant to the Hague Convention, attached as Exhibit 38 to the Cohen Decl., ¶ 21.

detailed analysis that the challenged statements in Mr. Egiazaryan's Amended Complaint were protected expressions *of opinion*, as opposed to actionable statements *of fact*, the very fact that this Court initially determined that certain of the allegedly defamatory statements were actionable statements of fact -- and that this dispositive element tipped in Mr. Egiazaryan's favor -- bespeaks the reasonableness of Mr. Egiazaryan's allegations on what is a close legal issue.  (*See* December 7, 2011 Order (Ex. 27), pp. 13-15.)  Under these circumstances, the Court should conclude that Mr. Egiazaryan's lawsuit had a substantial basis in fact and law.  *See Friends of Rockland Shelter Animals, Inc. (FORSA)*, 313 F. Supp. 2d at 344-45 (where an action is commenced "under a cognizable legal theory and it presented facts that tended to show some of [defendant's] statements were misleading," the action has a substantial basis in law and fact; further, even if the court finds certain arguments to be unpersuasive, so long as the action is not frivolous, the anti-SLAPP claimant cannot prove that the action is "without a substantial basis in fact and law").

Finally, in assessing the reasonableness of Mr. Egiazaryan's defamation claims, the Court should look to the claims as a whole.[53]  It is not sufficient for defendant to argue that a particular component of an element of a cause of action is lacking.  Defendant cannot demonstrate that the defamation claims as a whole lacked a substantial basis in fact and law.

### 1. Mr. Egiazaryan had a Substantial Basis to Conclude That Mr. Zalmayev's Statement that Mr. Egiazaryan Has a "well-established record of anti-Semitism and hate speech" was a Defamatory Statement of Fact

A detailed analysis of one of Mr. Zalmayev's writings will make obvious that plaintiff's claims had a substantial basis in fact and law.  In particular, the statement drafted by Mr. Zalmayev

---

[53] For example, in the context of determining whether Rule 11 of the Federal Rules of Civil Procedure had been substantially violated, courts look to "whether nonfrivolous claims have been joined and, if so, whether these claims -- whatever their number -- are of a quality sufficient to make the suit as a whole nonabusive and the Rule 11 violation not substantial."  *Gurary v. Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 223 (2d Cir. 2002).

and published to Mr. Komarovsky and the <u>Moscow Times</u> concerning Mr. Egiazaryan's alleged

"well-established record of anti-Semitism and hate speech," described in Count II of the Amended

Complaint, serves as a prime example of how Mr. Egiazaryan's claims had a substantial basis in

fact and law.[54]  As set forth below, Mr. Egiazaryan had a substantial basis to conclude that such a

statement was defamatory under New York law.[55]

      In *Gross v. N.Y. Times Co.*, the New York Court of Appeals set forth the analysis to be

followed by New York courts in determining whether a statement constitutes fact rather than non-

actionable opinion:

> In our State the inquiry, which must be made by the court, entails an
> examination of the challenged statements with a view toward (1) whether the
> specific language in issue has a precise meaning which is readily understood;
> (2) whether the statements are capable of being proven true or false; and (3)
> whether either the full context of the communication in which the statement
> appears or the broader social context and surrounding circumstances are such
> as to " 'signal * * * readers or listeners that what is being read or heard is
> likely to be opinion, not fact.' "

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 817 (1993) (citations omitted);

*accord Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 243, 254, 566 N.Y.S.2d 906, 909-10, 917

(1991) ("The key inquiry is whether challenged expression, however labeled by defendant, would

reasonably appear to state or imply assertions of objective fact….  In determining whether speech is

actionable, courts must additionally consider the impression created by the words used as well as

---

[54] The full sentence in which defendant's statement appears reads as follows:  "In the last couple of weeks, callers to my daily Russian-language radio show have voiced concerns over Yegiazaryan's and his party's well-established record of anti-Semitism and hate speech."  (Exhibit 14.)  However, the statement concerning Mr. Egiazaryan's purported "well-established record of anti-Semitism and hate speech" is attributable to defendant because the uncontroverted evidence establishes that Mr. Zalmayev, using a Russian pseudonym, was the caller who called in to the show to prompt a pre-scripted "conversation" about Mr. Egiazaryan with Mr. Komarovsky.  (Zalmayev Tr. (Ex. 4), pp. 578-580.)  It was also Mr. Zalmayev who drafted this statement and published it to the <u>Moscow Times</u>.  (Zalmayev Tr. (Ex. 4), pp. 293-95, 418-21.)

[55] In its December 7, 2011 Order, this Court set forth the elements of a defamation claim under New York law as "(1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege."

the general tenor of the expression, from the point of view of the reasonable person . . . false

statements are actionable when they would be perceived as factual by the reasonable person.").

Applying these principles to Mr. Zalmayev's statement concerning Mr. Egiazaryan's alleged

"well-established record of anti-Semitism and hate speech" establishes that -- notwithstanding the

Court's dismissal of the Amended Complaint -- Mr. Egiazaryan had a substantial basis to conclude

that the writing was an actionable statement of fact, not a mere opinion.

First, it was reasonable to argue that defendant's statement could have been "readily

understood" by a reader or listener as factual.  The statement is not couched in vague, metaphoric or

hyperbolic language that lacks precise meaning.  By stating that there is a "well-established record"

of Mr. Egiazaryan engaging in "anti-Semitism and hate speech," Mr. Zalmayev intended to paint

Mr. Egiazaryan -- and he so appears to the reader -- as an abhorrent individual with a well-

documented and well-known history of reprehensible conduct or speech.

Second, an allegation that someone has a "well-established record of anti-Semitism and hate

speech" is a statement that in many circumstances is capable of being proven true or false.  Where,

as here, the individual has *no* record of anti-Semitic conduct and hate speech, the statement at issue

can be proven false.

Third, the full context of the communication as well as "the broader social context and

surrounding circumstances" could have supported the conclusion that Mr. Zalmayev's statement

was an actionable factual assertion, not an opinion.  As alleged in the Amended Complaint -- and as

now supported by the evidence adduced -- the very purpose of Mr. Zalmayev's U.S.-based paid-for

advocacy campaign was to present falsehoods about Mr. Egiazaryan to paint him as a reprehensible

individual who should be ostracized and not be allowed to stay in this country.  In the context of the

---

(December 7, 2011 Order (Ex. 27), p. 6 (citing *Dillon v. City of N.Y.*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) and
*Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001).)

entire article, his role in an overall campaign against Mr. Egiazaryan, and the audiences that he targeted with his statements, Mr. Zalmayev urged others to support Mr. Egiazaryan's expulsion from the country by virtue of his "well-established record" of anti-Semitism and other abhorrent views or acts.

Taken together, these factors demonstrate that Mr. Egiazaryan had a substantial basis to conclude that defendant's writing constituted actionable facts.

### 2.      Mr. Zalmayev's Statement was "Regarding the Plaintiff"

The statement at issue in the Moscow Times article expressly refers to "[E]giazaryan's and his party's well-established record of anti-Semitism and hate speech." (Exhibit B to Amended Complaint.) Accordingly, while the statement also refers to "his party[,]" there can be no doubt that this statement was regarding the plaintiff.

### 3.      Mr. Zalmayev's Statement was Published to a Third Party

The uncontroverted evidence establishes that Mr. Zalmayev drafted the article described in Count II of the Amended Complaint and submitted it to the Moscow Times, which then published the article on March 14, 2011 to its readers. At his deposition in March 2012, Mr. Zalmayev testified that he was the primary draftsperson of the Moscow Times article. (Zalmayev Tr. (Ex. 4), pp. 293-96, 418-21.) The documentary evidence and e-mail communications between Mr. Zalmayev and his co-conspirators further demonstrate that defendant drafted the article and then published it to the Moscow Times.

In mid-February of 2011, Mr. Zalmayev retained Mr. Komarovsky and paid him $7,000.[56] Shortly thereafter, on March 9, 2011, Mr. Zalmayev and his co-conspirator, Mr. Akhmetshin, discussed the need to submit a piece about Mr. Egiazaryan to the Moscow Times. During his discussions with Mr. Akhmetshin, Mr. Zalmayev suggested, with respect to the proposed article,

---

[56] Zalmayev Tr. (Ex. 4), p. 294.

"maybe sign it with Komarovsky's name? let's discuss."[57]  The evidence reveals that either later

that day or on the following day, Mr. Zalmayev submitted a draft of the article entitled "No Safe

U.S. Haven for Hatemongers" to the Moscow Times on "behalf" of Mr. Komarovsky without his

knowledge.[58]  Indeed, as he subsequently recounted to Mr. Akhmetshin, Mr. Zalmayev "took the

liberty of writing on [the Moscow Times piece] on behalf of Komar[ovsky].  let's see if they

respond."[59]

On March 13, 2011, the Moscow Times e-mailed Mr. Komarovsky, thanking him for

submitting the article about Mr. Egiazaryan and expressing its desire to publish it.[60]  It also

provided a "readback" of the article for Mr. Komarovsky's approval.[61]  Mr. Komarovsky apparently

was confused by the source of the submission and emailed Mr. Zalmayev about it.  He responded to

Mr. Komarovsky in Russian explaining that he wrote to the Moscow Times on Mr. Komarovsky's

behalf and asked that Mr. Komarovsky reply with the following words:  'looked it over, op-ed good

to go.'"[62]

These facts, based on uncontroverted, documentary evidence as well as Mr. Zalmayev's own

testimony, demonstrate that Mr. Zalmayev drafted the article described in Count II of the Amended

Complaint and "took the liberty" of publishing it to the Moscow Times.  The Moscow Times

subsequently published Mr. Zalmayev's article, which had been "sign[ed] with Komarovsky's

name," to its readers on March 14, 2011.

---

[57] Email from Peter Zalmayev to Rinat Akhmetshin, dated March 9, 2011, Bates stamped PZ000918, attached as Exhibit 39 to the Cohen Decl.

[58] Email from Peter Zalmayev to Rinat Akhmetshin, dated March 10, 2011, Bates stamped PZ000920, attached as Exhibit 40 to the Cohen Decl.

[59] Id.

[60] Emails from Andrew McChesney, Leonid Komarovsky, and Peter Zalmayev, dated March 13, 2011, Bates stamped PZ000921-PZ000923, attached as Exhibit 41 to the Cohen Decl., at PZ000921.

[61] Id.

[62] Id.

**4.      Mr. Zalmayev's Statement is False**

Mr. Zalmayev's statement alleging that Mr. Egiazaryan has a "well-established record of anti-Semitism and hate speech" is utterly, factually false.  Contrary to Mr. Zalmayev's assertion, there is *no* record of Mr. Egiazaryan having ever made anti-Semitic statements or other hate speech or having taken anti-Semitic positions in his personal life, in his professional life, as a member of the Russian Duma or in any other capacity.  In fact, Mr. Egiazaryan condemns anti-Semitism and he has never preached it or made anti-Semitic statements or engaged in other hate speech.  Nor has he supported any anti-Semitic policies or legislative proposals.

In fact, Mr. Zalmayev and his accomplices testified that they were unfamiliar with even a single anti-Semitic, anti-American or xenophobic statement or act by Mr. Egiazaryan.  (*See* Zalmayev Tr. (Ex. 4), pp. 8-9; Akhmetshin Tr. (Ex. 2), pp. 114-120, 183, 186-187, 224-225, 351-366; Bloomfield Tr., (Ex. 3) pp. 59-65, 235.)  They even conceded that "he, himself, [Mr. Egiazaryan] was almost never on the record on anything."  (February 5, 2011 e-mail from Mr. Akhmetshin, Bates stamped PZ002065-67 (Ex. 15), at PZ002065.)

**5.      Mr. Egiazaryan had a Substantial Basis to Conclude that Mr. Zalmayev Acted Intentionally and/or with a Reckless Disregard for the Truth in Publishing the False Statement**

At the time this action was commenced, Mr. Egiazaryan had a reasonable basis to believe that he was not a "public figure" in the United States, where he was unheard of, and that it would not be necessary for him to prove that defendant's defamatory statements were made with actual knowledge of their falsity or with a reckless disregard of the truth.[63]  It was only subsequent to the commencement of this action that the Court held, over plaintiff's objection, that Mr. Egiazaryan

---

[63] *See Lopez v. Univision Commc'ns Inc.*, 45 F. Supp. 2d 348, 361 (S.D.N.Y. 1999) ("[T]his Court is not prepared to say that the holding of any foreign public office is alone sufficient to require application of the *Times* standard. . . .   In consequence, the fact that the plaintiff is a member of the Colombian Senate does not alone require him to prove constitutional malice. . . .").

was a public figure. Of course, the fact that the Court rejected Mr. Egiazaryan's argument does not mean that Mr. Egiazaryan did not have a reasonable basis to believe that his position was correct.

Moreover, notwithstanding the Court's application of the "public figure" doctrine, Mr. Egiazaryan had a substantial basis to believe that defendant acted intentionally or with a reckless disregard of the truth in publishing his false statements. A party may rely on both direct and circumstantial evidence to prove the existence of actual malice.[64] Here, as alleged in Count II of the Amended Complaint and as established further by evidence adduced during discovery, there was both direct *and* circumstantial evidence which, when taken together, provided a substantial basis for Mr. Egiazaryan to allege that Mr. Zalmayev acted with actual malice.

First, as set forth above, Mr. Zalmayev published the statement that plaintiff had a "well-established record of anti-Semitism and hate speech" even though he and his co-conspirators were unaware of even a single anti-Semitic statement or act by Mr. Egiazaryan and even though they knew Mr. Egiazaryan was "almost *never* on the record on anything." Obviously, Mr. Egiazaryan himself was aware that he had no record of anti-Semitism and hate speech and he was perfectly justified in attacking that statement through the commencement of his defamation action.

---

[64] Courts have observed that "[t]he existence of actual malice may be shown in many ways. As a general rule, [for the practical reason that knowledge of the falsity of the claims is something that is typically in the sole possession of defendant] any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown…." *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct.1635, 1643 n.12 (1979) (holding that a plaintiff required to prove actual malice is not precluded from direct inquiry into a media defendant's editorial process or its state of mind) (quotation and citation omitted); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668, 109 S. Ct. 2678, 2686 (1989) ("[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence."); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("Although actual malice is subjective, a court typically will infer actual malice from objective facts. These facts should provide evidence of negligence, motive and intent such that *an accumulation of the evidence and appropriate inferences* supports the existence of actual malice.") (internal quotations and citations omitted) (emphasis in original); *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) ("In determining whether a plaintiff has adduced sufficient evidence to reach a jury, the Court may consider plaintiff's evidence of actual malice in the aggregate."); *see also Moore v. Vislosky*, 240 Fed. Appx. 457, 468 (3d Cir. 2007) ("[A] plaintiff may rarely be successful in proving awareness of falsehood from the mouth of the defendant himself. Accordingly, objective circumstantial evidence can suffice to demonstrate actual malice and can even

Second, Mr. Egiazaryan alleged in the Amended Complaint several facts constituting circumstantial evidence of defendant's actual malice.  These allegations describe evidence concerning (i) Mr. Zalmayev purposefully avoiding the truth and/or having serious doubts as to the accuracy of the statements at issue (*e.g.*, Amended Complaint, at pp. 35-37, ¶¶ 123-31); (ii) Mr. Zalmayev's ill will and hostility towards Mr. Egiazaryan (*e.g.*, Amended Complaint, at pp. 30-33, ¶¶ 112-16); and (iii) the manner in which Mr. Zalmayev drafted and disseminated the defamatory statements at issue, including the distortion of facts to maximize injury and the omission of facts that would have mitigated injury (*e.g.*, Amended Complaint, at pp. 33-35, ¶¶ 117-22).  Courts have found all of these factors to be persuasive evidence of a defendant's actual malice.[65]

In addition, other evidence adduced during discovery demonstrates that defendant acted intentionally or with a reckless disregard of the truth in publishing the other statements described in

---

override defendants' protestations of good faith and honest belief that the report was true.") (internal quotations and citations omitted).

[65] In each of the following cases, the court either affirmed a jury verdict finding certain statements to be defamatory based on the sufficiency of the evidence as to actual malice or denied defendants' dispositive motions based on the sufficiency of the plaintiffs' allegations concerning actual malice.  *See, e.g.*, *Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice."); *Guccione v. Flynt*, 618 F. Supp. 164, 166 (S.D.N.Y. 1985) (evidence of "the state of relations existing between the parties" is a factor that courts may consider in evaluating the existence of actual malice, as is "the degree of investigation undertaken by the defendants"); *Hayne v. The Innocence Project*, No. 09-CV-218, 2011 WL 198128, at *5 (S.D. Miss. Jan. 20, 2011) (courts may consider as evidence of actual malice the manner in which defendants "edited and distorted the actual facts ... so as to maximize the damage and harm to [the plaintiff], his reputation, and his ability to earn a living in his chosen profession" and whether defendants "ignore[ed] all contrary evidence and/or … edit[ed] their publications in such a way as to maximize the false light that was cast on [the plaintiff]"; in other words, actual malice may be demonstrated by defendants "editing and distorting facts in an effort to maximize the damage done by the publication, and… intentionally omit[ing] facts which would mitigate said damage.") (quotations and citations omitted); *Stokes v. CBS Inc.*, 25 F. Supp. 2d 992, 1004-05 (D. Minn. 1998) ("Finally, in combination with these other factors, the highly slanted perspective of each report would further support a finding of actual malice.  In fact, as the court has already discussed, the broadcasts' one-sidedness goes beyond merely favoring one party's version of events over another.  Through the use of ambush tactics and distorting visual and editorial techniques, both reports actively contributed to the impression that Stokes committed the crime.") (internal citations omitted); *Harte-Hanks Commc'ns*, 491 U.S. at 692, 109 S.Ct. at 2698 (1989) ("[I]t is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges.  Although failure to

the Amended Complaint.  For example, the Ponomarev and Alexeyeva letters that defendant drafted implied that Mr. Egiazaryan "provid[ed] cover for the numerous well-documented atrocities during the war" and that he "was a contributor to the destructive second Chechen war."  Mr. Zalmayev drafted these letters notwithstanding:  (1) his concession that he saw no documentation suggesting that Mr. Egiazaryan embezzled funds earmarked for Chechnya[66]; and (2) his co-conspirator's concession that the allegations against Mr. Egiazaryan were unfounded:

> [W]e established that Chechnya thing was not -- we could not say with certainty.  So, therefore, we dropped this matter and focused on other matter…. We couldn't find any credible information.  And I think that was the time when discussion of Mr. Egiazaryan's Chechen record was suspended, because we couldn't say with certainty about his Chechen activity.[67]

Of course, Mr. Egiazaryan knew the challenged statements were false.  Accordingly, when taken together, these facts and allegations demonstrate that Mr. Egiazaryan had a substantial basis to conclude that Mr. Zalmayev acted intentionally and with reckless disregard of the truth in publishing the statements described in the Amended Complaint.

### 6.    Mr. Zalmayev's Statement Caused Injury To Mr. Egiazaryan

As alleged in the Amended Complaint, Mr. Zalmayev's false and defamatory statement injured Mr. Egiazaryan's reputation in the United States and in the minds of Mr. Zalmayev's target audience, which includes those who will hate or hold in contempt an anti-Semite:  the sizable Jewish community of Los Angeles, prominent Jewish organizations, and proponents of human rights.  (*See* Amended Complaint (Ex. 28), pp. 37-38, ¶ 132.)  Being accused of having a "well-established record of anti-Semitism and hate speech" when, in fact, he does not, has caused Mr.

---

investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.") (internal citations omitted).

[66] Zalmayev Tr. (Ex. 4), pp. 210-217; *see also* e-mail from Peter Zalmayev to Rinat Akhmetshin, dated December 29, 2010, Bates stamped PZ002696-97 (Ex. 17) ("[T]his commission is quite murky and no one I've called in [M]oscow has any good idea or details about it. [sic] and [sic] there's hardly anything on-line."), at PZ002696.

[67] Akhmetshin Tr. (Ex. 2), pp. 286-87, 368.

Egiazaryan humiliation and mental anguish in his public and private life. (*Id.*) As a result, Mr. Egiazaryan has incurred in excess of many tens of thousands of dollars in fees for public relations experts to combat and counteract Mr. Zalmayev's false statements and the smear campaign against him.

### 7.    Mr. Zalmayev's Statement was Not Protected by Any Privilege

Mr. Zalmayev has not asserted that his statement alleging that Mr. Egiazaryan has a "well-established record of anti-Semitism and hate speech" was protected by any privilege. Nor is plaintiff aware of any privilege that would entitle Mr. Zalmayev to publish such false statements to third parties with *carte blanche*.

*               *               *

For these reasons, Mr. Egiazaryan had a substantial basis to assert a defamation claim against Mr. Zalmayev for publishing the statement that plaintiff had a "well-established record of anti-Semitism and hate speech." This statement, which is of the same nature as the other statements alleged to be defamatory in the Amended Complaint, serves as a prime example of how Mr. Egiazaryan's lawsuit against Mr. Zalmayev had a substantial basis in fact and law.

### POINT III

### DEFENDANT CANNOT RECOVER ANY DAMAGES UNDER NEW YORK'S ANTI-SLAPP STATUTE

Under New York law, a defendant may, but only at the Court's discretion, recover various categories of damages under the anti-SLAPP statute. If defendant, in addition to establishing that plaintiff's underlying lawsuit was a SLAPP suit which was "commenced or continued without a substantial basis in fact and law" (which may allow the defendant to be awarded costs and attorneys' fees), can also prove that the plaintiff's suit was "commenced or continued for the purpose [or **sole** purpose] of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights," defendant may be awarded "other

compensatory damages" or punitive damages.  N.Y. Civil Rights Law § 70-a(1)(a)-(c) (emphasis added).

Mr. Zalmayev cannot make these showings.  As set forth below, Mr. Zalmayev's anti-SLAPP claim should be dismissed because:  (i) Mr. Egiazaryan did not commence or continue his lawsuit for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Mr. Zalmayev's free exercise of speech, petition or association rights; and (ii) even if Mr. Zalmayev was entitled to damages under the anti-SLAPP statute, the Court should exercise its discretion and decline to award any damages to defendant.

> **A.   Mr. Egiazaryan Did Not Commence Or Continue His Lawsuit**
> **For The Purpose Of Harassing, Intimidating, Punishing Or**
> **Otherwise Maliciously Inhibiting Mr. Zalmayev's**
> **Free Exercise Of Speech, Petition Or Association Rights**

If defendant were able to prove that Mr. Egiazaryan's lawsuit lacked a substantial basis in fact and law -- although he cannot -- Mr. Zalmayev may be entitled to additional damages *only if* he can also prove that Mr. Egiazaryan commenced or continued his action "for the purpose [or sole purpose] of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."  N.Y. Civil Rights Law § 70-a(1)(b)-(c).  A showing that such a motive was Mr. Egiazaryan's "sole purpose" in bringing his lawsuit may allow Mr. Zalmayev to recover punitive damages, while a showing that it was just one purpose among others may allow Mr. Zalmayev to recover "other compensatory damages."  *Id*.  Because Mr. Zalmayev cannot make either of these showings, the Court should dismiss defendant's anti-SLAPP counterclaim.

As a preliminary matter, Mr. Zalmayev is not seeking compensatory damages; he is seeking costs and attorneys' fees and punitive damages (s*ee* Answer and Counterclaim, pp. 36-37, ¶¶ 58, 61).  Although he claims to be seeking the "other compensatory damages" contemplated under Civil Rights Law § 70-a(1)(b) (*see* Peter Zalmayev's Initial Disclosures Pursuant to Rule 26(a)(1), dated

July 8, 2011, attached as Exhibit 42 to the Cohen Decl.), Mr. Zalmayev has not provided *any* evidence of *any* damages other than litigation costs and fees, nor has he ever explained what those "other compensatory damages" might be. Moreover, at a conference held on November 8, 2011, Magistrate Judge Gorenstein asked defendant's counsel to identify what damages defendant sought, to which defendant's counsel replied, "at the moment it's just the cost of the lawsuit."[68] Therefore, because he is not credibly seeking the types of damages which would require a showing that inhibiting defendant's rights was only *one* of Mr. Egiazaryan's purposes, Mr. Zalmayev must show that harassing, intimidating, punishing or otherwise maliciously inhibiting defendant's free exercise of speech, petition or association rights was Mr. Egiazaryan's *sole* purpose in bringing his action.

Regardless, Mr. Zalmayev has failed to adduce any evidence that harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of Mr. Zalmayev's speech, petition or association rights was even a *single* purpose -- let alone the *sole* purpose -- of Mr. Egiazaryan's lawsuit. There simply is no evidence of any such kind. Rather, the evidence establishes that Mr. Egiazaryan commenced his action to "defend [his] honor and dignity" and to vindicate his reputation which had been damaged due to Mr. Zalmayev's speech. (Transcript of deposition of Ashot Egiazaryan, pp. 339-40, attached as Exhibit 44 to the Cohen Decl.) It is recognized in this country that "[t]he right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being - a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S. Ct. 669, 679 (1966) (Stewart, J., concurring). Under these circumstances, Mr. Egiazaryan should be entitled to summary judgment on Mr. Zalmayev's counterclaim. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("The movant's burden 'will be satisfied if he can point to an absence of evidence to support an essential element of

---

[68] Transcript of November 8, 2011 Conference, p. 7, attached as Exhibit 43 to the Cohen Decl.

the non-moving party's claim.'") (*quoting Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.

1988)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552 (1986).

Moreover, at the October 3, 2012 conference before Magistrate Judge Gorenstein -- the most

recent conference in this action to date -- defendant posited no fewer than three theories as to why

Mr. Egiazaryan commenced his lawsuit against Mr. Zalmayev, none of which had anything to do

with harassing, intimidating, punishing or otherwise maliciously inhibiting defendant's free exercise

of speech, petition or association rights.  First, defendant argued that plaintiff sued Mr. Zalmayev to

"help [Mr. Egiazaryan] get asylum and to secure compensation for his asset's losses."  (October 3

Conf. Tr. (Ex. 36), p. 7.)  Second, he argued that plaintiff sued Mr. Zalmayev in order to "get

discovery which [Mr. Egiazaryan] thought would help him in [both] his asylum application and in

his lawsuits in London."  (October 3 Conf. Tr. (Ex. 36), p. 8; *see also* p. 12 ("[O]ne of the purposes

of the lawsuit was to get information to support their weak asylum application.").)  Third, defendant

argued that plaintiff's "lawsuit was part of a strategy to help Mr. Egiazaryan sue his commercial

enemy, Mr. Karemav [sic] and to get asylum."  (October 3 Conf. Tr. (Ex. 36), p. 9.)

Even assuming that these three theories posited by defendant are true and that Mr.

Egiazaryan's purposes for suing Mr. Zalmayev included helping his position in legal proceedings

pending before the DHS and overseas tribunals, those purposes in no way violate New York's anti-

SLAPP statute because there is nothing improper about using the fruits of discovery obtained in one

legal proceeding in a different proceeding.  *See Williams v. Johnson & Johnson*, 50 F.R.D. 31, 32

(S.D.N.Y. 1970) ("[T]here is no merit to the all-encompassing contention that the fruits of

discovery in one case are to be used in that case only.").  More importantly, even if the use of legal

proceedings for the purpose of obtaining discovery for another set of legal proceedings was

somehow deemed to be an abusive purpose, it is not a purpose that gives rise to a remedy of

damages under the anti-SLAPP statute.  Indeed, the suggestion of these purposes necessarily

demonstrates the absence of malicious intent, which is the touchstone of the relevant inquiry under

Civil Rights Law § 70-a(1)(b)-(c).  As noted in the Court's November 9, 2012 Order, attributing

these purposes to Mr. Egiazaryan "would seem to defeat defendant's effort because proving that

plaintiff's motive for bringing the lawsuit was to obtain civil discovery would make it that much

harder to show that his motive was to inhibit defendant's First Amendment rights."[69]  Therefore,

defendant's own admissions at the October 3, 2012 conference, coupled with his similar admissions

in prior representations to this Court, make clear that plaintiff did not bring his lawsuit for the

purpose of inhibiting defendant's free exercise of speech, petition or association rights.

### B.   Even If Mr. Zalmayev Could Be Awarded Damages Under The Anti-SLAPP Statute, The Court Should Exercise Its Discretion To Decline To Award Any Damages To Defendant

#### 1.   Mr. Zalmayev's Unclean Hands Should Preclude an Award Of Damages Pursuant to New York's Anti-SLAPP Statute

Under New York law, an anti-SLAPP award of damages is subject to the court's discretion.

*See*, *e.g.*, *Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen*, 313 F. Supp. 2d 339, 344

(S.D.N.Y. 2004) (in declining to award damages, the court held that "even if the defendant

establishes that the suit is a SLAPP suit brought under circumstances that entitle it to and that it is

entitled to damages under § 70-a, the award of damages is within the sole discretion of the trial

court."); *Miness v. Alter*, 262 A.D.2d 374, 375, 691 N.Y.S.2d 171, 173 (2d Dep't 1999) ("[I]t was

---

[69] While not a formal decision and not binding on this Court, consistent with Mr. Egiazaryan's view, Magistrate Judge Gorenstein has questioned whether defendant's theories have any bearing on Mr. Zalmayev's burden under the anti-SLAPP statute.  (*See* October 3 Conf. Tr. (Ex. 36), pp. 17, 20.)  He noted that the statute does *not* prohibit a plaintiff from commencing an action for these purposes.  (October 3 Conf. Tr. (Ex. 36), p. 20; *see also* p. 17.)  Rather, as Magistrate Judge Gorenstein explained, defendant must prove that plaintiff's purpose was "specifically to inhibit the free exercise of petition [or] association rights." (October 3 Conf. Tr. (Ex. 36), p. 20; *see also* p. 17.)  It was only after Magistrate Judge Gorenstein expressed his doubts as to the relevance of these motives that defendant finally suggested that "a purpose of Egiazaryan's suit was to inhibit criticism of his asylum appeal" -- although defendant offered no support whatsoever for that suggestion and maintained further that the primary purpose was for Mr. Egiazaryan to "gather materials to support asylum and his commercial claims against Karemav [sic] in London and Cyprus."  (October 3 Conf. Tr. (Ex. 36), p. 18.)

not an improvident exercise of the court's discretion to decline to award the defendants relief under Civil Rights Law § 70-a(1), even assuming that the action was properly characterized as a Strategic Lawsuit Against Public Participation (SLAPP suit)."); *West Branch Conservation Ass'n, Inc. v. Planning Bd. of Town of Clarkson*, 222 A.D.2d 513, 514, 636 N.Y.S.2d 61, 63 (2d Dep't 1995) (because "the unambiguous use of the term 'may' in the statute makes the decision to award attorneys' fees and costs discretionary rather than mandatory," then even if the underlying claim was a SLAPP suit, there was "no improvident exercise of the court's discretion in declining to award costs and attorneys' fees under the circumstances of this case.").

The purpose of defendant's campaign against Mr. Egiazaryan and the manner in which he carried it out militate against an award of damages.  Mr. Zalmayev was not acting selflessly or for the good of the public, he was not exercising his personal right of public petition or even to protect his own private rights (as in the case of an adjoining land owner who challenges a developer's plans).  Here, he acted selfishly and for the good of his own pocket.  He claims that he was hired by Russian billionaire Andrey Vavilov and paid tens of thousands of dollars to carry out a malicious smear campaign in the United States against Mr. Egiazaryan.  (*See* Statement of Facts, *supra*.)  Mr. Zalmayev and his co-conspirators carried out this campaign fully aware that their client was motivated by a deep-seated animus toward Mr. Egiazaryan.[70]  They also understood that their marching orders were to do whatever it took "to send Mr. Egiazaryan packing"[71], and to "send his ass to where he came from."[72]

To accomplish this goal, Mr. Zalmayev and his co-conspirators published statements suggesting that Mr. Egiazaryan was an anti-Semitic and anti-American xenophobic bigot,

---

[70] Zalmayev Tr. (Ex. 4), p 95; Akhmetshin Tr. (Ex. 2), pp. 97, 102, 251.

[71] Position Paper, Bates stamped PZ001160-61 (Ex. 6), at PZ001161.

[72] E-mail chain between Messrs. Zalmayev and Akhmetshin, dated February 22-23, 2011, Bates stamped PZ002778 (Ex. 7).

notwithstanding their inability to identify even a single anti-Semitic, anti-American or xenophobic statement or act by Mr. Egiazaryan.[73]  Because they knew that "he, himself, [Mr. Egiazaryan] was almost never on the record on anything"[74], and that making the case for Mr. Egiazaryan as an anti-Semite was "[n]ot an easy issue [and] largely circumstantial, [because] it is the party and its leader, Zhirinovsky"[75], Mr. Zalmayev and his co-conspirators attempted to mislead their audience by ascribing to Mr. Egiazaryan anti-Semitic and anti-American statements allegedly made by Mr. Zhirinovsky.  Defendant also employed other deceptive tactics in a deliberate effort to mislead the audience, including:  altering the letters he drafted so they would not appear to be coming from one source; providing the signatories of the Freedom House letters with the Ponomarev and Alexeyeva letters he drafted but not the corresponding retractions by the letters' signatories; and lowering the "Google rankings" of Mr. Egiazaryan's website and the blog criticizing Mr. Zalmayev to make it less likely that people conducting internet searches on Mr. Egiazaryan would find and read information in Mr. Egiazaryan's defense.  (*See* Statement of Facts, *supra*.)

Even after the commencement of this action, defendant and his co-conspirator Rinat Akhmetshin acted in bad faith to obstruct Mr. Egiazaryan's efforts to clear his name and repair his previously untarnished reputation in this country through the prosecution of his lawsuit.  After being served with a subpoena issued by plaintiff in this action, Mr. Akhmetshin intentionally disposed of documents and communications relevant to the issues raised in Mr. Egiazaryan's pleadings.  Indeed, Mr. Akhmetshin has admitted as much, testifying at his deposition that he deleted relevant e-mails; that subsequent to being served with Mr. Egiazaryan's subpoena, he threw "out in the trash" his computer containing relevant e-mails; and that he never backed up that computer.  (*See* Akhmetshin

---

[73] Zalmayev Tr. (Ex. 4), pp. 8-9; Akhmetshin Tr. (Ex. 2), pp. 114-120, 183, 186-187, 224-225, 357, 351-366; Bloomfield Tr. (Ex. 3), pp. 59-65, 235.

[74] February 5, 2011 e-mail from Mr. Akhmetshin, Bates stamped PZ002065-67 (Ex. 15), at PZ002065.

Tr. (Ex. 2), pp. 42-47.)[76]

The intentional destruction of these documents and communications -- after plaintiff commenced his lawsuit and issued a subpoena to Mr. Akhmetshin -- may well support an argument that Mr. Akhmetshin, and by extension, Mr. Zalmayev, improperly spoliated evidence that is highly relevant to the issues in this case, and also that they have something larger to hide that would be material to this Court's exercise of discretion on whether or not to award damages.  To the extent the destruction of such evidence constitutes spoliation, Mr. Zalmayev bears responsibility because he exercised "control" over Mr. Akhmetshin pursuant to Rule 34 of the Federal Rules of Civil Procedure.  In this Circuit, a party may be subjected to a spoliation sanction where relevant evidence was in the possession of, and destroyed by, a non-party, so long as that party had "control" over the non-party pursuant to Rule 34.  *E.g.*, *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 200-01 (S.D.N.Y. 2007) (Peck, MJ).  Under Rule 34, the "concept of 'control' has been construed broadly" and requires only that the party had the "right, authority, or *practical ability* to obtain the documents from a non-party to the action."  *Id.* at 195 (quotations and citations omitted) (emphasis added). Here, Mr. Zalmayev had the "practical ability" to obtain relevant documents from Mr. Akhmetshin, given their relationship and collaboration as co-conspirators in the smear campaign against Mr. Egiazaryan, and that Mr. Zalmayev paid Mr. Akhmetshin for his efforts.  These facts, which at least

---

[75] Memorandum from Douglas Bloomfield, titled "Memcon", Bates stamped BA 00483-BA 00487, attached as Exhibit 45 to the Cohen Decl., at BA 00484.

[76] The relevance of Mr. Akhmetshin's missing or deleted e-mails is hardly speculative.  While Mr. Akhmetshin did not produce a *single* e-mail in response to the subpoena that was served upon him, his confederates Zalmayev, Bloomfield and PSI (the PR firm of Mr. Kerimov's shell company Denoro) produced at least 351 e-mails sent to or from Mr. Akhmetshin's Gmail Account that would have been responsive to the same discovery requests and, in the case of PSI, withheld and/or heavily redacted an indefinite number of emails on the dubious claims of work product.  This fact "strongly suggests" that there were additional relevant e-mails sent to or from the Gmail Account that have not yet been produced to plaintiff.  *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 317 (S.D.N.Y. 2003) (Scheindlin, J.) (where defendant produced only 100 pages of relevant e-mails without searching its backup tapes and plaintiff produced over 450 pages of relevant e-mails, the court found it likely that there were relevant e-mails on defendant's backup tapes that had not yet been produced to plaintiff).

suggest that Mr. Zalmayev may have spoliated relevant evidence sought by Mr. Egiazaryan, militate in favor of this Court exercising its discretion to decline to award any damages to defendant.

Additionally, because he was hired to orchestrate a U.S.-based smear campaign against Mr. Egiazaryan, and because he published the allegedly defamatory statements while acting on behalf of a foreign principal, Mr. Zalmayev was likely required to register under the Foreign Agents Registration Act and make public disclosure of his relationship with the foreign principal.[77]  If it is accepted that Mr. Zalmayev sought to influence United States public officials and United States foreign policy with respect to the United States government's determination of plaintiff's alleged asylum application -- which is exactly what Mr. Zalmayev claims to have done to warrant the protections of the anti-SLAPP statute -- Mr. Zalmayev could be prosecuted under the Foreign Agents Registration Acts for failure to disclose his foreign principal.  His failure to register under this Act, while purportedly trying to influence the government's determination of an asylum application, demonstrates his unclean hands and warrants the dismissal of his anti-SLAPP counterclaim.

Unlike Mr. Egiazaryan, who is the real victim in this action and who never exhibited any malice towards Mr. Zalmayev either before or after the commencement of his lawsuit, Mr. Zalmayev has behaved maliciously towards Mr. Egiazaryan from the moment he was hired to engage in his attacks on Mr. Egiazaryan.  Defendant's conduct in carrying out this malicious smear campaign against Mr. Egiazaryan -- even if it consists of protected speech -- was reprehensible.

### 2. Any Attorneys' Fees Awarded to Mr. Zalmayev Pursuant to the Anti-SLAPP Statute Would Constitute an Improper Windfall

In this Circuit, it is axiomatic that an award of attorneys' fees should not amount to a windfall for the recovering party.  *See*, *e.g.*, *Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*,

---

[77] *See* 22 U.S.C. § 611 *et seq.*

246 F.3d 142, 151 (2d Cir. 2001) ("[W]e remind the District Court that in no event should the fees awarded amount to a windfall for the prevailing party.").  To determine whether an award of attorneys' fees constitutes such a windfall, courts place a significant emphasis on the actual billing arrangement that existed between the recovering party and its counsel.  *See Crescent Publishing Group, Inc.*, 246 F.3d at 150-51; *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, No. 98 Civ. 7128, 2004 WL 213032, at *5 (S.D.N.Y. Feb. 3, 2004).  This is because "the actual billing arrangement [c]ould require a lower payment than that which a court would find is the reasonable rate for attorneys of similar skill in the relevant community."  *Crescent Publishing Group, Inc.*, 246 F.3d at 150.  Therefore, under this approach, courts will not award fees to a recovering party that exceed the amount that the party paid to its counsel pursuant to the terms of the billing arrangement.  *See Video-Cinema Films, Inc.*, 2004 WL 213032, at *5 ("The Court finds that awarding more than [defendant] paid pursuant to the fee agreement here would amount to a windfall for [defendant] and a penalty against Plaintiff.").

Here, Mr. Zalmayev should not be awarded any attorneys' fees under the anti-SLAPP statute because Mr. Zalmayev has not -- and will not -- pay any fees to his counsel pursuant to the terms of their billing arrangement.  Instead, all legal fees and costs incurred by Mr. Zalmayev in defending against Mr. Egiazaryan's lawsuit and in prosecuting his own anti-SLAPP counterclaim are being paid by Andrey Vavilov -- the same Russian billionaire who retained Mr. Zalmayev and paid him tens of thousands of dollars to carry out the U.S.-based smear campaign against Mr. Egiazaryan. (*See* Zalmayev Tr. (Ex. 4), pp. 108-110, 121, 127.)  Indeed, as of June, 2012, Mr. Vavilov already had paid $1,126,444.74 in legal fees and costs incurred by defendant in this litigation.[78]  The anti-

---

[78] A series of checks from Andrey Vavilov to Peter Zalmayev's legal team, Bates stamped PZ003934-62, are attached collectively as Exhibit 46 to the Cohen Decl.

SLAPP statute is not designed to compensate third parties who finance a smear campaign through someone else.

Accordingly, because Mr. Zalmayev will not pay any of the fees incurred in this action, any fees awarded to Mr. Zalmayev under the anti-SLAPP statute would constitute a windfall for defendant and a penalty against Mr. Egiazaryan. This Court should exercise its discretion to decline to award any fees to Mr. Zalmayev and, consequently, to dismiss the anti-SLAPP counterclaim.

## CONCLUSION

Mr. Egiazaryan brought a lawsuit for completely legitimate purposes, based on documented facts and consistent with recognized legal principles. Defendant's counterclaim exceeds the scope of a law that must be strictly construed, is based on false pretenses and speculation and seeks to do nothing more than punish a litigant for seeking to assert his litigation rights. For the foregoing reasons, plaintiff's motion for summary judgment on defendant's anti-SLAPP counterclaim should be granted.

Dated: New York, New York
       April 19, 2013

FLEMMING ZULACK
     WILLIAMSON ZAUDERER LLP

By:_____/s/_____
         Mark C. Zauderer
         Jason T. Cohen
         Grant A. Shehigian
One Liberty Plaza
New York, New York 10006
(212) 412-9500

*Attorneys for Plaintiff Ashot Egiazaryan*