UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------

ASHOT EGIAZARYAN,

                    Plaintiff,

            -against-                    Case No.
                                         1:11-cv-02670
PETER ZALMAYEV,                          (PKC)

                    Defendant.

---------------------------------------

                    March 27, 2012
                    10:03 a.m.

Videotaped deposition of PETER ZALMAYEV, taken

by Plaintiff, pursuant to Notice, held at the

offices of Flemming Zulack Williamson Zauderer,

LLP, One Liberty Plaza, New York, New York,

before Joseph R. Danyo, a Shorthand Reporter

and Notary Public within and for the State of

New York.


HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------

ASHOT EGIAZARYAN,

                    Plaintiff,

          -against-         Case No.
                            1:11-cv-02670
                               (PKC)
PETER ZALMAYEV,             Volume 2


                    Defendant.

---------------------------------------

                    March 28, 2012
                    10:08 a.m.

               VOLUME II


     Videotaped deposition of PETER ZALMAYEV,

taken by Plaintiff, pursuant to Notice, held at

the offices of Flemming Zulack Williamson

Zauderer, LLP, One Liberty Plaza, New York, New

York, before Joseph R. Danyo, a Shorthand

Reporter and Notary Public within and for the

State of New York.


HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

1                    Zalmayev

2    States?

3         A.    Yes.

4         Q.    Were you born here?

5         A.    No.

6         Q.    You are a naturalized citizen?

7         A.    Yes.

8         Q.    When were you naturalized?

9         A.    I was naturalized in 2005, I believe.

10        Q.    And are you aware of the plaintiff --

11   withdrawn.  Have you ever heard of the plaintiff,

12   Ashot Egiazaryan?

13        A.    Yes.

14        Q.    Do you know who he is?

15        A.    Yes.

16        Q.    Have you ever met him?

17        A.    No.

18        Q.    You understand that he is a plaintiff

19   and you are a defendant in a lawsuit regarding

20   defamation.  Do you understand that?

21        A.    Yes, I do.

22        Q.    Let me ask you are you aware of any

23   anti-Semitic statements made by Ashot Egiazaryan

24   either in public or in private?

25        A.    No.

1                          Zalmayev

2        Q.   Are you aware of any vote cast by

3   Ashot Egiazaryan while he was in Duma for any

4   legislation that was anti-Semitic?

5        A.   No.

6        Q.   Are you aware of Mr. Egiazaryan

7   taking any positions that were anti-Semitic?

8        A.   No.

9        Q.   Now I would like to show you a couple

10  of documents here.  We are going to mark this

11  document as Exhibit 210.  It is the answer and

12  counterclaim.

13             (Exhibit 210, Answer and

14             counterclaim, was so marked for

15             identification, as of this date.)

16        Q.   As you now see, Mr. Zalmayev, during

17  the course of the deposition, you will be given

18  documents that are marked with a little sticker

19  in the corner.  The first thing I will ask

20  probably is whether you recognize the document,

21  and you should take as long or as little as you

22  need to answer that question, and then to the

23  extent I will be asking you specific questions

24  about the document, I will direct you to those

25  sections, but you should feel free to read as

```
 1                    Zalmayev
 2   Egiazaryan?
 3        A.   Eventually you mean?
 4        Q.   Yes.
 5        A.   I had an understanding, yes.
 6        Q.   What was that understanding?
 7        A.   The understanding was that Mr.
 8   Vavilov may have wanted Mr. Egiazaryan to be held
 9   accountable.
10        Q.   Mr. Vavilov didn't like Mr.
11   Egiazaryan too much, did he?
12        A.   I don't think -- no, I don't think he
13   did.
14        Q.   Fair to say that Mr. Vavilov hated
15   Mr. Egiazaryan's guts?
16        A.   There was a degree of animosity.
17        Q.   A lot of animosity, huh?
18        A.   I'm not sure I could judge the degree
19   of that animosity.
20        Q.   Now, when you met with Mr. Akhmetshin
21   in 2009, had you ever heard of the name Andrey
22   Vavilov before?
23        A.   Yes.
24        Q.   In what context had you heard it?
25        A.   In the context of his performing of
```

```
 1                      Zalmayev

 2   awareness of the fact that Mr. Egiazaryan had

 3   fled Russia by then.  So he was aware of this

 4   brouhaha.  He was aware.

 5            He also, I think he mentioned it in

 6   terms of his friendship with Zhirinovsky.

 7   Zhirinovsky's name came up, and generally just

 8   looking at it, I think from the beginning showed

 9   enthusiasm about signing onto the campaign.

10       Q.   Did you present him with a draft

11   letter?

12       A.   Yes.

13       Q.   Did he take it?

14       A.   He took it.

15       Q.   Did he make any edits to it?

16       A.   I gave him the hard copy of the

17   letter.  I also believe I allowed him to download

18   it onto his hard drive.  He told me he would look

19   at it and requested that I return the following

20   day to discuss it further.

21       Q.   And did you?

22       A.   Yes, I did.

23       Q.   Where did that happen?  At his

24   office?

25       A.   Yes.
```

```
 1                     Zalmayev
 2          Q.    What did you say to him and what did
 3   he say to you?
 4          A.    I showed up the next day.  He said, I
 5   looked at it.  I don't see any problems.  I don't
 6   read English, but can you just sort of tell me
 7   what it is about.  I proceeded to translate it
 8   for him verbatim, lest there be any
 9   misunderstanding later.
10                He said, I am willing to sign it.
11   Let's do it.  He signed several copies of the
12   letter.  There were five recipients, I believe.
13   He signed all of them.
14          Q.    Now you said that when you arrived
15   and inquired about the letter, Mr. Ponomarev
16   said, I didn't see any problems with the letter
17   or words to that effect, correct?
18          A.    Correct.
19          Q.    How could he have said that if he
20   didn't understand English?
21          A.    My understanding was there was a
22   young secretary, very sophisticated young lady
23   with knowledge of English who was there the first
24   time and the second time who in the meantime
25   conveyed the contents of the letter, so Mr.
```

1                          Zalmayev

2    Ponomarev had an idea of what the letter was

3    about.

4            Q.   Do you remember the young lady's

5    name?

6            A.   No, I don't.

7            Q.   If the young lady read it to Mr.

8    Ponomarev, why was it necessary for you to

9    translate it?

10           A.   Because he wanted to discuss it

11   further, and I'm not sure that she -- I'm not

12   sure the extent to which they discussed it.  He

13   looked at it, and I volunteered, and I had said,

14   here, Lev, let me read it to you, let's go

15   through it, and that is what I did.

16           Q.   Did he ask for payment?

17           A.   No.

18           Q.   Did he ever ask for payment?

19           A.   No.

20           Q.   Did you ever pay Mr. Ponomarev

21   $3,000?

22           A.   I paid him $2,000, not three.

23           Q.   Do you know why Mr. Akhmetshin would

24   have said that you paid him $3,000?

25           A.   That was the discussion we had, and

```
1                    Zalmayev

2         Q.   In what way?

3         A.   In a way similar to my previous

4    encounter with Mr. Ponomarev in a kind of

5    negative way.  She had an idea this gentleman was

6    a member of LDPR.  LDPR came up repeatedly, and

7    once again visible, visible disgust on her face

8    once the matter of LDPR came up, the name, and

9    when I said Egiazaryan, she said, her prompt was,

10   you mean that LDPR fellow?  I said yes.  So that

11   was the initial exchange.

12        Q.   Did you discuss anti-Semitism with

13   her in connection with Mr. Egiazaryan?

14        A.   Anti-Semitism did come up in

15   connection with LDPR.  Not exactly in connection

16   with Mr. Egiazaryan, no.

17        Q.   Did she ever say to you in words or

18   substance, Mr. Egiazaryan is an anti-Semite?

19        A.   No.

20        Q.   So, after this initial introduction

21   to the Egiazaryan subject, tell me what else

22   happened during that meeting.

23        A.   I proceeded to describe to her the

24   particulars of the campaign.  I mentioned the no

25   entry list initiative by Senator Cardin.  She
```

```
 1                      Zalmayev
 2    mentioned her enduring friendship with several of
 3    the recipients of the letters including Mr.
 4    Cardin and Christopher Smith, a congressman from
 5    New Jersey.  She said they were upstanding
 6    fellows.
 7               She remembered very fondly all the
 8    times that she was engaged with them, and I think
 9    when I showed her, then when I produced the
10    letters, I said, Ms. Alekseeva, here are some
11    letters I prepared on this issue, would you be
12    willing to sign.
13               When she saw the names of Mr. Smith
14    and Cardin, she said, these are my friends.  They
15    will listen to me.  Then she read them very
16    carefully, and her English is quite impressive.
17    I know she is very fluent in English.  She read
18    it carefully.  She took about ten minutes to read
19    through the letter, and shortly afterwards she
20    grabbed a pen and signed them.
21          Q.   Right in front of you?
22          A.   Right in front of me.
23          Q.   By the way, did you tell Mr.
24    Ponomarev that you were working on behalf of a
25    client?
```

```
 1                    Zalmayev

 2        A.   Mr. Ponomarev?

 3        Q.   Yes.

 4        A.   It did not come up, no.

 5        Q.   So you did not tell him?

 6        A.   I did not tell him.  We did not

 7   discuss it.

 8        Q.   How about Ms. Alekseeva, did you tell

 9   her that you were working on behalf of a paid

10   client?

11        A.   I did not say that.

12        Q.   Did she ask you?

13        A.   No.

14        Q.   Did you make a payment to Ms.

15   Alekseeva?

16        A.   I did not.

17        Q.   Do you know why Mr. Akhmetshin would

18   have said that a payment of $2,000 was made to

19   Ms. Alekseeva?

20        A.   We also discussed similar to Mr.

21   Ponomarev, this was my original understanding and

22   Mr. Akhmetshin's understanding that this is how

23   things are done in Russia.  You thank people.

24             So I automatically put down that

25   amount.  Like I said, it was a tentative budget
```

1                    Zalmayev

2    Helsinki Group."

3          A.    Which page is that?

4          Q.    Page 31, paragraph 35.  I will wait

5    for you to be ready.

6          A.    Yes.

7          Q.    "Mr. Zalmayev collaborated with

8    Lyudmila Alekseeva, chairperson, Moscow Helsinki

9    Group, on letters to members of the United States

10   Congress about Mr. Egiazaryan.  Ms. Alekseeva was

11   aware of Mr. Egiazaryan, his situation and the

12   public information and criticism of him.  Part of

13   the collaboration was that Mr. Zalmayev's English

14   is better than Ms. Alekseeva's English."

15               Is that a true statement?

16         A.    That is a true statement.

17         Q.    Is there any reason why Ms. Alekseeva

18   couldn't have drafted the letter that she

19   ultimately signed?

20         A.    Ms. Alekseeva is a very busy woman,

21   and she probably deals with such requests on a

22   daily basis, so I wanted to take -- I did not

23   want to take her time with this.  She is also a

24   very old woman.  She is pushing on I think 85.

25   She is definitely past 80.

```
 1                    Zalmayev

 2        Q.   Do you think her English is good

 3   enough to have drafted a letter of this sort?

 4        A.   It was good enough to read it and

 5   understand it.  To have drafted it in that way,

 6   it is not that good, no.

 7        Q.   I want to show you a series of

 8   documents that were marked at an earlier

 9   deposition collectively as 82.  I would like you

10   to take a look at this exhibit.  It bears Bates

11   numbers BA 00153 and runs through and including

12   BA 00160.  Do you see that?

13        A.   Yes.

14        Q.   Do you recognize these letters?

15        A.   Smith, Cardin, Smith.  Yes, I do.

16        Q.   All right.  Are these the letters

17   that were drafted by Mr. Ponomarev -- withdrawn.

18   Were these the letters that were signed by Mr.

19   Ponomarev and Ms. Alekseeva that you presented to

20   them during your trip to Moscow?

21        A.   Yes.

22        Q.   Do you know whether or not --

23   withdrawn.  Who sent these letters to their

24   recipients, did you or did they?

25        A.   Neither.
```

1                         Zalmayev

2          A.    I did.

3          Q.    When did you do that?

4          A.    I think it was the last day of my

5    trip.  It was sometime once again the first week

6    of February that I met with him.

7          Q.    Where did you meet with him?

8          A.    Some breakfast place in Washington.

9          Q.    So he was in the United States, not

10   Russia?

11         A.    Correct.

12         Q.    Let me call your attention to the

13   letterhead that appears on Mr. Ponomarev's letter

14   BA 00154.  Would you agree with me that it is the

15   same letterhead on all of Mr. Ponomarev's letters

16   in this exhibit?

17         A.    For human rights, for human rights.

18   One second.  It does appear to be the same

19   letterhead, yes.

20         Q.    Do you know where that letterhead

21   came from?

22         A.    That letterhead came from Mr.

23   Ponomarev.

24         Q.    So you didn't put this letterhead on

25   the letter, did you?

1                        Zalmayev

2          A.   I don't think so, no.

3          Q.   You say you don't think so.  Are you

4    sure?

5          A.   I am pretty sure.

6          Q.   How about the letterhead for Ms.

7    Alekseeva, do you see that beginning on page

8    BA 00156?

9          A.   I see it.

10         Q.   Is it the same letterhead that

11   appears throughout this document?

12         A.   Yes, I think so.

13         Q.   Did you put this letterhead on it?

14         A.   I did.

15         Q.   Where did you get it from?

16         A.   I think I remember getting it from

17   the organization's website.

18         Q.   Did it say download letterhead here?

19         A.   It could have been that, or I could

20   have just cut and pasted it from the website.

21         Q.   You cut and pasted it from the

22   website, didn't you?

23         A.   From the website, yes.

24         Q.   And did the letter appear on this

25   letterhead when you presented it to Ms.

1                        Zalmayev

2    some more on that document.

3         Q.   Did the information about the

4    commission get any less murky after December 29,

5    2010?

6         A.   First of all, I think eventually I

7    was able to correct some of the inaccuracies as

8    far as the basic chronology that you just pointed

9    out in that rough draft here that was really for

10   Rinat's use, and, yes, I was able to establish

11   that the commission was founded in 2000 and

12   disbanded in 2003, and that the general

13   impression I had from more sources which was

14   following this communication such as websites and

15   Russian NGOs information, et cetera, is that the

16   commission was notorious in its short history was

17   marked by allegations of impropriety of funds

18   being embezzled, et cetera.  That was just sort

19   of the public knowledge that was available.  That

20   was the impression I generally had.

21        Q.   You say, had a history marked by

22   allegations of impropriety.  You found no

23   evidence that those allegations were proven,

24   right?

25        A.   Evidence?  I don't remember that I

```
 1                    Zalmayev
 2   found the evidence, no.
 3        Q.   Isn't it true, sir, that during the
 4   course of all your research, you couldn't find --
 5   withdrawn.  Isn't it true that you couldn't say
 6   with certainty anything about Mr. Egiazaryan's
 7   Chechen record?
 8            MR. GOLDEN:  Objection to the form.
 9        A.   No, it is not true.  I was able to
10   say that Mr. Egiazaryan, A, initiated the
11   founding of the commission and was one of its
12   leaders, B, that the commission was murky, and
13   there were serious allegations as a matter of
14   public knowledge of its inactivity or wrongful
15   inactivity in Chechnya, and C, that as such, Mr.
16   Egiazaryan shared in some of its complicity and
17   responsibility.
18        Q.   But you could not establish with
19   certainty that Mr. Egiazaryan shared in the
20   complicity, correct?
21            MR. GOLDEN:  Objection to the form.
22        A.   As one of the leaders and a founder
23   of this commission, yes.  He was associated with
24   the commission, and therefore in my opinion and
25   view he was associated with whatever the
```

```
 1                    Zalmayev
 2   commission was known for and its results, the
 3   results of its work, whatever allegations were
 4   made against it.
 5        Q.   But you were never able to
 6   substantiate those allegations, right?
 7        A.   My substantiation was scores of media
 8   reports that I familiarized with while doing my
 9   research on this subject.
10        Q.   Other than media reports, what did
11   you look at to establish the accuracy of the
12   allegations that you are talking about here?
13             MR. GOLDEN:  Objection to the form.
14        A.   The media reports were a substantial
15   first step that gave me a good idea of what I was
16   dealing with.  I also spoke with some of my NGO
17   colleagues including some of the people that you
18   saw on that list who we just discussed who
19   corroborated the impression of that body being
20   completely inactive, completely inept and
21   completely counterproductive.  The body that
22   didn't really do what it was asked to do.
23        Q.   Did you come up with any credible
24   evidence that Mr. Egiazaryan was complicit in
25   embezzling Chechen funds?
```

1                        Zalmayev

2          A.   I got that impression once again from

3    media sources that, as I mentioned to you

4    earlier, lamented the fact that there was this

5    commission and that Mr. Egiazaryan was put in

6    charge of that commission, how that it was sort

7    of the public perception that with Mr. Egiazaryan

8    in charge one might just as well kiss goodbye to

9    the money.  I think that is one particular

10   article put it in those terms that I remember.

11         Q.   That was not my question, though.  My

12   question was did you come up with any credible

13   evidence that Mr. Egiazaryan was complicit in the

14   embezzlement of Chechen funds?

15              MR. GOLDEN:  Objection, asked and

16         answered.

17              MR. LUPKIN:  It is not answered, but

18         it was asked.

19         A.   If you are asking me if I saw him

20   pocket money, no, I did not see him pocket money.

21         Q.   Other than seeing him pocket money,

22   are you aware of any credible evidence of Mr.

23   Egiazaryan embezzling Chechen funds?

24              MR. GOLDEN:  Objection, asked and

25         answered.  Now you are arguing with the

```
 1                    Zalmayev

 2         witness, and you are doing it in a way

 3         that is inappropriate.

 4         Q.   You can answer the question.

 5         A.   But I think I already answered it in

 6   several different ways.  I don't know how else to

 7   tell you.

 8         Q.   Help me one more time.  Did you come

 9   up with any credible evidence establishing that

10   Mr. Egiazaryan embezzled Chechen funds?

11              MR. GOLDEN:  That is a different

12         question, and I'm not going to object to

13         it because it is a different question.

14         A.   Now I am confused.  What is the

15   question?  What is your next question?

16         Q.   The question was did you come up with

17   any credible evidence of Mr. Egiazaryan

18   embezzling Chechen funds?

19         A.   Funds allocated for the

20   reconstruction in Chechnya?

21         Q.   Yes.

22         A.   That was my impression that I had

23   from reading media reports, as I said.

24         Q.   But you have no credible evidence,

25   right?
```

<pre>
 1                         Zalmayev

 2          A.    I did not see him personally

 3   embezzling the funds, no, I did not see him.    I

 4   was not there to catch him red-handed, no.

 5          Q.    And you didn't examine any ledger

 6   books, did you?

 7              MR. GOLDEN:   Objection to the form.

 8          Wait a second.   Objection to the form.

 9          A.    I'm not sure what ledger books is

10   referring to.   I'm not familiar with the term.

11          Q.    Do you know whether the commission in

12   charge of funds for the reconstruction of

13   Chechnya even touched any of the money that was

14   earmarked for Chechnya?

15              MR. GOLDEN:   Objection to the form.

16          I don't understand that question.

17          Q.    Do you understand my question?

18          A.    I'm not sure I do.

19              MR. GOLDEN:   Would you read it back.

20              (Record read)

21              MR. GOLDEN:   My problem is the use of

22          the word "touch."   I just don't know what

23          you mean.

24              MR. LUPKIN:   I will rephrase it.

25          Q.    Do you know whether the commission in
</pre>

1                        Zalmayev

2    charge of the funds for the reconstruction of

3    Chechnya ever actually handled any of the money

4    that was earmarked for Chechnya, or was it an

5    oversight committee?

6            A.   It was a committee that was

7    responsible for restoring order, reconstructing

8    Chechnya.  I relied on scores of media reports in

9    forming the general impression I had that the

10   commission did not contribute in any meaningful

11   positive way to that reconstruction, and there

12   were serious concerns voiced by civil society

13   activists, in media, that there was impropriety

14   involved, funds may have been embezzled.

15           Q.   But you have no credible evidence of

16   that, do you?

17           MR. GOLDEN:  Objection to the form.

18           Q.   You can answer.

19           A.   I wasn't there to witness it, no.

20           Q.   Did you ever see any original

21   documents suggesting that Mr. Egiazaryan

22   embezzled funds earmarked for Chechnya?

23           MR. GOLDEN:  Please define what you

24           mean by original documents.

25           Q.   Something other than a media report.

1                        Zalmayev

2        A.    Something other than a media report

3   and an opinion of my fellow NGO activists?

4        Q.    Yes.

5        A.    Documentation, I do not remember

6   seeing, no.

7        Q.    How long after this December -- when

8   did you reach this conclusion?

9        A.    I'm sorry.  Which conclusion?

10       Q.    Withdrawn.  Is it because there was

11  no credible evidence that you dropped the matter

12  on Chechnya with respect to Mr. Egiazaryan?

13             MR. GOLDEN:  Objection to the form.

14       A.    I don't think there was ever any

15  issue of dropping the matter.

16       Q.    Did there come a time where you

17  stopped pressing the Chechnya angle with respect

18  to the Mr. Egiazaryan project?

19       A.    Well, I never really considered it an

20  angle.  It was a legitimate issue of concern that

21  I found eventually less salient with the Western

22  audiences, with American audience.

23       Q.    What do you mean by that?

24       A.    I mean how many people in America

25  have heard of Chechnya?  I mean how many people

                         Zalmayev

 1

 2    various sources, not just one.

 3         Q.   Now when you delivered this letter

 4    from Mr. Ponomarev to Senator Cardin, who did you

 5    hand it to physically?

 6         A.   I believe it was a meeting with Mr.

 7    Kyle Parker.  He was a staffer.

 8         Q.   Did you --

 9         A.   A staffer on Russian affairs and

10    Russia at the Helsinki Commission in Washington.

11         Q.   Did you tell Mr. Parker that you were

12    the primary draftsman of this document, the

13    letter?

14         A.   At the initial point of my meeting,

15    that was not part of our discussion.

16         Q.   Did you ever tell Mr. Parker that you

17    were a primary draftsman of the letter by Mr.

18    Ponomarev?

19         A.   There may have been a discussion

20    after he was able to familiarize himself with it.

21    He may have noticed a similarity in the style.  I

22    do recall some e-mail exchange with him where he

23    asked me who is it coming from?  Who is the one

24    who drafted the letters?  I believe I did say

25    that I helped prepare the message and I was a

1                     Zalmayev

2     participant in that process, so there was that

3     discussion, yes.

4          Q.   Did you tell Mr. Parker that you paid

5     Mr. Ponomarev $2,000 in cash?

6          A.   No.

7          Q.   Didn't you think that would be an

8     important piece of information?

9          A.   No, I did not think so.

10         Q.   If you were Mr. Parker, would you

11    have wanted to know whether or not Mr. Ponomarev

12    received $2,000 in cash?

13              MR. GOLDEN:  Objection to the form.

14         Q.   You can answer.

15         A.   A, I'm not Mr. Parker, I can't tell

16    you.  B, my opinion of someone who has been a

17    long-term Russia hand in a major policies

18    establishment in Washington, he knows Russia all

19    too well to be concerned about that.

20         Q.   But you don't know one way or the

21    other because you didn't tell him, right?

22              MR. GOLDEN:  Objection, asked and

23              answered.

24         A.   I'm not Mr. Parker.  I don't know

25    what he really -- he didn't ask me.

1                    Zalmayev

2         Q.    And you didn't tell him?

3         MR. GOLDEN:   Objection, asked and

4    answered.

5         Q.    You can answer.

6         A.    And I did not tell him.   No.   I said

7    it.

8         Q.    Then you write at the end of this

9    paragraph, "As such, therefore, Mr. Egiazaryan

10   was a contributor to the destructive Second

11   Chechen War."

12             Did I read that accurately?

13        A.    Yes.

14        Q.    You didn't say there was credible

15   evidence that Mr. Egiazaryan was a contributor to

16   the destructive Chechen War, right?

17        MR. GOLDEN:   Objection to the form.

18        A.    I said according to several reports

19   in the previous sentence.

20        Q.    Right.   But in the sentence I just

21   read to you, there is no qualifying language.

22   Would you agree with that?

23        MR. GOLDEN:   Objection to the form.

24        A.    I can just read you back the sentence

25   and have you decide.

1                    Zalmayev

2        Q.   Please do.

3        A.   "As such, Mr. Egiazaryan was a

4    contributor to the destructive Second Chechen

5    War."  That is what it literally says.

6        Q.   Did you tell Mr. Parker that you were

7    working for a client?

8        A.   That was not a subject of our

9    conversation.

10       Q.   At the time you delivered this letter

11   to Senator Cardin's office, you knew you were

12   working for a client, right?

13       A.   I knew I was working for a client,

14   yes.

15       Q.   And did you tell Mr. Parker that you

16   were being paid for your work on this project?

17       A.   No.

18       Q.   Did you tell Senator Cardin that you

19   were being paid for the work on this project?

20            MR. GOLDEN:  Objection to the form.

21       A.   I did not tell him that.

22       Q.   Let me ask you to turn to the Senator

23   Cardin letter that was prepared over Ms.

24   Alekseeva's signature.  Do you see that BA 00158

25   in Exhibit 82?

                              Zalmayev

1

2              (Exhibit 221, Document bearing Bates

3         numbers Freedom H 00002 through 00005, was

4         so marked for identification, as of this

5         date.)

6         Q.   By the way, before we get to that

7    article, you indicated that you sent a copy of

8    the Ponomarev and Alekseeva letters.  Before we

9    get to that document, you will have as much time

10   as you want to read it, but, before we get to

11   that document, you said you transmitted a copy of

12   the Alekseeva and Ponomarev letters to Freedom

13   House.  Do you recall giving that testimony?

14        A.   Yes.

15        Q.   When you received a copy of what I

16   have been calling the retraction letters, did you

17   provide copies of those to Freedom House?

18        A.   I don't think so.

19        Q.   When you learned of the Voice of

20   America article in which Ms. Alekseeva stated

21   what is quoted in what we have just read from,

22   Exhibit 220, I'm sorry, not from 220, Exhibit 85,

23   the Voice of America article, did you bring that

24   to Freedom House's attention?

25        A.   I don't remember that, no.

```
 1                   Zalmayev

 2        Q.   Anyone else?

 3        A.   No.

 4        Q.   How long did you meet with them?

 5        A.   I would say about 30 to 40 minutes

 6   the meeting lasted.

 7        Q.   Tell me what it is you said to them

 8   and what it is they said to you.

 9        A.   I described to them the campaign I

10   was leading.  They asked me questions about the

11   campaign.  We also talked about the general state

12   of human rights in Russia, human rights in

13   Chechnya specifically.

14        Q.   Did you tell Mr. Patton that you were

15   working on behalf of a client?

16        A.   That was not an issue that was

17   discussed.  No.

18        Q.   You didn't tell him that you were

19   being paid for your work here, right?

20        A.   I did not say that, no.

21        Q.   You didn't say that to Ms. Asoyan

22   either, right?

23        A.   No.

24        Q.   During the course of your discussion

25   about what you have been calling the campaign,
```

1                    Zalmayev

2    subject?

3        A.   I expressed my general incredulity on

4    that subject.

5        Q.   You indicated at the beginning of

6    this deposition that you were paid a certain sum

7    of money that totaled approximately $100,000,

8    correct?

9        A.   A total, yes.

10       Q.   And you don't know whether that money

11   came from Mr. Kerimov, do you, one way or the

12   other?

13       A.   I never had any information

14   indicating that it came from Mr. Kerimov, no.

15       Q.   And you never had any information

16   that it didn't come from Mr. Kerimov, right?

17       A.   I actually did have that information.

18   It was -- I was aware that Mr. Kerimov had

19   nothing to do with the campaign I was leading.

20       Q.   How did you become aware of that?

21       A.   From my conversations with Rinat.

22   There was just no piece of information that I was

23   in possession of, no piece of evidence, no

24   information, hearsay, anything, that would

25   indicate Mr. Kerimov had anything to do with the

```
 1                    Zalmayev

 2    campaign that I was leading.

 3         Q.   You don't know the source of the

 4    funds used to pay the $100,000 to Eurasia

 5    Democracy Initiative, do you?

 6         A.   Now I do.

 7         Q.   What do you know that to be?

 8         A.   I think Mr. Vavilov was revealed to

 9    me as the source.

10         Q.   When was he revealed to you as the

11    source?

12         A.   Shortly after the complaint was

13    filed.

14         Q.   Are you aware of the fact -- who

15    revealed that to you?

16         A.   Rinat mentioned it.

17         Q.   What did he say to you?

18         A.   This was information provided to me

19    on the eve of my meeting with Mr. Vavilov.

20         Q.   Did Mr. Vavilov say anything at the

21    meeting about having funded your project?

22         A.   He did not discuss that, no.

23         Q.   When Rinat Akhmetshin told you that

24    money had come from Mr. Vavilov, did he tell you

25    how he, Akhmetshin, received the money from Mr.
```

1                          Zalmayev

2     signature.  It had Ms. Alekseeva's signature.

3          Q.   And the Svetlana Gannushkina letters,

4     those were sent out over her signature as well,

5     correct?

6          A.   Yes.  Correct.

7          Q.   Not over your signatures, right?

8          A.   No.

9          Q.   There were letters sent out by

10    Freedom House, correct?

11         A.   Freedom House was a subsequent

12    co-signer of a letter on Mr. Egiazaryan's case.

13         Q.   We will get to that probably

14    tomorrow.  In what other ways did you disseminate

15    information or educate the public in connection

16    with your campaign?

17         A.   I prepared my own article which was

18    published in the Jewish Journal.  I worked with

19    other individuals, other reporters to bring to

20    their attention Mr. Egiazaryan's case.

21         Q.   And you worked with Leonid Komarovsky

22    as well, correct?

23         A.   Correct.

24         Q.   In fact, Mr. Komarovsky published an

25    article, No Safe Haven for Hate-Mongers, correct?

1                    Zalmayev

2         A.    That's correct.

3         Q.    And you participated in drafting

4    that, correct?

5         A.    I did.

6         Q.    And Mr. Komarovsky was paid $7,000 in

7    connection with this campaign, isn't that

8    correct?

9         A.    That's correct.

10         Q.    How did you arrive at the number

11    $7,000?

12         A.    Mr. Komarovsky wanted to know if he

13    could expect to be compensated for his time,

14    which he estimated would be significant because

15    the need was to research this matter thoroughly.

16    Then he asked me if that was the case.  I said,

17    yes, of course I would not expect you to work for

18    free.

19         Q.    Did he quote you an hourly rate?

20         A.    He did not quote.

21         Q.    Did you have an understanding of what

22    his hourly rate was?

23         A.    No.

24         Q.    Am I correct that you drafted the

25    article No Safe Haven for Hate-Mongers on his

```
1                    Zalmayev
2   behalf, did you not?
3        A.   I think I had discussed it with him,
4   but the bulk of it was my -- the product of my
5   labor, right.
6        Q.   So the bulk of it was the product of
7   your research, correct?
8        A.   My research, but also I believe that
9   by then Mr. Komarovsky had done a substantial,
10  substantial amount of research of his own.
11       Q.   How do you know that?
12       A.   Well, he prepared an article, an
13  opinion piece, let me restate that, an opinion
14  piece in a Russian Jewish American newspaper
15  which he published.
16       Q.   What was the name of that newspaper?
17       A.   I think the name of the newspaper?
18       Q.   Yes.
19       A.   It means Jewish World.
20       Q.   Was that published before or after No
21  Safe Haven for Hate-Mongers?
22       A.   I believe it was published before.
23       Q.   Apart from the meeting you had with
24  Mr. Vavilov in Mr. Ryan's office, have you ever
25  spoken with Mr. Vavilov?
```

```
 1                    P. Zalmayev

 2   document.

 3         Q.   So Mr. Rubin, Joel Rubin --

 4         A.   Yes.

 5         Q.   -- wanted to get Mr. Egiazaryan's

 6   side of the story, right?

 7         A.   Correct.

 8         Q.   Because he is a responsible

 9   journalist?

10              MR. GOLDEN:   Objection.

11         Q.   Do you know whether or not Mr. Rubin

12   is a responsible journalist?

13         A.   I would have no reason to doubt that

14   he is not.

15         Q.   You never looked to get Mr.

16   Egiazaryan's side of the story, did you?

17         A.   I did not.

18         Q.   You didn't reach out to any of his

19   lawyers to get his side of the story, did you?

20         A.   I'm not a lawyer.   I am sorry.   I'm

21   not a journalist; so, no, I didn't feel like I

22   needed to abide by that standard.   No, I did not.

23         Q.   Whether you felt you needed to abide

24   by it or not, you didn't do it?

25         A.   I did not do it.   No.
```

1                       P. Zalmayev

2           A.    I don't think so, no.

3           Q.    Did you offer it to him?

4           A.    No.

5           Q.    By the way, did you tell Mr. Rubin

6    that you were working for a client?

7           A.    No.

8           Q.    And presumably you didn't tell Mr.

9    Joel Rubin that you were being paid for your work

10   on this campaign for a client, correct?

11          A.    I did not tell him that, no.

12          Q.    What was the purpose of your meeting

13   with him other than what you just told me?

14          A.    That was the purpose.

15          Q.    Was Mr. Rubin having difficulty

16   getting ahold of Mr. Egiazaryan?

17          A.    He did follow up with me.   I believe

18   he relayed some facts about his attempts or

19   shared with me some details about his attempts to

20   contact Mr. Egiazaryan.   To my knowledge, I

21   don't believe he was successful in meeting with

22   him.

23          Q.    So you wanted to help facilitate his

24   ability to meet with him?

25          A.    He requested and he wanted to see if

P. Zalmayev

1   I could, and I in turn also wanted to see if I

2   could.

3          Q.   By the way, weren't you interested in

4   what Mr. Egiazaryan's side of the story was?

5          A.   No, I wasn't.

6          Q.   Let me ask you to take a look at what

7   has been previously marked at this deposition --

8   by the way, before we do that, do you know who

9   conducted this surveillance that is reflected in

10  Exhibit 225?

11         A.   I believe I answered that question.

12  I'm not aware.

13         Q.   Have you ever heard of the name

14  Lawrence or Larry Weist?

15         A.   Larry Weist.   Larry Weist.   I

16  believe I do have a vague recollection of that

17  name.   Yes, I do.

18         Q.   How do you know that name?

19         A.   I believe I may have seen a document

20  having to do with some legal action taking place

21  in California at some point before the

22  commencement of my project when Mr. Weist was, I

23  believe there was his testimony, and I believe

24  somewhere in that testimony this document may

                        P. Zalmayev

1

2    about enlisting his assistance, you didn't tell

3    him that you were working for a client, did you?

4          A.   We did not have that discussion, no.

5          Q.   And you didn't tell him that you were

6    being paid by a client to perform this function,

7    did you?

8          A.   There was not that discussion.

9          Q.   And you didn't tell him, right?

10         A.   No.

11              MR. LUPKIN:   Let me ask you to mark

12         as the next exhibit, PZ 001287 through PZ

13         001289.

14              (Whereupon, Plaintiff's Exhibit 228,

15         document bearing Bates designation PZ

16         001287 through PZ 001289 was hereby marked

17         for identification, as of this date.)

18         Q.   Please take a look at this document

19    and when you are finished, let me know.

20         A.   Yes, I have looked at it.

21         Q.   Have you seen it before?

22         A.   I have.

23         Q.   What do you recognize it to be?

24         A.   It is a document, a Word document

25    that was saved in my -- part of my files.

                    P. Zalmayev

1

2        Q.    You can answer.

3        A.    No, I wouldn't.

4        Q.    By the way, February 4 is the same

5    day that you met with Doug Birch, isn't it?

6              MR. GOLDEN:   Excuse me.   Would you

7        just read that back.

8              [The requested portion of the record

9        was read back by the reporter.]

10       A.    It may be the day.   I know it was

11   sometime one or two days before the article, so,

12   yes.   I don't exactly recall the date.

13       Q.    This was Exhibit 178.   My question

14   is going to be do you recognize this document?

15       A.    I recognize a portion of this

16   document.

17       Q.    Which portion do you recognize?

18       A.    I recognize the text, the draft of

19   this.

20       Q.    What do you recognize the text of the

21   draft as?

22       A.    It is the draft of an opinion piece

23   that was in one, whether exactly in the same, you

24   know, form or not, was published in the Moscow

25   Times by Mr. Leonid Komarovsky.

1                    P. Zalmayev

2        Q.   This was the article that you

3   drafted, right, for Mr. Komarovsky?

4        A.   I drafted it largely with his input.

5   We discussed it before he finally published it.

6   Yes.

7        Q.   You drafted it, right?

8        A.   I helped draft it, yes.

9        Q.   You primarily drafted it, didn't you?

10       A.   I primarily drafted it, correct.

11       Q.   The article "No Safe Haven for

12   Hate-Mongers" that ultimately -- withdrawn --

13   start again.

14            And the article, "U.S. Must Get Real

15   on Anti-Semitism and Xenophobia No Safe Haven for

16   Hate-Mongers," when the final version of that

17   article came out in the Moscow Times -- I just

18   lost my train of thought.   Bear with me.   All

19   right.

20            Do you know why Mr. Akhmetshin is

21   forwarding a draft of the "No Safe Haven for

22   Hate-Mongers" article that you primarily drafted

23   to Mr. Greg Hitt?

24       A.   I do not.

25       Q.   As the primary draftsman of this

```
 1                    P. Zalmayev
 2   article and the leader of the Ashot Egiazaryan
 3   campaign, wouldn't you have wanted to know that?
 4            MR. GOLDEN:  Objection to the form.
 5       A.   No.
 6       Q.   You wouldn't be interested in whether
 7   or not one of your drafts was being sent to
 8   somebody outside of your inner team?
 9            MR. GOLDEN:  Objection to the form.
10       Q.   You can answer that question.
11       A.   I was interested in making sure that
12   the op-ed piece that I primarily drafted would be
13   published.   That was my primary concern.
14       Q.   And this article, the one that was
15   ultimately published in the -- I did it again.
16            This one the one that was ultimately
17   published in the Moscow Times is one of the
18   articles that is the subject matter of this
19   lawsuit, isn't that correct?
20       A.   Yes, I think so.
21       Q.   Did Mr. Akhmetshin tell you that he
22   was going to forward this to Mr. Hitt?
23            MR. GOLDEN:  Objection.   Asked and
24            answered.
25       A.   No.
```

P. Zalmayev

1

2   Q.   How about 179?   Have you ever seen

3   that document before, sir?

4   A.   A portion of it.

5   Q.   Which portion did you see?

6   A.   The opinion piece that was titled "No

7   Safe U.S. Haven for Hate-Mongers," which came out

8   in the Moscow Times on March 13, 2011 under the

9   byline of Leonid Komarovsky.

10   Q.   That was the piece that you primarily

11   drafted, correct?

12   A.   Correct.

13   Q.   Now do you know who Mr. Akhmetshin is

14   forwarding this -- withdrawn.

15   Who is Mr. Akhmetshin forwarding this

16   to?   Do you know?

17   A.   Since this is the first time I am

18   seeing this particular portion of this e-mail,

19   I'm not aware, and it doesn't say here.   So, no,

20   I don't.

21   Q.   Do you know how this document wound

22   up in the possession of Public Strategies?

23   MR. GOLDEN:   Objection to the form.

24   A.   I do not know that.

25   Q.   Next 180.   Have you ever seen this

```
 1                     P. Zalmayev
 2    document before?
 3         A.   I have not.
 4         Q.   Do you know why Mr. Akhmetshin is
 5    forwarding -- withdrawn.
 6              Do you know why this e-mail is being
 7    sent to Mr. Nariman Gadzhiev on February 22,
 8    2011?
 9              MR. GOLDEN:  Objection to the form.
10         A.   I do not know that.
11         Q.   Do you know why Mr. Akhmetshin would
12    have copied any of the people identified on this
13    e-mail?
14              MR. GOLDEN:  Objection to the form.
15         A.   I don't.
16         Q.   And you were not blind-copied on this
17    e-mail, were you?
18         A.   I do not remember this.  No, I don't
19    think so.
20         Q.   As the leader of the Ashot Egiazaryan
21    campaign, wouldn't you have wanted to know about
22    this communication?
23              MR. GOLDEN:  Objection to the form.
24         A.   I just correct.  The anti-Ashot
25    Egiazaryan campaign.
```

```
 1                      P. Zalmayev
 2   must be mentioned."
 3        Q.   Those were your words, right?
 4        A.   Yes.
 5        Q.   So, as far as you were concerned, it
 6   wasn't significant in and of itself to get a
 7   statement in the congressional record denouncing
 8   anti-Semitism generally.   Isn't that right?
 9             MR. GOLDEN:  Objection to the form.
10        A.   My concern was to mention the issue
11   of anti-Semitism in relation to Mr. Ashot
12   Egiazaryan.
13        Q.   But, if you were able to get a
14   statement in the Congressional record denouncing
15   anti-Semitism generally, that was of no concern
16   to you, was it?
17             MR. GOLDEN:  Objection to the form.
18        A.   My goal had to do and dealt with
19   spreading the message of Mr. Egiazaryan's
20   anti-Semitic associations and not anti-Semitism
21   in general.
22        Q.   I want to switch subjects a little
23   bit please and ask you, I think I know the answer
24   to the question, but you will let me know.   You
25   know what Google is, right?
```

1                    P. Zalmayev

2          A.    Yes.

3          Q.    What is Google?

4          A.    It is a search engine, online search

5     engine.

6          Q.    It is arguably the most popular

7     search engine on the web, right?

8          A.    It is a popular one.

9          Q.    Do you know how Google prioritizes

10    its results in response to a search request?

11              MR. GOLDEN:   Nobody knows that.

12         A.    I believe it depends.   My

13    understanding is that it depends on the order of

14    articles, order of various information pieces

15    being placed on the internet.

16         Q.    Obviously if you are say advertising

17    in business, you would want your business's

18    e-mail to come up higher on the list than lower

19    on the list, right?

20         A.    It depends on the information.

21         Q.    Well, if somebody was searching for

22    Eurasia human rights organizations and they typed

23    in Eurasia human rights organizations, you would

24    want Eurasia Democracy Initiative to come up

25    somewhere close to the top of the list, right?

```
 1                    P. Zalmayev
 2            MR. GOLDEN:  Excuse me.   When you
 3        were asking him, are you asking that as an
 4        example to talk about the search
 5        structure, or do you mean specifically
 6        what he cares about his organization?
 7            MR. LUPKIN:  I am just asking him
 8        whether he understands the importance of
 9        being listed up at the top.
10        A.   Being listed up at the top was never
11   my fervent goal nor desire specifically, no.
12        Q.   And let me ask you this.   If you had
13   positive information about you and somebody were
14   to search for you, you would want that positive
15   information at the top of the search, right?
16        A.   Yes, I would prefer positive rather
17   than negative information.
18        Q.   And, conversely, if there was
19   negative information about you, you would want
20   that to appear lower down on the search result
21   list, right?
22        A.   I would not want negative information
23   to be publicized especially if it was wantonly
24   negative or incorrect information, yes.
25        Q.   Are you aware of the fact that there
```

```
 1                    P. Zalmayev

 2   are ways in which parties can alter the order in

 3   which search results come up in response to a

 4   Google search?

 5        A.   I have been told from various sources

 6   I had an idea that that could be something that

 7   is possible.   Yes.

 8        Q.   In fact, you considered doing just

 9   that in connection with the Egiazaryan campaign.

10   Isn't that right?

11        A.   I am sorry.   Doing just what?

12        Q.   Altering the order of search results

13   on Google.

14        A.   There were a number of pieces that I

15   thought were generated by Mr. Egiazaryan and his

16   team that were up in the top of it.   Yes.

17        Q.   And you wanted to get that

18   information that was generated by Mr. Egiazaryan

19   and his team lower on the search results, right?

20        A.   Yes, I prefer to see it much lower in

21   the results, correct.

22        Q.   The reason you wanted to see it much

23   lower is because it would increase the likelihood

24   someone wouldn't notice it, right?

25        A.   It is because I did not want that
```

1                          P. Zalmayev

2     person searching for my name to see that in that

3     primarily and nothing but that, of course, yes.

4          Q.   So I am correct, right?

5               MR. GOLDEN:  Objection to the form.

6          A.   I just stated my preference.

7          Q.   But if -- withdrawn.

8               Did you in fact explore ways to lower

9     -- withdrawn.

10              Did you explore ways with Mr.

11    Akhmetshin to alter the order of search results

12    on Google in connection with the Egiazaryan

13    campaign?

14              MR. GOLDEN:  Objection.   I think the

15              two of you are talking about two slightly

16              different things.

17         Q.   Let me see what the witness has to

18    say.   You can answer it.

19         A.   That was an issue that came up in my

20    conversation, yes.

21         Q.   Did there come a time when you had

22    asked Mr. Akhmetshin to see whether he could

23    effectuate an alteration of Google result order?

24         A.   I believe so.

25         Q.   Let's take a look at this.    PZ

1                        P. Zalmayev

2      003158.    The next exhibit.

3                (Whereupon, Plaintiff's Exhibit 240,

4           document bearing Bates designation PZ

5           003158 was hereby marked for

6           identification, as of this date.)

7           Q.    Did you ever see this e-mail before?

8           A.    Yes.

9           Q.    Did you send this e-mail to Mr.

10   Akhmetshin on April 18, 2011 at 7:44 p.m., the

11   date and time indicated?

12          A.    I did.

13          Q.    Can you read to me the subject line.

14          A.    "Google."

15          Q.    Now can you read to me the text of

16   that e-mail.

17          A.    "Yo.    You mentioned there might be a

18   way to push down that" S H I T bad word "in the

19   search results.    Did you contact your guy about

20   that?"

21          Q.    When you used the term "Yo," what

22   were you talking about?

23          A.    Yo as in you addressing Mr.

24   Akhmetshin.

25          Q.    You didn't say you.    You said yo,

1                    P. Zalmayev

2    right?

3         A.    It is another way of saying you.

4    It's an address.   It is a form of address.

5    Informal form of address.

6         Q.    Very informal, isn't it?

7         A.    It is something used between friends,

8    yes.   My understanding of it.

9         Q.    What were you talking about here?

10        A.    This was in follow up to a

11   conversation when I expressed my dismay to Mr.

12   Akhmetshin of how much negative information and

13   how much -- how many references to this

14   particular case and the lawsuit were being placed

15   in Google and appearing in the top at which point

16   he mentioned that he may know some person, an IT

17   person, who has a way to push, whichever, pieces

18   down the line or down in the search engine.

19   This was my follow-up to that discussion after I

20   had not heard from Mr. Akhmetshin on that for

21   some time, so this was basically to refresh his

22   memory and see if he had any further information

23   as to that request.

24        Q.    Now this e-mail was sent on April 18.

25   You had not yet been served with a complaint in

```
 1                    P. Zalmayev

 2   this case.   Isn't that right?

 3        A.   No.

 4        Q.   I am correct, right?

 5        A.   You are correct.

 6        Q.   So, if you hadn't yet been served

 7   with a complaint, where were you looking to push

 8   that shit down in the search results about?

 9        A.   Once again I have a very vague

10   recollection about that, but it may have been

11   some media reports in the Russian media that were

12   to my mind spreading erroneous information about

13   me and the information such as EDI.

14        Q.   What kind of erroneous information?

15        A.   There may have been information.

16   There may have been just basic allegations.   I'm

17   not sure if it had to do with, I believe it had

18   to do with Mr. Egiazaryan and his backers and

19   their attempts to paint the entire campaign, my

20   campaign in specific, with a quite broad brush

21   stroke.   You know, and to paint it into

22   something that would be coming from various

23   political forces and interests that I had no

24   relation to.

25        Q.   Take a look at this next e-mail, PZ
```

1              P. Zalmayev

2    002947.

3              (Whereupon, Plaintiff's Exhibit 241,

4         document was hereby marked for

5         identification, as of this date.)

6         Q.   Do you recognize this e-mail chain?

7         A.   Let me see.  Yes, I do.

8         Q.   Starting from the bottom up, did you

9    send an e-mail to Mr. Akhmetshin on April 22,

10   2011 at 12:59 a.m.?

11        A.   Yes.

12        Q.   Can you read it please?

13        A.   "The whole first page of 'latest'

14   search results of my name is links to A's letter

15   to editor and the filed suit.   Have you checked

16   with your guy yet?"

17        Q.   What were you talking about there?

18        A.   Here I was talking about Mr.

19   Egiazaryan's letter to the editor of the Jewish

20   Journal, and I believe by that time, I'm not

21   sure, by that time the suit had been filed

22   against me, so I am referring to that complaint,

23   and I was also inquiring to see if he had checked

24   with his contact about that.

25        Q.   You say checked with his contact

                        P. Zalmayev

1

2    about that.   What you mean is to check with his

3    IT guy to see whether or not something could be

4    done to lower the reference to Mr. Egiazaryan's

5    letter to the editor and reference to the lawsuit

6    on Google searches.   Correct?

7         A.   That's correct.

8         Q.   Now Mr. Akhmetshin responds the same

9    day a few hours later April 22, 2011 at 3:07 p.m.

10   Right?

11        A.   Correct.

12        Q.   Did you get that e-mail at or around

13   that time?

14        A.   Yes.

15        Q.   Can you please read that into the

16   record.

17             MR. GOLDEN:   Peter, read all the

18        words.   Read the profanity.

19             THE WITNESS:   Yes?

20             MR. GOLDEN:   Yes.

21        A.   "It is a holiday, yo.  We'll deal

22   with that.   Stop being antsy.   This is what

23   those fucks want to do to make you feel bad.   You

24   shouldn't.   Get your mind off that shit, yo!!"

25        Q.   Do you recall Mr. Akhmetshin sending

```
 1                    P. Zalmayev
 2    you this e-mail?
 3         A.   I do recall that.
 4              MR. LUPKIN:   Mark this as the next
 5         document, please.
 6              (Whereupon, Plaintiff's Exhibit 242,
 7         document bearing Bates designation PZ
 8         002948 was hereby marked for
 9         identification, as of this date.)
10         Q.   Exhibit 242 bearing Bates designation
11    PZ 002948 you have in front of you, sir?
12         A.   Yes, I do.
13         Q.   Do you recognize this e-mail
14    exchange?
15         A.   I do.
16         Q.   At the bottom of the page you sent
17    Mr. Akhmetshin an e-mail on May 9, 2011 at 7:29
18    p.m. the date and time indicated?
19         A.   Yes.
20         Q.   You write, "Also please see item 6 in
21    this search.   It must go:"   And then there is a
22    Google search with a bunch of computer characters
23    and then Eurasia Democracy Initiative.
24              Do you see that?
25         A.   Yes, I do.
```

1                    P. Zalmayev

2          Q.    Do you know what item 6 in the search

3   was?

4          A.    I would probably recognize it.    I

5   don't remember on the top of my head.   No.

6          Q.    Does the fact that this e-mail is

7   dated May 10 help you recall what item 6 was?

8          A.    No, it doesn't.

9          Q.    The top e-mail is from Mr. Akhmetshin

10  to you May 10, 2011 at 7 a.m.   Did you receive

11  the e-mail at or around that date and time?

12         A.    Yes.

13         Q.    Can you please read that into the

14  record please.

15         A.    "Yes and? I will be surprised if it

16  wouldn't pop up.   It will be pushed down at some

17  point, but, as you can see, those fucks are pushy

18  over those Google searches.   It is irrelevant

19  and dynamic.   Things change and so do searches."

20         Q.   Thank you.   We are finished with

21  that.   Exhibit 243.   Please mark it.

22              (Whereupon, Plaintiff's Exhibit 243,

23              document bearing Bates designation PZ

24              001212 was hereby marked for

25              identification, as of this date.)

                    P. Zalmayev

1

2          Q.    This is the one that you had a

3   primary drafting responsibility for, correct?

4          A.    Correct.

5          Q.    This is one of the articles that is

6   the subject matter of the complaint in this case,

7   right?

8          A.    Yes.

9          Q.    Take a look at this please.    The

10  next exhibit.

11              (Whereupon, Plaintiff's Exhibit 246,

12              document bearing Bates designation PZ

13              000980 was hereby marked for

14              identification, as of this date.)

15         Q.    Can you please take a look at Exhibit

16  246 which bears Bates designation PZ 000980.

17         A.    Yes.

18         Q.    Is this a check cut on the Eurasia

19  Democracy Initiative bank account to Leonid

20  Komarovsky for $7,000?

21         A.    Correct.

22         Q.    This was the $7,000 payment made to

23  Mr. Komarovsky in connection with the

24  anti-Egiazaryan campaign that you were leading,

25  correct?

1                           P. Zalmayev

2           A.    Yes.

3           Q.    Next.   You indicated a moment ago

4    that Mr. Komarovsky also had a radio show, right?

5           A.    Yes.

6           Q.    Where is the radio show based?    Do

7    you know?

8           A.    He broadcasts out of Boston.

9           Q.    Do you know Mr. Komarovsky outside

10   the context of the Mr. Egiazaryan case?

11          A.    Yes.

12          Q.    Do you speak with him fairly

13   regularly?

14          A.    Yes.

15          Q.    Is he a friend of yours?

16          A.    Yes.

17          Q.    When did you first meet him?

18          A.    I met him in the year 2003.

19          Q.    Have you ever listened to his show?

20          A.    Yes.

21          Q.    Do you listen to the show frequently?

22          A.    Not frequently.

23          Q.    From time to time?

24          A.    Very rarely.

25          Q.    Have you listened to the show in

```
 1                    P. Zalmayev
 2          Q.   By the way, you said that you were
 3     the first caller into the show.   Did you direct
 4     other people to call into Mr. Komarovsky's show?
 5          A.   No.
 6          Q.   Do you know whether Mr. Komarovsky
 7     encouraged other people to call into the show?
 8          A.   I don't know that.
 9          Q.   Do you know whether or not Mr.
10     Akhmetshin encouraged other people to call into
11     the show?
12          A.   I don't know that.
13          Q.   Do you know whether Mr. Akhmetshin
14     himself called into the show?
15          A.   I don't know that.
16          Q.   Now when you called for the first
17     time?
18          A.   Yes.
19          Q.   Did you identify yourself as Ilya?
20          A.   I don't remember that was Ilya.   I
21     don't think so.
22          Q.   Do you know anybody else that called
23     the show about Mr. Egiazaryan?
24          A.   No, I don't.   I called myself, but I
25     don't think it was -- I don't remember the name
```

1                           P. Zalmayev

2    Ilya.  No.

3          Q.   Did you identify yourself as Peter

4    Zalmayev?

5          A.   No.

6          Q.   Who did you identify yourself as?

7          A.   I am trying to remember.   It may

8    have been a Paul, a perverted Russian version.

9    I don't remember the exact name.   It was not

10   Peter Zalmayev.

11         Q.   Why didn't you identify yourself as

12   Peter Zalmayev?

13         A.   I did not want -- I wanted to remain

14   kind of anonymous.

15         Q.   Isn't it true that you wanted to give

16   the impression that there were other people

17   concerned about the Egiazaryan matter other than

18   Peter Zalmayev?

19         A.   I wanted to just jump-start the

20   conversation on his show as it was requested of

21   me by Mr. Komarovsky.

22         Q.   You could have done that by

23   identifying yourself as Peter Zalmayev, right?

24         A.   I could have as well, yes.

25         Q.   But you used a pseudonym, isn't that

```
 1                        P. Zalmayev

 2   right?

 3           A.   I used a pseudonym.  That's correct.

 4           Q.   Do you use Yahoo calendar?

 5           A.   Yahoo calendar, yes, I have used

 6   Yahoo calendar.

 7           Q.   I would like you to look at PZ

 8   000875.

 9                (Whereupon, Plaintiff's Exhibit 248,

10           document bearing Bates designation PZ

11           000875 was hereby marked for

12           identification, as of this date.)

13           Q.   Do you recognize what this is?

14           A.   Yes.

15           Q.   What is it?

16           A.   This is a reminder, calendar reminder

17   to myself to call Komarovsky's program on the

18   stated date of February 16, 2011.

19           Q.   That was two days before the excerpt

20   that we just played which was February 18,

21   correct?

22           A.   Yes.

23           Q.   Did you in fact call on February 16?

24           A.   I'm not sure if it was that date, but

25   I would imagine that it is, yes.
```

1                    P. Zalmayev

2          Q.   But you don't know one way or the

3     other, right?

4          A.   I know that I was the first caller to

5     the show.   Yes.

6          Q.   Did you ever call him again?

7          A.   No.

8          Q.   Do you remember the date that you

9     called him?

10              MR. GOLDEN:   Objection.   Asked and

11              answered.

12         A.   I don't remember the date.   No.

13         Q.   Did you call him on more than one

14     occasion?

15              MR. GOLDEN:   Objection.   Asked and

16              answered.

17         A.   You mean whom?

18         Q.   Komarovsky's show.

19         A.   Komarovsky's show.   O.K.

20              Let's clarify here.   Did I call on

21     his show as it was live?   It was only once that I

22     called.   I have called to speak with him, and I

23     may have dialed this number to speak with him

24     while he was off the air.   That may have

25     happened.   I do recall that I may have dialed

1                        P. Zalmayev

2          A.   I'm not aware of another number that

3    he uses, no.

4          Q.   Do you know Douglas Bloomfield's

5    telephone number?

6          A.   Not by heart.

7          Q.   Do you have that information on you?

8          A.   I believe so.

9          Q.   Can you tell me what numbers he uses.

10         A.   I have the following number as

11   indicated marked as his mobile as 301-346-2707,

12   and I have another number that says here marked

13   as work number.   301-460-3285.

14         Q.   Is that it?

15         A.   Yes.

16         Q.   Let me ask you to look at what was

17   previously marked as Exhibit 7.   Do you

18   recognize this document?

19         A.   Yes, I do.

20         Q.   What is it?

21         A.   It is a group letter signed by a

22   representative of Freedom House, American Jewish

23   committee and national council on Soviet Jewry

24   and addressed to Secretary Janet Napolitano.

25         Q.   You played a principal role in

```
 1                    P. Zalmayev

 2   drafting this, did you not?

 3        A.   I did.

 4        Q.   This was the version that ultimately

 5   went out to Secretary Napolitano, correct?

 6        A.   I believe it did, yes.

 7        Q.   Your name doesn't appear anywhere on

 8   here, right?

 9        A.   No, it doesn't.

10        Q.   Isn't it true that earlier drafts of

11   this letter contained the letterhead for Eurasia

12   Democracy Initiative?

13        A.   Yes, they did.

14        Q.   And it didn't appear on the final,

15   right?

16        A.   I don't think it did, no.

17        Q.   Why not?

18        A.   It was decided, I spoke with Doug in

19   particular I remember that I remember also having

20   a conversation with Mr. Akhmetshin.   I was

21   conferring.   It was decided that EDI was not

22   serious enough to warrant that sort of inclusion

23   compared to these large and very old

24   organizations.   It was just not the same degree

25   of prominence, and I was afraid that EDI's
```

```
 1                      P. Zalmayev

 2   presence in it would not contribute much to the

 3   weight of this letter.

 4          Q.   Isn't it also true that you expressed

 5   a view that you would rather not have EDI's stamp

 6   on the document at all?

 7          A.   Yes.   I probably did.

 8          Q.   Why?

 9              MR. GOLDEN:   Objection.   Asked and

10          answered.

11              MR. LUPKIN:   I don't believe so.

12          A.   I think I answered that question.   I

13   did not think it really -- I felt too modest to

14   put my name there with these large organizations.

15          Q.   By the way, are you aware of the

16   existence of any letterhead that has Freedom

17   House, AJC and NCSJ all on the same document?

18              MR. GOLDEN:   Objection to the form.

19          A.   I think this letter that I am holding

20   in my hand has them.

21          Q.   Right.   Did you create this

22   letterhead that appears at Exhibit 7?

23          A.   I did.

24          Q.   So --

25          A.   I did not create the logos, but I
```

```
 1                        P. Zalmayev
 2      think I compiled, I did compile them and put them
 3      on the letter.
 4             Q.    You made one letterhead out of it,
 5      correct?
 6             A.    Yes.
 7             Q.    This document Exhibit 7 was part of
 8      the anti-Egiazaryan campaign that you were
 9      leading, correct?
10             A.    This was part of it.   Yes.
11             Q.    This document Exhibit 7 is one of the
12      documents that forms the basis of Mr.
13      Egiazaryan's complaint in this case, isn't that
14      right?
15             A.    I'm not sure if it is the basis, but
16      it is, yes, it is one of the exhibits.   Correct.
17             Q.    Take a look at what was previously
18      marked as Exhibit 8.   Do you recognize this
19      document?
20             A.    Yes, I do.
21             Q.    What is it?
22             A.    That is generally if not exactly the
23      same content as the previous letter.   It is a
24      letter signed by the three organizations that I
25      just mentioned.   You want me to say the names
```

```
 1                    P. Zalmayev

 2    again?

 3         Q.    Sure.

 4         A.    Freedom House, American Jewish

 5    Committee and the National Council on Soviet

 6    Jewry and this time it is addressed to the

 7    Honorable Hannah Rosenthal.

 8         Q.    Who is she?

 9         A.    She is the special envoy at the state

10    department on the issue of anti-Semitism.    That

11    is not her correct title.    Office to monitor and

12    combat anti-Semitism.

13         Q.    And you were a principal draftsman of

14    this document, right?

15         A.    It is the same document, so, yes.

16         Q.    You created this letterhead, right?

17         A.    Correct.

18         Q.    Now I don't remember whether I asked

19    you this or not and if I did please forgive me.

20    Did you tell Sam Patton that you were working on

21    behalf of a client for money?

22         A.    Those are two different questions.

23         Q.    Let me ask you first.    Did you tell

24    Sam Patton that in connection with this

25    anti-Egiazaryan campaign you were working on
```

```
 1                    P. Zalmayev

 2   behalf of a client, right?

 3        A.   I don't recall saying that to him

 4   specifically.

 5        Q.   You didn't tell him you were being

 6   paid, right?

 7        A.   No.

 8        Q.   Same questions for Mr. Kliger.   Did

 9   you tell Mr. Kliger that you were working on

10   behalf of a client?

11        A.   No.

12        Q.   Did you tell him you were being paid

13   for your work in connection with the

14   anti-Egiazaryan campaign?

15        A.   No, I don't remember saying that to

16   him.

17        Q.   Do you remember -- the same questions

18   for Lesley Weiss.   Did you tell Lesley Weiss

19   that you were working on behalf of a client with

20   respect to this anti-Egiazaryan campaign that you

21   were leading?

22        A.   No.

23        Q.   Did you tell her that you were being

24   paid for your work?

25        A.   No.
```

P. Zalmayev

1

2      Q.   Same questions with respect to Mark

3  Levin.   Did you tell Mark Levin that you were

4  being paid for your work on the anti-Egiazaryan

5  campaign that you were leading?

6      A.   No.

7      Q.   Did you tell Mark Levin that the

8  anti-Egiazaryan campaign that you were leading

9  was on behalf of a client?

10     A.   No.

11     Q.   Let me ask you to take a look at the

12  next document.   This one bears Bates designation

13  PZ 001430 and runs through PZ 001457.

14          (Whereupon, Plaintiff's Exhibit 250,

15          document bearing Bates designation PZ

16          001430 and runs through PZ 001457 was

17          hereby marked for identification, as of

18          this date.)

19     Q.   Have you ever seen this document

20  before?

21     A.   Yes, I do recall seeing this

22  document.

23     Q.   Did you create this document?

24     A.   No.

25     Q.   Do you know who did?