Mark C. Zauderer, Esq.
Jonathan D. Lupkin, Esq.
Jason T. Cohen, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006-1404
Telephone:  (212) 412-9500
Facsimile:  (212) 964-9200
Email:  mzauderer@fzwz.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

ASHOT EGIAZARYAN,                          :
                                           :   Civ. Action No.  11 Civ. 2670 (PKC)(GWG)
                        Plaintiff,         :
                                           :
            -against-                      :   AMENDED
                                           :   COMPLAINT
PETER ZALMAYEV,                            :
                                           :
                        Defendant.         :

-------------------------------------------------------------x

        Plaintiff, by his attorneys, Flemming Zulack Williamson Zauderer LLP, alleges

upon personal knowledge as to himself and his own acts, and upon information and belief

as to all other matters, as follows:

### Nature of the Action

1.        This is an action for defamation brought by Ashot Egiazaryan against

Peter Zalmayev arising from a malicious disinformation campaign being conducted by

Mr. Zalmayev against Mr. Egiazaryan.  The smear campaign against Mr. Egiazaryan is

part of a Russian "corporate raid" and Mr. Egiazaryan's fall into political disfavor in

Russia.  After challenging the legality of the raid through international litigations, Mr.

Egiazaryan and his family have been prevented from returning to Russia from the United

States out of concern for their personal safety.  The campaign against Mr. Egiazaryan is

intended to force him to return to Russia, where he and his family will be subject to risk

of loss of life and liberty, as well as physical, reputational and pecuniary harm, and where he will be coerced to abandon his legal claims associated with his valuable investment. It is impossible for Mr. Egiazaryan to secure justice in a Russian court.

2.      Defendant Peter Zalmayev has played a key role in the campaign against Mr. Egiazaryan through his participation in an elaborate negative public relations and lobbying effort in which he propagated known falsehoods. To further the illegitimate efforts of his masters in Russia, and in an effort to ascribe his campaign with gravitas and legitimacy, Mr. Zalmayev enlisted prominent individuals and organizations in his efforts and communicated false, defamatory and injurious statements that plaintiff is, among other things: (1) anti-Semitic, (2) anti-American, (3) a significant contributor to a climate of ethnically-based intolerance and xenophobia in Russia, (4) a human rights violator, and (5) a corrupt Russian legislator who has committed war crimes and embezzled funds intended for war-torn Chechnya.

3.      Mr. Zalmayev paid thousands of dollars to several individuals to induce their support and cooperation for his malicious campaign against Mr. Egiazaryan.

4.      As alleged in detail below, Mr. Zalmayev's words were false, defamatory and injurious, were known or should have been known to the defendant to be false, defamatory and injurious, and were written willfully and maliciously with intent to damage plaintiff's name, credibility and reputation, sabotage his investment and undermine his ability to remain in the United States.

**The Parties**

5.      Plaintiff Ashot Egiazaryan is a Russian citizen who is no longer able to return to Russia. He currently resides with his family in the State of California. A prominent former banker and holder of a Ph.D. in Economics, Mr. Egiazaryan was, until December 2011, an elected public servant representing the Russian people as a member

of the Russian Duma (lower house of the Russian parliament) and a member of the
Duma's Budget and Taxes Committee.

6.      Defendant Peter Zalmayev is a United States citizen, a domiciliary of the
State of New York and the director of the New York-based organization Eurasia
Democracy Initiative, Inc. ("EDI"), which is registered with the New York Attorney
General as a not-for-profit corporation.  EDI's 2010 tax return reports revenue of
$53,500, net assets at year-end of $2,498, and that Mr. Zalmayev took no compensation.
EDI's tax-exempt purpose is described on its tax returns as to "organize educational
events."  Upon information and belief, EDI is not registered with the United States
Internal Revenue Code as a 501(c)(3) corporation.

7.      Notwithstanding his portrayal of himself as an altruistic human rights
activist, Mr. Zalmayev, who has described himself in this litigation as "impoverished," in
fact offers human rights advocacy services on a commercial basis and utilizes his
organization, EDI, as a front to mask the "pay to play" aspects of his operation.  As set
forth more fully herein, Mr. Zalmayev is a central figure in a dishonest smear campaign
against Mr. Egiazaryan.

**Additional Smear Campaign Participants**

8.      Suleyman Kerimov is a member of the upper house of the Russian
parliament, a confederate of Vladimir Putin and a businessman who has been identified
as the 17th most wealthy person in Russia by *Forbes* magazine; his reported net worth is
$7.6 billion.  Mr. Kerimov, his wholly held company, Denoro Investments Ltd.
("Denoro"), and others have been sued by Mr. Egiazaryan in the London Court of
International Arbitration ("LCIA") for wresting from Mr. Egiazaryan his ownership
interest in the lucrative Moskva Hotel reconstruction project through illicit and coercive

means.  Mr. Kerimov is the sponsor and leader of the smear campaign against Mr. Egiazaryan, which is designed to induce Mr. Egiazaryan's removal from the United States and his compulsory return to Russia.  Entities retained by Kerimov's company, Denoro, including the Washington-based public relations firm Public Strategies, Inc. ("Public Strategies") and the global investigative and security firm Thomas Dale & Associates ("Thomas Dale"), have collaborated with and provided material assistance to Mr. Zalmayev in effectuating his specific role in the smear campaign.

9.     Rinat Akhmetshin is the Washington, D.C.-based director of the International Institute for Economic and Political Research and a paid political consultant and lobbyist.  Mr. Akhmetshin worked closely with Mr. Zalmayev and has acted in concert with Public Strategies and Mr. Kerimov or his agents and representatives in the smear campaign against Mr. Egiazaryan.  Significantly, Mr. Akhmetshin has also previously acted on behalf of other high-ranking officials in the Russian government with a background in Russia's security services.  As set forth below, Mr. Akhmetshin received at least $10,000 from Mr. Zalmayev for his work on the campaign.

10.    Douglas Bloomfield is a political consultant retained in connection with the smear campaign against Mr. Egiazaryan.  As set forth below, Mr. Bloomfield played an active role in shaping the contours of the campaign and received $20,000 compensation from Mr. Zalmayev; $10,000 constituted Mr. Bloomfield's agreed-upon fee, and the additional $10,000 represented the unsolicited "bonus" paid by Mr. Zalmayev to Mr. Bloomfield for his efforts.

11.    In connection with their efforts against Mr. Egiazaryan, including seeking to influence United States public officials and United States foreign policy, neither Mr. Zalmayev, Mr. Akhmetshin nor Mr. Bloomfield registered as lobbyists under the Foreign

Agents Registration Act, the Lobbying Disclosure Act or other similar legislation requiring persons acting as agents in a political or quasi-political capacity to make public disclosure of their relationship with the principal. The failure to register as required under these laws may constitute federal crimes.

## Jurisdiction and Venue

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over defendant because he is, and at all relevant times has been, domiciled in the state of New York.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because defendant resides in this judicial district.

## Factual Background

15.     The false, defamatory and injurious factual statements that are the subject of this Complaint are the outgrowth of a now longstanding dispute and litigation in which Mr. Egiazaryan's opponents have engaged in a campaign of falsehoods, harassment, intimidation, persecution, abuse and character assassination to achieve their desired outcome. This factual history gives context to the statements and communications that form the basis of plaintiff's Complaint against Mr. Zalmayev.

**Enlisting The Assistance Of Powerful Russian Politicians And
Corrupt Law Enforcement Officials, Mr. Egiazaryan's
Opponents Wrest From Him Control Of A Lucrative Real
Estate Project To Rebuild The Historic Moskva Hotel In Moscow.**

16.     Mr. Egiazaryan is currently engaged in a complex, international legal dispute resulting from a Russian "corporate raid,"[1] orchestrated by Russian Senator and billionaire Suleyman Kerimov to steal Mr. Egiazaryan's ownership interest in a project to rebuild and develop the landmark Moskva Hotel, which sits on prime Moscow real estate near the Kremlin ("Hotel Project" or "Project").

17.     From 2002 to 2008, Mr. Egiazaryan worked diligently to demolish and rebuild the Moskva Hotel.  Mr. Egiazaryan raised and contributed over US$250 million in financing for the Hotel Project.  Mr. Egiazaryan also arranged for a US$792 million loan from Deutsche Bank AG, one of the largest loans ever made for a real estate project in Russia.  Mr. Egiazaryan secured the financing with his own interest in the Hotel Project and another project.  As a result of Mr. Egiazaryan's efforts, the old Moskva Hotel was demolished and a new building was constructed.

18.     Ultimately, Mr. Kerimov, Moscow Mayor Yury Luzhkov and Arkadi Rotenberg, a close confidant of Russian Prime Minister Vladimir Putin, embarked on an

---

[1] A Russian "corporate raid" is

> the redistribution of a company's ownership through a combination of legal, illegal, and illegitimate means, including forced bankruptcies, the use of administrative resources, raids by police, tax officers, or government inspectors, and even violent seizure of documents, assets, offices, and places of business.

Alexander Settles, *Evolving Corruption: Hostile Takeovers, Corporate Raiding, and Company Capture in Russia,* ECONOMIC REFORM FEATURE SERVICE (Center for Int'l Private Enterprise, D.C.), August 31, 2009, at 2.

illegal corporate raid to strip Mr. Egiazaryan of his interest in the Project and transfer it to

Mr. Kerimov.  This corporate raid included the following elements:

- The City of Moscow (through the arbitrary and bad faith withholding of the City's consent) caused a loan for the Project to fail and forced Mr. Egiazaryan to enter into a contractual arrangement whereby control of the Hotel Project was effectively transferred to the City of Moscow;

- The City of Moscow and certain individuals forged corporate minutes to install a Kerimov employee as director in a company controlled by Mr. Egiazaryan, a position that directly controlled the Hotel Project;

- Armed raids by special police forces in masks and with automatic weapons were carried out on (a) the homes of three of Mr. Egiazaryan's associates and family members, (b) an office building where Mr. Egiazaryan's office was located, and (c) Mr. Egiazaryan's legal advisers in connection with the Hotel Project, including the preeminent international law firms of White & Case LLP, DLA Piper and Lovells;

- Threats of spurious criminal prosecution were made against Mr. Egiazaryan (including on February 17, 2009, when Mr. Kemirov personally told Mr. Egiazaryan that he would be subject to criminal proceedings based on trumped-up charges if he did not sign certain agreements pertaining to the Hotel Project), and baseless claims alleging fraud were brought against Mr. Egiazaryan's associate Vitaly Gogokhiya; and

- Political pressure was applied by Mayor Luzhkov, including a request to the Prosecutor General of Russia that proceedings be initiated to strip Mr. Egiazaryan of his parliamentary immunity and for the commencement of a criminal prosecution against him.

19.     In June 2009, the illegal corporate raid and related actions eventually

forced Mr. Egiazaryan to transfer to Mr. Kerimov his entire interest in the Project for

nothing.

**Mr. Egiazaryan Seeks Legal Redress in Litigation in the
United Kingdom, And His Russian Opponents Respond
With Ominous Threats Against The Egiazaryan Family.**

20.     On September 13, 2010, Mr. Egiazaryan commenced arbitrations in
London seeking damages and to invalidate the agreements Mr. Kerimov illegally coerced
Mr. Egiazaryan into signing.

21.     The harassment and threats by Mr. Kerimov and his accomplices against
Mr. Egiazaryan did not end with the transfer of the Hotel Project to Mr. Kerimov.  To
discourage Mr. Egiazaryan from exercising his legal rights to challenge the Project's
transfer, Mr. Egiazaryan continued to be pressured.  For example, in the months
following Kerimov's illegal takeover, Mr. Egiazaryan received anonymous death threats
on his work and parliament telephones warning him to stay away from the Hotel Project.
Threats were also made against Mr. Egiazaryan's family.

22.     In late-November 2010, Aslan Aslanbekov, Mr. Egiazaryan's cousin-in-
law, received a telephone call from Mr. Kerimov in which Mr. Kerimov asked Mr.
Aslanbekov to "cooperate" in his campaign against Mr. Egiazaryan.  Mr. Aslanbekov
refused.  A week later, Mr. Aslanbekov was executed, "gangland" style, with a gunshot
to the head.

**Mr. Egiazaryan Remains In The Cross-Hairs Of His Well-Connected
And Well-Heeled Opponents, Even In The United States.**

23.     In 2010, Mr. Egiazaryan decided that he had no choice but to challenge
the theft of the Hotel Project.  At the time the claims were filed, Mr. Egiazaryan was in
the United States.  Almost immediately after filing the claims, direct threats were made
against his family in Russia, and to secure their safety, they promptly took measures to
join him.

24.     Despite uprooting his family and moving to the United States, the attacks on Mr. Egiazaryan have not abated.  Since his arrival in the United States, Mr. Egiazaryan and others in his circle have been under constant surveillance.  For example, and without limitation, Mr. Egiazaryan was under surveillance on at least the following dates that he knows of:  November 1 and 5, 2010, December 18, 2010, February 10, 2011, April 2 and 27, 2011, June 25 and 28, 2011, July 8, 2011, August 5, 2011 and September 11, 2011.

25.     The foregoing surveillance was performed by professional investigators, including Thomas Dale, on behalf of Denoro, Mr. Kerimov's wholly owned company.

26.     Mr. Zalmayev and his confederates have received information collected about Mr. Egiazaryan and his family as a result of this surveillance.  Upon information and belief, this information was directly or indirectly provided to Mr. Zalmayev by Mr. Kerimov, his company or people working on his behalf.

**Egiazaryan's Enemies Organize A Multi-Faceted Disinformation Campaign Designed to Force Mr. Egiazaryan From The United States And To Otherwise Undermine Mr. Egiazaryan's Ability To Exercise His Litigation Rights.**

27.     Beginning at around the time of Mr. Egiazaryan's arrival in the United States, defendant Mr. Zalmayev and others began a black (*i.e.,* negative) public relations campaign against Mr. Egiazaryan, designed to discredit him, undermine his chances of remaining in the United States and force him to return to Russia.  Mr. Egiazaryan's litigation foes and the corrupt Russian authorities who are believed to have enlisted Mr. Zalmayev's active participation in this campaign have tactical reasons to discredit Mr. Egiazaryan and force him to return to Russia.  In Russia, where he and his family face a real and imminent risk of losing life and liberty, Mr. Egiazaryan can be permanently silenced or more easily controlled.

28.     Mr. Zalmayev himself has characterized this smear campaign of falsehoods against Mr. Egiazaryan as an "aggressive advocacy campaign" designed to remove Mr. Egiazaryan from the United States and have him returned to Russia.

29.     Moreover, Mr. Zalmayev did more than merely publish a single article in a single publication.  He recruited and collaborated with others to advance his false, defamatory and injurious statements about Mr. Egiazaryan in published periodicals and other formats.

30.     Douglas Bloomfield, the Washington, D.C.-based political consultant, testified that in February of 2011 he was contacted by Rinat Ahkmetshin, another Washington, D.C.-based consultant, regarding a potential "project."  According to Mr. Bloomfield, Mr. Akhmetshin, who was already involved in Mr. Zalmayev's campaign, identified Zalmayev as "the person who was in charge of the project."

31.     In return for Mr. Bloomfield's work, Mr. Zalmayev (either directly or through Mr. Akhmetshin) agreed to pay a $10,000 fee.  Not only was Mr. Bloomfield in fact paid the agreed-upon $10,000, he was also offered (and accepted) an unsolicited $10,000 bonus.  Both checks were drawn on the account of "Eurasia Democracy Initiative," Mr. Zalmayev's ostensible human rights organization, and at least one check was delivered personally by Mr. Akhmetshin on behalf of Mr. Zalmayev.  For his part, Mr. Akhmetshin also received at least $10,000 from Mr. Zalmayev.

32.     Messrs. Bloomfield and Akhmetshin collaborated extensively with Mr. Zalmayev on several of the writings that are described below and that accuse Mr. Egiazaryan of being a virulent anti-Semite:  (a) the March 9, 2011 article in the Los Angeles-based *Jewish Journal* entitled "Hiding Out in Beverly Hills" which carries Mr. Zalmayev's by-line, (b) and the March 14, 2011 letters ghost-written by Messrs.

Zalmayev, Akhmetshin and Bloomfield on behalf of the National Council of Soviet Jewry ("NCSJ"), Freedom House and the American Jewish Committee ("AJC") to the United States State Department Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

33.    Mr. Zalmayev's recruitment of and collaboration with Messrs. Akhmetshin and Bloomfield in drafting the false, defamatory and injurious statements described above, for the stated goal of "remov[ing] Ashot Yegiazaryan from the United States," are among the facts demonstrating the willfulness and maliciousness of his actions.

34.    Since August 29, 2010, the smear campaign against Mr. Egiazaryan also involved the creation of www.ashotyegiazaryan.com, an English language website that misappropriates his name and exists for no purpose other than to publish defamatory and offensive material about Mr. Egiazaryan.

35.    Beginning no later than January 2011, Mr. Zalmayev and his confederates co-opted respected human rights advocates and organizations into the dirty tricks campaign against Mr. Egiazaryan.  Mr. Zalmayev misled these otherwise legitimate organizations into action against Mr. Egiazaryan by spoon-feeding them false, defamatory and injurious statements and convincing them to speak out in a negative way against Mr. Egiazaryan.

36.    Mr. Zalmayev's efforts to date have included:

      i.    publishing an article on March 9, 2011 in the <u>Jewish Journal</u>, a publication with an active circulation of 150,000 households.  In his article, entitled "Hiding in Beverly Hills," Mr. Zalmayev makes

11

numerous defamatory statements against Mr. Egiazaryan, including the accusation that Mr. Egiazaryan is an avowed anti-Semite;

ii.    inducing the publication of a defamatory article, "No Safe U.S. Haven for Hatemongers," published on March 14, 2011 in the <u>Moscow Times</u>.  This article states, among other things, that Mr. Egiazaryan is "an anti-Semitic bigot" with a "well-established record of anti-Semitism and hate speech";

iii.   drafting and then inducing prominent Russian human rights organizations to sign false and misleading letters about Mr. Egiazaryan to members of the United States House of Representatives, asserting that Mr. Egiazaryan is not fit to be present in the United States.  As set forth more fully below, the Ponomarev and Alexeyeva letters, sent in late January 2011, were soon retracted, with both of the signatories independently stating that they were "misled" into writing and sending the letters; and

iv.    drafting and then inducing United States human rights and Jewish advocacy organizations to sign letters in March of 2011 to the United States Department of State Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security. These letters repeat false, defamatory and injurious statements and forcefully advocate for the removal of Mr. Egiazaryan and his family from the United States.

37.    The specific defamatory and injurious language contained in these writings and communications is discussed more fully below.

## The False, Defamatory and Injurious Statements

### A. "Hiding in Beverly Hills"

38.     The Jewish Journal claims to be the largest Jewish weekly outside New York City and to reach 150,000 educated, involved and affluent readers each week.  The Jewish Journal also boasts that its website, www.JewishJournal.com, is America's most widely used Jewish news site.

39.     On or about January 1, 2011, Mr. Zalmayev's confederate, Mr. Bloomfield, contacted the Jewish Journal and inquired as to whether it would be interested in a story about plaintiff.

40.     To pique the Jewish Journal's interest in such an article, Mr. Bloomfield transmitted to the periodical the letters signed by noted human rights advocates Lev Ponomarev and Lyudmila Alexeyeva to United States government officials, condemning Mr. Egiazaryan and concluding that he should be included on the United States' "no entry" list and was unfit to remain in the United States.

41.     Messrs. Zalmayev, Akhmetshin and Bloomfield became aware of Ponomarev's and Alexeyeva's January, 2011 retractions of their respective letters in or around February of 2011, but none of them forwarded the retractions to the Jewish Journal or even notified the periodical that retractions had been issued.

42.     On March 9, 2011, the Jewish Journal published an article entitled "Hiding in Beverly Hills."  A copy of the article is attached as Exhibit A to this Complaint and can also be found at http://www.jewishjournal.com/opinion/article/hiding_in_beverly_hills_20110309/ (last visited on April 19, 2011).  The Jewish Journal disseminated the article in its print and on-line editions, and the article was and remains available nation-wide.

13

43. Messrs. Zalmayev, Bloomfield and Akhmetshin all participated in drafting and editing the article, and it was published under Mr. Zalmayev's by-line. The biography that accompanied the article describes Mr. Zalmayev as the "director of the Eurasia Democracy Initiative, a U.S.-based international nonprofit organization dedicated to fighting anti-Semitism and xenophobia and to promoting democracy and rule of law in post-communist transitional societies of Eastern and Central Europe, the Caucasus and Central Asia." Notably, neither the homepage nor the "About Us" page of EDI's website mentions anti-Semitism being part of EDI's mission.

44. "Hiding in Beverly Hills," which is about Mr. Egiazaryan and reproduces a picture of him, contains a number of false, defamatory and injurious statements and meanings that constitute "defamation *per se*" and "defamation *per quod*."

45. The Article begins by asking:

> Why would a wealthy businessman with ties to his notorious ultranationalist party known for its anti-American and anti-Semitic positions flee to Beverly Hills?

This immediately establishes the primary subject matter of the article (*i.e.*, Mr. Egiazaryan and his purported anti-American and anti-Semitic proclivities).

46. Later, the article picks up on its lead theme -- Mr. Egiazaryan's alleged anti-Semitic and anti-American beliefs and associations:

> Since 1999, he has been a prominent financial backer and member of the ultranationalist Liberal Democratic Party of Russia (LDPR), headed by his friend Vladimir Zhirinovsky.
>
> Zhirinovsky, who is infamous for his outspoken anti-American and anti-Semitic attacks . . . remains the vice chair of the Duma and continues to speak out freely on any and all subjects – often repugnant – without threat of retribution by the state.

14

\*     \*     \*

> Jewish groups in America and Russia have repeatedly condemned the LDPR and its leader as anti-Semitic and have urged Americans, as a form of protest, to avoid any meetings with members of Zhirinovsky's party who may visit the United States.
>
> Zhirinovsky denies his party is anti-Semitic, while blaming the Jews for sparking both the Bolshevik revolution and World War II, provoking the Holocaust and masterminding 9/11.

47.     The article concludes that Mr. Egiazaryan is a leader of a racist and anti-Semitic movement and is himself an anti-Semite:

> The Zhirinovsky-Egiazaryan party's racism and bigotry has contributed significantly to Russia's growing climate of ethnically based intolerance and xenophobia. Anti-Semitism remains pernicious and insidious, as the recent scandal with Christian Dior's John Galliano has demonstrated so vividly. The fashion label must be commended for the swiftness with which it condemned its bigoted designer's rant and distanced itself from him. The U.S. government must likewise put anti-Semites worldwide on notice:  You are not welcome in this country.

48.     The false, defamatory and injurious meanings of the article, communicated through the literal words of the article and also by implication, are that Mr. Egiazaryan is anti-Semitic and actively supports anti-Semitism.

49.     In fact, the 676 word article uses the word or a variant of the word anti-Semitism seven times, it alleges to be authored by someone "dedicated to fighting anti-Semitism," it was published in a Jewish magazine and website, and the Jewish Journal web-site on which it was published lists "anti-Semitic" as a search tag for the article. http://www.jewishjournal.com/opinion/article/hiding_in_beverly_hills_20110309/ (last visited on April 19, 2011).

50.     Clear insinuations in the article that Mr. Egiazaryan is anti-American, are also false, defamatory and injurious. The article uses the term "anti-American" twice and the website also lists "anti-American" as a search tag.  *Id.*

51.     These messages are communicated through the ordinary and everyday meanings, express and implied, of the specific words and phrases employed in the article and their juxtaposition, the subject and subject matter of the article, as well as the gist of the article, when considered in the context of the avowed background and mission of the author and the nature of the publication and its readership.

**The Article's Falsity**

52.     The article's defamatory and injurious statements, express and implied, that Mr. Egiazaryan is an anti-Semite and is anti-American, are entirely false.

53.     The defamatory and injurious statements, express and implied, that Mr. Zalmayev suggests demonstrate as a matter of fact that Mr. Egiazaryan is an anti-Semite and is anti-American, are also entirely false.

54.     The article provides no evidence of any bigoted or anti-Semitic or anti-American statements by Mr. Egiazaryan or attributed to him in support of the article's inflammatory rhetoric.  Mr. Egiazaryan condemns anti-Semitism and has never preached it or made anti-Semitic statements.  He has not supported any anti-Semitic policies or legislative proposals.  In fact, there is no legitimate record of Mr. Egiazaryan having ever made anti-Semitic or anti-American statements or having taken anti-Semitic or anti-American positions in his personal life, in his professional life, as a member of the Russian Duma or in any other capacity.

55.     Mr. Egiazaryan is not and has never been a member or a leader of the Liberal Democratic Party of Russia ("LDPR"), or even attended a LDPR party

conference. He is a non-party candidate nominated to its parliament group.[2]  As such, Mr. Egiazaryan has not ascribed to, is not bound by and should not be tarnished by the LDPR's program or the decisions or statements of its leadership, much less by the personal views expressed by its individual members, including Vladimir Zhirinovsky.

56.    Mr. Egiazaryan has not blamed Jewish people for horrific, historic events and has never made any of the inflammatory statements regarding the responsibility of the Jews for such events.

57.    Mr. Egiazaryan is not a friend of Mr. Zhirinovsky.

**B.  Mr. Zalmayev's Clandestine Operations Against Mr. Egiazaryan**

58.    In addition to writing and having published an article containing false, defamatory and injurious statements about Mr. Egiazaryan, Mr. Zalmayev has also worked furtively to promote the circulation of these false, defamatory and injurious statements through written and spoken communications with others.

**i.  "No Safe U.S. Haven for Hatemongers"**

59.    Mr. Zalmayev communicated false, defamatory and injurious statements to Leonid Komarovsky and the Moscow Times that led or contributed to Mr. Komarovsky's March 14, 2011 article in the Moscow Times entitled "No Safe U.S. Haven for Hatemongers." A copy of this article is attached as Exhibit B. The article is available on the English language website of the Moscow Times at http://www.themoscowtimes.com/opinion/article/no-safe-us-haven-for-hatemongers/432450.html (last visited April 19, 2011).

60.    The Moscow Times is an English-language daily newspaper published in Moscow, Russia. The internet edition has world-wide circulation and is widely read by

---

[2] "Fraktsiya" in Russian.

Russian expatriates residing in the United States and others with a professional and personal interest in Russian politics, business and culture.

61.     Mr. Komarovsky's article is a remix of Mr. Zalmayev's "Hiding in Beverly Hills," and the articles use many of the same themes and phrases. The article is itself false, defamatory and injurious.

62.     Among other things, Mr. Komarovsky's article, whose title itself tars Mr. Egiazaryan a "Hatemonger," falsely states:

- "As a long-standing member of the Liberal Democratic Party, or LDPR, and, consequently, its anti-Semitic and xenophobic agenda, Yegiazaryan does not deserve safe haven in the United States."

- "[C]allers to my daily Russian-language radio show have voiced concerns over Yegiazaryan's . . . well-established record of anti-Semitism and hate speech."

- "if there is a database containing names of terrorists banned from entering the United States, there should likewise be one for characters like Yegiazaryan."

- "Undoubtedly, Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance."

The article concludes by explicitly branding Mr. Egiazaryan an "Anti-Semitic bigot."

**Mr. Zalmayev's Participation in the Publication of Mr. Komarovsky's Article**

63.     In mid-February of 2011, Mr. Zalmayev paid Mr. Komarovsky $7,000 from an expense account that had been established by Mr. Zalmayev for his campaign against Mr. Egiazaryan.

64.     Mr. Komarovsky initially wrote a Russian language piece on Mr. Egiazaryan for the newspaper *Yevreisky Mir* (Jewish World). Mr. Zalmayev was dissatisfied, and on February 23, 2011 wrote to Mr. Akhmetshin: "… [I] just read it and was a bit horrified at how long and rambling it was – but remember … he's only playing

to the Russian-Jewish community, who like this sort of shit, and its only for the Rus-Jewish newspaper… for the Boston Globe piece, of course, it'll have to be much different."  Mr. Akhmetshin replied: "sure, go ahead and draft that [B]oston [G]lobe piece y[ou]rs[e]lf".

65.     On February 23, 2011, Mr. Zalmayev wrote to Mr. Komarovsky: "… I thought about it and decided that the text format does not suit the B[oston] G[lobe] and it would be better to simply re-write the whole thing.  I will write everything from scratch, about 700-800 words, and send it to you".

66.     On March 4, 2011, Mr. Zalmayev and one of his collaborators, Rinat Akhmetshin, discussed the need to submit a piece about Mr. Egiazaryan to the <u>Moscow Times</u>.  During his discussions with Mr. Akhmetshin, Mr. Zalmayev suggested, with respect to the proposed article, "maybe sign it with Komarovsky's name? let's discuss."

67.     The following day, Mr. Zalmayev submitted a draft of the article entitled "No Safe U.S. Haven for Hatemongers" to the <u>Moscow Times</u> on "behalf" of Mr. Komarovsky.  As he subsequently recounted to Mr. Akhmetshin, Mr. Zalmayev "took the liberty of writing on [the <u>Moscow Times</u> piece] on behalf of Komar[ovsky].  let's see if they respond."

68.     On March 13, 2011, the <u>Moscow Times</u> e-mailed Mr. Komarovsky, thanking him for submitting the article about Mr. Egiazaryan and expressing its desire to publish it.  It also provided a "readback" of the article for Mr. Komarovsky's approval.

69.     Mr. Komarovsky apparently was surprised by the e-mail and asked Mr. Zalmayev about it.  Mr. Zalmayev responded to Mr. Komarovsky that he "wrote to [the <u>Moscow Times</u>] in your name and left your address expressing indignation about Ashot's

article last week.  Please reply to him with the following words:  'looked it over, op-ed good to go.'"

70.     The similarities between Mr. Komarovsky's article and Mr. Zalmayev's are striking.  For example:

    i.   Mr. Komarovsky's article makes the same associations between Mr. Egiazaryan and the LDPR as does Mr. Zalmayev's article "Hiding in Beverly Hills."

   ii.   Both articles explicitly advocate for Mr. Egiazaryan's expulsion from the United States;

  iii.   Both articles make the same odd John Galliano analogy ("As demonstrated by the recent scandal following Christian Dior designer John Galliano being caught on tape spouting anti-Semitic vitriol, anti-Semitism remains an insidious scourge of our society."); and

  iv.   Mr. Komarovsky's article makes similar claims as does Mr. Zalmayev's article that "Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance" and that "the party has made shockingly incendiary pronouncements, which, among other things, assigned Jews blame for 'starting World War II,' and 'provoking the Holocaust,' 'masterminding 9/11,' . . . and generally, 'running the world.'"

**The Article's Falsity**

71.     Like the defamatory statements identified in Mr. Zalmayev's "Hiding in Beverly Hills" article, the defamatory and injurious statements, express and implied, that Mr. Egiazaryan is an anti-Semite, are entirely false.

72.     The defamatory and injurious statements, express and implied, that Mr. Komarovsky suggests demonstrate as a matter of fact that Mr. Egiazaryan is an anti-Semite, are also entirely false.

73.     The article provides no evidence of any bigoted or anti-Semitic statements by Mr. Egiazaryan or attributed to him in support of the article's untrue and injurious statements.  Mr. Egiazaryan condemns anti-Semitism and has never preached it or made anti-Semitic statements.  Nor has he supported any anti-Semitic policies or legislative proposals.  In fact, there is no legitimate record of Mr. Egiazaryan having ever made anti-Semitic statements or having taken anti-Semitic positions in his personal life, in his professional life, as a member of the Russian Duma or in any other capacity.

74.     Mr. Egiazaryan is not and has never been a member or a leader of the LDPR, or even attended a LDPR party conference.  He is a non-party candidate nominated to its parliament group.  As such, Mr. Egiazaryan has not ascribed to, is not bound and should not be tarnished by the LDPR's program or the statements, decisions and views of its leadership or individual members.

75.      Mr. Egiazaryan has not blamed Jewish people for horrific, historic events and has never made any of the inflammatory statements regarding the responsibility of the Jews for such events.

76.     Mr. Zalmayev sought to cause injury to Mr. Egiazaryan through the false statement that he is an anti-Semitic bigot, proposing that Mr. Egiazaryan merited inclusion in a "database of persons banned from entering their United States" for his alleged views.

21

### ii. The Letters of Lev Ponomarev and Lyudmila Alexeyeva

77.     In or around January 2011, Mr. Zalmayev made false, defamatory and injurious statements to Lev Ponomarev and Lyudmila Alexeyeva, two prominent Russian human rights activists, about Mr. Egiazaryan.  These statements induced Mr. Ponomarev and Ms. Alexeyeva to sign letters ostensibly drafted by them for submission to members of the Helsinki Commission in the United States Congress.  The letters both encourage Congress to place Mr. Egiazaryan on a "no-entry list" for foreign nationals due to his allegedly abhorrent views and positions.

78.     Mr. Ponomarev is the Executive Director of the All-Russian Public Movement for Human Rights.  Ms. Alexeyeva is the Chairperson for the Moscow Helsinki Group.  Both are based in Russia.

79.     Copies of the two letters, dated January 29, 2011 and January 30, 2011, are attached as Exhibit C.

80.     Mr. Zalmayev has admitted that he drafted the two letters and provided them to Mr. Ponomarev and Ms. Alexeyeva for their respective signatures. The letters are addressed to the same members of Congress, were sent within one day of one another and are nearly identical in content and writing style.

81.     Both letters imply that Mr. Egiazaryan is one of the leaders of the LDPR. *See* Ponomarev letter ("Mr. Yegiazaryan was for many years a member of the Russian Parliament for the extreme-Nationalist Liberal-Democratic Party of Russia (with Vladimir Zhirinovsky as its head)); Alexeyeva letter ("As a ranking member of Vladimir Zhirinovsky's ultra-nationalist Liberal-Democratic Party of Russia, Mr. Yegiazaryan . . .").

82.     Both letters accuse Mr. Egiazaryan of having committed war crimes as

well as the theft, embezzlement or mismanagement of funds.  *See* Ponomarev letter:

> In 2000, Mr. Yegiazaryan initiated the creation of the
> Duma committee for Assistance in Political Regulation and
> Observance of Human rights in Chechnya, of which he
> would become deputy chairman and which dissolved in
> 2003.  The Committee was entrusted with funds for the
> reconstruction of the war-torn region – a large portion of
> which funds, according to several credible reports, did not
> reach their addressee.  As such Mr. Yegiazaryan was a
> contributor to the destructive second Chechen war.

Alexeyeva letter:

> Mr. Yegiazaryan occupied from 2000 to 2003 the post of
> deputy chairman of the Duma committee for Assistance in
> Political Regulation and Observance of Human Rights in
> Chechnya, which he himself initiated and helped set up.  In
> addition to providing cover for the numerous well-
> documented atrocities during the war, the Committee's
> management of the funds allocated for Chechnya's
> reconstruction was said to have resulted in significant
> amounts never reaching their destination – the destitute
> people of the war-torn republic.

83.     Mr. Zalmayev personally sent the letters to Kyle Parker, an assistant to

Senator Benjamin Cardin, a Co-Chairman of the Helsinki Commission.  On February 7,

2011, Kyle Parker wrote to Mr. Zalmayev: "Peter, these letters look strikingly similar and

not in keeping with the usual manner that Lyud[mila] Alexeyeva [and] Lev [Ponomarev]

communicate with us."  Mr. Parker noted that "[i]t seems from [Lyudmila Alexeyeva's]

quote in the recent AP story that something is amiss.  Who's orchestrating this

campaign?"

84.     Failing to address Mr. Parker's concern about "[w]ho's orchestrating this

campaign," Mr. Zalmayev responded: "… I discussed this appeal with my colleagues in

Moscow and we all agreed that Egiazaryan's was a case that merited attention in the

context of the 'no-entry' initiative on the Hill.  Naturally, it was decided that I would help

draft the language, considering my greater degree of fluency in the language and with this sort of communications."

85.     In connection with his preparation of the Ponomarev and Alexeyeva letters to United States congressional representatives, Mr. Zalmayev never registered as a lobbyist under the Foreign Agents Registration Act, the Lobbying Disclosure Act or other similar legislation.

### The Letters' Falsity And Their Immediate Retraction

86.     As noted above, Mr. Egiazaryan is not a member of the LDPR and does not share any "ultra-nationalist" views of the LDPR and Mr. Zhirinovsky.

87.     The letters suggest, with no factual basis, that Mr. Egiazaryan embezzled or mismanaged funds from a parliamentary "committee" meant to assist in Chechnya's reconstruction.  In fact, these funds were controlled not by the "Committee" (actually, a commission), but by the Russian Ministry of Finance.  Mr. Egiazaryan had no access to these funds.  In fact, he has repeatedly and publicly criticized the Ministry's lack of transparency and oversight.

88.     The letters falsely suggest that Mr. Egiazaryan was responsible for war crimes or contributed to human rights violations.  Indeed, the Ponomarev letter says that "Mr. Yegiazarian was a contributor to the destructive second Chechen war."  Mr. Egiazaryan never committed any war crimes or contributed to any human rights atrocities at any time in his life and certainly was not the cause of the Second Chechen War.

89.     Mr. Ponomarev and Ms. Alexeyeva almost immediately wrote retractions of their letters and sent the retraction letters to the Congressional recipients of the original letters.  Mr. Ponomarev sent retractions to Representatives Christopher Smith and Dana Rohrabacher and Senator Benjamin Cardin on or about February 7, 2011.  Ms. Alexeyeva

sent a retraction letter to Representative Christopher Smith on or about February 7, 2011.

Copies of the retraction letters are attached as Exhibit D. The almost immediate

retraction of these January 2011 Ponomarev and Alexeyeva letters demonstrates not only

the falsity of their contents, but that the original letters were drafted by Mr. Zalmayev.

90.    Mr. Ponomarev's retractions admit that he "made a grave mistake," that

"[h]aving reviewed the circumstances of this matter linked to the so-called Egiazaryan

case, I, acting within my mandate of a human rights defender, withdraw my signature

from that letter. Once again, I express my apologies if I have misled you."

91.    Ms. Alexeyeva likewise admitted that "[r]ecently I got new information

about Mr. Yegiazaryan's activity which was mentioned in my letter and which was the

point of my concern. And this information has been called by me into questions[sic]."

92.    Additionally, Ms. Alexeyeva stated in a Voice of America Russian Service

interview that she "had been misled" when she sent the letters and that "[j]udging by how

promptly [Mr. Egiazaryan] was stripped of his parliamentary immunity some very high-

ranking individuals have a stake in making short shrift of him. In no way do I want to

play into their hands. This person did not do what I accused him of doing." The

interview is discussed in depth in a February 9, 2011 Associated Press article, which

states, among other things:

> In a telephone interview with VOA Russian Service, head
> of the Moscow Helsinki Group, Lyudmila Alexeyeva said
> that she "had been misled" when, on January 29, 2011, she
> sent a letter to key US legislators asking that the matter of
> Yeghiazarian's presence in the United States be raised with
> the State Department and the Department of Homeland
> Security.   Last Monday, she sent another letter to
> Washington in which she explained her mistake. "The
> thing is," she said to a VOA correspondent, "that
> Yeghiazarian (who is listed as Deputy Chairman of the
> State Duma Committee for Budget and Taxes – M.G.) did
> not have anything to do with the plundering of the public

25

during the distribution of compensatory payments for
housing in Chechnya," of which he had been suspected by
human rights advocates.

93.    Based on investigation and inferences from the above evidence, the person

who "misled" Ms. Alexeyeva and drafted the defamatory statements was Mr. Zalmayev.

Mr. Zalmayev sought to cause injury to Mr. Egiazaryan through false statements that Mr.

Egiazaryan had embezzled funds and thus contributed to the destructive Chechen war,

stating that these concerns should serve to determine whether he be permitted to remain

in the United States.

94.    Plaintiff is not suing Mr. Ponomarev or Ms. Alexeyeva.

**iii. The Freedom House Letters**

95.    Seeking to further perpetuate his false, defamatory and injurious

statements, Mr. Zalmayev and his confederates contacted Freedom House, the American

Jewish Committee and the National Council on Soviet Jewry.  The request made of these

organizations was that they sign on to letters to the United States State Department Office

to Monitor and Combat Anti-Semitism and the United States Department of Homeland

Security, urging these agencies to reject Mr. Egiazaryan's efforts to remain in the United

States (the "Freedom House Letters").

96.    The fact that the letters were sent to the United States State Department

Office to Monitor and Combat Anti-Semitism and to the United States Department of

Homeland Security in and of itself suggests that the letters assert allegations of anti-

Semitism and that Mr. Egiazaryan somehow poses a threat to the national security of the

United States.

97.    As part of the effort to enlist the support of these organizations, Mr.

Zalmayev and his confederates misleadingly provided the organizations with the January

2011 letters signed by Ponomarev and Alexeyeva, urging Mr. Egiazaryan's inclusion on the United States' "no entry" list. Significantly, at no time did Mr. Zalmayev or his confederates tell Freedom House, the National Council on Soviet Jewry or the American Jewish Committee that he drafted the Ponomarev and Alexeyeva letters.

98.     In addition, although Mr. Zalmayev and his confederates became aware of the Ponomarev and Alexeyeva retractions in February of 2011, they used the letters to bolster misleadingly their case against Mr. Egiazaryan. Defendant never provided the retractions to Freedom House, the National Council on Soviet Jewry or the American Jewish Committee and never even notified the organizations of the retractions' existence.

99.     Mr. Zalmayev, along with Mr. Akhmetshin and Mr. Bloomfield, drafted and edited the Freedom House Letters. In fact, the metadata to the electronic version of the letters identify the author as "peter." The two nearly identical March 14, 2011 letters are attached as Exhibit E.

100.     Representatives of Freedom House, the National Council on Soviet Jewry and the American Jewish Committee all "signed on" to the Freedom House Letters, and the letters were ultimately sent to the United States State Department Office to Monitor and Combat Anti-Semitism and to the United States Department of Homeland Security.

101.     The two letters begin by stating that:

> We are writing to express our concern about media reports which indicate that Mr. Ashot Egiazaryan, a Russian businessman and member of the Russian Duma who is wanted in his country for fraud and other criminal charges, had fled to the United States and intends to apply for political asylum. His actions in Russia do not equate with American standards of sanctuary, and we do not believe that his record qualifies him for a status generally conferred on those who have risked their own welfare for freedom, democracy and human rights of others.

102.   The letters continue by describing the false and misleading information fed to these organizations by Mr. Zalmayev and upon which they assert that Mr. Egiazaryan does not have the character and fitness to warrant remaining in the United States.  The letters state that:

> "[A]nti-Semitism remains a ubiquitous blight on global society. Unless swift action is taken to condemn it and hold those who preach it accountable, it will spread. We believe that in the case of Mr. Egiazaryan the United States government must once again demonstrate its intolerance for bigotry and deny his bid for political asylum".

103.   The false and defamatory statements associating Mr. Egiazaryan with anti-Semitic, anti-American and other reprehensible views and positions are almost identical to the false statements contained in Mr. Zalmayev's article "Hiding in Beverly Hills" that was published five days earlier and in Mr. Komarovsky's article "No Safe U.S. Haven for Hatemongers" published that same day.

104.   The third paragraph of the letters go on to draw a parallel with the John Galliano scandal in which the fashion designer was fired from his job at Christian Dior for making racist comments to customers in a café.  The same analogy is used in the Zalmayev and Komarovsky articles.

105.   In sum, Mr. Zalmayev fed these organizations these pernicious lies about Mr. Egiazaryan, drafted the defamatory letters for them and persuaded them to send the defamatory letters to U.S. government officials.  Mr. Zalmayev sought to cause injury to Mr. Egiazaryan through the false statement that Mr. Egiazaryan is a bigoted anti-Semite, invoking this as the conclusive reason why he should not be allowed safe haven in the United States.

106.   In connection with their work on the Freedom House Letters, Mr. Zalmayev, Mr. Bloomfield and Mr. Akhmetshin never registered as lobbyists under the

28

Foreign Agents Registration Act, the Lobbying Disclosure Act or other similar legislation.

**In Publishing The False And Defamatory Statements Described Above, Defendant Zalmayev Acted Both Negligently As Well As Intentionally And With Reckless Disregard for the Truth.**

A.   **Because Plaintiff Is A Private Figure, He Needs Only Plead And Prove Negligence To Support His Defamation Claim**

107.   Mr. Egiazaryan is a private figure leading a private life in the United States.  He is not an elected or public figure in the United States.  He has not assumed any roles of special prominence in the affairs of United States society or sought to influence any policy or any issue.  At the time Mr. Zalmayev published his defamatory statements, Mr. Egiazaryan had not thrust himself into the public eye in the United States in any way:  he had not appeared on television shows, published any writings, or given any presentations or speeches in the United States.  As such, he is not a public figure and he needs only plead and prove negligence to support his defamation claim.

108.   Indeed, Mr. Zalmayev himself has characterized Mr. Egiazaryan as "little known" in the United States, and of the six witnesses deposed to date in this action, including one of Mr. Zalmayev's own confederates and those whom he deceived into sending anti-Egiazaryan letters to government officials, none had ever heard of Mr. Egiazaryan prior to being introduced to him by Mr. Zalmayev or those working with him. Notably, these witnesses all worked in positions that should have and would have made them knowledgeable about notorious anti-Semitism or anti-Semitics in Russia.

109.   In publishing the false, defamatory and injurious statements (express and implied) described above, Mr. Zalmayev was negligent in that he failed to exercise reasonable care in verifying the statements' accuracy.

**B.     Regardless Of Whether Plaintiff Is A Private Or Public Figure, Defendant Zalmayev Acted Intentionally And With Reckless Disregard For The Truth In Publishing The False And Defamatory Statements Described Above**

110.    Mr. Zalmayev's conduct transcends mere negligence.  His defamatory statements were made with actual malice (*i.e.* intentionally and with reckless disregard for whether or not the statements were true), which may be established by demonstrating (i) Mr. Zalmayev's ill will, hostility and rivalry towards Mr. Egiazaryan; (ii) the manner in which Mr. Zalmayev drafted and disseminated the defamatory statements at issue, including the distortion of facts to maximize injury and the omission of facts that would have mitigated injury; and (iii) the defendant's disregard of the known falsity of the statements and failure to investigate or conduct due diligence as to the accuracy of the statements at issue.

111.    Assessing these factors in the context of the facts developed in discovery to date and otherwise demonstrates that Mr. Zalmayev acted intentionally and with reckless disregard for the truth in publishing the false and defamatory statements at issue.

**i.     Defendant Zalmayev's Conduct Bespeaks Ill Will, Rivalry and Hostility Toward Plaintiff and His Malicious Purpose of Having Plaintiff Removed from the United States**

112.    Mr. Zalmayev's actions were part of an elaborate negative public relations and lobbying effort designed specifically to paint Mr. Egiazaryan as a despicable human being, foment outrage against him in the United States, and have him expelled from the country.

113.    Mr. Zalmayev participated in this campaign, which had the effect of advancing the political and other interests of Mr. Zalmayev's Russian collaborators, including Mr. Egiazaryan's political and business rival, Russian Senator and billionaire Suleyman Kerimov.

114.    Upon information and belief, Mr. Zalmayev was recruited and either paid or underwritten by Mr. Kerimov or his agents to spread falsehoods about Mr. Egiazaryan in the United States in furtherance of the smear campaign.

115.    There are several facts that support the conclusion that Mr. Zalmayev is working as part of Mr. Kerimov's team and that Mr. Kerimov is clandestinely funding the "black" public relations campaign against plaintiff, including the following:

    i.    Mr. Zalmayev has in his possession private investigator's reports concerning the homes where Mr. Egiazaryan and his family resides, the vehicles they own and the people who drive them.  On information and belief, these non-public documents were prepared by private investigators retained by Denoro;

    ii.    Mr. Zalmayev has in his possession surveillance photographs of Mr. Egiazaryan.  On information and belief, these photographs were taken by private investigators retained by Denoro;

    iii.    Mr. Zalmayev has in his possession a draft letter addressed to a journalist at the LA Times, claiming to possess sensitive personal information about Mr. Egiazaryan.  On information and belief, this information was gathered by private investigators retained by Denoro.

    iv.    Mr. Egiazaryan was apparently tailed on a trip from California to Washington, D.C. in 2011.  Mr. Zalmayev knew about the visit itself and also knew the date of his arrival.

    v.    Mr. Akhmetshin, defendant's collaborator on the black public relations campaign, had a series of communications about Mr. Egiazaryan with Public Strategies, Inc., a Washington D.C.-based public relations firm

and, more specifically, about the retraction by Lyudmila Alexeyeva and her letters to Congress that requested the placement of Mr. Egiazaryan on the "no-entry" list. Mr. Akhmetshin forwarded each of these communications to Mr. Zalmayev. Discovery to date has revealed that Public Strategies, Inc. was hired by Denoro, and, like defendant Zalmayev and his confederates, was retained to perform anti-Egiazaryan public relations work in the United States.

vi. Mr. Zalmayev and his confederates have several documents in their possession that were either filed in the confidential LCIA arbitration referenced above or that were prepared on behalf of Denoro but never filed publicly. On information and belief, these documents were provided to defendant and his confederates by Mr. Kerimov or someone acting on his behalf.

vii. Despite his claims of being "impoverished," Mr. Zalmayev paid at least $42,000 variously to Messrs. Akhmetshin, Bloomfield, Komarovsky and others, including payments to certain of the individuals or entities who are signatories to letters to United States public officials. On information and belief, the funds for these substantial outlays of cash were provided by Mr. Kerimov or someone acting on his behalf.

116. In light of the apparent cooperation between Mr. Kerimov and Mr. Zalmayev, Mr. Zalmayev's professed inability to personally finance his campaign, the uniformity of target, purpose and methods of Mr. Kerimov's and Mr. Zalmayev's efforts

against plaintiff, there is substantial reason to infer that Mr. Zalmayev is carrying out his campaign on a commercial basis for Mr. Kerimov, a foe of Mr. Egiazaryan.

> **ii.   Defendant Zalmayev Drafted and Disseminated the Statements at Issue, and He Purposefully Omitted and Suppressed Information that would have Mitigated Injury to Plaintiff**

117.   The defamatory meanings and injurious conclusions alleged in this Complaint were not, and could not have been, mere happenstance, accident or mistake. Mr. Zalmayev employed phrasing, sequencing and "guilt by association" in an intentional and calculated fashion to convey the defamatory meaning that Mr. Egiazaryan is anti-American, a vile and pernicious anti-Semite and a supporter of human rights abuses. Indeed, Mr. Zalmayev edited and distorted his publications in such a way as to maximize the damage done by the publications, and he intentionally omitted facts which would have mitigated any damage to Mr. Egiazaryan.

118.   The methods used by Mr. Zalmayev -- discrediting by association with disreputable people or groups -- are particularly reprehensible.  For example and without limitation, Mr. Zalmayev and his collaborators deliberately and recklessly misled his intended audience by ascribing to Mr. Egiazaryan anti-Semitic and anti-American statements made by Mr. Zhirinovsky.  In fact, when Mr. Zalmayev attempted to arrange for a condemnation of Mr. Egiazaryan to be placed in the Congressional Record, the staffer refused to do so.  After being provided with a copy of Mr. Zalmayev's Jewish Journal article, the staffer responded "No guilt by association.  Zhirinovsky may be anti-Semitic . . . but the article doesn't provide any evidence that Egiazaryan is."

119.   Discovery to date shows that among Mr. Zalmayev and his confederates, there was disagreement as to whether, in connection with the campaign to tar plaintiff as an anti-Semite, efforts should be made to link Mr. Egiazaryan with Mr. Zhirinovsky.  Mr.

Akhmetshin expressed concern that the inclusion of references to Zhirinovsky will "dilute our punch." Mr. Bloomfield expressed a contrary view: that "Zhirinovsky definitely enhances our case. His name is well-known among nearly all those we will be contacting. He is an identifier for Ashot. . . ."

120.    After vetting the issue and recognizing that Mr. Egiazaryan himself had never uttered an anti-Semitic statement verbally or in writing, defendant and his confederates concluded that in order successfully to portray plaintiff as an anti-Semite, they would need to associate plaintiff prominently with Mr. Zhirinovsky and Zhirinovsky's reputation for anti-Semitism to try to make the false and misleading case that Mr. Egiazaryan is himself an anti-Semite.

121.    Another example of Mr. Zalmayev's deceptive drafting techniques is his strategy to alter the various letters that he and his collaborators drafted so that they would not appear to be coming from one source. Mr. Akhmetshin supported this strategy and stated that they should "have several variations [of the letters], so it doesn't look suspiciously similar coming from different folks."

122.    Mr. Zalmayev also engaged in activities calculated to suppress information that could have mitigated injury to Mr. Egiazaryan. For example:

  i.  Mr. Zalmayev sought to lower the "Google rankings" of Mr. Egiazaryan's website, a website established by Mr. Egiazaryan to combat the black public relations campaign. The lowering of a website's "Google rankings" would make it less likely that people conducting internet searches on Mr. Egiazaryan would find and read information in his defense.

  ii. Mr. Zalmayev also sought to lower the "Google rankings" of a blog reporting that Mr. Zalmayev's own human rights organization is a front for commercial

lobbying and public relations activities, which would make it less likely that people would find and read the blog and question the source of the false accusations against Mr. Egiazaryan.

iii. In connection with securing the Freedom House letters, Mr. Zalmayev provided the organizations whose assistance he sought to enlist with the defamatory January 2011 Ponomarev and Alexeyeva letters, but not the corresponding retractions by the letters' signatories. By omitting the retractions, Mr. Zalmayev increased the chances that the organizations, which had not heard of plaintiff prior to learning about him from defendant, would sign onto the Freedom House Letters.

### iv. Defendant Zalmayev Disregarded Evidence of the Known Falsity and/or Failed to Investigate and Conduct Due Diligence as to the Accuracy of Any of the Challenged Statements

123. In connection with publishing the defamatory statements described above, defendant published the statements with knowledge of their falsity or with reckless disregard for the truth.

124. Mr. Zalmayev and his confederates spoke at some length about the most effective line of attack to discredit plaintiff.

125. With regard to whether to claim that Mr. Egiazaryan was an anti-Semite, Mr. Zalmayev and his confederates recognized that there was no evidence of plaintiff uttering any anti-Semitic statement or holding any anti-Semitic views. According to a memorandum prepared by Mr. Bloomfield of a conversation he had with Mr. Zalmayev, the two men agreed that the only way to effectively accuse plaintiff of anti-Semitism is through guilt-by-association and no more. In this case, defendant sought to associate plaintiff with the LDPR and, in particular, Mr. Zhirinovsky. In Mr. Bloomfield's words,

making the case for Mr. Egiazaryan as an anti-Semite is "[n]ot an easy issue, largely circumstantial, [because] it is the party and its leader, Zhirinovsky."

126.   Notwithstanding this conclusion, and pointing to nothing more than his affiliation with the LDPR and his supposed friendship with Mr. Zhirinovsky, defendant nonetheless falsely advanced the accusation that plaintiff is a virulent anti-Semite who should not be permitted to remain in the United States.

127.   Mr. Zalmayev manifested the same reckless disregard for the truth with regard to claims that while a member of the Duma committee for Assistance in Political Regulation and Observance of Human rights in Chechnya, plaintiff embezzled funds earmarked for Chechnyan war relief.  In written communications with Mr. Akhmetshin, Mr. Zalmayev acknowledged the absence of evidence to support the claim.  Defendant noted that "this commission is quite murky and no one I've called in [M]oscow has any good idea or details about it. [sic.] and [sic.] there's hardly anything on-line."

128.   Had Mr. Zalmayev researched further, he would have uncovered contemporaneous media reports in which Mr. Egiazaryan criticized the mismanagement of the Chechnyan relief funds by the executive authorities and called for an investigation and further transparency.

129.   Notwithstanding this dearth of condemnatory information, and in reckless disregard for the truth, Mr. Zalmayev nevertheless enlisted support from Lev Ponomarev and Lyudmila Alexyeva to sign and send letters to members of Congress that accuse Mr. Egiazaryan of embezzling Chechnyan war relief funds.

130.   Mr. Zalmayev's reckless disregard for the truth is also apparent in connection with his claims that Mr. Egiazaryan was a war criminal who contributed to the atrocities committed during the Second Chechyan War.  In communications with Mr.

Akhmetshin, defendant acknowledged that ascribing fault to Mr. Egiazaryan for war atrocities was something about which "caution" needed to be taken.  Defendant admitted to Mr. Akhmetshin that "we need to think how to formulate that, cause [sic.] that second phase has been prosecuted, really, under the auspices of [sic.] Kremlin's current occupants."  Put differently, defendant acknowledged that the atrocities committed during this "second phase" were really attributable to those then in power in the Kremlin (*i.e.*, not Egiazaryan.)

131.    Notwithstanding this acknowledgment, defendant nevertheless enlisted support from Lev Ponomarev and Lyudmilla Alexeyeva to sign letters to members of Congress, accusing Mr. Egiazaryan of contributing to the atrocities committed during the Second Chechnyan War.

### Damage to Plaintiff

132.    The false defamatory and injurious statements, express and implied, that were communicated by Mr. Zalmayev in his article "Hiding in Beverly Hills" and in his statements and actions with respect to others that resulted in the publication of false, defamatory and injurious articles or letters caused and continue to cause Mr. Egiazaryan serious damage.  These damages include:

> i.    presumed compensatory damages for the injury to his reputation and the humiliation and mental anguish in his public and private life caused by Defendant's false, misleading and injurious statements. Plaintiff is entitled to fair and just compensation in an amount to be determined by a jury for the injury suffered by Plaintiff to his reputation, which is substantial.

    ii.  actual or special compensatory damages for financial loss actually suffered by plaintiff.  Plaintiff has incurred in excess of $203,750.00 in fees for public relations experts to combat and counteract the "black" (*i.e.*, negative) public relations campaign against him.  A majority of these fees are attributable to Plaintiff's effort to combat and counteract Defendant's smear campaign against Plaintiff and the false, defamatory and injurious statements made and procured by Defendant.

    iii.  punitive damages to punish Defendant, who has acted maliciously, and to discourage others from doing the same.  Plaintiff is entitled to punitive damages in an amount to be determined by a jury.

113.    If Mr. Egiazaryan is forced to return to Russia, he will be subject to severe harassment, the possibility of incarceration for trumped-up criminal charges, and he and his family may well be physically assaulted or even killed.

114.    As a result of the foregoing, Mr. Egiazaryan seeks special damages, actual and presumed damages and punitive damages.

## COUNT I
### (Defamation with Regard to the Article "Hiding in Beverly Hills")

115.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116.    In his article, "Hiding in Beverly Hills," defendant Zalmayev made several statements of fact about plaintiff Egiazaryan, which are set forth in detail above.

117.    The ordinary and everyday meanings, express and implied, of the words and phrases used in the article, as well as the overall impression of the article -- that Mr. Egiazaryan is anti-Semitic and anti-American -- are communicated principally in the opening paragraph and second half of the article, in the paragraphs reproduced above.

38

118.    The opening sentence says that Mr. Egiazaryan has ties to a Russian "ultranationalist party known for its anti-American and anti-Semitic positions." The sentence clearly suggests to an ordinary reader that Mr. Egiazaryan shares those positions.

119.    Later in the article, the author makes additional false and misleading statements, including that Mr. Egiazaryan is a friend of Mr. Zhirinovsky, the notorious head of the LDPR. These statements are intended to falsely and misleadingly associate Mr. Egiazaryan with Mr. Zhirinovsky's statements and views.

120.    The next paragraph discusses Mr. Zhirinovsky in more detail to hammer home the false and misleading "guilt by association" point made in the prior paragraph by making reference to Mr. Zhirinovsky's "outspoken anti-American and anti-Semitic attacks."

121.    Two paragraphs later, in the thirteenth paragraph, in seeking to add verisimilitude and gravity to the account, Mr. Zalmayev continues to discuss what he alleges are the abhorrent views of the LDPR and Mr. Zhirinovsky, including that "Jewish Groups in America and Russia have repeatedly condemned the LDPR and its leader as anti-Semitic and have urged Americans, as a form of protest, to avoid any meetings with members of Zhirinovsky's party who may visit the United States."

122.    In the next paragraph, Mr. Zalmayev says that Mr. Zhirinovsky blames the Jews for "sparking both the Russian revolution and World War II, provoking the Holocaust and masterminding 9/11."

123.    In one of the article's most damaging and deceptive passages, the final paragraph explicitly connects for the reader everything that Mr. Zalmayev has said about Mr. Zhirinovsky and the LDPR to Mr. Egiazaryan. It refers to the LDPR as the "Zhirinovsky-Egiazaryan party," and thus accuses Mr. Egiazaryan of "racism and bigotry

[that] has contributed significantly to Russia's growing climate of ethnically based intolerance and xenophobia."

124.    When Mr. Zalmayev writes that Americans should "avoid any meetings with members of Mr. Zhirinovsky's party who may visit the United States," he is clearly implying that Mr. Egiazaryan's anti-Semitic and anti-American positions are so despicable that people should not even meet with him.

125.    When Mr. Zalmayev says that "[a]nti-Semitism remains pernicious and insidious," the reader can reach no conclusion other than that Mr. Zalmayev is writing about Mr. Egiazaryan's anti-Semitism.

126.    When Mr. Zalmayev next writes that "The U.S. government must likewise put anti-Semites worldwide on notice:  You are not welcome in this country," it is obvious that the conclusion that Mr. Zalmayev intends the reader to reach is that the "anti-Semite" who is "not welcome in this country" is Mr. Egiazaryan.

127.    Taken as a whole, the article is understood to the average reader as communicating the false, defamatory and injurious meaning that Mr. Egiazaryan is a hardcore bigot and anti-Semite unworthy of the rights and freedoms afforded to United States residents and, indeed, is so detestable a human being that no American should even meet with him.

128.    "Hiding in Beverly Hills," was published, both in hard copy and on-line, in the Jewish Journal, a periodical with a large number of subscribers and other readers around the United States.

129.    Defendant Zalmayev was negligent in verifying the statements contained in the article.

130.     Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements contained in the article.

131.     By writing and publishing "Hiding in Beverly Hills," defendant Zalmayev caused plaintiff to suffer the damages set forth more fully above.

132.     By reason of the foregoing, plaintiff is entitled to monetary damages from defendant in an amount to be determined at trial.

## COUNT II
**(Defamation Resulting from Defendant's Communications that Caused
Or Contributed to the Article "No Safe U.S. Haven for Hatemongers")**

133.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 132 of this Complaint as if fully set forth herein.

134.     Defendant Zalmayev had one or more communications about plaintiff Egiazaryan with Leonid Komarovsky, a journalist and United States-based Russian-language radio talk show host.

135.     Defendant Zalmayev communicated to Mr. Komarovsky the statements Mr. Zalmayev published in his article, "Hiding in Beverly Hills" and induced publication of a similar article in another publication -- an article that Mr. Zalmayev himself participated in writing.

136.     On March 14, 2011 the Moscow Times published an article entitled "No Safe U.S. Haven for Hatemongers," after the article was submitted to the Moscow Times by defendant Zalmayev "on behalf" of Mr. Komarovsky.

137.     The Moscow Times is an English-language daily newspaper published in Moscow, Russia.  The internet edition has world-wide circulation and is widely read by Russian expatriates residing in the United States and others with a professional and personal interest in Russian politics, business and culture.

138.    Among other things, Mr. Komarovsky's article, whose title itself tars Mr. Egiazaryan as a "Hatemonger," re-published the false and defamatory statements made by defendant Zalmayev.  Among other things, the article falsely states:

- "As a long-standing member of the Liberal Democratic Party, or LDPR, and, consequently, its anti-Semitic and xenophobic agenda, Yegiazaryan does not deserve safe haven in the United States."

- "[C]allers to my daily Russian-language radio show have voiced concerns over Yegiazaryan's . . . well-established record of anti-Semitism and hate speech."

- "if there is a database containing names of terrorists banned from entering the United States, there should likewise be one for characters like Yegiazaryan."

- "Undoubtedly, Yegiazaryan's party's anti-Semitic platform has contributed significantly to Russia's prevailing climate of ethnic intolerance."

The article concludes by explicitly branding Mr. Egiazaryan an "Anti-Semitic bigot."

139.    Defendant Zalmayev was negligent in verifying the statements communicated to Mr. Komarovsky and the Moscow Times and that were republished by Mr. Komarovsky in the Moscow Times article.

140.    Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements communicated to Mr. Komarovsky and the Moscow Times and that were republished in the Moscow Times article.

141.    By communicating the false and defamatory statements to Mr. Komarovsky and the Moscow Times and inducing Mr. Komarovsky to republish the statements in the Moscow Times article, defendant Mr. Zalmayev caused plaintiff to suffer the damages set forth more fully above.

142.    By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

## COUNT III
### (Defamation Resulting from Defendant's Communications with Lev Ponomarev and Lyudmila Alexeyeva that Caused or Contributed to the January 29 and January 30, 2011 Letters)

143.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 142 of this Complaint as if fully set forth herein.

144.    In or around January 2011, Mr. Zalmayev made false, defamatory and injurious statements to Lev Ponomarev and Lyudmila Alexeyeva, two prominent Russian human rights activists, about Mr. Egiazaryan.  These statements, coupled with payments totaling $5,000, induced Mr. Ponomarev and Ms. Alexeyeva to write to the United States Congress on January 29, 2011 and January 30, 2011 and to encourage Congress to place Mr. Egiazaryan on a "no-entry list" for foreign nationals due to his allegedly abhorrent views and positions.

145.    Both letters accuse Mr. Egiazaryan of having committed war crimes as well as the theft, embezzlement or mismanagement of funds, as set forth more fully above.

146.    Defendant Zalmayev was negligent in verifying the statements communicated to Mr. Ponomarev and Ms. Alexeyeva that were republished by them in their letters of January 29, 2011 and January 30, 2011.

147.    Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements communicated to Mr. Ponomarev and Ms. Alexeyeva that were republished by them in their letters of January 29, 2011 and January 30, 2011.

148.    By communicating the false and defamatory statements to Mr. Ponomarev and Ms. Alexeyeva and encouraging them to publish these statements in their letters of January 29, 2011 and January 30, 2011, defendant Zalmayev caused plaintiff to suffer the damages set forth more fully above.

149.    Defendant Zalmayev's false and defamatory statements to Mr. Ponomarev and Ms. Alexeyeva concerning plaintiff Egiazaryan's alleged embezzlement and his alleged involvement in the funding of war crimes, which were ultimately republished in the Ponomarev and Alexeyeva letters of January 29, 2011 and January 30, 2011 constitute defamation *per se,* and damages with respect to these statements are presumed.

150.    By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

### COUNT IV
**(Defamation Resulting from Defendant's Communications with Freedom House, The American Jewish Committee and The National Council On Soviet Jewry That Caused or Contributed to the Freedom House Letters)**

151.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 150 of this Complaint as if fully set forth herein.

152.    Seeking to further perpetuate his false, defamatory and injurious statements, Mr. Zalmayev contacted Freedom House, a human rights organization, with the January 2011 Ponomarev and Alexeyeva letters, but not the retractions sent by Mr. Ponomarev and Ms. Alexeyeva shortly thereafter.

153.    After the retractions of the Alexeyeva and Ponomarev letters were issued, Mr. Zalmayev made false, defamatory and injurious statements to representatives of Freedom House, the American Jewish Committee and the National Council on Soviet Jewry.  At no time during Mr. Zalmayev's attempts to enlist the assistance of these organizations in the smear campaign against Mr. Egiazaryan did Mr. Zalmayev inform these organizations that he played any role in preparing or inducing the preparation of the January 2011 Ponomarev and Alexeyeva letters, that he misled Mr. Ponomarev and Ms. Alexeyeva into signing them or that the letters were later retracted.

154.     Defendant Zalmayev caused Freedom House, the American Jewish Committee and the National Council on Soviet Jewry to send false and defamatory letters to the United States State Department Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

155.     Mr. Zalmayev played a key role in drafting these letters.

156.     The letters contain false, defamatory and injurious statements, as set forth more fully above.

157.     Defendant Zalmayev was negligent in verifying his statements concerning Mr. Egiazaryan communicated to Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and republished by them in letters to the United States Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

158.     Defendant Zalmayev also acted with actual malice and reckless disregard for the truth of the statements concerning Mr. Egiazaryan communicated to Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and republished by them in letters to the United States Office to Monitor and Combat Anti-Semitism and the United States Department of Homeland Security.

159.     By communicating the false and defamatory statements to Freedom House, the American Jewish Committee and the National Council on Soviet Jewry and inducing them to republish these statements in letters to these departments of the United States Government, defendant Zalmayev caused plaintiff to suffer the damages as set forth more fully above.

160.     By reason of the foregoing, plaintiff Egiazaryan is entitled to monetary damages from defendant Zalmayev in an amount to be determined at trial.

WHEREFORE, plaintiff respectfully requests that judgment be entered, for plaintiff and against defendant, as follows:

a.  On Count I, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

b.  on Count II, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

c.  on Count III, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

d.  on Count IV, awarding damages in an amount to be determined at trial but which are well in excess of the jurisdictional amount, for special, presumed or actual damages;

e.  awarding punitive damages in an amount to be determined at trial;

f.  awarding the costs and disbursements of this action; and

g.  awarding such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Ashot Egiazaryan demands a trial by jury on all issues so triable.

Dated:  New York, New York
        February 28, 2012

                                FLEMMING ZULACK WILLIAMSON
                                ZAUDERER LLP

                                By: _____
                                     Mark C. Zauderer
                                     Jonathan D. Lupkin
                                     Jason T. Cohen
                                One Liberty Plaza
                                New York, New York 10006
                                (212) 412-9500

                                Attorneys for Plaintiff Ashot Egiazaryan