*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*


**Claim No: CR 2012-559**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**IN THE MATTER OF AN APPLICATION UNDER PART 34 OF THE CIVIL PROCEDURE RULES**

**AND IN THE MATTER OF A CIVIL OR COMMERCIAL MATTER NOW PENDING IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**BETWEEN:**

**PETER ZALMAYEV**

**Applicant**

**-and-**

**JOHN LOUGH**

**Respondent**

---

### SECOND WITNESS STATEMENT of JAMES PHILIP GOLDEN
Re application in respect of Mr. Lough

---

I, **JAMES PHILIP GOLDEN**, Attorney-at-Law, of Hamburg & Golden, P.C., 1601 Market Street, Suite 3310, Philadelphia, PA 191-3-1443, do hereby say as follows.

1.    I am the same James Philip Golden who made a first witness statement in this matter. I make this statement in answer to the Respondent's application to discharge the Order of this Honorable Court requiring him to be deposed pursuant to a Letter of Request from the United States District Court for the Southern District of New York as part of the evidence for trial in an action is entitled ***Ashot Egiazaryan*** (*plaintiff*) – v- ***Peter Zalmayev*** (*defendant*) 1: 11- cv-02670 (PKC) (GWG) ('*the New York action*'). I respectfully refer the Court to my previous witness statement and

1

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

accompanying exhibits '**JPG 1-25**'. I also make this witness statement in response to the witness statements of Mr Cyrus Benson of Gibson Dunn, dated 22 October 2012, and of Mr Jason Todd Cohen of Flemming Zulack, of the same date.

2.    I am duly authorised to make this witness statement and the facts and matters contained herein come from my own knowledge of the case, or from information provided to me by my colleague, Ms Jane Silver, who was involved in discussions with Mr Cohen and his colleague Mr Lupkin at Flemming Zulack. All of the facts and matters herein are true to the best of my knowledge and belief.

**The Respondent's application**

3.    I respectfully contend that the Respondent's application is nothing more than a contrived abuse of the processes of both the U.S. Federal District Court, who issued the Letters of Request, and, with all due respect, this Honorable Court who is being requested to assist the Federal District Court in obtaining evidence for the trial of action. My reasons for contending this are set out in detail below.

**No objection in the United States to the Letters of Request**

4.    The Letters of Request in this case, including that in relation to the Respondent, were not the product of some ex parte application in the United States concerning witnesses in the U.K. who played no part in the U.S. proceedings. On the contrary, the Respondent and his employers, BGR Gabara ('BGR'), were fully represented before the Federal District Court in New York in relation to the issuing of the Letters of Request and clearly submitted to the jurisdiction of that Court. The BGR witnesses were represented by Mr Cohen's firm, Flemming Zulack, who also represented Mr. Egiazaryan. The complaint was filed in April 2011 by Flemming Zulack for Mr. Egiazaryan; Flemming Zulack began its representation of BGR in August or September 2011, shortly after Mr. Zalmayev served subpoenas on BGR at BGR's Washington, D.C. office. The Letters of Request issued were in fact the product of '*negotiations*' with Flemming Zulack. The latter offered that they would raise no objections before the Federal District Court to the issuing of these Letters of Request

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

for the deposing of the oral evidence of these BGR witnesses if Mr Zalmayev dropped his request for documentary disclosure which had formed part of the original Letters of Request. This was agreed between the parties and confirmed to the Federal District Court at a telephone conference on the 23 May 2012. On that occasion, when the New York judge specifically raised with Mr Cohen and Flemming Zulack whether they had any objections to the contents of the Letters of Request. Mr Cohen told the Federal District Court that he had none (as I noted in my subsequent letter to the Court at **JPG 23, p. 23**). In doing so, the BGR witnesses thereby waived under U.S. law any objections to relevancy of the issues for deposition or any other matters relating to the Letters of Request. These matters are set out in detail below.

5. I would also respectfully remind this Honorable Court that the Respondent was, and is, part of a public relations company hired, since February 2011, by Mr. Egiazaryan's lawyers, Gibson Dunn. BGR is still being paid $77,000 a month, to provide PR services to Mr. Egiazaryan. Indeed, some $203,750.00 of BGR fees formed part of Mr. Egiazaryan's damages claim against Mr. Zalmayev in the New York action before that claim was dismissed: (see paragraph 59 of my first witness statement, and **JPG 8, p. 138**, paragraph 132 (ii)). Thus the work that the Respondent was doing for Mr. Egiazaryan, and the individual BGR Gabara employees' knowledge of both Mr. Egiazaryan's reputation and purpose of his lawsuit against Mr. Zalmayev was and remains, highly relevant to the trial of both the original claim for defamation (now dismissed) and to Mr. Zalmayev's continuing anti-SLAPP counterclaim in the New York action, which involves exactly the same factual issues as arose in the defamation claim, as well as Mr. Egiazaryan's motives in bringing the proceedings against Mr. Zalmayev.

6. As I set out in my first witness statement, and will demonstrate below, the Respondent had every opportunity before the Federal District Court to make any representations regarding the relevance, the scope of any evidence requested of him or indeed any other aspect of the Letter of Request or the procedure for deposing him. The Respondent and the other witnesses deliberately chose not to. This they did

3

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

with the active advice and participation of Flemming Zulack, and probably, Gibson Dunn, both of whom now represents the Respondent and other BGR witnesses and who also represent Mr. Egiazaryan in England, (including in relation to the latters' seven arbitrations before the London Court of International Arbitration). I do not know when Gibson Dunn's representation of BGR began; Gibson Dunn was representing Mr. Egiazaryan since before the suit against Mr. Zalmayev. Gibson Dunn's representation of BGR now is at the minimum curious, since BGR's contract for services for Mr. Egiazaryan is *nominally with Gibson Dunn.* (**JPG 13**).

**The Letters of Request: May –June 2012**

7.      When the Letters of Request were made in May 2012, there was no objection at the time by the Respondent or Flemming Zulack to the witness giving of oral evidence, on *any* of the grounds that are now being put forward by Mr. Cohen or Mr. Benson in their witness statements. Not one. Instead, Flemming Zulack and Mr Cohen's reaction to Letters of Request indicated that, as long as the requests for documentary disclosure of BGR Gabara documents were removed, they '*will not object to or seek a protective order in the South District of New York with regard to the defendant's request that Magistrate Judge Gorenstein endorse the requests*' (i.e. in relation to the oral depositions of all three witnesses): see paragraph 64 of my First Witness Statement and (**JPG 23**, p. 1). This was repeated in Mr Cohen's letter of 18 May 2012 to the Federal District Court (see paragraph 65 of my First Witness Statement and **JPG 23**, p. 2), when he said:

> '*Plaintiff and BGR take no position in this Court with regard to the sought after depositions, but expressly reserve their right to object and / or seek any and all remedies and limitations in the United Kingdom*'.

8.      Under U.S. law, such a stance on the part of the Respondent and the other witnesses has important consequences. It constitutes a waiver of any objections by the Respondent on the grounds of relevancy of the evidence sought in the Letter of

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

Request, or indeed of any other objection which could have been raised before the U.S. Court: (see e.g. the defendant's request to depose a third party witness in Northern Ireland in *Metso Minerals Inc. –v– Powerscreen International Distribution Limited*, United States District Court for the Eastern District of New York, of June 25, 2007 ('**JPG 26**', p. 2, footnote 2). Unusually, this was not just one of the parties to the litigation choosing to make no representations before the Federal District Court and reserving their rights before the foreign court. In this case, it was also the witnesses themselves, who were fully represented in the U.S. proceedings, deliberately choosing on legal advice to make no representations challenging any aspect of the relevancy of the evidence being sought under the Letters of Request or appropriateness of the making of the Letters of Request at all. Obviously, that advice was given by lawyers also representing Mr. Egiazaryan, and was, no doubt, designed to suit his wider interests.

9.   I responded to Mr Cohen's letter of 18 May in a letter of 23 May 2012 to the Federal District Court (**JPG 23, p. 7-10**). In my letter, I pointed out that all those problems had been caused by Mr Cohen's firm failing to disclose the requested BGR documents within the US proceedings (see **JPG 23, p. 8-9**). Flemming Zulack had promised to disclose the BGR documents if I withdrew a motion of the 9 March 2012 seeking an order that they do so[1].But by 23 May 2012, Flemming Zulack had still not produced the promised BGR documents. As I pointed out to the Federal District Court:

> '*The solution is simple. Counsel for Mr. Egiazaryan and the BGR non-parties can eliminate entirely Mr. Zalmayev's need to proceed under the Hague Convention for documents and testimony by actually producing the BGR documents (as promised) and scheduling the depositions of Mr. Lough, Mr. Gabara and Mr. Amsterdam to take place in London or anywhere in the United States, an offer that has*

---

[1]   This 9 March Letter Motion (**JPG 37**) is discussed further below.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

been repeated[ly] made by counsel for Mr. Zalmayev and repeatedly refused by Flemming Zulack': (**JPG 23, p. 8-9**).

**The 23 May 2012 telephone conference with Judge Gorenstein**

10.    The Letters of Request were considered by the Federal District Court in a telephone conference before Judge Gorenstein on the 23 May 2012. Mr Cohen appeared on behalf of Mr. Egiazaryan and the Respondent and the other BGR witnesses. Mr Cohen's attitude to the deposing of these three witnesses was confirmed. Mr Cohen represented to the Federal District Court that if Mr. Zalmayev withdrew the request for documents, there would be no objection to Judge Gorenstein signing the Hague Evidence requests for the oral depositions of the witnesses: see paragraph 66 of my first witness statement.

11.    During this hearing, Judge Gorenstein very carefully explored with Mr Cohen whether or not he had any objections to the issuing of such Letters of Request. None were put forward by Mr Cohen: (**JPG 23, p. 23**).

12.    Thus despite their being fully represented before the Federal District Court, and despite Judge Gorenstein raising specific inquiries as to whether or not they had any objections to the Letters of Request being issued, there was no attempt by any of the BGR witnesses to challenge or limit the scope of the evidence requested in the Letters of Request in any way. There was no suggestion that the topics they were to be questioned about were not relevant to the proceedings or were '*overbroad*', or that they personally did not have any relevant knowledge of the issues; or that the requests were in some way duplicative of either the other witnesses or of the earlier depositions already taken or of the documentary disclosure that had (or would) take place. Nor was there any suggestion that that their evidence might in some way be the subject of any privilege under U.S. law. This is despite the Federal District Court being the best placed to adjudicate on any of the factual or legal disputes concerning the contents and scope of the Letters of Request for matters relating to the trial before it. This was a manifestly deliberate and abusive ploy on the part of Flemming Zulack,

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

acting for Mr. Egiazaryan as well as the BGR witnesses who, of course, are paid by Mr. Egiazaryan.

13.   These inquiries made by the Judge Gorenstein on the 23 May 2012 were important under US law. As was noted in **Metso**, the United States Supreme Court has emphasised that '[i]*t is the duty of this court to carefully scrutinize applications of this type to attempt to minimize the burden placed on the foreign judiciary by virtue of such an application*': See **Societe Nationale Industrielle Aerospatiale v. United States**, 482 U. S. 522, 546. This Judge Gorenstein did, and thus the Federal District Court issued the Letters of Request in good faith, seeking the assistance of this Honorable Court.

14.   In the absence of any objection being raised by Mr Cohen and Flemming Zulack, I re-filed the Letters of Request, and these that were issued on 8 June 2012: see **JPG 23, p. 19**, my letter to the New York court of 24 July 2012).

### The "creation" of objections to the Letters of Request

15.   Even after the Letters of Request had been issued, when asked what the '*rights*' they were reserving in London, Flemming Zulackwere unable to articulate what their substantive objections might be.

16.   By July 10, 2012, Ms. Silver of my firm was trying to ascertain the basis of any objections to the taking of depositions. As I would subsequently tell the court, Mr. Cohen told her that there were '*various questions*' about the '*adequacy of the specificity and whether some topics listed as subjects of testimony in the Hague requests... were outside the scope*', but Mr Cohen said '*we haven't got to that stage*'. Mr Cohen admitted that they '*haven't made a determination as to whether there was something specific*': (**JPG 23, p. 21**). On the 17 July 2012, Mr Cohen again told Ms Silver that '*BGR and / or Egiazaryan intends to interfere with the depositions, but the exact objections are still being determined by London counsel. Mr Cohen confirmed that there objections could be to particular topics, or may involve privilege issues*':

(**JPG 23, p. 22**). Thus, they were then, as they are now, simply the product of collusion and artificial contrivance between Mr. Egiazaryan's various advisors.

17.    I also respectfully invite the Court to note that these objections were in the process of being created even *before* the dismissal of Mr. Egiazaryan's defamation claim. The complaint was dismissed by 30 July 2011 opinion. (**JPG 9**)

**The 24 August 2012 Hearing**

18.    The fact that the time for any objections in the United States had long passed, was emphasised by Judge Gorenstein at the hearing on 24 August 2012, when Mr Cohen's firm subsequently tried to raise objections to the Letters of Request. Judge Gorenstein stated:

> "*I think all of these issues should have been raised, whatever they are, when the letter of request was made. We carefully checked to see if there was any objection by the plaintiff and the request was issued, so that's it*": (**JPG 24, p. 10**, and paragraph 71 of my first witness statement).

**The continuing relevance of the Letters of Request after dismissal of the Egiazaryan defamation claim**

19.    Despite the dismissal of the last of Mr. Egiazaryan's defamation claims against Mr. Zalmayev, the scope of evidence of these three witnesses that is sought under the terms of the Letters of Request remains exactly the same as prior to the dismissal, and it remains entirely relevant for the trial of Mr. Zalmayev's Anti-SLAPP counterclaim. The claims by Mr Cohen and / or Mr Benson to the contrary are without foundation. Mr. Zalmayev's position was made abundantly clear to the Federal District Court in my letter of 14 August 2012: (**JPG 23, p. 33-36**), in advance of the hearing on the 24 August 2012.

20.    At the hearing before him on the 24 August 2012, Judge Gorenstein rejected Flemming Zulack's argument that the dismissal of the Egiazaryan defamation claim

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

in his Amended Complaint changed anything in relation to discovery, including the issues relating to the trial of Mr. Zalmayev's anti-SLAPP Counterclaim: (see paragraphs 72-74 of my first witness statement, and **JPG 24**). Mr Cohen's current claims regarding a hearing before Judge Gorenstein of the 3 October 2012 are both erroneous and entirely improper as he is seeking to make reference to proceedings which are subject to confidentiality imposed by the New York Court at Mr. Cohen's client's demand. I would like to demonstrate this properly but the transcript of that hearing is closed.

**The anti-SLAPP Counterclaim**

21.    Despite Mr. Egiazaryan having lost his case in New York that is not enough for Mr. Zalmayev to win his counterclaim, which is necessary for him to do if he is even to recover his attorney's fees in defending the original action.  Mr. Zalmayev's counterclaim under McKinney's Civil Rights Law, the New York '*anti-SLAPP*' statute, crucially requires him to prove that Mr. Egiazaryan (as a '*public applicant or permittee*')[2] brought an action which '*is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application*',[3] and that Mr. Egiazaryan's defamation action was commenced against Mr. Zalmayev:

(i)     '*without a substantial basis in fact and law*': (§ 70-a (a)); and

(ii)    '*... for the purpose of harassing, intimidating or maliciously inhibiting free speech*: (§70-a (b)); or

(iii)   '*... for the <u>sole</u> purpose of maliciously harassing, intimidating, or inhibiting free speech*: (§ 70-a (c)).

22.    The essence of the anti-SLAPP counterclaim is showing that Mr.Egiazaryan's original action was baseless. Mr. Zalmayev has to prove that the defamation claim

---

[2]    Defined as meaning '*any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body...*(**§** 76-a.1 (b))

[3]    § 76-a. 1. (a)).

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

was without any substantial basis in fact and law.  This requires the same evidence as defending the original defamation claims.  In addition, Mr. Zalmayev has to prove that Mr. Egiazaryan's motive in bringing the defamation lawsuit included the *'purpose'* or *'sole purpose'* of *'harassing, intimidating or maliciously inhibiting free speech'* by Mr. Zalmayev in relation to his reporting or commenting on Mr. Egiazaryan's asylum application in the United States. Indeed as I informed this Honorable Court previously Judge Gorenstein expressly noted this on the 24 August, saying that:

> *'Zalmayev has to show that Egiazaryan didn't have a substantial basis for filing the various claims he did in which he alleges that Zalmayev falsely called him an anti-Semite and a member of this party and so forth...*

> *'But the substantial basis, that judgment is based upon the actual evidence that was available to him as of the time the suit was brought, right?..,* **(JPG 24, p. 4)**.

**The evidence of the three BGR witnesses**

23.    All three of the BGR witnesses will have detailed knowledge and information about Mr. Egiazaryan's reputation at the time the defamation proceedings against Mr. Zalmayev were issued, and also about Mr. Egiazaryan's motives for bringing his defamation action against Mr. Zalmayev. For it was BGR, acting primarily by Mr. Gabara, Mr Lough and Mr Amsterdam, who were engaged at that time in creating an entirely new PR *'narrative'* for Mr. Egiazaryan in the period before and immediately after he issued defamation proceedings against Mr. Zalmayev. This sought to wash away what they described as Mr. Egiazaryan's *'reputational baggage'* from the past, including the consequences of his *'association'* with the Liberal Democratic Party of Russia (*'LDPR'*), whose leader, Vladimir Zhirinovsky, is known in America for his ultra-nationalist, anti-Semitic, xenophobic and anti-American rhetoric). This new *'victim'* narrative sought to create the impression that

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

Mr. Egiazaryan was the innocent victim of a Russian corporate raid and of oppression by the Russian government. The role of BGR, and their objectives on behalf of Mr. Egiazaryan, were reflected in, *inter alia*:

(1)     **The Outline Proposal (JPG 12)** prepared by BGR that advocated '*an assertive global media campaign*' for the three-fold purpose of (a) creating '*media coverage that will be conducive to a successful outcome of the arbitration proceedings in London and Cyprus*', (b) rebuffing '*the adverse campaign   waged   by   Mr. Egiazaryan's opponents   and   protect   his   reputation*' and (c) '*to   put Mr. Egiazaryan's opponents under pressure through the media   and limit their capacity to continue their campaign against him via domestic or international media*': (**JPG 12, p. 2**);

(2)     **The BGR Contract** of 14 March 2011 (**JPG 13**), which involved BGR developing '*a set of key messages and compelling narrative in support of the legal cases*' and developing and implementing '*a program in Washington DC in support of Mr. Egiazaryan's Application to settle in the US*': (**JPG 13, p. 1**);[4] and

(3)     **A BGR prepared Corporate Raid Slide Presentation**, entitled '*Theft of Ashot Egiazaryan's Stake in the Moskva Hotel*' (**JPG 27**),[5] which purports to tell a tale of such matters, and claims that Mr. Egiazaryan was the innocent victim who lost control of that project in a Russian '*corporate raid*'; and

(4)     An undated and unsigned BGR document entitled '***Reflections on PR Strategy***' (**JPG 28**)[6] which is addressed directly to Mr. Egiazaryan from one of these BGR witnesses, probably Mr. Gabara or Mr. Lough.

---

[4]     Bates reference from the U.S. proceedings (*EA-0000052*)
[5]     (*EA0011259-267*)
[6]     (*EA-0011272—276*)

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

Mr Gabara and / or Mr Lough would need to confirm who was the author of the same for the trial; and

(5)     An e-mail from Mr John Lough to Mr Gabara, entitled '*PR Strategy for Ashot*' (**JPG 29**).[7] In this e-mail, Mr Lough wrote to Mr Gabara:

> '...*We need to come up with some ideas for Ashot. He's getting twitchy again.*
> *His idea of PR is having a website like Alexander Lebedev or Gary Kasparov with lots of videos and blog posts. He does not understand the strategic dimension...*
> *Here are some initial thoughts:*
> *If we start from his objectives a. get asylum and b. secure compensation for his assets / losses). It's clear that he needs to present himself as a victim...*
> *Of course people will be sceptical about who he is and how he did business for so long within the system...*'

24.    When preparing this new '*victim*' narrative, these BGR witnesses were fully aware that '*western audiences' perceptions of*' Mr Egiazaryan were affected by his '*reputational baggage in Russia from the 1990s*', his '*association with the LDPR*',and his questionable financial success in Russia as a member of the '*"inner circle"*' who '*played by one set of rules when it suited [Egiazaryan] and [who] now wish[es] to apply another*' set of rules.  This is addressed in BGR's unsigned five-page document entitled '*Reflections on PR Strategy*' (**JPG 28** p. 1).[8]  The document makes no reference to Mr.Zalmayev, contrary to Egiazaryan's assertion in the

---

[7]    *Formerly marked (Exhibit 5/EA Attorney's Eyes Only 2386).*I should inform this Honorable Court that while this document may contain an 'unauthorized copy' watermark,  the attorney's eyes only restriction has been lifted by the New York Court, but Mr. Egiazaryan's lawyers, Flemming Zulack, have failed to provide an unmarked copy since 3 October, despite my firm's repeated requests that they do so.

[8]    *(EA-0011272).*

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

complaint (paragraph 89) that he hired BGR to '*combat the defamation*' by Mr.Zalmayev. **(JPG 4)** The author of the document, either Mr. Lough or Mr.Gabara, will testify how BGR's hiring by Mr.Egiazaryan had nothing to do with Mr.Zalmayev.

25.    It is the reality of Mr.Egiazaryan's poor reputation, his reputational baggage and the real nature of his association with Zhirinovsky's LDPRwhich is why Mr.Egiazaryan's defamation suit against Mr Zalmayev in New York had no "*substantial basis in law or fact*," (which the applicable legal standard for the trial of the anti-SLAPP suit in New York). This is why the evidence of the BGR witnesses is important for the trial of the New York court action. For they are likely to know the true position relating to Mr.Egiazaryan's reputation at the time proceedings were brought against Mr Zalmayev. This is also reflected in their other comments in the document about the '*lack of people prepared to publicly support you in Russia*', and '*your time as a successful businessman in the "inner circle" may suggest to some sceptical observers that you played by one set of rules when it suited you and now wish to apply another*'. **(JPG 28)**.[9]

26.    Ultimately, at trial, Mr.Zalmayev will contend that the New York litigation against Mr Zalmayev was simply part of a PR strategy to create a new narrative for Mr.Egiazaryan in support of his US asylum application and / or his London arbitrations. It had nothing to do with anything written by Mr Zalmayev that was supposedly untrue or unjustified, and nothing to do with protecting Mr.Egiazaryan's reputation in the United States.All of these three witnesses are likely to have relevant and important evidence for the trial of the anti-SLAPP suit in New York. All three have important roles in the creation of Mr.Egiazaryan's 'new' reputation.

27.    Despite what is now being said for the first time by Flemming Zulack (Mr. Cohen) about Mr Lough supposedly having the '*greatest overall knowledge*' regarding BGR's work for Mr Egiazaryan, Mr.Lupkin of Flemming Zulack has previously told the Federal District Court on 8 November 2011 that Mr.Egiazaryan's work by BGR

---

[9]    (*EA-0011272*).

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

was '*handled out of London, by two individuals*', namely Mr.Gabara and Mr. Lough. (The Federal District Court also noted at that hearing that the scope of BGR's work would be more than just the BGR Contract engagement letter: '*Not everything is put in letters*': (see **JPG 30**, pp. 45-46 of the transcript of the 8 November hearing).

28.     Both Mr Gabara and Mr Lough are likely to have relevant evidence for trial as they played key roles in the creation of this new narrative for Mr.Egiazaryan. Mr.Gabara is BGRGabara's President and one of its founders. The Outline Proposal for BGR's services for Mr Egiazaryan (**JPG 12**) was written on Mr.Gabara's letter head, after a 10 February 2011 meeting in London between Mr.Gabara and Gibson Dunn. That proposal was put forward on the basis of not only what Gibson Dunn had told. Mr.Gabara and BGR but also on the basis of '*our own research into the media coverage about the case*' (**JPG 12, p. 1**). It was Mr.Gabara who signed the 14 March 2011 contract ('*the BGR Contract*'), and Mr.Gabara described himself personally in it as the leader of the '*BGR Team*' who would provide the services in question:

> '*I will lead the BGR team and will be assisted by Principal WalkerRoberts, BGR Public Relations President Jeffrey Birnbaum, and Vice Presidents John Lough and Bill Turenne Jr*': (**JPG 13**, page 2).

29.     Mr Gabara was believed to be heavily engaged in the development of this strategy for Mr.Egiazaryan. Mr.Egiazaryan appears to have been '*his*' client throughout this whole process.

30.     Mr. John Lough is now BGR's vice-president, and was a part of the BGR Team led by Mr.Gabara.As (**JPG 29**)[10] shows, Mr. Lough was heavily involved in the creation of Mr.Egiazaryan's '*victim*' narrative. As the '*Reflections on PR Strategy*' (**JPG 28**)[11] also shows, BGR wanted to have '*a regular weekly conference call with you to update you on our work*'. According to the BGR website,Mr. Lough is fluent in

---

[10]     (Formerl ymarked Exhibit 5/EA Attorney's Eyes Only 2386)
[11]     (EA-0011276)

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

Russian; there is no similar reference for Mr.Gabara or Mr. Amsterdam. Mr Egiazaryan does not speak English. Any direct communication with Mr.Egiazaryan is likely to have come through Mr. Lough.

31.  Mr. Amsterdam is BGR's Head of Online Communications, and he was heavily involved in the creation of the new web-site and its content, as well as other on-line social media presence (Facebook, Twitter, Stumble Upon, You Tube and Digg platforms) for Mr.Egiazaryan which was an essential part of the BGR global media strategy for Mr.Egiazaryan, as the '*Reflections on PR Strategy*' (**JPG 28**)[12] emphasised. It was Mr. Amsterdam who posted on Facebook an entry confirming that Mr.Egiazaryan was affiliated with theLDPR before being ordered to take it down: (see **JPG** 31).[13] It is likely in creating the content of the digital media sites that Mr. Amsterdam has been fully informed of a number of the above mentioned key issues that are likely to be in dispute at trial. Furthermore, Mr. Amsterdam is likely to know details that Messrs Gabara and Lough will not: particularly regarding BGR's monitoring of the Internet as regards Mr.Egiazaryan and his reputation.

**The Letters of Request: Riders 'A' and 'B'**

32.  I have referred to these matters in some detail at paragraphs 77-85 of my first witness statement. But given the fallacious nature of the challenges now being raised by Messrs Benson and Cohen, I respectfully invite this Honorable Court to note the following facts and matters. All of the matters contained in Riders A and B relate to both the originally dismissed defamation claim *and* the anti-SLAPP counterclaim. They cannot be separated out.

33.  Rider 'A' to each Letter of Request, summarised the New York Action and the relationship between Mr.Egiazaryan and BGR, and emphasised that:

> '*The testimony sought by Zalmayev in London from BGR and BGR's representatives who are actively involved in important aspects of the*

---

[12]   *(EA-0011272—276)*
[13]   *(EA-0008261)*

> *Egiazaryan representation are important t oZalmayev'sdefense of Egiazaryan's defamation claims and important to the prosecution of Zalmayev's anti-SLAPP counterclaim. The testimony is needed by Zalmayev for trial... '* (e.g. **JPG 3, p. 2-3**).

34.   Thereafter, Rider A (**JPG, p. 4-6**) gave a detailed review of what information it is believed the BGR witnesses have and what it was intended for to use it for at trial.

35.   At Rider B, eight subjects for the questioning of were specifically identified, and all remain relevant to the trial of Mr.Zalmayev's anti-SLAPP Counterclaim, despite the attempts by Mr Cohen to suggest otherwise. All of the topics are inter-related and all relate to the evidence for trial in the anti-SLAPP counterclaim. I respectfully refer the Court to the text of Rider B, but summarise for convenience sake below.

**(1)**   **The background to BGR's relationship with Mr. Egiazaryan  beginning  on  or about January 2011.**

36.   It is believed that these BGR witnesses will confirm that BGR was hired by Mr.Egiazaryan before Mr.Zalmayev's article to significantly improve his global reputation, by creating this new '*victim narrative*' in order to assist his obtaining political asylum in the US and improve his chances of winning his legal actions in London and Cyprus against Mr. Kerimov.

37.   The intention is to examine with these witnesses the nature of the work that was being undertaken by BGR to try and create this new reputation for Mr.Egiazaryan. All of this will form an essential factual background to questions of whether or not Mr.Egiazaryan had a '*substantial basis in fact or law*' for bringing his defamation claim against Mr.Zalmayev, and indeed his purposes in doing so. Mr.Zalmayev's case is that the motive for the defamation action was to silence him and to advance Mr.Egiazaryan's asylum application and his cases against Mr.Kerimov in London. Testimony about BGR's creation and execution of the story of Mr.Egiazaryan as a victim corroborates Mr.Zalmayev's claim that the motive for suing him was other than good faith redress for alleged defamation.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

(2)    **Lobbying work, United States government work and global media work for Mr.Egiazaryan.**

38.    As we have said previously, this subject will be used at trial as part of Mr.Zalmayev's proof that Mr.Egiazaryan had a bad reputation because of his activities and association with the LDPR and his various business and political disputes and criminal charges. It will be used to prove the truth of the allegedly defamatory statements made by Mr.Zalmayev as part and parcel of showing that there was '*no substantial basis in fact*' for Mr.Egiazaryan bringing the defamation action Mr.Zalmayev in the first place, which is an essential requirement of the anti-SLAPP counterclaim. This information will also be used to show that Mr.Egiazaryan's purpose in filing the action against Mr.Zalmayev violated the anti-SLAPP statute.

(3)    **Mr.Egiazaryan's websites and online content contributed by BGR from January 2011 to present.**

39.    Again, this topic of questioning is concerned with the true nature of Mr.Egiazaryan's bad reputation and the truth of the allegedly defamatory statements which show that there was no '*substantial basis in fact*' for the defamation action against Mr.Zalmayev. BGR's work on the website and online content were designed to create a new reputation for Mr.Egiazaryan to wash away the bad reputation that Messrs Gabara, Lough and Amsterdam were well aware that Mr.Egiazaryan had. The evidence of what BGR did to create this new reputation online will help prove to the trial court what the true position was regarding Mr.Egiazaryan at the time proceedings were issued, as well as highlighting what Mr.Egiazaryan's purposes were in bringing the defamation proceedings.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

(4)     **Invoices and agreements for work performed on behalf of Mr. Egiazaryan from February 2011 to present.**

40.     It must be remembered that Mr.Egiazaryan was apparently claiming some $203,750.00 of BGR fees part of his damages claim against Mr.Zalmayev. Mr Zalmayev's case was that such a claim was false and unjustified. However, even though that claim is now dismissed, the purpose of the questioning of the BGR witnesses is to show that there was no basis in fact for such aclaim against Mr.Zalmayev in relation to the work that BGR was undertaking for Mr.Egiazaryan. Demonstrating this is one element of the anti-SLAPP Counterclaim.

(5)     **Mr.Egiazaryan's reputation.**

41.     As we pointed out in Rider 'B', the questioning of the BGR witnesses would be about what they knew about Mr.Egiazaryan's reputation from January 2011 to the present. This would be used at trial by Mr.Zalmayev to refute Mr.Egiazaryan's claims regarding his reputation, and in particular, that Mr.Zalmayev's alleged defamatory statements harmed Mr.Egiazaryan's reputation. Because of the work they were undertaking for him, BGR's witnesses will have information about Mr.Egiazaryan's bad reputation and how BGR was hired to '*significantly improve*' that reputation. It is believed that this evidence will show and be used at trial to prove that Mr.Egiazaryan was a member of the LDPR, to establish the underlying truth of the statements made by Mr.Zalmayev and to demonstrate the underlying bases for Mr.Egiazaryan's bad reputation.

42.     As shown above in this statement (and in exhibit **JPG 28, 29 and 31** in particular), the BGR witnesses knew that Mr.Egiazaryan had a bad reputation, and had considerable '*reputational baggage in Russia from the 1990s*' including that arising out of his '*association with the LDPR*' (**JPG 28** p. 1).[14] Mr.Egiazaryan, on the other hand, has denied in this action being a member of the LDPR (despite his being appointed to the DUMA by the LDPR) and has tried to limit the extent of his

---

14      *(EA-0011272).*

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

involvement with LDPR. However, we believe that the BGR witnesses are likely to confirm what they knew about the extent of Mr.Egiazaryan's connections with the LDPR and his bad reputation generally. Their evidence is also likely to show that, in reality, Mr Zalmayev did nothing to affect Mr.Egiazaryan's reputation, and that the BGR witnesses (and indeed Mr.Egiazaryan) knew that to be the case. The evidence sought will also deal with the decision to sue Mr.Zalmayev. Any defamation suit that was brought on false pretences is an important element of the anti-SLAPP counterclaim.

**(6)    News, press releases and on-site articles assembled and / or prepared about Mr.Egiazaryan (deposition exhibit 55, e.g.) from January 2011 to the present.**

43.     As we previously said, this subject will used at trial to prove that Mr.Egiazaryan had a bad reputation because of his activities and association with the LDPR and business and political disputes and criminal charges against him. Evidence obtained in relation to these materials would also be used to prove the truth of the allegedly defamatory statements made by Mr.Zalmayev, which of course, is an essential part of proving there was '*no substantial basis in fact*' for the defamation claim under the anti-SLAPP statute.

44.     I believe that in giving evidence under oath, the BGRwitnesses' knowledge about specific articles will show Mr.Egiazaryan's bad reputation, and the fact that nothing Mr.Zalmayev did damaged that reputation or made it worse. It is intended to show that the BGR witnesses (and indeed Mr.Egiazaryan) knew that the complaint was baseless and without merit. The BGR witnesses knowledge about the press releases issued will show that what BGR did to manipulate Mr.Egiazaryan's reputation, and secondly that this manipulation had nothing to do with anything Mr Zalmayev did or said.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

(7)     **The subjects and contents of BGR documents provided or to be provided to Mr.Zalmayev's counsel.**

45.     The purpose of this topic of questioning is to allow the BGR witnesses to identify and testify about documents they prepared and the work that they performed on behalf of Egiazaryan. It allows the trial court to know, for example, who created key documents: for example **JPG 27** and the undated and unsigned **JPG 28***Reflections on PR Strategy'*, that is discussed above.

(8)     **Communications from January 2011 to the present within BGR or by BGR about Mr.Zalmayev or the lawsuit captioned AshotEgiazaryanv. Peter Zalmayev, United States District Court for the Southern District of New York, No. 1:11-Cv   02670**

46.     This topic involves considering with the BGR witnesses the documents that within BGR or prepared by BGR about Mr.Zalmayev and / or the New York action. It is believed that the evidence of the BGR witnesses in relation to these materials will show that BGR's work had nothing to do with Mr.Zalmayev, contrary to what was alleged by Mr.Egiazaryan in the complaint in the New York action. This evidence is relevant to the anti-SLAPP counterclaim because it will tend to demonstrate to the Federal District Court that Mr.Egiazaryan and the BGR witnesses who were engaged in his developing his *'global media strategy'* and *'significantly enhancing'* his reputation, were only concerned with silencing Mr.Zalmayev.

47.     It is respectfully contended that all of this is proper evidence to ask the BGR witnesses, whose company was, and is, being paid so handsomely for their work on behalf of Mr.Egiazaryan.To claim, as Mr Benson does,[15] that the Letters of Request amounts to a *'roving enquiry to discover information'*, and is *'not a genuine attempt to obtain witness evidence for trial'* is entirely without any foundation in truth. Mr Zalmayev's case could not be more clearly spelt out. All of these issues are relevant to trial of the anti-SLAPP claim, as Mr Benson and Cohen well know.

---

[15]     Benson, paragraph 5(a).

48.    Mr. Cohen's purported analysis of the '*four general categories*' of the topics in Rider B, '*none of which are relevant to the anti-SLAPP claims*'[16] is, with all due respect to him, as bogus as his client's original defamation claim: in that Mr Cohen's arguments have '*no substantial basis in fact or law*' and it reflects the consistently '*unreal*' approach of Flemming Zulack throughout the litigation. To suggest, as Mr Cohen does[17] that '*the purpose of filing the defamation lawsuit by Mr.Egiazaryan*' is a subject that is '*potentially relevant*' to the anti-SLAPP lawsuit ignores the whole basis of the anti-SLAPP laws. The remainder of paragraph 28 of Mr. Cohen's statement is just sophistry indicative of preparation by someone who unfamiliar with the nature of anti-SLAPP litigation in New York and the facts of this case.

49.    I would however, comment that Mr. Cohen's claim at paragraph 28 of his statement that "Magistrate Judge Gorenstein offered Applicant's US counsel an opportunity to revise the list of issues in light of the dismissal of the direct claims, but counsel declined to do so', is untrue. It is an inaccurate description of what happened at the hearing on the 24 August 2012 as the transcript shows: see paragraphs 71-74 of my first witness statement and **JPG 24, p. 7-10)**. Having issued the Letters of Request, Judge Gorenstein did not think there was any procedure or mechanism for a US court to issue an order to a foreign court and he did not think it appropriate. Commenting on the objections that Mr Cohen was then making, Judge Gorenstein indicated that 'all of those issues should have been raised, whatever they are, when the letter of request was made. We very carefully checked to see if there was any objection by the plaintiff and the request was issued, so that's it': (**JPG 24, p. 10**). The Court raised the question if my client wanted to vacate the Letters of Request he would start the process all over again, but in the absence of such a request that was the end of the matter. Judge Gorenstein correctly assumed that my client was not making such a request: (**JPG 24, p. 10**).

50.    Indeed, the arguments about the scope of discovery under FRCP 26, and the claim that the Letters of Request should have been amended by the Federal District Court

---

[16]    Cohen, paragraph 28.
[17]    Cohen, paragraph 28.

after the dismissal of the defamation claim was dismissed, [18] is both wrong and wholly ignores the position taken by Flemming Zulack before the Federal District Court and the observations of Judge Gorenstein at the 24 August 2012 hearing that I have discussed above, when he rejected Flemming Zulack's arguments about the scope of discovery after the dismissal of their client's claim. As their 7 August 2012 letter to the Court demonstrates, as part of their scheme, whatever the Federal District Court might do with the Letters of Request, Flemming Zulack were going to contend that the English Court should decide '*the propriety of the requests*':

> '*...these Letters of Request may no longer be valid. However, we leave it to defendant to determine whether he needs to modify the Letters of Request in light of the changed circumstances. In any event, whether he modifies the Letters of leaves them be, an English court will have to consider for itself, pursuant to English law, the propriety of the requests given the current status of the case*': (**JPG 23, p. 28**).

**The claims that the Requests are 'oppressive' is misconceived**

51.     The Respondent's claims about the Letters of Request being oppressive because they involve more than one witness and follow on from depositions of two other BGRwitnesses, are equally misconceived. In fact, the previous attempts made by Mr Zalmayev to get evidence from any BGR witness who claimed to effectively know nothing about the Egiazaryan case and deferred to the knowledge of the Respondent and the other BGR witnesses, demonstrates how important it is for these three witness to be deposed.BGR has been paid $77,000 per month since February 2011 by Mr.Egiazaryan for their services.  It is hardly oppressive for each BGR witness to be deposed for no more than one day each on the work they have undertaken for these fees.  This   Honorable   Court   should   note   thatMr.Egiazaryan's   lawyers, Flemming Zulack, deposed Mr.Zalmayev for two days in their effort to prosecute a baseless defamation suit that was subsequently dismissed.

---

[18]     Benson, paragraph 5(b)(ii)

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

**The two previous depositions of BGR "witnesses"**

52.   In the BGR Contract (**JPG 13**, page 2] Mr Gabara had described the '*BGR Team*' in the following terms:

> '*I [Mr.Gabara] will lead the BGR team and will be assisted byPrincipal Walker Roberts, BGR Public Relations President Jeffrey Birnbaum, and Vice Presidents John Lough and Bill Turenne Jr*'.

53.   I took a deposition of the second of those named persons, Mr Jeffrey H. Birnbaum, in Washington D.C. on 28 September 2011. Mr Egiazaryan's, and BGR's interests, were represented by Mr Cohen of Flemming Zulack: (see exhibit **JPG 32**, pages 1-2 of the Birnbaum transcript). At this stage, I had access to very few documents disclosed by BGR, who were claiming privilege over almost all relevant materials. Mr Birnbaum's evidence was that he knew next to nothing about BGR's work for Mr.Egiazaryan, despite being named in the BGR Contract as part of the BGR Team. When asked however, about whom at BGR provided services for Mr.Egiazaryan, Mr Birnbaum's evidence was it was the three currently proposed witnesses: Messrs Gabara, Lough and Amsterdam, as well as Mr Walker Roberts: (see **JPG 32**, p. 72 of the Birnbaum deposition):

> '**Q.   As far as you know, did the contract proceed at the $77,000 a month level?**
>
> A.   I do not know. I didn't know it was at that level.
>
> **Q.   Do you know who at any of the BGR entities provided services for Mr.         Egiazaryan?**
>
> A.   I know some people who did serve, yes.
>
> **Q.   And who—who is that?**

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

    A.    I believe Walker Roberts did. As I mentioned, I did that one thing. <u>And in BGR Gabara Ivo Gabara, John Lough, and Sam Amsterdam'</u>.(Emphasis added).

54.    But when asked what did Mr Gabara and Mr Lough did for Mr.Egiazaryan, Mr Birnbaum did not know: (see **JPG 32**, pages 74-75 of the Birnbaum transcript).

55.    As indicated above, it was only after Mr. Birnbaum's deposition that Mr.Lupkin of Flemming Zulack told the Federal District Court on 8 November 2011, that it was Mr Gabara and Mr Lough who dealt with the matter: see**JPG 30**, (p. 45-46 of the transcript).

56.    I deposed the first of the named persons in the '*BGR Team*', Mr Walker Roberts, on 14 December 2011 in Washington D.C. Mr Egiazaryan, and BGR, were again represented by Mr Cohen of Flemming Zulack: (See **JPG 33**, pages 1- 2 of the transcript). Mr Roberts was described as the '*managing director of the London office*' in his BGR biography and Mr Roberts had also written the internal e-mail of 18 February 2011 that I referred to in my first witness statement (see '**JPG 14'**), entitled '*Lobbying plan needed for Ashot', in which he had said that 'we' [BGR] believe that with a properly thought-through and well-co-ordinated media campaign BGR Gabara can help significantly improve the overall reputation of Mr.Egiazaryan both in London and in the US...*'.The 18 February 2011 email (**JPG 14**) was not provided to me by Mr. Egiazaryan's/BGR's lawyers until after I deposed Mr Roberts.

57.    But when I first asked Mr Walker Roberts about what he did as managing director of BGR's London office, Mr Roberts' answered:

    A.    *Nothing. I have no – I have no role relative to management or any with regard to that entity'*…. (See **JPG 33**, page 16 of the transcript).

58.    Indeed, when it came to questions relating to BGR's role in relation to Mr.Egiazaryan, Mr. Walker Roberts' evidence was that he had '*a very limited*

*understanding*' of why BGR Gabara was retained of behalf of Mr.Egiazaryan, and '*I don't know why the issue initially came to Ivo* [Gabara] *or John Lough…*': (see **JPG 33 pages 42-43** of the transcript). In fact, Mr Walker Roberts did not know whose client Mr Egiazaryan was, and indicated that, in relation to Mr.Egiazaryan:

> … '[i]*t was never quite clear to me whether Ivo* [Gabara] *was the primary person on charge of this client or John Lough…*' (See **JPG 33**, page 26 of the transcript).

59.   Mr. Walker Roberts thought it likely it that the media strategy for Mr Egiazaryan was handled in London by Mr Gabara or Mr Lough :

> A.   *In BGR Gabara it would likely be either Ivo* [Gabara] *or John Lough, and in Washington, it would likely be Jeff Birnbaum*':(see **JPG 33**, page. 47 of the transcript).

60.   Mr. Walker Roberts's evidence was that had not even seen the BGR Contract until the afternoon before the deposition. When asked about what BGRGabara's role under the BGR Contract in the developing for Mr.Egiazaryan '*key messages and a compelling narrative in support of the legal cases*' actually meant, Mr Roberts could only answer:

> 'A.   *I don't know. This is a document, this contract was created and signed by Ivo Gabara. I have never seen it before yesterday. It does not, the scope of work does not—and we can go through each one of these and I'm glad to do that, but none of them touch on anything within my expertise or work in terms of government relations. Each one of these bullets relates primarily to messaging and media*': (see **JPG 33**, pages 47-48 of the transcript).

61.   Asked about the '*legal cases*' involving Mr Egiazaryan that featured in this BGRGabara contract for which his firm (and his office) was being paid, Mr Walker

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

Roberts' evidence was that he had no understanding of the legal cases involved. After that response, a break in the deposition was then called by Mr Cohen. Mr Walker Roberts returned, having discussed the deposition with Mr Cohen during the break, to confirm that in relation to the BGR Contract for Mr Egiazaryan, he had '*no involvement with any of it*': (see **JPG 33**, pages 50-51 of the transcript).

62.    In relation to the items of work listed in the BGR Contract, Mr Walker Roberts went on to say that he knew nothing about them. He didn't even know Mr.Egiazaryan had a web-site (which, of course he did, as it was was, of course, developed by BGRGabara and Mr Amsterdam in particular). Mr Roberts was '*not familiar with the specifics or even the generalities of what PR was done or envisioned to be done on behalf of Ashot*' [Egiazaryan]: (see **JPG 33**, pages 52-53 of the transcript). When asked if, other than what was written on the 14 March 2011 contract, Mr Roberts had '*any understanding of when any of the BGR entities started to do work for Mr.Egiazaryan*', Mr Robert replied:

> '*A.    I do not recollect, do not know*': (see pages 61-62 of the Transcript).

63.    Thus to suggest, as Mr Cohen does, that '*BGR has played a significant role in the discovery*' sought by Mr Zalmayev by reason of these two BGR employees, does not actually characterise their involvement. Essentially two BGR employees, named as being on the BGR Team under the contract with Mr.Egiazaryan, have turned up to give evidence that they knew little, if anything, about what BGR were actually doing in relation to Mr.Egiazaryan and the BGR Contract, and instead deferred to the knowledge of Messrs Gabara, Lough and / or Amsterdam. That is why the evidence of these witnesses is important.

**The one-witness "proposal"**

64.    Mr Cohen's description of the events in paragraph 32 of his witness statement regarding Mr Lough being the sole witness is not one that I can agree with.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

65.   As I pointed out in paragraph 67 of my first witness Statement, it was only after the issue of the Letters of Request, during a call on the 29 June 2012, that Mr Cohen and Mr Lupkin of Flemming Zulack first advised my firm that that they objected to the taking of the three additional BGR depositions *'on the grounds that these depositions are unduly burdensome to a non-party'*: (see **JPG 23, p. 20)**.In a further telephone call on 3 July 2012, Mr. Cohen and Mr.Lupkin first suggested to my colleague, Ms Silver, *'[i]f we would settle for one deposition they would discuss with their client not objecting to that one deposition'*: (**JPG 23, p. 20**, penultimate paragraph).On 16 July 2012, Mr Cohen wrote an e-mail to Ms Silver he put forward a vague suggestion of a trade-off on unspecified terms, to provide Mr Lough if the other depositions were withdrawn:

> *'...In addition, this will confirm that, subject to our clients' approval and agreement upon mutually agreeable terms, we had proposed to voluntarily make Mr. Lough available to be deposed if you would withdraw the other two requests. You declined the offer and indicated that defendant intends to continue to seek the deposition of the three BGR witnesses who are the subject of the current Hague requests (in addition to the two BGR depositions already completed). We remain available to discuss a compromise of this sort if you want'.*(**'JPG 23', p. 14**). (See also **JPG 23, p. 22**):

66.   On 17 July, Ms Silver and Mr Cohen spoke again, and Ms Silver pointed out that:

> *'(2)    That Zalmayev will not accept Egiazaryan's or BGR's offer to forego the depositions of Mr.Gabara and Mr. Amsterdam in exchange for an agreement to voluntarily produce Mr. Lough for a deposition upon certain unspecified terms and conditions. Ms. Silver explained that Zalmayev sought to take all three depositions because each witness had a different role and each could provide relevant testimony needed for trial that was not duplicative:*(**JPG 23, p. 22**).

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

67.   This 'offer' in relation to Mr. Lough was never clarified and not repeated. Nor was there any suggestion prior to paragraph 32 of Mr Cohen's witness statement that Mr.Lough has '*the greatest overall knowledge regarding BGR's work for Mr Egiazaryan*'. Indeed, such a suggestion also tends to contradict the prior evidence in the case that I have set out above, and even if accurate, does not mean that Mr. Gabara, Mr. Lough's senior and the head of the team, does not also have important knowledge that Mr. Lough does not have.**(JPG 13, p. 2)**

68.   Leaving aside the fact that each of these 3 witnesses do have different roles in relation to BGR's representation of Mr.Egiazaryan, and thus each has independent evidence to give at trial, another difficulty for Mr.Zalmayev and my firm in relation to any such offer is simple: until the deposition of any of these three witnesses actually takes place, we have no way of knowing whether or not Mr Lough (or indeed any other BGR witness) would not do exactly as Mr Walker Roberts and Mr.Birnbaum did in the earlier depositions and claim that they knew nothing and that someone else might know the answer to the questions being raised but not them. Any proposal which resulted in the other two of the Letters of Request being treated as abandoned or waived would be an open invitation to a repetition of what has already taken place in the United States in relation to the two BGR witnesses who have already been deposed.

69.   As I've shown above Mr Walker Roberts was listed as being the managing director of BGR Gabara, but when deposed claimed he had no role at all in relation to it, and he claimed knew nothing about the BGR contract at all: despite being the first named person in the '*BGRTeam*' working on the contract after Mr Gabara **(JPG 14, p. 2)**. Mr.Birnbaum, the third named person in the '*BGR team*' claimed that the people who essentially provided for the services to Mr.Egiazaryan under the BGR contract were Messrs Walker Roberts (who subsequently denied having any real knowledge of any such work) and Gabara, Lough and Amsterdam.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

**The claims for privilege and BGR documents**

70.  My client's concerns over these matters are justified by the way Flemming Zulack and Mr.Egiazaryan have already dealt with the disclosure of documents in relation to BGR and the purported claims for privilege.

71.  As the Court will note, there is no mention in the Letters of Request of any privilege for these witnesses under U.S. law.

72.  Indeed, not only did Flemming Zulack not invite the Federal District Court to consider any such question of privilege, but they abandoned such claims in relation to BGR documents listed in the original privilege logs, and (even more remarkably) are currently arguing the exact opposite case in current proceedings in Washington D.C. against Mr.Kerimov's PR firm.**(JPG 40, pages 13-14)** The history of these matters is indicative of how Flemming Zulack and Mr.Egiazaryan have conducted their case in the United States.

73.  In July 2011, at the beginning of the case, my firm requested disclosure of documents on behalf of Mr Zalmayev. This included disclosure of BGR's documents which were in Mr.Egiazaryan's control.  On 17 August 2011, Flemming Zulack, objected to disclosure of *every* requested category of document, including all the BGR documents.[19] There then followed many months of attempts to try and resolve the question of discovery. Indeed, as I would inform the New York Court on 10 April 2012:

> '[e]*very motion has resulted in an order or instruction that discovery we requested be provided, or a withdrawal of objections after we submitted our letter motion. Counsel  continues to take a long time to provide documents. It is now almost one year since the complaint was filed, nine months since we first served discovery in July 2011, and we*

---

[19]  For a detailed summary of the history of discovery, please my letter to the New York Court of 10 April 2012 at exhibit **(JPG 34)**.

> *still do not have the most significant documents or information requested*': (**JPG 34, p. 7**).

74. As regards the BGR documents, Flemming Zulack's objections to disclosing them were not that they were not relevant to the issues in the case, but were on the basis that they were protected from disclosure by privilege. Flemming Zulack identified more than 300 documents on a 23 page privilege log which they said should not be disclosed at all. These they listed under a number of categories under heading which included everything from *'development and / or maintenance of the website'*, *'preparation and / or distribution of press release(s)'*, *'collection of media'*, *'concerns actions in response to defamatory* website *about Ashot Egiazaryan'*, to *'concerns strategy for media relations and public affairs services'*: all of these supposed categories of documents were qualified with the addition of the words *'with regard to ongoing and / or anticipated litigation'*. Mr Egiazaryan's lawyers     also made extensive redactions to another approximately 300 documents that they eventually did chose to disclose, again asserting privilege for the redacted parts.

75. Mr Egiazaryan's claim to privilege against disclosure of these BGR documents was identified on the privilege log as *'Kovel Privilege; Work Product'*. Flemming Zulack were thus purporting to rely upon the decision of the US Court of Appeals for the Second Circuit, entitled *UNITED STATES OF AMERICA –V– KOVEL* (1961) 296 F. 2d 918 (a copy of which is produced as **JPG 35**). Although sometimes for short hand it is called the *KOVEL* privilege, it is not in fact a privilege: the decision in *KOVEL* merely recognizes circumstances when the involvement of a non-lawyer may not result in the waiver of an existing privilege against disclosure. *KOVEL* holds that existing attorney-client privilege is not *'waived'* by the mere presence or involvement of a non-lawyer (such as an accountant as in *KOVEL* itself or a translator), if the communication is made in confidence for the purpose of obtaining legal advice.[20]

---

[20]     See e.g. *KOVEL* at p. 922:
> *'...if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret is so that the lawyer may better give legal advice, communications by the*

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

76.     Such a '*privilege*' had no application to the facts of this case. As the BGR Contract
        and the documents evidencing the work BGR did for Mr.Egiazaryan showed, BGR
        were engaged by Gibson Dunn to provide public relations services for Mr.
        Egiazaryan. BGR were involved in '*global media strategy*', ensuring '*consistency of
        message globally*', providing '*informed media coverage*', as well as to '*provide
        media training*', and '*manage ... Mr.Egiazaryan's website*', etc. Accordingly, BGR's
        engagement bore no comparison with the circumstances in KOVEL (where an
        accountant was helping a lawyer understand accounting issues so that the lawyer
        could provide legal advice to the client).

77.     Furthermore, in such circumstances, there is well established New York Federal
        District Court authority that showed that no privilege applied to public relations firms
        such as BGR who essentially were performing ordinary public relations services:
        even when they had been hired by lawyers on behalf of a client engaged in litigation.
        The leading case of CALVIN KLEIN TRADEMARK TRUST V. WATCHER,[21] (see **JPG 36**)
        concerned communications between plaintiff CALVIN KLEIN'S law firm and a public
        relations firm retained in anticipation of bringing the lawsuit by those lawyers.
        CALVIN KLEIN'S's lawyers sought to avoid disclosure of certain documents on the
        basis of work product privilege. The Federal District Court rejected their claim. Even
        if the documents contained nuggets of client confidential communications that were
        made for the purpose of seeking legal advice, their  disclosure to the public relations
        firm waived that privilege. [22] Indeed, CALVIN KLEIN, in the District Court emphasised
        by quoting KOVEL, that '*[n]othing in the policy of the privilege suggests that*

---

> *client reasonably related to that purpose ought to fall within the privilege; there can
> be no more virtue in requiring the lawyer to sit by while the client pursues these
> possibly tedious preliminary conversations with the accountant than in insisting on
> the lawyer's physical presence while the client dictates a statement to the lawyer's
> secretary or in interview by a clerk not yet admitted to practice. What is vital to the
> privilege is that the communication be made in confidence for the purpose of
> obtaining legal advice from the lawyer. If what is sought is not legal advice but only
> accounting service...or if the advice sought is the accountant's rather than the
> lawyer's, no privilege exists... '.*

[21]   CALVIN KLEIN TRADEMARK TRUST V. WATCHER 198 F.R.D. 53 (S.D.N.Y. 2000). CALVIN KLEIN was a
       trademark infringement case.
[22]   CALVIN KLEIN: p. 54: '... [RLM- the public relations firm] *far from serving the kind of 'translator'
       function served by the accountant in KOVEL,... is, at most, simply providing ordinary public relations
       advice so far as these documents are concerned*':(p. 54)

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

*attorneys, simply by placing accountants, scientists, or investigators [or, here, a public relations firm] on their payroll ... should be able to invest all communications by clients to such persons with a privilege that the law has not seen fit to extend when the latter are operating under their own steam*', KOVEL, 296 F.2d, at 921 (at p. 55). The court in CALVIN KLEIN were prepared to consider the possibility that some privilege could be preserved if attorney work product is given to the public relations advisor in confidence, but, as I show below, none of this is relevant in this case, or for the taking of these depositions in Great Britain.

78.    Mr Cohen and Flemming Zulack refused to accept this position. Accordingly, on 9 March 2012, my firm was obliged to make an application by letter motion to the New York Court to seek orders for the production and disclosure of the BGR documents, without any redaction on the basis of any such an alleged privilege. A copy of my letter application of 9 March 2012 is produced at exhibit JPG 37. My firm's application was supported by the decisions in CALVIN KLEIN and NXVIM CORPORATION V. O'HARA,[23] a copy of which latter decision is at **JPG 38**.

79.    The 9 March 2012 letter motion (**JPG 37**) highlighted the many attempts my firm had made over the previous five months with Flemming Zulack to try and resolve discovery issues, all of which had failed. Further, details of the history of discovery issues were summarised in my letter to the New York Court of 10 April 2012: (see **JPG 34**).

80.    The Federal District Court directed both sides to discuss the 9 March letter motions, which we duly did. After a lengthy discussion on 18 March, eventually in the week commencing 2 April 2012, I was informed by Flemming Zulack that '*all requested documents would be produced*': see **JPG 34**, 10 April letter, p. 5). But'[n]*o date for providing the documents was given and the documents have not been provided as of this writing*': (see **JPG 34**, 10 April letter, p. 5).

---

[23]    *NXVIM CORPORATION V. O'HARA*, 241 F.R.D. 109, (N.D. N.Y., February 9, 2007).

81.  On 11 April 2012 (**JPG 39**), Flemming Zulack wrote to the Federal District Court abandoning the so-called "*KOVEL* privilege": see (item iii) on page 3 of **JPG 39**. Flemming Zulack wrote, indicating that they were withdrawing any claim to "*Kovel privilege*" in relation to the listed BGR documents, and abandoning any attempt to resist my firm's letter motion to have the court resolve the issue. They sought to justify their position in the following terms:

> '*After considering further our privilege claims for those documents identified on plaintiff's log, claims that were entirely supportable under applicable case law but admittedly not clear cut, we elected to produce all of the documents listed without litigating the privilege issue. We advised defense counsel of our intentions and indicated that our decision was subject final approval from our client [Mr. Egiazaryan] and the general counsel at BGR. We obtained approval from our client, but approval from BGR has been delayed due to the fact that the firm's general counsel was away on a ten (10) day cruise with his family; our expectation is that approval from BGR will be forthcoming*'.

82.  Having received this letter, we were expecting to receive all the BGR documents, but this did not take place as anticipated. Indeed, the documents had not been received by the 9 May 2012 when we filed our application for the issuance of Letters of Request, which originally included requests under the Hague Evidence Convention to obtain those same documents from BGR which Flemming Zulack (who were acting for BGR too) had failed to produce. This resulted in a letter motion of 18 May 2012 from Flemming Zulack seeking to set aside the Hague Evidence Convention requests for these documents, because '[t]*hose documents are being processed for production. We expect to produce them within the next week*': (**JPG 23, p. 3**). They had not been received by 23 May 2012, when I wrote to the court: (**JPG 23, p. 8**). During the telephone conference call with the Judge Gorenstein on the 23 May 2012, Flemming Zulack promised that they would produce all outstanding BGR

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

documents, thereby eliminating the need for the duplicative Hague Evidence documentary requests. Purportedly full disclosure of these BGR documents were sent by a letter on 30 May 2012: As a result, as discussed above we amended our Letters of Request to remove the Hague Evidence documentary requests, and the New York Court signed the three revised Hague requests for oral testimony on 8 June 2012:(**JPG 23, p. 19**).

### Flemming Zulack's Washington DC proceedings arguing the exact opposite of what they now contend in England

83. Meanwhile, having abandoned their own claim for *KOVEL* privilege in respect of the listed BGR documents at the beginning of April 2012, Flemming Zulack then did a 180 degree turn and went before the United States District Court for the District of Columbia ('*Washington D.C.*') arguing against the very existence of any such *KOVEL* privilege for PR firms. They did so as part of their attempt to obtain disclosure orders from the Washington DC court to support their claim against Mr.Zalmayev in New York.

84. There is now produced and shown to me, marked '**JPG 40**', a true copy of the Flemming Zulack's Reply Memorandum of Law, dated 11 June 2012 in the Washington DC proceedings, in which Flemming Zulack were seeking disclosure of evidence from a PR firm ('*PublicStrategies*') and its managing director (Mr. Greg Hilt) who they say act ultimately for Mr. Kerimov, Mr. Egiazaryan's key opponent in the LCIA arbitrations being conducted in London. They reason why Mr. Egiazaryan and Flemming Zulack were purportedly seeking such disclosure was to try and bolster their entirely false claim that Mr. Zalmayev's comments on Mr. Egiazaryan's US asylum application was part of a '*black public relations campaign*' that had been perpetrated in collaboration with, or at the request or direction of Mr. Kerimov. This had already been denied, under oath, by Mr. Zalmayev in his deposition.

85. However, the real purpose was appears to be to obtain materials to use in the LCIA arbitration. As this document shows, Mr. Egiazaryan was clearly intending to use

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

such documentation '*gleaned in this litigation in other legal proceedings, including in the London Court of International Arbitrations*' ("LCIA"): (see **JPG 40, p. 9**.)

86.   Mr. Kerimov's PR advisers had been refusing to provide disclosure, it is believed, in part on the basis of the same alleged *Kovel* privilege that Flemming Zulack had attempted to use on behalf of BGR and Mr. Egiazaryan in the New York proceedings. Now, as part of their application, Flemming Zulack was inviting the Washington DC court to compel the PR advisers to produce the documents they were withholding '*... based upon dubious invocations of privilege and work product*': (**JPG 40, p. 10**), which are the same '*dubious invocations*' that they now wish to raise in these proceedings.

87.   Relying on the arguments my firm had raised in our 9 March 2012 letter motion against their own such '*dubious invocations of privilege and work product*', and relying upon the decision in *Calvin Klein* which my firm had referred them do, Flemming Zulack were now arguing that no such *Kovel* privilege applied to this other public relations apparently doing for Mr. Kerimov what BGR were doing for Mr. Egiazaryan: (see e.g. **JPG 40**, p. 13-15). The outcome of that application in Washington DC is still apparently awaited.

88.   BGR, in this case, was performing public relations services for Mr. Egiazaryan. Their work involved discoverable matters involving both Mr. Egiazaryan's defamation claims and Mr. Zalmayev's anti-SLAPP counterclaim as I have shown above. It is only since they have disclosed the BGR documents listed that Flemming Zulack are again purporting to object to further disclosure of unlisted documents on, an as yet, undecided issue of privilege. This, as the assertion made in Mr. Cohen's witness statement, amounts to no more than another piece of delaying tactics in the case by Flemming Zulack and Mr. Egiazaryan.

**Confidentiality**

89.   I find Mr. Cohen's comments about the protection of confidentiality (paragraph 38 of his witness statement) to be confusing. Certainly, Mr. Zalmayev only wishes to

obtain this evidence for use for his trial. But that has not been the position of Mr. Egiazaryan and his advisors, either as regards the LCIA Arbitrations or indeed in relation to Mr. Egiazaryan's asylum application. For as the Memorandum and Order of District Judge Castel of January 12, 2012 shows (**JPG 41**), Mr. Egiazaryan's lawyers were assisting his asylum lawyers to update U.S. immigration officials with information obtained from the action against Mr.Zalmayev, saying:

> '*We continue to utilize this litigation to expose the truth and will provide an update when we have additional information*'. (**JPG 41, p. 4**).

90.    There are issues of confidentiality in the case pending the in U.S., orders concerning which would govern these depositions, and Mr. Zalmayev would abide by any order considered appropriate by this Honorable Court. The use of evidence in the case is a matter that has been and will continue to be decided by the U.S. court.

**The conduct of the depositions**

91.    In any event, as is usual, we would in any event, be providing the Respondent and the BGR witnesses with a bundle of documents that we may refer to during the deposition. We are happy to have that requirement made part of any directions.

92.    However, I respectfully see no proper basis for Mr. Cohen's request that Mr. Zalmayev be restricted to only examining the Respondents in chief. This is an improper attempt to restrict the utility of the deposition for obtaining evidence for trial.

**Mr. Amsterdam**

93.    Mr Benson's witness statement, paragraph 6, says that Mr. Amsterdam resides in Canada, though Flemming Zulack repeatedly refused to provide us with any details of Mr. Amsterdam's residence when they were refusing to accept service on his behalf. This is the first time it has been suggested to us that Mr. Amsterdam resides in Canada, and is inconsistent with existing information and what we have been told.

*For the Applicant*
*James P. Golden*
*Second Witness Statement*
*Exhibits: JPG-26 to JPG-41*
*Dated: 9 November 2012*

94.   We were told by Egiazaryan's and BGR's counsel, Flemming Zulack that we should depose Mr. Amsterdam in London, which is what we are attempting to do. BGR's U.S. website identifies Mr. Amsterdam as BGR Group's Head of Online Communication (www.bgrdc.com/about-biographies.html). BGR's London website has the same biography as BGR's U.S. website (www.bgrdc.com/bgr_gabara.html). BGR's Birnbaum said that he thought that Mr. Amsterdam *'resides in London.'*(**JPG 32, p. 72**).We would be happy to depose him either in London or in Washington, D.C., the location of BGR's U.S. office.

## Conclusion

95.   In the circumstances, I respectfully invite this Honorable Court to dismiss the application of the Respondent and the other two BGR witnesses, and require their depositions as requested by the Federal District Court in their Letters of Request.

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true

Signed _____
          JAMES PHILIP GOLDEN

Dated   9 November 2012