UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ASHOT EGIAZARYAN | : | |
| | : | |
| v. | : | Case No. 1:11-cv-02670 |
| | : | (PKC)(GWG) |
| | : | |
| PETER ZALMAYEV | : | |

**PETER ZALMAYEV'S MEMORANDUM OF LAW
OPPOSING ASHOT EGIAZARYAN'S MOTION FOR SUMMARY JUDGMENT AND
SUPPORTING PETER ZALMAYEV'S CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION .......................................... 1

FACTS ................................................. 3

ARGUMENT .............................................. 8

  I.    EGIAZARYAN FILED A SLAPP SUIT .................. 8

     A.    The Court Ruled Twice That The Case Is A
SLAPP Suit ............................... 8

     B.    All The Requirements For A SLAPP Suit
Exist ................................... 9

       1.    Egiazaryan's Asylum Application
Makes Him A Permittee/Applicant ...... 10

       2.    Zalmayev Challenged The Asylum
Application .......................... 11

     C.    Egiazaryan's Purpose For Filing The Suit
Was To Limit *P*ublic *P*articipation ......... 14

  II.    THE COMPLAINT WAS WITHOUT SUBSTANTIAL BASIS .... 14

     A.    The Complaint and Amended Complaint Were
Dismissed On Rule 12 Grounds .............. 14

     B.    The Statements That Are The Subject Of
The Complaint Are True and Egiazaryan
Knew That The Statements Are True ......... 20

       1.    The statements are true .............. 20

       2.    Egiazaryan knows the statements are
true ................................. 21

       3.    Egiazaryan had the assistance of
lawyers and public relations
professionals ........................ 24

     C.    Zalmayev Made Statements Of Opinion ....... 25

ii

D.    Zalmayev was subject to the actual malice
      standard ................................    25

III.  THE ANTI-SLAPP STATUTE PROTECTS IMPORTANT
      RIGHTS .....................................    28

      A.    Summary Judgment Would Eviscerate The
            anti-SLAPP statute .......................    28

      B.    Zalmayev Suffered Damages .................    30

            1.    Attorney's fees ......................    30

            2.    Other damages ........................    35

            3.    Punitive Damages .....................    40

IV.   ZALMAYEV IS ENTITLED TO SUMMARY JUDGMENT ON
      LIABILITY ..................................    41

CONCLUSION ...................................................    41

## TABLE OF CITATIONS

600 W. 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130,
138, 603 N.E.2d 930, 933 (1992) .......................... 1, 2, 29

Bonime v. Avaya, 2006 WL 3751219 (E.D. N.Y.) ............. 16–18

Celle v. Filipino Reporter Enterprises Inc., 209 F.3d
163, 176–77 (2d Cir. 2000) ............................... 27

Chandok v. Klessig, 648 F.Supp. 2d 449, 459 (N.D.N.Y.
2009) (same), aff'd on other grounds, 632 F.3d 803 (2d
Cir. 2011) ............................................... 27

Cooper Indus. v. Leatherman Tool Group, 532 U.S. 424, 437
n. 11, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) ............ 36

Crescent Publishing Group v. Playboy Enterprises, 246
F.3d 142 (2d Cir. 2001) .................................. 31

Davis, et al. v. The New York City Housing Authority,
2002 WL 31748586, at *2. (S.D.N.Y.) ...................... 31

Duane Reade v. Clark and The Wave Publishing Co., 784
N.Y.S.2d 920, 2 Misc.3d 1007(A), (2004), 2004 WL 690191 .. 13–14, 32,
                                                           34, 37–40

Egiazaryan v. Zalmayev, No. 11 Civ. 2670, 2011 WL 6097136
(S.D.N.Y. Dec.7, 2011) ................................... 8, 9, 11

Erie Railway Co. v. Tompkins, 304 U.S. 64 (1938) ......... 16–18

Fort v. White, 530 F.2d 1113, 1116 (2d Cir. 1976) ........ 36

Friends of Rockland Shelter Animals v. Mullen and Humane
Society of the United States, 313 F.Supp.2d 339 (S.D.N.Y.
2004) .................................................... 33

Garland-Sash v. Lewis, 2009 WL 3227297 C.A.2
(N.Y.) ................................................... 35–36

Gertz v. Robert Welch (418 U.S. 323, 344 [1974]) ......... 38–39

Gilman v. Spitzer, 2012 WL 4510681 (S.D.N.Y. Oct. 1,
2012) .................................................... 9

Giovanniello v. New York Law Publishing Company, 2007 WL
2244321 (S.D.N.Y.) ....................................... 17

Giovanniello v. Carolina Wholesale Office Machine
Company, 2007 WL 2363614 (S.D.N.Y.) ...................... 17

Guaranty Trust Co. of N.Y. v. York, 326 U.S. 99, 106 (1945) ................................................. 17

Guerrero v. Carva, 10 A.D.3d 105, 779 N.Y.S.2d (1st Dep't 2004) ................................................. 13, 26

Hanna v. Plumer, 380 U.S. 460, 468 (1965) ................. 17–18

Miness v. Alter, 262 A.d.2d 374, 691 N.Y.2d 171 (1999) ................................................. 33

Muset v. Ishimaru, 783 F. Supp.2d 360, 373 (E.D.N.Y. 2011) ................................................. 19

New York Times Co. v. Sullivan, 376 U.S. 254 (1964) ...... 26–27

Rankin v. City of Niagara Falls, 2012 WL 3886327, *3 (W.D.N.Y. September 6, 2012) ........................... 19

Sanders v. Sullivan, 900 F.2d 601, 605 (2d Cir. 1990) .... 9

Simmonds and Henderson v. New York City Department of Corrections, 2008 WL 4303474 (S.D.N.Y.) .................. 31

Sing v. Sukham, 56 A.D.3d 187, 194 (2d Dept. App. Div., 2008) ................................................. 26

Storey v. Cello Holdings, 347 F.3d 370, 387 (2d Cir. 2003) ................................................. 19

T.S. Haulers, Inc. v. Kaplan, 295 A.D.2d 595 (2d Dept. App. Div., 2002) ........................................ 26

Video-Cinema Films v. Cable News Network, 2004 WL 213032 (S.D.N.Y.) ................................................. 32

West Branch Conservation Association v. Planning Board of the Town of Clarkstown, 222 A.D.2d 513, 636 N.Y.S.2d 61 (1995) ................................................. 33

Westerbeke Corp. v. Daihatsu Motor Co Ltd., 304 F.3d 200, 219 (2d Cir. 2002) ........................................ 9

ii

8 C.F.R. section 208.9 .................................... 11

28 U.S.C. § 1927 ......................................... 19

CPLR 3211 and 3212 ....................................... 15–19

CPLR, Vol. 17, ¶ 3211.51, p. 32–149 ...................... 18

N.Y. Civ. Rights Law § 70-a .............................. 1, 9, 14–
                                                           16, 35, 40
N.Y. Civ. Rights Law § 76-a .............................. 14–16, 26


Practice Commentaries by David D. Siegel, 7B CPLR 3201 to
3211 ..................................................... 18–19, 37


1 JEROME H. NATES ET AL., DAMAGES IN TORT ACTIONS §  3.01
(2009) ................................................... 36

**INTRODUCTION**

Ashot Egiazaryan sued Peter Zalmayev in April 2011 in a five-count complaint for defamation.  Zalmayev made a counterclaim based on New York's anti-SLAPP statute.  N.Y. Civ. Rights Law § 70-a.  On December 7, 2011, this Court dismissed four of the five counts in the complaint, all the counts that were the subject of Zalmayev's motion to dismiss the complaint.  Document 66.  That opinion also denied Egiazaryan's motion to dismiss Zalmayev's anti-SLAPP counterclaim.  After almost one year of discovery, Egiazaryan filed an amended complaint.  On July 30, 2012, this Court dismissed the amended complaint in its entirety.  (Document 159.)

> As this Court noted:
>
> SLAPP suits, or "strategic lawsuit[s] against public participation," are "primarily defamation suits, [brought] to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards." 600 W. 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 138 n. 1[] (1992).  In order to "broaden[] the protection of citizens facing litigation arising from their public petition and participation," New York State enacted an anti-SLAPP statute.  Id.

December 7, 2013, opinion, p. 19.  Document 66.

Egiazaryan moved for summary judgment essentially by asserting that no reasonable jury could ever find that this case was "commenced or continued without a substantial basis in fact and law."  N.Y. Civ. Rights Law § 70-a, 1.(a)).  If the anti-

SLAPP statute is to mean anything, predicated as it is on "broadening the protection of citizens facing litigation arising from their public petition and participation" (Von Gutfeld, 80 N.Y.2d at 138, n. 1), Zalmayev has to have a trial to prove his claims.  If Zalmayev is not entitled to a trial here, where a wealthy plaintiff sues an individual with limited means, where a complaint and amended complaint were dismissed pursuant to Fed. R. Civ. P. 12, then no defendant with an anti-SLAPP counterclaim can ever rely on the statute to *broaden his protection*.

Most of Egiazaryan's brief is devoted to showing that Zalmayev intended to harm Egiazaryan, which is often involved in the speech that the First Amendment protects.  This Court wrote:

> It is not enough to allege that the defendant intended to inflict harm; the defendant must intend to inflict harm through falsehood.

December 7, 2013, opinion, p. 10, citing Garrison v. Louisiana, 379 U.S. 64, 73.  (Document 66.)

Zalmayev's counsel has had to prosecute this case with the burden of extreme confidentiality assigned to some of the most important documents in the case, which requires in many cases the filing under seal of pleadings containing confidential information.  This memorandum does not contain confidential information.  Zalmayev will, however, serve and file under seal a short companion memorandum detailing relevant confidential information.

2

**FACTS**

Egiazaryan begins his brief with almost eight pages of "facts" about Zalmayev's objective to prevent Egiazaryan from obtaining asylum in the United States.  Some of the facts are correct, such as Zalmayev's objective; some of the "facts" are incorrect and unsupported by evidence, such as the assertion, as in the complaint[1], that Zalmayev was working for Egiazaryan's nemesis Suleiman Kerimov (Egiazaryan mem. p. 6); some of the "facts" are not facts, as they are conjecture preceded by critical adjectives and adverbs.  The alleged "facts" essentially are a restatement of the complaint.

Most important, however, is that none of Egiazaryan's "facts" matter.  What is at issue now has nothing to do with what Zalmayev did or what Egiazaryan imagines Zalmayev did.  What is at issue is whether there was a substantial basis for the complaint.  The following facts are relevant to that issue.

Egiazaryan is a citizen of Russia.  (Am. Comp. ¶ 5) Since the 1990s, he has been a prominent banker and businessman in Moscow, and in 1999 the Liberal Democratic Party of Russia (LDPR) appointed Egiazaryan as one of its deputies in the Duma, the lower house of the Russian legislature, where Egiazaryan served until 2011. (Am. Comp. ¶¶ 5 & 55.)

---

[1]  Unless referring to specific paragraphs of the complaint or amended complaint, the brief will use "complaint" to refer to the complaint and amended complaint when the reference is general.

3

At some point, a Russian prosecutor began a criminal investigation into some of Egiazaryan's business dealings, none of which involve Zalmayev.  The Duma subsequently voted to eliminate Egiazaryan's legislative immunity from prosecution (Am. Comp. ¶ 92), and Egiazaryan was indicted in Moscow.  (Am. Comp. second ¶ 113 on p. 38.)[2]  By that time, Egiazaryan had left Russia, presumably to avoid arrest.  (Exhibit 9.)  Egiazaryan arrived in the United States in 2010 and lives in Beverly Hills, California.[3]  (Am. Comp. ¶ 5.)

Egiazaryan gave an interview to the Associated Press's Douglas Birch, who met with Egiazaryan while "flanked by lawyers," which was published on February 6, 2011.  Exhibit 7. Egiazaryan told Birch that "he [was] considering seeking asylum in the U.S."  He also described his dispute with Suleiman Kerimov, whose *$6 billion* of assets Egiazaryan froze in an *ex parte* proceeding in Cyprus in September 2010.

On February 15, 2011, the Cyprus court dissolved the September injunction freezing Mr. Kerimov's assets.  The opinion notes the incomplete presentation by Egiazaryan to obtain the injunction.  Exhibit 15, p. 38, et seq.  The court noted that Egiazaryan had not disclosed the involvement of his lawyers in

---

[2] The numbers 113 through 132 are assigned to two sets of paragraphs in the amended complaint.

[3] Neither the coversheet nor the initial complaint provided Egiazaryan's street address in Beverly Hills, California.

4

the Moscow Hotel transaction at the heart of his dispute with

Mr. Kerimov.  The court concluded:

> . . . I am of the opinion that the applicants are guilty of serious non disclosure of facts, which if they were disclosed they would give to the court a very different picture than the one given when they referred to the court ex parte in order to be granted the orders in question and which would likely affect the exercise of the discretion of the court in terms of whether or not to grant the contested orders.

February 15, 2011, Cyprus opinion, p. 41, exhibit 15.

Egiazaryan applied for asylum in the United States, submitting more than 2,000 pages of materials.  January 12, 2012, opinion (document 84).

In a March 9, 2011, article apparently based on information Egiazaryan gave to Birch, Birch wrote

> Egiazaryan is a member of the Duma faction of the ultranationalist Liberal Democratic Party of Russia.  RIA Novosti reported that the party's flamboyant leader, Vladimir Zhirinovski denounced [the Duma vote authorizing Egiazaryan's arrest].

Exhibit 9.  That article described how the Duma lifted Egiazaryan's immunity from prosecution, allowing his arrest.  A 2009 article in The Washington Times had described the possibility that Egiazaryan would lose his Duma immunity.  Exhibit 8.  That article also referenced a "former Western intelligence officer" who said that

> for the past two decades Mr. Yegiazaryan has colluded with Moscow government officials to secure properties illegally and development rights at a fraction of their real value.

5

Exhibit 8.

Egiazaryan retained the Washington and London based lobbying and public relations firm BGR Group effective February 12, 2011, for a fee of $77,000 per month.  Exhibit 14.  Examples of BGR's work for Egiazaryan are exhibits 6, 11, 12, 13, 14, 20, 21, 24, 25, 26, 27, 28.

On March 9, 2011, The Jewish Journal, a weekly newspaper in Los Angeles, California with approximately 150,000 readers, published a commentary written by Zalmayev about Egiazaryan, Zhirinovsky and the LDPR.  (Am. Comp. ¶ 38 & Exhibit A.)  The commentary stated facts and opinions about Egiazaryan—-all of which are true—-and criticized Egiazaryan's association with Zhirinovsky and the LDPR.  Zalmayev's commentary accurately described Egiazaryan's connections to the LDPR and the "criminal case against him on charges that he defrauded business partners in a multimillion-dollar real estate deal that went south."[4]  The commentary referred to some of the LDPR's policies, as expressed by the LDPR's leader, Zhirinovsky, who "blam[es] the Jews for sparking both the Bolshevik revolution and World War II, provoking the Holocaust and masterminding 9/11."  The commentary clearly expressed Zalmayev's opinion that Egiazaryan should not be granted asylum in the United States.

---

[4] Egiazaryan does not dispute the existence of the criminal charges or the article's summary of the criminal charges.

6

BGR prepared a response to Zalmayev's commentary over Egiazaryan's name and sent it to the *Jewish Journal*.  Exhibit 6.

On April 19, 2011, Egiazaryan sued Zalmayev.  Exhibit 1.  The complaint mentions Egiazaryan's dispute with Mr. Kerimov and among adversarial other figures, names Mr. Kerimov (¶ 10), Yury Luzhkov, Arkadi Rotenberg, and Prime Minister (now President) Vladimir Putin (¶ 12).

The gist of Zalmayev's commentary and the other writings, is associating Egiazaryan with the LDPR.  Egiazaryan denies his affiliation in the complaint and amended complaint.  Egiazaryan asserts:

1.   He is not a member of the LDPR.  Compl. ¶ 28, 37, 57; Amend. compl. ¶ 55, 74;

2.   He is not a financial backer of the LDPR.  Compl.¶ 28; Reply to counterclaim, ¶ 20.

The LDPR is led by Vladimir Zhirinovsky, an outspoken ultra-nationalist, anti-American and anti-Semite who blames Jews for, among other things, having started the Second World War, the Holocaust, and the attack on the World Trade Center. (Am. Comp. ¶ 55 and Exhibits A — E to the amended complaint.)  In the amended complaint, Egiazaryan attempts to distance himself from the LDPR and thereby acknowledges that the LDPR's policies are repellent, although he served as the party's representative for twelve years.  (Am. Comp. ¶ 55.)  An example of the LDPR's

7

policies and methods is shown in exhibits 22 and 23.  Exhibit 23 is a repellent letter signed by 500 members of the "orthodox-patriotic community" (P.  PZ 1640), including LDPR Duma deputies. Exhibit 22.  The Duma voted 306-58 to condemn the letter.  The 58 votes against condemning the letter were from "the ultranationalist LDPR."  Exhibit 22.

Egiazaryan has been a deputy appointed to the Duma to represent the LDPR since 1999, what he calls a "non-party candidate nominated to [LDPR's] parliament group."  (Am. Comp. ¶ 55.)  Russians vote for political parties, and the parties fill the seats they win in the Duma from a list prepared by the party leadership.  Egiazaryan has always obtained his seat in the Duma through this process.  He has never been directly elected to the Duma by the voters and owes his position in the Duma to the LDPR leadership. (Am. Comp. ¶ 55.)

**ARGUMENT**

    **I.   EGIAZARYAN FILED A SLAPP SUIT**

        **A.   The Court Ruled Twice That The Case Is A SLAPP Suit**

In Egiazaryan v. Zalmayev, No. 11 Civ. 2670, 2011 WL 6097136 (S.D.N.Y. Dec.7, 2011)(Castel, J.), concluding that "a petition for asylum . . . is an application for 'permission to act'" under the statute, this Court held that the defamation lawsuit could be construed as "materially related to ... [the defendant's] alleged efforts to 'comment on, ... challenge or

8

oppose' any asylum application by [the plaintiff]." Gilman v. Spitzer, 2012 WL 4510681 (S.D.N.Y. Oct. 1, 2012) (quoting Egiazaryan v. Zalmayev, at *12).

The Court's decision on this issue was correct on the law, but should also be adhered to based upon the law of the case doctrine. The "law of the case" is a discretionary rule that focuses and advances litigation. Westerbeke Corp. v. Daihatsu Motor Co Ltd., 304 F.3d 200, 219 (2d Cir. 2002). "Under the law of the case doctrine, this court adheres to its own decision at an earlier stage of the litigation unless there are cogent or compelling reasons not to, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Sanders v. Sullivan, 900 F.2d 601, 605 (2d Cir. 1990)(internal quotations and citations omitted).

**B.    All The Requirements For A SLAPP Suit Exist**

The anti-SLAPP statute provides, in part:

**§ 70-a. Actions involving public petition and participation; recovery of damages**

1. A defendant in an action involving public petition and participation, . . ., may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that:

(a) costs and attorney's fees may be recovered upon a demonstration that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could

9

> not be supported by a substantial argument for the extension, modification or reversal of existing law;
>
> (b) other compensatory damages may only be recovered upon an additional demonstration that the action involving public petition and participation was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights; and
>
> (c) punitive damages may only be recovered upon an additional demonstration that the action involving public petition and participation was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights.

N.Y. Civ. Rts. Law § 70—a.

### 1.   Egiazaryan's Asylum Application Makes Him A Permittee/Applicant

An "action involving public petition and

participation" is an:

> action, claim, cross claim or counterclaim for damages that is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission.

N.Y. Civ. Rts. Law § 76—a(1)(a).

The phrase "public applicant or permittee" is defined

as:

> any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body, or any person with an interest, connection or affiliation with such person that is materially related to such application or permission.

N.Y. Civ. Rts. Law § 76—a(1)(b).

10

Although the Court has ruled twice that the case is a SLAPP suit, because Egiazaryan challenges the ruling again, Zalmayev addresses the requirements for a SLAPP suit.

Judge Castel ruled in his opinion denying Egiazaryan's motion to dismiss the anti-SLAPP counterclaim that Egiazaryan has made the type of application, his application for asylum, that triggers the anti-SLAPP statute.  December 7, 2011, opinion, pp. 19-21 (document 66); Egiazaryan v. Zalmayev, No. 11 Civ. 2670, 2011 WL  6097136 (S.D.N.Y. Dec. 7, 2011).

### 2.    Zalmayev Challenged The Asylum Application

Asylum applications are reviewed in a closed process. Initially, the alien applies for asylum and an Immigration Officer interviews the applicant in a non-adversarial proceeding.  8 C.F.R. section 208.9.  If, after the interview, the government does not grant the alien asylum, the government generally commences removal proceedings, where the alien may reassert his asylum claim in an adversarial hearing before an Immigration Judge.  During both parts of this process, the United States government rarely obtains access to witnesses with knowledge of the asylum applicant's behavior and treatment in his or her home country.  This asymmetrical access to information has resulted in notorious instances of asylum being granted on uncontradicted — but false - testimony tailored by the alien to track the State Department's report of the county conditions in

11

the alien's home.  Suketu Mehta wrote an article, "The Asylum Seeker," describing such abuses in the August 1, 2011, issue of "The New Yorker."  Exhibit 1 to Zalmayev's answer to Egiazaryan's motion to dismiss the counterclaim.

To take advantage of this situation and to deter any individual who attempts to explain Egiazaryan's actual history to United States authorities, Egiazaryan filed a defamation action against Zalmayev.  Zalmayev opposes the misuse of asylum applications by corrupt and/or anti-Semitic foreign officials and has collaborated with like-minded human rights advocates opposing Egiazaryan's asylum application.  Zalmayev wrote commentary published in the Jewish Journal outlining reasons why the United States government should not grant Egiazaryan asylum.  Writing such letters and newspaper commentary is the only practical method by which concerned citizens can protect against the inadvertent award of asylum to applicants who convincingly misrepresent themselves and their history in their asylum applications.

Egiazaryan contends that his complaint is not a SLAPP suit because Zalmayev's opposition to his asylum application was not made as part of a process where the Department of Homeland Security invites comment on asylum applications as if the asylum process were like the Environmental Protection Agency proposing a new regulation.  (Mem. at p. 22.)  This is absurd, but it is

12

central to the case.  The only way someone can oppose an asylum application is to publish commentary in newspapers and write to government officials.

Challenging the application of the anti-SLAPP statute to the complaint for the third time, Egiazaryan adds the word "directly" to the statute (mem. p. 20)[5] and audaciously suggests that Zalmayev's challenge was not public enough.  In Duane Reade v. Clark and The Wave Publishing Co., 784 N.Y.S.2d 920, 2 Misc.3d 1007(A) (2004), 2004 WL 690191, the pharmacy Duane Reade intended to build a store that included, not surprisingly, a sign for the store.  Some Rockaway Beach residents opposed the sign because of the sign's proximity to a park commemorating victims of a nearby plane crash, and one resident, Mr. Clark, purchased an advertisement in a local Rockaway Beach newspaper called The Wave objecting to Duane Reade's sign.  The dispute was in the best tradition of the balance of commerce, commercial speech, non-commercial speech and a difference of opinion.  Duane Reade did not lack the resources to participate in the debate.

Participation in the debate was not enough for Duane Reade, so Duane Reade sued Mr. Clark and The Wave for defamation.  Mr. Clark and The Wave moved to dismiss the

---

[5]  Egiazaryan urges the Court to reverse itself by citing Guerrero v. Carva, 10 A.D. 3d 105, 779 N.Y.S2d (1st Dep't 2004) as if it were a new case or it were missed by the Court.  To the contrary, in this Court's finding that the complaint was a SLAPP suit, it first considered Guerrero v. Carva.  December 7, 2011, opinion (document 66), p. 19-20.

13

complaint alleging that the complaint was a SLAPP suit.  Duane
Reade, like Egiazaryan, contended that the advertisement was not
enough opposition because "Clark ha[d] not taken any steps to
challenge the company's existing permit and because Clark's
communication was not directed to Duane Reade, as permit
applicant."  Duane Reade, *6.  The court did not hesitate to find
that Mr. Clark's advertisement opposing Duane Reade's sign was
exactly what the anti-SLAPP statute protects.  So, too, for
Zalmayev's dissenting commentary in the *Jewish Journal* and his
collaboration with others in publishing commentary and writing
to government officials.

###     C.    Egiazaryan's Purpose For Filing The Suit Was To Limit Public Participation

Mr. Egiazaryan commenced an action that is a Strategic
Lawsuit Against Public Participation, subject to the anti-SLAPP
provisions of New York's Civil Rights Law, §§ 70-a and 76-a.
Egiazaryan filed the suit because Zalmayev commented about the
propriety of Egiazaryan's request for asylum application and
advocated that asylum be denied.

### II.   THE COMPLAINT WAS WITHOUT SUBSTANTIAL BASIS

###     A.    The Complaint And Amended Complaint Were Dismissed On Rule 12 Grounds

This Court held that intention to inflict harm is
insufficient and that the illegal intention has to be to inflict
harm "through falsehood."  December 7, 2013, opinion, p. 10,

14

citing <u>Garrison v. Louisiana</u>, 379 U.S. 64, 73. (Document 66.)
The December 7 opinion expressly says that hostility is not enough. "Without more, allegations of Zalmayev's hostility fail plausibly to establish Zalmayev's actual malice." December 7, 2013, opinion, p. 15.

The dismissal of the complaint conclusively established that the complaint was brought without a substantial basis. The 1992 Act that added § 70-a and § 76-a also amended CPLR 3211 and 3212. Section 3211 was amended with the addition of section (g), creating the standard for a motion to dismiss a SLAPP suit. The new section puts the burden on the <u>plaintiff</u> to show that a complaint has a "substantial basis in law." Governor's bill packet, exhibit 1 to Egiazaryan's motion.

> 3211(g) **Standards for motions to dismiss in certain cases involving public petition and participation. A motion to dismiss** based on paragraph seven of subdivision (a) of this section, in which the moving party has demonstrated that the action, claim, cross claim or counterclaim subject to the motion is an action involving public petition and participation as defined in paragraph (a) of subdivision one of section seventy-six-a of the civil rights law, **shall be granted unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law** or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant preference in the hearing of such motion.

CPLR 3211 (emphasis added).

15

The Rule 12 dismissal of the complaint and amended complaint means conclusively that the case had no substantial basis in law. This is true because the revisions to CPLR 3211 as part of the anti-SLAPP legislation lowers the standard for a defendant to obtain the dismissal of a SLAPP complaint at the same time that the legislation declares that dismissing the case means that it had no substantial basis, which is the standard for anti-SLAPP liability under § 70-a 1.(a).

The revisions to CPLR 3211 and 3212 are part of the *substantive* anti-SLAPP law, and are not *procedural*, and apply in this court notwithstanding that the revisions are part of "rules." The revisions are part of the legislation, not a "rules committee" revision to Rule 3211. The revisions affect the burden of persuasion, just as § 76-a(2) requires a SLAPP plaintiff to prove defamation by clear and convincing evidence.

In a diversity a case a federal court applies state substantive law and federal procedural law. Erie Railway Co. v. Tompkins, 304 U.S. 64 (1938). Sometimes, state substantive law is found in the state "rules." Bonime v. Avaya, 2006 WL 3751219 (E.D. N.Y.). The point of the Eric Doctrine is that the outcome of diversity cases should be the same in state court as in federal court, since the case could be brought in either forum.

> in all cases where a federal court is exercising
> jurisdiction solely because of the diversity of
> citizenship of the parties, the outcome of the
> litigation in the federal court should be

16

> substantially the same, so far as legal rules determine the outcome of a litigation, as it would be tried in a State court.

Bonime v. Avaya, p. *2, quoting Guaranty Trust Co. of N.Y. v. York, 326 U.S. 99, 106 (1945).  The principle of the Erie Doctrine is to discourage forum shopping and the inconsistent administration of the law.  Bonime v. Avaya, p. *2, citing Hanna v. Plumer, 380 U.S. 460, 468 (1965).

In Bonime the issue was whether New York CPLR 901(b) limiting class actions applied in a diversity case based on a federal statute (the Telephone Consumer Protection Act, 47 U.S.C. § 227).  The Federal Rules of Civil Procedure include a rule governing class actions, Rule 23.  The court determined that CPLR 901(b) was *substantive law*, applied it in the federal diversity case and dismissed the case.[6]

Those principles apply here.  If Egiazaryan had brought this case in New York state court, the standard and burden of Rule 3211(g) would apply and a dismissal of the case would mean that Egiazaryan had not demonstrated that there was a substantial basis in law for his case.  The dismissal would necessarily mean that Zalmayev would have met the "no substantial basis" prong of the anti-SLAPP law by the dismissal

---

[6]  Bonime v. Avaya was approved in the Southern District of New York. Giovanniello v. New York Law Publishing Company, 2007 WL 2244321 (S.D.N.Y.); Giovanniello v. Carolina Wholesale Office Machine Company, 2007 WL 2363614 (S.D.N.Y.).

of the case.  <u>Bonime</u>, <u>Erie</u>, and <u>Hanna</u> all require that the result in this federal court be the same.

The New York State Assembly Memorandum in Support of Legislation describes the bill in substantive law terms and confirms that the requirement that a SLAPP suit have a substantial basis is a *higher requirement* than the reasonable basis required of other suits:

> <u>EFFECTS OF PRESENT LAW WHICH THIS BILL WOULD ALTER:</u> The bill would change the standard for obtaining dismissal in summary judgement [sic] in certain actions.  The bill would change the standard for obtaining attorney's fees in certain action by requiring that an action be supported by a "substantial" basis, which is more support than the "reasonable" basis required in other actions.

New York State Assembly Memorandum in Support of Legislation, exhibit 1 to Egiazaryan motion, p. 11 of 54.

That the standard under a motion to dismiss a SLAPP complaint is substantive is confirmed by the commentators. Weinstein, Korn and Miller, New York Civil Practice:  CPLR, Vol. l7, ¶ 3211.51, p. 32-149, writes that "[s]ubstantively, the 1992 Civil Rights Law provisions" provide for attorney's fees if the SLAPP complaint is without a substantial basis and that "[t]he substantive provisions are implemented procedurally by the concomitantly enacted CPLR 3211(g) . . ."  Id., p. 32-150. Practice Commentaries by David D. Siegel, 7B CPLR 3201 to 3211, C3211:73 notes that the anti-SLAPP act puts the burden in a motion to dismiss a SLAPP complaint on the plaintiff to

18

> make[] it easier for the opposer (the defendant in the action) to get [SLAPP] complaints dismissed.
>
> Two of the several amendments [in the act] with that purpose affect the CPLR: subdivision (g), added to CPLR 3211, and subdivision (h), added to CPLR 3212.

Siegel, C3211:73, p. 118.

Magistrate Gorenstein suggested that whether the complaint was "without a 'substantial basis in law or fact' . . . is an objective test." November 9, 2012, order (docket 192) p. 2. No citation is provided and counsel could find no case applying New York's anti-SLAPP statute that answers whether that test is objective or subjective. Similar statutes or rules providing compensation or sanctions for improper or frivolous litigation are determined under both subjective or objective tests. Fed. R. Civ. P. 11 sanctions motions are determined under an objective test. Muset v. Ishimaru, 783 F. Supp.2d 360, 373 (E.D.N.Y. 2011), citing Storey v. Cello Holdings, 347 F.3d 370, 387 (2d Cir. 2003). Sanctions motions under 28 U.S.C. § 1927 are determined by the *subjective good or bad faith* of the challenged actor. Rankin v. City of Niagara Falls, 2012 WL 3886327, *3 (W.D.N.Y. September 6, 2012).

Even Rule 11, however, while applying what it calls an objective test, requires examining the individual circumstances of the challenged complaint.

> The court is expected to **avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time** the pleading, motion or other paper was submitted.  Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion or other paper; . . .

Fed. R. Civ. P. 11, Advisory Committee Notes, 1983 Amendment

(emphasis added).  The 1993 amendment to Rule 11 changes "good

faith" to "nonfrivolous" for one of the four subsections in Rule

11(b), and the Advisory Committee Note to the 1993 amendment

establishing an "objective standard" for that subsection,

nonetheless advises that the actual work done by a litigant to

find support for a new theory is to be considered.  That is, one

looks at what the challenged litigant was actually thinking and

intending, i.e., the factual underpinnings.

Whether the "substantial basis" inquiry under anti-

SLAPP is objective, like Rule 11, or subjective, like § 1927,

there has to be an inquiry into what Egiazaryan knew, or thought

he knew, whether it was reasonable, and what his purpose was in

filing this case.

    **B.**    **The Statements That Are The Subject Of The Complaint Are True and Egiazaryan Knew That The Statements Are True**

        **1.**    **The statements are true**

The essence of the defamation claim is that Zalmayev's

commentary falsely asserted that **Egiazaryan was (1) a member of**

20

**the LDPR and that Egiazaryan (2) provided significant financing for the LDPR,** and that those assertions were untrue. Notwithstanding that the dismissal of the case was based in part on Zalmayev's, and the others' writing was opinion, the assertions of membership were true.

### 2.    Egiazaryan knows the statements are true

The heart of the case is Egiazaryan's affiliation with the LDPR, which Zalmayev for sure, and Egiazaryan apparently, think is repellent.  Egiazaryan says that the LDPR's world view is "alleged[ly] odious" (Egiazaryan mem. in opposition to the motion to dismiss the complaint,  p. 21), but he contends that associating him with the LDPR is defamatory.  Egiazaryan mem. in opposition to the motion to dismiss the complaint, p. 19. Egiazaryan's accusation is Zalmayev's unfair use of "guilt by association."  Members of political parties *are* guilty by association for defamation purposes.  David Duke was the Grand Wizard of the Knights of the Ku Klux Klan.  Among other odious statements, as Grand Wizard David Duke said "It's really the Jew Marxists who see the nigger as their instrument, as their bullets, by which to destroy our society." adl.org/special_reports/duke_own_words/print.asp.  A person correctly identified as a Klan member in media commentary that notes the Klan's leaders statements, could not bring a defamation suit against the writer by saying "I don't agree with

21

David Duke, I just go to the Klan meetings." Egiazaryan attempted to do just that by claiming that he is not a "member" of the LDPR.

BGR carefully "spun" the communications about Egiazaryan and the LDPR in an attempt to distance Egiazaryan from the LDPR. BGR ignored questions from journalist Motlagh about the LDPR. Exhibit 20. BGR ignored journalist von Twickel's direction to the Central Elections Committee on list of LDPR party members. Exhibit 21. After BGR created a Facebook page for Egiazaryan that contained under the Facebook category affiliation: "Liberal Democratic Party of Russia," Egiazaryan's lead lawyer Drew Holiner angrily told BGR to delete the reference and told BGR's John Lough (the person in charge) to "[p]lease make sure you approve content before publishing these things!" Exhibit 25.

### LDPR Membership

Egiazaryan's attempt to distinguish between being an LDPR member and a "non-party candidate nominated to its parliament group" (amend. compl.¶ 55, 74) proves that even if that distinction had any meaning, it could not support a defamation claim. More important, however, is that Egiazaryan is a member of the LDPR and would appear to a person doing research to be a member.

22

1.   Egiazaryan applied in 1999 to run for the Duma as a member of the LDPR.  Exhibit  16.

2.   Egiazaryan was featured in a 2007 book about the LDPR that contained his picture on the cover and described him as a member.  Exhibit 18.

3.   The 2003 Elections Committee LDPR list identifies Egiazaryan as a member.  Exhibit 17.

The 2003 Elections Committee LDPR list was identified by Nikolaus von Twickel, a journalist, who wrote to BGR's John Lough on June 9, 2011, after receiving the complaint.  Mr. von Twickel wrote:

> Maybe you could also double check on this — the defamation suit papers clearly state that Yegiazaryan "is not and has never been a member (or a leader) of the LDPR.
>
> This hardly squares with data from the Central Elections Committee, which listed him as a party member for the 2003 elections: http://gd2003.cikrf.ru/gd2003/209sp

Exhibit 21.  The webpage identified in the email is exhibit 17. Mr. von Twickel's email was circulated in BGR and forwarded to Egiazaryan's lead lawyer, Drew Holiner, but this information, available to everyone in the world with internet access, did not deter or slow down Egiazaryan's attack on Zalmayev.

**Financing the LDPR**

An example of Egiazaryan's suspicious movement of more than $20 million is found in the declaration of Andrey Gloriozov,

23

exhibit 30.  Mikhail Ananiev described how Egiazaryan embezzled $18 million from him and how $6 million of that was given to Egiazaryan *in cash*, in 2003, an election year.  P. PZ 000402. Exhibit 31, p. PZ 402.  Ananiev's banker Alexey Mironiuk corroborated Ananiev's description, and explained how he transferred $6 million of Ananiev's cash to Egiazaryan.  Exhibit 32, p. PZ 412-413.

This issue is also addressed in the companion memorandum filed under seal.

### 3. Egiazaryan had the assistance of lawyers and public relations professionals

The December 7, 2011, Opinion correctly held that Egiazaryan is a public figure due to (i) his prominence as a legislator and business executive in Moscow and (ii) his ability to access channels of effective communication.  (Opinion p. 8-9)

Discovery has provided evidence of Egiazaryan's ability to access the media.  Media coverage of Egiazaryan relevant to this case began when Associated Press reporter Douglas Birch wrote on February 6, 2011, that he met with Egiazaryan, who was "flanked by lawyers."  Exhibit 7.  On March 9, 2011, Birch wrote again about Egiazaryan, though he does not say whether Egiazaryan was "flanked by lawyers" when they met. He wrote that Egiazaryan "denounced a vote in Russia's parliament authorizing his arrest in a $65 million fraud and

24

embezzlement case." Exhibit 9. Interpol issued a "wanted" notice for Egiazaryan. Exhibit 19.

Birch wrote about Mr. Egiazaryan a third time, on May 27, 2011. Exhibit 10. Among other topics, he wrote about this lawsuit, apparently having received the complaint from Mr. Egiazaryan's agents. With the assistance of his public relations firm Egiazaryan was the nominal author of commentary in the Wall Street Journal online edition on October 17, 2011. Exhibits 11, 28, 29.

Egiazaryan entered a contract with public relations lobbying firm BGR effective February 12, 2011, for $77,000 per month. The one-year contract totals $924,000. Exhibit 14. Examples of BGR's work for Egiazaryan are exhibits 6, 11, 12, 13, 14, 20, 21, 24, 25, 26, 27, 28.

### C.   Zalmayev Made Statements Of Opinion

This is thoroughly and conclusively addressed in the July 30, 2012, opinion. That the subjects of the defamation claim were opinion is one more reason by there is no substantial basis.

### D.   Zalmayev was subject to the actual malice standard

The Court held twice that Egiazaryan was a public figure, which makes Egiazaryan's burden heavier.

In addition, New York's Anti-SLAPP statute also imposes the actual malice standard on Egiazaryan. New York's

25

Civil Rights Law section 76-a.2 provides that:

> In an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made **with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.**

(Emphasis added.)  This provision imposes the actual malice requirements upon plaintiffs who bring SLAPP suits.  Sing v. Sukham, 56 A.D.3d 187, 194 (2d Dept. App. Div., 2008)("a defendant in a [SLAPP] suit may still be liable for libel when proof of malice, as defined in New York Times v. Sullivan is established."  (page citation omitted)); and Guerrero v. Carva, 10 A.D.3d 105 (1st Dept. App. Div., 2004)(section 76-a.2 requires the plaintiff to demonstrate actual malice by the person who made the defamatory statement).  The December 7, 2011, Opinion held that this case met the requirements for the application of the anti-SLAPP statute.

Section 76-a.2 also requires that Egiazaryan prove that Zalmayev acted with actual malice by "clear and convincing" evidence.  In T.S. Haulers, Inc. v. Kaplan, 295 A.D.2d 595 (2d Dept. App. Div., 2002), the Second Department upheld the grant of summary judgment to a defendant in a SLAPP suit because "the plaintiff failed to demonstrate by clear and convincing evidence that the challenged statements were known to be false by the

26

defendants, or were made with reckless disregard of whether they were false. . . ." (citations omitted).  See also, Chandok v. Klessig, 648 F.Supp. 2d 449, 459 (N.D.N.Y. 2009) (same), aff'd on other grounds, 632 F.3d 803 (2d Cir. 2011).  Accordingly, Egiazaryan had the burden to allege facts demonstrating that Zalmayev acted with actual malice to state a claim for defamation consistent with the requirements of the anti-SLAPP statute and the First Amendment.  New York Times Co. v. Sullivan, 376 U.S. 254 (1964); and Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176-77 (2d Cir. 2000).

Egiazaryan writes that "[a]t the time this action was commenced, Egiazaryan had a reasonable basis to believe that he was not a "public figure" in the United States [] and that it would not necessary for him [to prove] actual malice" (mem. p. 36), as if he filed the complaint without a substantial basis because his lawyers did not properly determine the applicable legal burdens.  First, that would not be a defense and would be a subject of post-litigation "discussion" between Egiazaryan and his lawyers and second, it could not possibly be true.  In this case, Egiazaryan has been represented by:

> Flemming Zulack Williamson Zauderer
>
> Gibson, Dunn & Crutcher
>
> Greenberg Traurig
>
> Drew Holiner (English barrister)

27

In Egiazaryan's Moscow Hotel dealings he was also represented by "the preeminent international law firms of White & Case, LLP, DLA Piper and Lovells." Compl. ¶ 12.  That group of fine and expensive lawyers were certainly capable of determining in their required Fed. R. Civ. P. 11 precase analysis that there was a "substantial" possibility, probability even, that Egiazaryan would have to prove actual malice *and* carry his burdens by clear and convincing evidence.

## III. THE ANTI-SLAPP STATUTE PROTECTS IMPORTANT RIGHTS

### A.   Summary Judgment Would Eviscerate The anti-SLAPP statute

The point of anti-SLAPP statutes is to prevent rich or powerful individuals or companies who seek something from a government from suing their opponents as a means to intimidate or inhibit them from exercising protected First Amendment rights.  The New York Court of Appeals noted the broad policy of protecting speech that motivated the legislature to adopt the anti-SLAPP law:

> In recent years, there has been a rising concern about the use of civil litigation, primarily defamation suits, to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards.  Termed SLAPP suits – strategic lawsuits against public participation – such actions are characterized as having little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future.  In response, New York State enacted

28

> a law specifically aimed at broadening the protection of citizens facing litigation arising from their public petition and participation (*see,* L.1992, ch. 767).

<u>600 W. 115th St. Corp. v. Von Gutfeld</u>, 80 N.Y.2d 130, 138, 603 N.E.2d 930, 933 (1992)(citations omitted).

The legislative and judicial expression of the importance of First Amendment rights and the role of the anti-SLAPP statute in protecting those rights is significant.

> Section one of the anti-SLAPP act says

> Section 1.  Legislative findings and purpose.  The legislature hereby declares it to be the policy of the state that the rights of citizens to participate freely in the public process must be safeguarded with great diligence.  The laws of the state must provide the utmost protection for the free exercise of speech, petition and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern.

> The legislature further finds that the threat of personal damages and litigation costs can be and has been used as a means of harassing, intimidating or punishing individuals, unincorporated associations, not-for-profit corporations and others who have involved themselves in public affairs.

Egiazaryan exhibit 1, p. 1.

In contrast to Egiazaryan's incomplete quotation from Governor Cuomo's bill signing memorandum, the Governor noted the importance of free speech and public debate and how the statute protects First Amendment rights in situations where the powerful use defamation suits to "stifle opposition."

29

In order to stifle opposition, plaintiffs in SLAPP suits say that the people opposing them have defamed them, have maliciously prosecuted them or have interfered with their businesses. Although the suits are without substantial basis, large damages are sought, and an individual unfamiliar with legal proceedings is forced to hire a defense as the price of speaking out in a public forum or urging on government an earnest belief. The aim of SLAPP suits is simple and brutal: the individual is to regret ever having entered the public area to tell government what she thinks about something directly affecting her.

* * *

But it is the measure of our commitment to free debate in this State that we value speech and public participation knowing that the power may be misused, aware that the advocacy of some may be injurious or false, refusing to judge in individual cases whether debate itself would be good or bad. We protect public participation regardless of the content of the views expressed. **Punitive and needless lawsuits without substantial basis in fact or law should be generally discouraged. But they should be discouraged all the more if, as there is reason to believe, they deter public debate which we as a nation consistently protect without a value judgment about whether what is said is good, bad, ill-motivated, pretextual or welcome.**

Egiazaryan exhibit 1, p. 10 (emphasis added.)

### B.   Zalmayev Suffered Damages

#### 1.   Attorney's fees

The anti-SLAPP statute provides that Zalmayev is entitled to attorney's fees if the case is brought without a substantial basis. As explained above, this case was brought without a substantial basis. That Zalmayev's legal fees were

30

paid by Mr. Vavilov, a non-party who shares Zalmayev's desire to preclude Egiazaryan's asylum, does not affect Zalmayev's right, as defendant, to recover attorney's fees.  In Simmonds and Henderson v. New York City Department of Corrections, 2008 WL 4303474 (S.D.N.Y.) attorney's fees were award to the prevailing plaintiffs Ms. Simmonds and Ms. Henderson notwithstanding that Ms. Simmonds and Ms. Henderson did not actually pay attorneys fees because they were represented by the ACLU and a private law firm on a *pro bono* basis.  See also Davis, et al. v. The New York City Housing Authority, 2002 WL 31748586, at *2. (S.D.N.Y.).  In both Simmonds and Davis the issue was not even whether pro bono counsel would be compensated, but the claim by defendants that the applicable rate should be lower.

Zalmayev's counsel did not provide services in this case for free, but like Simmonds and Davis, Zalmayev did not pay the fees.  If a defendant were entitled to attorney's fees in a case where the fees were paid by an insurance company, no one would seriously contend that no fees should be awarded.  Counsel could not find a case such as that, probably because the principle is so clear that it was never challenged.

Egiazaryan misconstrues what an attorney's fees windfall might be.  In Crescent Publishing Group v. Playboy Enterprises, 246 F.3d 142 (2d Cir. 2001), the issue was the relationship between a fee agreement and market rates.  The court

31

noted that the market rate might "trump" an actual lower agreed rate, but that the actual rate would be relevant.  Video-Cinema Films v. Cable News Network, 2004 WL 213032 (S.D.N.Y.), also cited by Egiazaryan, also deals with the relationship between market billing rates and actual agreed rates between client and attorney.  Neither case even suggests that fees paid by a non-party (a law firm working pro-bono, the ACLU, an insurance company) should not be awarded when a party is entitled to attorney's fees by law.

It follows automatically that if the complaint is dismissed, there is no substantial basis for the complaint and Zalmayev is entitled to attorney's fees.  In Duane Reade, the court dismissed the complaint, because it had no substantial basis, and in the next sentence, automatically, found that attorney's fees were appropriate.

> This court finds that Duane Reade brought this lawsuit, which is "materially related" to Clark's efforts to comment on Duane Reade's permit, without any substantial basis in fact or law. Accordingly, defendants are entitled to recover costs and attorney's fees.

Duane Reade, p. *10.

A trial should be held to determine the amount of attorney's fees.

Egiazaryan asks the Court to exercise is discretion to preclude attorney's fees for Zalmayev, essentially by asserting the facts alleged in the dismissed complaint.  Egiazaryan cites

32

three cases in which attorney's fees were not awarded under the anti-SLAPP statute: Friends of Rockland Shelter Animals v. Mullen and Humane Society of the United States, 313 F.Supp.2d 339 (S.D.N.Y. 2004); Miness v. Alter, 262 A.d.2d 374, 691 N.Y.2d 171 (1999); West Branch Conservation Association v. Planning Board of the Town of Clarkstown, 222 A.D.2d 513, 636 N.Y.S.2d 61 (1995). In Miness and West Branch, the appellate courts affirm the trial court's discretion in not awarding anti-SLAPP damages but there is no explanation *why* the courts exercised that discretion as they did. Friends of Rockland cites Miness and West Branch, and offers little explanation why the court did not award anti-SLAPP damages except to say that it had not determined that the complaint was a SLAPP suit and that it did not think that damages were "warranted in the present case." Friends of Rockland, 313 F.Supp.2d at 345.

Friends of Rockland involved a dispute between two animal rights organizations where the court dismissed the anti-SLAPP counterclaim when the complaint was dismissed *on the court's* motion over the objection of the defendant. Miness and West Branch also involved local disputes between parties of equal strength that seem to have ended at the outset.

In this case, Egiazaryan requested, and the Court agreed, that Zalmayev answer the complaint while his motion to

33

dismiss counts two through five were pending, and discovery proceeded at the same time.

Duane Reade, where the plaintiff was a huge company represented by a huge New York-based law firm, is a better guide for this case, where the plaintiff is a rich and powerful oligarch represented by three big law firms and an English barrister.  The principle of the anti-SLAPP law applies critically here.  Egiazaryan sued Zalmayev, and not his commercial nemesis Mr. Kerimov because Egiazaryan, like Duane Reade, thought he could crush Zalmayev with Egiazaryan's economic advantage.  Egiazaryan would have succeeded if Mr. Vavilov had not paid for counsel for Zalmayev. That Mr. Vavilov was available to pay counsel is a reason *why* the anti-SLAPP damages should be awarded, not a reason to discretionarily deny the damages.

Egiazaryan offers two reasons why the Court should discretionarily deny anti-SLAPP damages.  (Mem. p. 44, et seq.) The first is that Zalmayev was paid and had the specific objective of preventing Egiazaryan's asylum.  Again, this is a reason to *award* damages, not deny them, and is in the worst tradition of those who want to inhibit First Amendment rights. The First Amendment applies to writers who work for money (see, for example, The New York Times and author Henry Miller) and the

34

First Amendment's protections are not based on the content or the motive of the writer.

The second is the assertion that Rinat Akhmetshin destroyed documents.  Had this been true or an issue in the case, it would have been subject to an appropriate motion by Egiazaryan; it was not, and discovery to Mr. Akhmetshin had nothing to do with Zalmayev.  Of note, is that Mr. Akhmetshin was represented by counsel other than Zalmayev's counsel, unlike, for example, Egiazaryan's public relations firm, BGR, who was represented by the same lawyers (Flemming Zulack, and Gibson Dunn) who represented Egiazaryan.

### 2.   Other damages

The statute provides that "other compensatory damages" may be recovered if the case were brought with "the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."  § 70-a.1.(b).

"Other compensatory damages" includes pain and suffering, unless the statute providing for compensatory damages explicitly states otherwise by, for example, limiting compensatory damages to economic damages.  The anti-SLAPP statute does not explicitly preclude pain and suffering or limit compensatory damages to economic damages.  In Garland-Sash v. Lewis, 2009 WL 3227297 C.A.2 (N.Y.) the Second Circuit reversed

35

and remanded a case where the district court had not considered the award of non-economic damages under a statute that provided for "compensatory damages."  The court explained that a statute that provides for "compensatory damages" includes damages for pain and suffering.  The previous version of the statute said that "[d]amages for violations of any subsection . . . are limited to economic damages."  Garland-Sash, p. **1.  The amended, applicable statute said:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator **to obtain compensatory damages** and injunctive relief or other equitable relief.

18 U.S.C. § 1030(g), (emphasis added).  The court explained:

> The new version applicable to Garland-Sash's claim provides for a civil action to obtain "compensatory damages."  18 U.S.C. § 1030(g); [citation omitted]  The law generally construes the phrase **"compensatory damages" to include damages for pain, suffering and other emotional harms.**  See, e.g., Cooper Indus. v. Leatherman Tool Group, 532 U.S. 424, 437 n. 11, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (observing that pain and suffering and generally available as species of compensatory damages); Fort v. White, 530 F.2d 1113, 1116 (2d Cir. 1976) (same);  1 JEROME H. NATES ET AL., DAMAGES IN TORT ACTIONS §  3.01 (2009), ("[**C**]**ompensatory damages include** economic injuries, such as medical expenses and lost wages, **as well as noneconomic injuries, such as pain and suffering.**")

Garland-Sash, p. **1, (emphasis added)(footnote omitted).

36

Zalmayev has described his pain and suffering in an affidavit. Exhibit 33. Unlike perhaps the attorney's fees, these damages are actual and unique to Zalmayev.

For summary judgment purposes, Zalmayev has provided sufficient evidence to be entitled to a trial to determine Egiazaryan's purpose. In the absence of an admission of a purpose to inhibit speech, the purpose has to be inferred, and once there is no substantial basis (which is Egiazaryan's burden to prove), an inhibiting purpose is easily inferred.

> If it is found that the applicant was motivated by harassment or intimidation in bringing the suit—and such a finding won't be hard if the action is determined to lack "substantial basis"—punitive damages can be assessed against the plaintiff/applicant, in addition to such compensatory damages as may be called for.

Siegel, C3211:73, p. 119.

Even without a trial, the Duane Reade court found an improper purpose with the same analysis supporting the dismissal of the case and the award of attorney's fees.

> Duane Reade obtained its permit and its right to place its sign on the store rooftop and has not even alleged that Clark's boycott call has had any impact on its sales. Plaintiff has not shown any substantial basis for the lawsuit and its Complaint establishes no purpose other than intimidation, harassment and punishment for its initiation. Therefore, the court holds that defendants are entitled to both compensatory and punitive damages from Duane Reade.

Duane Reade, p. *10.

37

Egiazaryan similarly did not allege in the complaint or amended complaint any damages and he admitted that his defamation damage claim is on nominal damages (November 8, 2011, hearing transcript, pp. 6-7; December 22, 2011, hearing transcript pp. 36-37), what was described in the amended complaint as "presumed compensatory damages for the injury to his reputation." Am. compl. ¶132 i., p. 37.[7] It is significant that the complaint repeatedly alleges that Egiazaryan's commercial nemesis Suleiman Kerimov is behind Zalmayev's work, but Egiazaryan did not even attempt to sue Kerimov for defamation in the United States, or in England or Cyprus where Egiazaryan did sue or begin arbitration against Mr. Kerimov. Egiazaryan sued Zalmayev to silence all dissent to the narrative Egiazaryan wanted to present without challenge to the government to obtain asylum.

Regarding a factfinder's inference of a SLAPP plaintiff's purpose, the Duane Reade court wrote that Duane Reade should have engaged in debate.

> The court wholeheartedly embraces the observation of the United States Supreme Court in Gertz v. Robert Welch (418 U.S. 323, 344 [1974]) that "[t]he first remedy of any victim of defamation is self-help using available opportunities to contradict the lie or correct and thereby minimize the adverse impact on reputation."

---

[7] There are two paragraphs numbered 132. The one cited is on p. 37.

Duane Reade, p. *10.  This Court noted that, as alleged in the complaint, Egiazaryan had the means to participate in debate.

> Finally, the Complaint alleges that Egiazaryan has employed "attorneys, consultants and public relations professionals to fight the defendant's smear campaign." (Compl. ¶ 89.iii.)  That is to say, Egiazaryan "enjoy[s] significantly greater access to the channels of effective communication and hence ha[s] a more realistic opportunity to counteract false statements than private individuals normally enjoy." Gertz, 418 U.S. at 345.

December 7, 2011, opinion (document 66), p. 9.  In fact, Egiazaryan used his lawyers Drew Holiner and Sanford Saunders (Greenberg Traurig) and his public relations professionals John Lough and Ivo Gabara to prepare for Egiazaryan a letter to the *Jewish Journal* responding to Zalmayev's commentary.  Exhibit 6.

Egiazaryan claimed as damages the fees paid to BGR, etc. (compl. ¶ 89.iii), which in the amended complaint became fees paid to BGR in "excess of $203,700." (Amend. compl. ¶ 132.ii., page 38.  The truth, however, is that BGR was retained for reasons unrelated to Zalmayev.  In addition to the retention documents (exhibits 12, 13, 14) BGR was explicit in August 2011.

> If we start from his objectives (a. get asylum and b. secure compensation from his assets/losses), it's clear that he needs to present himself as a victim.  We need to ensure that the western community of Russia watchers (academics, government people, journalists) knows about his case.

August 4, 2011, BGR email, exhibit 24.

39

Zalmayev acknowledges that there remain disputed issue of facts, mostly in the form of Egiazaryan's assertions about his purpose in bringing the case, to require a trial on the requirements for § 70-a.1(b) and also to determine the amount of Zalmayev's "other compensatory damages."

### 3.   Punitive Damages

The statute provides that "punitive damages" may be recovered if the case were brought with "the *sole* purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." § 70-a.1.(c).  The Siegel commentary and <u>Duane Reade</u> both say that determining that the sole purpose of a SLAPP suit is to inhibit free speech, etc., can be easily made once the complaint is dismissed and it is found that no substantial basis exists for the complaint.

Zalmayev has alleged in the case that Egiazaryan sued to inhibit free speech, etc. and to obtain discovery to assist Egiazaryan's case in London against Mr. Kerimov.  Egiazaryan has denied them both.  In a trial on purpose, the factfinder could find that Egiazaryan had the two purposes alleged by Zalmayev, in which event there would be no punitive damages, or the factfinder could find that Egiazaryan's sole purpose was to inhibit free speech, etc., in which event punitive damages would be awarded.

40

Though Zalmayev will introduce evidence of Egiazaryan's wealth at a trial, on the complaint alone, in which Egiazaryan describes contributing more than $1 billion in financing to the real estate project at the center of his dispute with Mr. Kerimov (e.g., compl. ¶11; see also, December 7, 2011, opinion (document 66), pp. 8-9), significant punitive damages could be awarded.

## IV.   ZALMAYEV IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY

The issue for Egiazaryan's summary judgment motion, whether the complaint had a substantial basis, is the same as the issue for Zalmayev's motion for summary judgment for liability.  For all the reasons Egiazaryan's motion should be denied, Zalmayev's should be granted.

There are issues of fact regarding the amount of attorney's fees, whether a purpose of Egiazaryan was to inhibit First Amendment rights, etc., and whether the *sole* purpose of Egiazaryan was to inhibit First Amendment rights, and to the determination of Zalmayev's "other compensatory damages" and punitive damages.  A trial should be held on those issues.

## CONCLUSION

Egiazaryan's motion for summary judgment should be denied.

Zalmayev's motion for summary judgment should be granted.

41

A trial should be held to determine:

1.   The amount of Zalmayev's attorney's fees.

2.   Whether a purpose of Egiazaryan's was to inhibit First Amendment rights, etc.

3.   Zalmayev's other compensatory damages.

4.   Whether the *sole* purpose of Egiazaryan was to inhibit First Amendment rights, etc.

5.   The amount of punitive damages.


Respectfully submitted


/s/ Andrew J Ryan
Andrew J. Ryan
Matthew P. Feser
SALISBURY & RYAN
1325 Avenue of the Americas, 7th Fl.
New York, NY  10019
212-977-4660
212-977-4668 (fax)
ar@salisburyryan.com
mf@salisburyryan.com


/s/ James P. Golden
JAMES P. GOLDEN
Pennsylvania I.D. No. 32169
Thomas B. Roberts (TR5233)
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103
215-255-8590 (O)
215-255-8583 (fax)
goldenjp@hamburg-golden.com

Attorneys for defendant
Peter Zalmayev

Dated:  June 3, 2013

42

**EXHIBITS**

1.  Complaint
2.  Answer and counterclaim
3.  Reply
4.  Amended complaint
5.  Zalmayev commentary
6.  Egiazaryan/BGR response to commentary
7.  February 6, 2011, Washington Post article.
8.  November 23, 2009, Washington Times article.
9.  March 9, 2011, Washington Post article.
10. May 27, 2011, Washington Post article.
11. Egiazaryan/BGR Wall Street Journal commentary, October 17, 2011.
12. February 18, 2011, BGR email.
13. BGR Proposal to Egiazaryan
14. Egiazaryan/Gibson Dunn-BGR public relations lobbying contract.
15. February 15, 201l, opinion in Egiazaryan Cyprus litigation.
16. Egiazaryan 1999 Duma application, translation, and declaration.
17. 2003 Elections Committee LDPR list, translation and declaration.
18. LDPR book excerpts and translation.
19. Interpol wanted notice for Egiazaryan.
20. March 14, 2011, email from Jason Motlagh to BGR, and BGR to Drew Holiner.
21. June 9, 2011, email from Nikolaus von Twickel to BGR, and BGR to Drew Holiner.
22. February 7, 2005, report of Duma vote.
23. Letter that is the subject of Duma vote reported on February 7, 2005.
24. August 4, 2011, email from John Lough to Ivo Ilic Gabara.
25. March 21, 2011, BGR/Drew Holiner email deleting Liberal Democratic Party of Russia affiliation on Egiazaryan Facebook page.
26. BGR memo Reflections on PR strategy.
27. BGR presentation Theft of Ashot Egiazaryan's Stake in the Moskva Hotel.
28. October 13, 2011, BGR emails and drafts of Egiazaryan Wall Street Journal commentary.
29. October 25, 2011, BGR email about writing Egiazaryan commentary.
30. October 06, 2011, Andrey Gloriozov declaration.
31. September 30, 2010, transcript of interrogation of Mikhail Borisovich Ananiev.

32. October 4, 2010, transcript of the interrogation of Alexey Vladimir Mironiuk.
33. Declaration of Peter Zalmayev.
34. Ashot Egiazaryan deposition transcript—January 18,2012, not confidential.
35. Ashot Egiazaryan deposition transcript—January 19,2012, not confidential.
36. Rinat Akhmetshin depositon transcript excerpts, March 20, 2012.
37. Peter Zalmayev deposition transcript exceprts, March 27 and 28, 2012.
38. Douglas Bloomfield deposition transcript excerpts, November 10, 2011.