# EXHIBIT 37

0001

```
 1
 2   UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   -------------------------------------

 4   ASHOT EGIAZARYAN,

 5                    Plaintiff,

 6              -against-              Case No.

                                  1:11-cv-02670

 7   PETER ZALMAYEV,                   (PKC)

 8                    Defendant.

 9   -------------------------------------

10                    March 27, 2012
                      10:03 a.m.
11
12
13
14   Videotaped deposition of PETER ZALMAYEV, taken

15   by Plaintiff, pursuant to Notice, held at the

16   offices of Flemming Zulack Williamson Zauderer,

17   LLP, One Liberty Plaza, New York, New York,

18   before Joseph R. Danyo, a Shorthand Reporter

19   and Notary Public within and for the State of

20   New York.

21

22   HUDSON REPORTING & VIDEO, INC.
23   124 West 30th Street, 2nd Fl.
24   New York, New York 10001
25   Tel: 212-273-9911  Fax: 212-273-9915
```

```
0002

 1

 2   A P P E A R A N C E S :

 3
         FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
 4         Attorneys for Plaintiff
           One Liberty Plaza
 5         New York, New York 10006-1404
 6       By:   JASON T. COHEN, ESQ.
               JONATHAN D. LUPKIN, ESQ.
 7             MARK ZAUDERER, ESQ.
 8                  -and-
 9       MONCKTON CHAMBERS
           1 & 2 Raymond Buildings
10         Gray's Inn
           London WC1R 5NR
11
         By:   DREW HOLINER, ESQ.
12
13
         HAMBURG & GOLDEN, P.C.
14         Attorneys for Defendant
           1601 Market Street
15         Suite 3310
           Philadelphia, Pennsylvania 19103-1443
16
         By:   JAMES P. GOLDEN, ESQ.
17
                   -and-
18
         SALISBURY & RYAN LLP
19         1325 Avenue of the Americas
           Seventh Floor
20         New York, New York 10019-6026
21       By:   ANDREW J. RYAN, ESQ.
22
23   Also Present:
24       HENRY MARTE,
           Videographer
25                       oOo
```

0003

1                    Zalmayev

2           THE VIDEOGRAPHER:  This marks the

3    beginning of videotape number one in the

4    videotaped deposition of Mr. Peter

5    Zalmayev in the matter of Ashot Egiazaryan

6    versus Peter Zalmayev, case number

7    1:11-cv-02670(PKC).

8           This deposition is being held at

9    Flemming Zulack Williamson Zauderer, One

10   Liberty Plaza, New York, New York, on

11   March 27, 2012 at approximately 10:03 a.m.

12   The court reporter is Joe Danyo.  The

13   video operator is Henry Marte.  We are

14   both here on behalf of Hudson Reporting &

15   Video.

16          Would counsel please introduce

17   themselves for the record.

18          MR. LUPKIN:  Good morning, Jonathan

19   Lupkin from the firm Flemming Zulack

20   Williamson Zauderer on behalf of Mr. Ashot

21   Egiazaryan.  With me are my colleagues

22   Jason Cohen, also from Flemming Zulack,

23   and Drew Holiner from Monckton Chambers in

24   London.

25          MR. GOLDEN:  James Golden

0090

1                    Zalmayev

2   reports to you?

3        A.   I think it was a combination.  It was

4   kind of a major news item.  At some point it

5   became, you know, newsworthy, and I think in my

6   conversations with Rinat, he also brought that to

7   my attention.

8        Q.   I want to talk about those

9   conversations with Rinat.  When was the first

10  time you had a conversation with Rinat Akhmetshin

11  about Ashot Egiazaryan?

12       A.   I think it was in some period in 2009

13  that initial Washington Times article where he

14  brought his name to my attention.

15       Q.   Where did he do that?  Was it

16  face to face or on the telephone?

17       A.   I think he came to New York and I

18  remember we met, and he mentioned his name.

19       Q.   Did you meet over drinks?

20       A.   I am sure we drank something, yes.

21  We usually do drink and eat when we see each

22  other.

23       Q.   How long did that encounter last?

24       A.   A few hours I would say.

25       Q.   I would like you to tell me with as

0091

1                    Zalmayev

2     much specificity as you can what it is Mr.

3     Akhmetshin said to you and what it is you said to

4     Mr. Akhmetshin regarding Mr. Egiazaryan during

5     that meeting in 2009.

6          A.   He pointed this out to me.  I believe

7     he mentioned his name in connection with one of

8     his clients at the time, I think it was Andrey

9     Vavilov that he mentioned specifically as someone

10    who had a particular grievance with this

11    individual who I believe there was a story about

12    Mr. Egiazaryan having attempted to kidnap Mr.

13    Vavilov's daughter at some point.

14               Rinat also mentioned to me that this

15    individual was involved in shady dealings having

16    to do with Chechnya, among other things, as

17    someone who initiated that particular Duma

18    commission that was responsible for allocating

19    funds, and I believe he encouraged me to look

20    into it and see if I could get more information,

21    investigate that matter further as far as his

22    connection to, in relation to Chechnya.

23         Q.   You mentioned this was sometime in

24    2009?

25         A.   Yes.

0092

1                    Zalmayev

2        Q.   It was after the Washington Times

3   article?

4        A.   That I don't recall.

5        Q.   The Washington Times article, just to

6   help you frame it in time, was in November 2009.

7   Was it before or after November 2009?

8        A.   I can't tell you.  I don't remember.

9        Q.   Do you recall anything else that Mr.

10  Akhmetshin said to you regarding Mr. Egiazaryan

11  at that first meeting?

12       A.   That pretty much covered it.

13       Q.   What did you say to him?

14       A.   I told him I was not aware of this

15  gentleman, because he asked me if I knew his

16  name.  I don't think at that point I knew his

17  name, and I told him that I would.

18       Q.   When you say his name, which name are

19  you talking about?

20       A.   Mr. Egiazaryan's name.  I told him I

21  would investigate this further.

22       Q.   You mentioned something about

23  kidnapping of a daughter.  Was that charge ever

24  substantiated?

25       A.   I don't know if it was.  I saw it in

0093

1                        Zalmayev

2    media reports.

3         Q.   But, as you sit here now, you don't

4    know whether or not it was substantiated or not,

5    correct?

6         A.   I don't know that.

7         Q.   And you mentioned the name Andrey

8    Vavilov.  Who is Andrey Vavilov?

9         A.   Andrey Vavilov, to my understanding,

10   was a former government official in Russia.

11        Q.   Did you get a sense as to whether he

12   was rich or not?

13        A.   My understanding was that he was

14   definitely more well off than I.

15        Q.   I want to go back to the meeting for

16   a second before we get into Mr. Vavilov.  During

17   that meeting when Mr. Akhmetshin asked you to

18   look into Mr. Egiazaryan and Chechnya, did you

19   say how much are you going to pay me or words to

20   that effect?

21        A.   There was no discussion of money or

22   even a potential project at that point, no.

23        Q.   You told me before you don't do

24   anything for nothing, right?

25             MR. GOLDEN:  That is not exactly what

0094

1                    Zalmayev

2      he said.

3      A.   That is not exactly what I said.

4      Q.   Well, whether it was exactly what you

5  said or approximately what you said, is that

6  essentially what you said earlier today?

7      A.   Something like an investigation,

8  looking up of someone's name, I do not

9  necessarily expect to be compensated for that.

10     Q.   Did you have an understanding at that

11 time as to how much of your time it would take to

12 conduct this investigation?

13     A.   No.

14     Q.   I want to go back to Mr. Vavilov for

15 a second.  What did Mr. Akhmetshin tell you about

16 Mr. Vavilov's interest in Mr. Egiazaryan?

17     A.   My understanding was, and I don't

18 remember if that was communicated to me exactly

19 in those words, my understanding was that there

20 was a grievance between these two gentlemen.

21 Exactly what he wanted, I don't think I formed

22 that or I had that clear understanding at that

23 point, no.

24     Q.   Did you ever form an understanding as

25 to what Mr. Vavilov wanted vis-a-vis Mr.

0095

1                    Zalmayev

2    Egiazaryan?

3        A.    Eventually you mean?

4        Q.    Yes.

5        A.    I had an understanding, yes.

6        Q.    What was that understanding?

7        A.    The understanding was that Mr.

8    Vavilov may have wanted Mr. Egiazaryan to be held

9    accountable.

10        Q.    Mr. Vavilov didn't like Mr.

11    Egiazaryan too much, did he?

12        A.    I don't think -- no, I don't think he

13    did.

14        Q.    Fair to say that Mr. Vavilov hated

15    Mr. Egiazaryan's guts?

16        A.    There was a degree of animosity.

17        Q.    A lot of animosity, huh?

18        A.    I'm not sure I could judge the degree

19    of that animosity.

20        Q.    Now, when you met with Mr. Akhmetshin

21    in 2009, had you ever heard of the name Andrey

22    Vavilov before?

23        A.    Yes.

24        Q.    In what context had you heard it?

25        A.    In the context of his performing of

0116

1                    Zalmayev

2    not that charge was ever substantiated, correct?

3         A.   No, I don't.

4         Q.   I am correct, right?

5         A.   You are correct.

6         Q.   And at that time in that first

7    meeting, did you say anything to Mr. Akhmetshin

8    on the subject of Mr. Egiazaryan?

9         A.   No.

10        Q.   Did Mr. Akhmetshin ask you to do

11   anything during that meeting?

12        A.   Pardon.  The very first meeting, no?

13        Q.   No, I am now -- fast-forward at that

14   first meeting.  You said that between that first

15   meeting in 2009 and the time that things began

16   again in earnest at the end of 2010, there were

17   another two meetings that you had approximately,

18   right?

19        A.   Correct.

20        Q.   At the first of those meetings, did

21   Mr. Akhmetshin ask you to do anything vis-α-vis

22   Mr. Egiazaryan?

23        A.   There was a discussion, as I

24   remember, to look into Mr. Egiazaryan's doings,

25   his activities, while a member of the Russian

0117

1                    Zalmayev

2    Duma.

3         Q.   Did he tell you why he was asking you

4    to do this?

5         A.   This was in order to consider, my

6    understanding was, a campaign to raise public

7    awareness about this gentleman.

8         Q.   Now did you understand that this work

9    was being commissioned, if you will, by Mr.

10   Vavilov?

11        A.   There was no discussion at that point

12   then.

13        Q.   There was no discussion of what at

14   that point?

15        A.   Of who was the interested party.

16        Q.   When you were asked to look into Mr.

17   Egiazaryan's work on the Duma, did you agree to

18   do that?

19        A.   Yes.

20        Q.   Did you discuss a fee?

21        A.   Not at that point, no.

22        Q.   Did you in fact then do some

23   research?

24        A.   Yes.

25        Q.   On what subject matters?

0118

1                         Zalmayev

2          A.   I considered his political leanings,

3     his membership in political organizations, and

4     also his tenure as chairman of the commission

5     in -- and I am using shorthand, I don't remember

6     the title, but it was a Duma commission entrusted

7     with the responsibility for reconstruction in

8     Chechnya.

9          Q.   How much time did you spend

10    researching these topics at that time?

11         A.   A substantial amount.  I at least did

12    several days of hours and hours of research.

13         Q.   Did you produce a result?  Did you

14    produce a written result?

15         A.   There may have been, yes, there may

16    have been some effort to compile.  I think I

17    compiled information.

18         Q.   What did you do with that?

19         A.   I may have shared -- there may have

20    been an e-mail exchange where I shared with Rinat

21    some of my findings.

22         Q.   That was in the middle of 2010?

23         A.   Sometime after November.  Maybe

24    December 2010.  I don't recall.  I am actually

25    quite hazy on the chronology.

0119

1                        Zalmayev

2        Q.   When you did these hours and hours

3   and days and days of research, by the way, what

4   were you researching?  What were the sources of

5   your research?

6        A.   Sources was just media, Internet

7   websites, reports by NGOs, human rights NGOs,

8   et cetera.

9        Q.   What NGOs made reports on Mr.

10  Egiazaryan at that time?

11       A.   I don't recall seeing a report

12  specifically on Mr. Egiazaryan, no.

13       Q.   Do you recall a report generally

14  about Mr. Egiazaryan issued by an NGO at this

15  time?

16       A.   No.

17       Q.   Is there anything else you looked at

18  other than websites?

19       A.   It was mostly websites.  Yes.

20  Whatever was publicly available.  Publicly

21  available information.

22       Q.   After these hours and hours and days

23  and days of research, did you go back to Mr.

24  Akhmetshin and say, we have to discuss, am I

25  getting paid for this?

0120

1                    Zalmayev

2       A.   I never volunteered that sort of

3  discussion or initiated that sort of discussion.

4       Q.   Before we get to that discussion, you

5  said that there were two meetings before December

6  2010.  Do you have a clear recollection of the

7  second one?

8       A.   No.

9       Q.   How did the subject of payment come

10 about?

11      A.   It came about after the period of

12 research was done, and I believe I drew up a

13 plan, a work plan, a strategy, that I submitted

14 to Rinat for his perusal, after which he informed

15 me that a payment would be arranged and I should

16 expect that in EDI's account.

17      Q.   With regard to the work plan or

18 strategy, did you understand that it was a work

19 plan or strategy being prepared on behalf of a

20 client?

21      A.   A client, yes.

22      Q.   Did you know what client it was at

23 the time?

24      A.   At the time, I did not have the

25 discussion.

0121

1                    Zalmayev

2        Q.   Did you have an understanding as to

3   whether or not Mr. Akhmetshin was going to be

4   paying you directly?

5        A.   My understanding was that he would

6   arrange for a payment, as I said.

7        Q.   Did you ask him where the payment was

8   coming from?

9        A.   No.

10       Q.   What was the amount of the payment?

11       A.   I think it was just about 70,000.  I

12   think it was 70,000, something like that.

13       Q.   Did you get a $70,000 payment?

14       A.   It came in EDI's account.

15       Q.   Did you understand that it was

16   something that was facilitated by Mr. Akhmetshin?

17       A.   That was my understanding.

18       Q.   Did you understand who the source of

19   the $70,000 was?

20       A.   My understanding was that it may have

21   come from Mr. Vavilov, yes.

22       Q.   So you say you understand that it may

23   have come from Mr. Vavilov.  What is the basis

24   for your understanding?

25       A.   Mr. Vavilov was mentioned as someone

0122

1                    Zalmayev

2   with a grievance against Mr. Egiazaryan and

3   someone, as I said, who was interested in seeing

4   justice served in that case, accountability

5   achieved.

6          Q.   When the $70,000 -- how did the

7   $70,000 get to your bank account?  Was it a wire

8   transfer?

9          A.   It was a wire transfer.

10         Q.   Do you know where the wire transfer

11  came from?

12         A.   No.

13         Q.   Do you know what the source of the

14  wire transfer was?

15         A.   No.

16         Q.   Did you ever ask Mr. Akhmetshin who

17  is paying me the $70,000?

18         A.   No, I didn't.

19         Q.   Has anybody ever wire transferred

20  $70,000 to you before?

21         A.   No, not that same amount, no.

22         Q.   Anybody ever wire transfer anything

23  close to that amount to you before?

24         A.   I got some wire transfers in the

25  amount of 50,000 before.

0123

1                    Zalmayev

2       Q.   Did you always know the source?

3       A.   Not always.

4       Q.   Weren't you curious to know where the

5  $70,000 was coming from?

6       A.   Quite frankly, no.

7       Q.   It didn't matter to you?

8       A.   No.

9       Q.   Did you understand that the $70,000

10  was coming from the ultimate client that you were

11  performing work for?

12       A.   Yes.

13       Q.   But you didn't know who that was at

14  the time?

15       A.   I had my thoughts.  I did surmise it

16  was Vavilov, but it was not discussed with Rinat.

17       Q.   But your thoughts were just that,

18  thoughts, correct?

19       A.   Yes.

20       Q.   Now did there come a time when you

21  received additional monies from Mr. Akhmetshin?

22       A.   There was another wire transfer

23  arranged.  Let me go back on that.  There was a

24  check from Mr. Akhmetshin subsequent to that wire

25  transfer of 70,000 that you mentioned.

0124

1                    Zalmayev

2       Q.   Do you remember the amount of the

3   check?

4       A.   I believe it was $20,000, if I'm not

5   mistaken.  It was exactly $20,000.

6       Q.   Was it one check or two checks?

7       A.   From Mr. Akhmetshin to me, I think it

8   was one check in the amount of $20,000.

9       Q.   What did you do with the check?

10      A.   The check was deposited in EDI's

11  account, so it was a check to EDI.

12      Q.   Did you receive any more money?

13      A.   Ever since?

14      Q.   Other than the 70,000 and the 20,000.

15      A.   There was a check from Mr. Akhmetshin

16  in the amount of $10,000.

17      Q.   There was an additional $10,000?

18      A.   An additional like I would say --

19           MR. GOLDEN:  Let him finish the

20      question.

21           MR. LUPKIN:  I think I did finish it,

22      but maybe I didn't.

23      A.   Go ahead.  Sorry.

24      Q.   In addition to the 70,000 and the

25  20,000, there was an additional $10,000 payment,

0125

1                     Zalmayev

2   correct?

3        A.   Correct.

4        Q.   From whom did that come?

5        A.   From Rinat.

6        Q.   Rinat Akhmetshin?

7        A.   Yes.

8        Q.   Was he paying it on his own behalf or

9   on behalf of a client?

10        A.   This was from his personal account.

11        Q.   Whether it was from his personal

12   account or not, did you understand that he was

13   making the payment on behalf of somebody else or

14   on behalf of himself?

15        A.   We really did not have that

16   discussion.

17        Q.   What about the $20,000, did you have

18   an understanding as to whether or not he made the

19   $20,000 check on behalf of himself or somebody

20   else?

21        A.   Really all I knew is that it was

22   funds allocated to continue implementing the

23   project, all three.

24        Q.   You say the project.  You mean the

25   Ashot Egiazaryan project, correct?

0126

1                    Zalmayev

2        A.   Yes.

3        Q.   When you received these checks, you

4    didn't know what the ultimate source was,

5    correct?

6        A.   I had a better understanding

7    following the filing of the suit against me that

8    the ultimate source was Mr. Vavilov.

9        Q.   Putting aside the ultimate source --

10   withdrawn.  Putting aside what you learned after

11   the filing of this lawsuit, is it your testimony

12   that from the time you began getting money to the

13   time this lawsuit began, you had no idea who the

14   ultimate source was?

15       A.   I never said that I had no idea.

16       Q.   Did Mr. Akhmetshin tell you who the

17   ultimate source was at any point in time between

18   the time you began and received the first $70,000

19   payment and the time you were served with this

20   lawsuit?

21       A.   I believe that in our conversations

22   with Rinat, though we never discussed it

23   directly, because it was also my acquiescence

24   that I didn't want to get mired in discussions of

25   sources.  It was pretty clear to me that the

0127

1                    Zalmayev

2   ultimate source was Mr. Vavilov.

3        Q.   Was it clear from anything Mr.

4   Akhmetshin said or did?

5        A.   Yes.

6        Q.   What did he say or do that led you to

7   believe that it was Mr. Vavilov?

8        A.   Because from the very beginning of

9   our engagement on this project it was clear to me

10  that Mr. Vavilov was Mr. Akhmetshin's paid client

11  who had a grievance against Mr. Egiazaryan.

12       Q.   But you didn't know for certain until

13  after this lawsuit was filed who the ultimate

14  source or who the ultimate client was, correct?

15       A.   I would say if not 100 percent, I

16  knew 85 percent certainty.

17       Q.   That was based on certain assumptions

18  you made, correct?

19       A.   Yes.

20       Q.   Other than the assumptions you made,

21  he never said, by the way, Mr. Vavilov is the

22  ultimate client, did he?

23       A.   Eventually we had that discussion,

24  yes.

25       Q.   But that was after the lawsuit,

0128

1                    Zalmayev

2  correct?

3      A.   Either right before or after the

4  lawsuit, I don't remember exactly, but sometime

5  thereabouts.  About a year ago I would say.

6      Q.   So okay.  Now of that $100,000 that

7  was deposited into the EDI account, how much of

8  it was used for expenses?

9      A.   I really have not done a full

10  accounting because I haven't filed my taxes yet,

11  but I remember I drew up a budget, a tentative

12  budget where I allocated certain items,

13  et cetera, but I would say that it was definitely

14  of the initial $70,000 transferred, it was at

15  least half, maybe a little less than half that

16  eventually it was allocated as budget expenses.

17            MR. LUPKIN:  I would like to have

18        marked as the next exhibit a document

19        bearing Bates PZ 001273 to 1277.

20            (Exhibit 217, Document bearing Bates

21        numbers PZ 001273 through 1277, was so

22        marked for identification, as of this

23        date.)

24      Q.   Do you recognize document 217 that

25  has been marked for identification and that you

0154

1                          Zalmayev

2     that discussion other than what you just told me?

3          A.   That is pretty much it.

4          Q.   All right.  I would like to go to Mr.

5     Ponomarev.  You said you met with him twice?

6          A.   Correct.

7          Q.   Remind me again who is Mr. Ponomarev?

8          A.   Mr. Ponomarev is director of the

9     human rights movement or I think the way he

10    himself has it translated into English is all

11    Russia human rights movement, which is a major

12    human rights organization NGO in Russia.

13         Q.   By the way -- where did you meet with

14    him?

15         A.   I met him in his office.

16         Q.   You said you met with him twice.  Did

17    you meet with him both times in his office?

18         A.   Correct.

19         Q.   When you met with him the first time,

20    what did he say to you, and what is it that you

21    said to him?

22         A.   The first time we did some catching

23    up.  We had known each other, not too well, but

24    he knew who I was, and I definitely knew who Lev

25    was.  It was general chitchat.  Talked about the

0155

1                    Zalmayev

2   weather.  Talked about this and that.  He told me

3   he wanted to do more traveling to the United

4   States to speak with students and professors and

5   to give talks.  He wanted to see if I could help

6   him with that, so we had some, a professional

7   chitchat.  What he was up to, what I was up to.

8   Then we proceeded to discuss the purpose of my

9   visit.

10       Q.   And what did you say to him on that

11  subject and what did he say to you?

12       A.   I mentioned Mr. Egiazaryan's name and

13  that is what was the purpose of my visit, and Mr.

14  Ponomarev from the very beginning showed very

15  acute understanding or impression of Mr.

16  Egiazaryan.  The very moment I mentioned the name

17  I was assured that he was very much in the loop.

18       Q.   What did he say or do to give you

19  that impression?

20       A.   I remember a very visible grimace, a

21  wince, when he heard the name, and I think he

22  proceeded to say that great corruptioner, if

23  there is a word like that, corrupsenia, some

24  derogatory terms about the fellow.

25       Q.   He didn't say he was an anti-Semite,

0156

1                    Zalmayev

2    did he?

3         A.   No, that is not what he said at

4    first.

5         Q.   What about Ms. Gannushkina, did she

6    say he was an anti-Semite?

7         A.   There was discussion of anti-Semitism

8    I believe in both conversations.  Mr. Egiazaryan

9    being an anti-Semite, I don't think that phrase

10   was uttered.  That was not the formula we used.

11        Q.   Did Ms. Gannushkina express to you

12   her view that Mr. Egiazaryan was an anti-Semite?

13        A.   I don't believe I said that to her,

14   and I don't believe she said that to me either.

15   Once again we did not make that link in the

16   conversation.

17        Q.   So after wincing at the name of Mr.

18   Egiazaryan, please tell me about the rest of the

19   discussion.

20        A.   He immediately brought up the LDPR

21   association.  He said that LDPR member, the

22   runaway, the corrupt one, and he was wincing and

23   he was saying, he kept saying what a bad guy.  He

24   was just saying, I think -- shaking his head and

25   just saying, I think he also demonstrated his

0157

1                     Zalmayev

2    awareness of the fact that Mr. Egiazaryan had

3    fled Russia by then.  So he was aware of this

4    brouhaha.  He was aware.

5           He also, I think he mentioned it in

6    terms of his friendship with Zhirinovsky.

7    Zhirinovsky's name came up, and generally just

8    looking at it, I think from the beginning showed

9    enthusiasm about signing onto the campaign.

10          Q.   Did you present him with a draft

11   letter?

12          A.   Yes.

13          Q.   Did he take it?

14          A.   He took it.

15          Q.   Did he make any edits to it?

16          A.   I gave him the hard copy of the

17   letter.  I also believe I allowed him to download

18   it onto his hard drive.  He told me he would look

19   at it and requested that I return the following

20   day to discuss it further.

21          Q.   And did you?

22          A.   Yes, I did.

23          Q.   Where did that happen?  At his

24   office?

25          A.   Yes.

0158

1                    Zalmayev

2         Q.   What did you say to him and what did

3    he say to you?

4         A.   I showed up the next day.  He said, I

5    looked at it.  I don't see any problems.  I don't

6    read English, but can you just sort of tell me

7    what it is about.  I proceeded to translate it

8    for him verbatim, lest there be any

9    misunderstanding later.

10             He said, I am willing to sign it.

11   Let's do it.  He signed several copies of the

12   letter.  There were five recipients, I believe.

13   He signed all of them.

14        Q.   Now you said that when you arrived

15   and inquired about the letter, Mr. Ponomarev

16   said, I didn't see any problems with the letter

17   or words to that effect, correct?

18        A.   Correct.

19        Q.   How could he have said that if he

20   didn't understand English?

21        A.   My understanding was there was a

22   young secretary, very sophisticated young lady

23   with knowledge of English who was there the first

24   time and the second time who in the meantime

25   conveyed the contents of the letter, so Mr.

0159

1                    Zalmayev

2    Ponomarev had an idea of what the letter was

3    about.

4         Q.    Do you remember the young lady's

5    name?

6         A.    No, I don't.

7         Q.    If the young lady read it to Mr.

8    Ponomarev, why was it necessary for you to

9    translate it?

10        A.    Because he wanted to discuss it

11   further, and I'm not sure that she -- I'm not

12   sure the extent to which they discussed it.  He

13   looked at it, and I volunteered, and I had said,

14   here, Lev, let me read it to you, let's go

15   through it, and that is what I did.

16        Q.    Did he ask for payment?

17        A.    No.

18        Q.    Did he ever ask for payment?

19        A.    No.

20        Q.    Did you ever pay Mr. Ponomarev

21   $3,000?

22        A.    I paid him $2,000, not three.

23        Q.    Do you know why Mr. Akhmetshin would

24   have said that you paid him $3,000?

25        A.    That was the discussion we had, and

0162

1                    Zalmayev

2         MR. GOLDEN:  Objection to the form.

3         MR. LUPKIN:  Withdrawn.

4    Q.   What led you to the conclusion to put

5    down in your budget a line item for paying Mr.

6    Ponomarev?

7    A.   Can you repeat that.

8    Q.   Yes.  What led you to put down as a

9    line item on your budget $3,000 to Mr. Ponomarev?

10   A.   May I clarify the question again?

11   Q.   Sure.

12   A.   You mean 3,000 as opposed to two that

13   was eventually paid or just any money at all?

14   Q.   Well, let's start with any money at

15   all.  What led you to believe that you were going

16   to need to pay Mr. Ponomarev money?

17   A.   Once again, let me be very clear on

18   this.  It was not a matter of need.  Something I

19   had to do.  Something that was good form, good

20   form, good custom in Russia to thank someone.  It

21   was a gratitude, and I felt like for his time the

22   fact that he bothered to meet with me, take time

23   out of his very busy schedule, we are talking of

24   a very prominent individual here.  I would

25   compensate him.  Do something nice.

0163

1                    Zalmayev

2        Q.   What made you change from 3,000 to

3   2,000?

4        A.   Once again I thought that 2,000 was

5   sufficient, and I also realized there may be

6   other people as well for me to thank, so I wanted

7   to be economical.

8        Q.   Did you think about making a donation

9   to his organization?

10       A.   To my mind, this was akin to that.

11  Money to Mr. Ponomarev in his office was akin to

12  making a contribution to not just him or the

13  organization but the very cause and the very

14  cause that he stood for and represented in my

15  mind.

16       Q.   But you paid him $2,000 in cash that

17  was held in an envelope, right?

18       A.   Exactly.

19       Q.   When you gave it to him, what did you

20  say to him?

21       A.   I said, here, I just wanted to thank

22  you.

23       Q.   You didn't say I want you to use this

24  towards your organization, did you?

25       A.   I did not say that, no.

0164

1                     Zalmayev

2        Q.   You didn't say anything about what

3   you would wish to have done with the $2,000,

4   correct?

5        A.   Correct.

6        Q.   What did Mr. Ponomarev say to you

7   when you handed him the two grand?

8        A.   I think he smiled shyly.  He thanked

9   me and proceeded to throw the envelope in one of

10  his desk drawers and slammed it shut.

11       Q.   With the money in it?

12       A.   Exactly.

13       Q.   Do you know why he shoved it into his

14  desk drawer and then slam the drawer?

15            MR. GOLDEN:  Objection to the form.

16       Q.   Sure.  Why did he throw the envelope

17  into one of his desk drawers and then slam it

18  shut?

19       A.   It was done in a way to denote

20  certain -- it was part of a polite ritual.  When

21  you thank someone, the other person just is shy

22  about it, and it is like, oh, you didn't have to

23  kind of gesture or you didn't have to, so it

24  wasn't really anything above and beyond just a

25  kind of ritual of politeness.

0165

1                    Zalmayev

2        Q.   Did he count the money in front of

3   you?

4        A.   No.

5        Q.   Do you remember anything else about

6   your meeting with Mr. Ponomarev other than what

7   you just told me?

8        A.   I do.  After that, he expressed his

9   fervent desire to pay a visit to the United

10  States in the near future and see if I could be

11  helpful in setting up speaking engagements,

12  opportunities for speaking engagements for Mr.

13  Ponomarev at various universities including

14  Columbia University where I said I could be

15  helpful, I am a graduate and I know people, and I

16  have done that routinely for colleagues, and I

17  think it was a general promise to stay in touch.

18       Q.   And did you?

19       A.   Did I stay in touch?

20       Q.   Yes.

21       A.   Did we talk after that?  Yes, we did.

22       Q.   Other than you and Mr. Ponomarev, was

23  anybody else present at any of those two

24  meetings?

25       A.   There were several staff members.  I

0166

```
 1                    Zalmayev
 2   would say when I came in, there were maybe six or
 3   seven staff members who were coming in and out.
 4   His secretary was there most of the time.  She
 5   may -- I don't remember if she was there the
 6   second time, I think she may have been, but there
 7   were several men and women shuttling back and
 8   forth.
 9        Q.   Did Mr. Ponomarev have his own
10   private office?
11        A.   He had a room in his office.
12   Correct.  Yes.
13        Q.   And that is where you met with him?
14        A.   That is where I met with him.
15        Q.   When you met with him, did anybody
16   come in or out of that room other than you and
17   Mr. Ponomarev?
18        A.   Like I said, there was free movement
19   of his secretary was there and some other
20   staffers were coming in and out.
21        Q.   Was anybody present when you handed
22   him the $2,000 in the envelope?
23        A.   There may have been his secretary
24   sitting slightly to the left of me at the
25   computer.  She may have been.  I don't exactly
```

0167

1                    Zalmayev

2   remember.

3        Q.   Were you able to tell whether or not

4   she was aware of the fact that you were handing

5   over $2,000 in an envelope?

6        A.   That did not matter to me.

7        Q.   By the way, why didn't you give him a

8   check?

9        A.   You don't do that in Russia.  You

10   don't give people checks.  I don't even know how

11   it would work, giving a check from an American

12   bank to someone in Russia.  It is not done.

13        Q.   And did anybody accompany you to your

14   meeting with Mr. Ponomarev?

15        A.   No.

16        Q.   At either of the meetings, correct?

17        A.   Correct.

18        Q.   Now you testified that you didn't

19   thank Mrs. Gannushkina with any cash, right?

20        A.   Correct.

21        Q.   Why was Mr. Ponomarev so lucky as to

22   get the $2,000?

23             MR. GOLDEN:  Objection to the form.

24             MR. LUPKIN:  Withdrawn.

25        Q.   Why was Mr. Ponomarev the recipient

0169

1                    Zalmayev

2  pay Ms. Gannushkina as a thank you?

3       A.   I could have, yes.

4       Q.   But you didn't?

5       A.   I didn't.

6       Q.   Why not?

7       A.   I didn't feel it was necessary.  I

8  didn't think it was that sort of opportunity or

9  occasion.

10       Q.   Do you remember anything else about

11  your meetings with Mr. Ponomarev other than what

12  you just testified to?

13       A.   Those two meetings, as far as

14  physical meetings, those two meetings.  That is

15  it.

16       Q.   How about Ms. Alekseeva?  You met

17  with her one time, right?

18       A.   On Mr. Egiazaryan's matter, yes,

19  once.

20       Q.   During this trip?

21       A.   Yes.

22       Q.   And where did you meet with her?

23       A.   At her apartment.

24       Q.   Where is that?

25       A.   That is in Arbat Street.

0170

1                      Zalmayev

2          Q.   In Moscow?

3          A.   Central Moscow, yes.

4          Q.   What did you say to her, and what did

5    she say to you?

6          A.   We met, did some catching up.  She

7    informed me of her trip the following day to

8    Herrenberg.  That is a regional center in Russia

9    where she was attending a major human rights

10   conference with other Russian NGOs, so she was

11   flying the next day she told me.

12              She generally brought me up to date

13   on the activities of her organization, her state

14   of health.  We reminisced about the good old

15   times we had at that apartment.  I had been a

16   visitor there several times before including back

17   in the year 2001 during the twenty-fifth

18   anniversary of Moscow Helsinki Group.  We talked

19   about people we knew in common, this and that,

20   after which I proceeded to describe to her the

21   particulars of the campaign.

22         Q.   Did Ms. Alekseeva express -- manifest

23   knowledge of Mr. Egiazaryan to you during that

24   meeting?

25         A.   Yes.

0171

1                    Zalmayev

2        Q.   In what way?

3        A.   In a way similar to my previous

4   encounter with Mr. Ponomarev in a kind of

5   negative way.  She had an idea this gentleman was

6   a member of LDPR.  LDPR came up repeatedly, and

7   once again visible, visible disgust on her face

8   once the matter of LDPR came up, the name, and

9   when I said Egiazaryan, she said, her prompt was,

10  you mean that LDPR fellow?  I said yes.  So that

11  was the initial exchange.

12       Q.   Did you discuss anti-Semitism with

13  her in connection with Mr. Egiazaryan?

14       A.   Anti-Semitism did come up in

15  connection with LDPR.  Not exactly in connection

16  with Mr. Egiazaryan, no.

17       Q.   Did she ever say to you in words or

18  substance, Mr. Egiazaryan is an anti-Semite?

19       A.   No.

20       Q.   So, after this initial introduction

21  to the Egiazaryan subject, tell me what else

22  happened during that meeting.

23       A.   I proceeded to describe to her the

24  particulars of the campaign.  I mentioned the no

25  entry list initiative by Senator Cardin.  She

0172

1                    Zalmayev

2    mentioned her enduring friendship with several of

3    the recipients of the letters including Mr.

4    Cardin and Christopher Smith, a congressman from

5    New Jersey.  She said they were upstanding

6    fellows.

7             She remembered very fondly all the

8    times that she was engaged with them, and I think

9    when I showed her, then when I produced the

10   letters, I said, Ms. Alekseeva, here are some

11   letters I prepared on this issue, would you be

12   willing to sign.

13            When she saw the names of Mr. Smith

14   and Cardin, she said, these are my friends.  They

15   will listen to me.  Then she read them very

16   carefully, and her English is quite impressive.

17   I know she is very fluent in English.  She read

18   it carefully.  She took about ten minutes to read

19   through the letter, and shortly afterwards she

20   grabbed a pen and signed them.

21        Q.   Right in front of you?

22        A.   Right in front of me.

23        Q.   By the way, did you tell Mr.

24   Ponomarev that you were working on behalf of a

25   client?

0211

1                    Zalmayev

2   found the evidence, no.

3        Q.   Isn't it true, sir, that during the

4   course of all your research, you couldn't find --

5   withdrawn.  Isn't it true that you couldn't say

6   with certainty anything about Mr. Egiazaryan's

7   Chechen record?

8             MR. GOLDEN:  Objection to the form.

9        A.   No, it is not true.  I was able to

10  say that Mr. Egiazaryan, A, initiated the

11  founding of the commission and was one of its

12  leaders, B, that the commission was murky, and

13  there were serious allegations as a matter of

14  public knowledge of its inactivity or wrongful

15  inactivity in Chechnya, and C, that as such, Mr.

16  Egiazaryan shared in some of its complicity and

17  responsibility.

18       Q.   But you could not establish with

19  certainty that Mr. Egiazaryan shared in the

20  complicity, correct?

21            MR. GOLDEN:  Objection to the form.

22       A.   As one of the leaders and a founder

23  of this commission, yes.  He was associated with

24  the commission, and therefore in my opinion and

25  view he was associated with whatever the

0212

1                    Zalmayev

2    commission was known for and its results, the

3    results of its work, whatever allegations were

4    made against it.

5         Q.   But you were never able to

6    substantiate those allegations, right?

7         A.   My substantiation was scores of media

8    reports that I familiarized with while doing my

9    research on this subject.

10        Q.   Other than media reports, what did

11   you look at to establish the accuracy of the

12   allegations that you are talking about here?

13             MR. GOLDEN:  Objection to the form.

14        A.   The media reports were a substantial

15   first step that gave me a good idea of what I was

16   dealing with.  I also spoke with some of my NGO

17   colleagues including some of the people that you

18   saw on that list who we just discussed who

19   corroborated the impression of that body being

20   completely inactive, completely inept and

21   completely counterproductive.  The body that

22   didn't really do what it was asked to do.

23        Q.   Did you come up with any credible

24   evidence that Mr. Egiazaryan was complicit in

25   embezzling Chechen funds?

0264

1                    Zalmayev

2      Q.   Anyone else?

3      A.   No.

4      Q.   How long did you meet with them?

5      A.   I would say about 30 to 40 minutes

6  the meeting lasted.

7      Q.   Tell me what it is you said to them

8  and what it is they said to you.

9      A.   I described to them the campaign I

10  was leading.  They asked me questions about the

11  campaign.  We also talked about the general state

12  of human rights in Russia, human rights in

13  Chechnya specifically.

14      Q.   Did you tell Mr. Patton that you were

15  working on behalf of a client?

16      A.   That was not an issue that was

17  discussed.  No.

18      Q.   You didn't tell him that you were

19  being paid for your work here, right?

20      A.   I did not say that, no.

21      Q.   You didn't say that to Ms. Asoyan

22  either, right?

23      A.   No.

24      Q.   During the course of your discussion

25  about what you have been calling the campaign,

0289

1                    Zalmayev

2        Q.   Yes.

3        A.   As I said, I have never had to pay

4   him.  I've never paid him.

5        Q.   What is the total amount of legal

6   fees paid to Mr. Golden on your behalf to date?

7        A.   I don't have the total figure for

8   you.  I can't tell you.

9        Q.   Do you know how much -- withdrawn.

10  Do you know whether Mr. Ryan's firm is being paid

11  for his representation of you?

12       A.   I don't know that.

13       Q.   How about Mr. Markaryan's firm?

14       A.   I don't know that.

15       Q.   How about the London firm?

16       A.   I don't know.

17       Q.   How about Mr. Muranov's firm?

18       A.   I don't know that.

19       Q.   Are you being paid for the time you

20  spend defending this litigation by anybody?

21       A.   As I mentioned to you, the three

22  payments includes some of my compensation for my

23  time.

24       Q.   When you say the three payments, you

25  are talking about the total of $100,000 that you

334

1

2      UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
3      -------------------------------------

4      ASHOT EGIAZARYAN,

5                    Plaintiff,

6              -against-    Case No.
                            1:11-cv-02670
7                           (PKC)
       PETER ZALMAYEV,       Volume 2
8

9                    Defendant.

10     -------------------------------------

11                   March 28, 2012
                     10:08 a.m.
12
                     VOLUME II
13

14          Videotaped deposition of PETER ZALMAYEV,

15     taken by Plaintiff, pursuant to Notice, held at

16     the offices of Flemming Zulack Williamson

17     Zauderer, LLP, One Liberty Plaza, New York, New

18     York, before Joseph R. Danyo, a Shorthand

19     Reporter and Notary Public within and for the

20     State of New York.

21

22     HUDSON REPORTING & VIDEO, INC.

23     124 West 30th Street, 2nd Fl.

24     New York, New York 10001

25     Tel: 212-273-9911  Fax: 212-273-9915

335

```
 1
 2        A P P E A R A N C E S :
 3
           FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
 4            Attorneys for Plaintiff
              One Liberty Plaza
 5            New York, New York 10006-1404
 6        By:  JASON T. COHEN, ESQ.
                 JONATHAN D. LUPKIN, ESQ.
 7               MARK ZAUDERER, ESQ.
 8                    -and-
 9         MONCKTON CHAMBERS
             1 & 2 Raymond Buildings
10            Gray's Inn
              London WC1R 5NR
11
           By:  DREW HOLINER, ESQ.
12
13
           HAMBURG & GOLDEN, P.C.
14            Attorneys for Defendant
              1601 Market Street
15            Suite 3310
              Philadelphia, Pennsylvania 19103-1443
16
           By:  JAMES P. GOLDEN, ESQ.
17
                      -and-
18
           SALISBURY & RYAN LLP
19            1325 Avenue of the Americas
              Seventh Floor
20            New York, New York 10019-6026
21        By:  ANDREW J. RYAN, ESQ.
22
23     Also Present:
24         HENRY MARTE,
             Videographer
25                    o O o
```

336

1

2                    STIPULATIONS

3          IT IS HEREBY STIPULATED AND AGREED, by and

4     among counsel for the respective parties hereto,

5     that the filing, sealing and certification of the

6     within deposition shall be and the same are

7     hereby waived;

8          IT IS FURTHER STIPULATED AND AGREED that all

9     objections, except as to form of the question,

10    shall be reserved to the time of the trial;

11         IT IS FURTHER STIPULATED AND AGREED that the

12    within deposition may be signed before any Notary

13    Public with the same force and effect as if

14    signed and sworn to before the Court.

15

16                    *      *      *

17

18

19

20

21

22

23

24

25

337

```
 1                    P. Zalmayev
 2     P E T E R      Z A L M A Y E V,
 3         the Witness herein, having first been duly
 4         sworn by the Notary Public, was examined and
 5         testified as follows:
 6              THE VIDEOGRAPHER:   This marks the
 7         beginning of videotape number 1, volume 2
 8         of the videotaped deposition of Mr. Peter
 9         Zalmayev on March 28, 2012 at
10         approximately 10:08 a.m.
11              Counsel, you may proceed.
12              MR. LUPKIN:  Thank you.
13     EXAMINATION BY
14     MR. LUPKIN:
15         Q.   Good morning, Mr. Zalmayev.
16         A.   Good morning.
17         Q.   We will try to follow the same rules
18     and guidelines we followed yesterday.   Allow me
19     to finish my question before you give your answer
20     and vice versa.   O.K.?
21         A.   Okay.
22         Q.   And you understand, sir, that you are
23     still testifying under oath here today?
24         A.   Yes.
25         Q.   Now yesterday, when we spoke, you
```

359

```
 1                    P. Zalmayev
 2      document.
 3           Q.   So Mr. Rubin, Joel Rubin --
 4           A.   Yes.
 5           Q.   -- wanted to get Mr. Egiazaryan's
 6      side of the story, right?
 7           A.   Correct.
 8           Q.   Because he is a responsible
 9      journalist?
10                MR. GOLDEN:  Objection.
11           Q.   Do you know whether or not Mr. Rubin
12      is a responsible journalist?
13           A.   I would have no reason to doubt that
14      he is not.
15           Q.   You never looked to get Mr.
16      Egiazaryan's side of the story, did you?
17           A.   I did not.
18           Q.   You didn't reach out to any of his
19      lawyers to get his side of the story, did you?
20           A.   I'm not a lawyer.  I am sorry.  I'm
21      not a journalist; so, no, I didn't feel like I
22      needed to abide by that standard.  No, I did not.
23           Q.   Whether you felt you needed to abide
24      by it or not, you didn't do it?
25           A.   I did not do it.  No.
```

362

1               P. Zalmayev

2     I could, and I in turn also wanted to see if I

3     could.

4          Q.   By the way, weren't you interested in

5     what Mr. Egiazaryan's side of the story was?

6          A.   No, I wasn't.

7          Q.   Let me ask you to take a look at what

8     has been previously marked at this deposition --

9     by the way, before we do that, do you know who

10    conducted this surveillance that is reflected in

11    Exhibit 225?

12         A.   I believe I answered that question.

13    I'm not aware.

14         Q.   Have you ever heard of the name

15    Lawrence or Larry Weist?

16         A.   Larry Weist.   Larry Weist.   I

17    believe I do have a vague recollection of that

18    name.   Yes, I do.

19         Q.   How do you know that name?

20         A.   I believe I may have seen a document

21    having to do with some legal action taking place

22    in California at some point before the

23    commencement of my project when Mr. Weist was, I

24    believe there was his testimony, and I believe

25    somewhere in that testimony this document may

378

1                    P. Zalmayev

2    salary from, you worked on the Kazhegeldin case,

3    correct?

4         A.   As part of my duties working for the

5    International League For Human Rights, yes.

6         Q.   The next sentence says, "Our message

7    is and will continue to remain simply:  There is

8    no place for people of A's character and past in

9    the United States."

10             Did I read that accurately?

11        A.   Yes, you did.

12        Q.   Does that sentence accurately reflect

13   the goal of this campaign to get Mr. Egiazaryan

14   out of the United States?

15        A.   Yes, it was definitely a goal of the

16   campaign.

17        Q.   It was the goal of the campaign, was

18   it not?

19        A.   It was a major goal, yes.

20        Q.   Let me ask you to look at the next

21   document.   This is PZ 000992 to 993.

22             (Whereupon, Plaintiff's Exhibit 229,

23             document bearing Bates designation PZ

24             000992 to 993 was hereby marked for

25             identification, as of this date.)

419

```
1                    P. Zalmayev
2         Q.   This was the article that you
3    drafted, right, for Mr. Komarovsky?
4         A.   I drafted it largely with his input.
5    We discussed it before he finally published it.
6    Yes.
7         Q.   You drafted it, right?
8         A.   I helped draft it, yes.
9         Q.   You primarily drafted it, didn't you?
10        A.   I primarily drafted it, correct.
11        Q.   The article "No Safe Haven for
12   Hate-Mongers" that ultimately -- withdrawn --
13   start again.
14             And the article, "U.S. Must Get Real
15   on Anti-Semitism and Xenophobia No Safe Haven for
16   Hate-Mongers," when the final version of that
17   article came out in the Moscow Times -- I just
18   lost my train of thought.  Bear with me.  All
19   right.
20             Do you know why Mr. Akhmetshin is
21   forwarding a draft of the "No Safe Haven for
22   Hate-Mongers" article that you primarily drafted
23   to Mr. Greg Hitt?
24        A.   I do not.
25        Q.   As the primary draftsman of this
```

550

1                    P. Zalmayev

2    are ways in which parties can alter the order in

3    which search results come up in response to a

4    Google search?

5         A.   I have been told from various sources

6    I had an idea that that could be something that

7    is possible.   Yes.

8         Q.   In fact, you considered doing just

9    that in connection with the Egiazaryan campaign.

10   Isn't that right?

11        A.   I am sorry.   Doing just what?

12        Q.   Altering the order of search results

13   on Google.

14        A.   There were a number of pieces that I

15   thought were generated by Mr. Egiazaryan and his

16   team that were up in the top of it.   Yes.

17        Q.   And you wanted to get that

18   information that was generated by Mr. Egiazaryan

19   and his team lower on the search results, right?

20        A.   Yes, I prefer to see it much lower in

21   the results, correct.

22        Q.   The reason you wanted to see it much

23   lower is because it would increase the likelihood

24   someone wouldn't notice it, right?

25        A.   It is because I did not want that

551

                    P. Zalmayev

1

2      person searching for my name to see that in that

3      primarily and nothing but that, of course, yes.

4           Q.   So I am correct, right?

5                MR. GOLDEN:  Objection to the form.

6           A.   I just stated my preference.

7           Q.   But if -- withdrawn.

8                Did you in fact explore ways to lower

9      -- withdrawn.

10               Did you explore ways with Mr.

11     Akhmetshin to alter the order of search results

12     on Google in connection with the Egiazaryan

13     campaign?

14               MR. GOLDEN:  Objection.  I think the

15               two of you are talking about two slightly

16               different things.

17          Q.   Let me see what the witness has to

18     say.  You can answer it.

19          A.   That was an issue that came up in my

20     conversation, yes.

21          Q.   Did there come a time when you had

22     asked Mr. Akhmetshin to see whether he could

23     effectuate an alteration of Google result order?

24          A.   I believe so.

25          Q.   Let's take a look at this.   PZ

554

1                    P. Zalmayev

2    this case.  Isn't that right?

3         A.  No.

4         Q.  I am correct, right?

5         A.  You are correct.

6         Q.  So, if you hadn't yet been served

7    with a complaint, where were you looking to push

8    that shit down in the search results about?

9         A.  Once again I have a very vague

10   recollection about that, but it may have been

11   some media reports in the Russian media that were

12   to my mind spreading erroneous information about

13   me and the information such as EDI.

14        Q.  What kind of erroneous information?

15        A.  There may have been information.

16   There may have been just basic allegations.  I'm

17   not sure if it had to do with, I believe it had

18   to do with Mr. Egiazaryan and his backers and

19   their attempts to paint the entire campaign, my

20   campaign in specific, with a quite broad brush

21   stroke.  You know, and to paint it into

22   something that would be coming from various

23   political forces and interests that I had no

24   relation to.

25        Q.  Take a look at this next e-mail, PZ

561

P. Zalmayev

1      Q.   Now did you ever visit that website?

2      A.   I believe so.

3      Q.   And that website -- withdrawn.

4           Do you know who created that website

5    for Mr. Egiazaryan?

6      A.   No.

7      Q.   Do you know that Mr. Egiazaryan

8    played a role in setting up that website?

9      A.   I don't know that.

10     Q.   Are you aware of the fact that Mr.

11   Egiazaryan set up a website?

12     A.   My understanding was there was a

13   website that was working to spread information

14   that was favorable to Mr. Egiazaryan's image,

15   yes.

16     Q.   And you didn't want anything on that

17   site to come up at the top of any ranking.

18   Isn't that right?

19     A.   I wanted the articles from the

20   website, from that website lowered.   That's

21   correct.

22     Q.   By wanting it lowered, it was your

23   hope that fewer people would look at it, right?

24     A.   I did not want it to be the primary

562

1              P. Zalmayev

2    source of information about EDI or me.

3         Q.   You didn't talk about lowering

4    anything on the Ashot-Egiazaryan.com website

5    relating only to you.   Here you wrote that as

6    far as you were concerned you wanted all articles

7    on his site lowered.   Isn't that right?

8         A.   I can tell you about my intent here.

9         Q.   I don't want to know about your

10   intent.   I want to know what you wrote.

11             MR. GOLDEN: Objection.   Please

12        finish your answer.

13        A.   Yes.   It says here once again I can

14   translate.   I will not dispute what I said here.

15   What it says here.   With respect to A, capital

16   letter A, lower all articles from his website.

17   Then there is the URL, and then in particular and

18   then there is a list of two links that I refer to

19   here.   Right.

20        Q.   After those two links, there is

21   another Russian language phrase.   Can you

22   translate that, please.

23        A.   And also to move up the following.

24        Q.   So you wanted to move up in the

25   Google ratings your Jewish Journal article Hiding

570

1                    P. Zalmayev

2    buy that newspaper.

3         Q.   I want to go back to Glen Beck for a

4    moment.  Isn't it true that Glen Beck is known

5    as a conspiracy theorist?

6         A.   Glen Beck is known to be a

7    provocateur of sorts, yes.

8         Q.   And a conspiracy theorist, right?

9         A.   I believe he was someone who never

10   really was shy of controversy.  I am sure he may

11   have spread some ideas to indicate that he

12   believed in certain conspiracies.  Yes.

13        Q.   Can you please mark the next document

14   PZ 001270 through 1272.

15            (Whereupon, Plaintiff's Exhibit 245,

16            document bearing Bates designation PZ

17            001270 through 1272 was hereby marked for

18            identification, as of this date.)

19        Q.   Can you take a look at that document,

20   sir, and can you just confirm for me that this is

21   the no U.S. -- this is the No Safe U.S. Haven for

22   Hate-Mongers article that appears under Leonid

23   Komarovsky's bylines in the Moscow Times on March

24   14, 2011?

25        A.   Yes.

571

1                    P. Zalmayev

2          Q.   This is the one that you had a

3     primary drafting responsibility for, correct?

4          A.   Correct.

5          Q.   This is one of the articles that is

6     the subject matter of the complaint in this case,

7     right?

8          A.   Yes.

9          Q.   Take a look at this please.   The

10    next exhibit.

11               (Whereupon, Plaintiff's Exhibit 246,

12               document bearing Bates designation PZ

13               000980 was hereby marked for

14               identification, as of this date.)

15         Q.   Can you please take a look at Exhibit

16    246 which bears Bates designation PZ 000980.

17         A.   Yes.

18         Q.   Is this a check cut on the Eurasia

19    Democracy Initiative bank account to Leonid

20    Komarovsky for $7,000?

21         A.   Correct.

22         Q.   This was the $7,000 payment made to

23    Mr. Komarovsky in connection with the

24    anti-Egiazaryan campaign that you were leading,

25    correct?

579

1                    P. Zalmayev

2      Ilya.  No.

3            Q.   Did you identify yourself as Peter

4      Zalmayev?

5            A.   No.

6            Q.   Who did you identify yourself as?

7            A.   I am trying to remember.   It may

8      have been a Paul, a perverted Russian version.

9      I don't remember the exact name.   It was not

10     Peter Zalmayev.

11           Q.   Why didn't you identify yourself as

12     Peter Zalmayev?

13           A.   I did not want -- I wanted to remain

14     kind of anonymous.

15           Q.   Isn't it true that you wanted to give

16     the impression that there were other people

17     concerned about the Egiazaryan matter other than

18     Peter Zalmayev?

19           A.   I wanted to just jump-start the

20     conversation on his show as it was requested of

21     me by Mr. Komarovsky.

22           Q.   You could have done that by

23     identifying yourself as Peter Zalmayev, right?

24           A.   I could have as well, yes.

25           Q.   But you used a pseudonym, isn't that

589

1                    P. Zalmayev

2          A.   I'm not aware of another number that

3    he uses, no.

4          Q.   Do you know Douglas Bloomfield's

5    telephone number?

6          A.   Not by heart.

7          Q.   Do you have that information on you?

8          A.   I believe so.

9          Q.   Can you tell me what numbers he uses.

10         A.   I have the following number as

11   indicated marked as his mobile as 301-346-2707,

12   and I have another number that says here marked

13   as work number.   301-460-3285.

14         Q.   Is that it?

15         A.   Yes.

16         Q.   Let me ask you to look at what was

17   previously marked as Exhibit 7.   Do you

18   recognize this document?

19         A.   Yes, I do.

20         Q.   What is it?

21         A.   It is a group letter signed by a

22   representative of Freedom House, American Jewish

23   committee and national council on Soviet Jewry

24   and addressed to Secretary Janet Napolitano.

25         Q.   You played a principal role in

590

1                            P. Zalmayev

2      drafting this, did you not?

3              A.    I did.

4              Q.    This was the version that ultimately

5      went out to Secretary Napolitano, correct?

6              A.    I believe it did, yes.

7              Q.    Your name doesn't appear anywhere on

8      here, right?

9              A.    No, it doesn't.

10             Q.    Isn't it true that earlier drafts of

11     this letter contained the letterhead for Eurasia

12     Democracy Initiative?

13             A.    Yes, they did.

14             Q.    And it didn't appear on the final,

15     right?

16             A.    I don't think it did, no.

17             Q.    Why not?

18             A.    It was decided, I spoke with Doug in

19     particular I remember that I remember also having

20     a conversation with Mr. Akhmetshin.   I was

21     conferring.   It was decided that EDI was not

22     serious enough to warrant that sort of inclusion

23     compared to these large and very old

24     organizations.   It was just not the same degree

25     of prominence, and I was afraid that EDI's

593

                    P. Zalmayev

1

2    again?

3         Q.   Sure.

4         A.   Freedom House, American Jewish

5    Committee and the National Council on Soviet

6    Jewry and this time it is addressed to the

7    Honorable Hannah Rosenthal.

8         Q.   Who is she?

9         A.   She is the special envoy at the state

10   department on the issue of anti-Semitism.   That

11   is not her correct title.   Office to monitor and

12   combat anti-Semitism.

13        Q.   And you were a principal draftsman of

14   this document, right?

15        A.   It is the same document, so, yes.

16        Q.   You created this letterhead, right?

17        A.   Correct.

18        Q.   Now I don't remember whether I asked

19   you this or not and if I did please forgive me.

20   Did you tell Sam Patton that you were working on

21   behalf of a client for money?

22        A.   Those are two different questions.

23        Q.   Let me ask you first.   Did you tell

24   Sam Patton that in connection with this

25   anti-Egiazaryan campaign you were working on

594

1                       P. Zalmayev

2       behalf of a client, right?

3           A.   I don't recall saying that to him

4       specifically.

5           Q.   You didn't tell him you were being

6       paid, right?

7           A.   No.

8           Q.   Same questions for Mr. Kliger.   Did

9       you tell Mr. Kliger that you were working on

10      behalf of a client?

11          A.   No.

12          Q.   Did you tell him you were being paid

13      for your work in connection with the

14      anti-Egiazaryan campaign?

15          A.   No, I don't remember saying that to

16      him.

17          Q.   Do you remember -- the same questions

18      for Lesley Weiss.   Did you tell Lesley Weiss

19      that you were working on behalf of a client with

20      respect to this anti-Egiazaryan campaign that you

21      were leading?

22          A.   No.

23          Q.   Did you tell her that you were being

24      paid for your work?

25          A.   No.

595

1                    P. Zalmayev

2          Q.   Same questions with respect to Mark

3     Levin.   Did you tell Mark Levin that you were

4     being paid for your work on the anti-Egiazaryan

5     campaign that you were leading?

6          A.   No.

7          Q.   Did you tell Mark Levin that the

8     anti-Egiazaryan campaign that you were leading

9     was on behalf of a client?

10          A.   No.

11          Q.   Let me ask you to take a look at the

12     next document.   This one bears Bates designation

13     PZ 001430 and runs through PZ 001457.

14                    (Whereupon, Plaintiff's Exhibit 250,

15               document bearing Bates designation PZ

16               001430 and runs through PZ 001457 was

17               hereby marked for identification, as of

18               this date.)

19          Q.   Have you ever seen this document

20     before?

21          A.   Yes, I do recall seeing this

22     document.

23          Q.   Did you create this document?

24          A.   No.

25          Q.   Do you know who did?