UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ASHOT EGIAZARYAN,                                           :

                    Plaintiff,          : REPORT AND RECOMMENDATION

    -v.-                                                   :
                                   11 Civ. 2670 (PKC) (GWG)
                                   :

PETER ZALMAYEV,                                             :

                  Defendant.          :
---------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Ashot Egiazaryan brought this action for defamation and injurious falsehood

against Peter Zalmayev.  Zalmayev counterclaimed for defamation and violation of New York

Civil Rights Law §§ 70-a and 76-a, which permit a victim of what are commonly called

"strategic lawsuits against public participation," or "SLAPP" suits, to make a claim for

attorney's fees, costs, and damages.  All claims and counterclaims have been dismissed except

for Zalmayev's anti-SLAPP counterclaim.  Before the Court are the parties' motions for

summary judgment on that counterclaim.  For the following reasons, the counterclaim should be

dismissed.

I.  BACKGROUND

      A.  Procedural History

      Egiazaryan brought this action asserting claims of defamation and injurious falsehood.

See Complaint, filed April 19, 2011 (Docket # 1).  Zalmayev moved to dismiss Egiazaryan's

complaint for failure to state a claim.  See Motion to Dismiss, filed June 21, 2011 (Docket # 15).

He also filed counterclaims, alleging that Egiazaryan defamed him and that Egiazaryan's suit

was a SLAPP suit.  See Answer and Counterclaim, filed Aug. 5, 2011 (Docket # 26) ("Answer"

or "Counterclaim").  Following a cross-motion by Egiazaryan to dismiss Zalmayev's

counterclaims, Judge Castel dismissed Egiazaryan's injurious falsehood claim and three of the

defamation claims.  Egiazaryan v. Zalmayev, 2011 WL 6097136, at *6-9 (S.D.N.Y. Dec. 7,

2011) ("Egiazaryan I").  He granted Egiazaryan's motion to dismiss Zalmayev's defamation

counterclaim but denied his motion to dismiss the anti-SLAPP counterclaim.  Id. at *9, 10-12.

Following this decision, Egiazaryan filed an amended complaint, which we will refer to

as "the complaint."  See Amended Complaint, filed Feb. 29, 2012 (Docket # 110) ("Compl.").

The complaint omitted the injurious falsehood claim but asserted the same four defamation

claims contained in the original complaint.  Id.  After Zalmayev moved to dismiss, Judge Castel

granted the motion as to all four defamation claims and denied leave to further amend.

Egiazaryan v. Zalmayev, 880 F. Supp. 2d 494, 507-13 (S.D.N.Y. 2012) ("Egiazaryan II").

Following this decision, all that remained was Zalmayev's anti-SLAPP counterclaim.  The

parties engaged in discovery on the counterclaim.  Each side has now moved for summary

judgment.[1]

---

[1]  See Notice of Motion by Egiazaryan for Summary Judgment, filed Apr. 19, 2013
(Docket # 221); Memorandum of Law in Support of Egiazaryan's Motion for Summary
Judgment, filed Apr. 19, 2013 (Docket # 222) ("Pl. Mem."); Plaintiff's Statement of Material
Facts Pursuant to Local Rule 56.1, filed Apr. 19, 2013 (Docket # 223); Declaration of Jason T.
Cohen in Support of Egiazaryan's Motion for  Summary Judgment, filed Apr. 19, 2013 (Docket
# 224) ("Cohen Decl."); Notice of Cross-Motion by Zalmayev for Summary Judgment, filed
June 6, 2013 (Docket # 229); Memorandum of Law  in Opposition to Egiazaryan's Motion for
Summary Judgment and Supporting Zalmayev's Cross-Motion for Summary Judgment, filed
June 6, 2013 (Docket # 230) ("Def. Mem."); Declaration of James P. Golden in Support of
Zalmayev's Opposition and Cross-Motion, filed June 6, 2013 (Docket # 231) ("Golden Decl.");
Zalmayev's Statement of Material Facts Pursuant to Local Rule 56.1, filed July 3, 2013 (Docket
# 232) ("Def. 56.1 Stat."); Zalmayev's Response to Egiazaryan's Rule 56.1 Statement, filed June
3, 2013 (Docket # 233) ("Def. 56.1 Response"); Memorandum of Law in Further Support of
Egiazaryan's Motion for Summary Judgment, filed July 3, 2013 (Docket # 235); Declaration of
Jason T. Cohen in Support of Egiazaryan's Motion for Summary Judgment, filed July 3, 2013
(Docket # 236); Egiazaryan's Response to Zalmayev's Rule 56.1 Statement, filed July 3, 2013

B. Facts

The following facts are undisputed unless otherwise noted.

1. Parties

Egiazaryan is a former banker and former member of the Duma, Russia's lower house of parliament.  Answer ¶ 4; Def. 56.1 Stat. ¶ 12.  He was first elected as a member of the Duma in 1999 and continued in that role until 2010, when he left Russia for the United States, although new elections for Duma members were not held until December 2011.  Deposition of Ashot Egiazaryan ("Egiazaryan Dep.") 29, 32 (annexed as Ex. 34 to Golden Decl. and Ex. 44 to Cohen Decl.).  Egiazaryan alleges that he has been engaged in a "complex, international legal dispute resulting from a Russian 'corporate raid' orchestrated by Russian Senator and billionaire Suleyman Kerimov to steal [Egiazaryan's] ownership interest in a project to rebuild and develop the landmark Moskva Hotel."  Compl. ¶ 16.  Egiazaryan also alleges that Kerimov was behind various violent threats leveled against his family and, as a result, he moved to the United States with his family.  Id. ¶ 23.  Once in the United States, Egiazaryan applied for asylum.  See, e.g., Order, dated Mar. 14, 2012 (Docket # 112); Transcript of Conference held Apr. 11, 2012, at 2-21 (Docket # 140).  However, since his arrival in the United States, Egiazaryan believes he has been the victim of a "black (i.e., negative) public relations campaign . . . designed to . . . undermine his chances of remaining in the United States and force him to return to Russia."  Compl. ¶ 27.

_____

(Docket # 237); Memorandum of Law in Further Support of Zalmayev's Cross-Motion for Summary Judgment, filed July 18, 2013 (Docket # 239) ("Def. Reply Mem."); Egiazaryan's Letter Brief in Response to Order of October 8, 2013, filed Oct. 16, 2013 (Docket # 243); Zalmayev's Letter Brief in Response to Order of October 8, 2013, filed Oct. 16, 2013 (Docket # 242); Egiazaryan's Letter Brief in Response to Order of November 4, 2013, filed Nov. 11, 2013 (Docket # 248); Zalmayev's Letter Brief in Response to Order of November 4, 2013 (Docket # 247) ("Def. Nov. 11 Letter").

Zalmayev's counterclaim states that he is the executive director of the New York-based "Eurasia Democracy Initiative," which he founded to "promote democracy, the rule of law and tolerance in post-Communist societies and countries in Eastern and Central Europe, the Caucasus and Central Asia."  Counterclaim at 22, ¶ 5.  He believes that Egiazaryan fled Russia because the Duma voted to eliminate his legislative immunity and because he was indicted in Moscow.  Id. at 28-29, ¶¶ 26, 27, 29.  Zalmayev is "opposed to Mr. Egiazaryan's asylum application and has written and collaborated with others to oppose [his] continued presence in the United States."  Id. at 4, ¶ 18.  In furtherance of this effort, Zalmayev has written or drafted several articles and letters urging the United States to deny Egiazaryan asylum, as has been alleged in the complaint.  Deposition of Peter Zalmayev ("Zalmayev Dep.") 157-59; 171-73; 179-80; 183-84; 225-28; 293-95; 418-22; 589-94 (annexed as Ex. 4 to Cohen Decl. and supplemented Oct. 22, 2013 (Docket # 245)); Compl. ¶¶ 32, 36, 38-51.[2]  Zalmayev concedes that he was paid $100,000 by a person named Andrey Vavilov in connection with these activities, Zalmayev Dep. 277-78; Def. 56.1 Response ¶ 3, and that the objective was to "prevent Egiazaryan from obtaining asylum in the United States," Def. 56.1 Response ¶¶ 3, 7.  More specifically, Zalmayev has admitted that "Andrey Vavilov retained Rinat Akhmetshin, who in turn retained [Zalmayev], to engage in a project the objective of which was to prevent Egiazaryan from obtaining asylum in the United States."  Id. ¶ 8.[3]  Thus, Zalmayev "received

---

[2] Zalmayev uses the word "commentaries" rather than articles.  See, e.g., Counterclaim at 9, ¶ 43; Def. 56.1 Response ¶ 9.b.  The Court's use of the term "articles" has no bearing on the resolution of the motion.

[3] Egiazaryan's complaint describes Akhmetshin as the "Washington, D.C.-based director of the International Institute for Economic and Political Research and a paid political consultant and lobbyist."  Compl. ¶ 9.

the money indirectly from Vavilov, who paid Akhmetshin directly."  Id. ¶ 4.  Zalmayev paid

Leonid Komarovsky, a friend and Boston-based radio host, $7,000 in connection with this

campaign, see Zalmayev Dep. 571-72, and has also retained an individual named Douglas

Bloomfield for this purpose, Def. 56.1 Response ¶ 4.  Bloomfield testified at his deposition that

he was paid $20,000 for his participation.  Deposition of Douglas Bloomfield (annexed as Ex. 3

to Cohen Decl.) 34.  Zalmayev has also testified that "from the very beginning of [his and

Akhmetshin's] engagement on this project, it was clear to [him] that Mr. Vavilov was Mr.

Akhmetshin's paid client who had a grievance against Mr. Egiazaryan."  Zalmayev Dep. 127.

Zalmayev also conceded that "[t]here was a degree of animosity" held by Vavilov toward

Egiazaryan.  Id. at 95.  Akhmetshin testified at his deposition that "Vavilov hates [Egiazaryan's]

guts."  Deposition of Rinat Akhmetshin ("Akhmetshin Dep.") 102 (annexed as Ex. 2 to Cohen

Decl. and supplemented Oct. 22, 2013 (Docket # 244)).  Zalmayev has not personally paid any

of the legal fees in this litigation; instead, his legal fees have been paid by Vavilov.  See Def.

Mem. at 30-31.  As of July 2012, Vavilov had already paid approximately $1,141,441 in legal

fees.  See Defendant's Responses to Plaintiff's Second Set of Interrogatories to Defendant,

Response to Interrogatory No. 1, dated Apr. 17, 2012 (annexed as Ex. 5 to Cohen Decl.)

(identifying Vavilov as the source of payments to Zalmayev's lawyers for "legal work

concerning this case or Mr. Egiazaryan"); Scanned Check Images from Andrey Vavilov to

Zalmayev's Legal Team (annexed as Ex. 46 to Cohen Decl.).  These payments are in addition to

the payments made by Vavilov to Akhmetshin and Zalmayev.  See id.

> 2.  Conduct Giving Rise to Egiazaryan's Claims

On March 9, 2011, the Jewish Journal published an article titled "Hiding in Beverly

Hills" with Zalmayev listed as the author.  See Jewish Journal Article (annexed as Ex. 5 to

Golden Decl. & Ex. 13 to Cohen Decl.); see also Compl. ¶¶ 32, 36, 38-57.  The article described

Egiazaryan as a "fugitive Russian" who had his immunity stripped by the Russian Duma before

becoming the object of a state criminal investigation on charges that he "defrauded business

partners in a multimillion-dollar real estate deal that went south."  Jewish Journal Article at 1.

The article questioned his eligibility for asylum in the United States and described him as a

"prominent financial backer and member of the ultranationalist Liberal Democratic Party of

Russia (LDPR) headed by his friend Vladimir Zhirinovsky."  Id. at 2.  The article states that

Zhirinovsky is "infamous for his outspoken anti-American and anti-Semitic attacks."  Id.  The

article states that "Jewish groups in American [sic] and Russia have repeatedly condemned the

LDPR and its leader as anti-Semitic and have urged Americans, as a form of protest, to avoid

any meetings with members of Zhirinovsky's party who may visit the United States."  Id.  The

article describes the LDPR as the "Zhirinovsky-Egiazaryan party," stating that the party has

"blam[ed] the Jews for sparking both the Bolshevik revolution and World War II, provoking the

Holocaust and masterminding 9/11."  Id.  It concludes by urging the U.S. government to "put

anti-Semites worldwide on notice" with the following admonition: "You are not welcome in this

country."  Id.

   While the precise nature of Zalmayev's contribution is contested, it is undisputed that he

was closely involved with the publication of an article called "No Safe U.S. Haven for

Hatemongers," published on March 14, 2011 in the Moscow Times, with Leonid Komarovsky

listed as the author.  See Moscow Times Article (annexed as Ex. 14 to Cohen Decl.); see also

Compl. ¶¶ 36, 59-76.  Zalmayev testified that he "drafted [the article] largely with

[Komarovsky's] input."  Zalmayev Dep. 419.  This article stated that Egiazaryan threatened the

"rapprochement" between the U.S. and Russia, and that Egiazaryan was a "member of the

notoriously anti-Semitic Liberal Democratic Party."  Ex. 14 to Cohen Decl. at 1.  The article

argued that "[a]s a long-standing member of the [LDPR] and, consequently, its anti-Semitic and

xenophobic agenda," Egiazaryan did not deserve "safe haven" in the United States.  Id.  It stated

that Jewish-American groups have repeatedly condemned "the LDPR's anti-Semitic message"

and questioned why "anti-Semitic bigots like [E]giazaryan" are not banned from the United

States.  Id. at 2.

In addition to writing or helping to disseminate these two publications, Zalmayev also

"collaborated" with human rights activists Lev Ponomarev and Lyudmila Alexeyeva, who sent

several letters in January 2011 about Egiazaryan to Representative Chris Smith, identified as the

"Ranking Member of the Commission on Security and Cooperation in Europe," expressing

concerns over Egiazaryan's presence in the United States (the "Ponomarev and Alexeyeva

Letters").  Zalmayev Dep. 157-60; 171-73; 179-80; 183-84; Def. 56.1 Response  ¶ 9.c; see also

Compl. ¶¶ 36, 77-94.  On January 29, 2011, a letter signed by Ponomarev was sent to

Representative Smith.  See Ponomarev Letter (annexed as Ex. 16 to Cohen Decl.)  The letter

stated that Egiazaryan was deputy chairman of a Duma committee "entrusted with funds for the

reconstruction of the war-torn [Chechnya] region," a "large portion" of which allegedly did not

reach their intended recipient.  Id.  As such, according to the letter, "[Egiazaryan] was a

contributor to the destructive second Chechen War."  Id.  The letter urged Representative Smith

to raise concerns about Egiazaryan's past with "relevant officials at the State Department and the

Department of Homeland Security" and to raise these concerns in an "ongoing discussion in

Congress of creating a no-entry list for foreign officials."  Id.  Alexeyeva sent a similar letter to

Representative Smith on January 30, 2011, which again raised the issue of the "no-entry list" for

"corrupt foreign government officials."  See Alexeyeva Letter (annexed as Ex. 16 to Cohen

Decl.).  This letter identified Egiazaryan as a "ranking member of Vladimir Zhirinovsky's ultra-nationalist Liberal-Democratic Party of Russia" and stated that he "provid[ed] cover for the numerous well-documented atrocities during the war."  Id.  It elaborated that the committee's "management of the funds" meant for Chechnya's reconstruction was "said to have resulted in significant amounts never reaching their destination — the destitute people of the war-torn republic."  Id.  It urged Representative Smith to support the no-entry list initiative and to inquire with the State Department and the Department of Homeland Security.  Id.  Both Ponomarev and Alexeyeva retracted their letters within days of sending them.  See Retractions, dated Feb. 7, 2011 (annexed as Ex. 18 to Cohen Decl.).  The retractions — addressed to several members of Congress, including Representative Smith and two others —  indicate that Ponomarev and Alexeyeva chose to withdraw their signatures from the letters based on having made "grave mistake[s]."  Id.

The complaint includes allegations that human rights and Jewish advocacy organizations — specifically, Freedom House, the American Jewish Committee, and the National Council on Soviet Jewry — sent the "United States Department of State Office to Monitor and Combat Anti-Semitism" and the United States Department of Homeland Security two letters that defamed Egiazaryan and were "ghost-written" by Zalmayev, Akhmetshin, and Bloomfield on behalf of these groups (the "Freedom House Letters").  See Compl. ¶¶ 32, 36, 95-106.  Zalmayev testified that he "played a principal role in drafting" the letters.  Zalmayev Dep. 589-90.  The two letters are nearly identical and stated that "Mr. Egiazaryan has for years been one of the leaders and a Duma representative of the Liberal Democratic Party of Russia . . . which is known for its virulently anti-Semitic, anti-American and xenophobic views."  See Freedom House Letters (annexed as Ex. 19 to Cohen Decl.).  They further recounted Zhirinovsky's alleged anti-

8

Semitic views and statements.  The letters concluded that the United States must "once again demonstrate its intolerance for bigotry by denying [Egiazaryan's] bid for political asylum" and urged the recipients (i.e., the Departments of State and Homeland Security) to "oppose any request for political asylum for Egiazaryan." Id.

II.  APPLICABLE LAW

    A.  Law Applicable to Motions for Summary Judgment

    Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Notice of Motion by Egiazaryan for Summary Judgment, filed Apr. 19, 2013 (Docket # 221); Notice of Cross-Motion by Zalmayev for Summary Judgment, filed June 6, 2013 (Docket # 229).[4]  Under Rule 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

    In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex Corp.

_____

    [4]  We will assume without deciding that an anti-SLAPP counterclaim is to be treated as an ordinary claim for procedural purposes — that is, one that would be the subject of a plenary trial.

v. Catrett, 477 U.S. 317, 322 (1986) (internal quotation marks omitted)); see also Brady v. Town of Colchester, 863 F.2d 205, 210-11 (2d Cir. 1988) (where the "nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citation omitted); accord Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial.") (internal quotation marks and citation omitted); Feurtado v. City of New York, 337 F. Supp. 2d 593, 599–600 (S.D.N.Y. 2004). The party with the burden of proof "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted), but instead must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256; accord Major League Baseball Prop., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citation omitted); see also Niagara Mohawk Power Corp v. Jones Chem. Inc., 315 F.3d 171,175 (2d Cir. 2000) ("The 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment.") (quoting Anderson, 477 U.S. at 252). Where it is clear that no rational finder of fact "could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22

F.3d 1219, 1224 (2d Cir. 1994)).

    B. <u>New York's Anti-SLAPP Statute</u>

Before turning to the text of New York's anti-SLAPP, we begin by noting that in a diversity case such as this one, "[w]here the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." <u>Travelers Ins. Co. v. 633 Third Assoc.</u>, 14 F.3d 114, 119 (2d Cir. 1994). "In making this prediction, we give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts." <u>Travelers Ins. Co. v. Carpenter</u>, 411 F.3d 323, 329 (2d Cir. 2005) (citation omitted). Our task is to "carefully review available resources to predict how the New York Court of Appeals would resolve the questions at bar. . . . These resources include the statutory language, pertinent legislative history, the statutory scheme set in historical context, how the statute can be woven into the state law with the least distortion of the total fabric, state decisional law, federal cases which construe the state statute, scholarly works and any other reliable data tending to indicate how the New York Court of Appeals would resolve the issue." <u>633 Third Assoc.</u>, 14 F.3d at 119 (citation and internal punctuation omitted).

New York Civil Rights Law § 70–a allows a defendant in an "action involving public petition and participation" to bring a claim against the person who brought that suit provided certain additional conditions are met. Costs and attorney's fees for defending the suit may be recovered if there is a "demonstration that the [SLAPP action] was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." <u>Id.</u> § 70-a(1)(a). The statute states that "other compensatory damages may be recovered" but only upon the "additional

11

demonstration" that the action was commenced or continued for the "purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." Id. § 70-a(1)(b).  Finally, punitive damages may be recovered if it is demonstrated that the underlying suit "was commenced or continued for the sole purpose" of achieving the objectives listed in subsection (b).  Id. § 70a-(1)(c).

Under N.Y. Civ. Rights Law § 76-a, an "action involving public petition and participation" is one brought by a "public applicant or permittee" that is "materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose" the application or permission.  Id. § 76-a(1)(a).  A "public applicant or permittee" is someone who has "applied for or obtained a permit . . . or other entitlement for use or permission to act from any government body . . . ."  Id. § 76-a(1)(b).

The New York Court of Appeals gave some background on the anti-SLAPP statute in 600 West 115th Street Corp. v. Von Gutfeld, 80 N.Y.2d 130 (1992), cert. denied, 508 U.S. 910 (1993), shortly after it was enacted.  As the court explained:

> In recent years, there has been a rising concern about the use of civil litigation, primarily defamation suits, to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards.  Termed SLAPP suits—strategic lawsuits against public participation—such actions are characterized as having little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future . . . In response, New York State enacted a law specifically aimed at broadening the protections of citizens facing litigation arising from their public petition and participation (see, L.1992, ch. 767).

Id. at 137 n.1.  Because the anti-SLAPP law is in derogation of common law, it must be "strictly" and "narrowly"construed.  Hariri v. Amper, 51 A.D.3d 146, 151 (1st Dep't 2008); Guerrero v. Carva, 10 A.D.3d 105, 117 (1st Dep't 2004); Silvercorp Metals Inc. v. Anthion

12

Mgmt. LLC, 36 Misc.3d 660, 666 (Sup. Ct. N.Y. Co. 2012).

III.  DISCUSSION

The parties have each raised a number of issues that they contend entitle them to summary judgment.  For the reasons described in section III.A below, we conclude that Egiazaryan is entitled to summary judgment on the issue of whether his defamation suit could be "supported by a substantial argument for the extension, modification or reversal of existing law" under N.Y. Civ. Rights Law § 70-a(1)(a).  For this reason alone, the counterclaim should be dismissed.

Further, even assuming arguendo that Zalmayev could show that Egiazaryan's suit both lacked a "substantial basis in fact and law" and could not be "supported by a substantial argument for the extension, modification or reversal of existing law," see id., Egiazaryan would still be entitled to summary judgment because, as described in section III.B below: (1) Zalmayev would at most be entitled to attorney's fees and costs (rather than compensatory or punitive damages) given that he cannot show that Egiazaryan had a motive to harass; and (2) the Court should exercise its discretion not to award attorney's fees and costs to Zalmayev.

A.  The Threshold Showing Required Under the anti-SLAPP Statute

1.  Legal Standard

To obtain any relief under the anti-SLAPP statute, Zalmayev must demonstrate that the suit here not only was commenced or continued without a substantial basis in fact and law but also that it "could not be supported by a substantial argument for the extension, modification or reversal of existing law."  Id. § 70-a(1)(a) (emphasis added).  We will assume arguendo that Zalmayev could show that the suit lacked a "substantial basis in fact and law."  Accordingly, we turn to the question of whether he has shown that the suit could not be "supported by a

substantial argument for the extension, modification or reversal of existing law." While we are
not aware of any cases that interpret the meaning of this phrase, we do not believe that the
legislature intended to require an anti-SLAPP claimant to demonstrate that the SLAPP suit was
legally frivolous. We reach this conclusion not only based on our reading of the text of the
statute but also because there exists a separate standard that governs in New York as to when
litigation conduct is frivolous. Under this standard, litigation conduct is "frivolous" if, inter alia,
"it is completely without merit in law and cannot be supported by a reasonable argument for an
extension, modification or reversal of existing law." 22 N.Y.C.R.R. § 130-1.1(c)(1). We believe
the use of the term "substantial" in the anti-SLAPP statute rather than "reasonable" reflects the
legislature's intent to impose a standard more favorable to the anti-SLAPP claimant.

      As to the parties' arguments on the standard's application here, we reject Zalmayev's
argument that if a plaintiff does not argue in opposing a motion to dismiss that "the complaint
was supported by a substantial argument for the extension, etc. of existing law," the defendant
automatically demonstrates the absence of such a "substantial argument" merely by securing
dismissal of the complaint under Fed. R. Civ. P. 12(b)(6). See Def. Nov. 11 Letter at 4. This
argument is premised on the application of a state rule regarding motions to dismiss in SLAPP
suits that was not advanced by the parties or relied upon by the court in either Egiazaryan I or
Egiazaryan II. Under New York law, a motion to dismiss a SLAPP suit must be granted unless
the plaintiff shows either that the cause of action "has a substantial basis in law" or that it is
"supported by a substantial argument for an extension, modification or reversal of existing law."
N.Y. C.P.L.R. § 3211(g). Zalmayev argues, see Def. Nov. 11 Letter at 5, that the granting of a
motion to dismiss under section 3211(g) means that the defendant has necessarily made the
demonstration required by N.Y. Civ. Rights Law § 70–a(1)(a).

The most obvious flaw in this argument is that the substantive standard contemplated by N.Y.C.P.L.R. § 3211(g) was never applied here.[5]  Instead, both of Zalmayev's motions to dismiss relied exclusively on the standard contained in Fed. R. Civ. P. 12(b)(6); that is, whether the complaint stated a claim upon which relief could be granted.  See Notice of Motion to Dismiss the Complaint Pursuant to Rule 12(b)(6), filed June 21, 2011 (Docket # 15); Notice of Motion to Dismiss the Amended Complaint Pursuant to Rule 12(b)(6), filed Mar. 30, 2012 (Docket # 117).  Judge Castel's decisions similarly refer only to the standard set forth in Rule 12(b)(6). Egiazaryan I, 2011 WL 6097136, at *3; Egiazaryan II, 880 F. Supp. 2d at 502.  Thus, the two grants of dismissal meant only that Egiazaryan had not stated a claim for relief.  They did not indicate whether Egiazaryan's claims were supported by substantial arguments seeking the extension, modification or reversal of existing law.  In accordance with the mandate of N.Y. Civ. Rights Law § 70–a(1)(a), however, it is Zalmayev's burden to "demonstrat[e]" on this motion that the claims in this case could not have been supported "by a substantial argument for the extension, modification or reversal of existing law."

We also reject Zalmayev's related contention that, "[t]o allow Egiazaryan to argue now that his complaint could be supported by an argument for the extension, etc., of existing law . . . would be to allow Egiazaryan to relitigate the motion to dismiss the amended complaint."  Nov. 11 Letter at 4.  According to Zalmayev, if the Court were to determine that the amended complaint "w[as] supported by a substantial argument . . . then it would follow that the

---

[5]  Indeed, even if a party had sought application of the state standard, it is doubtful this Court would have accepted the invitation to do so.  See generally Zurich Am. Ins. Co. v. Pillsbury Co., 264 F. Supp. 2d 710, 711 (N.D. Ill. 2003) ("There is no such thing as a motion to dismiss under [a state dismissal standard] in [federal] court; there are only motions to dismiss under Federal Rule 12(b).").

amended complaint should be reinstated long after it was dismissed.  That would be absurd."  Id.

Again, Zalmayev incorrectly assumes that the decisions on the motions to dismiss resolved the

applicability of the "substantial argument" standard contained in N.Y. Civ. Rights Law

§ 70-a(1)(a).  The inquiry on a motion to dismiss under Rule 12(b)(6), however, is only whether

a complaint states a claim.  The inquiry does not extend to a determination of whether the

complaint — even if it fails to state a claim under existing law — is nevertheless supported by a

"substantial argument for the extension, modification or reversal of existing law."  N.Y. Civ.

Rights Law § 70-a(1)(a).   In other words, section § 70-a(1)(a) does not require that the

"substantial" argument be a winning argument.   Indeed, the structure of the statute assumes that

it would not be a wining argument.  Otherwise, there would have been no reason for the

legislature to have included the "substantial argument" standard as an additional means to avoid

liability under the anti-SLAPP statute.  In the end, the statute contemplates that a party may have

a "substantial" argument that the law should be extended, modified or reversed to support an

otherwise unsupportable complaint.  Parties who have such a "substantial" argument are not

liable under the anti-SLAPP statute.

Indeed, the one case of which we are aware that addressed the proposition advanced by

Zalmayev rejects his contention.  In Niagara Mohawk Power Corp. v. Testone, 272 A.D.2d 910,

912 (4th Dep't 2000), the Appellate Division held that the plaintiff's complaint had to be

dismissed because numerous causes of actions failed to state a claim under N.Y. C.P.L.R.

§ 3211(a)(7), which provides — similar to Fed. R. Civ. P. 12(b)(6) — for dismissal where "the

pleading fails to state a cause of action."  Id.  These claims included causes of action in which

plaintiff had purported to sue under criminal statutes that did not allow a private cause of action.

Id. at 911-12.  The Appellate Division stated that "[a]lthough defendants are entitled to dismissal

of the complaint," the trial court's failure to dismiss the anti-SLAPP counterclaim would have to be reversed.  Id. at 912.  One of the grounds it gave for this result was that

> plaintiff's action, although now dismissed, was "supported by a substantial argument for the extension, modification or reversal of existing law" (Civil Rights Law § 70-a [1] [a]).

Id. (emphasis added).  In other words, the court found that, although the plaintiff had failed to state a claim, no anti-SLAPP counterclaim would lie because defendants had not made the additional showing required: that the claim was not "supported by a substantial argument for the extension, modification or reversal of existing law."

    To the extent that Zalmayev contends that Egiazaryan waived the argument that his complaint was supported by a substantial argument for the extension, modification, or reversal of existing law by not raising it in his opposition to the motions to dismiss, see Def. Nov. 11 Letter at 6, that contention is also rejected.  First, there was no reason for Egiazaryan to have addressed that issue because it was not relevant to the Zalmayev's motion to dismiss, which relied exclusively on Rule 12(b)(6).  Raising it would have contributed nothing to his efforts to defeat that motion.  Second, the anti-SLAPP statute puts the burden on Zalmayev to "demonstrat[e]" that there was no such substantial argument.  N.Y. Civil Rights Law § 70-a(1)(a).  Egiazaryan has no burden on this motion and thus any failure on his part to argue the point in the past does nothing to allow Zalmayev to meet his burden now.

    2.  Analysis

    On the issue of whether Zalmayev has met his burden of demonstrating that Egiazaryan's suit could not be supported by a "substantial argument for the extension, modification or reversal of existing law," we note that the statute requires the defendant to demonstrate that the plaintiff does not have "a" substantial argument – that is, a substantial argument in the singular — to

17

support the "action" — that is, the action as a whole.  See id.  Accordingly, if we find that at

least one of Egiazaryan's claims is supported by a "substantial argument for the extension,

modification or reversal of existing law," Zalmayev will not have met his burden and cannot

recover under the anti-SLAPP statute.

　　　　While Zalmayev's submission to the Court declares affirmatively that Egiazaryan did not

meet the statutory standard, Def. Nov. 11 Letter at 6, it makes no argument at all as to why this

is so — even though the Court specifically sought briefing on this topic, see Order, dated Nov. 4,

2013 (Docket # 246).  Instead, as his response to the Court's request for briefing on this issue,

Zalmayev relies exclusively on his assessment of the interplay of state statutes and on the fact

that Egiazaryan never made the argument in the course of responding to Zalmayev's motion to

dismiss.  While we believe that Zalmayev's failure to address this issue speaks volumes about

his ability to do so on the merits, and while we believe he may be deemed to have abandoned the

argument given that he has the burden of making this showing, we will nonetheless consider the

question on the merits.

　　　　Because they provide the strongest basis for Egiazaryan's claims, we discuss Zalmayev's

statements that (1) Egiazaryan is an anti-Semite, and in particular that Egiazaryan is an

"anti-Semitic bigot," Compl. ¶¶ 36, 62, 78, 127, 138, and (2) that Egiazaryan embezzled or

mismanaged funds, was responsible for war crimes, and contributed to human rights violations.

Compl. ¶¶ 82, 87-88, 93, 127, 129, 130-31, 145.

　　　　There are a number of elements to a defamation claim, see Egiazaryan II, 880 F. Supp. 2d

at 503-07, but the only matters disputed by Zalmayev in his motion papers as to the amended

complaint were whether his statements constituted statements of fact and whether Egiazaryan

had pled the "actual malice" standard applicable to a public figure.  See Memorandum of Law in

18

Support of Motion to Dismiss the Amended Complaint Pursuant to Rule 12(b)(6), filed Mar. 30, 2012 (Docket # 118) at 12-32.  We begin by noting that there is case law supporting the notion that calling someone an anti-Semite or a racist constitutes a defamatory statement of fact.  See, e.g., Sweeney v. Schenectady Union Publ. Co., 122 F.2d 288, 290-91 (2d Cir. 1941), aff'd, 316 U.S. 642 (1942); Como v. Riley, 287 A.D.2d 416, 416 (1st Dep't 2001); Herlihy v. Metro. Museum of Art, 214 A.D.2d 250, 261 (1st Dep't 1995); Oluwo v. Hallum, 2007 WL 2701286, at *4-5 (Sup. Ct. Kings Co. Aug. 31, 2007).  In Egiazaryan II, the actionability of Zalmayev's statements as to Egiazaryan's alleged anti-Semitism turned on whether these statements legally constituted statements of opinion as opposed to statements of fact, 880 F. Supp. 2d at 503, and not on whether calling someone an anti-Semite could be defamatory under New York law. Under New York law, "context should be the primary focus of the fact/opinion analysis."  Id. at 513 (citing Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235 (1991).  Egiazaryan II contains a detailed analysis of this question with respect to Zalmayev's accusations of Egiazaryan's anti-Semitism, 880 F. Supp. 2d at 505-09, and reflects that the question was a close one for the Court. The Court parsed the context in which the statements regarding Egiazaryan being an anti-Semite were made, and after an exhaustive analysis, concluded that the statements should be construed as "allegations to be investigated," thus bringing them within the realm of opinion.  880 F. Supp. 2d at 509 (emphasis and citations omitted).

Similarly, statements regarding Egiazaryan being an embezzler and responsible for war crimes might in other contexts have constituted defamatory statements of fact.  See, e.g., Silsdorf v. Levine,  59 N.Y.2d 8, 16 (1983) ("[A]lthough expressions of opinion are constitutionally protected, accusations of criminal or illegal activity, even in the form of opinion, are not.") (citations omitted); accord Campanella v. Cnty. of Monroe, 853 F. Supp. 2d 364, 371 (W.D.N.Y.

19

2012) ("Under New York law, words are per se defamatory if they import criminal activity
. . . ."). Thus, Egiazaryan II's dismissal of the defamation claim based on these statements
similarly turned on a detailed analysis of the context in which the accusations were presented,
rather than on the content of the statements themselves. The Court focused on the "tone" of the
Ponomarev and Alexeyeva Letters, 880 F. Supp. 2d at 510, and concluded that the accusations
contained in the letters were "not provable enough" and were too "vague[]" to constitute
assertions of fact. Id. at 511. Again, Egiazaryan II's analysis makes plain that the result was far
from a foregone conclusion. Indeed, the closeness of the question is demonstrated by the fact
that Egiazaryan I reached the opposite result on this point from Egiazaryan II. See Egiazaryan I,
2011 WL 6097136, at *7 (Ponomarev and Alexeyeva Letters "imply as fact that Egiazaryan was
complicit in the mismanagement or misappropriation of humanitarian funds").

As to the issue of whether Egiazaryan had pled actual malice, the law requires allegations
showing that the defendant "in fact entertained serious doubts as to the truth of his publication."
St. Amant v. Thompson, 390 U.S. 727, 731 (1968); see also Egiazaryan II, 880 F. Supp. 2d at
501. Such a showing may be made though circumstantial evidence, including evidence that "the
defendant has a motive for defaming the plaintiff." Biro v. Conde Nast., 2013 WL 3948394, at
* 17 (S.D.N.Y. Aug. 1, 2013) (citing Kipper v. NYP Holdings Co., Inc., 12 N.Y.3d 348, 355
n. 4 (2009) (whether there is an "intent to injure plaintiff" is relevant to the actual malice
inquiry)).

Here, there was a substantial argument that this legal framework could be extended to
cover the allegations in the complaint. Egiazaryan's allegations regarding Zalmayev's motive
included claims that Zalmayev actions were "part of an elaborate negative public relations and
lobbying effort designed specifically to paint Mr. Egiazaryan as a despicable human being,

foment outrage against him in the United States, and have him expelled from the country,"
Compl. ¶ 112; that Zalmayev was paid or underwritten by Suleyman Kerimov, a Russian
billionaire, or his agents to spread falsehoods about Egiazaryan, id. ¶¶ 8, 113-114; that Zalmayev
had in his possession surveillance photographs of Egiazaryan that were taken by Kerimov's
company, id. ¶¶ 8, 115(ii); that Zalmayev also had documents relating to a confidential
arbitration between Egiazaryan and Kerimov's company, id. ¶¶ 8, 20, 115(vi); that Zalmayev,
with the assistance of Kerimov, paid at least $42,000 to various individuals who signed letters to
United States public officials regarding Egiazaryan, id. ¶ 115 (vii); that when Zalmayev
attempted to arrange for a statement of condemnation of Egiazaryan to be placed in the
Congressional Record, the Congressional staffer informed Zalmayev that it amounted to "guilt
by association," id. ¶ 118; that Zalmayev linked Egiazaryan to Zhirinovsky specifically "to make
the false and misleading case" that Egiazaryan was himself an anti-Semite, id. ¶ 120; that
Zalmayev altered various letters he worked on so that they would not appear to be coming from
one source, id. ¶ 121; that Zalmayev sought to lower the "Google rankings" of Egiazaryan's
website and blog that contained information defending him, id. ¶ 122; that Zalmayev provided
organizations with the letters from Ponomarev and Alexeyeva but not with their later retractions,
id. ¶¶ 41, 98, 122(iii); that Zalmayev "recognized that there was no evidence of [Egiazaryan]
uttering any anti-Semitic statement or holding any anti-Semitic views," id. ¶ 125; that Zalmayev
knew he had no evidence to support the claim that Egiazaryan embezzled funds, id. ¶ 127; and
that Zalmayev should have been able to find contemporaneous media reports in which
Egiazaryan criticized the mismanagement of the Chechnyan relief funds by the executive
authorities and called for an investigation and further transparency, id. ¶ 128.  Taken together,
these allegations provided a strong case that Zalmayev's statements were made with actual

malice.

In sum, this is not a case where the claims made against Zalmayev were obviously outside the range of what New York law might consider actionable. To the contrary, there were substantial arguments to support the view that these allegations could pass muster under New York defamation law, and thus that existing New York case law might have been "extend[ed]" to cover the allegations in the complaint. In light of this conclusion, Zalmayev has not met his burden of "demonstrat[ing]" that pursuit of Egiazaryan's complaint "could not be supported by a substantial argument for the extension, modification or reversal of existing law." N.Y. Civ. Rights Law § 70-a(1)(a). For this reason alone, the counterclaim must be dismissed.

B. Improper Purpose and Entitlement to Costs and Attorney's Fees

Even if we were to assume arguendo that Zalmayev could meet his burden of demonstrating that Egiazaryan's suit lacked both a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law, Egiazaryan would still be entitled to summary judgment dismissing the anti-SLAPP counterclaim because, as described in section III.B.1, Egiazaryan is entitled to summary judgment on whether he had an improper purpose in bringing the suit. In light of this conclusion, as described in section III.B.2, Zalmayev could recover only costs and attorney's fees as damages. In this case, however, the Court should exercise its discretion not to award costs and attorney's fees.

1. Improper Purpose

To obtain anything more than attorney's fees and costs, an anti-SLAPP counterclaimant must show at a minimum that the plaintiff commenced or continued his suit for the "purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of

22

speech, petition or association rights."  N.Y. Civ. Rights Law § 70-a(1)(b).  If the counterclaimant can show any of these was a purpose of the plaintiff's suit, the anti-SLAPP counterclaimant may be awarded compensatory damages.  Id.  If he can show any of these was the "sole purpose," he may also recover punitive damages.  Id. § 70-a(1)(c).

At the outset, we reject Zalmayev's argument that "Egiazaryan wrongly puts the burden of proving purpose at this stage on Zalmayev" and that "[i]t is Egiazaryan's burden to prove that [he] did not have a purpose to inhibit speech." Def. Reply Mem. at 6 (emphasis omitted).  To the contrary, the burden of proof on this issue rests on Zalmayev as the plaintiff on the anti-SLAPP counterclaim.  While Zalmayev may be correct that the anti-SLAPP defendant has the burden of showing the lawsuit has a certain level of merit in order to avoid dismissal under N.Y. C.P.L.R. § 3211(g), see Hariri, 51 A.D.3d at 150-51, it does not follow that the anti-SLAPP defendant also has the burden of showing that he was motivated by something other than a desire to stifle free speech for purposes of section 70-a(1)(b).  The text of the statute makes clear that the burden of proof rests upon the anti-SLAPP claimant inasmuch as it makes relief available only "upon an additional demonstration" that the action was "commenced or continued for the purpose [or sole purpose] of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."  See N.Y. Civ. Rights Law § 70-a(1)(b) & (c) (emphasis added).  Because the statutory text makes clear that it is the anti-SLAPP counterclaimant — not the counterdefendant — who must make this "additional demonstration," the burden of proof on whether or not Egiazaryan sued with an improper purpose rests with Zalmayev.  Thus, Zalmayev's burden is to marshal admissible evidence that would allow a reasonable factfinder to find in his favor on this question.  See, e.g., Parker, 260 F.3d at 111 ("A defendant need not prove a negative when it moves for summary judgment on an

23

issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial.") (citation and internal quotation marks omitted).

Zalmayev's brief on this point, <u>see</u> Def. Mem. at 35-41, marshals virtually no substantive evidence — either direct or circumstantial — that would allow a reasonable factfinder to conclude that Egiazaryan's motive in bringing this suit was for the purpose of "harassing, intimidating, punishing or otherwise maliciously inhibiting [Zalmayev's] free exercise of speech, petition or association rights."  Instead, Zalmayev relies upon an extremely broad inference that we believe does not apply in the unusual circumstances of this case.  Zalmayev quotes a commentator to the effect that, once it is determined a suit lacked a substantial basis in fact and law — a circumstance we have assumed for purposes of this argument — a finding that the plaintiff had a motive to harass "won't be hard."  <u>Id.</u> at 37 (citing David D. Siegel, <u>Practice Commentaries</u>, CPLR3211:73 at 119).  But whether it will be "hard" in most cases to prove such a motive does not speak to the question of whether Zalmayev has in fact pointed to evidence that would permit such a finding here.

Zalmayev references a few circumstances that he contends support a finding that Egiazaryan had the improper motive identified in the statute.  But none of these circumstances separately or in combination would permit a reasonable factfinder to make the finding he seeks.  He argues that Egiazaryan's failure to sue Kerimov — the individual Egiazaryan has alleged is behind Zalmayev's work — suggests that the real goal of the defamation lawsuit was to harass Zalmayev.  Def. Mem. at 38.  Zalmayev has pointed to no evidence in the record, however, as to whether it would have even been practical or possible for Egiazaryan to sue Kerimov.  In any event, this fact does little to show motive inasmuch as Zalmayev and not Kerimov is the actual

author or drafter of the allegedly defamatory articles and letters.

Zalmayev also argues that Egiazaryan must have been driven by a motive to harass because, instead of suing, he could have used his "lawyers . . . and his public relations professionals" to respond to Zalmayev's articles.  Id. at 39.  But this inference is not a reasonable one as there are many logical and highly plausible reasons why a wealthy plaintiff with a retained public relations firm might legitimately institute a defamation suit — including, most obviously, obtaining a judicial ruling regarding the falseness of the challenged statements. Zalmayev's proposed inference — that the availability of these resources means that the defamation lawsuit must have been based on a purpose to harass or act "maliciously" —  is a significant and conclusory inferential leap that we cannot accept as sufficient to allow a factfinder to conclude that Egiazaryan had an impermissible motive.  See, e.g., Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.") (citation omitted); accord Scotto,143 F.3d at 114 ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal quotation marks, citation, and alteration omitted).

Zalmayev also cites Duane Reade v. Clark, 2 Misc.3d 1007(A) (Sup. Ct. N.Y. Co. 2004), in which the trial court dismissed a SLAPP suit under N.Y. C.P.L.R. § 3211(g) and awarded punitive damages because it concluded that "[the plaintiff's] complaint establishes no purpose other than intimidation, harassment and punishment . . . . "  Id. at * 10; see Def. Mem. at 37. Duane Reade adds nothing to Zalmayev's argument, however, as it is obvious — as was true in Duane Reade — that a complaint may be so plainly without basis as to warrant the inference of an improper purpose.  But this is not such a case.  As explained above, the dismissal of

Egiazaryan's complaint turned on close legal questions, and even if it could not survive a motion to dismiss, it was not so lacking in foundation as to demonstrate by itself a malicious motive on Egiazaryan's part.

While Egiazaryan has no burden to produce evidence on the question of purpose, we note that there is testimony in the record that he had no malicious motive in bringing the suit and was instead attempting to "defend [his] honor and dignity" and to vindicate his reputation. Egiazaryan Dep. 339-40.  Zalmayev certainly is entitled to counter Egiazaryan's testimony as to motive, but he must do so by offering concrete evidence, and not speculation.

Because we conclude that a reasonable factfinder could resort only to speculation to support a finding that Egiazaryan's lawsuit against Zalmayev was brought with a purpose of "harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights," Egiazaryan is entitled to summary judgment on the question of whether he harbored a malicious purpose under the anti-SLAPP statute.  See, e.g., Gallo, 22 F.3d at 1224 (2d Cir. 1994) (where "no rational jury could find in favor of the nonmoving party because the evidence to support is case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper") (citation omitted).  As a result of this conclusion, Zalmayev cannot obtain compensatory or punitive damages under N.Y. Civ. Rights Law §§ 70-a(1)(b) or (c).  Instead, he would be limited, at best, to recovery of attorney's fees and costs.  See id. § 70-a(1)(a).

C.  Attorney's Fees and Costs

As already noted, N.Y. Civ. Rights Law § 70-a(1)(a) provides that "costs and attorney's fees may be recovered upon a demonstration that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could

not be supported by a substantial argument for the extension, modification or reversal of existing law."  Assuming <u>arguendo</u>, that Zalmayev could make this demonstration, his counterclaim would still fail because the Court should not exercise its discretion to award such fees and costs.

The anti-SLAPP statute does not obligate a court to award attorney's fees or damages but instead repeatedly uses the word "may."  Thus, it is settled that a court has "discretion to decline to award the defendants relief under Civil Rights Law § 70–a(1)."  <u>Miness v. Alter</u>, 262 A.D.2d 374, 375 (2d Dep't 1999); <u>accord</u> <u>West Branch Conservation Ass'n, Inc. v. Planning Bd. of Town of Clarkston</u>, 222 A.D.2d 513, 514 (2d Dep't 1995) ("[W]hile it is clear that New York State public policy strongly disfavors SLAPP suits designed to chill the exercise of a citizen's right to petition the government or appropriate administrative agency for redress of a perceived wrong . . . it is also clear that the unambiguous use of the term 'may' in the statute makes the decision to award attorneys' fees and costs discretionary rather than mandatory.") (internal citation and quotation marks omitted); <u>see</u> <u>also</u> <u>Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen</u>, 313 F. Supp. 2d 339, 344 (S.D.N.Y. 2004) ("[E]ven if the defendant establishes that the suit is a SLAPP suit brought under circumstances that entitle it to and that it is entitled to damages under § 70–a, the award of damages is within the sole discretion of the trial court.").

Because any award of attorney's fees is made available under a New York state statute, and because the question of whether an award of attorney's fees is appropriate is governed by state law in a diversity case, <u>Grand Union Co. v. Cord Meyer Dev. Co.</u>, 761 F.2d 141, 147 (2d Cir. 1985); <u>RLS Assoc., LLC v. United Bank of Kuwait PLC</u>, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006) (citing cases), we turn to New York law to determine the parameters under which the Court's discretion should be exercised.  Under New York law, "[t]he determination of

reasonable counsel fees is a matter within the sound discretion of the trial court and, absent abuse, that court's determination should be upheld." Hinman v. Jay's Village Chevrolet, Inc., 239 A.D.2d 748, 748 (3d Dep't 1997) (citations omitted). The parties have pointed to no New York case law providing substantive guidance on how that discretion should be exercised.

Having considered all the circumstances surrounding the content, prosecution, and defense of this lawsuit, we find this to be the perhaps unusual case where no award of attorney's fees or costs should be made. We base this determination on a number of circumstances that together suggest that the equities tilt strongly in favor of not awarding fees and costs.

First, Zalmayev is not the typical defendant contemplated by the statute – that is, an individual who has been "burden[ed] . . . with legal defense costs." See 600 West 115th Street Corp, 80 N.Y.2d at 137, n.1. To the contrary, Vavilov has been paying all of Zalmayev's legal expenses in connection with this litigation. See Defendant's Responses to Plaintiff's Second Set of Interrogatories to Defendant, Response to Interrogatory No. 1 (annexed as Ex. 5 to Cohen Decl.); Scanned Check Images from Andrey Vavilov to Andrew Ryan (annexed as Ex. 46 to Cohen Decl.). There is no evidence that Zalmayev has any legal obligation to repay these monies. Moreover, as a citizen of Russia, see Def. 56.1 Response ¶ 3, Vavilov obviously has no interest in the integrity of the United States asylum petitioning process. Rather, he apparently harbors an independent interest in harming Egiazaryan given that he originally retained Rinat Akhmetshin, who in turn retained Zalmayev, to undertake a public relations campaign targeting Egiazaryan. See Def. 56.1 Response ¶ 8.

Second, the nature of the underlying claims in this case reflect that there was a legitimate basis for the suit and that it might well have been expected to have been successful. The dismissal of Egiazaryan's lawsuit resulted only from an exhaustive analysis of the complex legal

28

doctrines that characterize New York's law of defamation.  See section III.A.2 above.

Third, Zalmayev did not speak his mind about Egiazaryan with only the inherent reward of knowing that he was participating in a petitioning process.  Instead, he has admitted that he was paid $100,000 to try to derail Egiazaryan's asylum application.  Def. 56.1 Stat. ¶ 3. Zalmayev pursued the public relations campaign – including the claims that Egiazaryan was an "anti-Semitic bigot," see, e.g., Moscow Times Article (annexed as Ex. 14 to Cohen Decl.) – despite not being "aware of any anti-Semitic statements made by Ashot Egiazaryan either in public or in private," his casting any vote in the Duma for anti-Semitic legislation, or his "taking any positions that were anti-Semitic."  Zalmayev Dep. 8-9.  Similarly, Akhmetshin admitted at his deposition that the claims regarding Egiazaryan's embezzlement of Chechen relief funds were not based on "any credible information."  Akhmetshin Dep. 286-87.  Zalmayev is thus a far cry from the homeowners speaking at zoning board meetings whose well-being drove the enactment of the anti-SLAPP statute.  See, e.g., 600 West 115th Street Corp., 80 N.Y.2d at 137 n.1.

For these reasons, assuming arguendo that Zalmayev had been able to make the showing required by N.Y. Civ. Rights Law § 70-a(1)(a), this is not a case where the court should exercise its discretion to award attorney's fees or costs.  Accordingly, Zalmayev's counterclaim would have to be dismissed for this reason as well.

## IV.  CONCLUSION

For the foregoing reasons, Egiazaryan's motion for summary judgment (Docket # 221) should be granted, Zalmayev's cross-motion for summary judgment (Docket # 229) should be denied, and the anti-SLAPP counterclaim should be dismissed.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

denied, and the anti-SLAPP counterclaim should be dismissed.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. P. Kevin Castel, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Castel. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: December 11, 2013
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge